**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| | Case No. |
| NORTH COLLIER FIRE CONTROL AND RESCUE DISTRICT FIREFIGHTERS' PENSION PLAN, individually and on behalf of all others similarly situated, | |
| | <u>CLASS ACTION</u> |
| Plaintiff, | |
| | **<u>JURY TRIAL DEMANDED</u>** |
| v. | |
| MERCURY SYSTEMS, INC., MARK ASLETT, and MICHAEL RUPPERT, | |
| Defendants. | |

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

North Collier Fire Control and Rescue District Firefighters' Pension Plan ("Plaintiff"), by and through its undersigned counsel, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and for all other allegations based upon the investigation undertaken by Plaintiff's counsel, which included, but was not limited to, the review and analysis of: (i) public filings made by Mercury Systems, Inc. ("Mercury" or the "Company") with the SEC; (ii) press releases and other public statements issued by Mercury and the other Defendants named herein; (iii) securities and financial analysts' research reports; (iv) media and news reports related to Mercury; and (v) transcripts of Mercury's earnings and other investor conference calls. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is a federal securities class action that Plaintiff brings on behalf of itself and a class consisting of all persons and entities that purchased or otherwise acquired the common stock of Mercury between December 7, 2020 and June 23, 2023, inclusive (the "Class Period"). Plaintiff asserts claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants Mercury, former CEO Mark Aslett, and former CFO Michael Ruppert (collectively, "Defendants"). Defendants Aslett and Ruppert are referred to as the "Individual Defendants."

2.      Mercury is a technology company that produces component modules and subsystems for the aerospace and defense industries. Prior to and during the Class Period, Mercury was a serial acquirer that used acquisitions and improper revenue recognition practices to mask its inability to grow organically.

3.    Throughout the Class Period, Mercury was hyper-focused on achieving its goal of generating $1 billion in revenue and used its acquisition strategy and improper revenue recognition practices to artificially inflate its financial results so that it appeared on track to meet this goal. For example, Mercury transitioned from "point-in-time" to "long-term contracts," which allowed for a greater degree of accounting subjectivity in terms of revenue recognition.  By pulling forward long-term contract revenues to boost short-term results, Mercury was able to show a rosy financial picture that simply was not true. Indeed, unbeknownst to investors, those revenues were not sustainable and caused the Company to have inflated unbilled receivables and working capital that it falsely blamed on supply chain issues. Mercury did nothing to alert investors of this transition or the real problems that certain contracts were experiencing at the time.

4.    In addition, Mercury's highly touted acquisition of Physical Optics Corporation ("POC"), a leading designer, developer, and integrator of advanced technologies primarily focused on avionics and mission subsystems for defense applications, in December 2020 (the "Acquisition") – the Company's largest acquisition ever at $310 million – was disastrous.  Despite Mercury's assurances that everything was going well with the integration, Defendants withheld information that the Acquisition had all but eviscerated POC's value.  Historically, the majority of POC's business was comprised of smaller-scale contracts, which it was able to obtain in part thanks to its small business certification.  But due to its acquisition by the much larger Mercury, POC lost that certification, causing significant portions of POC's historical business to be jeopardized or lost entirely.  As a result, unbeknownst to investors, POC was forced to go after bigger projects despite not being properly equipped to do so.

5.    Mercury also misled investors about its highly-touted strategic growth initiative known as "1MPACT."  The initiative was introduced to the public on August 3, 2021, and was

presented to investors as a companywide effort that would increase margins and adjusted EBITDA in order to help the Company maintain value as it continued to scale through further acquisitions. In reality, however, 1MPACT not only failed to achieve its lofty goals, it instead was used to hide the truth of Mercury's finances. Specifically, Mercury used 1MPACT to improperly conceal various regular expenses as restructuring costs. This also enabled Mercury to claim that recurring expenses were one-time costs.

6.      The truth about Mercury's struggles was partially exposed in a July 26, 2022 short seller report issued by Glasshouse Research (the "Glasshouse Report"). The Glasshouse Report revealed that: (i) Mercury overstated organic growth; (ii) the Acquisition had been a "disaster" which was utilized to obscure Mercury's financial results; (iii) 1MPACT was a failure; and (iv) Mercury's management prematurely recognized revenue on significant projects to artificially boost both revenue and earnings unsustainably which also caused the Company's working capital and unbilled receivables to balloon far beyond industry norms. Indeed, the report claimed that skyrocketing unbilled receivables "suggest a pull-forward of $110 million of revenue." The Glasshouse Report attributed this premature revenue recognition to Mercury's executives, noting that management "juice[d] the numbers in their favor" in order to meet revenue and adjusted EBITDA targets, on which the executives' compensation was based.

7.      In reaction to the Glasshouse Report, the Company's share price fell $4.87 per share, or 7.8%, from $62.13 per share on July 25, 2022 to $57.26 per share on July 26, 2022.

