# Tab 12

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

## FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

**Date of report (Date of earliest event reported): November 7, 2023**

# Mercury Systems, Inc.
**(Exact Name of Registrant as Specified in its Charter)**

| **Massachusetts** | **000-23599** | **04-2741391** |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

| **50 Minuteman Road, Andover,    Massachusetts** | **01810** |
|---|---|
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (978) 256-1300**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 | MRCY | Nasdaq Global Select Market |

**Item 1.01. Entry Into a Material Definitive Agreement**

Due to the uncertainty surrounding a potential government shutdown or prolonged continuing resolution and the potential impact on second quarter and fiscal 2024 results, Mercury Systems, Inc. (the "Company") proactively executed an amendment to its revolving credit facility allowing for a temporary increase in the consolidated total net leverage ratio covenant requirement from 4.50 to 5.25 for the second quarter ending December 29, 2023. On November 7, 2023, the Company and certain of the Company's subsidiaries, as guarantors, entered into Amendment No. 5 ("Amendment No. 5") to the Company's Credit Agreement dated May 2, 2016, as amended to date, with a syndicate of commercial banks and Bank of America, N.A acting as the administrative agent. The Company paid a consent fee of 0.125% of the principal amount of the revolving credit commitments held by such consenting lender. The Company had $576.5 million in outstanding borrowings both prior to and following the closing of Amendment No. 5.

The foregoing description of the Amendment No. 5 does not purport to be complete and is qualified in its entirety by reference to the full text of the Amendment No. 5, which is filed as Exhibit 10.1 to this Current Report on Form 8-K and is incorporated by reference into this Item 1.01

**Item 2.02. Results of Operations and Financial Condition.**

On November 7, 2023, the Company issued a press release and an earnings presentation regarding its financial results for the first quarter ended September 29, 2023. The Company's press release and earnings presentation are attached as exhibits 99.1 and 99.2 to this Current Report on Form 8-K and incorporated by reference herein.

Information in Item 2.02 of this Current Report on Form 8-K and the exhibits 99.1 and 99.2 attached hereto shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, regardless of any general incorporation language in such filing.

**Use of Non-GAAP Financial Measures**

In addition to reporting financial results in accordance with generally accepted accounting principles, or GAAP, the Company provides adjusted EBITDA, adjusted income, adjusted EPS, free cash flow, organic revenue and acquired revenue, which are non-GAAP financial measures. Adjusted EBITDA, adjusted income, and adjusted EPS exclude certain non-cash and other specified charges. The Company believes these non-GAAP financial measures are useful to help investors more completely understand its past financial performance and prospects for the future. However, the presentation of these non-GAAP financial measures is not meant to be considered in isolation or as a substitute for financial information provided in accordance with GAAP. Management believes these non-GAAP financial measures assist in providing a more complete understanding of the Company's underlying operational results and trends, and management uses these measures along with the corresponding GAAP financial measures to manage the Company's business, to evaluate its performance compared to prior periods and the marketplace, and to establish operational goals.

**Item 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

On November 7, 2023, the Company and certain of the Company's subsidiaries entered into Amendment No. 5 to the Company's Credit Agreement dated May 2, 2016, as amended to date, with a syndicate of commercial banks and Bank of America, N.A acting as the administrative agent. Reference is made to Item 1.01 of this Current Report on Form 8-K for a summary of the Amendment No. 5.

**Item 9.01. Financial Statements and Exhibits.**

**(d) Exhibits.**

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Amendment No. 5 to Credit Agreement, dated November 7, 2023, among Mercury Systems, Inc., the Guarantors party thereto, the Lenders party thereto and Bank of America, N.A., as Administrative Agent |
| 99.1 | Press Release dated November 7, 2023 |
| 99.2 | Earnings Presentation dated November 7, 2023 |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: November 7, 2023                                    MERCURY SYSTEMS, INC.


By: /s/ David E. Farnsworth
David E. Farnsworth
Executive Vice President, Chief Financial Officer

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Amendment No. 5 to Credit Agreement, dated November 7, 2023, among Mercury Systems, Inc., the Guarantors party thereto, the Lenders party thereto and Bank of America, N.A., as Administrative Agent |
| 99.1 | Press Release, dated November 7, 2023 of Mercury Systems, Inc. |
| 99.2 | Earnings Presentation, dated November 7, 2023 of Mercury Systems, Inc. |

Execution Version

AMENDMENT NO. 5

This AMENDMENT NO. 5 dated as of November 7, 2023 (this "Amendment"), is entered into among MERCURY SYSTEMS, INC., a Massachusetts corporation (the "Borrower"), certain subsidiaries of the Borrower, as Guarantors, the Lenders party hereto (collectively, the "Lenders" and individually, a "Lender"), and BANK OF AMERICA, N.A., in its capacity as administrative agent for the Lenders (in such capacity, the "Administrative Agent"), and amends the Credit Agreement dated as of May 2, 2016 (as amended, supplemented or otherwise modified from time to time prior to the date hereof, including pursuant to Amendment No. 1, dated as of June 27, 2017, Amendment No. 2, dated as of December 21, 2017,  Amendment No. 3, dated as of September 28, 2018 and Amendment No. 4, dated as of February 28, 2022, the "Existing Credit Agreement") entered into among the Borrower, the Guarantors party thereto, the Lenders from time to time party thereto and the other parties thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Amended Credit Agreement (as defined below).

WITNESSETH:

WHEREAS, the Borrower has requested that the Existing Credit Agreement be amended as set forth herein;

WHEREAS, on the Amendment No. 5 Effective Date (as defined below), each Lender that shall have delivered their signature to this Amendment shall be deemed to have consented to the amendments and modifications to the Existing Credit Agreement effected hereby;

WHEREAS, the Administrative Agent, the Borrower, the Guarantors and the Lenders party hereto (which Lenders constitute the Required Lenders) desire to memorialize the terms of this Amendment and make certain other amendments as set forth herein in accordance with Section 11.01 of the Existing Credit Agreement, with such amendment to become effective at the Amendment No. 5 Effective Date.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Amendments.

Effective as of the Amendment No. 5 Effective Date, and subject to the terms and conditions set forth herein, the Existing Credit Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: stricken text) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the pages to the Existing Credit Agreement attached as Exhibit A hereto (as so amended, the "Amended Credit Agreement").

2.    Conditions to Effectiveness.

This Amendment shall become effective on the date (the "Amendment No. 5 Effective Date") when each of the following conditions shall have been satisfied:

(a)     The Administrative Agent shall have received counterparts of this Amendment executed and delivered by a duly authorized officer of each of the Credit Parties,  the Administrative Agent, the Collateral Agent and Lenders constituting the Required Lenders.

(b)     The Administrative Agent shall have received a certificate of a Responsible Officer to the effect that the representations and warranties set forth in Section 3 hereof are true and correct.

(c)     Prior to or substantially concurrently with the Amendment No. 5 Effective Date, the Borrower shall have paid to the Administrative Agent for the benefit of each Applicable Lender a consent fee of 0.125% of the principal amount of the Revolving Credit Commitments held by such Lender immediately prior to the Amendment No. 5 Effective Date.  "Applicable Lender" shall mean each Lender that has delivered an executed counterpart of this Amendment prior to 12:00 (noon), New York City time, on November 7, 2023 or such later date and time specified by the Borrower and notified in writing to the Lenders by the Administrative Agent.

(d)     Prior to or substantially concurrently with the occurrence of the Amendment No. 5 Effective Date, to the extent invoiced at least two Business Days prior to the Amendment No. 5 Effective Date, all reasonable costs and expenses of the Administrative Agent in connection with this Amendment.

3.     Representations and Warranties.

On and as of the Amendment No. 5 Effective Date, the Borrower hereby represents and warrants to the Administrative Agent and each Lender party hereto, after giving effect to the amendments set forth in this Amendment, that:

(a)     The representations and warranties of the Borrower and each other Credit Party contained in Article 6 of the Amended Credit Agreement or any other Credit Document are true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" or similar language is true and correct (after giving effect to any qualification therein) in all respects) on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects) as of such earlier date; and

(b)     No Default or Event of Default exists.

4.     Reference to the Effect on the Credit Documents.

(a)     Each reference in the Existing Credit Agreement to "this Agreement," "hereunder," "hereof," "herein," or words of like import and each reference in the other Credit Documents to the Existing Credit Agreement (including, without limitation, by means of words

-2-

like "thereunder," "thereof" and words of like import), shall mean and be a reference to the Amended Credit Agreement.

(b)    Except as expressly amended hereby, all of the terms and provisions of the Credit Documents are and shall remain in full force and effect and are hereby ratified and confirmed.

(c)    The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of the Lenders, the Borrower or the Administrative Agent under any of the Credit Documents, nor constitute a waiver or amendment of any other provision of any of the Credit Documents or for any purpose except as expressly set forth herein.

(d)    On and after the effectiveness of this Amendment, this Amendment shall for all purposes constitute a Credit Document.

5.    Reaffirmation.

Each Credit Party hereby consents to this Amendment and acknowledges and agrees that, notwithstanding the execution and delivery of this Amendment, the Collateral Documents and, to the extent such Credit Party is a party thereto, the Guaranty provided to the Administrative Agent by such Credit Party remain in full force and effect and the security interest granted by such Credit Party under the Collateral Documents shall secure all Secured Obligations (as defined in the Amended Credit Agreement), and the rights and remedies of the Administrative Agent thereunder and the obligations and liabilities of such Credit Party thereunder, in each case, as have been amended by this Amendment, remain in full force and effect and shall not be affected, impaired or discharged hereby.

This Amendment does not constitute a novation of the Existing Credit Agreement.

6.    Execution in Counterparts; Effectiveness.

This Amendment may be in the form of an Electronic Record and may be executed using Electronic Signatures (including, without limitation, facsimile and .pdf) and shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. This Amendment may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Amendment. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Administrative Agent of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. Notwithstanding anything contained herein to the contrary, the Administrative Agent is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Administrative Agent has agreed to accept such Electronic Signature, the Administrative and each of the Lenders shall be entitled to rely on any such Electronic Signature without further verification and (b) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by a manually executed, original counterpart. For purposes

hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

7.    Governing Law; Jurisdiction; Etc.

The governing law, submission to jurisdiction, waiver of venue, service of process and waiver of jury trial provisions set forth in Sections 11.14 and 11.15 of the Existing Credit Agreement shall apply to this Amendment, mutatis mutandis.

8.    Section Titles.

Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Amendment or any other Credit Document.

9.    Severability.

If any provision of this Amendment or the other Credit Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Amendment and the other Credit Documents shall not be affected or impaired thereby and the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.    Successors.

The terms of this Amendment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective permitted successors and assigns.

[SIGNATURE PAGES FOLLOW]

-4-

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers and general partners thereunto duly authorized, as of the date first written above.

**Borrower**

MERCURY SYSTEMS, INC.

By: _____
Name: David Farnsworth
Title:  Executive Vice President and CFO

**Subsidiary Guarantor**

MERCURY MISSION SYSTEMS, LLC

By: _____
Name: David Farnsworth
Title:  Executive Vice President and CFO

[Signature Page to Amendment No. 5]

BANK OF AMERICA, N.A.,
as Administrative Agent and Collateral Agent

By: _____
    Name: Gerund Diamond
    Title:  Vice President

[Signature Page to Amendment No. 5]

BANK OF AMERICA, N.A.,
as a Lender

By: _____
Name: Holver Rivera
Title:  Senior Vice President

[Signature Page to Amendment No. 5]

BMO Bank NA, as a Lender

By: _____

Name: Michael Weinert
Title: Managing Director

By: _____

Name: Harry Yergey
Title: Managing Director

DocuSign Envelope ID: AF17A074-4555-4888-8963-8DE9E6671FFB

Citibank N.A., as a Lender

By: Robert Robin

Name:    Robert G. Robin
Title:    SVP

[Signature Page to Amendment No. 5]

JPMORGAN CHASE BANK, N.A., as a Lender

By: _____

Name: Elizabeth O'Conor
Title: Authorized Officer

[Signature Page to Amendment No. 5]

TRUIST BANK, as a Lender

By: _____
    Name: Anika Kirs
    Title: Director

[Signature Page to Amendment No. 5]

Capital One National Association, as a Lender

By: _Anuj Dhingra_

Name: Anuj Dhingra
Title: Duly Authorized Signatory

[Signature Page to Amendment No. 5]

KEYBANK NATIONAL ASSOCIATION, as a
Lender

By: _____

    Name:    John R. Macks
    Title:    Vice President

[Signature Page to Amendment No. 5]

Regions Bank, as a Lender

By: _____
    Name: George Hunter
    Title: Vice President

Signature Page to Amendment No. 5

TD Bank, N.A., as a Lender

By: _____
    Name:     Leonid Batsevitsky
    Title:     Vice President

[Signature Page to Amendment No. 5]

U. S. BANK NATIONAL ASSOCIATION, as a
Lender

By: _____

    Name:    Paul F. Johnson
    Title:    Vice President

[Signature Page to Amendment No. 5]

Wells Fargo, as a Lender

By: _____

    Name: Chris Mandonas
    Title: Vice President

[Signature Page to Amendment No. 5]

FIRST NATIONAL BANK OF PENNSYLVANIA,
as a Lender

By: _____

    Name: Daniel Chimera
    Title: VP


If a second signature is necessary:


By:     _____
    Name:
    Title:


[Signature Page to Amendment No. 5]

Goldman Sachs Bank USA, as a Lender

By: _____

Name: Dan Martis
Title: Authorized Signatory

[Signature Page to Amendment No. 5]

EXHIBIT A

AMENDED CREDIT AGREEMENT

[See attached]

*Exhibit A*

Deal CUSIP:   58941BAA3
Facility CUSIP:   58941BAC9

**CREDIT AGREEMENT**

dated as of May 2, 2016,

As amended by Amendment No. 1, dated as of June 27, 2017
As amended by Amendment No. 2, dated as of December 21, 2017
As amended by Amendment No. 3, dated as of September 28, 2018
As amended by Amendment No. 4, dated as of February 28, 2022
As further amended by Amendment No. 4,5, dated as of February 28, 2022November 7, 2023

among

**MERCURY SYSTEMS, INC.,**
as the Borrower

and

**CERTAIN SUBSIDIARIES OF THE BORROWER**,
as Guarantors,

**THE LENDERS PARTY HERETO,**

**BANK OF AMERICA, N.A.,**
as Administrative Agent and Collateral Agent

---

**BOFA SECURITIES, INC.,**
**CITIBANK, N.A.,**
**JPMORGAN CHASE BANK, N.A.**, and
**TRUIST SECURITIES, INC.,**
as Joint Lead Arrangers, Joint Book Managers and Co-Syndication Agents,

and

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
**KEYBANK NATIONAL ASSOCIATION,**
**U.S. BANK, N.A.,**
**TD BANK NA,**
**BMO HARRIS BANK N.A.,**
**CAPITAL ONE, NATIONAL ASSOCIATION,**
**BANK OF THE WEST**
and
**REGIONS BANK**

as Co-Documentation Agents

**TABLE OF CONTENTS**

PAGE

ARTICLE 1
DEFINITIONS AND ACCOUNTING TERMS

| Section 1.01. | Defined Terms | 1 |
|---|---|---|
| Section 1.02. | Interpretive Provisions | 59 |
| Section 1.03. | Accounting Terms and Provisions | 60 |
| Section 1.04. | Rounding | 61 |
| Section 1.05. | Times of Day | 61 |
| Section 1.06. | Letter of Credit Amounts | 61 |
| Section 1.07. | Pro Forma Calculations | 61 |
| Section 1.08. | Timing of Payment and Performance | 65 |
| Section 1.09. | Currency Generally | 65 |
| Section 1.10. | Exchange Rates; Currency Equivalents | 65 |
| Section 1.11. | Additional Alternative Currencies | 66 |
| Section 1.12. | Cumulative Equity Credit Transactions | 67 |
| Section 1.13. | References to Agreements, Laws, Etc | 67 |
| Section 1.14. | Interest Rates | 67 |

