"**Term Commitment**" means, for each Term Lender, the commitment of such Term Lender to make Term Loans hereunder.

"**Term Lender**" means any Lender that holds Term Loans or Term Commitments at such time.

"**Term Loan**" means any Incremental Term Loan, Refinancing Term Loan, Extended Term Loan or Replacement Term Loan, as the context may require

"**Term Loan Facility**" means, at any time after the Amendment No. 4 Effective Date, the aggregate principal amount of the Term Loans of all Term Lenders outstanding at such time.

"**Term Note**" means a promissory note made by the Borrower in favor of a Term Lender evidencing Term Loans made by such Term Lender, substantially in the form of Exhibit 2.13-3.

"**Term SOFR**" means:

(a)     for any Interest Period with respect to a Term SOFR Loan, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the commencement of such Interest Period with a term equivalent to such Interest Period; *provided* that if the rate is not published prior to 11:00 a.m. on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto, in each case, *plus* the SOFR Adjustment for such Interest Period; and

(b)     for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the Term SOFR Screen Rate with a term of one month commencing that day, *plus* the SOFR Adjustment for such Interest Period;

*provided* that if the Term SOFR determined in accordance with either of the foregoing provisions (a) or (b) of this definition would otherwise be less than zero, the Term SOFR shall be deemed zero for purposes of this Agreement.

"**Term SOFR Loan**" means a Loan that bears interest at a rate based on clause (a) of the definition of Term SOFR.

"**Term SOFR Screen Rate**" means the forward-looking SOFR term rate administered by the SOFR Administrator (or any successor administrator satisfactory to the Administrative Agent) and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"**Test Period**" means, for any date of determination under this Agreement, the four consecutive fiscal quarters of the Borrower most recently ended as of such date of determination.

"**Total Assets**" means the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the

[Credit Agreement]

Borrower delivered pursuant to Section 7.01(a) or (b) (and, in the case of any determination relating to any transaction, on a Pro Forma Basis including any property or assets being acquired or disposed of in connection therewith).

"**Transaction Expenses**" means any fees or expenses incurred or paid by the Borrower or any of its Subsidiaries in connection with the Transactions, Amendment No. 4, this Agreement (as amended by Amendment No. 4) and the other Credit Documents and the transactions contemplated hereby and thereby.

"**Transactions**" means, collectively, the entering into of Amendment No. 4 and the transactions contemplated thereunder, including the refinancing of the Loans and the other Credit Extensions as of the Amendment No. 4 Effective Date.

"**Transferred Guarantor**" has the meaning provided in Section 4.09.

"**Treasury Management Agreement**" means any agreement governing the provision of treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services.

"**Treasury Management Obligations**" have the meaning provided in the definition of "Obligations."

"**Type**" means, with respect to any Revolving Credit Loan, its character as a Base Rate Loan, a Term SOFR Loan, an Alternative Currency Daily Rate Loan or an Alternative Currency Term Rate Loan.

"**UCC**" means the Uniform Commercial Code in effect in any applicable jurisdiction from time to time.

"**UK Financial Institution**" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan for purposes of Section 430 of the Internal Revenue Code for the applicable plan year.

"**United States**" or "**U.S.**" means the United States of America.

[Credit Agreement]

"**Unrestricted Subsidiary**" means any Subsidiary of the Borrower designated by the Board of Directors of the Borrower as an Unrestricted Subsidiary pursuant to Section 7.14 subsequent to the Closing Date.

"**U.S. Government Securities Business Day**" means any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"**U.S. Special Resolution Regimes**" has the meaning provided in Section 11.22.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness; *provided* that the effects of any prepayments made on such Indebtedness shall be disregarded in making such calculation.

"**Wholly Owned Subsidiary**" means, with respect to any direct or indirect Subsidiary of any Person, that 100% of the Capital Stock with ordinary voting power issued by such Subsidiary (other than directors' qualifying shares and investments by foreign nationals mandated by applicable Law) is beneficially owned, directly or indirectly, by such Person.

"**Write-Down and Conversion Powers**" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02. *Interpretive Provisions*. With reference to this Credit Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other

[Credit Agreement]

document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Credit Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any Credit Document, shall be construed to refer to such Credit Document in its entirety and not to any particular provision thereof, (iv) all references in a Credit Document to "Articles," "Sections," "Exhibits" and "Schedules" shall be construed to refer to articles and sections of, and exhibits and schedules to, the Credit Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all assets and property of whatever kind, real and personal, tangible and intangible, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(c)    Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Credit Agreement or any other Credit Document.

(d)    For purposes of determining compliance with any Section of Article 8 at any time, in the event that any Lien, Investment, Indebtedness (whether at the time of incurrence or upon application of all or a portion of the proceeds thereof) (subject to the third to last paragraph in Section 8.03), Disposition, Restricted Payment, Affiliate transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

(e)    Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.03.    *Accounting Terms and Provisions*. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data

[Credit Agreement]

(including financial ratios and other financial calculations) required to be submitted pursuant to this Credit Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time. Notwithstanding any changes in GAAP after the Closing Date, any lease of the Credit Parties and their Subsidiaries that would be characterized as an operating lease under GAAP in effect on the Closing Date (whether such lease is entered into before or after the Closing Date) shall not constitute Indebtedness, Attributable Indebtedness or a Capitalized Lease under this Agreement or any Credit Document as a result of such changes in GAAP.

(a)    Notwithstanding any provision herein to the contrary, determinations of (i) the applicable pricing level under the definition of "Applicable Percentage" and (ii) compliance with the Financial Covenants shall be made on a Pro Forma Basis.

(b)    If at any time after the Closing Date any change in GAAP or in the consistent application thereof would affect the operation of any provision set forth in any Credit Document, and either the Borrower or the Required Lenders requests an amendment to eliminate the effect of any such change, regardless whether such request is given before or after such change in GAAP or in the consistent application thereof, then until such request shall have been withdrawn or such provision amended in accordance herewith, (i) such provision shall continue to be interpreted in accordance with GAAP prior to such change therein and (ii) the Borrower will provide, or cause to be provided, to the Administrative Agent and the Lenders, financial statements and related certificates and documents required hereunder or hereby as reasonably requested setting forth a reconciliation between calculations of such ratios or requirements made before and after giving effect to such changes in GAAP.

(c)    With respect to any subject transaction that was permitted under any provision of this Agreement by reference to a basket based on a percentage of Total Assets, the permissibility of such subject transaction shall not be affected by any subsequent fluctuations in Total Assets.

Section 1.04.    *Rounding*.  Any financial ratios required to be maintained pursuant to this Credit Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05.    *Times of Day*.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.06.    *Letter of Credit Amounts*.  Unless otherwise specified herein all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Dollar Equivalent of the stated amount of such Letter of Credit in effect at such time; *provided*, *however*, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the Dollar Equivalent of the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

[Credit Agreement]

Section 1.07.   *Pro Forma Calculations.*

(a)      Notwithstanding anything to the contrary herein, financial ratios and tests, including the Consolidated Cash Interest Coverage Ratio and the Consolidated Total Net Leverage Ratio and compliance with covenants determined by reference to Consolidated EBITDA or Total Assets, shall be calculated (whether or not the applicable provision references that such calculation is to be done on a "Pro Forma Basis" or giving "Pro Forma Effect" or any other similar phrase) in the manner prescribed by this Section 1.07; *provided* that notwithstanding anything to the contrary herein, when calculating (A) any such ratio for the purpose of the definition of Applicable Percentage, any mandatory prepayment provision hereunder or compliance with Section 8.11, the events set forth in Sections 1.07(b), 1.07(c), 1.07(d) and 1.07(e) below that occurred subsequent to the end of the applicable Test Period shall not be given pro forma effect and (B) any such ratio or test for purposes of the incurrence of any Indebtedness, cash and Cash Equivalents resulting from the incurrence of any such Indebtedness shall be excluded from the pro forma calculation of any applicable ratio or test.  In addition, whenever a financial ratio or test is to be calculated on a Pro Forma Basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which internal financial statements of the Borrower are available (as determined in good faith by the Borrower) (it being understood that for purposes of determining pro forma compliance with Section 8.11, if no Test Period with an applicable level cited in Section 8.11 has passed, the applicable level shall be the level for the first Test Period cited in Section 8.11 with an indicated level).  For the avoidance of doubt, the provisions of the foregoing sentence shall not apply for purposes of calculating any financial ratio or test for purposes of (i) the definition of "Applicable Percentage" and (ii) Section 8.11 (other than for the purpose of determining Pro Forma Compliance with Section 8.11), each of which shall be based on the financial statements delivered pursuant to Section 7.01(a) or (b) for which a Compliance Certificate has been delivered pursuant to Section 7.02(a), as applicable, for the relevant Test Period.

(b)      For purposes of calculating any financial ratio or test or compliance with any covenant determined by reference to Consolidated EBITDA or Total Assets, Specified Transactions (and the incurrence or repayment of any Indebtedness in connection therewith) that have been consummated (i) during the applicable Test Period or (ii) if applicable as described in clause (a) above, subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, in either case, shall be calculated on a pro forma basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA, Total Assets and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or in the case of Total Assets, on the last day of the applicable Test Period).  If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.07, then such financial ratio or test (or Total Assets) shall be calculated to give pro forma effect thereto in accordance with this Section 1.07.

[Credit Agreement]

(c)     Whenever pro forma effect is to be given to a Specified Transaction, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Borrower and may include, for the avoidance of doubt, the amount of "run-rate" cost savings, operating expense reductions and synergies resulting from or relating to any Specified Transaction which is being given pro forma effect that have been realized or are expected to be realized and for which the actions necessary to realize such cost savings, operating expense reductions and synergies are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) (calculated on a pro forma basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions and synergies were realized during the entirety of such period and "**run-rate**" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken net of the amount of actual benefits realized during such period from such actions, and any such adjustments shall be included in the initial pro forma calculations of any financial ratios or tests (and in respect of any subsequent pro forma calculations in which such Specified Transaction is given pro forma effect) and during any applicable subsequent Test Period in which the effects thereof are expected to be realized) relating to such Specified Transaction; *provided* that (A) such amounts are reasonably identifiable and factually supportable in the good faith judgment of the Borrower, (B) such actions are taken, committed to be taken or with respect to which substantial steps have been taken or are expected to be taken no later than eighteen (18) months after the date of such Specified Transaction, and (C) no amounts shall be added pursuant to this clause (c) to the extent duplicative of any amounts that are otherwise added back in computing Consolidated EBITDA (or any other components thereof), whether through a pro forma adjustment or otherwise, with respect to such period; *provided further*, that any increase to Consolidated EBITDA as a result of cost savings, operating expense reductions and synergies pursuant to this Section 1.07(c) shall be subject to the limitations set forth in the final proviso of clause (vii) of the definition of Consolidated EBITDA.

(d)     In the event that the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of the Consolidated Cash Interest Coverage Ratio, the Consolidated Total Net Leverage Ratio or any other financial ratio or test subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio or test is made, then the Consolidated Cash Interest Coverage Ratio, the Consolidated Total Net Leverage Ratio or other financial ratio or test, as applicable, shall be calculated giving pro forma effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period (except in the case of the Consolidated Cash Interest Coverage Ratio or other similar interest or fixed charge test or ratio, in which case such incurrence, assumption, guarantee, redemption, repayment, retirement or extinguishment will be given effect as if the same had occurred on the first day of the applicable Test Period); *provided* that Indebtedness incurred, repaid or prepaid under any revolving credit facility shall be excluded from the application of this clause (d) unless such incurrence, repayment or prepayment (a) shall be in connection, or substantially concurrent, with a Specified Transaction  or (b) in the case of a repayment or prepayment, such Indebtedness has been permanently repaid and not replaced.

[Credit Agreement]

(e)    Notwithstanding anything to the contrary herein, with respect to any amounts incurred or transactions entered into (or consummated) in reliance on a provision of any Section in Article VIII of this Agreement (which, for purposes of Section 8.03 of this Agreement, shall be deemed to include Section 2.18 through Section 2.20 of this Agreement) that does not require compliance with a financial ratio or test (including, without limitation, the Consolidated Total Net Leverage Ratio and/or the Consolidated Cash Interest Coverage Ratio) (any such amounts, the "**Fixed Amounts**", including, for the avoidance of doubt, any grower component based on Consolidated EBITDA) substantially concurrently with any amounts incurred or transactions, in each case, entered into (or consummated) in reliance on a provision of such Section of this Agreement that requires compliance with any such financial ratio or test (any such amounts, the "**Incurrence-Based Amounts**"), it is understood and agreed that (x) any Fixed Amount (and any cash proceeds thereof) shall be disregarded in the calculation of the financial ratio or test applicable to the relevant Incurrence-Based Amount in connection with such substantially concurrent incurrence and (y) thereafter, the incurrence of the portion of any such amount under the Fixed Amount shall be included in the calculation of Incurrence-Based Amounts.

(f)    In connection with any action being taken solely in connection with a Limited Condition Transaction, for purposes of:

(i)    determining compliance with any provision of this Agreement (other than the Financial Covenants) which is subject to a default or event of default qualifier (including any representation and warranty related thereto) or which requires the calculation of any financial ratio or test, including the Consolidated Total Net Leverage Ratio and Consolidated Cash Interest Coverage Ratio; or

(ii)    testing availability under baskets set forth in this Agreement (including baskets measured as a percentage of Consolidated EBITDA, Total Assets and baskets subject to Default and Event of Default conditions);

in each case, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Transaction, an "**LCT Election**"), the date of determination of whether any such action is permitted hereunder (or any such representation, warranty, requirement or condition therefor is complied with or satisfied (including as to the absence of any continuing Default or Event of Default) shall be deemed to be the date the definitive agreements for such Limited Condition Transaction are entered into (the "**LCT Test Date**"), and if, after giving Pro Forma Effect to the Limited Condition Transaction and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if they had occurred at the beginning of the most recent Test Period ending prior to the LCT Test Date, the Borrower or any of its Restricted Subsidiaries would have been permitted to take such action on the relevant LCT Test Date in compliance with such ratio, test or basket (and any related representations, warranties, requirements and conditions), such ratio, test or basket (and any related representations, warranties, requirements and conditions) shall be deemed to have been complied with (or satisfied).  For the avoidance of doubt, if the Borrower has made an LCT Election and any of the ratios, tests, baskets or

[Credit Agreement]

requirements or conditions for which compliance was determined or tested as of the LCT Test Date are exceeded (or not satisfied) as a result of fluctuations in any such ratio, test or basket (or due to other intervening events in the case of other requirements or conditions), including due to fluctuations in Consolidated EBITDA or Total Assets of the Borrower or the Person subject to such Limited Condition Transaction, at or prior to the consummation of the relevant transaction or action, such baskets, tests, ratios or requirements or conditions will not be deemed to have been exceeded (or not satisfied) as a result of such fluctuations (or intervening events). If the Borrower has made an LCT Election for any Limited Condition Transaction, then in connection with any calculation of any ratio, test or basket availability with respect to the incurrence of Indebtedness or Liens, the making of Restricted Payments, the making of any Investment permitted hereunder, mergers, the conveyance, lease or other transfer of all or substantially all of the assets of the Borrower, the prepayment, redemption, purchase, defeasance or other satisfaction of Indebtedness, or the designation of an Unrestricted Subsidiary (a "**Subsequent Transaction**") following the relevant LCT Test Date and prior to the earlier of the date on which such Limited Condition Transaction is consummated or the date that the definitive agreement or irrevocable notice for such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, for purposes of determining whether such Subsequent Transaction is permitted under this Agreement, any such ratio, test or basket shall be required to be satisfied on a Pro Forma Basis assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated.

(g)    If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation of the Consolidated Cash Interest Coverage Ratio is made had been the applicable rate for the entire period (taking into account any interest hedging arrangements applicable to such Indebtedness); *provided* that, in the case of repayment of any Indebtedness, to the extent actual interest related thereto was included during all or any portion of the applicable Test Period, the actual interest may be used for the applicable portion of such Test Period. Interest on a Capitalized Lease shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease in accordance with GAAP. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a London interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or Restricted Subsidiary may designate.

Section 1.08.    *Timing of Payment and Performance.*    When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day and such extension shall be reflected in the computation of interest or fees, as the case may be.

Section 1.09.    *Currency Generally.*    For purposes of determining compliance with Sections 8.01, 8.02, 8.03 and 8.06 with respect to any amount of Indebtedness or Investment in a

[Credit Agreement]

currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

For purposes of calculating the Consolidated Total Net Leverage Ratio or Consolidated Cash Interest Coverage Ratio in connection with determining compliance with the Financial Covenants, or otherwise calculating the Consolidated Total Net Leverage Ratio on any date of determination, amounts denominated in a currency other than Dollars will be translated into Dollars at the currency exchange rates used in the Borrower's latest financial statements delivered pursuant to Section 7.01(a) or (b), and will, in the case of Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of Swap Contracts permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar Equivalent of such Indebtedness.

Section 1.10.    *Exchange Rates; Currency Equivalents.*

(a)    The L/C Issuer, as applicable, shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Equivalent amounts of L/C Credit Extensions and Outstanding Amounts denominated in Alternative Currencies.  Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur.  Except for purposes of financial statements delivered by Credit Parties hereunder or calculating financial covenants hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Credit Documents shall be such Dollar Equivalent amount as so determined by the L/C Issuer.

(b)    Wherever in this Agreement in the issuance, amendment or extension of a Letter of Credit, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Letter of Credit is denominated in an Alternative Currency, such amount shall be the relevant Alternative Currency Equivalent of such Dollar amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the L/C Issuer, as the case may be.