8.      Despite the assertions in the Glasshouse Report, Mercury's share price remained artificially inflated as management continued to hide the full truth about its financial condition. Then, on August 2, 2022, Mercury reported its 4Q and FY '22 financial results that were well below prior forecasts and widely missed analyst estimates. Yet Defendants continued to report

3

revenue forecasts in the range of $1 billion to $1.05 billion and told investors that the Acquisition and 1MPACT initiative were performing well.

9.      When Mercury missed its guidance for adjusted EBITDA and adjusted EPS during its report of its 2Q '23 financial results on January 31, 2023, it announced that its Board of Directors had decided to initiate a review of strategic alternatives to enhance shareholder value, including a potential sale of the Company.  Despite this news, Defendants once again promised future strong financial results, going so far as to project "a record quarter for Mercury across all key metrics" in 4Q '23.

10.      However, on May 2, 2023 after the market closed, Mercury announced weak third quarter 2023 earnings and lower margins that caused the Company to slash its full year 2023 guidance. Mercury also disclosed that approximately a dozen of its 300-plus active programs had been negatively affected by higher costs related to labor and supply chain inefficiencies, manufacturing constraints, and inflation.  However, the Company continued to downplay the significance of these issues, claiming that these "challenges" were "not unique to Mercury" and that "structurally, our business model and financial outlook are sound."  On this news, the price of the Company's common stock declined $7.84 per share, or 17.3%, to close at $37.44 per share on May 3, 2023.

11.      Analysts universally excoriated the Company, with Raymond James stating that the results show "a rather bleak narrative" and "we don't expect meaningful improvement until 2Q24." Likewise, Truist Securities stated "once again management cut its FY23 outlook while also disclosing that a range of technical challenges impacting 12 programs was the primary driver of the down revision – info we believe would have been useful to know 90 days ago."

12.     Then, on June 23, 2023, Mercury shocked investors when it announced that Aslett had abruptly resigned and that the Company's recent strategic review of acquisition alternatives did not result in the sale of the Company. On this news, Mercury's share price declined an additional $3.37 per share, or 9.6%, to close at $31.50 per share on June 26, 2023.

13.     An analyst at RBC stated that the fact that Mercury was not acquired raised doubts about the strength of the underlying EBIDTA and pointed to the potential for significant restructuring.

14.     In sum, since July 26, 2022 when the Glasshouse Report was issued, Mercury's stock price has declined nearly 50%, to close at $31.50 per share on June 26, 2023, wiping out billions of dollars in market capitalization and damaging investors.

15.     In Mercury's August 15, 2023 quarterly earnings report, new CEO William Ballhaus admitted that the Company had at least 20 programs that were experiencing significant issues that were hurting profitability because the Company had failed to properly integrate and account for the costs of its overly rapid and aggressive acquisition strategy.  Notably, Ballhaus's statements confirmed that Mercury had been using improper revenue recognition in its accounting since "fiscal year 20" and that the Company's issues were of its own making rather than industry-wide.

## II.     JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business in this District and a significant portion of the damages due to Defendants' misconduct were suffered within this District.  Further, Mercury's common stock trades on the NASDAQ, located within this District.

18.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiff

19.    Plaintiff North Collier Fire Control and Rescue District Firefighters' Pension Plan is a defined benefit public pension fund based in Fort Meyers, Florida that provides retirement, death, and disability benefits to firefighters.  Plaintiff purchased or otherwise acquired Mercury common stock during the Class Period and was damaged thereby.

### B.    Defendants

20.    Defendant Mercury is a Delaware corporation headquartered in Andover, Massachusetts.  It currently has 59,277,051 shares of common stock which trade on the NASDAQ under the ticker "MRCY."

21.    Throughout the Class Period, Defendant Mark Aslett served as Mercury's CEO. As described herein, Aslett made false and misleading statements during the Class Period.

22.    From the beginning of the Class Period to February 17, 2023, Defendant Michael Ruppert served as Mercury's CFO. As described herein, Ruppert made false and misleading statements during the Class Period.

## IV.    MERCURY'S FAILED BUSINESS STRATEGY

23.    Mercury is a technology company that delivers modules and subsystems to the global aerospace and defense industry.  Headquartered in Andover, Massachusetts, Mercury sells to defense contractors, the U.S. government, and to original equipment manufacturers commercial aerospace companies. Mercury's products and solutions are deployed in more than three hundred programs with over twenty-five different defense contractors and commercial aviation customers including Lockheed Martin Corporation, the Raytheon Company, Sierra Nevada Corporation, General Atomics Aeronautical Systems, Inc., and others.

24.    Prior to and during the Class Period, Mercury's business model was based on a mergers and acquisition ("M&A") roll-up strategy focused on the defense electronics market. Mercury claimed that this strategy helped it to build scale, as well as expand capabilities and technological breadth.  Since fiscal year 2014, Mercury completed fifteen acquisitions, expending $1.4 billion in capital.