ARTICLE 2
COMMITMENTS AND CREDIT EXTENSIONS

| Section 2.01. | Commitments | 68 |
|---|---|---|
| Section 2.02. | Borrowings, Conversions and Continuations. | 69 |
| Section 2.03. | Additional Provisions with Respect to Letters of Credit | 71 |
| Section 2.04. | Additional Provisions with Respect to Swingline Loans | 80 |
| Section 2.05. | Repayment of Loans | 83 |
| Section 2.06. | Prepayments | 83 |
| Section 2.07. | Termination or Reduction of Commitments | 87 |
| Section 2.08. | Interest | 88 |
| Section 2.09. | Fees | 89 |
| Section 2.10. | Computation of Interest and Fees; Retroactive Adjustments to Applicable Percentage | 90 |
| Section 2.11. | Payments Generally; Administrative Agent's Clawback | 91 |
| Section 2.12. | Sharing of Payments by Lenders | 93 |
| Section 2.13. | Evidence of Debt | 94 |
| Section 2.14. | [Reserved] | 95 |
| Section 2.15. | [Reserved] | 95 |
| Section 2.16. | Cash Collateral | 95 |
| Section 2.17. | Defaulting Lenders | 96 |
| Section 2.18. | Incremental Facilities | 98 |
| Section 2.19. | Amend and Extend Transactions | 104 |

Section 2.20.   Refinancing Facilities .................................................. 106

## ARTICLE 3
### TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01.   Taxes .......................................................................... 110
Section 3.02.   Illegality ..................................................................... 116
Section 3.03.   Inability to Determine Rates ...................................... 117
Section 3.04.   Increased Cost; Capital Adequacy ............................. 120
Section 3.05.   Compensation for Losses ........................................... 122
Section 3.06.   Mitigation Obligations; Replacement of Lenders ....... 122
Section 3.07.   Survival Losses ........................................................... 124

## ARTICLE 4
### GUARANTY

Section 4.01.   The Guaranty .............................................................. 124
Section 4.02.   Obligations Unconditional .......................................... 124
Section 4.03.   Reinstatement ............................................................. 125
Section 4.04.   Certain Waivers .......................................................... 125
Section 4.05.   Remedies ..................................................................... 126
Section 4.06.   Rights of Contribution ................................................ 126
Section 4.07.   Guaranty of Payment; Continuing Guarantee ............. 126
Section 4.08.   Keepwell ..................................................................... 126
Section 4.09.   Release of Guarantors ................................................. 127

## ARTICLE 5
### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 5.01.   [Reserved] ................................................................... 127
Section 5.02.   Conditions to all Credit Extensions after the Closing Date ....... 127

## ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

Section 6.01.   Existence, Qualification and Power ............................ 128
Section 6.02.   Authorization; No Contravention ............................... 129
Section 6.03.   Governmental Authorization; Other Consents ........... 129
Section 6.04.   Binding Effect ............................................................. 129
Section 6.05.   Financial Statements .................................................. 129
Section 6.06.   No Material Adverse Effect ......................................... 129
Section 6.07.   Litigation .................................................................... 129
Section 6.08.   Labor Matters ............................................................ 130
Section 6.09.   Ownership of Property; Liens ..................................... 130
Section 6.10.   Environmental Matters ............................................... 130
Section 6.11.   [Reserved] ................................................................... 130
Section 6.12.   Taxes ........................................................................... 130

ii

Section 6.13.    ERISA Compliance    131
Section 6.14.    Subsidiaries    131
Section 6.15.    Margin Regulations; Investment Company Act    132
Section 6.16.    Disclosure    132
Section 6.17.    Compliance with Laws    132
Section 6.18.    Collateral Documents    132
Section 6.19.    Intellectual Property    133
Section 6.20.    Solvency    133
Section 6.21.    Patriot Act; Sanctioned Persons    133
Section 6.22.    EEA Financial Institutions    134

## ARTICLE 7
### AFFIRMATIVE COVENANTS

Section 7.01.    Financial Statements    134
Section 7.02.    Certificates; Other Information    135
Section 7.03.    Notification    137
Section 7.04.    Payment of Taxes    137
Section 7.05.    Preservation of Existence, Etc    138
Section 7.06.    Maintenance of Properties    138
Section 7.07.    Maintenance of Insurance    138
Section 7.08.    Compliance with Laws; Environmental Laws    138
Section 7.09.    Books and Records    139
Section 7.10.    Inspection Rights    139
Section 7.11.    Use of Proceeds    139
Section 7.12.    Joinder of Subsidiaries as Guarantors    140
Section 7.13.    Further Assurances    141
Section 7.14.    Designation of Subsidiaries    141

## ARTICLE 8
### NEGATIVE COVENANTS

Section 8.01.    Liens    142
Section 8.02.    Investments    145
Section 8.03.    Indebtedness    148
Section 8.04.    Mergers and Dissolutions    153
Section 8.05.    Dispositions    154
Section 8.06.    Restricted Payments    156
Section 8.07.    Change in Nature of Business    157
Section 8.08.    Change in Fiscal Year    157
Section 8.09.    Transactions with Affiliates    158
Section 8.10.    [Reserved]    158
Section 8.11.    Financial Covenants    158
Section 8.12.    Prepayments etc. of Indebtedness    159
Section 8.13.    Burdensome Agreements    159

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

Section 9.01.   Events of Default ............................................................. 160
Section 9.02.   Remedies Upon Event of Default .................................... 163
Section 9.03.   Application of Funds ....................................................... 163

## ARTICLE 10
### ADMINISTRATIVE AGENT

Section 10.01.   Appointment and Authorization of Administrative Agent ............ 164
Section 10.02.   Rights as a Lender .......................................................... 165
Section 10.03.   Exculpatory Provisions ................................................... 165
Section 10.04.   Reliance by Administrative Agent ................................... 167
Section 10.05.   Delegation of Duties ....................................................... 167
Section 10.06.   Resignation of the Administrative Agent ........................ 167
Section 10.07.   Non-Reliance on Administrative Agent and Other Lenders ...... 168
Section 10.08.   No Other Duties ............................................................... 169
Section 10.09.   Administrative Agent May File Proofs of Claim; Credit Bidding ... 169
Section 10.10.   Collateral and Guaranty Matters ..................................... 170
Section 10.11.   Swap Contracts and Treasury Management Agreements ... 171
Section 10.12.   Compliance with ERISA .................................................. 172
Section 10.13.   Recovery of Erroneous Payments .................................. 173

## ARTICLE 11
### MISCELLANEOUS

Section 11.01.   Amendments, Etc .............................................................. 173
Section 11.02.   Notices; Effectiveness; Electronic Communications ....... 178
Section 11.03.   No Waiver; Cumulative Remedies; Enforcement ............ 180
Section 11.04.   Expenses; Indemnity; Damage Waiver ........................... 181
Section 11.05.   Payments Set Aside ......................................................... 183
Section 11.06.   Successors and Assigns .................................................. 183
Section 11.07.   Treatment of Certain Information; Confidentiality ........... 190
Section 11.08.   Right of Setoff ................................................................. 191
Section 11.09.   Interest Rate Limitation ................................................... 192
Section 11.10.   Integration; Effectiveness ............................................... 192
Section 11.11.   Survival of Representations and Warranties .................... 193
Section 11.12.   Severability ...................................................................... 193
Section 11.13.   Replacement of Lenders .................................................. 193
Section 11.14.   Governing Law; Jurisdiction; Etc .................................... 194
Section 11.15.   Waiver of Jury Trial ........................................................ 195
Section 11.16.   USA Patriot Act Notice ................................................... 196
Section 11.17.   Termination ...................................................................... 196
Section 11.18.   No Advisory or Fiduciary Responsibility ........................ 196
Section 11.19.   Electronic Execution; Electronic Records; Counterparts ... 197

iv

Section 11.20.   Acknowledgment and Consent to Bail-In of Affected Financial
               Institutions ................................................................................. 197
Section 11.21.   Judgment Currency ...................................................................... 198
Section 11.22.   Acknowledgement Regarding Any Supported QFCs ................... 199
Section 11.23.   Intercreditor Agreements ............................................................ 200

v

SCHEDULES

Schedule I            Guarantors
Schedule 2.01         Lenders and Commitments
Schedule 6.14         Subsidiaries
Schedule 8.01         Existing Liens
Schedule 8.02         Existing Investments
Schedule 8.03         Existing Indebtedness
Schedule 8.09         Transactions with Affiliates
Schedule 8.13         Burdensome Agreements
Schedule 11.02        Notice Addresses

EXHIBITS

Exhibit 1.01-1        Form of Perfection Certificate
Exhibit 1.01-2        Form of Security Agreement
Exhibit 1.01-3        Form of Intercompany Note
Exhibit 1.01-4        Form of First Lien Intercreditor Agreement
Exhibit 1.01-5        Form of Junior Lien Intercreditor Agreement
Exhibit 2.02          Form of Loan Notice
Exhibit 2.13-1        Form of Revolving Credit Note
Exhibit 2.13-2        Form of Swingline Note
Exhibit 2.13-3        Form of Term Note
Exhibit 5.01(j)       Form of Solvency Certificate
Exhibit 7.02(a)       Form of Compliance Certificate
Exhibit 7.12          Form of Joinder Agreement
Exhibit 11.06(b)      Form of Assignment and Assumption
Exhibit 11.06(i)      Dutch Auction Procedures

# CREDIT AGREEMENT

This CREDIT AGREEMENT, dated as of May 2, 2016 (as amended by Amendment No. 1, dated as of June 27, 2017, as amended by Amendment No. 2, dated as of December 21, 2017, as amended by Amendment No. 3, dated as of September 28, 2018, as amended by Amendment No. 4, dated as of February 28, ~~2022~~2022, as amended by Amendment No. 5, dated as of November 7, 2023 and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**" or the "**Agreement**") is entered into by MERCURY SYSTEMS, INC., a Massachusetts corporation (the "**Borrower**"), the Guarantors identified herein, each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**") and BANK OF AMERICA, N.A., as Administrative Agent, Collateral Agent, Swingline Lender and L/C Issuer.

## PRELIMINARY STATEMENTS

The Borrower has requested that the Lenders extend credit to the Borrower in the form of an upsized revolving credit facility with an initial aggregate principal amount of commitments of $1,100,000,000. The revolving credit facility will permit the issuance of one or more Letters of Credit from time to time and the making of one or more Revolving Credit Loans and/or Swingline Loans from time to time.

The proceeds of the revolving credit facility and the commitments hereunder made available on the Amendment No. 4 Effective Date will be used by the Borrower for general corporate purposes (including Acquisitions and other purposes not prohibited hereunder).

The Lenders have indicated their willingness to lend and the L/C Issuer has indicated its willingness to issue letters of credit, in each case, on the terms and subject to the conditions set forth herein.

In consideration of these premises and the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

## ARTICLE 1
### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01. *Defined Terms*. As used in this Credit Agreement, the following terms have the meanings provided below:

"**Acquired Indebtedness**" means, with respect to any specified Person,

(a) Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging, amalgamating or consolidating with or into, or becoming a Restricted Subsidiary of, such specified Person; and

[Credit Agreement]

(b)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"**Acquisition**" means the purchase or acquisition by any Person of (a) more than 50% of the Capital Stock with ordinary voting power of another Person (including as a result of the purchase by such Person of Capital Stock of an existing joint venture to the extent that after giving effect thereto, such Person owns more than 50% of such Capital Stock) or (b) all or any substantial portion of the property (other than Capital Stock) of, or a business unit, a line of business or division of, another Person, whether or not involving a merger or consolidation with such Person.

"**Act**" has the meaning provided in Section 11.16.

"**Additional Lender**" means, at any time, any Person that is not an existing Lender and that agrees to provide any portion of any (a) Incremental Loans or Incremental Commitments pursuant to an Incremental Amendment in accordance with Section 2.18 or (b) Refinancing Facilities pursuant to a Refinancing Amendment in accordance with Section 2.20; *provided* that such Additional Lender shall be (x) with respect to Incremental Term Loans, Incremental Term Commitments or Refinancing Term Loans, an Eligible Assignee with respect to Term Loans and (y) with respect to Incremental Revolving Commitments or Refinancing Revolving Commitments, an Eligible Assignee with respect to Revolving Credit Commitments.

"**Adequate Assurance**" means (i) with respect to L/C Obligations, such assurance as the L/C Issuer may reasonably require, and (ii) with respect to Swingline Loans, such assurance as the Swingline Lender may reasonably require, in each case, that any Defaulting Lender will be capable of honoring its obligations to fund its portion of L/C Obligations and Swingline Loans, as appropriate, and participation interests therein, including existing and future obligations hereunder and under the other Credit Documents.  Adequate Assurance may be in the form of cash collateral, posting of letters of credit or other arrangement, in each case in form, amount and other respects reasonable satisfactory to the L/C Issuer or the Swingline Lender, as applicable, in their discretion.

"**Administrative Agent**" means Bank of America in its capacity as administrative agent under any of the Credit Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 11.02 (as may be updated from time to time), or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an administrative questionnaire for the Lenders in a form supplied by the Administrative Agent.

"**Affected Financial Institution**" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

[Credit Agreement]

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agent Parties**" has the meaning provided in Section 11.02(c).

"**Agent-Related Distress Event**" means, with respect to the Administrative Agent or any Person that directly or indirectly Controls the Administrative Agent (each, a "**Distressed Agent-Related Person**"), a voluntary or involuntary case with respect to such Distressed Agent-Related Person under any Debtor Relief Law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Agent-Related Person or any substantial part of such Distressed Agent-Related Person's assets, or such Distressed Agent-Related Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Agent-Related Person to be, insolvent or bankrupt; *provided* that an Agent-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any Capital Stock in the Administrative Agent or any Person that directly or indirectly Controls the Administrative Agent by a Governmental Authority or an instrumentality thereof.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent and the Arrangers.

"**Aggregate Commitment Percentage**" means (a) in respect of the Term Loan Facility, with respect to any Term Lender at any time, the percentage (carried out to the ninth decimal place) of the Term Loan Facility represented by the principal amount of such Term Lender's Term Loans at such time and (b) in respect of the Revolving Credit Facility, with respect to any Revolving Credit Lender at any time, the percentage (carried out to the ninth decimal place) of the Revolving Credit Facility represented by such Revolving Credit Lender's Revolving Credit Commitment at such time. If the Revolving Credit Commitments have been terminated pursuant to Section 9.02 or have expired, then the Aggregate Commitment Percentage of each Revolving Credit Lender in respect of the Revolving Credit Facility shall be determined based on the Aggregate Commitment Percentage of such Revolving Credit Lender in respect of the Revolving Credit Facility most recently in effect, giving effect to any subsequent assignments. The initial Aggregate Commitment Percentage of each Lender, as of the Amendment No. 4 Effective Date is set forth opposite the name of such Lender on Schedule 2.01 to Amendment No. 4 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"**Aggregate Commitments**" means the Commitments of all Lenders.

"**Aggregate Revolving Credit Commitments**" means the Revolving Credit Commitments of all Revolving Credit Lenders.

"**Aggregate Revolving Credit Committed Amount**" has the meaning provided in Section 2.01(b).

"**Agreed Currency**" means Dollars or any Alternative Currency, as applicable.

[Credit Agreement]

"**Agreement**" has the meaning provided in the introductory paragraph hereto.

"**Agreement Currency**" has the meaning specified in Section 11.21.

"**Alternative Currency**" means the following currencies: Euros and Sterling, together with each other currency (other than Dollars) that is approved in accordance with Section 1.11, provided that for each Alternative Currency, such requested currency is an Eligible Currency.

"**Alternative Currency Daily Rate**" means, for any day, with respect to any Credit Extension:

      (a)    denominated in Sterling, the rate per annum equal to SONIA determined pursuant to the definition thereof plus the SONIA Adjustment; and

      (b)    denominated in any other Alternative Currency (to the extent such Loans denominated in such currency will bear interest at a daily rate), the daily rate per annum as designated with respect to such Alternative Currency at the time such Alternative Currency is approved by the Administrative Agent and the relevant Lenders pursuant to Section 1.11(a) plus the adjustment (if any) determined by the Administrative Agent and the relevant Lenders pursuant to Section 1.11(a);

provided, that, if any Alternative Currency Daily Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement. Any change in an Alternative Currency Daily Rate shall be effective from and including the date of such change without further notice.