Section 1.11.    *Additional Alternative Currencies.*

(a)    The Borrower may from time to time request that Alternative Currency Loans be made and/or Letters of Credit be issued in a currency other than those specifically listed in the definition of "Alternative Currency"; *provided* that such requested currency is an Eligible Currency. In the case of any such request with respect to the making of Alternative Currency Loans, such request shall be subject to the approval of the Administrative Agent and each Lender; and in the case of any such request with respect to the issuance of Letters of Credit, such request shall be subject to the approval of the Administrative Agent and the L/C Issuer.

(b)    Any such request shall be made to the Administrative Agent not later than 11:00 a.m., twenty (20) Business Days prior to the date of the desired Credit Extension (or such other time or date as may be agreed by the Administrative Agent and, in the case of any such

[Credit Agreement]

request pertaining to Letters of Credit, the L/C Issuer, in its or their sole discretion). In the case of any such request pertaining to Alternative Currency Loans, the Administrative Agent shall promptly notify each Lender thereof; and in the case of any such request pertaining to Letters of Credit, the Administrative Agent shall promptly notify the L/C Issuer thereof. Each Lender (in the case of any such request pertaining to Alternative Currency Loans) or the L/C Issuer (in the case of a request pertaining to Letters of Credit) shall notify the Administrative Agent, not later than 11:00 a.m., ten (10) Business Days after receipt of such request whether it consents, in its sole discretion, to the making of Alternative Currency Loans or the issuance of Letters of Credit, as the case may be, in such requested currency.

(c)    Any failure by a Lender or the L/C Issuer, as the case may be, to respond to such request within the time period specified in the preceding sentence shall be deemed to be a refusal by such Lender or the L/C Issuer, as the case may be, to permit Alternative Currency Loans to be made or Letters of Credit to be issued in such requested currency. If the Administrative Agent and such Lenders consent to making Alternative Currency Loans in such requested currency and the Administrative Agent reasonably determines in consultation with the Borrower that an appropriate interest rate is available to be used for such requested currency, the Administrative Agent shall so notify the Borrower and (i) the Administrative Agent may in consultation with the Borrower amend the definition of Alternative Currency Daily Rate or Alternative Currency Term Rate to the extent necessary to add the applicable rate for such currency and any applicable adjustment for such rate and (ii) to the extent the definition of Alternative Currency Daily Rate or Alternative Currency Term Rate, as applicable, has been amended to reflect the appropriate rate for such currency, such currency shall thereupon be deemed for all purposes to be an Alternative Currency for purposes of any Borrowings of Alternative Currency Loans. If the Administrative Agent and the L/C Issuer consent to the issuance of Letters of Credit in such requested currency, the Administrative Agent shall so notify the Borrower and (i) the Administrative Agent and the L/C Issuer may in consultation with the Borrower amend the definition of Alternative Currency Daily Rate or Alternative Currency Term Rate, as applicable, to the extent necessary to add the applicable rate for Letters of Credit in such currency and any applicable adjustment for such rate and (ii) to the extent the definition of Alternative Currency Daily Rate or Alternative Currency Term Rate, as applicable, has been amended to reflect the appropriate rate for Letters of Credit in such currency, such currency shall thereupon be deemed for all purposes to be an Alternative Currency, for purposes of any Letter of Credit issuances. If the Administrative Agent shall fail to obtain consent to any request for an additional currency under this Section 1.11, the Administrative Agent shall promptly so notify the Borrower.

Section 1.12.    *Cumulative Equity Credit Transactions*.  If more than one action occurs on any given date the permissibility of the taking of which is determined hereunder by reference to the amount of the Cumulative Equity Credit immediately prior to the taking of such action, the permissibility of the taking of each such action shall be determined independently and in no event may any two or more such actions be treated as occurring simultaneously.

Section 1.13.    *References to Agreements, Laws, Etc.*  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Credit Documents) and other contractual instruments shall be deemed to include all subsequent

[Credit Agreement]

amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by the Credit Documents; and (b) references to any Law (including by succession of comparable successor laws) shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.14.    *Interest Rates.*  The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to any reference rate referred to herein or with respect to any rate (including, for the avoidance of doubt, the selection of such rate and any related spread or other adjustment) that is an alternative or replacement for or successor to any such rate (including, without limitation, any Successor Rate) (or any component of any of the foregoing) or the effect of any of the foregoing, or of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions or other activities that affect any reference rate referred to herein, or any alternative, successor or replacement rate (including, without limitation, any Successor Rate) (or any component of any of the foregoing) or any related spread or other adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any reference rate referred to herein or any alternative, successor or replacement rate (including, without limitation, any Successor Rate) (or any component of any of the foregoing), in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or other action or omission related to or affecting the selection, determination, or calculation of any rate (or component thereof) provided by any such information source or service.

## ARTICLE 2
### COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01.    *Commitments.*  Subject to the terms and conditions set forth herein:

(a)    *[Reserved]*.

(b)    *Revolving Credit Loans.*  During the Commitment Period, each Revolving Credit Lender severally agrees to make revolving credit loans (the "**Revolving Credit Loans**") to the Borrower in Dollars or in an Alternative Currency, from time to time, on any Business Day; *provided* that after giving effect to any such Revolving Credit Loan, (i) with regard to the Revolving Credit Lenders collectively, the Outstanding Amount of Revolving Credit Obligations shall not exceed the Aggregate Revolving Credit Commitments (as the Aggregate Revolving Credit Commitments may be increased or decreased in accordance with the provisions hereof, the "**Aggregate Revolving Credit Committed Amount**") and (ii) with regard to each Revolving Credit Lender individually, such Revolving Credit Lender's Aggregate Commitment Percentage of the Outstanding Amount of Revolving Credit Obligations shall not exceed its Revolving

[Credit Agreement]

Credit Commitment. Revolving Credit Loans may consist of Base Rate Loans, Term SOFR Loans, Alternative Currency Daily Rate Loans or Alternative Currency Term Rate Loans, or a combination thereof, as the Borrower may request, and may be repaid and reborrowed in accordance with the provisions hereof.

(c)    *Letters of Credit.* During the Commitment Period, (i) the L/C Issuer agrees (A) to issue Letters of Credit denominated in Dollars or in one or more Alternative Currencies for the account of the Borrower or any of its Restricted Subsidiaries on any Business Day, (B) to amend or extend Letters of Credit previously issued hereunder, and (C) to honor drawings under Letters of Credit; and (ii) the Revolving Credit Lenders severally agree to purchase from the L/C Issuer a participation interest in the Letters of Credit issued hereunder in an amount equal to such Revolving Credit Lender's Aggregate Commitment Percentage thereof; *provided* that (x) the Outstanding Amount of L/C Obligations shall not exceed $50,000,000 (as such amount may be decreased in accordance with the provisions hereof, the "**L/C Sublimit**"), (y) the Outstanding Amount of Revolving Credit Obligations shall not exceed the Aggregate Revolving Credit Committed Amount, and (z) with regard to each Revolving Credit Lender individually, such Revolving Credit Lender's Aggregate Commitment Percentage of the Outstanding Amount of Revolving Credit Obligations shall not exceed its Revolving Credit Commitment. Subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(d)    *Swingline Loans.* During the Commitment Period, the Swingline Lender agrees to make revolving credit loans (the "**Swingline Loans**") to the Borrower in Dollars on any Business Day; *provided* that (i) the Outstanding Amount of Swingline Loans shall not exceed $40,000,000 (as such amount may be decreased in accordance with the provisions hereof, the "**Swingline Sublimit**") and (ii) with respect to the Revolving Credit Lenders collectively, the Outstanding Amount of Revolving Credit Obligations shall not exceed the Aggregate Revolving Credit Committed Amount; *provided further* that no Swingline Loans may be made on the Amendment No. 4 Effective Date. Swingline Loans shall be comprised solely of Base Rate Loans, and may be repaid and reborrowed in accordance with the provisions hereof. Immediately upon the making of a Swingline Loan, each Revolving Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swingline Lender a participation interest in such Swingline Loan in an amount equal to the product of such Revolving Credit Lender's Aggregate Commitment Percentage thereof; *provided* that the participation interest shall not be funded except on demand as provided in Section 2.04(b)(ii).

(e)    Notwithstanding the foregoing, from the Amendment No. 5 Effective Date until after the Covenant Relief Period End Date, the Borrower shall not permit the Outstanding Amount of Revolving Credit Obligations to exceed $750,000,000.

Section 2.02.    *Borrowings, Conversions and Continuations.*

(a)    Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Term SOFR Loans or Alternative Currency Term Rate Loans, as applicable, shall be made upon the Borrower's irrevocable notice to the Administrative Agent by

[Credit Agreement]

(A) telephone, or (B) a Loan Notice; *provided* that any telephonic notice by the Borrower must be confirmed promptly by delivery to the Administrative Agent of a Loan Notice; *provided further*, that the notice in connection with any Acquisition or other transaction permitted under this Agreement, may be conditioned on the closing of such Acquisition or other transaction, as applicable. Each such notice must be received by the Administrative Agent not later than noon, (A) with respect to Term SOFR Loans or any conversion of Term SOFR Loans to Base Rate Loans, three Business Days prior to the requested date thereof, (B) with respect to Alternative Currency Loans, three Business Days prior to the requested date thereof and (C) with respect to Base Rate Loans, on the requested date of, any Borrowing, conversion or continuation.

(b)     Each telephonic notice by the Borrower pursuant to this Section 2.02 must be confirmed promptly by delivery to the Administrative Agent of a written Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Except as provided in Sections 2.03(c) and 2.04(b) each Borrowing, conversion or continuation shall be in a principal amount of (x) with respect to Term SOFR Loans and Alternative Currency Loans, $1,000,000 or a whole multiple of $1,000,000 in excess thereof or (y) with respect to Base Rate Loans, $500,000 or a whole multiple of $100,000 in excess thereof. Each Loan Notice (whether telephonic or written) shall specify (i) whether such request is for a Term Borrowing, Revolving Credit Borrowing, a conversion or a continuation, (ii) the requested date of such Borrowing, conversion or continuation (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Class and Type of Loans to be borrowed, converted or continued and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Term SOFR Loans or Alternative Currency Term Rate Loans, as applicable, with an Interest Period of one month. If the Borrower requests a Borrowing of, conversion to, or continuation of Term SOFR Loans or Alternative Currency Term Rate Loans, as applicable, in any Loan Notice, but fails to specify an Interest Period, the Interest Period will be deemed to be one month. Except as provided pursuant to Section 2.12(a) and 3.03, no Loan may be converted into or continued as a Loan denominated in a different currency, but instead must be repaid in the original currency of such Loan and reborrowed in the other currency.

(c)     Following its receipt of a Loan Notice, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its pro rata share of the applicable Loans. In the case of a Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 2:00 p.m., on the Business Day specified in the applicable Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 5.02 (and, on the Amendment No. 4 Effective Date, Section 2 of Amendment No. 4), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower; *provided, however*, that if, on the date of any Revolving Credit Borrowing there are Swingline Loans or LC Borrowings outstanding, then the proceeds of such Borrowing shall be applied, first, to the payment in full of any such L/C Borrowing, second,

[Credit Agreement]

to the payment in full of any such Swingline Loans, and third, to the Borrower as provided above.

(d)    Except as otherwise provided herein, without the consent of the applicable Required Facility Lenders, (i) a Term SOFR Loan or Alternative Currency Term Rate Loan, as applicable, may be continued or converted only on the last day of an Interest Period for such Term SOFR Loan or Alternative Currency Term Rate Loan, as applicable, and (ii) any conversion into, or continuation as, a Term SOFR Loan or Alternative Currency Term Rate Loan, as applicable, may be made only if the conditions to Credit Extensions in Section 5.02 have been satisfied.  During the existence of a Default or Event of Default, (x) no Loan may be requested as, converted to or continued as a Term SOFR Loan or Alternative Currency Term Rate Loan, as applicable, and (y) at the request of the applicable Required Facility Lenders, any outstanding Term SOFR Loan shall be converted to a Base Rate Loan on the last day of the Interest Period with respect thereto.

(e)    The Administrative Agent shall promptly notify the Borrower and the Appropriate Lenders of the interest rate applicable to any Interest Period for Term SOFR Loans or Alternative Currency Term Rate Loans upon determination of such interest rate.  The determination of the Term SOFR or Alternative Currency Term Rate by the Administrative Agent shall be conclusive in the absence of manifest error.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Appropriate Lenders of any change in Bank of America's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(f)    After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than ten Interest Periods in effect with respect to the Facilities; *provided* that after the establishment of any new Class of Loans pursuant to an Incremental Amendment, Refinancing Amendment or Extension Amendment, the number of Interest Periods otherwise permitted by this Section 2.02(f) shall increase by three (3) Interest Periods for each applicable Class so established.

(g)    With respect to any Alternative Currency Daily Rate or SOFR, the Administrative Agent and the Borrower will have the right to jointly make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document; provided that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Conforming Changes to the Lenders reasonably promptly after such amendment becomes effective.

Section 2.03.    *Additional Provisions with Respect to Letters of Credit.*

(a)    Obligation to Issue or Amend.

(i)    The L/C Issuer shall not issue any Letter of Credit if:

[Credit Agreement]

(A)    except as otherwise provided in Section 2.03(b)(iii), the expiry date would occur more than (I) in the case of a standby Letter of Credit, one year from the date of issuance or (II) in the case of a commercial Letter of Credit, 180 days from the date of issuance, in each case unless the Required Revolving Credit Lenders and the L/C Issuer shall have otherwise given their approval;

(B)    the expiry date of any such Letter of Credit would occur after the L/C Expiration Date, unless the Revolving Credit Lenders and the L/C Issuer shall have otherwise given their approval or the Outstanding Amount of L/C Obligations in respect of such requested Letter of Credit has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the applicable L/C Issuer; *provided* that once such Letter of Credit is fully Cash Collateralized, the other Lenders are released from liability as a Participant; or

(C)    any such Letter of Credit is to be used for purposes other than those permitted under Section 7.11, unless the Required Lenders shall have otherwise given their approval.

(ii)    The L/C Issuer shall not be under any obligation to issue any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or request that the L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense that was not applicable on the Closing Date and that the L/C Issuer in good faith deems material to it;

(B)    the issuance of such Letter of Credit would violate any Law or one or more policies of the L/C Issuer;

(C)    except as otherwise agreed by the L/C Issuer and the Administrative Agent, such Letter of Credit is in an initial stated amount less than $100,000, in the case of a commercial Letter of Credit, or $200,000, in the case of a standby Letter of Credit;

(D)    such Letter of Credit is to be denominated in a currency other than Dollars or an Alternative Currency;

(E)    such Letter of Credit contains provisions for automatic reinstatement of the stated amount after any drawing thereunder;

[Credit Agreement]

(F)    any Revolving Credit Lender is at such time a Defaulting Lender, unless Cash Collateral or other Adequate Assurance shall have been provided, including arrangements to eliminate the L/C Issuer's actual or potential Fronting Exposure (after giving effect to Section 2.17(a)(vii)) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other L/C Obligations as to which the L/C Issuer has actual or potential Fronting Exposure, as it may elect in its sole discretion; or

(G)    except with respect to any Letter of Credit to be issued in Dollars, the L/C Issuer does not as of the issuance date of the requested Letter of Credit issue Letters of Credit in the requested currency.

(iii)    The L/C Issuer shall not amend any Letter of Credit if the L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof.

(iv)    The L/C Issuer shall not be under any obligation to amend any Letter of Credit if:

(A)    the L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof; or

(B)    the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(v)    The L/C Issuer shall act on behalf of the Revolving Credit Lenders with respect to any Letter of Credit issued by it and the documents associated therewith.  The L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article 10 with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by them or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article 10 included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(b)    *Procedures for Issuance and Amendment; Auto-Extension Letters of Credit.*

(i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the L/C Issuer (with a copy to the Administrative Agent) in the form of an L/C Application appropriately completed and signed by a Responsible Officer of the Borrower.  L/C Applications must be received by the L/C Issuer and the Administrative Agent not later than 12:00 p.m. at least two Business Days (or, in the case of a Letter of Credit denominated in an Alternative Currency, three Business Days) prior to the proposed issuance date or date of amendment, as the case may be, or such later

[Credit Agreement]

date and time as the L/C Issuer and the Administrative Agent may agree in a particular instance in their sole discretion. In the case of a request for an initial issuance of a Letter of Credit, such L/C Application shall specify in form and detail reasonable satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount and currency thereof and in the absence of specification of currency shall be deemed a request for a Letter of Credit denominated in Dollars; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such L/C Application shall specify in form and detail reasonable satisfactory to the L/C Issuer (I) the Letter of Credit to be amended; (II) the proposed date of amendment thereof (which shall be a Business Day); (III) the nature of the proposed amendment; and (IV) such other matters as the L/C Issuer may reasonably require. Additionally, the Borrower shall furnish to the L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer or the Administrative Agent may reasonably require.

(ii)    Promptly after receipt of any L/C Application, the L/C Issuer will confirm (by telephone or in writing) with the Administrative Agent that the Administrative Agent has received a copy of such L/C Application from the Borrower and, if not, the L/C Issuer will provide the Administrative Agent with a copy thereof. Unless the L/C Issuer has received written notice from the Administrative Agent, any Lender or any Credit Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article 5 shall not then be satisfied, then, subject to the terms and conditions hereof, the L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrower (or any of its Restricted Subsidiaries) or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices. Immediately upon the issuance of each Letter of Credit, each Revolving Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the L/C Issuer a risk participation in such Letter of Credit in an amount equal to such Revolving Credit Lender's Aggregate Commitment Percentage thereof.