25.    In 2020, at the beginning of the Class Period, Mercury acquired POC, which was its largest acquisition to date at $310 million. As the Class Period progressed, Mercury acquired three companies – Pentek Technologies, LLC and Pentek Systems, Inc.; Avalex Technologies Corporation; and Atlanta Micro, Inc. – using $300 million of capital.  Mercury's growth-by-acquisition strategy came to an abrupt halt when the Company's financial condition started to unravel in early 2022.

26.    Prior to being acquired by Mercury, POC received a significant portion of its contracts (and revenue) through awards given by the Small Business Innovation Research ("SBIR"), a government program that funds startups and small businesses.  However, after being acquired by Mercury and losing its small business accreditation, those awards evaporated, as evidenced in the below chart:



Exhibit 1: Physical Optics Corporation Awards from SBIR



27. The loss of these small business awards significantly impacted POC's revenue, with Glasshouse estimating that POC lost roughly $10 million in revenue out of an anticipated $36 million.

28. As exemplified by POC, Mercury struggled throughout the Class Period to properly integrate all of the companies that it was rapidly acquiring. In order to hide these shortcomings, the Company began using improper accounting practices. One of these practices was to prematurely recognize revenue from long-term contracts to inflate Mercury's reported revenue. For example, Mercury recognized revenue on contracts that had yet to be performed and where the clients had not even agreed to the cost.

29. Another of Mercury's improper accounting schemes was implemented through its initiative, 1MPACT. The Company first announced that it would be forming this new program in

conjunction with the release of its 4Q and FY '21 financial results on August 3, 2021.  Aslett described 1MPACT as a "companywide effort" that would "lay the foundation for our next phase of value creation at scale, with a goal of achieving Mercury's full growth, margin expansion and adjusted EBITDA potential over the course of the next five years."  Aslett further noted that "the way in which we are thinking about 1MPACT, [ ] and this was kind of the primary focus when we were contemplating the activity, was related to M&A."  The Company also issued a press release in which Aslett further touted the program, claiming that "1MPACT is expected to yield estimated annualized net savings of $30-50 million by fiscal 2025, with approximately $22 million of this total expected to be realized in fiscal 2022 and included in the Company's full-year fiscal 2022 outlook."

30.    In reality, however, 1MPACT was used to hide the truth of Mercury's finances.  Specifically, Mercury used 1MPACT to improperly conceal various regular expenses as restructuring costs.  This also enabled Mercury to claim that recurring expenses were one-time costs.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

31.    The Class Period begins on December 7, 2020. On that day, Mercury announced that it had signed a definitive agreement to acquire POC, a leading designer, developer, and integrator of advanced technologies primarily focused on avionics and mission subsystems for defense applications.  Under the terms of the merger agreement, Mercury would acquire POC in an all-cash transaction. The Company noted that POC was expected to generate over $120 million revenue for its fiscal year ending December 31, 2020. The POC acquisition was expected to be immediately accretive to Mercury's adjusted EPS.  In connection with the acquisition, Aslett stated: "The acquisition of Physical Optics Corporation adds important capabilities on new and existing airborne programs in the platform and mission management market."  The same press

release also claimed that, "[s]imilar to Mercury, POC is well-positioned in faster-growing segments of the defense market and benefits from secular growth drivers, such as supply chain delayering. Together, Mercury and POC can provide customers new capabilities and subsystem solutions."

32.    Aslett's statements in ¶ 31 were materially false and misleading because they failed to disclose that: (a) Mercury's serial acquiror strategy was not working and the company was using improper revenue recognition practices such as changing to long-term contracts to mask deteriorating organic growth and (b) the Acquisition would cause POC to lose its small business accreditation, which would prevent POC from winning contracts that made up a large portion of its historical business.

33.    On this news, the price of the Company's common stock increased $3.06 per share, or 4%, to close at $77.25 per share.

34.    On February 2, 2021, Mercury reported its 2Q '21 financial results.[1] During the Company's earnings conference call, Aslett commented on the POC acquisition, stating that "POC's strategy and culture fit well with us," and that:

> [W]e're pleased to have completed the acquisition of POC. We believe that we're well positioned to continue supplementing Mercury's high level of organic growth with accretive acquisitions going forward. The market is very active. Our pipeline is robust with multiple opportunities of varying sizes all in line with the core of our strategy.

35.    In addition, Ruppert noted that Mercury was raising its full year fiscal 2021 guidance due, in part, to the POC acquisition.  Specifically, Ruppert stated that:

---

[1] Mercury's fiscal year runs from the beginning of July to the end of June of the following year. Its first quarter runs from July through September, its second quarter from October through December, its third quarter from January through March, and its fourth quarter from April through June. Mercury numbers its fiscal years by the calendar year in which the fiscal year ends.