"**Alternative Currency Daily Rate Loan**" means a Loan that bears interest at a rate based on the definition of "Alternative Currency Daily Rate." All Alternative Currency Daily Rate Loans must be denominated in an Alternative Currency.

"**Alternative Currency Equivalent**" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the Administrative Agent or the L/C Issuer, as the case may be, by reference to Bloomberg (or such other publicly available service for displaying exchange rates), to be the exchange rate for the purchase of such Alternative Currency with Dollars at approximately 11:00 a.m. on the date two (2) Business Days prior to the date as of which the foreign exchange computation is made; provided, however, that if no such rate is available, the "Alternative Currency Equivalent" shall be determined by the Administrative Agent or the L/C Issuer, as the case may be, using any reasonable method of determination its deems appropriate in its discretion (which shall be conclusive absent manifest error).

"**Alternative Currency Loan**" means an Alternative Currency Daily Rate Loan or an Alternative Currency Term Rate Loan, as applicable.

"**Alternative Currency Rate**" means, with respect to an Alternative Currency Loan that is (x) an Alternative Currency Daily Rate Loans, the Alternative Currency Daily Rate and (y) an Alternative Currency Term Rate Loan, the Alternative Currency Term Rate.

[Credit Agreement]

"**Alternative Currency Term Rate**" means, for any Interest Period, with respect to any Credit Extension:

(a)    denominated in Euros, the rate per annum equal to the Euro Interbank Offered Rate ("**EURIBOR**"), as published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) on the day that is two TARGET Days preceding the first day of such Interest Period with a term equivalent to such Interest Period; and

(b)    denominated in any other Alternative Currency (to the extent such Loans denominated in such currency will bear interest at a term rate), the term rate per annum as designated with respect to such Alternative Currency at the time such Alternative Currency is approved by the Administrative Agent and the relevant Lenders pursuant to Section 1.11(a) plus the adjustment (if any) determined by the Administrative Agent and the relevant Lenders pursuant to Section 1.11(a);

provided, that, if any Alternative Currency Term Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

"**Alternative Currency Term Rate Loan**" means a Loan that bears interest at a rate based on the definition of "Alternative Currency Term Rate." All Alternative Currency Term Rate Loans must be denominated in an Alternative Currency.

"**Amendment No. 1**" means Amendment No. 1 to this Agreement, dated as of June 27, 2017, among the Borrower, the Guarantors party thereto, the Administrative Agent and the Lenders party thereto.

"**Amendment No. 1 Effective Date**" means June 27, 2017.

"**Amendment No. 2**" means Amendment No. 2 to this Agreement, dated as of December 21, 2017, among the Borrower, the Guarantors party thereto, the Administrative Agent and the Lenders party thereto.

"**Amendment No. 2 Effective Date**" means December 21, 2017.

"**Amendment No. 3**" means Amendment No. 3 to this Agreement, dated as of September 28, 2018 among the Borrower, the Guarantors party thereto, the Administrative Agent and the Lenders party thereto.

"**Amendment No. 3 Effective Date**" means September 28, 2018.

"**Amendment No. 4**" means Amendment No. 4 to this Agreement, dated as of February 28, 2022 among the Borrower, the Guarantors party thereto, the Administrative Agent and the Lenders party thereto.

"**Amendment No. 4 Effective Date**" means February 28, 2022.

[Credit Agreement]

"**Amendment No. 5**" means Amendment No. 5 to this Agreement, dated as of November 7, 2023 among the Borrower, the Guarantors party thereto, the Administrative Agent and the Lenders party thereto.

"**Amendment No. 5 Effective Date**" means November 7, 2023.

"**Annual Financial Statements**" means the audited consolidated balance sheets and related statements of comprehensive income, shareholders' equity and cash flows of the Borrower for the fiscal years ended June 30, 2016, June 30, 2017 and June 30, 2018.

"**Applicable Authority**" means (a) with respect to SOFR, the SOFR Administrator or any Governmental Authority having jurisdiction over the Administrative Agent or the SOFR Administrator with respect to its publication of SOFR, in each case acting in such capacity and (b) with respect to any Alternative Currency, the applicable administrator for the Relevant Rate for such Alternative Currency or any Governmental Authority having jurisdiction over the Administrative Agent or such administrator with respect to its publication of the applicable Relevant Rate in each case acting in such capacity.

"**Applicable Percentage**" means in respect of the Revolving Credit Facility, the following percentages per annum, based on the Consolidated Total Net Leverage Ratio as set forth in the most recent Compliance Certificate received by the Administrative Agent pursuant to Section 7.02(a); *provided* that from the Amendment No. 4 Effective Date until the receipt by the Administrative Agent of the Compliance Certificate with respect to the first full fiscal quarter of the Borrower following the Amendment No. 4 Effective Date, Pricing Level II shall apply to the Revolving Credit Loans, the Letter of Credit Fee and the Commitment Fee:

| Pricing Level | Consolidated Total Net Leverage Ratio | Applicable Percentage for | | | | | |
|---|---|---|---|---|---|---|---|
| | | Term SOFR Loans | Base Rate Loans | Alternative Currency Daily Rate Loans | Alternative Currency Term Rate Loans | Letter of Credit Fees | Commitment Fee |
| I | Less than or equal to 1.00:1.00 | 1.000% | 0.000% | 1.000% | 1.000% | 1.000% | 0.150% |
| II | Greater than 1.00:1.00 but less than or equal to 2.00:1.00 | 1.250% | 0.250% | 1.250% | 1.250% | 1.250% | 0.200% |
| III | Greater than 2.00:1.00 but less than or equal to 3.00:1.00 | 1.375% | 0.375% | 1.375% | 1.375% | 1.375% | 0.250% |
| IV | Greater than 3.00:1.00 but less than or equal to 4.00:1.00 | 1.500% | 0.500% | 1.500% | 1.500% | 1.500% | 0.300% |

[Credit Agreement]

| Pricing Level | Consolidated Total Net Leverage Ratio | Applicable Percentage for | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Term SOFR Loans | Base Rate Loans | Alternative Currency Daily Rate Loans | Alternative Currency Term Rate Loans | Letter of Credit Fees | Commitment Fee |
| V | Greater than 4.00:1.00 but less than or equal to 4.50:1.00 | 1.750% | 0.750% | 1.750% | 1.750% | 1.750% | 0.350% |
| VI | Greater than 4.50:1.00 | [2.000]% | 1.000 % | 2.000 | 2.000 | 2.000 % | 0.400% |

Any increase or decrease in the Applicable Percentage resulting from a change in the Consolidated Total Net Leverage Ratio shall become effective on the date a Compliance Certificate is delivered pursuant to Section 7.02(a); *provided*, *however*, that if (i) a Compliance Certificate is not delivered when due in accordance therewith, then Pricing Level VVI shall apply as of the first Business Day after the date on which such Compliance Certificate was required to have been delivered until the first Business Day after the date on which such Compliance Certificate was delivered and (ii) at the option of the Administrative Agent or the Required Lenders, as of the first Business Day after (x) in the case of an Event of Default under Section 9.01(a) that has occurred and is continuing, the delivery of written notice to the Borrower or (y) in the case of an Event of Default under Section 9.01(f) that has occurred and is continuing, the date such Event of Default shall have occurred, then in either case Pricing Level VVI shall apply, and shall continue to so apply to but excluding the date on which such Event of Default is cured, waived or no longer continuing (and thereafter the Pricing Level otherwise determined in accordance with this definition shall apply).

Notwithstanding the foregoing, (v) the Applicable Percentage in respect of any Class of Extended Revolving Commitments or any Extended Term Loans or Revolving Credit Loans or Swingline Loan made pursuant to any Extended Revolving Commitments shall be the applicable percentages per annum set forth in the relevant Extension Amendment, (w) the Applicable Percentage in respect of any Class of Incremental Commitments, and Class of Incremental Term Loans or any Class of Incremental Revolving Loans shall be the applicable percentages per annum set forth in the relevant Incremental Amendment, (x) the Applicable Percentage in respect of any Class of Replacement Term Loans shall be the applicable percentages per annum set forth in the relevant agreement, (y) the Applicable Percentage in respect of any Class of Refinancing Revolving Commitments, any Class of Refinancing Revolving Loans or any Class of Refinancing Term Loans shall be the applicable percentages per annum set forth in the relevant Refinancing Amendment and (z) in the case of any Term Loans and any Class of Incremental Term Loans, the Applicable Percentage shall be increased as, and to the extent, necessary to comply with the provisions of Section 2.18.

"**Applicable Time**" means, with respect to any payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be reasonably determined by the L/C Issuer and notified to the Borrower at the time such Letter of Credit is

[Credit Agreement]

issued to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"**Appropriate Lender**" means, at any time, (a) with respect to either the Term Loan Facility or the Revolving Credit Facility, a Lender that has a Commitment with respect to such Facility or holds a Term Loan or a Revolving Credit Loan, respectively, at such time, (b) with respect to the L/C Sublimit, (i) the L/C Issuer and (ii) if any Letters of Credit have been issued pursuant to Section 2.03(a), the Revolving Credit Lenders and (c) with respect to the Swingline Sublimit, (i) the Swingline Lender and (ii) if any Swingline Loans are outstanding pursuant to Section 2.04(a), the Revolving Credit Lenders.

"**Approved Bank**" means (a) any Lender, (b) any domestic commercial bank of recognized standing having combined capital and surplus in excess of $250,000,000 or any foreign bank of recognized standing having capital and surplus in excess of $100,000,000 (or the Dollar Equivalent as of the date of determination) or (c) any bank whose short-term commercial paper rating from S&P is at least A-2 or the equivalent thereof or from Moody's is at least P-2 or the equivalent thereof.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Arrangers**" means BofA, Citibank, N.A., JPMorgan Chase Bank, N.A. and Truist Securities, Inc., in their respective capacities as joint lead arrangers, joint book managers and co-syndication agents.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignees**" has the meaning set forth in Section 11.06(b).

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06 and accepted by the Administrative Agent), in substantially the form of Exhibit 11.06(b) or any other form approved by the Administrative Agent.

"**Attributable Indebtedness**" means, subject to Section 1.03(a), on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auction**" has the meaning provided in Section 11.06(i).

"**Auction Manager**" means the Administrative Agent.

"**Auction Procedures**" means the Dutch Auction Procedures set forth on Exhibit 11.06(i).

[Credit Agreement]

"**Auto-Extension Letter of Credit**" has the meaning provided in Section 2.03(b)(iii).

"**Auto-Reinstatement Letter of Credit**" has the meaning provided in Section 2.03(b)(iv).

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act of 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bank of America**" means Bank of America, N.A., together with its successors.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended.

"**Base Rate**" shall mean for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1.00%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate," (c) Term SOFR applicable for an interest period of one month plus 1.00% and (d) 1.00%. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change. If the Base Rate is being used as an alternate rate of interest pursuant to Section 3.03 hereof, then the Base Rate shall be the greater of clauses (a), (b) and (d) above and shall be determined without reference to clause (c) above.

"**Base Rate Loan**" means a Revolving Credit Loan or a Term Loan that bears interest based on the Base Rate.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

"**BofA**" means BofA Securities, Inc., together with its successors.

"**Borrower**" has the meaning provided in the introductory paragraph hereto.

[Credit Agreement]

"**Borrowing**" means a Revolving Credit Borrowing, a Swingline Borrowing or a Term Borrowing, as the context may require.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located; provided that:

> (a)    if such day relates to any interest rate settings as to an Alternative Currency Loan denominated in Euro, any fundings, disbursements, settlements and payments in Euro in respect of any such Alternative Currency Loan, or any other dealings in Euro to be carried out pursuant to this Agreement in respect of any such Alternative Currency Loan, means a Business Day that is also a TARGET Day;

> (b)    if such day relates to any interest rate settings as to an Alternative Currency Loan denominated in Sterling, means a day other than a day banks are closed for general business in London because such day is a Saturday, Sunday or a legal holiday under the laws of the United Kingdom;

> (c)    if such day relates to any interest rate settings as to an Alternative Currency Loan denominated in a currency other than Euro or Sterling, means any such day on which dealings in deposits in the relevant currency are conducted by and between banks in the applicable offshore interbank market for such currency; and

> (d)    if such day relates to any fundings, disbursements, settlements and payments in a currency other than Euro in respect of an Alternative Currency Loan denominated in a currency other than Euro, or any other dealings in any currency other than Euro to be carried out pursuant to this Agreement in respect of any such Alternative Currency Loan (other than any interest rate settings), means any such day on which banks are open for foreign exchange business in the principal financial center of the country of such currency.

"**Capital Stock**" means (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"**Capitalized Leases**" means, subject to the second sentence of the first paragraph of Section 1.03, all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"**Capitalized Software Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and the Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as

[Credit Agreement]

capitalized costs on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries.

"**Cash Collateral**" has the meaning provided in the definition of "Cash Collateralize."

"**Cash Collateralize**" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Administrative Agent, the L/C Issuer or the Swingline Lender (as applicable) and the Revolving Credit Lenders, as collateral for L/C Obligations, Obligations in respect of Swingline Loans, or obligations of Revolving Credit Lenders to fund participations in respect of either thereof (as the context may require), cash or deposit account balances or, if the L/C Issuer or the Swingline Lender benefitting from such collateral shall agree in its sole discretion, other credit support ("**Cash Collateral**"), in each case pursuant to documentation in form and substance reasonable satisfactory to (a) the Administrative Agent and (b) the L/C Issuer or the Swingline Lender (as applicable). Derivatives of such term have corresponding meanings.

"**Cash Equivalents**" means to the extent owned by the Borrower or any Restricted Subsidiary: (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twenty four (24) months from the date of acquisition, (b) time deposits or eurodollar time deposits with, insured certificates of deposit, bankers' acceptances or overnight bank deposits of, or letters of credit issued by, any Approved Bank, in each case with maturities of not more than twenty four (24) months from the date of acquisition, (c) commercial paper and variable or fixed rate notes issued by any Approved Bank (or by the parent company thereof) or any variable rate notes issued by, or guaranteed by, any domestic corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, and maturing within twelve months of the date of acquisition, (d) repurchase agreements entered into by any Person with a bank or trust company (including any of the Lenders) or recognized securities dealer having capital and surplus in excess of $250,000,000 for direct obligations issued by or fully guaranteed by the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least one hundred percent (100%) of the amount of the repurchase obligations, (e) Investments (classified in accordance with GAAP as current assets) in money market investment programs registered under the Investment Company Act of 1940 that are administered by reputable financial institutions having capital of at least $250,000,000 and the portfolios of which are limited to Investments of the character described in the foregoing subclauses hereof, (f) securities with average maturities of twenty four (24) months or less from the date of acquisition issued or fully guaranteed (1) by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by (2) any foreign government, in each case, having an investment grade rating from either S&P or Moody's (or the equivalent thereof), (g) Investments (other than in structured investment vehicles and structured financing transactions) with average maturities of twelve (12) months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's, (h) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing and local currencies held by them from time to

[Credit Agreement]

time in the ordinary course of business and not for speculation, (i) securities with maturities of twelve (12) months or less from the date of acquisition backed by standby letters of credit issued by an Approved Bank and (j) investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (i) above.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holdco**" means any Domestic Subsidiary that has no material assets other than Capital Stock (or Capital Stock and indebtedness) of one or more Foreign Subsidiaries that are CFCs or any other Domestic Subsidiary that itself is a CFC Holdco.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, issued or implemented; *provided* that a Lender shall be entitled to compensation with respect to any such adoption taking effect, making or issuance becoming effective after the date of this Agreement only if it is the applicable Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

"**Change of Control**" means the occurrence of any of the following:

(a)    any person or persons constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), becomes the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of equity interests representing more than thirty-five (35%) of the aggregate ordinary voting power represented by the issued and outstanding equity interests of the Borrower;

(b)    the first day on which a majority of the members of the Board of Directors of the Borrower are not Continuing Directors; or

(c)    a "change of control" (or similar event) shall occur in any document pertaining to the Incremental Equivalent Debt, Refinancing Equivalent Debt, Ratio Debt or any refinancing thereof; *provided* that such debt is in an aggregate outstanding principal amount in excess of $15,000,000.