(iii)    If the Borrower so requests in an L/C Application, the L/C Issuer shall agree to issue a standby Letter of Credit that has automatic extension provisions (each, an "**Auto-Extension Letter of Credit**"); *provided* that any such Auto-Extension Letter of Credit must permit the L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof

[Credit Agreement]

not later than a day (the "**Non-Extension Notice Date**") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by the L/C Issuer, the Borrower shall not be required to make a specific request to the L/C Issuer for any such extension.   Once an Auto-Extension Letter of Credit has been issued, the Revolving Credit Lenders shall be deemed to have authorized (but may not require) the L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than the L/C Expiration Date; *provided, however*, that the L/C Issuer shall not permit any such extension if (1) the L/C Issuer has determined that it would not be permitted or would have no obligation at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of Section 2.03(a) or otherwise), or (2) it has received notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Extension Notice Date (x) from the Administrative Agent that the Required Revolving Credit Lenders have elected not to permit such extension or (y) from the Administrative Agent, any Revolving Credit Lender or the Borrower that one or more of the applicable conditions specified in Section 5.02 is not then satisfied, and in each case directing the L/C Issuer not to permit such extension.

(iv)    If the Borrower so requests in any L/C Application, the L/C Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that permits the automatic reinstatement of all or a portion of the stated amount thereof after any drawing thereunder (each, an "**Auto-Reinstatement Letter of Credit**"). Unless otherwise directed by the L/C Issuer, the Borrower shall not be required to make a specific request to the L/C Issuer to permit such reinstatement.  Once an Auto-Reinstatement Letter of Credit has been issued, except as provided in the following sentence, the Revolving Credit Lenders shall be deemed to have authorized (but may not require) the L/C Issuer to reinstate all or a portion of the stated amount thereof in accordance with the provisions of such Letter of Credit. Notwithstanding the foregoing, if such Auto-Reinstatement Letter of Credit permits the L/C Issuer to decline to reinstate all or any portion of the stated amount thereof after a drawing thereunder by giving notice of such non-reinstatement within a specified number of days after such drawing (the "**Non-Reinstatement Deadline**"), the L/C Issuer shall not permit such reinstatement if it has received a notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Reinstatement Deadline (A) from the Administrative Agent that the Required Facility Lenders have elected not to permit such reinstatement or (B) from the Administrative Agent, any Revolving Credit Lender or the Borrower that one or more of the applicable conditions specified in Section 5.02 is not then satisfied (treating such reinstatement as an L/C Credit Extension for purposes of this clause) and, in each case, directing the L/C Issuer not to permit such reinstatement.

(v)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Borrower and the

[Credit Agreement]

Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(vi)    The L/C Issuer will provide to the Administrative Agent, at least quarterly and more frequently upon request of the Administrative Agent, a summary report on the Letters of Credit it has issued, including, among other things, on whose account each Letter of Credit is issued and each Letter of Credit's beneficiary, face amount and expiry date.

(c)    *Drawings and Reimbursements; Funding of Participations.*

(i)    Upon any drawing under any Letter of Credit, the L/C Issuer shall notify the Borrower and the Administrative Agent thereof. In the case of a Letter of Credit denominated in an Alternative Currency, the Borrower shall reimburse the L/C Issuer in such Alternative Currency, unless (A) the L/C Issuer (at its option) shall have specified in such notice that it will require reimbursement in Dollars, or (B) in the absence of any such requirement for reimbursement in Dollars, the Borrower shall have notified the L/C Issuer promptly following receipt of the notice of drawing that the Borrower will reimburse the L/C Issuer in Dollars. In the case of any such reimbursement in Dollars of a drawing under a Letter of Credit denominated in an Alternative Currency, the L/C Issuer shall notify the Borrower of the Dollar Equivalent of the amount of the drawing promptly following the determination thereof. Not later than 12:00 p.m. on the Business Day following any payment by the L/C Issuer under a Letter of Credit to be reimbursed in Dollars, or the Applicable Time on the date of any payment by the L/C Issuer under a Letter of Credit to be reimbursed in an Alternative Currency (such date, an "**L/C Honor Date**"), the Borrower shall reimburse the L/C Issuer in Dollars in an amount equal to the amount of such drawing and in the applicable currency. In the event that (A) a drawing denominated in an Alternative Currency is to be reimbursed in Dollars pursuant to the second sentence in this Section 2.03(c)(i) and (B) the Dollar amount paid by the Borrower, whether on or after the L/C Honor Date, shall not be adequate on the date of that payment to purchase in accordance with normal banking procedures a sum denominated in the Alternative Currency equal to the drawing, the Borrower agrees, as a separate and independent obligation, to indemnify the L/C Issuer for the loss resulting from its inability on that date to purchase the Alternative Currency in the full amount of the drawing. The L/C Issuer shall notify the Administrative Agent of any failure of the Borrower to reimburse a drawn Letter of Credit. If the Borrower fails to so reimburse the L/C Issuer by such time, the Administrative Agent shall promptly notify each Revolving Credit Lender of the L/C Honor Date, the amount of the unreimbursed drawing (expressed in Dollars in the amount of the Dollar Equivalent thereof in the case of a Letter of Credit denominated in an Alternative Currency) (the "**L/C Unreimbursed Amount**"), and the amount of such Revolving Credit Lender's Aggregate Commitment Percentage thereof. In such event, the Borrower shall be deemed to have requested a Revolving Credit Borrowing of Base Rate Loans to be disbursed on

[Credit Agreement]

the L/C Honor Date in an amount equal to the L/C Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.02(b) for the principal amount of Base Rate Loans, the amount of the unutilized portion of the Aggregate Revolving Credit Committed Amount or the conditions set forth in Section 5.02. Any notice given by the L/C Issuer or the Administrative Agent pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)    Each Revolving Credit Lender shall upon any notice pursuant to Section 2.03(c)(i) make funds available to the Administrative Agent (and the Administrative Agent shall apply Cash Collateral provided for this purpose) for the account of the L/C Issuer, in Dollars, at the Administrative Agent's Office for Dollar-denominated payments in an amount equal to its Aggregate Commitment Percentage of the L/C Unreimbursed Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.03(c)(iii), each Revolving Credit Lender that so makes funds available shall be deemed to have made a Revolving Credit Loan that is a Base Rate Loan to the Borrower in such amount. The Administrative Agent shall remit the funds so received to the L/C Issuer in Dollars.

(iii)    With respect to any L/C Unreimbursed Amount that is not fully refinanced by a Revolving Credit Borrowing of Base Rate Loans for any reason, the Borrower shall be deemed to have incurred from the L/C Issuer an L/C Borrowing in the amount of the L/C Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate. In such event, each Revolving Credit Lender's payment to the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Revolving Credit Lender in satisfaction of its participation obligation under this Section 2.03(c)(iii).

(iv)    Until each Revolving Credit Lender funds its Revolving Credit Loan or L/C Advance pursuant to this Section 2.03(c) to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Revolving Credit Lender's Aggregate Commitment Percentage of such amount shall be solely for the account of the L/C Issuer.

(v)    Each Revolving Credit Lender's obligation to make Revolving Credit Loans or L/C Advances, to reimburse the L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right that such Revolving Credit Lender may have against the L/C Issuer, the Borrower or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default or

[Credit Agreement]

Event of Default, (C) non-compliance with the conditions set forth in Section 5.02, or (D) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided* that the L/C Issuer shall have complied with the applicable provisions of Section 2.03(b)(ii). No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrower to reimburse the L/C Issuer for the amount of any payment made by the L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)    If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the L/C Issuer any amount required to be paid by such Revolving Credit Lender pursuant to the foregoing provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(ii), the L/C Issuer shall be entitled to recover from such Revolving Credit Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the L/C Issuer at a rate per annum equal to the applicable Overnight Rate from time to time in effect. A certificate of the L/C Issuer submitted to any Revolving Credit Lender (through the Administrative Agent) with respect to any amounts owing under this clause (vi) shall be conclusive absent manifest error.

(d)    *Repayment of Participations.*

(i)    At any time after the L/C Issuer has made a payment under any Letter of Credit and has received from any Revolving Credit Lender such Revolving Credit Lender's L/C Advance in respect of such payment in accordance with Section 2.03(c), if the Administrative Agent receives for the account of the L/C Issuer any payment in respect of the related L/C Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Revolving Credit Lender its Aggregate Commitment Percentage thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Credit Lender's L/C Advance was outstanding) in Dollars or in the same currency as those received by the Administrative Agent.

(ii)    If any payment received by the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(ii) is required to be returned under any of the circumstances described in Section 11.05 (including pursuant to any settlement entered into by the L/C Issuer in its discretion), each Revolving Credit Lender shall pay to the Administrative Agent for the account of the L/C Issuer its pro rata share thereof on demand of the Administrative Agent, *plus* interest thereon from the date of such demand to the date such amount is returned by such Revolving Credit Lender, at a rate per annum equal to the applicable Overnight Rate from time to time in effect. The obligations of the Lenders under

[Credit Agreement]

this clause shall survive the payment in full of the Obligations and the termination of this Credit Agreement.

(e)    *Obligations Absolute.* The obligation of the Borrower to reimburse the L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Credit Agreement under all circumstances, including the following:

(i)    any lack of validity or enforceability of such Letter of Credit, this Credit Agreement or any other Credit Document;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that the Borrower or any of its Subsidiaries may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Credit Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)    any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)    any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or any Guarantor; or

(vi)    any adverse change in the relevant exchange rates or in the availability of the relevant Alternative Currency to the Borrower or any Subsidiary or in the relevant currency markets generally.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to the Borrower and, in the event of any claim of non-compliance with the Borrower's instructions or other irregularity, the Borrower will immediately notify the L/C Issuer. The Borrower shall be conclusively deemed to have waived

[Credit Agreement]

any such claim against the L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)     *Role of the L/C Issuer in such Capacity.* Each Lender and the Borrower agrees that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Revolving Credit Lenders or the Required Revolving Credit Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence, bad faith or willful misconduct; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to the Borrower's use of any Letter of Credit; *provided, however,* that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as the Borrower may have against the beneficiary or transferee at law or under any other agreement. None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer, shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.03(e); *provided, however,* that anything in such clauses to the contrary notwithstanding, the L/C Issuer shall be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower that the Borrower proves were caused by the L/C Issuer's willful misconduct, bad faith or gross negligence as determined by a court of competent jurisdiction by a final and non-appealable judgment or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, that may prove to be invalid or ineffective for any reason. The L/C Issuer may send a Letter of Credit or conduct any communication to or from the beneficiary via the Society for Worldwide Interbank Financial Telecommunication ("**SWIFT**") message or overnight courier, or any other commercially reasonable means of communicating with a beneficiary.

(g)     *Applicability of ISP and UCP.* Unless otherwise expressly agreed by the L/C Issuer and the Borrower when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each commercial Letter of Credit.

[Credit Agreement]

(h)    *Letters of Credit Issued for Restricted Subsidiaries*.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, any other Restricted Subsidiary, the Borrower shall be obligated to reimburse the L/C Issuer for any and all drawings under such Letter of Credit.  The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of any other Restricted Subsidiary inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such other Restricted Subsidiaries.

(i)    *Letter of Credit Fees*.  The Borrower shall pay Letter of Credit fees as set forth in Section 2.09(b).

(j)    *Conflict with Issuer Documents*.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

Section 2.04.    *Additional Provisions with Respect to Swingline Loans*.

(a)    *Borrowing Procedures*.

(i)    *Swingline Loans*.  Each Swingline Borrowing shall be made upon the Borrower's irrevocable notice to the Swingline Lender and the Administrative Agent (A) telephone, or (B) a Loan Notice; *provided* that any telephonic notice by the Borrower must be confirmed promptly by delivery to the Administrative Agent of a Loan Notice.  Each such notice must be received by the Swingline Lender and the Administrative Agent not later than 2:00 p.m. on the requested borrowing date, and shall specify (a) the amount to be borrowed, which shall be a minimum of $100,000, and (b) the requested borrowing date, which shall be a Business Day.  Each such telephonic notice must be confirmed promptly by delivery to the Swingline Lender and the Administrative Agent of a written Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower.  Promptly after receipt by the Swingline Lender of any telephonic Loan Notice, the Swingline Lender will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has also received such Loan Notice and, if not, the Swingline Lender will notify the Administrative Agent (by telephone or in writing) of the contents thereof.  Unless the Swingline Lender has received notice (by telephone or in writing) from the Administrative Agent (including at the request of any Lender) prior to 3:00 p.m. on the date of the proposed Swingline Borrowing (i) directing the Swingline Lender not to make such Swingline Loan as a result of the limitations set forth in this Article 2, or (ii) that one or more of the applicable conditions specified in Article 5 is not then satisfied, then, subject to the terms and conditions hereof, the Swingline Lender will, not later than 3:00 p.m. on the borrowing date specified in such Loan Notice, make the amount of its Swingline Loan available to the Borrower at its office by crediting the account of the Borrower on the books of the Swingline Lender in immediately available funds.  Notwithstanding anything to the contrary contained in this Section 2.04 or elsewhere in this Agreement, the Swingline Lender shall not be obligated to make any Swingline Loan at a time when a Revolving Credit

[Credit Agreement]

Lender is a Defaulting Lender unless the Swingline Lender has entered into arrangements reasonably satisfactory to it and the Borrower to eliminate the Swingline Lender's Fronting Exposure (after giving effect to Section 2.17(a)(vii)) with respect to the Defaulting Lender's or Defaulting Lenders' participation in such Swingline Loans, including by providing Cash Collateral or other Adequate Assurance to support such Defaulting Lender's or Defaulting Lenders' Aggregate Commitment Percentage of the outstanding Swingline Loans or other applicable share provided for under this Agreement. The Borrower shall repay to the Swingline Lender each Defaulting Lender's portion (after giving effect to Section 2.17(a)(vii)) of each Swingline Loan promptly following demand by the Swingline Lender.

(b)     *Refinancing.*

(i)     The Swingline Lender at any time in its sole and absolute discretion may request, on behalf of the Borrower (which hereby irrevocably authorizes the Swingline Lender to so request on its behalf), that each Revolving Credit Lender make a Revolving Credit Loan that is a Base Rate Loan in an amount equal to such Revolving Credit Lender's Aggregate Commitment Percentage of Swingline Loans then outstanding. Such request shall be made in writing (which written request shall be deemed to be a Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02(a), without regard to the minimum and multiples specified in Section 2.02(b) for the principal amount of Revolving Credit Loans, the unutilized portion of the Aggregate Revolving Credit Commitments or the conditions set forth in Section 5.02. The Swingline Lender shall furnish the Borrower with a copy of the applicable Loan Notice promptly after delivering such notice to the Administrative Agent. Each Revolving Credit Lender shall make an amount equal to its pro rata share of the amount specified in such Loan Notice available to the Administrative Agent in immediately available funds (and the Administrative Agent may apply Cash Collateral available with respect to the applicable Swingline Loan) for the account of the Swingline Lender at the Administrative Agent's Office not later than 1:00 p.m. on the day specified in such Loan Notice, whereupon, subject to Section 2.04(b)(ii), each Revolving Credit Lender that so makes funds available shall be deemed to have made a Revolving Credit Loan that is a Base Rate Loan to the Borrower in such amount. In such case, the Administrative Agent shall remit the funds so received to the Swingline Lender.

(ii)     If for any reason any Swingline Loan cannot be refinanced by such a Borrowing of Revolving Credit Loans in accordance with Section 2.04(b)(i), the request for Revolving Credit Loans submitted by the Swingline Lender as set forth herein shall be deemed to be a request by the Swingline Lender that each of the Revolving Credit Lenders fund its risk participation in the relevant Swingline Loan and each Revolving Credit Lender's payment to the Administrative Agent for the account of the Swingline Lender pursuant to Section 2.04(b)(i) shall be deemed payment in respect of such participation.

[Credit Agreement]

(iii)    If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the Swingline Lender any amount required to be paid by such Revolving Credit Lender pursuant to the foregoing provisions of this Section 2.04(b) by the applicable time specified in Section 2.04(b)(i) the Swingline Lender shall be entitled to recover from such Revolving Credit Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swingline Lender at a rate per annum equal to the applicable Overnight Rate from time to time in effect. A certificate of the Swingline Lender submitted to any Revolving Credit Lender (through the Administrative Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)    Each Revolving Credit Lender's obligation to make Revolving Credit Loans or to purchase and fund risk participations in Swingline Loans pursuant to this Section 2.04(b) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right that such Lender may have against the Swingline Lender, the Borrower or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default or Event of Default, (C) non-compliance with the conditions set forth in Section 5.02, or (D) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided* that the Swingline Lender has complied with the provisions of Section 2.04(a). No such purchase or funding of risk participations shall relieve or otherwise impair the obligation of the Borrower to repay Swingline Loans, together with interest as provided herein.

(c)    *Repayment of Participations.*

(i)    At any time after any Revolving Credit Lender has purchased and funded a risk participation in a Swingline Loan, if the Swingline Lender receives any payment on account of such Swingline Loan, the Swingline Lender will distribute to such Revolving Credit Lender its Aggregate Commitment Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Credit Lender's risk participation was funded) in the same funds as those received by the Swingline Lender.

(ii)    If any payment received by the Swingline Lender in respect of principal or interest on any Swingline Loan is required to be returned by the Swingline Lender under any of the circumstances described in Section 11.05 (including pursuant to any settlement entered into by the Swingline Lender in its discretion), each Revolving Credit Lender shall pay to the Swingline Lender its Aggregate Commitment Percentage thereof on demand of the Administrative Agent, *plus* interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the applicable Overnight Rate. The

[Credit Agreement]

Administrative Agent will make such demand upon the request of the Swingline Lender. The obligations of the Revolving Credit Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Credit Agreement.

(d)     *Interest for Account of the Swingline Lender.* The Swingline Lender shall be responsible for invoicing the Borrower for interest on the Swingline Loans. Until each Revolving Credit Lender funds its Revolving Credit Loan or risk participation pursuant to this Section 2.04 to refinance such Revolving Credit Lender's Aggregate Commitment Percentage of any Swingline Loan, interest in respect thereof shall be solely for the account of the Swingline Lender.