[O]n December 30th, we completed the acquisition of POC, which we funded with a combination of cash on hand and our revolving credit facility. As a result of the acquisition as well as Mercury's strong organic performance in the first half, we are increasing our full year fiscal 2021 guidance for revenue, net income, adjusted EBITDA and adjusted EPS.

. . .

For Q3 fiscal 2021, we currently expect total revenue in the range of $245 million to $255 million representing growth of 18% to 23% compared to Q3 fiscal 2020. At the midpoint this guidance includes approximately $30 million of revenue attributable to the POC acquisition.

36.      Aslett's and Ruppert's statements in ¶¶ 34-35 were materially false and misleading because they failed to disclose that: (a) Mercury's serial acquiror strategy was not working and the company was using improper revenue recognition practices such as changing to long-term contracts to mask deteriorating organic growth; (b) the Acquisition caused POC to lose its small business accreditation, which prevented POC from winning contracts that made up a large portion of its historical business; and (c) as result, Mercury's statements about its financial performance and its ability to meet its lofty projections were based on false assumptions.

37.      On August 3, 2021, Mercury reported its 4Q and FY '21 financial results for the fiscal year ending July 2, 2021.  The Company also issued its FY '22 guidance, which included its forecast for $1 billion in revenue.  During the Company's earnings call that day, Aslett touted the success of the Company's M&A strategy, saying: "Since fiscal 2014, we have completed 13 acquisitions multiplying the size of the company, delivering significant synergies and creating substantial value for shareholders." He added, "we're in an extremely active period for M&A right now. Our pipeline is very robust with multiple opportunities of varying sizes, all in line with the core of our strategy. With the acceleration organic growth expected in FY'23 combined with M&A, we believe that we have the opportunity over time to replicate what we've done so successfully since FY'14."  Aslett further stated: "The integrations of POC and Pentek are on track

11

and both businesses are performing well.  Looking forward, we believe that we're well positioned to continue supplementing Mercury's organic growth with accretive acquisitions."

38.     Aslett's statements in ¶ 37 were materially false and misleading because they failed to disclose that: (a) Mercury's serial acquiror strategy was not working and the company was using improper revenue recognition practices such as changing to long-term contracts to mask deteriorating organic growth and (b) the Acquisition caused POC to lose its small business accreditation, which prevented POC from winning contracts that made up a large portion of its historical business.

39.     During the same call, Ruppert stated: "Revenue for Q4 increased 15% from Q4 2020 to $251 million, which is above the top end of our guidance range of $236.5 million to $246.5 million. Organic revenue was $210 million and acquired revenue, which included Physical Optics Corporation and Pentek, was $40.8 million. Our acquisitions continued to perform well as we integrate them into Mercury."  With respect to Mercury's financial projections, he noted, "We are expecting approximately 10% total company revenue growth prior to future M&A approaching $1 billion for the first time and record adjusted EBITDA."

40.     Ruppert's statement in ¶ 39 was materially false and misleading because it failed to disclose that: (a) Mercury's serial acquiror strategy was not working and the company was using improper revenue recognition practices such as changing to long-term contracts to mask deteriorating organic growth; (b) the Acquisition caused POC to lose its small business accreditation, which prevented POC from winning contracts that made up a large portion of its historical business; (c) Mercury had at least twenty programs that were suffering and not performing well; and (d) as result, Mercury's statements about its financial performance and its ability to meet its lofty projections were based on false assumptions.

41.    In connection with the August 3, 2021 earnings release, Mercury also announced the formation of 1MPACT.  In a press release regarding 1MPACT, Aslett stated that:

> Our long-term outlook remains intact and our strategy remains the same: to deliver strong margins while growing the business organically and supplementing this organic growth with disciplined M&A and full integration. We've launched 1MPACT to change the way we fundamentally do business with a goal of setting the stage for rapid organic and inorganic growth over the next five years."

42.    Aslett's statement in ¶ 41 was materially false and misleading because it failed to disclose that Mercury's serial acquiror strategy was not working and the company was using improper revenue recognition practices such as changing to long-term contracts to mask deteriorating organic growth.

43.    On November 2, 2021, the Company reported its 1Q '22 financial results. The results showed that Mercury met or exceeded its 1Q '22 guidance for revenue, adjusted EBITDA, and adjusted EPS. The Company also maintained its FY '22 revenue and adjusted EBITDA guidance. Despite increasing risks related to the defense budget, COVID vaccine mandates, and pending supply chain issues, Ruppert stated, "We remain on track towards achieving our previously announced revenue and adjusted EBITDA guidance for full year fiscal 2022."

44.    Ruppert's statement in ¶ 43 was materially false and misleading because it failed to disclose that: (a) Mercury's serial acquiror strategy was not working and the company was using improper revenue recognition practices such as changing to long-term contracts to mask deteriorating organic growth; (b) Mercury had at least twenty programs that were suffering and not performing well; and (c) as result, Mercury's statements about its financial performance and its ability to meet its lofty projections were based on false assumptions.