[Credit Agreement]

"**Class**" means (i) with respect to Commitments or Loans, those of such Commitments or Loans that have the same terms and conditions (without regard to differences in the Type of Loan, Interest Period, upfront fees, OID or similar fees paid or payable in connection with such Commitments or Loans, or differences in tax treatment (*e.g.*, "fungibility")); *provided* that such Commitments or Loans may be designated in writing by the Borrower and Lenders holding such Commitments or Loans as a separate Class from other Commitments or Loans that have the same terms and conditions and (ii) with respect to Lenders, those of such Lenders that have Commitments or Loans of a particular Class.

"**Closing Date**" means May 2, 2016.

"**Closing Fee**" has the meaning provided in Section 2.09(d).

"**Collateral**" means the collateral identified in, and at any time covered by, the Collateral Documents.

"**Collateral Agent**" means Bank of America, in its capacity as collateral agent under any of the Credit Documents, or any successor collateral agent.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

      (a)     the Administrative Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date, pursuant to Section 5.01(a) of this Agreement as in effect on the Closing Date and (ii) at such time as may be designated therein, pursuant to the Collateral Documents, Section 7.12 or 7.13, subject, in each case, to the limitations and exceptions of this Credit Agreement and the Collateral Documents, duly executed by each Credit Party thereto;

      (b)     all Obligations (other than, with respect to any Guarantor, any Excluded Swap Obligations of such Guarantor) shall have been unconditionally guaranteed by each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary (other than any Excluded Subsidiary) including those that, as of the Amendment No. 4 Effective Date, are listed on Schedule I hereto (each, a "**Guarantor**");

      (c)     the Obligations and the Guaranty shall have been secured by a first-priority security interest (subject to Permitted Liens) in (i) all Capital Stock of each Restricted Subsidiary that is a Domestic Subsidiary (other than a Domestic Subsidiary described in the following clause (ii)(A)) that is directly owned by the Borrower or any Guarantor and (iii) 65% of the issued and outstanding Capital Stock directly owned by the Borrower or any Guarantor of (A) each Restricted Subsidiary that is a CFC Holdco and (B) each Restricted Subsidiary that is a Foreign Subsidiary; and

      (d)     except to the extent otherwise provided hereunder, or under any Collateral Document, the Obligations and the Guaranty shall, subject to Permitted Liens, have been secured by a perfected first-priority security interest (to the extent such security interest may be perfected by delivering certificated securities or instruments, filing financing statements under the Uniform Commercial Code or making any necessary filings with the

[Credit Agreement]

United States Patent and Trademark Office or United States Copyright Office or to the extent required in the Security Agreement or this Agreement) in substantially all tangible and intangible assets of the Borrower and each Guarantor (including accounts receivable, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, intercompany notes and proceeds of the foregoing), in each case, with the priority required by the Collateral Documents, and in each case subject to exceptions and limitations otherwise set forth in this Credit Agreement and the Collateral Documents;

*provided*, *however*, that the foregoing definition shall not require and the Credit Documents shall not contain any requirements as to the creation or perfection of pledges of, security interests in, or taking other actions with respect to any Excluded Property.

The Administrative Agent may grant extensions of time for the perfection of security interests in particular assets and the delivery of assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Credit Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Credit Agreement or the Collateral Documents.

No actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. or to perfect such security interests, including any intellectual property registered in any non-U.S. jurisdiction (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction). No actions shall be required with respect to Collateral requiring perfection through control agreements or perfection by "control" (as defined in the UCC) (including deposit accounts or other bank accounts or securities accounts) or possession, other than in respect of (i) certificated Capital Stock of wholly owned Restricted Subsidiaries directly owned by the Borrower or by any Guarantor otherwise required to be pledged pursuant to the provisions of clause (c) of this definition of "Collateral and Guarantee Requirement" and not otherwise constituting Excluded Property and (ii) Pledged Debt (as defined in the Security Agreement) to the extent required to be delivered to the Administrative Agent pursuant to the terms of the Security Agreement.

"**Collateral Documents**" means the Security Agreement, the Intellectual Property Security Agreements, the Intercreditor Agreements (if any) and any other documents executed and delivered by the Credit Parties in order to grant to the Collateral Agent a security interest in the Collateral as security for the Obligations.

"**Commitment**" means a Term Commitment or a Revolving Credit Commitment, as the context may require.

"**Commitment Fee**" has the meaning set forth in Section 2.09(a)(i).

"**Commitment Period**" means, in respect of the Revolving Credit Facility, the period from and including the Amendment No. 4 Effective Date to the earlier of (a)(i) in the case of Revolving Credit Loans and Swingline Loans, the Revolving Termination Date or (ii) in the case

[Credit Agreement]

of the Letters of Credit, the L/C Expiration Date, or (b) the date on which the Revolving Credit Commitments shall have been terminated as provided herein.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Communication**" means this Agreement, any Credit Document and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to any Credit Document.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit 7.02(a).

"**Conforming Changes**" means, with respect to the use, administration of or any conventions associated with SOFR, SONIA or any proposed Successor Rate for an Agreed Currency or Term SOFR, as applicable, any conforming changes to the definitions of "Base Rate," "SOFR,", "SONIA", "Term SOFR" and "Interest Period," timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definitions of "Business Day" and "U.S. Government Securities Business Day," timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the reasonable discretion of the Administrative Agent in consultation with the Borrower, to reflect the adoption and implementation of such applicable rate(s) and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice for such Agreed Currency (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such rate for such Agreed Currency exists, in such other manner of administration as the Administrative Agent in consultation with the Borrower determines is reasonably necessary in connection with the administration of this Agreement and any other Credit Document).

"**Connection Income Taxes**" means Taxes as described in clause (a)(ii) of "Excluded Taxes" that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Cash Interest Coverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated EBITDA for such Test Period to (b) Consolidated Interest Expense for such Test Period.

"**Consolidated EBITDA**" means, for any period, the Consolidated Net Income for such period, *plus* (a) without duplication, and except with respect to clauses (vii) and (ix) below, to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income, the sum of the following amounts for such period with respect to the Borrower and its Restricted Subsidiaries:

      (i)     total interest expense determined in accordance with GAAP and, to the extent not reflected in such total interest expense, any expense or loss on hedging

obligations or other derivative instruments entered into for the purpose of hedging interest rate risk and not for speculative purposes, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities (whether amortized or immediately expensed),

(ii)     provision for taxes based on income, profits or capital gains of the Borrower and the Restricted Subsidiaries, including federal, state, local, franchise and similar taxes and foreign withholding taxes paid or accrued during such period including penalties and interest related to such taxes or arising from any tax examinations and the net tax expense associated with any adjustments made pursuant to the definition of "Consolidated Net Income,"

(iii)    depreciation and amortization (including amortization of intangible assets, deferred financing fees and Capitalized Software Expenditures) for such period,

(iv)    [reserved],

(v)     (A) restructuring charges or reserves, severance, relocation costs or expenses, integration costs, transition costs, pre-opening, opening, closing and consolidation costs for facilities and one-time compensation charges (including signing, retention and completion bonuses), other costs relating to the closure of facilities or impairment of facilities, costs incurred in connection with acquisitions, other business optimization expenses (including costs and expenses relating to business optimization programs and new systems design, retention charges, systems establishment costs (including information technology systems) and implementation costs), production line start-up costs, severance and other restructuring charges representing cash items (including restructuring costs related to acquisitions and to closure of facilities, and excess pension charges) and (B) earn-out and contingent consideration obligations (including to the extent accounted for as bonuses, compensation or otherwise) and adjustments thereof and purchase price adjustments, in each case in connection with acquisitions, and (C) Transaction Expenses.

(vi)    the amount of any expense or reduction of Consolidated Net Income consisting of Restricted Subsidiary income attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Restricted Subsidiary,

(vii)   cost savings, operating expense reductions and synergies related to mergers and other business combinations, acquisitions, divestitures, restructurings, cost savings initiatives and other similar initiatives and actions that are reasonably identifiable, factually supportable and projected by the Borrower in good faith to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within eighteen (18) months after such merger or other business combination, acquisition or divestiture is consummated or any other restructuring, cost savings initiative or other initiative or action (calculated on a *pro forma* basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions and synergies were realized during the entirety

[Credit Agreement]

of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that no cost savings, operating expense reductions and synergies shall be added back pursuant to this clause (vii) to the extent duplicative of any expenses or charges otherwise added back to Consolidated EBITDA, whether through a *pro forma* adjustment or otherwise, for such period; *provided, further,* that the aggregate amount of adjustments made pursuant to this clause (vii) for any Test Period, when added to the aggregate amount of add backs made pursuant to Section 1.07(c), shall not exceed 25% of Consolidated EBITDA (after giving effect to this clause (vii), Section 1.07(c) and other pro forma adjustments) for such Test Period,

(viii) any net loss from disposed, abandoned or discontinued operations (excluding held-for-sale discontinued operations until actually disposed of),

(ix) cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income or netting arrangement were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back,

(x) non-cash expenses, charges and losses (including reserves, impairment charges or asset write-offs, write-offs of deferred financing fees, losses from investments recorded using the equity method, stock-based awards compensation expense), in each case other than (A) any non-cash charge representing amortization of a prepaid cash item that was paid and not expensed in a prior period and (B) any non-cash charge relating to write-offs, write-downs or reserves with respect to accounts receivable in the normal course or inventory; *provided* that if any non-cash charges referred to in this clause (x) represents an accrual or reserve for potential cash items in any future period, (1) the Borrower may elect not to add back such non-cash charge in the current period and (2) to the extent the Borrower elects to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to such extent paid,

(xi) any fees and expenses incurred during such period (including any premiums, make-whole or penalty payments), or any amortization thereof for such period, in connection with any acquisition, investment, asset disposition, issuance or repayment of debt, issuance of equity securities, refinancing transaction or amendment or other modification of any debt instrument (in each case, including any such transaction consummated on or prior to the Closing Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful (including, for the avoidance of doubt the effects of expensing all transaction related expenses in accordance with FASB ASC 805 and gains or losses associated with FASB ASC 460),

(xii) any non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options,

[Credit Agreement]

restricted stock or other rights or equity incentive programs or any other equity-based compensation,

(xiii)   any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Credit Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 day period),

(xiv)   to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is in fact reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption,

*minus* (b) without duplication and to the extent included in arriving at such Consolidated Net Income, (i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period), (ii) any net income from disposed, abandoned or discontinued operations (excluding held-for-sale discontinued operations until actually disposed of) and (iii) the amount of any minority interest income consisting of Restricted Subsidiary losses attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Restricted Subsidiary; *provided* that, for the avoidance of doubt, any gain representing the reversal of any non-cash charge referred to in clause (a)(x)(B) above for a prior period shall be added (together with, without duplication, any amounts received in respect thereof to the extent not increasing Consolidated Net Income) to Consolidated EBITDA in any subsequent period to such extent so reversed (or received);

*provided further*, that:

(A)   to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA (x) currency translation or transaction gains and losses related to currency remeasurements of Indebtedness (including the net loss or gain (i) resulting from Swap Contracts for currency exchange risk and (ii) resulting from intercompany indebtedness) and (y) all other foreign currency translation or transaction gains or losses to the extent such gains or losses are non-cash items,

(B)   to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of FASB ASC 815 and International Accounting Standard No. 39 and their respective related pronouncements and interpretations,

[Credit Agreement]

(C)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any income (loss or expenses) for such period attributable to the early extinguishment of (i) Indebtedness, (ii) obligations under any Swap Contracts or (iii) other derivative instruments.

For the avoidance of doubt, Consolidated EBITDA shall be calculated, including pro forma adjustments, in accordance with Section 1.07.

"**Consolidated Interest Expense**" means, for any period, the cash interest expense (including that attributable to Capitalized Leases), net of cash interest income, of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, with respect to all outstanding Indebtedness of the Borrower and its Restricted Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net cash costs under Swap Contracts; *provided* that there shall be excluded from Consolidated Interest Expense for any period:

(a)    deferred financing costs, debt issuance costs, commissions, fees (including amendment and contract fees) and expenses and, in each case, the amortization thereof, and any other amounts of non-cash interest,

(b)    the accretion or accrual of discounted liabilities and any prepayment premium or penalty during such period,

(c)    non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under Swap Contracts or other derivative instruments pursuant to FASB ASC 815,

(d)    any cash costs associated with early termination in respect of hedging agreements for interest rates,

(e)    Transaction Expenses,

(f)    annual agency fees paid to the Administrative Agent,

(g)    costs associated with obtaining Swap Contracts,

(h)    any expense resulting from the discounting of any Indebtedness in connection with the application of recapitalization accounting or, if applicable, acquisition accounting in connection with any acquisition, and

(i)    the cash interest expense (or income) of all Unrestricted Subsidiaries for such period to the extent otherwise included in Consolidated Interest Expense.

"**Consolidated Net Income**" means, for any period, net income (or loss) of the Borrower and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, but excluding

[Credit Agreement]

(i)    any after-tax effect of extraordinary, non-recurring or unusual items (including gains or losses and all fees and expenses relating thereto) for such period,

(ii)    the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income,

(iii)    any net after-tax effect of gains or losses (less all fees, expenses and charges relating thereto) on discontinued operations or asset dispositions, abandonments or the sale or other disposition of Capital Stock of any Person, in each case other than in the ordinary course of business (as determined in good faith by the Borrower),

(iv)    the net income (loss) for such period of any Person that is not a Subsidiary of the Borrower, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting; *provided* that Consolidated Net Income of the Borrower shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent subsequently converted into cash or Cash Equivalents) to the Borrower or a Restricted Subsidiary thereof in respect of such period,

(v)    any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a Change in Law, in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP, and

(vi)    the income (or loss) of any Person accrued prior to the date it becomes a Restricted Subsidiary of Borrower or is merged into or consolidated with Borrower or any of its Subsidiaries or that Person's assets are acquired by Borrower or any of its Restricted Subsidiaries shall be excluded (except to the extent required for any calculation of Consolidated EBITDA on a Pro Forma Basis in accordance with Section 1.07).

There shall be excluded from Consolidated Net Income for any period the acquisition accounting effects of adjustments in component amounts required or permitted by GAAP pursuant to FASB ASC 805 (including in the inventory, property and equipment, fair value of leased property, software, goodwill, intangible assets, in-process research and development, deferred revenue, deferred rent, contingent considerations and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries), as a result of any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Amendment No. 4 Effective Date, or the amortization or write-off of any amounts thereof.

"**Consolidated Total Net Debt**" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of acquisition accounting in connection with any

[Credit Agreement]

acquisition constituting an Investment permitted under this Agreement) consisting of Indebtedness for borrowed money, Attributable Indebtedness, and debt obligations evidenced by promissory notes or similar instruments (including purchase money debt) and all guarantees of Indebtedness of such type that is owed by a Person that is not the Borrower or a Restricted Subsidiary, minus (b) the aggregate amount not to exceed for purposes of this clause (b) $150,000,000 of cash and Cash Equivalents (other than Restricted Cash), in each case, included on the consolidated balance sheet of the Borrower and the Restricted Subsidiaries as of such date, free and clear of all Liens (other than Liens permitted by clauses (a), (b), (c), (e), (f), (j), (l), (m), (p), (t) and (w) of Section 8.01 (to the extent, with respect to such clauses (m), (t) and (w) of Section 8.01, such Liens are not first priority Liens or the obligations secured by such Lien are subordinated to the Obligations); *provided* that (A) Consolidated Total Net Debt shall not include Indebtedness in respect of (i) letters of credit, except to the extent of unreimbursed amounts thereunder and (which unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Net Debt until three Business Days after such amount is drawn) and (ii) Unrestricted Subsidiaries and (B) for the avoidance of doubt, it is understood and agreed that obligations under Swap Contracts do not constitute Consolidated Total Net Debt.

"**Consolidated Total Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Continuing Directors**" means, as of any date of determination, any director or manager (or their equivalent) of the Borrower:

> (a)    who was a director or manager (or their equivalent) on the Closing Date; or

> (b)    whose nomination for election to the board of directors or managers (or their equivalent) of the Borrower is recommended by, or is otherwise elected to the board of directors or managers (or their equivalent) with the approval of, a majority of the then Continuing Directors at the time of such nomination or election.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

"**Covenant Relief Period End Date**" means the earlier of (x) May 15, 2024 and (y) the date on which the Compliance Certificate for the Test Period ending March 31, 2024 is delivered pursuant to Section 7.02(a).