(e)     *Payments Directly to Swingline Lender.* The Borrower shall make all payments of principal and interest in respect of the Swingline Loans, directly to the Swingline Lender.

Section 2.05.    *Repayment of Loans.*

(a)     *[Reserved].*

(b)     *Revolving Credit Loans.* The Outstanding Amount of Revolving Credit Loans shall be repaid in full on the Revolving Termination Date.

(c)     *Swingline Loans.* The Outstanding Amount of the Swingline Loans shall be repaid in full on the earlier to occur of (i) the date five (5) Business Days after such Loan is made and (ii) the Revolving Termination Date.

Section 2.06.    *Prepayments.*

(a)     *Voluntary Prepayments.* The Loans may be repaid in whole or in part without premium or penalty (except, in the case of Loans other than Base Rate Loans, amounts payable pursuant to Section 3.05)); *provided* that:

(i)     in the case of Loans other than Swingline Loans, notice thereof must be received by 12:00 p.m. by the Administrative Agent (A) at least three Business Days prior to the date of prepayment, in the case of Term SOFR Loans, (B) on the date of prepayment, in the case of Base Rate Loans and (C) at least three Business Days prior to the date of prepayment, in the case of Alternative Currency Loans, and in each case, any such prepayment shall be a minimum principal amount of $1,000,000 and integral multiples of $1,000,000 in excess thereof, in the case of Term SOFR Loans and Alternative Currency Loans and $500,000 and integral multiples of $100,000 in excess thereof, in the case of Base Rate Loans, or, in each case, the entire remaining principal amount thereof, if less;

(ii)     in the case of Swingline Loans, (A) notice thereof must be received by the Swingline Lender by 1:00 p.m. on the date of prepayment (with a copy to the Administrative Agent), and (B) any such prepayment shall be in the same

[Credit Agreement]

minimum principal amounts as for advances thereof (or any lesser amount that may be acceptable to the Swingline Lender).

Each such notice of voluntary prepayment hereunder shall be irrevocable (*provided* that the notice may be conditional upon any refinancing or other conditional event and may be rescinded by the Borrower if such refinancing or other conditional event shall not be consummated or is otherwise delayed) and shall specify the date and amount of prepayment and the Class and Type(s) of Loans that are being prepaid and, if Term SOFR Loans or Alternative Currency Term Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will give prompt notice to the Appropriate Lenders of any prepayment on the Loans and the Appropriate Lender's interest therein. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Prepayments of Term SOFR Loans or Alternative Currency Term Rate Loans hereunder shall be accompanied by accrued interest on the amount prepaid and breakage or other amounts due, if any, under Section 3.05.

     (b)    *Mandatory Prepayments.*

        (i)    *Revolving Credit Commitments.* If at any time (A) the Outstanding Amount of Revolving Credit Obligations shall exceed the Aggregate Revolving Credit Committed Amount, (B) the Outstanding Amount of L/C Obligations shall exceed the L/C Sublimit or (C) the Outstanding Amount of Swingline Loans shall exceed the Swingline Sublimit, the Borrower will immediately prepay the Revolving Credit Obligations in an amount equal to such excess; *provided*, *however*, that L/C Obligations will not be required to be Cash Collateralized hereunder until the Revolving Credit Loans and Swingline Loans have been paid in full.

        (ii)    (A) *Dispositions and Involuntary Dispositions.* Subject to Section 2.06(b)(ii)(D) and the terms set forth in any applicable Incremental Amendment, Extension Amendment, Refinancing Amendment or Replacement Amendment, the Borrower will prepay the Term Loans (if any) on the fifth Business Day following receipt of Net Cash Proceeds in an amount equal to 100% of the Net Cash Proceeds received from any Disposition pursuant Section 8.05(b) or any Involuntary Disposition by the Borrower or any Restricted Subsidiary; *provided* that if (x) the Borrower delivers, no later than the last day of such five Business Day period following receipt, a certificate of a Responsible Officer to the Administrative Agent setting forth the Borrower's intent to reinvest such proceeds in assets useful in the business of the Borrower or any Restricted Subsidiary and (y) no Default or Event of Default shall have occurred and be continuing at the time of such certificate or at the proposed time of the application of such proceeds, and such proceeds shall not be required to be applied to prepay the Term Loans except to the extent such proceeds are not so reinvested within (A) twelve (12) months following receipt of such Net Cash Proceeds or (B) if the Borrower or any Restricted Subsidiary enters into a legally binding commitment to reinvest such Net Cash Proceeds within twelve (12) months following receipt

[Credit Agreement]

thereof, the later of (I) twelve (12) months following receipt thereof and (II) one hundred eighty (180) days after the end of such 12-month period.

(B)     *Incurrence of Indebtedness.* The Borrower will prepay the Term Loans (if any) on or prior to the fifth Business Day following receipt of Net Cash Proceeds in an amount equal to 100% of the Net Cash Proceeds received from any incurrence or issuance of Indebtedness by the Borrower or any Restricted Subsidiary, other than Indebtedness permitted to be incurred or issued pursuant to Section 8.03.

(C)     *Refinancing Loans and Refinancing Equivalent Debt.* If the Borrower incurs or issues any Refinancing Term Loans (or Refinancing Equivalent Debt) resulting in Net Cash Proceeds (as opposed to such Refinancing Term Loans or Refinancing Equivalent Debt arising out of an exchange of existing Term Loans for such Refinancing Term Loans or Refinancing Equivalent Debt), the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans in an amount equal to 100% of all Net Cash Proceeds received therefrom on or prior to the fifth Business Day following receipt of such Net Cash Proceeds.

(D)     *Foreign Dispositions and Foreign Involuntary Dispositions.* Notwithstanding anything to the contrary contained in this Section 2.06(b), mandatory prepayments arising from the receipt of Net Cash Proceeds from any Disposition or Involuntary Disposition by any Foreign Subsidiary pursuant to Section 2.06(b)(ii)(A) (each, a "**Foreign Disposition**") shall not be required (1) to the extent the making of any such mandatory prepayment from the Net Cash Proceeds of such Foreign Disposition (or the repatriation of funds to effect such payment) would give rise to a material adverse tax consequence (as reasonably determined in good faith by the Borrower), (2) without duplication (including with respect to any reduction set forth in the definitions of Net Cash Proceeds), to the extent such amounts have been applied to prepay any Indebtedness of any Foreign Subsidiary or to the extent such Foreign Subsidiary has reinvested such amounts in assets useful in its business or the business of the Borrower or its Restricted Subsidiaries, *provided* that no such reinvestments shall be permitted at the time an Event of Default shall then be continuing or (3) so long as the applicable local Law will not permit repatriation thereof to the United States (the Borrower hereby agreeing to use commercially reasonable efforts to cause the applicable Foreign Subsidiary to promptly file any required forms, obtain any necessary consents and take all similar actions reasonably required by the applicable local Law to permit such repatriation); *provided* that if such repatriation of any such affected Net Cash Proceeds is later permitted under applicable Law, unless such amounts have previously been applied to prepayments or reinvestments to the extent permitted by clause (2) above, such repatriation will, subject to clause (1) above, be effected as promptly as practicable and such repatriated Net Cash Proceeds will be promptly after such repatriation applied pursuant to Section 2.06(b)(ii)(A), deeming such Net Cash Proceeds as having been received for purposes of such Section on the date of such repatriation. All mandatory prepayments required to be made from the Net Cash Proceeds of any Foreign Dispositions shall not be required until a date which is 65 Business Days following the receipt of such Net Cash Proceeds.

[Credit Agreement]

(E)      The Borrower shall deliver to the Administrative Agent, in connection with each prepayment required under this Section 2.06(b)(ii), (i) a certificate signed by a Responsible Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) at least three (3) Business Days' prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date and the principal amount of each Loan (or portion thereof) to be prepaid.

(F)      Each Term Lender may reject all (but not less than all) of its applicable share of any mandatory prepayment required to be made by the Borrower pursuant to clauses (A), (B) and (D) (such declined amounts, the "**Mandatory Prepayment Declined Proceeds**") of Term Loans required to be made pursuant to this Section 2.06(b)(ii) by providing written notice (each, a "**Mandatory Prepayment Rejection Notice**") to the Administrative Agent and the Borrower not later than 5:00 p.m., New York City time, one Business Day after the date of such Term Lender's receipt of notice from the Administrative Agent regarding such prepayment.  If a Term Lender fails to deliver a Mandatory Prepayment Rejection Notice to the Administrative Agent within the time frame specified above such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans.  Any Mandatory Prepayment Declined Proceeds shall be shall be offered to the Term Lenders not so declining such prepayment on a pro rata basis in accordance with the amounts of the Term Loans of such Lender (with such non-declining Term Lenders having the right to decline any prepayment with Mandatory Prepayment Declined Proceeds at the time and in the manner specified by the Administrative Agent).  To the extent such non-declining Term Lenders elect to decline their pro rata share of such Mandatory Prepayment Declined Proceeds, any Mandatory Prepayment Declined Proceeds remaining thereafter shall be retained by the Borrower.

(c)      *Application*.  Within each Class, prepayments will be applied to each Type of Loan as directed by the Borrower.  In addition:

(i)      *Voluntary Prepayments*.  Voluntary prepayments shall be applied as specified by the Borrower.  In the absence of a designation by the Borrower, any voluntary prepayment of the Term Loans shall be applied within each Class of Term Loans to reduce the principal repayment installments of such Class of Term Loans in direct order of maturity.  Voluntary prepayments on the Loan Obligations will be paid by the Administrative Agent to the Lenders ratably in accordance with their respective Aggregate Commitment Percentage.

(ii)     *Mandatory Prepayments.*

(A)      Mandatory prepayments in respect of the Revolving Credit Facility under Section 2.06(b)(i) above shall be applied *first*, to the Swingline Loans until paid in full, *second*, to the Revolving Credit Loans until paid in full, and, *third*, to Cash Collateralize outstanding Letters of Credit.

(B)      Mandatory prepayments in respect of Term Loans under Section 2.06(b)(ii) above shall be applied to scheduled installments of principal as specified by the Borrower.  In the absence of a designation by the Borrower, any

[Credit Agreement]

mandatory prepayment of the Term Loans shall be applied to reduce the principal repayment installments of such Term Loan Facility in direct order of maturity.

All prepayments under Section 2.06(b) shall be subject to Section 3.05, but otherwise without premium or penalty, and shall be accompanied by interest on the principal amount prepaid through the date of prepayment.

Section 2.07.    *Termination or Reduction of Commitments.*

(a)    *Voluntary Reductions of Revolving Credit Commitments.*  The Aggregate Revolving Credit Commitments hereunder may be permanently reduced in whole or in part by notice from the Borrower to the Administrative Agent; *provided* that (i) any such notice thereof must be received by 12:00 p.m. at least three Business Days prior to the date of reduction or termination and any such prepayment shall be in a minimum principal amount of $5,000,000 and integral multiples of $1,000,000 in excess thereof; (ii) none of the Aggregate Revolving Credit Commitments may be reduced to an amount less than the Revolving Credit Obligations then outstanding thereunder and (iii) if, after giving effect to any reduction of any of the Aggregate Revolving Credit Commitments, the L/C Sublimit or the Swingline Sublimit exceeds the amount of applicable Aggregate Revolving Credit Commitments, such sublimit shall be automatically reduced by the amount of such excess.  The Administrative Agent will give prompt notice to the Revolving Credit Lenders of any such reduction in the Aggregate Revolving Credit Commitments.  Notwithstanding the foregoing, the Borrower may rescind or postpone any notice of termination of any Revolving Credit Commitments if such termination would have resulted from a refinancing of all of the applicable Class of Revolving Credit Commitments or other conditional event, which refinancing or other conditional event shall not be consummated or shall otherwise be delayed.

(b)    *Mandatory Reductions of Revolving Credit Commitments.*  The Aggregate Revolving Credit Committed Amount shall not be permanently reduced upon application of any mandatory prepayments to the Revolving Credit Obligations.

(c)    *[Reserved].*

(d)    *Payment of Fees.*  All Commitment Fees or other fees accrued with respect to such portion of the Aggregate Revolving Credit Commitments terminated or reduced pursuant to Section 2.07 through the effective date of such termination or reduction shall be paid on the effective date of such termination or reduction.

Section 2.08.    *Interest.*

(a)    Subject to the provisions of subsection (b) below, (i) each Term SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Term SOFR for such Interest Period *plus* the Applicable Percentage; (ii) each Loan that is a Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Percentage, (iii) each Alternative Currency Daily Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum

[Credit Agreement]

equal to the Alternative Currency Daily Rate plus the Applicable Percentage; (iv) each Alternative Currency Term Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Alternative Currency Term Rate for such Interest Period plus the Applicable Percentage and (v) each Swingline Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Percentage.

(b)     (i)  If any amount of principal of any Loan is not paid when due (after giving effect to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such overdue amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.

(ii)     If any amount (other than principal of any Loan) payable under any Credit Document is not paid when due (after giving effect to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such overdue amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.

(iii)     Upon the occurrence and during the continuation of an Event of Default under Section 9.01(f), the principal amount of all outstanding Obligations hereunder shall bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.

(iv)     Accrued and unpaid interest on past due amounts (including interest on past due amounts) shall be due and payable upon demand.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09.  *Fees*

(a)     *Commitment Fees.*

(i)     *Revolving Credit Commitment.*  The Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender (other than a Defaulting Lender which shall be dealt with as provided in Section 2.17) in accordance with its Aggregate Commitment Percentage, a commitment fee in Dollars (the "**Commitment Fee**"), at a rate per annum equal to the product of (A) the Applicable Percentage *times* (B) the actual daily amount by which the Aggregate Revolving Credit Commitments exceed the sum of (x) the Outstanding Amount of Revolving Credit Loans and (y) the Outstanding Amount of L/C Obligations, subject to adjustment as provided in Section 2.17.

[Credit Agreement]

(ii)    *Payments.*  The Commitment Fee shall accrue at all times during the Commitment Period, including at any time during which one or more of the conditions in Article 5 is not met, and shall be due and payable quarterly in arrears on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Closing Date, on the Revolving Termination Date (and, if applicable, thereafter on demand).  The Commitment Fee shall be calculated quarterly in arrears, and if there is any change in the Applicable Percentage during any quarter, the actual daily amount shall be computed and multiplied by the Applicable Percentage separately for each period during such quarter that such Applicable Percentage was in effect.  For purposes of clarification, Swingline Loans shall not be considered outstanding for purposes of determining the unused portion of the Aggregate Revolving Credit Commitments.

(b)    *Commercial and Standby Letter of Credit Fees.*

(i)    *Letter of Credit Fees.*    The Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender in accordance with its Aggregate Commitment Percentage a Letter of Credit fee in Dollars for each Letter of Credit equal to the Applicable Percentage *multiplied* by the Dollar Equivalent of the actual daily maximum amount available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Letter of Credit) (the "**Letter of Credit Fees**"); *provided*, *however*, any Letter of Credit Fees otherwise payable for the account of a Defaulting Lender with respect to any Letter of Credit as to which such Defaulting Lender has not provided Cash Collateral or other Adequate Assurance reasonable satisfactory to the L/C Issuer pursuant to Section 2.03(a)(ii) and Section 2.17 shall be payable into the Defaulting Lender Account or, to the maximum extent permitted by applicable Law, to the other Revolving Credit Lenders in accordance with the upward adjustments in their respective Aggregate Commitment Percentages allocable to such Letter of Credit pursuant to Section 2.17(a)(vii), with the balance of such fee, if any, payable to the L/C Issuer for its own account.  The Letter of Credit Fees shall be computed on a quarterly basis in arrears, and shall be due and payable on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the L/C Expiration Date, and on the Revolving Termination Date.  If there is any change in the Applicable Percentage during any quarter, the Dollar Equivalent of the daily maximum amount of each standby Letter of Credit shall be computed and multiplied by the Applicable Percentage separately for each period during such quarter that such Applicable Percentage was in effect.  Notwithstanding anything to the contrary contained herein, upon the request of the Required Revolving Credit Lenders, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate.

[Credit Agreement]

(ii)     *Fronting Fee and Documentary and Processing Charges Payable to the L/C Issuer.* The Borrower shall pay directly to the L/C Issuer for its own account a fronting fee in Dollars equal to 0.125% per annum of the Dollar Equivalent of the actual daily maximum amount available to be drawn under such Letter of Credit. In addition, the Borrower shall pay directly to the L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(c)     *Other Fees.* The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

(d)     *Closing Fees.* The Borrower agrees to pay on the Amendment No. 4 Effective Date to each Lender party to Amendment No. 4 on the Amendment No. 4 Effective Date, as fee compensation for the funding of such Lender's Revolving Credit Commitment as in effect on the Amendment No. 4 Effective Date, a closing fee (the "**Closing Fee**") in an amount provided in Section 2(d) of Amendment No. 4. Such Closing Fee will be in all respects fully earned, due and payable on the Amendment No. 4 Effective Date and non-refundable and non-creditable thereafter and, the Closing Fee shall be netted against Revolving Credit Commitments of such Lender on the Amendment No. 4 Effective Date.