45.    On February 1, 2022, Mercury reported its 2Q '22 financial results. The 2Q '22 revenue, adjusted EBITDA, and adjusted EPS all fell within the Company's guidance. In addition,

Mercury maintained its FY '22 revenue, adjusted EBITDA, and adjusted EPS guidance.  With respect to the 1MPACT initiative, during the Company's earnings call, Aslett stated:

> We continue to expect 1MPACT to generate $30 million to $50 million of incremental adjusted EBITDA by fiscal '25. This includes a $27 million net benefit related to 1MPACT actions taken in fiscal '22. We're on track to meet our targets with upside opportunities that would allow us to deliver value in excess of our targets and quicker than originally expected.

46.      Aslett's statement in ¶ 45 was materially false and misleading because it failed to disclose that: (a) Mercury's 1MPACT initiative to increase margins was not working and was in fact cutting into margins and (b) as result, Mercury's statements about its financial performance and its ability to meet its lofty projections were based on false assumptions.

47.      On May 3, 2022, the Company reported its 3Q '22 financial results, revising its FY '22 forecast downward by lowering the top end of its revenue forecast to $1.02 billion. It also lowered its forecast for adjusted EBITDA to a range of $210 million to $217 million and adjusted EPS to a range of $2.34 to $2.44 per share.  Despite these results, Aslett downplayed any issues, emphasizing the potential of 1MPACT to drive revenue and optimize the Company's balance sheet:

> We continue to expect 1MPACT to generate $30 million to $50 million of incremental adjusted EBITDA by fiscal 2025. We're on track to meet this target with upside opportunities that would allow us to potentially deliver greater value earlier than originally anticipated. 1MPACT is aimed at improving our organic growth as well as the fundamentals of the business. It's enabling us to better align with our customers' priorities and to partner with them on larger opportunities. As a result, we expect to continue to take share and grow faster than the industry over time. 1MPACT is also aimed at optimizing our balance sheet by improving our working capital and asset efficiency.

48.      Aslett's statement in ¶ 47 was materially false and misleading because it failed to disclose that: (a) Mercury's serial acquiror strategy was not working and the company was using improper revenue recognition practices such as changing to long-term contracts to mask

deteriorating organic growth and (b) Mercury's 1MPACT initiative to increase margins was not working and was in fact cutting into margins.

49.     Notwithstanding the lowered guidance, Aslett also stated, "Despite the industry headwinds and order delays, we anticipate total company revenue growth of approximately 8% to 10% for fiscal 2022, exceeding $1 billion for the first time together with record adjusted EBITDA."

50.     Ruppert added: "While we have updated our fiscal '22 guidance as a result of the current macro environment, we are still expecting record financial results for the fourth quarter and full fiscal year."

51.     Aslett's and Ruppert's statements in ¶¶ 49-50 were materially false and misleading because they failed to disclose that: (a) Mercury's serial acquiror strategy was not working and the company was using improper revenue recognition practices such as changing to long-term contracts to mask deteriorating organic growth; (b) Mercury had at least twenty programs that were suffering and not performing well; and (c) as result, Mercury's statements about its financial performance and its ability to meet its lofty projections were based on false assumptions.

52.     On this news, the Company's share price increased $3.93 per share, or 7.4%, to close at $59.77 on May 4, 2022.

## VI.     THE TRUTH IS REVEALED THROUGH MULTIPLE DISCLOSURES

53.     The truth about Mercury's scheme was partially revealed on July 26, 2022, when Glasshouse Research initiated coverage of Mercury with a strong sell report entitled "Roll-Up Mercury Systems Set to Unravel." The Glasshouse Report asserted that Mercury's management "has used accounting gimmicks to obfuscate true economic earnings while concealing the decay of its core company." The Glasshouse Report also asserted that Mercury's reported organic revenue was greatly overstated and that the acquisition of POC "has been a disaster." The report further claimed that "[m]anagement has prematurely recognized revenue on significant projects

boosting both revenue and earnings unsustainably" and that skyrocketing unbilled receivables "suggest a pull-forward of $110 million of revenue."

54.     The Glasshouse Report revealed several of Mercury's failings and improper practices.  First, with regards to the Acquisition, the Glasshouse Report exposed that unbeknownst to investors, POC's revenues declined precipitously after being acquired by Mercury because POC lost its small business status.  The Glasshouse Report asserted that the Company intentionally did not break out POC's performance in financial statements – despite it being Mercury's largest acquisition ever – in order to obfuscate the deterioration of POC's performance due to its lack of integration and the failure of anticipated synergies to materialize.