[Credit Agreement]

"**Covered Party**" has the meaning provided in Section 11.22.

"**Credit Agreement**" has the meaning provided in the introductory paragraph hereto.

"**Credit Documents**" means this Credit Agreement, the Notes, the Issuer Documents, the Collateral Documents, the Guaranties, each Request for Credit Extension, any agreement creating or perfecting rights in Cash Collateral pursuant to the provisions of Section 2.16 of this Credit Agreement, the Joinder Agreements, and any amendments to any Credit Documents that are deemed pursuant to their terms to be "Credit Documents" for purposes hereof.

"**Credit Extension**" means each of the following: (a) a Borrowing, (b) the conversion or continuation of a Borrowing and (c) an L/C Credit Extension.

"**Credit Parties**" means, collectively, the Borrower and the Guarantors.

"**Credit Party Materials**" has the meaning provided in Section 7.02.

"**Cumulative Equity Credit**" means, at any date, an amount determined on a cumulative basis equal to, without duplication:

(a)    the cumulative amount of cash and Cash Equivalent proceeds from the sale of Qualified Stock of the Borrower after the Closing Date and on or prior to such time (including upon exercise of warrants or options) (other than any amount used to incur Indebtedness pursuant to Section 8.03(o), make Restricted Payments pursuant to Section 8.06(d) or make prepayments of Junior Debt pursuant to Section 8.12(a)) which proceeds have been contributed as common equity to the capital of the Borrower, plus

(b)    100% of the aggregate amount of contributions to the common capital of the Borrower received in cash and Cash Equivalents after the Closing Date (other than any amount used to incur Indebtedness pursuant to Section 8.03(o), make Restricted Payments pursuant to Section 8.06(d) or make prepayments of Junior Debt pursuant to Section 8.12(a)), plus

(c)    an amount equal to any returns in cash and Cash Equivalents (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) actually received by the Borrower or any Restricted Subsidiary in respect of any Investments made pursuant to Section 8.02(m)(y), minus

(d)    any amount of the Cumulative Equity Credit used to make Investments pursuant to Section 8.02(m)(y), make Restricted Payments pursuant to Section 8.06(h)(y) or make payments or distributions in respect of Junior Debt pursuant to Section 8.12(a)(iii)(y) after the Closing Date and prior to such time.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or

[Credit Agreement]

other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event, act or condition that constitutes an Event of Default or that, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"**Default Rate**" means,

(a)    in the case of the Letter of Credit Fee, an interest rate equal to the sum of (i) the Applicable Percentage for Revolving Credit Loans that are Base Rate Loans, *plus* (ii) two percent (2.0%) per annum;

(b)    in the case of Term SOFR Loans under any Facility, an interest rate equal to the sum of (i) Term SOFR therefor, *plus* (ii) the Applicable Percentage in respect of Term SOFR Loans under such Facility, *plus* (iii) two percent (2.0%) per annum;

(c)    in the case of any Alternative Currency Loans under any Facility, an interest rate equal to the sum of (i) the Alternative Currency Rate therefor, *plus* (ii) the Applicable Percentage in respect of such Alternative Currency Loans under such Facility, *plus* (iii) two percent (2.0%) per annum;

(d)    in the case of Base Rate Loans under any Facility, an interest rate equal to the sum of (i) the Base Rate, *plus* (ii) the Applicable Percentage in respect of Base Rate Loans under such Facility, *plus* (iii) two percent (2.0%) per annum; and

(e)    in all other cases, an interest rate equal to the sum of (i) the Base Rate, *plus* (ii) the Applicable Percentage in respect of Revolving Credit Loans that are Base Rate Loans, *plus* (iii) two percent (2.0%) per annum.

"**Defaulting Lender**" means any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default, shall be specifically identified in such writing) has not been satisfied or (ii) pay to the Administrative Agent, the L/C Issuer, the Swingline Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swingline Loans) within two Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent, the L/C Issuer or the Swingline Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable Default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a

[Credit Agreement]

Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) became the subject of a Bail-in Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower, the L/C Issuer, the Swingline Lender and the Lenders.

"**Defaulting Lender Account**" has the meaning provided in Section 2.17(a)(iv).

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease, abandonment or other disposition of any Property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, but excluding, for purposes hereof, (a) Dispositions of obsolete, worn out, surplus or no longer used or useful property, whether now owned or hereafter acquired, (b) Dispositions of inventory and goods held for sale in the ordinary course of business in the ordinary course of business, (c) Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property, (d) Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business, (e) any Involuntary Disposition and (f) the unwinding of any Swap Contract.

"**Disqualified Institutions**" means those Persons (the list of all such Persons, the "**Disqualified Institutions List**") that are (i) identified in writing by the Borrower to the Administrative Agent prior to February 9, 2022, (ii) competitors of the Borrower and its Subsidiaries that are identified in writing by the Borrower to the Administrative Agent from time to time or (iii) Affiliates of such Persons set forth in clauses (i) and (ii) above (in the case of Affiliates of such Persons set forth in clause (ii) above, other than bona fide fixed income investors or debt funds) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name; *provided* that to the extent Persons are identified as Disqualified Institutions in writing by the Borrower to the Administrative Agent after the Closing Date pursuant to clauses (ii) or (iii)(a), the inclusion of such Persons as Disqualified Institutions shall not retroactively apply to prior assignments or participations (or binding agreements to acquire an assignment or

[Credit Agreement]

participation) in respect of any Loan under this Credit Agreement. Until the disclosure of the identity of a Disqualified Institution to the Lenders generally by the Administrative Agent, such Person shall not constitute a Disqualified Institution for purposes of a sale of a participation in a Loan or an assignment of a Loan by a Lender; *provided* that no disclosure of the Disqualified Institutions List (or the identity of any Person that constitutes a Disqualified Institution) to the Lenders shall be made by the Administrative Agent without the prior written consent of the Borrower. Notwithstanding the foregoing, the Borrower, by written notice to the Administrative Agent, may from time to time in its sole discretion remove any entity from the Disqualified Institutions List (or otherwise modify such list to remove any particular entity), and such entity removed from the Disqualified Institutions List shall no longer be a Disqualified Institution for any purpose under this Credit Agreement or any other Credit Document.

"**Disqualified Institutions List**" has the meaning as set forth in the definition of "Disqualified Institutions."

"**Disqualified Stock**" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder of the Capital Stock), or upon the happening of an event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Stock), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations described in clauses (b) and (c) of the definition thereof and (iii) any Letter of Credit that has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the L/C Issuer or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the L/C Issuer) that are accrued and payable and the termination of the Commitments and the termination of all outstanding Letters of Credit (unless the Outstanding Amount of the L/C Obligations related thereto has been Cash Collateralized, back-stopped by a letter of credit reasonably satisfactory to the L/C Issuer or deemed reissued under another agreement reasonably acceptable to the L/C Issuer)), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Stock and other than as a result of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations described in clauses (b) and (c) of the definition thereof and (iii) any Letter of Credit that has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the L/C Issuer or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the L/C Issuer) that are accrued and payable and the termination of the Commitments and the termination of all outstanding Letters of Credit (unless the Outstanding Amount of the L/C Obligations related thereto has been Cash Collateralized, back-stopped by a letter of credit reasonably satisfactory to the L/C Issuer or deemed reissued under another agreement reasonably acceptable to the L/C Issuer)), in whole or in part or (c) is or becomes convertible into or exchangeable for Indebtedness or any other Capital Stock that would constitute Disqualified Stock, in each case, prior to the date that is 91 days after the Latest Maturity Date at the time of issuance of such Capital Stock; *provided* that if such Capital Stock is issued pursuant to a plan for the benefit of future, current or former employees, directors,

[Credit Agreement]

officers, members of management or consultants of the Borrower or the Restricted Subsidiaries or by any such plan to such employees, directors, officers, members of management or consultants, such Capital Stock shall not constitute Disqualified Stock solely because they may be permitted to be repurchased by the Borrower or its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination of employment or service, as applicable, death or disability.

"**Distressed Agent-Related Person**" has the meaning provided in the definition of "Agent-Related Distress Event."

"**Documentation Agents**" means Wells Fargo Bank, National Association, Keybank National Association, U.S. Bank, N.A., TD Bank NA, BMO Harris Bank N.A., Capital One, National Association, Bank of the West and Regions Bank, in their respective capacities as co-documentation agents.

"**Dollar**" or "**$**" means the lawful currency of the United States.

"**Dollar Equivalent**" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any Alternative Currency, the equivalent amount thereof in Dollars as determined by the L/C Issuer at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of any state of the United States or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electronic Copy**" shall have the meaning assigned to such term in Section 11.19.

"**Electronic Record**" and "**Electronic Signature**" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

"**Eligible Assignee**" has the meaning set forth in Section 11.06(a)(i). For the avoidance of doubt, "Eligible Assignee" shall not include any Disqualified Institution.

"**Eligible Currency**" means any lawful currency other than Dollars that is readily available, freely transferable and convertible into Dollars in the international interbank market available to the Lenders or the L/C Issuer, as applicable, in such market and as to which a Dollar Equivalent may be readily calculated. If, after the designation by the Lenders or the L/C Issuer, as applicable, of any currency as an Alternative Currency (or if, with respect to any currency that constitutes an Alternative Currency on the Amendment No. 4 Effective Date, after the Amendment No. 4 Effective Date), any change in currency controls or exchange regulations or any change in the national or international financial, political or economic conditions are imposed in the country in which such currency is issued, result in, in the reasonable opinion of the Administrative Agent (in the case of any Loans to be denominated in an Alternative Currency) or the L/C Issuer (in the case of any Letter of Credit to be denominated in an Alternative Currency), (a) such currency no longer being readily available, freely transferable and convertible into Dollars, (b) a Dollar Equivalent is no longer readily calculable with respect to such currency or (c) providing such currency is impracticable for the Lenders or the L/C Issuer, as applicable, or (d) no longer a currency in which the Required Lenders are willing to make such Credit Extensions (each of clauses (a), (b), (c) and (d), a "**Disqualifying Event**"), then the Administrative Agent shall promptly notify the Lenders and the Borrower, and such country's currency shall no longer be an Alternative Currency until such time as the Disqualifying Event(s) no longer exist(s). Within five (5) Business Days after receipt of such notice from the Administrative Agent, the Borrower shall either, at its sole option, (x), in the case of clauses (a), (b) or (c), repay all Loans in such currency to which the Disqualifying Event applies or (y), in the case of clauses (a), (b), (c) or (d), convert such Loans into the Dollar Equivalent of Loans in Dollars, subject to the other terms contained herein.

"**Environment**" means ambient air, indoor air, surface water, groundwater, drinking water, land surface, sediments, and subsurface strata and natural resources such as wetlands, flora and fauna.

"**Environmental Laws**" means any and all applicable federal, state, local, and foreign statutes, laws (including the common law), regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution, the protection of the Environment or the Release of any Hazardous Materials into the Environment.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of or relating to the Borrower, any other Credit Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) any Environmental Law, including a violation of any Environmental Law, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

[Credit Agreement]

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Offering**" means the issuance by the Borrower of any Capital Stock in an underwritten public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission in accordance with the Securities Act or in a private placement pursuant to an exemption from the Securities Act.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with the Borrower or any other Credit Party is treated as a single employer under Section 414(b) or (c) of the Internal Revenue Code (and Sections 414(m) and (o) of the Internal Revenue Code for purposes of provisions relating to Section 412 of the Internal Revenue Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Credit Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Credit Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition that would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination by the PBGC of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the failure by a Credit Party or any ERISA Affiliate to satisfy the minimum funding standard applicable to a Pension Plan for any plan year under Section 412 of the Internal Revenue Code or Section 303 of ERISA; (g) the determination that any Pension Plan is considered an at-risk plan within the meaning of Section 430 of the Internal Revenue Code or Section 303 of ERISA; (h) receipt by a Credit Party or any ERISA Affiliate of any notice that any Multiemployer Plan is in "endangered" or "critical" status within the meaning of Section 432 of the Internal Revenue Code and Section 305 of ERISA; or (i) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Credit Party or any ERISA Affiliate.

"**Erroneous Party**" shall have the meaning set forth in Section 10.13.

"**Escrow Assumption**" means with respect to any Incremental Term Loan that is initially established as an Escrow Incremental Term Loan, the assumption of the Escrow Borrower's obligations with respect thereto by the Borrower pursuant to an assumption agreement in form reasonably satisfactory to the Administrative Agent.

"**Escrow Borrower**" means a Person that is a U.S. entity and is not the Borrower established to (i) borrow Escrow Incremental Term Loans pending assumption of such

Incremental Term Loans by the Borrower or (ii) assume the obligations of the Borrower with respect to previously incurred Incremental Term Loans, in each case, that is designated in the applicable Incremental Amendment or assumption agreement as an Escrow Borrower and that is not engaged in any material operations and does not have any other material assets other than in connection therewith.

"**Escrow Funding Assignment**" means the assignment by the Borrower to an Escrow Borrower and the assumption by such Escrow Borrower, in each case, of the obligations of the Borrower with respect to previously incurred Incremental Term Loans.

"**Escrow Incremental Term Loan**" means any Incremental Term Loan that either (x) is initially borrowed by an Escrow Borrower or (y) is initially borrowed by the Borrower but was subsequently converted to an Escrow Incremental Term Loans in accordance with Section 2.18, in each case, for so long as the Escrow Assumption with respect to such Incremental Term Loan has not occurred.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Euros**" means the lawful currency of the Participating Member States.

"**Event of Default**" has the meaning provided in Section 9.01.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Excluded Property**" means (i) any fee-owned real property and any leasehold rights and interests in real property (it being understood that there shall be no requirement to obtain landlord waivers, estoppels and collateral access letters), (ii) motor vehicles, aircraft and other assets subject to certificates of title, except to the extent a security interest therein can be perfected by the filing of a UCC financing statement, (iii) Commercial Tort Claims (as defined in the Security Agreement) where the amount of damages claimed by the applicable Credit Party is less than $5,000,000, (iv) governmental licenses or state or local franchises, charters and authorizations and any other property and assets to the extent that the Collateral Agent may not validly possess a security interest therein under applicable Laws (including rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest in which would require governmental consent, approval, license or authorization, other than to the extent such prohibition or limitation is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition or to the extent such consent has been obtained, (v) any particular asset or right under contract, if the pledge thereof or the security interest therein is prohibited or restricted by applicable Law, rule or regulation (including any rules or regulations of any Governmental Authority or agency), or any third party (so long as any agreement with such third party that provides for such prohibition or restriction was not entered into in contemplation of the acquisition of such assets or entering into of such contract for the purpose of creating such prohibition or restriction), other than to the extent any such prohibition or restriction is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition or restriction, (vi) (A) margin stock, (B) Capital Stock in any Unrestricted

[Credit Agreement]

Subsidiaries and (C) Capital Stock in any non-wholly owned Restricted Subsidiaries and any entities which do not constitute Subsidiaries, but only to the extent that (x) the Organization Documents or other agreements with equity holders (other than the Borrower and its Restricted Subsidiaries) of such non-wholly owned Restricted Subsidiary or other entity do not permit or restrict the pledge of such Capital Stock (to the extent such restriction existed on the Closing Date or on the date of acquisition of such non-wholly owned Restricted Subsidiary), or (y) the pledge of such Capital Stock (including any exercise of remedies) would result in a change of control, repurchase obligation or other adverse consequence to any of the Credit Parties or such non-wholly owned Restricted Subsidiary or other entity, (vii) any lease, license or agreement or any property subject to a purchase money security interest, Capitalized Lease obligations or similar arrangement permitted hereunder, in each case permitted hereunder, to the extent the grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money or similar arrangement or create a right of termination in favor of any other party thereto (other than the Borrower or any of its Restricted Subsidiaries) after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC or other applicable Law notwithstanding such prohibition, (viii) any property or assets for which the creation or perfection of pledges of, or security interests in, such property or assets pursuant to the Collateral Documents would result in material adverse tax consequences to the Borrower or any of its Subsidiaries, as reasonably determined by the Borrower in consultation with the Administrative Agent, (ix) letter-of-credit rights, except to the extent the security interest therein may be perfected by the filing of a UCC financing statement, (x) (A) payroll and other employee wage and benefit accounts, (B) tax accounts, including sales tax accounts, (C) escrow accounts and (D) fiduciary or trust accounts and, in the case of clauses (A) through (D), the funds or other property held in or maintained in any such account (as long as the accounts described in clauses (A) through (D) are used solely for such purposes), (xi) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal Law and (xii) assets in circumstances where the cost of obtaining a security interest in such assets, including the cost of title insurance, surveys or flood insurance (if necessary), would be excessive in light of the practical benefit to the Lenders afforded thereby as reasonably determined together by the Borrower and the Administrative Agent; *provided*, *however*, that Excluded Property shall not include any proceeds, substitutions or replacements of any Excluded Property referred to in clause (i) through (xii) (unless such proceeds, substitutions or replacements would independently constitute Excluded Property referred to in clauses (i) through (xii)).