Section 2.10.     *Computation of Interest and Fees; Retroactive Adjustments to Applicable Percentage.*

(a)     All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to Term SOFR) and for Loans denominated in Alternative Currencies shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest, including those with respect to Term SOFR Loans, shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.11(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(b)     If at any time prior to the termination of the Commitments of all of the Lenders and the repayment of all other Obligations hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations described in clauses (b) and (c) of the definition thereof and (iii) any Letter of Credit that has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the L/C Issuer or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the L/C Issuer), as a result of any restatement of or other adjustment to the financial statements of the Borrower or for any other reason, the Borrower or the Lenders determine that (1) the

[Credit Agreement]

Consolidated Total Net Leverage Ratio as calculated by the Borrower in any Compliance Certificate delivered to the Administrative Agent was inaccurate and (2) a proper calculation of the Consolidated Total Net Leverage Ratio would have resulted in a higher Applicable Percentage for such period, then the Borrower shall be obligated to pay as immediately due and payable to the Administrative Agent for the account of the applicable Lenders or the L/C Issuer, as the case may be, within three (3) Business Days after notice by the Administrative Agent to the Borrower (or, after the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code, automatically and without further action by the Administrative Agent, any Lender or the L/C Issuer), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period.  During such three Business Day period and thereafter, if the preceding sentence is complied with, the failure to previously pay such shortfall in interest and fees and the delivery of such inaccurate certificate shall not in and of themselves constitute a Default or Event of Default and no amounts shall be payable at the Default Rate in respect of any such interest or fees. This paragraph shall not limit the rights of the Administrative Agent, any Lender or the L/C Issuer, as the case may be, under Section 2.03(c)(iii), 2.03(i) or 2.08(b) or under Article 9.

Section 2.11. *Payments Generally; Administrative Agent's Clawback.*

(a) *General.* All payments to be made by any Credit Party shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by any Credit Party hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  If, for any reason, any Borrower is prohibited by any Law from making any required payment hereunder in an Alternative Currency, such Borrower shall make such payment in Dollars in the Dollar Equivalent of the Alternative Currency payment amount.  The Administrative Agent will promptly distribute to each Lender its pro rata share of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent (i) after 2:00 p.m., in the case of payments in Dollars, or (ii) after the Applicable Time related to payments in an Alternative Currency, shall in each case, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  Subject to the definition of "Interest Period," if any payment to be made by any Credit Party shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b) *Funding by Lenders; Presumption by Administrative Agent.* Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Term SOFR Loans or Alternative Currency Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time

[Credit Agreement]

required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (x) in the case of a payment to be made by such Lender, the Overnight Rate *plus* any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing and (y) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans under the Facility in which such Loan was made. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(c)     *Payments by the Borrower; Presumptions by Administrative Agent.* Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the L/C Issuer hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the L/C Issuer, as the case may be, the amount due.

With respect to any payment that the Administrative Agent makes for the account of the Lenders or the L/C Issuer hereunder as to which the Administrative Agent determines (which determination shall be conclusive absent manifest error) that any of the following applies (such payment referred to as the "**Rescindable Amount**"): (1) the Borrower has not in fact made such payment; (2) the Administrative Agent has made a payment in excess of the amount so paid by the Borrower (whether or not then owed); or (3) the Administrative agent has for any reason otherwise erroneously made such payment; then each of the Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount so distributed to such Lender or the L/C Issuer, in Same Day Funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(d)     *Failure to Satisfy Conditions Precedent.* If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article 2, and such funds are not made available to the Borrower by

[Credit Agreement]

the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article 5 are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)    *Obligation of the Lenders Several*.    The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and Swingline Loans and to make payments pursuant to Section 11.04(c) are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 11.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 11.04(c).

(f)    *Funding Source*.  Subject to Section 3.06, nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)    *Allocation of Funds*.  If at any time insufficient funds are received by or are available to the Administrative Agent to pay fully all amounts of principal, L/C Borrowings, interest and fees then due hereunder, such funds shall be applied (i) first, toward costs and *expenses* (including all reasonable and documented out-of-pocket fees, expenses and disbursements of any law firm or other counsel and amounts payable under Article 3) incurred by the Administrative Agent and each Lender, (ii) second, toward repayment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (iii) third, toward repayment of principal and L/C Borrowings then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and L/C Borrowings then due to such parties.

Section 2.12.    *Sharing of Payments by Lenders*.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, or the participations in L/C Obligations or in Swingline Loans held by it resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans or participations and accrued interest thereon greater than its pro rata share of the applicable Class of Loans thereof as provided herein, then the Lender receiving such greater proportion shall notify the Administrative Agent of such fact, and purchase (for cash at face value) participations in the Loans and subparticipations in L/C Obligations and Swingline Loans of the other Appropriate Lenders, or make such other adjustments among the group of Appropriate Lenders as shall be equitable, so that the benefit of all such payments shall be shared by the Appropriate Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; *provided* that:

(a)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

[Credit Agreement]

(b)    the provisions of this Section shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Credit Agreement, including Sections 2.18, 2.19 and 2.20 and the application of funds arising from the existence of a Defaulting Lender, (y) any amounts applied to L/C Obligations by the L/C Issuer or Swingline Loans by the Swingline Lender, as appropriate, from Cash Collateral or other Adequate Assurance provided under Section 2.16 or (z) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or subparticipations in L/C Obligations or Swingline Loans to any assignee or participant, other than to the Borrower or any of its Restricted Subsidiaries (as to which the provisions of this Section shall apply) unless such assignment occurs in accordance with Section 11.06(i).

Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Credit Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Credit Party in the amount of such participation.

Section 2.13.    *Evidence of Debt.*

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to the Administrative Agent a Note for such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    In addition to the accounts and records referred to in subsection (a), each Revolving Credit Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Revolving Credit Lender of participations in Letters of Credit and Swingline Loans.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Revolving Credit Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

Section 2.14.    *[Reserved]*.

Section 2.15.    *[Reserved]*.

[Credit Agreement]

Section 2.16.    *Cash Collateral.*

(a)    *Certain Credit Support Events.*  Upon the request of the Administrative Agent or the L/C Issuer if the L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing or if, as of the L/C Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrower shall immediately Cash Collateralize the then Outstanding Amount of the L/C Obligations.  If the Administrative Agent notifies the Borrower at any time that the Outstanding Amount of all L/C Obligations at such time exceeds 103% of the L/C Sublimit, then, within two Business Days after receipt of such notice, the Borrower shall Cash Collateralize the L/C Obligations in an amount equal to the amount by which the Outstanding Amount of all L/C Obligations exceeds the L/C Sublimit.  At any time that there shall exist a Defaulting Lender, immediately upon the request of the Administrative Agent, the L/C Issuer or the Swingline Lender, the Borrower shall deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover all Fronting Exposure (after giving effect to Section 2.17(a)(vii) and any Cash Collateral provided by the Defaulting Lender).  At any time that there shall exist a Defaulting Lender, promptly upon the request of the Administrative Agent, the L/C Issuer or the Swingline Lender, the Borrower shall deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover all Fronting Exposure or other Adequate Assurance (after giving effect to Section 2.17(a)(vii) and any Cash Collateral or other Adequate Assurance provided by the Defaulting Lender).  Additionally, if the Administrative Agent notifies the Borrower at any time that the Outstanding Amount of all L/C Obligations at such time exceeds 103% of the L/C Sublimit then in effect, then within two (2) Business Days after receipt of such notice, the Borrower shall provide Cash Collateral for the Outstanding Amount of the L/C Obligations in an amount not less than the amount by which the Outstanding Amount of all L/C Obligations exceeds the L/C Sublimit.

(b)    *Grant of Security Interest.*  All Cash Collateral (other than credit support not constituting funds subject to deposit) shall be maintained in blocked, non-interest bearing deposit accounts with the Administrative Agent.  The Borrower, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to (and subjects to the control of) the Administrative Agent, for the benefit of the Administrative Agent, the L/C Issuer and the Revolving Credit Lenders (including the Swingline Lender), and agrees to maintain, a first priority security interest in all such cash, deposit accounts and all balances therein, and all other property so provided as collateral pursuant hereto, and in all proceeds of the foregoing, all as security for the obligations to which such Cash Collateral may be applied pursuant to Section 2.16(c).  If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent as herein provided, or that the total amount of such Cash Collateral is less than the applicable Fronting Exposure and other obligations secured thereby, the Borrower or the relevant Defaulting Lender will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency.

(c)    *Application.*  Notwithstanding anything to the contrary contained in this Credit Agreement, Cash Collateral provided under any of this Section 2.16 or Sections 2.03, 2.04, 2.06, 2.17 or 9.02 in respect of Letters of Credit or Swingline Loans shall be held and applied to the satisfaction of the specific L/C Obligations, Swingline Loans, obligations to fund

[Credit Agreement]

participations therein (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may be provided for herein.

(d)     *Release.* Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or other obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Lender (or, as appropriate, its assignee following compliance with Section 11.06(b)(vi))) or (ii) the Administrative Agent's good faith determination that there exists excess Cash Collateral; *provided*, *however*, (x) that Cash Collateral furnished by or on behalf of a Credit Party shall not be released during the continuance of an Event of Default (and following application as provided in this Section 2.16 shall be applied in accordance with Section 9.03), and (y) the Person providing Cash Collateral and the L/C Issuer or the Swingline Lender, as applicable, may agree that Cash Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.

Section 2.17.    *Defaulting Lenders.*

(a)     *Adjustments.* Notwithstanding anything to the contrary contained in this Credit Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)     [reserved];

(ii)     [reserved];

(iii)     the Defaulting Lender shall not be entitled to vote, or participate in amendments, waivers or consents hereunder or in respect of the other Credit Documents, except as may be expressly provided herein;

(iv)     the Defaulting Lender may be replaced and its interests assigned as provided in Section 11.13; all payments of principal, interest and other amounts owing to a Defaulting Lender will be paid into an account or subaccount with the Administrative Agent (collectively, the "**Defaulting Lender Account**") to secure the Defaulting Lender's obligations under this Credit Agreement;

(v)     amounts held in the Defaulting Lender Account shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to the L/C Issuer or the Swingline Lender hereunder; *third*, if so determined by the Administrative Agent or requested by the L/C Issuer or the Swingline Lender, to be held as Cash Collateral for future funding obligations of that Defaulting Lender of any participation in any Swingline Loan or Letter of Credit; *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of

[Credit Agreement]

which that Defaulting Lender has failed to fund its portion thereof as required by this Credit Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released pro rata in order to satisfy obligations of that Defaulting Lender to fund Loans under this Credit Agreement; *sixth*, to the payment of any amounts owing to the Lenders, the L/C Issuer or the Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the L/C Issuer or the Swingline Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Credit Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Credit Agreement; and *eighth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans or L/C Borrowings were made at a time when the conditions set forth in Section 5.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Borrowings owed to, all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Borrowings owed to, that Defaulting Lender until such time as all Loans and funded and unfunded participations in L/C Obligations and Swingline Loans are held by the Lenders in accordance with their respective Aggregate Commitment Percentage under the applicable Facility without giving effect to Section 2.17(a)(vii). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.17(a)(v) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto;

(vi)    the Defaulting Lenders shall not be entitled to receive any Commitment Fee, facility fee, letter of credit fee or other fees hereunder (which fees may be retained by the Borrower rather than paid into the Defaulting Lender Account); and

(vii)    during any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit or Swingline Loans pursuant to Sections 2.03 and 2.04, the "Aggregate Commitment Percentage" of each non-Defaulting Lender shall be computed without giving effect to the Revolving Credit Commitment of that Defaulting Lender; *provided* that (A) each such reallocation shall be given effect only if, at the date the applicable Lender becomes a Defaulting Lender, no Event of Default exists; and (B) the aggregate obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit and Swingline Loans shall not exceed

[Credit Agreement]

the positive difference, if any, of (1) the Revolving Credit Commitment of that non-Defaulting Lender *minus* (2) the aggregate Outstanding Amount of the Revolving Credit Obligations of that Lender.

(b)    *Defaulting Lender Cure.*  If the Borrower, the Administrative Agent, the Swingline Lender and the L/C Issuer agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Revolving Credit Loans and funded and unfunded participations in Letters of Credit and Swingline Loans to be held on a pro rata basis by the Revolving Credit Lenders in accordance with their Aggregate Commitment Percentages (without giving effect to Section 2.17(a)(vii)), whereupon that Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.18.    *Incremental Facilities.*

(a)    *Incremental Commitments.*  The Borrower (or in the case of Escrow Incremental Term Loans, the Escrow Borrower) may, by written notice to the Administrative Agent from time to time, request Incremental Commitments, which may be a new Class of term loans (an "**Incremental Term Loan**") or an increase in loans under any then-existing Class of Term Loans (an "**Incremental Term Loan Increase**") and/or one or more increases in the amount of the Revolving Credit Commitments (a "**Revolving Commitment Increase**") or the establishment of one or more new revolving credit commitments.  Such notice shall set forth:  (i) the amount of the Incremental Commitments being requested (which shall be in a minimum amount of $5,000,000; *provided* that such amount may be less than $5,000,000 if such amount represents all remaining availability under the limit set forth in Section 2.18(c)(ii)), (ii) the date on which such Incremental Commitments are requested to become effective, (iii) whether such Incremental Commitments are Incremental Revolving Commitments or Incremental Term Commitments and (iv) whether such Incremental Commitments will constitute Escrow Incremental Term Loans.   The Borrower may in its sole discretion seek Incremental Commitments from existing Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) or any Additional Lender.

(b)    *Incremental Loans.*  On the applicable date (each, an "**Incremental Facility Closing Date**") specified in any Incremental Amendment, subject to the satisfaction of the terms and conditions in this Section 2.18 and in the applicable Incremental Amendment, (i)(A) each Incremental Term Lender of such Class shall make an Incremental Term Loan to the Borrower in an amount equal to its Incremental Term Commitment of such Class and (B) each Incremental Term Lender of such Class shall become a Lender hereunder with respect to the

[Credit Agreement]

Incremental Term Commitment of such Class and the Incremental Term Loans of such Class made pursuant thereto and (ii) (A) each Incremental Revolving Lender of such Class shall make its Commitment available to the Borrower in an amount equal to its Incremental Revolving Commitment of such Class and (B) each Incremental Revolving Lender of such Class shall become a Lender hereunder with respect to the Incremental Revolving Commitment of such Class and the Incremental Revolving Loans of such Class made pursuant thereto.

(c)    *Effectiveness of Incremental Amendment.*    The effectiveness of any Incremental Amendment, and the Incremental Commitments thereunder, shall be subject to the satisfaction on the applicable date (which shall be no earlier than the date of such Incremental Amendment) specified therein (the "**Incremental Amendment Date**") of each of the following conditions, together with any other conditions set forth in the Incremental Amendment:

(i)    after giving effect to such Incremental Commitments, the conditions of Section 5.02 shall be satisfied (it being understood that all references to "the date of such Credit Extension" or similar language in such Section 5.02 shall be deemed to refer to the Incremental Amendment Date); *provided* that in connection with any Incremental Commitment, the primary purpose of which is to finance a Limited Condition Transaction, if agreed by the Incremental Lenders providing such Incremental Commitments, the conditions set forth in clauses (a) and (b) (other than with respect to any Event of Default under Section 9.01(a) or (f)) of Section 5.02 may be agreed not to apply and excluded in the relevant Incremental Amendment and the condition set forth in clause (c) of Section 5.02 may be satisfied by the delivery of a Request for Credit Extension within such lesser time period as agreed by such Incremental Lenders, the Administrative Agent and the Borrower;

(ii)    (A) after giving Pro Forma Effect to both (x) the making of Incremental Term Loans or establishment of Incremental Revolving Commitments (assuming a borrowing of the maximum amount of Loans available thereunder) under such Incremental Amendment and (y) any Specified Transactions consummated in connection therewith, the Consolidated Total Net Leverage Ratio does not exceed 3.50:1.00 (or 4.00:1.00 if such Incremental Facility is established in connection with a Permitted Acquisition); or (B) together with the Incremental Term Loans made and Incremental Revolving Commitments established under such Incremental Amendment, the aggregate principal amount of Incremental Term Loans made, Incremental Equivalent Debt deemed incurred and Incremental Revolving Commitments established under this clause (B) does not exceed the greater of (x) $225,000,000 and (y) 100% of Consolidated EBITDA; *provided* that it is understood that Incremental Term Loans and Incremental Revolving Commitments may be incurred under either clause (A) or clause (B) as selected by the Borrower in its sole discretion, including by designating any portion of Incremental Commitments in excess of an amount permitted to be incurred under clause (A) at the time of such incurrence as incurred under clause (B) (it being understood, for the avoidance of doubt, that proceeds from any such incurrence may be utilized in a single transaction by first

[Credit Agreement]

calculating the amount available to be incurred under clause (A) and disregarding any concurrent utilization under the preceding clause (B)); *provided further* that it is understood that any portion of the Incremental Term Loans and Incremental Revolving Commitments incurred under clause (B) above may from time to time at the Borrower's election be reclassified as being incurred under clause (A) above if at the time of reclassification the Borrower is in compliance with the applicable Consolidated Total Net Leverage Ratio under clause (A) on a Pro Forma Basis, and if the applicable Consolidated Total Net Leverage Ratio under clause (A) would be satisfied on a Pro Forma Basis as of the end of any subsequent fiscal quarter after the initial incurrence of such Incremental Term Loans or Incremental Revolving Commitments, such reclassification shall be deemed to have automatically occurred whether or not elected by the Borrower; and

(iii)     to the extent reasonably requested by the Administrative Agent, receipt by the Administrative Agent of (A) customary legal opinions, board resolutions and officers' certificates (including a solvency certificate) consistent with those delivered on the Closing Date (conformed as appropriate) other than changes to such legal opinions resulting from a Change in Law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent and (B) reaffirmation agreements and/or such amendments to the Collateral Documents as may be reasonably requested by the Administrative Agent in order to ensure that such Incremental Commitments and extensions of credit thereunder are provided with the benefit of the applicable Credit Documents.