55.     The Glasshouse Report also exposed how Mercury had intentionally shifted from primarily using "point-in-time" contracts to long-term contracts in order to prematurely recognize revenue so that the Company could meet compensation and aspirational targets (which were tied to executive compensation).  The Glasshouse Report explained that recognizing revenue in point-in-time contracts is far less subjective than for long-term contracts, which are more complex and rely more heavily on management judgment.  However, even under the more pliable standard for long-term contracts, Mercury's accounting practices were improper.  For example, Mercury recognized revenue for contracts that had not yet been preformed or where the clients had not even agreed to costs.

56.     The Glasshouse Report further revealed that Mercury's strategic cost-saving initiative 1MPACT was in fact used by the Company to hide regular recurring expenses as non-GAAP "restructuring" expenses.  The Glasshouse Report noted that the 1MPACT program was less intended to increase growth and efficiency and more intended as a scheme for management to achieve the Company's "reckless aspiration of $1 billion revenue by any means necessary."

57.     The Glasshouse Report connected these issues to the rapid inflation of Mercury's

contract assets and unbilled receivables, noting that they were red flags for premature revenue

recognition.  Unbilled receivables are considered risky because they represent revenue that the

client has not yet been billed or agreed on but that management has recognized.  Contract assets

pose a similar risk.  A growth in contract assets accompanied by a decrease in liabilities indicates

that a company is spending money faster than it is billing on its projects, that project managers are

behind in getting bills out, or that the company has costs listed on its balance sheet that are actually

losses (such as job overruns or change orders that are not or will not be approved).  Based on

Mercury's financial statements, Glasshouse estimated that Mercury prematurely recognized ***$110***

***million*** in revenue, which Glasshouse predicted would require the Company to report negative

results in later periods.

58.     On this news, the price of the Company's common stock fell $4.87 per share, or

7.8%, to close at $57.26 per share.

59.     Over the next several quarters, however, Mercury continued to conceal the full truth

by continuing to hide troubled projects and providing an untrue picture of its financial condition.

On August 2, 2022, Mercury reported its 4Q and FY '22 financial results, which were well below

the Company's prior forecasts and widely missed analysts' consensus estimates.  At the same time,

the Company issued its FY '23 guidance which included a revenue forecast in the range of $1.00

billion to $1.05 billion.  With respect to the Company's M&A strategy, during the Company's

earnings call, Ruppert noted that "Physical Optics continues to perform well."

60.     On January 31, 2023, Mercury reported its 2Q '23 financial results. Mercury's

revenue fell within its guidance range, but the Company missed its guidance for adjusted EBITDA

and adjusted EPS. That day, the Company also announced that Ruppert would be stepping down

as CFO effective February 17, 2023.  Despite the disappointing report, Defendants continued to promise strong financial results. For example, during the earnings conference call, Aslett stated that Mercury was entering "a period of accelerating growth and profitability" as evidenced by the "record backlog." Ruppert similarly stated that 4Q '23 would be "a record quarter for Mercury across all key metrics."  Mercury also announced that its Board of Directors decided to initiate a review of strategic alternatives to enhance shareholder value including a potential sale of the Company.

61.    On May 2, 2023, Mercury reported its 3Q '23 financial results, which began to reveal a fuller picture of the Company's finances to the market. Notwithstanding prior statements that 4Q '23 would be a "record quarter," Mercury significantly slashed its FY '23 guidance. For the year, the Company forecast revenue to be in the range of $990.0 million to $1.01 billion (down from $1.01 billion to $1.05 billion), GAAP net loss of $19.0 million to $11.1 million (down from GAAP net income of $13.9 million to $24.8 million), adjusted EBITDA in a range of $160.0 million to $170.0 million (down from $202.5 million to $215.0 million), and adjusted EPS in a range of $1.36 to $1.50 per share (down from $1.90 to $2.08 per share).  On this news, the price of the Company's common stock plummeted $7.84 per share, or 17.3%, to close at $37.44 per share on May 3, 2023.

62.    Importantly, for the first time, the Company revealed that approximately a dozen of its 300-plus active programs had been negatively affected by higher costs related to both labor and supply chain inefficiencies, manufacturing constraints, and inflation.  Despite this admission, Mercury management, including Aslett, continued to downplay these issues, claiming that they were "not unique to Mercury" and that "structurally, our business model and financial outlook are sound."

63.     Analysts excoriated the Company, with Raymond James stating that the results showed "a rather bleak narrative" and that "we don't expect meaningful improvement until 2Q24." Likewise, Truist Securities stated that "once again management cut its FY23 outlook while also disclosing that a range of technical challenges impacting 12 programs was the primary driver of the down revision – info we believe would have been useful to know 90 days ago."

64.     Then on June 23, 2023, after the market closed, Mercury announced a series of changes to leadership and its Board of Directors, including changes to the positions of President and CEO, the appointment of a new independent director, and the identification of a second new independent director and a permanent CFO. In addition, Mercury disclosed that the Company's recent strategic review of acquisition alternatives did not result in the sale of the Company. An analyst at RBC stated that the fact that Mercury was not acquired raised doubts about the strength of the underlying EBIDTA and pointed to the potential for significant restructuring.  On this news, Mercury's share price fell an additional $3.37 per share, or 9.6%, to close at $31.50 per share on June 26, 2023.