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a Wholly Owned Subsidiary of the Borrower or a Guarantor, (b) any Subsidiary that is prohibited by applicable Law or by Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from guaranteeing the Obligations or if guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization, (c) any Subsidiary where the Administrative Agent and the Borrower agree that the cost of obtaining a Guaranty by such Subsidiary would be excessive in light of the practical benefit to the Lenders afforded thereby,

[Credit Agreement]

(d) any Foreign Subsidiary, (e) any not-for-profit Subsidiaries, (f) any Unrestricted Subsidiaries, (g) any special purpose securitization vehicle (or similar entity), (h) any CFC Holdco, (i) any Domestic Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary that is a CFC, and (j) any Subsidiary, the obtaining of a Guaranty with respect to which would result in material adverse tax consequences as reasonably determined by the Borrower in consultation with the Administrative Agent.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guaranty thereof) (after giving effect to any keepwell, support or other agreement provided by the Borrower or any of its Subsidiaries with respect to the obligations of such Guarantor) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty or security interest is or becomes illegal.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of any Credit Party hereunder, (a) Taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), in each case (i) by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, or (ii) as the result of any other present or former connection between such recipient and the jurisdiction imposing such Tax (other than any connection arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to or enforced any Credit Documents, or sold or assigned an interest in any Loan or Credit Document), (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which a Lender is located, (c) any U.S. federal withholding Taxes required to be withheld from amounts payable to a Lender that has failed to comply with clause (A) of Section 3.01(e)(ii), (d) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 11.13), any United States federal withholding tax that (i) is required to be imposed on amounts payable to such Foreign Lender pursuant to the Laws in force at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office, other than in the case of a designation under Section 3.06(a)), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the applicable Credit Party with respect to such withholding tax pursuant to Section 3.01(a)(ii) or (c), (e) U.S. federal backup withholding Taxes, and (f) any Taxes imposed under FATCA.

[Credit Agreement]

"**Extended Revolving Commitment**" means any Class of Revolving Credit Commitments the maturity of which shall have been extended pursuant to Section 2.19.

"**Extended Revolving Loans**" means any Revolving Credit Loans made pursuant to the Extended Revolving Commitments.

"**Extended Term Loans**" means any Class of Term Loans the maturity of which shall have been extended pursuant to Section 2.19.

"**Extension**" has the meaning provided in Section 2.19(a).

"**Extension Amendment**" has the meaning provided in Section 2.19(d).

"**Extension Offer**" has the meaning provided in Section 2.19(a).

"**Facility**" means the Term Loan Facility or the Revolving Credit Facility, as the context may require.

"**FASB ASC**" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version described above) and any intergovernmental agreement (and related fiscal or regulatory legislation, or related official rules or practices) implementing the foregoing.

"**FCPA**" has the meaning provided in Section 6.21(a).

"**Federal Funds Rate**" means, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; *provided* that if the Federal Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Financial Covenants**" means the covenants set forth in Section 8.11.

"**First Lien Intercreditor Agreement**" means an intercreditor agreement substantially in the form of Exhibit 1.01-4 hereto (which agreement in such form, or with immaterial changes thereto, the Administrative Agent is authorized to enter into) together with any material changes thereto which are reasonably acceptable to the Administrative Agent and which material changes shall be posted to the Lenders not less than five (5) Business Days before execution thereof and, if the Required Lenders shall not have objected to such changes within five (5) Business Days

[Credit Agreement]

after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's entry into such intercreditor agreement (with such changes) is reasonable and to have consented to such intercreditor agreement (with such changes) and to the Administrative Agent's execution thereof.

"**Fixed Amounts**" has the meaning set forth in Section 1.09(e).

"**Foreign Disposition**" has the meaning provided in Section 2.06(b)(ii)(D).

"**Foreign Lender**" means any Lender that is not a United States person for U.S. federal income tax purposes.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender, (a) with respect to the L/C Issuer, such Defaulting Lender's Aggregate Commitment Percentage of the outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Credit Lenders or Cash Collateralized in accordance with the terms hereof, and (b) with respect to the Swingline Lender, such Defaulting Lender's Aggregate Commitment Percentage of Swingline Loans other than Swingline Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Credit Lenders or Cash Collateralized in accordance with the terms hereof.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board in the United States, that are applicable to the circumstances as of the date of determination, or on adoption of the International Financial Reporting Standards (the "**IFRS**"), the IFRS, in either case, consistently applied and subject to the provisions of Section 1.03.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

[Credit Agreement]

"**Guarantors**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement" and shall include each Restricted Subsidiary who after the Closing Date becomes a Guarantor pursuant to a Joinder Agreement or other documentation in form and substance reasonably acceptable to the Administrative Agent, in each case together with their respective successors and permitted assigns. For avoidance of doubt, and notwithstanding any limitations to the requirement to provide a Guaranty or grant security interests in the assets of any Subsidiary to the contrary, the Borrower with the consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed) may cause any Restricted Subsidiary that is not a Guarantor to guarantee the Obligations and comply with the provisions of Section 7.12 (including in the case of any Foreign Subsidiary by delivering, within time frames and subject to extensions as agreed with the Administrative Agent, such Collateral Documents, as determined as reasonably necessary by the Administrative Agent in consultation with the Borrower, to grant and perfect security interests in such Foreign Subsidiary's relevant assets for which security interests are customarily granted in such Subsidiary's jurisdiction of organization but with exclusions consistent as applicable with the definition of Excluded Property) by causing such Restricted Subsidiary to execute a joinder to this Agreement in form and substance reasonably satisfactory to the Administrative Agent, and any such Restricted Subsidiary shall be a Guarantor and Credit Party hereunder for all purposes. In addition, the Borrower shall be a Guarantor in respect of Swap Obligations and Treasury Management Obligations to which the Borrower is not party.

"**Guaranty**" means (a) the guaranty provided pursuant to Article 4 hereof and/or (b) any other guaranty agreement given by any Person pursuant to the terms hereof.

"**Hazardous Materials**" means petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and all other substances, materials or wastes of any nature regulated pursuant to any Environmental Law.

"**Historical Financial Statements**" means (a) the audited consolidated balance sheets and related statements of comprehensive income, shareholders' equity and cash flows of the Borrower for the fiscal years ended June 30, 2014, June 30, 2015 and June 30, 2016 and (b) the unaudited consolidated balance sheets and related consolidated statements of comprehensive income and cash flows for the Borrower for the fiscal quarters of the Borrower ended September 30, 2016, December 31, 2016 and March 31, 2017.

"**IFRS**" has the meaning specified in the definition of "GAAP."

"**Incremental Amendment**" has the meaning provided in Section 2.18(e).

"**Incremental Amendment Date**" has the meaning provided in Section 2.18(c).

"**Incremental Commitment**" means an Incremental Revolving Commitment or an Incremental Term Commitment, as applicable.

"**Incremental Equivalent Debt**" has the meaning provided in Section 8.03(q).

"**Incremental Facility**" means an Incremental Term Commitment or an Incremental Revolving Commitment, as applicable.

[Credit Agreement]

"**Incremental Facility Closing Date**" has the meaning provided in Section 2.18(b).

"**Incremental Increase**" means an Incremental Term Loan Increase or a Revolving Commitment Increase, as applicable.

"**Incremental Lender**" means an Incremental Revolving Lender or an Incremental Term Lender, as applicable.

"**Incremental Loans**" means the Incremental Term Loans or the Incremental Revolving Loans, as applicable.

"**Incremental Revolving Commitment**" means the commitment of any Lender, established pursuant to Section 2.18, to make Incremental Revolving Loans to the Borrower.

"**Incremental Revolving Lender**" means a Revolving Credit Lender with an Incremental Revolving Commitment or an outstanding Incremental Revolving Loan.

"**Incremental Revolving Loan**" means Revolving Credit Loans made by one or more Revolving Credit Lenders to the Borrower pursuant to their Incremental Revolving Commitments.  Incremental Revolving Loans may only be made in the form of additional Revolving Credit Loans.

"**Incremental Term Commitment**" means the commitment of any Lender, established pursuant to Section 2.18, to make Incremental Term Loans to the Borrower.

"**Incremental Term Lender**" means a Lender with an Incremental Term Commitment or an outstanding Incremental Term Loan.

"**Incremental Term Loan Increase**" has the meaning specified in Section 2.18.

"**Incremental Term Loan**" has the meaning specified in Section 2.18.

"**Incurrence-Based Amounts**" has the meaning set forth in Section 1.09(e).

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all indebtedness and obligations in respect of the deferred purchase price of property or services (other than (i) trade accounts payable incurred in the ordinary course of business, (ii) any bona fide deferred purchase price arrangement, earn-out or similar obligation, unless such obligation has not been paid after becoming due and payable in accordance with its terms and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business);

[Credit Agreement]

     (c)     all obligations under letters of credit (including standby and commercial), bankers' acceptances and similar instruments (including bank guaranties, surety bonds, comfort letters, keep-well agreements and capital maintenance agreements) to the extent such instruments or agreements support financial, rather than performance, obligations;

     (d)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

     (e)     all Attributable Indebtedness;

     (f)     all obligations of such Person in respect of Disqualified Stock;

     (g)     net obligations of such Person under any Swap Contract; and

     (h)     to the extent not otherwise included above, all Support Obligations of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) or other similar entity in which such Person is a general partner or joint venturer, except to the extent such Person's liability for such obligation is expressly made non-recourse or otherwise limited and (B) in the case of the Borrower and its Restricted Subsidiaries, exclude all intercompany Indebtedness so long as such intercompany Indebtedness (i) has a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and (ii) is made in the ordinary course of business. The amount of Indebtedness shall be determined (i) based on Swap Termination Value in the case of net obligations under Swap Contracts under clause (g), and (ii) based on the outstanding principal amount of the Indebtedness that is the subject of the Support Obligations in the case of Support Obligations under clause (h). The amount of Indebtedness of any Person for purposes of clause (d) (unless such Indebtedness has been assumed by such Person or is otherwise recourse to such Person) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Credit Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitee**" has the meaning provided in Section 11.04(b).

"**Information**" has the meaning provided in Section 11.07.

"**Initial Revolving Credit Commitments**" means the Revolving Credit Commitments of the Revolving Credit Lenders on the Amendment No. 4 Effective Date pursuant to Section 2.01(b).

[Credit Agreement]

"**Intellectual Property Security Agreements**" means the Intellectual Property Security Agreements as such term is defined in the Security Agreement.

"**Intercompany Note**" means a promissory note substantially in the form of <u>Exhibit 1.01-3</u>.

"**Intercreditor Agreements**" means any First Lien Intercreditor Agreement, Junior Lien Intercreditor Agreement and Subordination Agreement, collectively, in each case to the extent then in effect.

"**Interest Payment Date**" means, (a) as to any Base Rate Loan (including Swingline Loans), the last Business Day of each March, June, September and December, and the Revolving Termination Date (in the case of Revolving Credit Loans) or the applicable Maturity Date (in the case of Term Loans) and, in the case of any Swingline Loan, any other dates as may be mutually agreed upon by the Borrower and the Swingline Lender, (b) as to any Term SOFR Loan, the last Business Day of each Interest Period for such Loan, the date of repayment of principal of such Loan, and the Revolving Termination Date (in the case of Revolving Credit Loans) or the applicable Maturity Date (in the case of Term Loans), (c) as to any Alternative Currency Daily Rate Loan, the last Business Day of each March, June, September and December and the Revolving Termination Date (in the case of Revolving Credit Loans) or the applicable Maturity Date (in the case of Term Loans) and (d) as to any Alternative Currency Term Rate Loan, the last Business day of each Interest Period applicable to such Loan and the Revolving Termination Date (in the case of Revolving Credit Loans) or the applicable Maturity Date (in the case of Term Loans); *provided*, *however*, that if any Interest Period for an Alternative Currency Term Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall be Interest Payment Dates. If an Interest Payment Date falls on a date that is not a Business Day, such Interest Payment Date shall be deemed to be the next succeeding Business Day.

"**Interest Period**" means, as to each Term SOFR Loan or Alternative Currency Term Rate Loan, the period commencing on the date such Term SOFR Loan or Alternative Currency Term Rate Loan is disbursed or converted to or continued as a Term SOFR Loan or Alternative Currency Term Rate Loan and ending on the date 1, 3 or 6 months thereafter, as selected by the Borrower in the applicable Loan Notice; *provided* that:

(a)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

[Credit Agreement]

(c)    no Interest Period with respect to (i) any Revolving Credit Loan shall extend beyond the Revolving Termination Date or (ii) any Term Loans shall extend beyond the applicable Maturity Date.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Capital Stock of another Person, (b) a loan, advance or capital contribution to, guaranty or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Restricted Subsidiaries, intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any roll over or extensions of terms) and made in the ordinary course of business) and any arrangement pursuant to which the investor undertakes any Support Obligation with respect to Indebtedness or other obligation of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit, a line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment, but in any event reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Restricted Subsidiary in respect of, but in no event exceeding the original amount of, such Investment.

For purposes of the definition of "Unrestricted Subsidiary" and the covenants described under Sections 7.14 and 8.02:

(1)    "Investments" shall include the portion (proportionate to the Borrower's Capital Stock in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Borrower at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Borrower shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a)    the Borrower's "Investment" in such Subsidiary at the time of such redesignation; less

(b)    the portion (proportionate to the Borrower's Capital Stock in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2)    any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer.

"**Involuntary Disposition**" means the receipt by the Borrower or any Restricted Subsidiary of any cash insurance proceeds or condemnation awards payable by reason of theft, loss, physical destruction or damage, taking or similar event with respect to any of its Property.

[Credit Agreement]

"**IP Rights**" has the meaning provided in Section 6.19.

"**IRS**" means the United States Internal Revenue Service.

"**ISP**" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance of such Letter of Credit).

"**Issuer Documents**" means, with respect to any Letter of Credit, the L/C Application and any other document, agreement or instrument (including such Letter of Credit) entered into by the Borrower (or any other Credit Party) and the L/C Issuer (or in favor of the L/C Issuer), relating to such Letter of Credit.

"**Joinder Agreement**" means with respect to any Guarantor, a joinder agreement substantially in the form of Exhibit 7.12 executed and delivered in accordance with the provisions of Section 7.12.

"**Judgment Currency**" has the meaning specified in Section 11.21.

"**Junior Debt**" has the meaning provided in Section 8.12.

"**Junior Lien Intercreditor Agreement**" means an intercreditor agreement substantially in the form of Exhibit 1.01-5 hereto (which agreement in such form, or with immaterial changes thereto, the Administrative Agent is authorized to enter into) together with any material changes thereto which are reasonably acceptable to the Administrative Agent and which material changes shall be posted to the Lenders not less than five (5) Business Days before execution thereof and, if the Required Lenders shall not have objected to such changes within five (5) Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's entry into such intercreditor agreement (with such changes) is reasonable and to have consented to such intercreditor agreement (with such changes) and to the Administrative Agent's execution thereof.

"**L/C Advance**" means, with respect to each Revolving Credit Lender, such Revolving Credit Lender's funding of its participation in any L/C Borrowing.

"**L/C Application**" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"**L/C Borrowing**" means any extension of credit resulting from a drawing under any Letter of Credit that has not been reimbursed or refinanced as a Borrowing of Revolving Credit Loans.