(d)     *Required Terms*.   The terms, provisions and documentation of the Incremental Term Loans and Incremental Term Commitments or the Incremental Revolving Loans and Incremental Revolving Commitments, as the case may be, of any Class shall be as agreed between the Borrower and the applicable Incremental Lenders providing such Incremental Commitments, and except as otherwise set forth herein, to the extent not identical to any Class of then-existing Term Loans or Revolving Credit Commitments, as applicable, each existing on the Incremental Facility Closing Date, shall be consistent with clauses (i) and (ii) below, as applicable, and otherwise shall be reasonably satisfactory to the Administrative Agent (except to the extent such terms are (a) conformed (or added) in the Credit Documents pursuant to the related Incremental Amendment for the benefit of all Lenders, (b) applicable only to periods after the Latest Maturity Date as of the Incremental Amendment Date or (c) current market terms for such type of Indebtedness (as determined in good faith by the Borrower)); *provided* that (x) in the case of an Incremental Term Loan Increase or a Revolving Commitment Increase, the terms, provisions and documentation (other than the Incremental Amendment evidencing such increase) of such Incremental Term Loan Increase or Revolving Commitment Increase shall be identical (other than with respect to upfront fees, OID or similar fees) to any then-existing Term Loan Facility or Revolving Credit Facility, as applicable, in each case, as existing on the Incremental Facility Closing Date (after giving effect to Section 2.18(e)) and (y) if such terms are more restrictive than the terms of any then-existing Term Loan Facility or Revolving Credit Facility, as the case may be, such more restrictive terms shall be conformed (or added) to the Credit Documents for the benefit of the then-existing Facilities. In any event:

[Credit Agreement]

(i)    the Incremental Term Loans:

(A)    (I) shall rank *pari passu* or junior in right of payment with the Obligations under Term Loans and Revolving Credit Loans that are senior in right of payment, (II) shall be secured by the Collateral and shall rank *pari passu* or junior in right of security with the Obligations under Term Loans and Revolving Credit Loans that are secured on a first lien basis (and subject to a Subordination Agreement (if subject to payment subordination) and/or a Junior Lien Intercreditor Agreement (if subject to lien subordination) (or, alternatively, terms in the Incremental Amendment substantially similar to those in such applicable agreement, as agreed by the Borrower and Administrative Agent) or other lien subordination and intercreditor arrangements reasonably satisfactory to the Borrower and the Administrative Agent) and (III) shall be guaranteed by the Guarantors;

(B)    as of the Incremental Amendment Date, shall not have a final scheduled maturity date earlier than the Revolving Termination Date;

(C)    (I) as of the Incremental Amendment Date, shall have a Weighted Average Life to Maturity not shorter than any then-existing Class of Term Loans and (II) subject to the foregoing, shall have an amortization schedule as determined by the Borrower and the applicable Incremental Term Loan arranger(s);

(D)    shall have an all-in-yield (whether in the form of interest rate margin, OID or otherwise) determined by the Borrower and the applicable Incremental Term Lenders; *provided* that the Applicable Percentage and amortization for an Incremental Term Loan Increase shall be (I) the Applicable Percentage and amortization for the Class being increased or (II) higher than the Applicable Percentage for the Class being increased as long as the Applicable Percentage for the Class being increased shall be automatically increased as and to the extent necessary to eliminate such deficiency;

(E)    shall have fees determined by the Borrower and the applicable Incremental Term Loan arranger(s); and

(F)    may participate on (I) a pro rata basis, less than pro rata basis or greater than pro rata basis in any voluntary prepayments of any then-existing Class of Term Loans and (II) a pro rata basis or less than pro rata basis (but not on a greater than pro rata basis (except for prepayments of any Class or Classes of Term Loans with a Maturity Date preceding the Maturity Date of the remaining Classes of Term Loans then outstanding or made with the proceeds of Refinancing Facilities)) in any mandatory prepayments of any existing Class of Term Loans hereunder;

(ii)    the Incremental Revolving Commitments and Incremental Revolving Loans:

[Credit Agreement]

(A)    (I) shall rank *pari passu* or junior in right of payment with the Obligations under Term Loans and Revolving Credit Loans that are senior in right of payment, (II) shall be secured by the Collateral and shall rank *pari passu* or junior in right of security with the Obligations under Term Loans and Revolving Credit Loans that are secured on a first lien basis (and subject to a Subordination Agreement (if subject to payment subordination) and/or a Junior Lien Intercreditor Agreement (if subject to lien subordination) (or, alternatively, terms in the Incremental Amendment substantially similar to those in such applicable agreement, as agreed by the Borrower and Administrative Agent) or other lien subordination and intercreditor arrangements reasonably satisfactory to the Borrower and the Administrative Agent) and (III) shall be guaranteed by the Guarantors;

(B)    (I) shall not have a final scheduled maturity date or commitment reduction date earlier than the Revolving Termination Date  with respect to the Initial Revolving Credit Commitments and (II) shall not have any scheduled amortization or mandatory commitment reduction prior to the Revolving Termination Date with respect to the Initial Revolving Credit Commitments;

(C)    shall have an all-in-yield (whether in the form of interest rate margin, OID or otherwise) determined by the Borrower and the applicable Incremental Revolving Lenders; *provided* that the Applicable Percentage for a Revolving Commitment Increase shall be (I) the Applicable Percentage for the Class being increased or (II) higher than the Applicable Percentage for the Class being increased as long as the Applicable Percentage for the Class being increased shall be automatically increased as and to the extent necessary to eliminate such deficiency;

(D)    shall have fees determined by the Borrower and the applicable Incremental Revolving Commitment arranger(s);

(E)    shall provide that the borrowing and repayment (except for (1) payments of interest and fees at different rates on Incremental Revolving Commitments (and related outstandings), (2) repayments required upon the Maturity Date of the Incremental Revolving Commitments and (3) repayment made in connection with a permanent repayment and termination of commitments (in accordance with clause (F) below)) of Loans with respect to Incremental Revolving Commitments after the associated Incremental Facility Closing Date shall be made on a pro rata basis or less than a pro rata basis (but not more than a pro rata basis) with all other Revolving Credit Commitments then existing on the Incremental Facility Closing Date; and

(F)    may provide that the permanent repayment of Revolving Credit Loans with respect to, and termination or reduction of, Incremental Revolving Commitments after the associated Incremental Facility Closing Date be made on a pro rata basis or less than pro rata basis (but not on a greater than pro rata basis

[Credit Agreement]

other than with respect to any termination of undrawn Revolving Credit Commitments or a permanent repayment of any Class of Revolving Credit Commitments (1) with the proceeds of a Refinancing Facility or (2) that mature earlier than other outstanding Classes of Revolving Credit Commitments) with all other Revolving Credit Commitments.

(e)    *Incremental Amendment*.  Commitments in respect of Incremental Term Loans and Incremental Revolving Commitments shall become additional Commitments pursuant to an amendment (an "**Incremental Amendment**") to this Credit Agreement and, as appropriate, the other Credit Documents, executed by the Borrower, each Incremental Lender providing such Commitments, the Administrative Agent and, for purposes of any election and/or increase to the Swingline Sublimit or L/C Sublimit, the Swingline Lender and each L/C Issuer.  The Incremental Amendment may, without the consent of any other Credit Party, the Administrative Agent or Lender, effect such amendments to this Credit Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.18, including any amendments necessary to establish the Incremental Loans and/or Incremental Commitments as a new Class of Loans, to provide to the Lenders of any Class of Loans or Commitments hereunder the benefit of any term or provision that is added under any Incremental Amendment for the benefit of the Lenders of an Incremental Facility (including to the extent necessary or advisable to allow any Incremental Facility to be an Incremental Increase) and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Class or tranche, in each case on terms consistent with this Section 2.18.  The Borrower will use the proceeds of the Incremental Term Loans and Incremental Revolving Commitments for any purpose not prohibited by this Agreement.

(f)    *Reallocation of Revolving Credit Exposure*.  Upon any Incremental Facility Closing Date on which Incremental Revolving Commitments are effected through Refinancing Amendment pursuant to this Section 2.18, (a) each of the Revolving Credit Lenders shall assign to each of the Incremental Revolving Lenders, and each of the Incremental Revolving Lenders shall purchase from each of the Revolving Credit Lenders, at the principal amount thereof, such interests in the Incremental Revolving Loans outstanding on such Incremental Facility Closing Date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Revolving Credit Loans will be held by existing Revolving Credit Lenders and Incremental Revolving Lenders ratably in accordance with their Revolving Credit Commitments after giving effect to the addition of such Incremental Revolving Commitments to the Revolving Credit Commitments, (b) each Incremental Revolving Commitment shall be deemed for all purposes a Revolving Credit Commitment and each Loan made thereunder shall be deemed, for all purposes, a Revolving Credit Loan and (c) each Incremental Revolving Lender shall become a Lender with respect to the Incremental Revolving Commitments and all matters relating thereto.  The Administrative Agent and the Lenders hereby agree that the minimum borrowing and prepayment requirements in Section 2.02(a) and 2.06(a)(i) of this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

[Credit Agreement]

(g)       The Incremental Term Loans made under each Incremental Term Loan Increase shall be made by the applicable Lenders participating therein pursuant to the procedures set forth in Section 2.01 and 2.02 and on the date of the making of such Incremental Term Loans, and notwithstanding anything to the contrary set forth in Section 2.01 and 2.02, such Incremental Term Loans shall be added to (and form part of) each Borrowing of outstanding Term Loans under the applicable Class of Term Loans on a pro rata basis (based on the relative sizes of the various outstanding Borrowings), so that each Lender under such Class will participate proportionately in each then outstanding Borrowing of Term Loans of such Class; *provided* that Escrow Incremental Term Loans shall not be deemed to be outstanding under this Agreement or any other Credit Document for any purposes hereof (including, without limitation, for purposes of any financial calculation, the definition of "Obligations," the definition of "Required Lenders" or Article 9 or Section 11.01 hereof) and the obligations with respect thereto shall not be recourse to any Credit Party, in each case, unless and until the Escrow Assumption with respect thereto has occurred and the Escrow Assumption shall only be permitted if the conditions set forth in Section 2.18(c) are satisfied as of the date of such Escrow Assumption

(h)       This Section 2.18 shall supersede any provisions in Section 2.12 or 11.01 to the contrary.

Section 2.19.   *Amend and Extend Transactions.*

(a)       The Borrower may, by written notice to the Administrative Agent from time to time, request an extension (each, an "**Extension**") of the maturity or termination date of any Class of Revolving Credit Commitments and/or Term Loans to the extended maturity or termination date specified in such notice.  Such notice shall set forth (i) the amount of the applicable Class of Revolving Credit Commitments and/or Term Loans to be extended (which shall be in minimum increments of $1,000,000 and a minimum amount of $5,000,000), (ii) the date on which such Extensions are requested to become effective (which shall be not less than five (5) Business Days nor more than 60 days after the date of such Extension request (or such longer or shorter periods as the Administrative Agent shall reasonably agree)) and (iii) identifying the relevant Class of Revolving Credit Commitments and/or Term Loans to which the Extension request relates.  Each Lender of the applicable Class shall be offered (an "**Extension Offer**") an opportunity to participate in such Extension on a pro rata basis and on the same terms and conditions as each other Lender of such Class pursuant to procedures established by, or reasonably acceptable to, the Administrative Agent.  If the aggregate principal amount of Term Loans (calculated on the face amount thereof) or Revolving Credit Commitments in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans or Revolving Credit Commitments, as applicable, offered to be extended by the Borrower pursuant to such Extension Offer, then the Term Loans or Revolving Credit Commitments, as applicable, of Lenders of the applicable Class shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer.

(b)       It shall be a condition precedent to the effectiveness of any Extension that (i) no Default or Event of Default shall have occurred and be continuing immediately prior to and

[Credit Agreement]

immediately after giving effect to such Extension, (ii) the representations and warranties set forth in Article 6 and in each other Credit Document shall be true and correct in all material respects on and as of the date of such Extension, (iii) the L/C Issuer and the Swingline Lender shall have consented to any Extension of the Revolving Credit Commitments, to the extent that such extension provides for the issuance of Letters of Credit or making of Swingline Loans at any time during the extended period and (iv) the terms of such Extended Revolving Commitments and Extended Term Loans shall comply with Section 2.19(c).

(c)     The terms of each Extension shall be determined by the Borrower and the applicable extending Lender and set forth in an Extension Amendment; *provided* that (i) the final maturity date of any Extended Term Loan or Extended Revolving Commitment shall be no earlier than the maturity or termination date of the Class of Term Loans or Revolving Credit Commitments being extended, (ii) (A) there shall be no scheduled amortization or mandatory commitment reduction of the Extended Revolving Commitments and (B) the Weighted Average Life to Maturity of the Extended Term Loans shall be no shorter than the remaining Weighted Average Life to Maturity of the Class of Term Loans being extended, (iii) the Extended Revolving Loans and the Extended Term Loans will rank *pari passu* in right of payment and with respect to security with the Revolving Credit Loans and the Term Loans and shall be guaranteed by the Guarantors, (iv) the interest rate margin, rate floors, fees, original issue discounts and premiums applicable to any Extended Term Loans or Extended Revolving Commitments (and the Extended Revolving Loans thereunder) shall be determined by the Borrower and the lenders providing such Extended Term Loans or Extended Revolving Commitments, as applicable, (v) none of the obligors or guarantors with respect to such Extended Term Loans or Extended Revolving Commitments shall be a Person that is not a Credit Party and (vi) to the extent the terms of the Extended Term Loans or the Extended Revolving Commitments are inconsistent with the terms set forth herein (except as set forth in clause (i) through (v) above), such terms shall be reasonably satisfactory to the Administrative Agent.

(d)     In connection with any Extension, the Borrower, the Administrative Agent and each applicable extending Lender shall execute and deliver to the Administrative Agent an amendment (an "**Extension Amendment**") and such other documentation as the Administrative Agent shall reasonably specify to evidence the Extension.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension.  Any Extension Amendment may, without the consent of any other Lender, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to implement the terms of any such Extension, including any amendments necessary to establish Extended Term Loans or Extended Revolving Commitments as a new Class or tranche of Term Loans or Revolving Credit Commitments, as applicable, and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Class or tranche (including to preserve the pro rata treatment of the extended and non-extended Classes and to provide for the reallocation of participation in Letters of Credit or Swingline Loans upon the expiration or termination of the commitments under any Class), in each case on terms not inconsistent with this Section 2.19).

[Credit Agreement]

Section 2.20.  *Refinancing Facilities.*

(a)    The Borrower may, by written notice to the Administrative Agent from time to time, request (x) Refinancing Revolving Commitments to replace all or a portion of any existing Class of Revolving Credit Commitments and (y) Refinancing Term Loans to refinance all or a portion of any existing Class of Term Loans (with respect to a particular Refinancing Commitment or Refinancing Loan, such existing Revolving Credit Commitments or Loans, "**Refinanced Debt**").  Such notice shall set forth (i) the amount of the applicable Refinancing Facility (which shall be in minimum increments of $1,000,000 and a minimum amount of $5,000,000), (ii) the date on which the applicable Refinancing Facility is to become effective and (iii) whether such Refinancing Facilities are Refinancing Revolving Commitments or Refinancing Term Loans.  The Borrower may in its sole discretion seek Refinancing Facilities from existing Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) or any Additional Lender.

(b)    *Refinancing Loans.*  On any Refinancing Facility Closing Date on which any Refinancing Term Commitments of any Class are effected, subject to the satisfaction of the terms and conditions in this Section 2.20, (i) each Refinancing Term Lender of such Class shall make a Loan to the Borrower (a "**Refinancing Term Loan**") in an amount equal to its Refinancing Term Commitment of such Class and (ii) each Refinancing Term Lender of such Class shall become a Lender hereunder with respect to the Refinancing Term Commitment of such Class and the Refinancing Term Loans of such Class made pursuant thereto.  On any Refinancing Facility Closing Date on which any Refinancing Revolving Commitments of any Class are effected, subject to the satisfaction of the terms and conditions in this Section 2.20, (i) each Refinancing Revolving Lender of such Class shall make its Commitment available to the Borrower (when borrowed, a "**Refinancing Revolving Loan**" and collectively with any Refinancing Term Loan, a "**Refinancing Loan**") in an amount equal to its Refinancing Revolving Commitment of such Class and (ii) each Refinancing Revolving Lender of such Class shall become a Lender hereunder with respect to the Refinancing Revolving Commitment of such Class and the Refinancing Revolving Loans of such Class made pursuant thereto.

(c)    *Effectiveness of Refinancing Amendment.*  The effectiveness of any Refinancing Amendment, and the Refinancing Commitments thereunder, shall be subject to the satisfaction on the date thereof (a "**Refinancing Facility Closing Date**") of each of the following conditions, together with any other conditions set forth in the Refinancing Amendment:

(i)    after giving effect to such Refinancing Commitments, the conditions of Sections 5.02(a) and (b) shall be satisfied (it being understood that all references to "the date of such Credit Extension" or similar language in such Section 5.02 shall be deemed to refer to the effective date of such Refinancing Amendment);

(ii)    each Refinancing Commitment shall be in an aggregate principal amount that is not less than $5,000,000 and shall be in an increment of $1,000,000 (*provided* that such amount may be less than $5,000,000 and not in an increment of $1,000,000 if such amount is equal to (x) the entire outstanding principal

[Credit Agreement]

amount of the Refinanced Debt that is in the form of Term Loans or (y) the entire principal amount of Refinanced Debt that is in the form of Revolving Credit Commitments); and

(iii)    to the extent reasonably requested by the Administrative Agent, receipt by the Administrative Agent of (i) customary legal opinions, board resolutions and officers' certificates consistent with those delivered on the Closing Date (conformed as appropriate) other than changes to such legal opinions resulting from a Change in Law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent and (ii) reaffirmation agreements and/or such amendments to the Collateral Documents as may be reasonably requested by the Administrative Agent in order to ensure that such Refinancing Lenders are provided with the benefit of the applicable Credit Documents.