65.     On August 15, 2023, Mercury reported its 4Q '23 financial results. Notably, the Company missed its $1 billion revenue target, reporting FY '23 revenues of $973.9 million. But it had even more significant shortfalls in net earnings and EBITDA.  During the earnings conference call, Mercury's new CEO, William Ballhaus, provided some insight into what went wrong:

> [O]ver the past several years, the company grew inorganically into strategically attractive areas, but didn't fully integrate some of the businesses and mature processes and management systems to align with Mercury's evolving business portfolio. In my experience, this is not uncommon in businesses that grow rapidly via acquisitions. At Mercury, though, the immaturity and lack of full integration of key functional areas have led to the serious challenges the company experienced forecasting business performance over the past several quarters.
>
> My third and most important takeaway is that while our recent results are disappointing, the majority of our business is performing well, delivering predictable and profitable growth. However, this solid performance has been masked by approximately 20 programs

that are experiencing unique and outsized costs primarily temporary cost growth related to initial development challenges. In fiscal '23, these few programs impacted our financial performance by approximately $56 million.

Since FY '20, working capital has grown from approximately 35% of revenue to approximately 65% of revenue in FY '23. This growth has primarily been driven by increases in unbilled receivables and inventory and is a direct result of the temporary execution challenges previously discussed.

66.     Notably, Ballhaus's statement confirmed that allegations in the Glasshouse Report – specifically, that Mercury: (i) had been using improper revenue recognition practices since "fiscal year 20" by reporting revenue in exchange for skyrocketing working capital and unbilled receivables; (ii) had issues that were of its own making rather than being industry-wide or related to challenges outside of Mercury's control; and (iii) had been mishandling its integration of its acquisitions, such as POC, contrary to the goals of the 1MPACT initiative.

## VII.     SCIENTER

67.     Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Mercury, and their control over and/or receipt and/or modification of Mercury's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

68.     Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge

and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

69.    The Individual Defendants, because of their positions with Mercury, controlled the contents of Mercury's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Mercury corporate statements and is, therefore, responsible and liable for the representations contained therein.

## VIII.    LOSS CAUSATION/ECONOMIC LOSS

70.    Plaintiff and other Class members were damaged as a result of Defendants' fraudulent conduct as alleged herein.  During the Class Period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omitting material facts, trends, commitments, and uncertainties required to be disclosed, relating to Mercury's operations, business, performance, and future prospects.

71.    As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of Mercury's common stock was artificially inflated throughout the Class Period.

72.    Class members unknowingly and in reliance on Defendants' materially false or misleading statements and/or omissions purchased Mercury stock at artificially inflated prices on the NASDAQ.  But for Defendants' misrepresentations, omissions, and fraudulent scheme,

Plaintiff and other Class members would not have purchased Mercury stock at the artificially inflated prices at which it traded during the Class Period.

73.    The truth regarding Defendants' fraud was revealed in several corrective disclosures that were made between July 26, 2022 and June 23, 2023. In response to these corrective disclosures, Mercury's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct was removed from Mercury's stock price.

74.    The decline in Mercury's stock price following the corrective disclosures is directly attributable to the market absorbing information that disclosed the falsities in or misleadingly omitted from Defendants' material misrepresentations and omissions.

75.    Plaintiff and other Class members suffered economic losses as the price of Mercury's stock fell in response to the corrective disclosures. It was foreseeable that such disclosures would cause Mercury's stock price to decline. Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and other Class members.

## IX.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

76.    At all relevant times, the market for Mercury common stock was open and efficient for the following reasons, among others: (i) Mercury common stock met the requirements for listing on, and was listed and actively traded on, the NASDAQ under the ticker symbol "MRCY"; (ii) as a registered and regulated issuer of securities, Mercury filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information; (iii) Mercury regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iv) Mercury was

followed by numerous securities analysts employed by major brokerage firms, including JPMorgan, RBC, Truist, William Blair, and Zacks, who wrote reports that were distributed to the customers of their respective brokerage firms; (v) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Mercury's common stock; and (vi) without knowledge of the misrepresented or omitted facts, Plaintiff and Class members purchased or otherwise acquired Mercury common stock between the time Mercury made the material misrepresentations and omissions and the time the truth was revealed, during which period the price of Mercury's common stock was artificially inflated as a result of Defendants' material misrepresentations and omissions.

77.    As a result of the foregoing, the market for Mercury common stock promptly digested current information regarding Mercury from all publicly available sources and the price of Mercury's stock reflected such information.  Based upon the materially false or misleading statements and omissions of material fact alleged herein, Mercury common stock traded at prices that exceeded its true value during the Class Period.  Plaintiff and other Class members purchased or otherwise acquired Mercury common stock relying upon the integrity of the market price of Mercury common stock and other market information relating to Mercury.