"**L/C Credit Extension**" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

[Credit Agreement]

"**L/C Expiration Date**" means the day that is five Business Days prior to the Revolving Termination Date then in effect (or, if such day is not a Business Day, the immediately preceding Business Day).

"**L/C Honor Date**" has the meaning provided in Section 2.03(c)(i).

"**L/C Issuer**" means Bank of America, through itself or through one of its designated Affiliates or branch offices, in its capacity as issuer of Letters of Credit hereunder, together with its successors in such capacity.

"**L/C Obligations**" means, at any time, the sum of (a) the maximum amount available to be drawn under Letters of Credit then outstanding, assuming compliance with all requirements for drawings referenced therein, *plus* (b) the aggregate amount of all L/C Unreimbursed Amounts, including L/C Borrowings. For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. For all purposes of this Credit Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**L/C Sublimit**" has the meaning provided in Section 2.01(c).

"**L/C Unreimbursed Amount**" has the meaning provided in Section 2.03(c)(i).

"**Latest Maturity Date**" means at any time, the latest maturity or expiration date applicable to any Loan or Commitment (or, if so specified, applicable to the specified Loans or Commitments or the Class thereof) hereunder at such time.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**LCT Election**" has the meaning provided in Section 1.07(e).

"**LCT Test Date**" has the meaning provided in Section 1.07(e).

"**Lender**" means each of the Persons identified as a "Lender" on the signature pages hereto (and, as appropriate, includes the Swingline Lender), each other Person that becomes a "**Lender**" in accordance with this Credit Agreement and their respective successors and assigns.

"**Lending Office**" means, as to any Lender, such office or offices of such Lender described in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent, which office may include any Affiliate of such Lender or any domestic or foreign branch of such Lender or

[Credit Agreement]

such Affiliate. Unless the context otherwise requires, each reference to a Lender shall include its applicable Lending Office.

"**Letter of Credit**" means each Existing Letter of Credit and each letter of credit issued hereunder. A Letter of Credit may be a commercial letter of credit or a standby letter of credit. Letters of Credit may be issued in Dollars or in any Alternative Currency.

"**Letter of Credit Fees**" has the meaning provided in Section 2.09(b)(i).

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, priority or other security interest in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property and any Capitalized Lease having substantially the same economic effect as any of the foregoing); *provided* that in no event shall an operating lease in and of itself be deemed a Lien.

"**Limited Condition Transaction**" means any acquisition permitted by Section 8.02 the consummation of which is not conditioned on the availability of, or on obtaining, third party financing.

"**Liquidity**" means, as of any date of determination, an amount equal to the sum of (a) amounts available at such time to be drawn under the Revolving Credit Commitments and (b) the amount of cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries on a consolidated basis.

"**Loan**" means any Term Loan, Revolving Credit Loan or Swingline Loan, and Base Rate Loans, Term SOFR Loans and Alternative Currency Loans comprising such Loans.

"**Loan Notice**" means a notice of (a) a Term Borrowing, (b) a Revolving Credit Borrowing, (c) a Swingline Borrowing, (d) a conversion of Loans from one Type to the other, or (e) a continuation of Term SOFR Loans or Alternative Currency Term Rate Loans, as applicable, which, if in writing, shall be substantially in the form of Exhibit 2.02 or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"**Loan Obligations**" has the meaning provided in the definition of "Obligations."

"**Mandatory Prepayment Declined Proceeds**" has the meaning provided in Section 2.06(b)(ii)(F).

"**Mandatory Prepayment Rejection Notice**" has the meaning provided in Section 2.06(b)(ii)(F).

"**Master Agreement**" has the meaning provided in the definition of "Swap Contract."

[Credit Agreement]

"**Material Acquisition**" means any acquisition of property or series of acquisitions of property that involves the payment of consideration by the Borrower and its Subsidiaries and any assumption of liabilities and Indebtedness in a consecutive 12-month period of at least $100,000,000; *provided* that, for purposes of Section 8.11(b) there shall not be more than one Material Acquisition after the Amendment No. 4 Effective Date unless the Consolidated Total Net Leverage Ratio has been less than or equal to 4.50 to 1.00 as of the last day of a Test Period ending subsequent to the most recent Material Acquisition.

"**Material Adverse Effect**" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole; (b) a material adverse effect of the ability of the Credit Parties, as a whole, to perform their payment obligations under the Credit Documents; or (c) a material adverse effect upon the rights and remedies available to the Lenders or the Administrative Agent under any Credit Document.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries (a) whose total assets (when combined with the assets of such Subsidiary's Subsidiaries after eliminating intercompany obligations) at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues (when combined with the revenues of such Subsidiary's Subsidiaries after eliminating intercompany obligations) for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Amendment No. 4 Effective Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 7.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such Test Period, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement (or such longer period as the Administrative Agent may agree in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 7.12 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets (when combined with the assets of such Subsidiary's Subsidiaries after eliminating intercompany obligations) at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues (when combined with the revenues of such Subsidiary's Subsidiaries after eliminating intercompany obligations) for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Amendment No. 4 Effective Date, Foreign Subsidiaries not meeting the thresholds set forth in clause (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the

[Credit Agreement]

Case 1:23-cv-13065-WGY Document 66-12 Filed 05/24/24 Page 76 of 90

end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 7.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such Test Period, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement (or such longer period as the Administrative Agent may agree in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of the definition of "Collateral and Guarantee Requirement."

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means the final maturity date specified in the applicable Incremental Amendment or Replacement Amendment and with respect to any Extended Term Loans in respect thereof shall be the final maturity date as specified in the applicable Extension Offer.

"**Maximum Rate**" has the meaning provided in Section 11.09.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Multiemployer Plan**" means a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA and subject to ERISA, to which a Credit Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means:

(a)     with respect to any Disposition or Involuntary Disposition, the aggregate proceeds paid in cash or Cash Equivalents received by the Borrower or any Restricted Subsidiary in connection with any Disposition or Involuntary Disposition, net of (i) direct costs (including legal, accounting and investment banking fees, sales commissions and underwriting discounts, consultant fees, and other customary fees and expenses incurred in connection therewith), (ii) estimated taxes paid or payable as a result thereof, (iii) amounts required to be applied to the repayment of Indebtedness (other than the Indebtedness hereunder, Incremental Equivalent Debt and Refinancing Equivalent Debt) secured by a Lien on the asset or assets the subject of such Disposition or Involuntary Disposition (or, in the case of Net Cash Proceeds of any Foreign Disposition, amounts applied during such period to the permanent repayment of any Indebtedness of the Foreign Subsidiaries to the extent required by the terms of such Indebtedness), (iv) in the case of any Disposition or Involuntary Disposition by a non-wholly owned Restricted Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly-owned Restricted Subsidiary as a result thereof and (v) the amount of any reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (ii) above) (x) related to any of the applicable assets and (y)

[Credit Agreement]

retained by the Borrower or any of the Restricted Subsidiaries including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (*provided*, *however*, the amount of any subsequent reduction of such reserve or reversal (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such Disposition or Involuntary Disposition occurring on the date of such reduction or reversal); *provided further*, that no proceeds realized in a single transaction or series of related transactions shall constitute Net Cash Proceeds unless (x) such proceeds shall exceed $7,500,000 or (y) the aggregate net proceeds exceed $15,000,000 in any fiscal year (and thereafter only net cash proceeds in excess of such amount shall constitute Net Cash Proceeds under this clause (a)); and

(b)    with respect to any incurrence or issuance of Indebtedness, the aggregate principal amount actually received in cash by the Borrower or any Restricted Subsidiary in connection therewith, net of direct costs (including legal, accounting and investment banking fees, sales commissions and underwriting discounts).

For purposes hereof, "Net Cash Proceeds" includes any cash or Cash Equivalents received upon the disposition of any non-cash consideration received by the Borrower or any Restricted Subsidiary in any Disposition or Involuntary Disposition.

"**Non-Consenting Lender**" has the meaning provided in Section 11.13.

"**Non-Extension Notice Date**" has the meaning provided in Section 2.03(b)(iii).

"**Non-Reinstatement Deadline**" has the meaning provided in Section 2.03(b)(iv).

"**Non-SOFR Successor Rate**" has the meaning provided in Section 3.03.

"**Notes**" means the Term Notes, the Revolving Credit Notes and the Swingline Notes.

"**Obligations**" means, without duplication, (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees and expenses that accrue after the commencement by or against any Credit Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees and expenses are allowed claims in such proceeding (the "**Loan Obligations**"), (b) all obligations under any Swap Contract between the Borrower or any Restricted Subsidiary, on the one hand, and any Agent, Lender or Affiliate of an Agent or Lender or any Person that was an Agent, a Lender or an Affiliate of an Agent or Lender on the date such Swap Contract was entered into, on the other hand, including the Swap Obligations relating to such Swap Contract but excluding the Excluded Swap Obligations (the "**Swap Contract Obligations**") and (c) all obligations under any Treasury Management Agreement between the Borrower or any Restricted Subsidiary, on the one hand, and any Agent, Lender or Affiliate of an Agent or Lender or any Person that was an Agent, a

[Credit Agreement]

Lender or an Affiliate of an Agent or Lender on the date such transaction was entered into, on the other hand (the "**Treasury Management Obligations**").

"**OID**" means original issue discount.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and the operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" means all present or future stamp, court, documentary, intangible, recording, filing or similar Taxes arising from any payment made hereunder or under any other Credit Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Credit Agreement or any other Credit Document, except any such Taxes imposed by a jurisdiction with which the Lender has a connection described in clause (a)(ii) of the definition of "Excluded Taxes" with respect to an assignment or grant of participation (other than assignment or designation of a new office made pursuant to Section 3.06 or Section 11.13).

"**Outstanding Amount**" means (i) with respect to any Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Loans occurring on such date; and (ii) with respect to any L/C Obligations on any date, the Dollar Equivalent of the aggregate outstanding amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrower of L/C Unreimbursed Amounts.

"**Outstanding Receivables Transaction Amount**" means, at any time of determination, the excess of (i) the face amount of all Receivables disposed of pursuant to Section 8.05(l) prior to such time of determination *minus* (ii) any amount included in clause (i) above that is attributable to Receivables with a stated due date prior to such time of determination *minus* (iii) any amount included in clause (i) above that is attributable to Receivables which have been collected prior to such time of determination.

"**Overnight Rate**" means, for any day, (a) with respect to any amount denominated in Dollars, the greater of (i) the Federal Funds Rate and (ii) an overnight rate determined by the Administrative Agent, the L/C Issuer, or the Swingline Lender, as the case may be, in accordance with banking industry rules on interbank compensation, and (b) with respect to any amount denominated in an Alternative Currency, an overnight rate determined by the L/C Issuer, as the case may be, in accordance with banking industry rules on interbank compensation.

"**Participant**" has the meaning provided in Section 11.06(d).

[Credit Agreement]

"**Participant Register**" has the meaning provided in Section 11.06(e).

"**Participating Member State**" means any member state of the European Union that adopts or has adopted the Euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"**Payment Conditions**" means, at any time of determination, calculated on a Pro Forma Basis giving effect to the transactions for which Payment Conditions need to be satisfied (and including any transactions contemplated in connection therewith), (i) the Consolidated Total Net Leverage Ratio does not exceed 3.50:1.00 and (ii) no Event of Default has occurred and is continuing or would result from such transactions.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by a Credit Party or any ERISA Affiliate or to which a Credit Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Perfection Certificate**" means the perfection certificate substantially in the form of Exhibit 1.01-1.

"**Permitted Acquisition**" means any Investment of the type described in Section 8.02(f).

"**Permitted Junior Secured Refinancing Debt**" has the meaning set forth in Section 8.03(r).

"**Permitted Liens**" means Liens permitted pursuant to Section 8.01.

"**Permitted Pari Passu Secured Refinancing Debt**" has the meaning set forth in Section 8.03(r).

"**Permitted Receivables Transaction**" means a Receivables Transaction, *provided* that (x) the financing terms, covenants, termination events and other provisions thereof, including any Standard Receivables Undertakings, shall be market terms (as determined in good faith by the Borrower) and (y) the aggregate Outstanding Receivables Transaction Amount at any time in respect of all Receivables Transactions does not exceed $60 million.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; *provided* that (i) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to any interest capitalized, any premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension; (ii) such modification, refinancing,

[Credit Agreement]

refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or longer than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended; (iii) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations on terms at least as favorable, taken as a whole, to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended; (iv) at the time of such modification, refinancing, refunding, renewal or extension, no Event of Default shall have occurred and be continuing; (v) if such Indebtedness being modified, refinanced, refunded, renewed or extended is secured, the terms and conditions relating to collateral of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, are not materially less favorable to the Credit Parties or the Lenders than the terms and conditions with respect to the collateral for the Indebtedness being modified, refinanced, refunded, renewed or extended, taken as a whole (and the Liens on any Collateral securing any such modified, refinanced, refunded, renewed or extended Indebtedness shall have the same (or lesser) priority as the Indebtedness being modified, refinanced, refunded, renewed or extended relative to the Liens on the Collateral securing the Obligations; (vi) the terms and conditions (excluding any subordination, pricing, fees, rate floors, discounts, premiums and optional prepayment or redemption terms) of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, shall not be materially less favorable to the Credit Parties than the Indebtedness being modified, refinanced, refunded, renewed or extended, except for covenants or other provisions applicable only to periods after the Latest Maturity Date; and (vii) such modification, refinancing, refunding, renewal or extension is incurred by the Person who is the obligor on the Indebtedness being modified, refinanced, refunded, renewed or extended. Any reference to a Permitted Refinancing in this Agreement or any other Credit Document shall be interpreted to mean (a) a Permitted Refinancing of the subject Indebtedness and (b) any further refinancing constituting a Permitted Refinancing of the Indebtedness resulting from a prior Permitted Refinancing.

"**Permitted Unsecured Refinancing Debt**" has the meaning set forth in Section 8.03(r).

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), including any Pension Plan (but excluding any Multiemployer Plan), that is subject to ERISA and that is maintained or sponsored by a Credit Party or, with respect to any such plan that is subject to Section 412 of the Internal Revenue Code or Title IV of ERISA, is maintained or sponsored by any ERISA Affiliate.

"**Platform**" has the meaning provided in Section 7.02.

"**Pre-Closing Equity Offering**" means the public offering and sale by the Borrower of Capital Stock consummated on April 13, 2016.

"**Primary Obligor**" has the meaning provided in the definition of "Support Obligations."

"**Pro Forma Basis**," "**pro forma basis**," "**Pro Forma Effect**" and "**pro forma effect**" means, for purposes of calculating compliance with the Financial Covenants or any other financial ratio or tests (including in connection with Specified Transactions), such calculation shall be made in accordance with Section 1.07.

"**Projections**" has the meaning provided in Section 7.02(b).

"**Property**" means an interest of any kind in any property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" has the meaning provided in Section 7.02.

"**QFC Credit Support**" has the meaning provided in Section 11.22.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, the Borrower and each Guarantor that has total assets exceeding $10,000,000 at the time the relevant guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Stock**" means any Capital Stock that is not Disqualified Stock.

"**Ratio Debt**" has the meaning provided in Section 8.03(g).

"**Receivables**" means any "account" as defined under the UCC including without limitation, any receivable, account receivable, right to payment of a monetary obligation, indebtedness, contract right, chose in action, and proceeds thereof, wherever located, arising out of the sale, lease, license or assignment of any products or any other goods or services that are the subject of any contracts pursuant to which goods are sold or services are rendered by the Borrower and that give rise to any Receivables by the Borrower or any Restricted Subsidiary ("Goods" or "Services," respectively); all related invoices, sales orders, bills of lading, and other contractual rights and supporting obligations relating thereto ("**Invoices**"); all rights to payment of any interest, finance, returned check or late charges, if any; all indebtedness and other obligations owed to the Borrower or any Restricted Subsidiary as a result of the sale of such Goods or Services pursuant to the Invoices; any and all returned, reclaimed, and repossessed Goods sold or financed pursuant thereto; all rights as to any Goods or other property, contracts of indemnity, letters of credit, guaranties or sureties, pledges, hypothecations, mortgages, chattel mortgages, security agreements, deeds of trust, proceeds of insurance (including credit insurance on such Receivables), and other collateral, liens or proceeds thereof at any time constituting supporting obligations for such Receivables; any proceeds of the foregoing; and any and all other

[Credit Agreement]

rights, remedies, benefits and interests, both legal and equitable, to which the Borrower or any Restricted Subsidiary may be entitled in respect of any of the foregoing, including, but not limited to, any rights, remedies, benefits, and interests set forth in the UCC with respect to "accounts," "payment intangibles" or "supporting obligations."