(d)    *Required Terms*.    The terms, provisions and documentation of the Refinancing Term Loans and Refinancing Term Commitments or the Refinancing Revolving Loans and Refinancing Revolving Commitments, as the case may be, of any Class shall be as agreed between the Borrower and the applicable Refinancing Lenders providing such Refinancing Commitments, and except as otherwise set forth herein, to the extent not identical to any Class of Term Loans or Revolving Credit Commitments, as applicable, each existing on the Refinancing Facility Closing Date, shall be consistent with clauses (i) and (ii) below, as applicable, and otherwise shall be reasonably satisfactory to the Administrative Agent (except to the extent such terms are (a) conformed (or added) in the Credit Documents pursuant to the related Refinancing Amendment for the benefit of all Lenders, (b) applicable only to periods after the Latest Maturity Date as of the Refinancing Amendment Date or (c) current market terms for such type of Indebtedness (as determined in good faith by the Borrower)); *provided* that if such terms are more restrictive than the terms of any then-existing Term Loan Facility or Revolving Credit Facility, as the case may be, such more restrictive terms shall be conformed (or added) to the Credit Documents for the benefit of the then-existing Facilities. . In any event:

(i)    the Refinancing Term Loans:

(A)    (I) (I) shall have the same or more junior rank in right of payment with respect to the other Obligations as the applicable Refinanced Debt and (II) shall be secured solely by the Collateral and shall have the same or more junior rank in right of security with respect to the other Obligations as the applicable Refinanced Debt (and, to the extent subordinated in right of payment or security with respect to the other Obligations, subject to a Subordination Agreement and/or a Junior Lien Intercreditor Agreement, as applicable (or, alternatively, terms in the Refinancing Amendment substantially similar to those in such applicable agreement, as agreed by the Borrower and Administrative Agent) or other lien subordination and intercreditor arrangement reasonably satisfactory to the Borrower and the Administrative Agent) and (III) shall be guaranteed by the Guarantors;

[Credit Agreement]

(B)    as of the Refinancing Facility Closing Date, shall not have a final scheduled maturity date earlier than the Maturity Date of the Refinanced Debt;

(C)    (I) as of the Refinancing Facility Closing Date, shall not have a Weighted Average Life to Maturity shorter than the remaining Weighted Average Life to Maturity of the Refinanced Debt and (II) shall have an amortization schedule as determined by the Borrower and the applicable Refinancing Lenders;

(D)    shall have an all-in-yield (whether in the form of interest rate margin, OID or otherwise) determined by the Borrower and the applicable Refinancing Term Lenders;

(E)    shall have fees determined by the Borrower and the applicable Refinancing Term Loan arranger(s);

(F)    may participate on (I) a pro rata basis, less than pro rata basis or greater than pro rata basis in any voluntary prepayments of Term Loans hereunder and (II) (x) in the case of Refinancing Term Loans that rank junior in right of payment or junior in right of security, in each case, with the Obligations under Term Loans that are senior in right of payment or secured on a first lien basis, shall participate on a less than pro rata basis in any mandatory prepayments of Term Loans hereunder and (y) in the case of Refinancing Term Loans that rank pari passu in right of payment and security with the Obligations under Term Loans that are secured on a first lien basis, may participate on a pro rata basis or less than pro rata basis (but not on a greater than pro rata basis) in any mandatory prepayments of such Term Loans hereunder; and

(G)    shall not have a greater principal amount than the principal amount of the Refinanced Debt plus accrued interest, fees, premiums (if any) and penalties payable by the terms of such tranche of Incremental Term Loans and reasonable fees, expenses, OID and upfront fees associated with the incurrence of such Refinancing Term Loans; and

(ii)    the Refinancing Revolving Commitments and Refinancing Revolving Loans:

(A)    (I) shall have the same or more junior rank in right of payment with respect to the other Obligations as the applicable Refinanced Debt (and, to the extent subordinated in right of payment with respect to the other Obligations, subject to a Subordination Agreement (or, alternatively, terms in the Refinancing Amendment substantially similar to those in such applicable agreement, as agreed by the Borrower and Administrative Agent) or other subordination arrangement satisfactory to the Borrower and the Administrative Agent), (II) shall be secured solely by the Collateral and shall have the same rank in right of security with respect to the other Obligations as the applicable Refinanced Debt and (III) shall be guaranteed by the Guarantors;

[Credit Agreement]

(B)    shall not have a final scheduled maturity date or commitment reduction date earlier than the Maturity Date or commitment reduction date, respectively, with respect to the Refinanced Debt;

(C)    shall have an all-in-yield (whether in the form of interest rate margin, OID or otherwise) determined by the Borrower and the applicable Refinancing Revolving Lenders;

(D)    shall have fees determined by the Borrower and the applicable Refinancing Revolving Commitments arranger(s);

(E)    shall provide that the borrowing and repayment (except for (1) payments of interest and fees at different rates on Refinancing Revolving Commitments (and related outstandings), (2) repayments required upon the Maturity Date of the Refinancing Revolving Commitments and (3) repayment made in connection with a permanent repayment and termination of commitments (in accordance with clause (F) below)) of Loans with respect to Refinancing Revolving Commitments after the associated Refinancing Facility Closing Date shall be made on a *pro rata* basis or less than a *pro rata* basis (but not more than a *pro rata* basis) with all other Revolving Credit Commitments then existing on the Refinancing Facility Closing Date,

(F)    may provide that the permanent repayment of Revolving Credit Loans with respect to, and termination or reduction of, Refinancing Revolving Commitments after the associated Refinancing Facility Closing Date be made on a pro rata basis or less than pro rata basis (but not on a greater than pro rata basis other than with respect to any termination of undrawn Revolving Credit Commitments or a permanent repayment of any Class of Revolving Credit Commitments (1) with the proceeds of a Refinancing Facility or (2) that mature earlier than other outstanding Classes of Revolving Credit Commitments) with all other Revolving Credit Commitments, and

(G)    shall not have a greater principal amount than the principal amount of the Refinanced Debt plus accrued interest, fees, premiums (if any) and penalties payable by the terms of such tranche of Revolving Credit Loans and reasonable fees, expenses, OID and upfront fees associated with the incurrence of such Refinancing Revolving Commitments;

(e)    *Refinancing Amendment.*  Commitments in respect of Refinancing Term Loans and Refinancing Revolving Commitments shall become additional Commitments pursuant to an amendment (a "**Refinancing Amendment**") to this Agreement and, as appropriate, the other Credit Documents, executed by the Borrower, each Refinancing Lender providing such Commitments and the Administrative Agent.  The Refinancing Amendment may, without the consent of any other Credit Party, Administrative Agent or Lender, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.20, including any amendments necessary to establish the Refinancing Loans and/or

[Credit Agreement]

Refinancing Commitments as a new Class or tranche of Loans and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Class or tranche (including to preserve the pro rata treatment of the refinanced and non-refinanced Classes or tranches and to provide for the reallocation of participation in Letters of Credit or Swingline Loans upon the expiration or termination of the commitments under any Class or tranche), in each case on terms consistent with this Section 2.20. The Borrower will use the proceeds of the Refinancing Term Loans and Refinancing Revolving Commitments to extend, renew, replace, repurchase, retire or refinance, substantially concurrently, the applicable Refinanced Debt.

(f)    *Reallocation of Revolving Credit Exposure.*    Upon any Refinancing Facility Closing Date on which Refinancing Revolving Commitments are effected pursuant to this Section 2.20, (a) each of the Revolving Credit Lenders shall assign to each of the Refinancing Revolving Lenders, and each of the Refinancing Revolving Lenders shall purchase from each of the Revolving Credit Lenders, at the principal amount thereof, such interests in the Refinancing Revolving Loans outstanding on such Refinancing Facility Closing Date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Revolving Credit Loans will be held by existing Revolving Credit Lenders and Refinancing Revolving Lenders ratably in accordance with their Revolving Credit Commitments after giving effect to the addition of such Refinancing Revolving Commitments to the Revolving Credit Commitments, (b) each Refinancing Revolving Commitment shall be deemed for all purposes a Revolving Credit Commitment and each Loan made thereunder shall be deemed, for all purposes, a Revolving Credit Loan and (c) each Refinancing Revolving Lender shall become a Lender with respect to the Incremental Revolving Commitments and all matters relating thereto.    The Administrative Agent and the Lenders hereby agree that the minimum borrowing and prepayment requirements in Section 2.02(a) and 2.06(a)(i) of this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(g)    This Section 2.20 shall supersede any provisions in Section 2.12 or 11.01 to the contrary.

## ARTICLE 3
### TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01.    *Taxes.*

(a)    *Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.*

(i)    Any and all payments by or on account of any obligation of the Credit Parties hereunder or under any other Credit Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes.  If, however, applicable Laws require any Credit Party or the Administrative Agent to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such Laws as determined by such Credit Party or the Administrative Agent, as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

[Credit Agreement]

(ii)      If the Credit Parties, the Administrative Agent or any other applicable withholding agent shall be required by the Internal Revenue Code to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment, then (A) the applicable withholding agent shall withhold or make such deductions as are determined by such withholding agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the applicable withholding agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Internal Revenue Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by the Credit Parties shall be increased as necessary so that after any required withholding or the making of all required deductions (including any withholding or deductions applicable to additional sums payable under this Section) the applicable Lender or L/C Issuer, as the case may be, or, in the case of an amount received by the Administrative Agent for its own account, the Administrative Agent, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)      If any Credit Party, the Administrative Agent or any other applicable withholding agent shall be required by any applicable Laws other than the Internal Revenue Code to withhold or deduct any Taxes from any payment, then the applicable withholding agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, such withholding agent, to the extent required by such Laws, shall timely pay the full amount so withheld or deducted by it to the relevant Governmental Authority in accordance with such Laws, and to the extent that the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by such Credit Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including any withholding or deductions applicable to additional sums payable under this Section) the applicable Lender or L/C Issuer, as the case may be, or, in the case of an amount received by the Administrative Agent for its own account, the Administrative Agent, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)      *Payment of Other Taxes by the Credit Parties.*  Without duplication of other amounts payable by the Borrower under this Section 3.01, the Credit Parties shall timely pay any Other Taxes to the relevant Governmental Authority, or at the option of the Administrative Agent timely reimburse it for the payment of any Other Taxes, in accordance with applicable Laws.

(c)      *Tax Indemnification.*

(i)      Without limiting the provisions of subsection (a) or (b) above, the Credit Parties shall, and do hereby, indemnify the Administrative Agent, each

[Credit Agreement]

Lender and the L/C Issuer, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or payable by the Credit Parties or the Administrative Agent or paid by the Administrative Agent, such Lender or the L/C Issuer, as the case may be, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of any such payment or liability delivered to the Borrower by a Lender or the L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or the L/C Issuer, shall be conclusive absent manifest error.

(ii)    Without limiting the provisions of subsection (a) or (b) above, each Lender and the L/C Issuer shall, and does hereby, indemnify each Credit Party and the Administrative Agent, and shall make payment in respect thereof within 10 days after demand therefor, against (i) any and all Taxes and any and all related losses, claims, liabilities, penalties, interest and expenses (including the reasonable and documented out-of-pocket fees, charges and disbursements of any counsel for each Credit Party and the Administrative Agent) incurred by or asserted against such Credit Party or the Administrative Agent by any Governmental Authority as a result of the failure by such Lender or the L/C Issuer, as the case may be, to deliver, or as a result of the inaccuracy, inadequacy or deficiency of, any documentation required to be delivered by such Lender or the L/C Issuer, as the case may be, to such Credit Party or the Administrative Agent pursuant to subsection (e) and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with this Credit Agreement or any other Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Government Authority. Each Lender and the L/C Issuer hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender or the L/C Issuer, as the case may be, under this Credit Agreement or any other Credit Document against any amount due to the Administrative Agent under this clause (ii). The agreements in this clause (ii) shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender or the L/C Issuer, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

(d)    *Evidence of Payments.* As soon as practicable, after any payment of Taxes by any Credit Party to a Governmental Authority as provided in this Section 3.01, the Credit Party shall deliver (or cause to be delivered) to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Law to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

[Credit Agreement]

(e)    *Status of Lenders; Tax Documentation.*

(i)    Each Lender shall deliver to the Borrower and to the Administrative Agent, at the time or times prescribed by applicable Laws or when reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine whether or not payments made hereunder or under any other Credit Document are subject to Taxes, if applicable, the required rate of withholding or deduction, such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by the Borrower pursuant to this Credit Agreement or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction and (D) whether or not payments made hereunder or under any other Credit Document are subject to backup withholding taxes or information reporting requirement.  Notwithstanding anything to the contrary in this Section 3.01(e)(i), the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), (ii)(B) and (ii)(C) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, if the Borrower is a resident for tax purposes in the United States:

(A)    Any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Credit Agreement (and from time to time thereafter upon the request of such Borrower and the Administrative Agent) executed originals of Internal Revenue Service Form W-9 or such other documentation or information prescribed by applicable Laws or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent, as the case may be, to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(B)    Each Foreign Lender to the extent that it is legally entitled to do so shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Credit Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

[Credit Agreement]

(1)     executed originals of Internal Revenue Service Form W-8 BEN or W-8 BEN-E, as applicable, claiming eligibility for benefits of an income tax treaty to which the United States is a party, with respect to (x) payments of interest under any Credit Document pursuant to the "interest" article of such tax treaty, and (y) any other applicable payments under any Credit Document pursuant to the "business profits" or "other income" article of such tax treaty,

(2)     executed originals of Internal Revenue Service Form W-8 ECI,

(3)     to the extent a Foreign Lender is not the beneficial owner, executed originals of Internal Revenue Service Form W-8 IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a certificate as required under Section 3.01(e)(ii)(B)(4), IRS Form W-8, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate as required under Section 3.01(e)(ii)(B)(4) on behalf of each such direct and indirect partner,

(4)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Internal Revenue Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Internal Revenue Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Internal Revenue Code and (y) executed originals of Internal Revenue Service Form W-8 BEN or W-8 BEN-E, as applicable, or

(5)     executed originals of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States federal withholding tax together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(C)     If a payment made to a Lender under any Credit Document would be subject to United States federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Administrative Agent and the Borrower at the time or times prescribed by Law and at such time or times reasonably requested by the Borrower or the Administrative Agent such

[Credit Agreement]

documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the Closing Date.

(iii)    On or before the date the Administrative Agent becomes a party to this Agreement, the Administrative Agent shall provide to the Borrower, two duly-signed, properly completed copies of the IRS Form W-9 or any successor thereto. At any time thereafter, the Administrative Agent shall provide updated documentation previously provided or a successor form thereto) when any documentation previously delivered has expired or become obsolete or invalid or otherwise upon the reasonable request of the Borrower.

(iv)    Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification, provide such successor form, or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so

(v)    Each Lender shall promptly notify the Borrower and the Administrative Agent of any change in circumstances that would modify or render invalid any claimed exemption or reduction, and take such steps as shall not be materially disadvantageous to it, in the reasonable judgment of such Lender, and as may be reasonably necessary (including the re-designation of its Lending Office) to avoid any requirement of applicable Laws of any jurisdiction that the Borrower or the Administrative Agent make any withholding or deduction for taxes from amounts payable to such Lender.

(vi)    Each of the Credit Parties shall promptly deliver to the Administrative Agent or any Lender, as the Administrative Agent or such Lender shall reasonably request, on or prior to the Closing Date (or such later date on which it first becomes a Credit Party), and in a timely fashion thereafter, such documents and forms required by any relevant taxing authorities under the Laws of any jurisdiction, duly executed and completed by such Credit Party, as are required to be furnished by such Lender or the Administrative Agent under such Laws in connection with any payment by the Administrative Agent or any Lender of Taxes or Other Taxes, or otherwise in connection with the Credit Documents, with respect to such jurisdiction.

(f)    *Treatment of Certain Refunds.* If the Administrative Agent, any Lender or the L/C Issuer determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by any Credit Party or with respect to which any

[Credit Agreement]

Credit Party has paid additional amounts pursuant to this Section 3.01, it shall pay to such Credit Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Credit Party under this Section 3.01 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses and net of any loss or gain realized in the conversion of such funds from or to another currency incurred by the Administrative Agent, such Lender or the L/C Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that each Credit Party, upon the request of the Administrative Agent, such Lender or the L/C Issuer, agrees to repay the amount paid over to such Credit Party (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, such Lender or the L/C Issuer in the event the Administrative Agent, such Lender or the L/C Issuer is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the Administrative Agent, any Lender or the L/C Issuer to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Credit Parties, any of their Subsidiaries or any other Person.

(g)    *Survival*. Each party's obligation under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

Section 3.02.    *Illegality*. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to a Relevant Rate, or to determine or charge interest rates based upon a Relevant Rate, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of such Lender to make or continue Alternative Currency Loans in the affected currency or currencies or, in the case of Loans denominated in Dollars, to make or continue Term SOFR Loans or to convert Base Rate Loans to Term SOFR Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay all Alternative Currency Loans in the affected currency or currencies or, if applicable and such Loans are denominated in Dollars, convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loan or Alternative Currency Term Rate Loan to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loan or Alternative Currency Term Rate Loan and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon SOFR, the Administrative Agent shall during the period of such suspension compute

[Credit Agreement]

the Base Rate applicable to such Lender without reference to the Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03.    *Inability to Determine Rates.*

(a)    If in connection with any request for a Term SOFR Loan or an Alternative Currency Loan or a conversion of Base Rate Loans to Term SOFR Loans or a continuation of any of such Loans, as applicable, (i) the Administrative Agent reasonably determines (which determination shall be conclusive absent manifest error) that (A) no Successor Rate for the Relevant Rate for the applicable Agreed Currency has been determined in accordance with Section 3.03(b), and the circumstances under clause (i) of Section 3.03(b) or the Scheduled Unavailability Date has occurred with respect to the Relevant Rate (as applicable), or (B) adequate and reasonable means do not otherwise exist for determining the Relevant Rate for the applicable Agreed Currency for any determination date(s) or requested Interest Period, as applicable, with respect to a proposed Alternative Currency Loan or Term SOFR Loan or in connection with an existing or proposed Base Rate Loan, or (ii) the Administrative Agent or the Required Lenders determine that for any reason that Relevant Rate with respect to a proposed Loan denominated in an Agreed Currency does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.