78.    Under these circumstances, Plaintiff and other Class members, as purchasers or acquirers of Mercury common stock at artificially inflated prices during the Class Period, suffered similar injuries and a presumption of reliance under the fraud-on-the-market doctrine applies.

79.    At all relevant times, Plaintiff and other Class members relied on Defendants to disclose material information as required by law.  Plaintiff and other Class members would not have purchased or otherwise acquired Mercury common stock at artificially inflated prices if Defendants had disclosed all material information as required by law.  To the extent that

Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## X. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

80.    The Private Securities Litigation Reform Act's statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

81.    None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

82.    To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof.  As set forth above, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

83.    To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of Mercury who knew that the forward-looking statement was materially false or misleading.

## XI.    CLASS ACTION ALLEGATIONS

84.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Mercury between December 7, 2020 and June 23, 2023.

85.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Mercury, members of Mercury's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of Mercury.

86.    The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Mercury's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class.  Class members may be identified from records maintained by Mercury or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

87.    Plaintiff's claims are typical of Class members' claims, as all Class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

88.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class and securities litigation.

89.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and

fact common to the Class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about Mercury's operations, business, performance, and future prospects; (iii) to what extent Class members have sustained damages; and (iv) the proper measure of such damages.

90.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    CAUSES OF ACTION

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

91.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is brought against Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

92.     During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiff; (ii) cause the market price of Mercury common stock to trade above its true value; and (iii) cause Plaintiff and other Class members to purchase or otherwise acquire Mercury common stock at artificially inflated prices that did not reflect the

stock's true value during the Class Period.  In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

93.    While in possession of material adverse non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Mercury common stock, in violation of Section 10(b) and Rule 10b-5.  Defendants are alleged as primary participants in the wrongful conduct alleged herein.

94.    Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein in that they failed to disclose such facts, even though such facts were readily available to them, if not known.  Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding Mercury's operations, business, performance, and future prospects from the investing public and supporting the artificially inflated price of its common stock.

95.    As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already in the market price of Mercury common stock during the Class Period.  Plaintiff and other Class members purchased or otherwise acquired Mercury common stock during the

Class Period at artificially inflated prices in direct or indirect reliance on: (i) the materially false or misleading statements made by Defendants; (ii) the efficiency and integrity of the market in which the Company's common stock trades; and (iii) the absence of material adverse information that Defendants knew of or recklessly disregarded but did not publicly disclose.  As the previously misrepresented and/or concealed material facts eventually emerged, the price of Mercury common stock substantially declined, causing losses to Plaintiff and other Class members.

96.    At the time of the material misrepresentations and omissions alleged herein, Plaintiff and other Class members were not aware of their falsity and believed them to be true. Had Plaintiff and other Class members known the relevant truth regarding Mercury's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Plaintiff and other Class members would not have purchased or otherwise acquired Mercury common stock at artificially inflated prices.

97.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection with their transactions in the Company's common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

98.    Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

99.    Prior to and during the Class Period, the Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information

concerning Mercury, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

100.    In their respective roles, the Individual Defendants had regular access to non-public information about Mercury's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of Mercury's corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

101.    Each of the Individual Defendants was a controlling person of Mercury within the meaning of Section 20(a), as alleged herein.  By virtue of their high-level positions, their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Plaintiff allege were materially false and misleading.

102.    Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Mercury common stock during the Class Period, which included the dissemination of materially false or misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) set forth above.  The scheme: (i) deceived the investing public regarding Mercury's operations and the true value of Mercury's common stock; and (ii) caused Plaintiff and other Class members to purchase Mercury common stock at artificially

inflated prices, which plummeted in value when the truth concerning Mercury's business, operations, performance, and future prospects was revealed.

103.    The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements Plaintiff allege were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be corrected.  In particular, the Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein and exercised the same.

104.    As set forth above, Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.  By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of Section 10(b) and Rule 10b-5, the Individual Defendants are liable under Section 20(a).  As a direct and proximate result of the Individual Defendants' culpable conduct, Plaintiff and other Class members suffered damages in connection with their transactions in Mercury's common stock during the Class Period.

## XIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, including:

1.    Certification of this action as a class action;

2.    Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

3.    Awarding Plaintiff its costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

4.      Awarding such other and further relief as may be just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: December 13, 2023                    Respectfully submitted,

**BLOCK & LEVITON LLP**
*/s/ Jeffrey Block*
Jeffrey Block
Bar No. 600747
260 Franklin Street
Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jeff@blockleviton.com

**GRANT & EISENHOFER, P.A.**
Daniel L. Berger
Caitlin M. Moyna
Lauren J. Salamon
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (610) 722-8501
dberger@gelaw.com
cmoyna@gelaw.com

*Counsel for North Collier Fire Control and Rescue*
*District Firefighters' Pension Plan and Proposed*
*Lead Counsel for the Class*