"**Receivables Related Rights**" means, in relation to any Receivable that is the subject of a Receivables Transaction, (i) any rights under or relating to the contract governing such Receivable to the extent necessary to enforce collection of such Receivable, (ii) all security interests or Liens and property subject thereto from time to time purporting to secure payment of such Receivable, whether pursuant to the contract governing such Receivable or otherwise, (iii) all guarantees, insurance (but only to the extent such insurance relates solely to Receivables that are of the same type as the Receivables subject of the Receivables Transaction) and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable whether pursuant to the contract governing such Receivable or otherwise and (iv) other assets relating to such Receivable which are customarily transferred in connection with sales or factoring of Receivables.

"**Receivables Transaction**" means, with respect to the Borrower and/or any of the Restricted Subsidiaries, any transaction or series of transactions of sales or factoring involving Receivables and Receivables Related Rights pursuant to which the Borrower or any Restricted Subsidiary may sell, convey or otherwise transfer to any other Person any Receivables (whether now existing or arising in the future) and Receivables Related Rights of the Borrower or any Restricted Subsidiary.

"**Refinanced Debt**" has the meaning provided in Section 2.20(a).

"**Refinancing Amendment**" has the meaning provided in Section 2.20(d).

"**Refinancing Commitments**" means, collectively, the Refinancing Revolving Commitments and the Refinancing Term Commitments.

"**Refinancing Equivalent Debt**" has the meaning provided in Section 8.03(r).

"**Refinancing Facilities**" means (a) with respect to any Class of Revolving Credit Commitments or Revolving Credit Loans, Refinancing Revolving Commitments or Refinancing Revolving Loans and (b) with respect to any Class of Term Loans, Refinancing Term Loans.

"**Refinancing Facility Closing Date**" has the meaning provided in Section 2.20(c).

"**Refinancing Lender**" means a Refinancing Revolving Lender or a Refinancing Term Lender, as applicable.

"**Refinancing Loans**" has the meaning provided in Section 2.20(b).

"**Refinancing Revolving Commitments**" means one or more new Classes of Revolving Credit Commitments established pursuant to a Refinancing Amendment in accordance with Section 2.20.

[Credit Agreement]

"**Refinancing Revolving Lender**" means any Lender providing a Refinancing Revolving Loan or a Refinancing Revolving Commitment in accordance with Section 2.20.

"**Refinancing Revolving Loan**" has the meaning provided in Section 2.20(b).

"**Refinancing Term Commitment**" means the commitment of any Lender to provide one or more new Classes of Refinancing Term Loans established pursuant to a Refinancing Amendment in accordance with Section 2.20.

"**Refinancing Term Lender**" means any Lender providing a Refinancing Term Loan in accordance with Section 2.20.

"**Refinancing Term Loans**" has the meaning provided in Section 2.20(b).

"**Register**" has the meaning provided in Section 11.06(c).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the Environment or within, from or into any building, structure, facility or fixture.

"**Relevant Rate**" means with respect to any Credit Extension denominated in (a) Dollars, SOFR or Term SOFR, (b) Sterling, SONIA and (c) Euros, EURIBOR, as applicable.

"**Reorganization Plan**" has the meaning set forth in Section 11.06(k).

"**Replaced Term Loans**" has the meaning provided in Section 11.01.

"**Replacement Amendment**" has the meaning provided in Section 11.01.

"**Replacement Term Loans**" has the meaning provided in Section 11.01.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the notice period has been waived under applicable regulations.

"**Request for Credit Extension**" means (a) with respect to a Borrowing of Loans (including Swingline Loans) or the conversion or continuation of Loans, a Loan Notice and (b) with respect to an L/C Credit Extension, an L/C Application.

"**Required Facility Lenders**" means (a) with respect to the Term Loan Facility, the Required Term Lenders and (ii) with respect to the Revolving Credit Facility, the Required Revolving Credit Lenders.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the Aggregate Commitments or, if the Commitments shall have expired or been

[Credit Agreement]

terminated, Lenders holding more than 50% of the aggregate principal amount of Loan Obligations (including, in each case, the aggregate principal amount of each Revolving Credit Lender's risk participation and funded participation in L/C Obligations and Swingline Loans); *provided* that the Commitments of, and the portion of the Loan Obligations held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Required Revolving Credit Lenders**" means, as of any date of determination, Revolving Credit Lenders having more than 50% of the Aggregate Revolving Credit Commitments or, if the Revolving Credit Commitments shall have expired or been terminated, Revolving Credit Lenders holding more than 50% of the aggregate principal amount of Revolving Credit Obligations (including, in each case, the aggregate principal amount of each Revolving Credit Lender's risk participation and funded participation in L/C Obligations and Swingline Loans); *provided* that the Revolving Credit Commitments of, and the portion of Revolving Credit Obligations held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Revolving Credit Lenders.

"**Required Term Lenders**" means, as of any date of determination, Term Lenders holding more than 50% of the Term Loan Facility on such date; *provided* that the portion of the Term Loan Facility held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Term Lenders.

"**Rescindable Amount**" shall have the meaning provided in Section 2.11(c).

"**Resignation Effective Date**" shall have the meaning provided in Section 10.06.

"**Responsible Officer**" means an officer functioning as the chief executive officer, chief operating officer, president, vice president, chief financial officer, chief accounting officer, chief legal officer, treasurer, assistant treasurer, controller or secretary of a Credit Party or such other Person as is authorized in writing to act on behalf of such Credit Party or, solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Credit Party designated in or pursuant to an agreement between the applicable Credit Party and the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Credit Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Credit Party. All references to a "Responsible Officer" hereunder shall refer to a Responsible Officer of the Borrower unless the context otherwise requires.

"**Restricted Cash**" means cash and Cash Equivalents which are listed as "Restricted" on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) by the Borrower in respect of its Capital Stock, or any payment (whether in cash, securities or other property) including any sinking fund payment or similar deposit, for or on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any Capital Stock of the Borrower or its Restricted Subsidiaries or

[Credit Agreement]

any option, warrant or other right to acquire any such Capital Stock of the Borrower or its Restricted Subsidiaries; *provided* that a transaction with an Affiliate shall not be a Restricted Payment pursuant to this definition solely because such transaction involves such Affiliate.

"**Restricted Subsidiary**" means any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"**Revaluation Date**" means with respect to any Letter of Credit, each of the following: (i) each date of issuance, amendment and/or extension of a Letter of Credit denominated in an Alternative Currency, (ii) each date of any payment by the L/C Issuer under any Letter of Credit denominated in an Alternative Currency, (iii) [reserved], and (iv) such additional dates as the Administrative Agent or the L/C Issuer shall determine.

"**Revolving Commitment Increase**" has the meaning provided in Section 2.18(a).

"**Revolving Credit Borrowing**" means a borrowing consisting of Revolving Credit Loans of the same Type and, in the case of Term SOFR Loans or Alternative Currency Term Rate Loans, having the same Interest Period made by each of the Revolving Credit Lenders pursuant to Section 2.01(b).

"**Revolving Credit Commitment**" means, for each Revolving Credit Lender, the commitment of such Revolving Credit Lender to make Revolving Credit Loans (and to share in Revolving Credit Obligations) hereunder pursuant to Section 2.01(b) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Revolving Credit Lender's name on Schedule 2.01 under the caption "Revolving Credit Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Revolving Credit Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Credit Agreement.

"**Revolving Credit Facility**" means, at any time, the aggregate amount of Revolving Credit Commitments at such time.

"**Revolving Credit Lender**" means, at any time, any Lender that has a Revolving Credit Commitment at such time.

"**Revolving Credit Loans**" has the meaning provided in Section 2.01(b).

"**Revolving Credit Note**" means a promissory note made by the Borrower in favor of a Revolving Credit Lender evidencing Revolving Credit Loans made by such Revolving Credit Lender, substantially in the form of Exhibit 2.13-1.

"**Revolving Credit Obligations**" means the Revolving Credit Loans, the L/C Obligations and the Swingline Loans.

"**Revolving Termination Date**" means the date that is five years following the Amendment No. 4 Effective Date; *provided* that if such date is not a Business Day, the Revolving Termination Date shall be the immediately preceding Business Day.

[Credit Agreement]

"**S&P**" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means (a) with respect to disbursements and payments in Dollars, immediately available funds, and (b) with respect to disbursements and payments in an Alternative Currency, same day or other funds as may be determined by the Administrative Agent or the L/C Issuer, as the case may be, to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Alternative Currency.

"**Sanctions**" has the meaning provided in Section 6.21(b).

"**Scheduled Unavailability Date**" has the meaning provided in Section 3.03(c)(ii).

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Obligations**" has the meaning provided in the Security Agreement.

"**Secured Parties**" has the meaning provided in the Security Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means, collectively, (a) the security agreement dated as of the Closing Date given by the Credit Parties party thereto, as grantors, to the Collateral Agent to secure the Obligations substantially in the form of Exhibit 1.01-2 and (b) any other security agreement in favor of the Collateral Agent to secure all or some portion of the Obligations that may be given by any Person pursuant to the terms hereof.

"**Senior Representative**" means, with respect to any series of Permitted Pari Passu Secured Refinancing Debt, Permitted Junior Secured Refinancing Debt, Incremental Equivalent Debt or subordinated Permitted Unsecured Refinancing Debt, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**SOFR**" means the Secured Overnight Financing Rate as administered by the Federal Reserve Bank of New York (or a successor administrator).

"**SOFR Adjustment**" means, with respect to Term SOFR, for any Interest Period, 0.10% (10 basis points) per annum.

"**SOFR Administrator**" means the Federal Reserve Bank of New York, as the administrator of SOFR, or any successor administrator of SOFR designated by the Federal Reserve Bank of New York or other Person acting as the SOFR Administrator at such time that is satisfactory to the Administrative Agent.

[Credit Agreement]

"**SOFR Successor Rate**" has the meaning provided in Section 3.03.

"**Solvency Certificate**" means a Solvency Certificate substantially in the form of Exhibit 5.01(j).

"**Solvent**" means with respect to the Borrower and its Restricted Subsidiaries that (a) after giving effect to the transactions contemplated to occur on the Amendment No. 4 Effective Date both (i) the fair value of the assets of the Borrower and its Restricted Subsidiaries, on a consolidated basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise and (ii) the present fair salable value of the property of the Borrower and its Restricted Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (b) after giving effect to the incurrence of the initial Credit Extension under this Credit Agreement on the Amendment No. 4 Effective Date and the consummation of the transactions contemplated to occur on the Amendment No. 4 Effective Date, the Borrower and its Restricted Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured, and (c) the incurrence of the initial Credit Extension under this Credit Agreement on the Amendment No. 4 Effective Date and the consummation of the transactions contemplated to occur on the Amendment No. 4 Effective Date, on a Pro Forma Basis, the Borrower and its Restricted Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

"**SONIA**" means, with respect to any applicable determination date, the Sterling Overnight Index Average Reference Rate published on the fifth (5th) Business Day preceding such date on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time); provided, that, (a) if such determination date is not a Business Day, SONIA means such rate that applied on the first (1st) Business Day immediately prior thereto and (b) if such rate shall be less than zero, such rate shall be deemed zero for the purposes of the Revolving Credit Facilities.

"**SONIA Adjustment**" means, with respect to SONIA, for any interest period, 0.0326% (3.26 basis points) per annum.

"**Specified Representations**" means the representations with respect to the Borrower and the Guarantors set forth in Section 6.01(a), Section 6.01(b)(ii), Section 6.02(a) and (b), Section 6.04, Section 6.20, Sections 6.21(a)(ii), 6.21(a)(iii) (only with respect to the use of proceeds of the Loans made on the Closing Date) and 6.21(b) (only with respect to the use of proceeds of the Loans made on the Closing Date), Section 6.15, and Section 6.18 (subject to Permitted Liens and customary post-closing provisions).

"**Specified Transaction**" means (v) any Investment that results in a Person becoming a Restricted Subsidiary, (w) any designation of a Subsidiary as a Restricted Subsidiary or an

[Credit Agreement]

Unrestricted Subsidiary, (x) any Permitted Acquisition or other Acquisition constituting an Investment permitted under Section 8.02, (y) any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower and any Disposition of a business unit, line of business or division of the Borrower or a Restricted Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise or (z) any incurrence or repayment of Indebtedness, Restricted Payment, Incremental Revolving Commitment, Incremental Revolving Loan or Incremental Term Loan, in each case, that by the terms of this Agreement requires a financial ratio or test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"**Spot Rate**" for a currency means the rate determined by the L/C Issuer to be the rate quoted by the L/C Issuer as the spot rate for the purchase by the L/C Issuer of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two (2) Business Days prior to the date as of which the foreign exchange computation is made; *provided* that the L/C Issuer may obtain such spot rate from another financial institution designated by the L/C Issuer if the L/C Issuer does not have as of the date of determination a spot buying rate for any such currency; and *provided further*, that the L/C Issuer may use such spot rate quoted on the date as of which the foreign exchange computation is made in the case of any Letter of Credit denominated in an Alternative Currency.

"**Standard Receivables Undertakings**" means representations, warranties, covenants and indemnities entered into by the Borrower or any Subsidiary of the Borrower that the Borrower has determined in good faith to be customary in a Permitted Receivables Transaction.

"**Sterling**" means the lawful currency of the United Kingdom.

"**Subsequent Transaction**" has the meaning provided in Section 1.07(e).

"**Subordination Agreement**" means a subordination agreement among the Administrative Agent and one or more Senior Representatives for the holders of Indebtedness subordinated to the Obligations, in form and substance reasonably acceptable to the Administrative Agent and the Borrower. Wherever in this Agreement a Senior Representative is required to become party to the Subordination Agreement, if the related Indebtedness is the initial Indebtedness incurred by the Borrower or any Restricted Subsidiary to be subordinated to the Obligations, then the Borrower, the Guarantors, the Administrative Agent and the Senior Representative for such Indebtedness shall execute and deliver the Subordination Agreement and the Administrative Agent shall be authorized to execute and deliver the Subordination Agreement.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (i) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person or (ii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, by such Person, to the extent such entity's financial results are required to be included in such Person's

[Credit Agreement]

consolidated financial statements under GAAP. Unless otherwise provided, "Subsidiary" shall refer to a Subsidiary of the Borrower.

"**Successor Company**" has the meaning provided in Section 8.04(d).

"**Successor Rate**" has the meaning provided in Section 3.03.

"**Support Obligations**" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Support Obligations shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Support Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"**Supported QFC**" has the meaning provided in Section 11.22.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

[Credit Agreement]

"**Swap Contract Obligations**" has the meaning provided in the definition of "Obligations."

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination values determined in accordance therewith, such termination values, and (b) for any date prior to the date referenced in clause (a), the amounts determined as the mark-to-market values for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**SWIFT**" has the meaning provided in Section 2.03(f).

"**Swingline Borrowing**" means a borrowing of a Swingline Loan pursuant to Section 2.01(d).

"**Swingline Lender**" means Bank of America, in its capacity as the Swingline Lender, together with any successor in such capacity.

"**Swingline Loan**" has the meaning provided in Section 2.01(d).

"**Swingline Note**" means the promissory note made by the Borrower in favor of the Swingline Lender, evidencing Swingline Loans made by the Swingline Lender, substantially in the form of Exhibit 2.13-2.

"**Swingline Sublimit**" has the meaning provided in Section 2.01(d).

"**TARGET2**" means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilizes a single shared platform and which was launched on November 19, 2007.

"**TARGET Day**" means any day on which TARGET2 (or, if such payment system ceases to be operative, such other payment system, if any, determined by the Administrative Agent to be a suitable replacement) is open for the settlement of payments in Euros.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Borrowing**" means a borrowing consisting of simultaneous Term Loans of the same Type and, in the case of Term SOFR Loans or Alternative Currency Term Rate Loans, having the same Interest Period.

[Credit Agreement]