(i)    Thereafter, (x) the obligation of the Lenders to make or maintain Loans in the affected currencies, as applicable, or to convert Base Rate Loans to Term SOFR Loans, shall be suspended in each case to the extent of the affected Alternative Currency Loans or Interest Period or determination date(s), as applicable, and (y) in the event of a determination described in the preceding sentence with respect to the Term SOFR component of the Base Rate, the utilization of the Term SOFR component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (or, in the case of a determination by the Required Lenders described in clause (ii) of this Section 3.03(a), until the Administrative Agent upon instruction of the Required Lenders) revokes such notice.

(ii)    Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, or conversion to Term SOFR Loans, or Borrowing of, or continuation of Alternative Currency Loans to the extent of the affected Alternative Currency Loans or Interest Period or determination date(s), applicable or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans denominated in Dollars in the Dollar Equivalent of the amount specified therein and (ii) (A) any outstanding Term SOFR Loans shall be deemed to have been converted to Base Rate Loans immediately and (B) any outstanding affected Alternative Currency Loans, at the Borrower's election, shall either (1) be converted into a Borrowing of Base Rate

[Credit Agreement]

Loans denominated in Dollars in the Dollar Equivalent of the amount of such outstanding Alternative Currency Loan immediately, in the case of an Alternative Currency Daily Rate Loan or at the end of the applicable Interest Period, in the case of an Alternative Currency Term Rate Loan or (2) be prepaid in full immediately, in the case of an Alternative Currency Daily Rate Loan, or at the end of the applicable Interest Period, in the case of an Alternative Currency Term Rate Loan; provided that if no election is made by the Borrower (x) in the case of an Alternative Currency Daily Rate Loan, by the date that is three Business Days after receipt by the Borrower of such notice or (y) in the case of an Alternative Currency Term Rate Loan, by the last day of the current Interest Period for the applicable Alternative Currency Term Rate Loan, the Borrower shall be deemed to have elected clause (1) above.

(b)    Replacement of SOFR or SOFR Successor Rate. Notwithstanding anything to the contrary in this Agreement or any other Credit Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Borrower) that the Borrower or Required Lenders (as applicable) have determined, that:

(i)    adequate and reasonable means do not exist for ascertaining any requested Interest Period, including, without limitation, because the Term SOFR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)    the Applicable Authority has made a public statement identifying a specific date after which Term SOFR shall or will no longer be made available, or permitted to be used for determining the interest rate of syndicated loans denominated in Dollars, or shall or will otherwise cease, provided that, in each case, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent that will continue to provide Term SOFR (the date on which Term SOFR is no longer available permanently or indefinitely, the "**SOFR Scheduled Unavailability Date**");

or if the events or circumstances of the type described in Section 3.03(c)(i) or (ii) have occurred with respect to the SOFR Successor Rate then in effect, then, the Administrative Agent and the Borrower may amend this Agreement solely for the purpose of replacing Term SOFR for Dollars or any then current SOFR Successor Rate for Dollars in accordance with this Section 3.03 with an alternative benchmark rate giving due consideration to any evolving or then existing convention for similar credit facilities syndicated and agented in the U.S. and denominated in Dollars for such alternative benchmarks, and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar credit facilities syndicated and agented in the U.S. and denominated in Dollars for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Administrative Agent from time to time in its

[Credit Agreement]

reasonable discretion and may be periodically updated (and any such proposed rate, including for the avoidance of doubt, any adjustment thereto, a "**SOFR Successor Rate**"), and any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to such amendment.

(c)     Replacement of Relevant Rate or Successor Rate.    Notwithstanding anything to the contrary in this Agreement or any other Credit Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Borrower) that the Borrower or Required Lenders (as applicable) have determined, that:

(i)     adequate and reasonable means do not exist for ascertaining the Relevant Rate (other than SOFR) for an Agreed Currency (other than Dollars) because none of the tenors of such Relevant Rate (other than SOFR) under this Agreement is available or published on a current basis, and such circumstances are unlikely to be temporary; or

(ii)    the Applicable Authority has made a public statement identifying a specific date after which all tenors of the Relevant Rate (other than SOFR) for an Agreed Currency (other than Dollars) under this Agreement shall or will no longer be representative or made available, or permitted to be used for determining the interest rate of syndicated loans denominated in such Agreed Currency (other than Dollars), or shall or will otherwise cease, provided that, in each case, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent that will continue to provide such representative tenor(s) of the Relevant Rate (other than SOFR) for such Agreed Currency (other than Dollars) (the latest date on which all tenors of the Relevant Rate for such Agreed Currency (other than Dollars) under this Agreement  are no longer representative or available permanently or indefinitely, the "**Scheduled Unavailability Date**");

or if  the events or circumstances of the type described in Section 3.03(b)(i) or (ii) have occurred with respect to the Successor Rate then in effect, then, the Administrative Agent and the Borrower may amend this Agreement solely for the purpose of replacing the Relevant Rate for an Agreed Currency or any then current Successor Rate for an Agreed Currency in accordance with this Section 3.03 with an alternative benchmark rate giving due consideration to any evolving or then existing convention for similar credit facilities syndicated and agented in the U.S. and denominated in such Agreed Currency for such alternative benchmarks, and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar credit facilities syndicated and agented in the U.S. and denominated in such Agreed Currency for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated (and any such proposed rate, including for the avoidance of doubt, any

[Credit Agreement]

adjustment thereto, a "**Non-SOFR Successor Rate**", and collectively with the SOFR Successor Rate, the "**Successor Rate**"), and any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to such amendment.

(d)     Successor Rate. The Administrative Agent will promptly (in one or more notices) notify the Borrower and each Lender of the implementation of any Successor Rate.

Any Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Administrative Agent, such Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than zero%, the Successor Rate will be deemed to be zero% for the purposes of this Agreement and the other Credit Documents.

In connection with the implementation of a Successor Rate the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Conforming Changes to the Lenders reasonably promptly after such amendment becomes effective.

(e)     For purposes of this Section 3.03, those Lenders that either have not made, or do not have an obligation under this Agreement to make, the relevant Loans in the relevant Alternative Currency shall be excluded from any determination of Required Lenders.

Section 3.04.   *Increased Cost; Capital Adequacy.*

(a)     *Increased Costs Generally.* If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in Term SOFR or contemplated by Section 3.04(e) hereof) or the L/C Issuer;

(ii)     subject any Lender or the L/C Issuer to any tax of any kind whatsoever with respect to this Credit Agreement, any Letter of Credit, any participation in a Letter of Credit or any Term SOFR ate Loan made by it, or change the basis of taxation of payments to such Lender or the L/C Issuer in respect thereof (except for (A) Indemnified Taxes or Other Taxes covered by Section 3.01(a) and Section 3.01(b), (B) the imposition of, or any change in the

[Credit Agreement]

rate of, any Taxes described in clauses (c) through (f) of the definition of "Excluded Taxes" and (C) Connection Income Taxes) payable by such Lender or the L/C Issuer; or

(iii)    impose on any Lender or the L/C Issuer or the London interbank market any other condition, cost or expense affecting this Credit Agreement or Term SOFR Loans made by such Lender or Alternative Currency Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Term SOFR Loan, the interest on which is determined by reference to the Term SOFR (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or the L/C Issuer, the Borrower will pay, or cause to be paid, to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)    *Capital Requirements*.   If any Lender or the L/C Issuer reasonably determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Credit Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or L/C Issuer or such Lender's or the L/C Issuer's holding company for any such reduction suffered.

(c)    *Certificates for Reimbursement*.   A certificate of a Lender or the L/C Issuer setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or the L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    *Delay in Requests*.   Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender or the L/C Issuer

[Credit Agreement]

pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender or the L/C Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    *Reserves on Term SOFR Loans.*  Without duplication of amounts paid pursuant to the definition of "Term SOFR," the Borrower shall pay, or cause to be paid, to each Lender, as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Term SOFR Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error), which shall be due and payable on each date on which interest is payable on such Loan; *provided* the Borrower shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest or costs from such Lender.  If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest or costs shall be due and payable 10 days from receipt of such notice.

Section 3.05.    *Compensation for Losses.*  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such compensation, the Borrower shall promptly compensate, or cause to be compensated, such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Term SOFR Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Term SOFR Loan or Alternative Currency Term Rate on the date or in the amount notified by the Borrower; or

(c)    any assignment of a Term SOFR Loan or Alternative Currency Term Rate on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 11.13;

including any loss or expense (excluding loss of anticipated profits, any foreign exchange losses or margin) arising from the liquidation or redeployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract.  The Borrower shall also pay, or cause to be paid, any customary administrative fees charged by such Lender in connection with the foregoing.  A certificate of a Lender setting forth in reasonable detail the amount or amounts

[Credit Agreement]

necessary to compensate such Lender as specified in this Section and delivered to the Borrower shall be conclusive absent manifest error.

Section 3.06. *Mitigation Obligations; Replacement of Lenders.*

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender (including the L/C Issuer) or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender (including the L/C Issuer) gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or issuing or participating in Letters of Credit hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender in any material economic, legal or regulatory respect; *provided* that nothing in this Section 3.06(a) shall affect or postpone any Obligations of the Borrower or the rights of the Lenders under this Article 3.  The Borrower hereby agrees to pay, or cause to be paid, all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Term SOFR Loans from one Interest Period to another Interest Period, or to convert Base Rate Loans into Term SOFR Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(d) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)     If the obligation of any Lender to make or continue any Term SOFR Loan or to convert Base Rate Loans into Term SOFR Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's applicable Term SOFR Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such Term SOFR Loans (or, in the case of any immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)     to the extent that such Lender's Term SOFR Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Term SOFR Loans shall be applied instead to its Base Rate Loans; and

(ii)     all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Term SOFR Loans shall be made or continued instead as Base Rate Loans (if possible), and all Base Rate Loans of

[Credit Agreement]

such Lender that would otherwise be converted into Term SOFR Loans shall remain as Base Rate Loans.

(d)      If any Lender gives notice to a Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.01, Section 3.02, Section 3.03 or Section 3.04 hereof that gave rise to the conversion of such Lender's Term SOFR Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Term SOFR Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted irrespective of whether such conversion results in greater than ten Interest Periods (as adjusted pursuant to Section 2.02(f)) being outstanding under this Agreement, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Term SOFR Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Term SOFR Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments.

(e)      *Replacement of Lenders.*  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives notice pursuant to Section 3.02, or if any Lender is then a Defaulting Lender, the Borrower may replace such Lender in accordance with Section 11.13.

Section 3.07.    *Survival Losses.*  All of the Borrower's obligations under this Article 3 shall survive termination of the Commitments hereunder and repayment of the Obligations.

## ARTICLE 4
### GUARANTY

Section 4.01.    *The Guaranty.*

(a)      Each of the Guarantors hereby jointly and severally guarantees to the Administrative Agent and each of the holders of the Obligations as hereinafter provided, as primary obligor and not as surety, the prompt payment of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof.  The Guarantors hereby further agree that if any of the Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

(b)      Notwithstanding any provision to the contrary contained herein or in any other of the Credit Documents or Swap Contracts, the obligations of each Guarantor (in its capacity as such) under this Credit Agreement and the other Credit Documents and Swap Contracts shall be limited to an aggregate amount equal to the largest amount that would not

[Credit Agreement]

render such obligations subject to avoidance under applicable Debtor Relief Laws or any comparable provisions of any applicable Law.

Section 4.02.   *Obligations Unconditional.*

(a)   The obligations of the Guarantors under Section 4.01 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Credit Documents or other documents relating to the Obligations, or any substitution, compromise, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor (other than payment or performance), it being the intent of this Section 4.02 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances.  Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against any other Guarantor for amounts paid under this Article 4 until such time as the Obligations have been paid in full and the commitments relating thereto have expired or terminated.

(b)   It is agreed that, to the fullest extent permitted by Law, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain absolute and unconditional as described above:

(i)   at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived; or

(ii)   any of the acts mentioned in any of the provisions of any of the Credit Documents, or other documents relating to the obligations or any other agreement or instrument referred to therein shall be done or omitted.

(c)   With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest, notice of acceptance of the guaranty given hereby and of extensions of credit that may constitute obligations guaranteed hereby, notices of amendments, waivers, consents and supplements to the Credit Documents and other documents relating to the Obligations, or the compromise, release or exchange of collateral or security, and all other notices whatsoever, and any requirement that the Administrative Agent or any holder of the Obligations exhaust any right, power or remedy or proceed against any Person under any of the Credit Documents or any other documents relating to the Obligations or any other agreement or instrument referred to therein, or against any other Person under any other guarantee of, or security for, any of the Obligations.

Section 4.03.   *Reinstatement.*  Neither the Guarantors' obligations hereunder nor any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by an impairment, modification, change, release or limitation of the liability of the Borrower, by reason of the Borrower's bankruptcy or insolvency or by reason of the invalidity or unenforceability of all or any portion of the Obligations.  In addition, the obligations of each Guarantor under this Article 4 shall be automatically reinstated if and to the extent that

[Credit Agreement]

for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded, avoided, or must be otherwise restored by any holder of any of the Obligations, whether as a result of any Debtor Relief Law or otherwise, and each Guarantor agrees that it will indemnify the Administrative Agent and each holder of the Obligations on demand for all reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and disbursements) incurred by the Administrative Agent or such holder of the Obligations in connection with such rescission, avoidance, or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Law.

Section 4.04. *Certain Waivers.* Each Guarantor acknowledges and agrees that the guaranty given hereby may be enforced without the necessity of resorting to or otherwise exhausting remedies in respect of any other security or collateral interests, and without the necessity at any time of having to take recourse against the Borrower or any other Person or against any collateral securing the Obligations or otherwise, and it will not assert any right to require that action first be taken against the Borrower or any other Person (including any co-guarantor) or pursuit of any other remedy or enforcement of any other right, and nothing contained herein shall prevent or limit action being taken against the Borrower hereunder, under the other Credit Documents or the other documents and agreements relating to the Obligations or from foreclosing on any security or collateral interests relating hereto or thereto, or from exercising any other rights or remedies available in respect thereof, if the Guarantors shall not timely perform their obligations, and the exercise of any such rights and completion of any such foreclosure proceedings shall not constitute a discharge of the Guarantors' obligations hereunder unless as a result thereof, the Obligations shall have been paid in full and the commitments relating thereto shall have expired or terminated, it being the purpose and intent that the Guarantors' obligations hereunder be absolute, irrevocable, independent and unconditional. Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation pursuant to Section 4.02(a) and through the exercise of rights of contribution pursuant to Section 4.06.

Section 4.05. *Remedies.* The Guarantors agree that, to the fullest extent permitted by Law, as between the Guarantors, on the one hand, and holders of the Obligations, on the other hand, the Obligations may be declared to be forthwith due and payable as provided in Section 9.02 (and shall be deemed to have become automatically due and payable in the circumstances specified in Section 9.02)) for purposes of Section 4.01. notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by the Guarantors for purposes of Section 4.01. The Guarantors acknowledge and agree that their obligations hereunder are secured in accordance with the terms of the Collateral Documents and that the holders of the Obligations may exercise their remedies thereunder in accordance with the terms thereof.

Section 4.06. *Rights of Contribution.* The Guarantors hereby agree as among themselves that, in connection with payments made hereunder, each Guarantor shall have a right

[Credit Agreement]

of contribution from each other Guarantor in accordance with applicable Law. Such contribution rights shall be subordinate and subject in right of payment to the Obligations until such time as the Obligations have been irrevocably paid in full and the commitments relating thereto shall have expired or been terminated, and none of the Guarantors shall exercise any such contribution rights until the Obligations have been irrevocably paid in full and the commitments relating thereto shall have expired or been terminated.

Section 4.07. *Guaranty of Payment; Continuing Guarantee.* The guarantee given by the Guarantors in this Article 4 is a guaranty of payment and not of collection, is a continuing guaranty, and shall apply to all Obligations whenever arising.

Section 4.08. *Keepwell.* Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations under the guaranty given hereby in respect of the Swap Obligations; *provided, however*, that each Qualified ECP Guarantor shall only be liable under this Section 4.08 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 4.08, or otherwise under the guaranty given hereby, voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount. The obligations of each Qualified ECP Guarantor under this Section 4.08 shall remain in full force and effect until the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations described in clauses (b) and (c) of the definition thereof and (iii) any Letter of Credit that has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the L/C Issuer or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the L/C Issuer). Each Qualified ECP Guarantor intends that this Section 4.08 constitute, and this Section 4.08 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 4.09. *Release of Guarantors.* If, in compliance with the terms and provisions of the Credit Documents, any Guarantor ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder (any such Guarantor, a "**Transferred Guarantor**"), such Transferred Guarantor shall be automatically released from its obligations under this Agreement (including under Section 11.04 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, so long as the Borrower shall have provided the Administrative Agent and Collateral Agent such certifications or documents as any such Agent shall reasonably request, the Administrative Agent and Collateral Agent shall take such actions as are necessary to effect each release described in this Section 4.09 in accordance with the relevant provisions of the Collateral Documents; *provided, however*, that the release of any Subsidiary Guarantor from its obligations under this Agreement if such Subsidiary Guarantor becomes an Excluded Subsidiary shall only be permitted if at the time such Subsidiary Guarantor becomes an Excluded Subsidiary of such type (1) after giving pro forma effect to such release and the consummation of the transaction that causes such Person to be an Excluded Subsidiary of such type, the Borrower is deemed to have made a new Investment in such Person (as if such Person were then newly acquired) and

[Credit Agreement]