such Investment is permitted at such time and (2) a Responsible Officer of the Borrower certifies to the Administrative Agent compliance with the preceding clause (1); *provided further*, that no such release shall occur if such Subsidiary Guarantor continues to be a guarantor in respect of any Incremental Equivalent Debt, any Refinancing Equivalent Debt or any Permitted Refinancing in respect of any of the foregoing.

## ARTICLE 5
### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 5.01.    *[Reserved]*.

Section 5.02.    *Conditions to all Credit Extensions after the Closing Date.*    The obligation of each Lender to honor any Request for Credit Extension after the Closing Date is subject to the satisfaction (or waiver in accordance with Section 11.01) of the following conditions precedent:

(a)    The representations and warranties of the Borrower and each other Credit Party contained in Article 6 or any other Credit Document shall be true and correct in all material respects on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided, however*, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates, and except that for purposes of this Section 5.02, the representations and warranties contained in Section 6.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 7.01.

(b)    Other than in connection with the initial Credit Extensions on the Closing Date, no Default or Event of Default shall exist immediately before or immediately after giving effect to such Credit Extension.

(c)    The Administrative Agent, the L/C Issuer and/or the Swingline Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

Each Request for Credit Extension (other than a Loan Notice requesting only a conversion of Loans to other Types of Loans, or a continuation of Term SOFR Loans or Alternative Currency Term Rate Loans) submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Section 5.02(a) and (b) have been satisfied (to the extent such conditions are required to be satisfied with respect to such Credit Extension) on and as of the date of the applicable Credit Extension.

## ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

Each of the Credit Parties represent and warrant to the Administrative Agent and the Lenders, as of the Closing Date, the Amendment No. 1 Effective Date, the Amendment No. 3 Effective Date, the Amendment No. 4 Effective Date and each other date on which such

[Credit Agreement]

representations and warranties are required to be true and correct pursuant to Section 5.02 or otherwise, that:

Section 6.01.  *Existence, Qualification and Power*.  Each Credit Party (a) is duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization; (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Credit Documents to which it is a party; and (c) is duly qualified and is licensed and in good standing (to the extent such concept exists in such jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except, in each case referred to in clause (a) (other than with respect to the Borrower), (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 6.02.  *Authorization; No Contravention*.  The execution, delivery and performance by each Credit Party of each Credit Document to which it is party, (a) have been duly authorized by all necessary corporate or other organizational action, (b) do not and will not contravene the terms of any of such Person's Organization Documents; and (c) do not and will not conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 8.01), or require any payment to be made under any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Restricted Subsidiaries or any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or violate any Law applicable to such Person; except with respect to any contravention, conflict or violation referred to in clause (c), to the extent that such contravention, conflict or violation could not reasonably be expected to have a Material Adverse Effect.

Section 6.03.  *Governmental Authorization; Other Consents*.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party of this Credit Agreement or any other Credit Document (other than as have already been obtained and are in full force and effect, filings to perfect security interests granted pursuant to the Credit Documents (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect).

Section 6.04.  *Binding Effect*.  This Credit Agreement has been, and each other Credit Document, when delivered hereunder, will have been, duly executed and delivered by each Credit Party that is party thereto.  This Credit Agreement constitutes, and each other Credit Document when so delivered will constitute, a legal, valid and binding obligation of such Credit Party, enforceable against each Credit Party that is party thereto in accordance with its terms, except (a) to the extent the enforceability thereof may be limited by applicable Debtor Relief Laws affecting creditors' rights generally and by equitable principles of law (regardless of

[Credit Agreement]

whether enforcement is sought in equity or at law) and (b) for any filing necessary to perfect security interests granted pursuant to the Credit Documents.

Section 6.05.    *Financial Statements*.  The Annual Financial Statements fairly present in all material respects the financial condition of the Borrower and its Subsidiaries, as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

Section 6.06.    *No Material Adverse Effect*.  Since the July 2, 2021, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Section 6.07.    *Litigation*.    There are no actions, suits, investigations, criminal prosecutions, civil investigative demands, imposition of criminal or civil fines or penalties, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Restricted Subsidiary or against any of their properties or revenues that either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

Section 6.08.    *Labor Matters*.  Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, there are no strikes or other labor disputes against the Borrower or any of its Restricted Subsidiaries pending or, to the knowledge of the Borrower, threatened.

Section 6.09.    *Ownership of Property; Liens*.    The Borrower and its Restricted Subsidiaries have good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The property of the Borrower and its Restricted Subsidiaries is not subject to Liens, other than Permitted Liens.

Section 6.10.    *Environmental Matters*.  Except with respect to any matters that, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect:

(a)    Each Credit Party, and their respective operations and properties, are in compliance with Environmental Laws, which includes obtaining and maintaining all permits, licenses and other approvals as required under any Environmental Law to carry on the business of the Credit Parties;

(b)    neither the Borrower nor any of its Restricted Subsidiaries have received or are subject to any claim under Environmental Laws;

(c)    there has been no Release of Hazardous Materials on, at, under or from any real property or facilities owned, operated or leased by any of the Credit Parties, or, to the

[Credit Agreement]

knowledge of the Borrower, real property formerly owned, operated or leased by any Credit Party that, in any case, could reasonably be expected to require the Borrower to perform any investigation, remedial activity or corrective action or cleanup under Environmental Laws or could otherwise reasonably be expected to result in the Borrower incurring Environmental Liability.

The Borrower and its Restricted Subsidiaries periodically conduct in the ordinary course of business a review of the effect of existing Environmental Laws and claims alleging potential liability or responsibility for violation of any Environmental Law and Environmental Liabilities on their respective businesses, operations and properties, and such Environmental Laws, claims and Environmental Liabilities would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 6.11.    *[Reserved]*.

Section 6.12.    *Taxes*.  The Borrower and its Restricted Subsidiaries have filed all U.S. federal income and other material tax returns and reports required to be filed, and have paid all taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those that are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP or that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 6.13.    *ERISA Compliance*.

(a)      Except as could not reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other federal or state Laws and each Credit Party and each ERISA Affiliate is in compliance with ERISA, the Internal Revenue Code and other applicable United States federal or United States state Laws with respect to each Multiemployer Plan.  Except as could not reasonably be expected to result in a Material Adverse Effect, each Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code is covered by a favorable determination letter from the IRS (or an application for such a letter is currently pending before the IRS with respect thereto) or is maintained under a prototype document that has received a favorable opinion letter from the IRS and, to the best knowledge of the Credit Parties, nothing has occurred that would prevent, or cause the loss of, such qualification.  Except as could not reasonably be expected to result in a Material Adverse Effect, each Credit Party and each ERISA Affiliate have made all required contributions that are due and owing to each Plan subject to Section 412 of the Internal Revenue Code or Section 303 of ERISA and to each Multiemployer Plan under Section 412 of the Internal Revenue Code or Section 304 of ERISA, and no application for a waiver of the minimum funding standard pursuant to Section 412 of the Internal Revenue Code or Section 302 of ERISA has been made with respect to any Plan.

(b)      There are no pending or, to the best knowledge of the Credit Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect.  There has been

[Credit Agreement]

no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that would reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred or is reasonably expected to occur that could reasonably be expected to result in a Material Adverse Effect; (ii) no Pension Plan has any Unfunded Pension Liability in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect; (iii) neither any Credit Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect (and no event has occurred that, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 of ERISA with respect to a Multiemployer Plan; and (iv) neither any Credit Party nor any ERISA Affiliate has engaged in a transaction involving any Pension Plan or Multiemployer Plan that would reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA.

Section 6.14.    *Subsidiaries*.  As of the Amendment No. 4 Effective Date, no Credit Party has any Subsidiaries other than those specifically disclosed in Schedule 6.14.  The outstanding Capital Stock of each Subsidiary that has been or is required to be pledged to the Collateral Agent pursuant to the Collateral and Guarantee Requirement has been validly issued, is owned free of Liens other than Permitted Liens, and with respect to any outstanding shares of such Capital Stock of a corporation, such shares have been validly issued and are fully paid and non-assessable.  As of the Closing Date, the outstanding shares of Capital Stock of each Subsidiary that have been or are required to be pledged to the Collateral Agent pursuant to the Collateral and Guarantee Requirement are not subject to any buy-sell, voting trust or other shareholder agreement except as identified on Schedule 6.14.

Section 6.15.    *Margin Regulations; Investment Company Act*.

(a)    The Credit Parties are not engaged and will not engage, principally or as one of their important activities, in the business of purchasing or carrying "margin stock" (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b)    Neither the Borrower nor any Credit Party is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 6.16.    *Disclosure*.  No report, financial statement, certificate or other written information furnished by or on behalf of any Credit Party (other than projected financial information and information of a general economic or industry nature) to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Credit Agreement or delivered hereunder or under any other Credit Document considered as a whole contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, not materially misleading in light of the circumstances under which they were made (after giving effect to all supplements and updates thereto); *provided* that, with respect to projected financial information, the Credit Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time furnished; it being understood that such projections may vary from actual results and that such variances may be material.

[Credit Agreement]

Section 6.17. *Compliance with Laws*. The Borrower and its Restricted Subsidiaries are in compliance with the requirements of all Laws and all orders, writs, injunctions, settlements or other agreements with any Governmental Authority and decrees having the force of law applicable to them or to their properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 6.18. *Collateral Documents*. Each Collateral Document is effective to create in favor of the Collateral Agent, for the benefit of the holders of the Obligations, a legal, valid and enforceable security interest in the Collateral identified therein, except to the extent that the enforceability thereof may be limited by applicable Debtor Relief Laws affecting creditors' rights generally and by equitable principles of law (regardless of whether enforcement is sought in equity or at law) and, together with such filings and other actions required to be taken hereby or by the applicable Collateral Documents, the Collateral Documents shall create a fully perfected first priority Lien on, and security interest in, all right, title and interest of the grantors thereunder in such Collateral (to the extent that such Liens may be perfected by the filing of a financing statement or other appropriate action), in each case subject to no other Lien (other than Permitted Liens).

Notwithstanding anything herein (including this Section 6.18) or in any other Credit Document to the contrary, neither the Borrower nor any other Credit Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Capital Stock of any Foreign Subsidiary, or as to the rights and remedies of the Collateral Agent or any Lender with respect thereto, under foreign Law or (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement.

Section 6.19. *Intellectual Property*. The Borrower and its Restricted Subsidiaries own, license or possess the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, licenses, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of their respective businesses as currently conducted, and such IP Rights do not conflict with the rights of any Person, except to the extent the absence of such IP Rights and such conflicts, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. The operation of the respective businesses of the Borrower and its Restricted Subsidiaries as currently conducted does not infringe upon any rights held by any Person except for such infringements, individually or in the aggregate, which would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any of the IP Rights is pending or, to the knowledge of the Borrower, threatened in writing against any Credit Party or any of the Restricted Subsidiaries, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

[Credit Agreement]

Section 6.20.  *Solvency.*  On the Amendment No. 4 Effective Date, after giving effect to the transactions contemplated to occur on the Amendment No. 4 Effective Date, the Borrower and its Restricted Subsidiaries are, on a consolidated basis, Solvent.

Section 6.21.  *Patriot Act; Sanctioned Persons.*

(a)  To the extent applicable, each Credit Party is in compliance, in all material respects, with (i) the United States Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the Act and (iii) the United States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), the UK Bribery Act or other applicable anti-corruption laws.  No part of the proceeds of the Loans will be used, directly or, to the Borrower's knowledge, indirectly, for any payments to any official or employee of a Governmental Authority, political party or official, or candidate for political office in order to obtain, retain or direct business or obtain any improper advantage, in each such case in violation of the FCPA, the UK Bribery Act or other applicable anti-corruption laws.

(b)  Neither the Borrower, nor any of its Subsidiaries, nor, to the knowledge of the Borrower, any director, officer, employee, agent or controlled affiliate of the Borrower is an individual or entity (for purposes of this Section 6.21(b), a "**Person**") that is, or is owned or controlled by Persons that are the subject of any sanctions (i) administered or enforced by the United States, including the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union or ~~Her~~His Majesty's Treasury or other applicable sanctions authority, (ii) pursuant to the U.S. Iran Sanctions Act, as amended, or Executive Order 13590 (collectively, "**Sanctions**") or (iii) located, organized or resident in a country or territory that is, or whose government is, the subject of a comprehensive trade Sanctions program or embargo.  The Borrower will not, directly or, to its knowledge, indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Person (x) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, in each such case as would violate Sanctions, or (y) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loan, whether as a lender, underwriter, advisor, investor or otherwise).

Section 6.22.  *EEA Financial Institutions.*  No Credit Party is an EEA Financial Institution.

## ARTICLE 7
### AFFIRMATIVE COVENANTS

From and after the Closing Date, until the Loan Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations described in clauses (b) and (c) of the definition thereof and (iii) any Letter of Credit that has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the L/C Issuer or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the L/C Issuer) shall have been paid in full or otherwise satisfied, and the Commitments

[Credit Agreement]

hereunder shall have expired or been terminated, the Borrower and its Restricted Subsidiaries will:

Section 7.01. *Financial Statements.* Deliver to the Administrative Agent (and the Administrative Agent will deliver to each Lender):

(a) within ninety (90) days after the end of each fiscal year of the Borrower, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of comprehensive income, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, including a customary management's discussion and analysis narrative, audited and accompanied by a report and opinion of KPMG LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion (i) shall be prepared in accordance with generally accepted auditing standards and (ii) shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (except as may be required as a result of (x) a prospective Event of Default with respect to the Financial Covenants or (y) the impending maturity of any Facility, any Incremental Equivalent Debt or any Refinancing Equivalent Debt);

(b) within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter and the related (i) consolidated statements of comprehensive income for such fiscal quarter and for the portion of the fiscal year then ended, (ii) consolidated statements of cash flows for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding portion of the previous fiscal year and (iii) a customary management's discussion and analysis narrative, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments; and

(c) simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 7.01(a) and 7.01(b) above, the related unaudited consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) (which may be in footnote form only) from such consolidated financial statements.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 7.01 may be satisfied with respect to financial information of the Borrower and the Restricted Subsidiaries by furnishing (A) the applicable financial statements of the Borrower or (B) the Borrower's Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to clauses (A) and (B), to the extent such information is in lieu of information required to be provided under Section 7.01(a), such materials are, to the extent applicable, accompanied by a report and opinion of KPMG LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with

[Credit Agreement]

generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (except as may be required as a result of (x) a prospective Event of Default with respect to the Financial Covenants or (y) the impending maturity of any Facility, any Incremental Equivalent Debt or any Refinancing Equivalent Debt).

Section 7.02. *Certificates; Other Information.* Deliver to the Administrative Agent (and the Administrative Agent will deliver to each Lender), in form and detail reasonable satisfactory to the Administrative Agent:

(a)    concurrently with the delivery of the financial statements referred to in Sections 7.01(a) and (b) (beginning with the first full fiscal quarter ending after the Closing Date), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)    concurrently with the delivery of the financial statements referred to in Sections 7.01(a) and (b), a reasonably detailed consolidated budget for the then-current fiscal year on a quarterly basis (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such fiscal year and the related consolidated statements of projected cash flow and projected income for such fiscal year and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of furnished, it being understood that actual results may vary from such Projections and that such variations may be material;

(c)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Borrower, and copies of all annual, regular, periodic and special reports and registration statements that the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Exchange Act, and not otherwise required to be delivered to the Administrative Agent pursuant hereto; and

(d)    promptly, such additional information regarding the business, financial or corporate affairs of any Credit Party or any Restricted Subsidiary of a Credit Party, or compliance with the terms of the Credit Documents, as the Administrative Agent (including at the direction of a Lender) may from time to time reasonably request.

Documents required to be delivered pursuant to Section 7.01 or Section 7.02(b) or (c) (to the extent that any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date on which the Borrower posts such documents, or provide a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 11.02 (as may be updated by the Borrower from time to time); or on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that: (a) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Borrower to deliver such

[Credit Agreement]

paper copies and (b) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 7.02(a) to the Administrative Agent (which may be electronic copies delivered via electronic mail). The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Credit Parties hereby acknowledge that (a) the Administrative Agent and/or the Arrangers will make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Credit Parties hereunder (collectively, "**Credit Party Materials**") by posting the Credit Party Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Subsidiaries and Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Credit Parties hereby agree that so long as any of the Credit Parties is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities that (w) all Credit Party Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Credit Party Materials "PUBLIC," the Credit Parties shall be deemed to have authorized the Administrative Agent, the Arrangers, the L/C Issuer and the Lenders to treat such Credit Party Materials as not containing any material non-public information (although such information may be sensitive and proprietary) with respect to the Credit Parties or their securities for purposes of United States federal and state securities Laws (*provided* that to the extent that such Credit Party Materials constitute Information, they shall be treated as set forth in Section 11.07), (y) all Credit Party Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Side Information" and (z) the Administrative Agent and the Arrangers shall be entitled to treat any Credit Party Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." Notwithstanding the foregoing, the Credit Parties shall be under no obligation to mark any Credit Party Materials "PUBLIC."

Section 7.03. *Notification*. Promptly after a Responsible Officer of the Borrower or any Guarantor has obtained actual knowledge thereof, notify the Administrative Agent:

(a)     of the occurrence of any Default;

(b)     of the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding (including pursuant to any applicable Environmental Laws), whether at law or in equity by or before any

[Credit Agreement]

Governmental Authority against the Borrower or any of its Restricted Subsidiaries, that could in each case reasonably be expected to result in a Material Adverse Effect; and

(c)     of the occurrence of any ERISA Event which could reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 7.03(a) shall describe with particularity any and all provisions of this Credit Agreement and any other Credit Document that have been breached.

Section 7.04.     *Payment of Taxes*. Pay and discharge, as the same shall become due and payable (beyond any period of grace or cure, if applicable), all its obligations and liabilities, in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower and its Restricted Subsidiaries or the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 7.05.     *Preservation of Existence, Etc.*

(a)     Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization, except (i) in connection with a transaction permitted by Section 8.04 or 8.05 or (ii) with respect to any Restricted Subsidiary, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)     take all commercially reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and

(c)     preserve or renew all of its patents, registered copyrights, registered trademarks, trade names and service marks, the non-preservation or non-renewal of which could reasonably be expected to have a Material Adverse Effect.

Section 7.06.     *Maintenance of Properties*. Maintain, preserve and protect all of its material Property necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted and casualty and condemnation excepted and make all necessary repairs and replacements thereof or thereto in accordance with customary industry practice, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.07.     *Maintenance of Insurance*. Maintain in full force and effect with financially sound and reputable insurance companies (in the good faith judgment of the Borrower) that are not Affiliates of the Borrower, flood, casualty and liability insurance with

[Credit Agreement]

respect to its material properties (that are necessary for the operation of their respective businesses) and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons (*provided* that the Borrower and its Restricted Subsidiaries may self-insure to the extent customary among companies engaged in similar businesses or advisable in the good faith judgment of the Borrower) and identifying the Administrative Agent as mortgagee and loss payee as its interests may appear, with respect to flood hazard and casualty insurance, and as additional insured, with respect to liability insurance and providing for prior notice to the Administrative Agent of the termination, lapse or cancellation of any such insurance.

Section 7.08.    *Compliance with Laws; Environmental Laws.*

(a)    Comply in all respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (ii) the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

(b)    Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply with all Environmental Laws; obtain and renew all Environmental Permits necessary for its operations and properties; and, in each case to the extent the Credit Parties are required by applicable Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws.

Section 7.09.    *Books and Records.*    Maintain proper books of record and account, in which true and correct entries in conformity with GAAP shall be made of all financial transactions and matters involving the assets and business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder), and such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or such Restricted Subsidiary.

Section 7.10.    *Inspection Rights.*    Permit representatives and independent contractors of the Administrative Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours once each fiscal year, upon reasonable advance notice to the Borrower; *provided, however,* that when an Event of Default has occurred and is continuing, the Administrative Agent (or any of its respective

[Credit Agreement]

representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours upon reasonable advance notice; *provided further*, that, excluding any such visits and inspections during the continuance of an Event of Default, the Borrower will be responsible for the costs and expenses of the Administrative Agent only for one such visit and inspection in any fiscal year of the Borrower.  The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 7.10, none of the Borrower or any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product; *provided* that, in each case, the Borrower shall provide notice to the Administrative Agent that such information is being withheld and (other than with respect to clause (c) above) the Borrower shall use its commercially reasonable efforts to obtain the relevant consents and to communicate, to the extent both feasible and permitted under applicable Law or confidentiality obligation, the applicable information.

Section 7.11.  *Use of Proceeds*.  Use the proceeds from any Credit Extension to finance working capital, capital expenditures and other general corporate purposes, including Acquisitions and Restricted Payments otherwise permitted hereunder.

Section 7.12.  *Joinder of Subsidiaries as Guarantors*.  At the Borrower's expense, subject to the limitations and exceptions of this Credit Agreement, including the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)  Upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Credit Party or the designation in accordance with Section 7.14 of any existing direct or indirect wholly owned Material Domestic Subsidiary as a Restricted Subsidiary (in each case, other than an Excluded Subsidiary) or any Subsidiary becoming a wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary):

(i)  within 60 days after such formation, acquisition or cessation, or such longer period as the Administrative Agent may agree in its discretion:

(A)  cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent a Joinder Agreement, joinders to the Security Agreement, Intellectual Property Security Agreements, a counterpart of the Intercompany Note, joinders to the Intercreditor Agreements then in effect and other security agreements and documents as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent

[Credit Agreement]

(consistent with the Security Agreement, Intellectual Property Security Agreements and other security agreements in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement, other than, in each case, with respect to any Excluded Property;

(B)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement (and the parent of each such Material Domestic Subsidiary that is a Guarantor) to deliver any and all certificates representing Capital Stock (to the extent certificated) and intercompany notes (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement or the Security Agreement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank;

(C)    take and cause such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement and the parent of such Material Domestic Subsidiary to take whatever action (including the filing of UCC financing statements and delivery of stock and membership interest certificates to the extent certificated) as may be required pursuant to the terms of the Collateral Documents or as may be necessary in the reasonable opinion of the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and perfected Liens to the extent required by the Collateral and Guarantee Requirement, and to otherwise comply with the requirements of the Collateral and Guarantee Requirement;

(ii)    if reasonably requested by the Administrative Agent, within forty-five (45) days after such request (or such longer period as the Administrative Agent may agree in its discretion), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the Lenders, of counsel for the Credit Parties to the Administrative Agent as to such matters set forth in this Section 7.12(a) as the Administrative Agent may reasonably request; and

(iii)    if reasonably requested by the Administrative Agent, within sixty (60) days after such request (or such longer period as the Administrative Agent may agree in its discretion), deliver to the Administrative Agent any other items necessary from time to time to satisfy the Collateral and Guarantee Requirement with respect to perfection and existence of security interests with respect to property of any Guarantor acquired after the Closing Date and subject to the Collateral and Guarantee Requirement, but not specifically covered by the preceding clauses (i) or (ii).

Section 7.13.    *Further Assurances*.    Promptly upon reasonable request by the Administrative Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document

[Credit Agreement]

or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents, to the extent required pursuant to the Collateral and Guarantee Requirement.

Section 7.14.   *Designation of Subsidiaries.*   The Borrower may at any time after the Closing Date designate any Restricted Subsidiary of the Borrower as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that (i) immediately before and after such designation, no Event of Default shall have occurred and be continuing, and (ii) the Borrower is in pro forma compliance with the Financial Covenants.   The designation of any Subsidiary as an Unrestricted Subsidiary after the Closing Date shall be deemed to constitute an Investment by the Borrower therein at the date of designation.   The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute (i) the incurrence at the time of designation of any Investment, Indebtedness or Liens of such Subsidiary existing at such time and (ii) a return on any Investment by the Borrower in Unrestricted Subsidiaries.

## ARTICLE 8
### NEGATIVE COVENANTS

From and after the Closing Date, until the Loan Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted, (ii) Obligations described in clauses (b) and (c) of the definition thereof and (iii) any Letter of Credit that has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the L/C Issuer or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the L/C Issuer) shall have been paid in full or otherwise satisfied, and the Commitments hereunder shall have expired or been terminated, the Borrower shall not, and shall not permit any Restricted Subsidiary to:

Section 8.01.   *Liens.*   Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)   Liens pursuant to any Credit Document securing the Loan Obligations, including Cash Collateral and other Adequate Assurance pledged to the L/C Issuer and the Swingline Lender to secure obligations of Defaulting Lenders;

(b)   Liens securing Indebtedness permitted by Section 8.03(q) and (r);

(c)   Liens securing obligations pursuant to a Swap Contract or Treasury Management Agreement permitted hereunder in favor of a Person that was (or was an Affiliate of) a Lender hereunder on the Closing Date or on the date such transaction was entered into, but only to the extent that (i) for any Swap Contract, the obligations under such Swap Contract are permitted under Section 8.03(d), (ii) such Liens are on the same collateral that secures the Loan Obligations and (iii) the obligations under such Swap Contract or Treasury Management Agreement and the Loan Obligations share *pari passu* in the collateral that is subject to such Liens;

[Credit Agreement]

(d)    Liens existing on the Amendment No. 4 Effective Date and listed on Schedule 8.01 and any modifications, replacements, renewals, refinancings or extensions thereof; *provided* that (i) the property covered thereby is not changed other than after-acquired property that is affixed or incorporated into the property covered by such Lien and any proceeds of products of such property, (ii) the amount secured or benefited thereby is not increased except by an amount equal to unpaid accrued interest and premium thereon plus other amounts owing or paid related to such Indebtedness, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal, replacement or extension, (iii) the direct or any contingent obligor with respect thereto is not changed and (iv) any modification, replacement, renewal, refinancing or extension of the obligations secured or benefited thereby is permitted by Section 8.03(b);

(e)    Liens for taxes not yet due or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(f)    carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlords' or sublandlords' or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 60 days or if more than 60 days overdue, are unfiled and no other action has been taken to enforce such Lien or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP or the equivalent accounting principles in the relevant local jurisdiction;

(g)    (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, health, disability or employee benefits, unemployment insurance and other social security legislation or similar legislation or regulation or other insurance-related obligations (including in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto), other than any Lien imposed by Title IV of ERISA and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Restricted Subsidiaries;

(h)    deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business or consistent with past practice or industry practice;

(i)    zoning restrictions, easements, rights-of-way, covenants, conditions, restrictions, reservations, encroachments and other similar encumbrances affecting real property that, in the aggregate, are not substantial in amount, and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries, taken as a whole;

(j)    Liens securing judgments for the payment of money not constituting an Event of Default under Section 9.01(h) or securing appeal or other surety bonds related to such judgments;

(k)    Liens securing, or in respect of, obligations under Capitalized Leases and purchase money obligations for fixed or capital assets; *provided* that such Liens do not at any time encumber any property (except for replacements, additions and accessions to such property) other than the property financed by such Indebtedness except that that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(l)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(m)    Liens on property or assets acquired in connection with an Acquisition permitted under this Agreement; *provided* that (i) the indebtedness secured by such Liens is permitted under Section 8.03 and (ii) the Liens (A) are not incurred in connection with, or in contemplation or anticipation of, the acquisition, (B) are not, in the case of any Credit Party, "blanket liens," and (C) do not attach or extend to any other property or assets (other than the proceeds or products thereof and other than after-acquired property subjected to such Lien in accordance with the terms governing the Indebtedness secured by such Lien);

(n)    Liens of landlords or mortgages of landlords on fixtures, equipment and movable property located on premises leased by the Borrower or any Restricted Subsidiary which do not interfere in any material respect with the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(o)    Liens incurred and financing statements filed or recorded in each case with respect to property leased by the Borrower and its Restricted Subsidiaries to the owners of such property which are operating leases; *provided* that such Lien does not extend to any other property of the Borrower and its Restricted Subsidiaries;

(p)    Liens (i) of a collection bank arising under Section 4-208 of the UCC on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions;

(q)    deposits of cash or the issuance of a Letter of Credit made to secure liability to insurance carriers under insurance or self-insurance arrangements;

(r)    Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted under Section 8.02 to be applied against the purchase price for such Investment or other acquisition, and (ii) consisting of an agreement to Dispose of any

[Credit Agreement]

property in a Disposition permitted under Section 8.05, in each case, solely to the extent such Investment or other acquisition or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(s)    Liens on property or assets of Restricted Subsidiaries that are not Credit Parties securing obligations of Restricted Subsidiaries that are not Credit Parties;

(t)    Liens on Collateral securing Ratio Debt (and any Permitted Refinancing thereof); *provided* that such Liens shall be junior to the Liens securing the Obligations and shall be subject to a lien subordination and intercreditor arrangement in form and substance reasonably satisfactory to the Administrative Agent;

(u)    leases, licenses, cross-licenses, subleases or sublicenses not interfering in any material respect with the business of the Borrower and its Restricted Subsidiaries, or otherwise materially diminishing the value of the Collateral, in either case taken as a whole;

(v)    Liens arising from precautionary UCC financing statements or similar filings in connection with any transaction otherwise not prohibited under this Agreement;

(w)    additional Liens so long as the aggregate principal amount of the obligations so secured does not exceed the greater of (i) $50,000,000 and (ii) 2.25% of Total Assets;

(x)    Liens that are contractual rights of set-off or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(y)    Liens solely on any cash earnest money deposits made by the Borrower or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(z)    Liens on specific items of inventory or other goods and the proceeds thereof of any Person securing such Person's obligations in respect of letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods in the ordinary course of business; and

(aa)    Liens (x) on deposit accounts established for the purpose of receiving the proceeds of Receivables sold or transferred in connection with a Permitted Receivables Transaction; *provided* that any amounts deposited into such accounts that do not represent (i) such proceeds or (ii) amounts deposited into such accounts to establish or maintain a minimum balance shall be transferred out of such accounts by or at the direction of the Borrower as soon as reasonably practicable but in no event more than 15 days from the date of their deposit into such

[Credit Agreement]

accounts; and (y) on Receivables and Receivables Related Rights subject of a Permitted Receivables Transaction.

The expansion of Liens by virtue of accrual of interest, accretion of accreted value, amortization of original issue discount and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 8.01.

Section 8.02.    *Investments*.  Make or permit to exist any Investments, except:

(a)    cash and Cash Equivalents;

(b)    Investments (including intercompany Investments) existing on the Amendment No. 4 Effective Date or committed to be made pursuant to an agreement existing on the Closing Date, in each case listed on Schedule 8.02, or an Investment consisting of any extension, modification, replacement, renewal or reinvestment of any such Investment or binding commitment existing on the Closing Date; *provided* that the amount of any such Investment or binding commitment may be increased (i) as required by the terms of such Investment or binding commitment as in existence on the Closing Date (including as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities) or (ii) as otherwise permitted under this Credit Agreement;

(c)    to the extent not prohibited by applicable Law, (i) advances to officers, directors, employees, managers, consultants and independent contractors of the Borrower and its Restricted Subsidiaries for travel, entertainment, relocation and other ordinary business purposes, (ii) loans and advances to officers, directors, employees, managers, consultants and independent contractors of the Borrower or any of its Restricted Subsidiaries to finance the purchase of Capital Stock of the Borrower and (iii) loans and advances to, or guarantees of Indebtedness of, officers, directors, employees, managers, consultants and independent contractors; *provided* that that the aggregate amount outstanding at any time under clauses (ii) and (iii) shall not exceed the greater of (x) $16,750,000 and (y) 0.75% of Total Assets;

(d)    (i) Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, (ii) Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and (iii) Investments received in satisfaction of judgments against other Persons;

(e)    any Investments in the Borrower or any of its Restricted Subsidiaries; *provided* that the aggregate amount of Investments by Credit Parties in Restricted Subsidiaries that are not Credit Parties (other than any Investment, the proceeds of which are used directly or indirectly in connection with an Acquisition by such non-Credit Parties) shall not exceed, together with the aggregate amount of cash or property provided by Credit Parties pursuant to Section 8.02(f)(A)(2), at the time of the making of any such Investment, an aggregate amount outstanding at any time equal to the greater of (i) $50,000,000 and (ii) 2.25% of Total Assets;

[Credit Agreement]

Case 1:23-cv-13065-WGY   Document 66-14   Filed 05/24/24   Page 20 of 55

(f)    any Acquisition by the Borrower or any of its Restricted Subsidiaries and any Investment that is part of the assets acquired in such Acquisition or otherwise held by a Person that is, directly or indirectly, a target of such Acquisition; *provided* that, with respect to each such Acquisition made pursuant to this Section 8.02(f):

(A)    (1) each applicable Credit Party and any such newly created or acquired Subsidiary shall, or will within the times specified therein, have complied with the applicable requirements of Section 7.12 to the extent required thereby, and (2) the aggregate amount of cash or property provided by Credit Parties to make any such purchase or acquisition of assets that are not purchased or acquired (or do not become owned) by a Credit Party or in Capital Stock in Persons that do not become Credit Parties upon consummation of such purchase or acquisition shall not exceed at any time outstanding, together with Investments pursuant to Section 8.02(e), the greater of (i) $50,000,000 and (ii) 2.25% of Total Assets; *provided, however*, that the limitation related to assets that are not acquired by a Credit Party or Persons that do not become Credit Parties under this clause (A)(2) shall not apply to any acquisition to the extent the ultimate Person so acquired (or the Person owning the assets so acquired) becomes a Credit Party even though such Credit Party owns Capital Stock in Persons that are not otherwise required to become Credit Parties, if, for such acquisition, not less than 90.0% of the Consolidated EBITDA of the Person(s) acquired (for this purpose and for the component definitions used therein, determined on a consolidated basis for such Persons and their Subsidiaries) is directly generated by Person(s) that become Credit Parties (i.e., disregarding all such Consolidated EBITDA generated by Subsidiaries of such Guarantors that are shall not become Credit Parties); *provided further*, that for the avoidance of doubt, such limitations on cash or property provided by Credit Parties shall exclude consideration provided in the form of Capital Stock of the Borrower;

(B)    immediately after giving Pro Forma Effect to any such purchase or other acquisition, (1) no Event of Default (or if such Permitted Acquisition is not conditioned on the availability of, or on obtaining third party financing any Event of Default under Section 9.01(a) or (f)) shall have occurred and be continuing and (2) the Consolidated Total Net Leverage Ratio is not greater than the Consolidated Total Net Leverage Ratio permitted under Section 8.11(b) as of the most recently ended Test Period for which financial statements have been delivered pursuant to Section 7.01 less 0.25x; and

(C)    the Borrower shall have delivered to the Administrative Agent, no later than five (5) Business Days (or such later date as acceptable to the Administrative Agent in its sole discretion) after the date on which any such purchase or other acquisition is consummated, a certificate of a Responsible Officer certifying that all of the requirements set forth in this clause (f) have been satisfied or will be satisfied on or prior to the consummation of such purchase or other acquisition;

(g)    Investments to the extent that payment for such investments is made with the Capital Stock of the Borrower;

(h)    Investments in respect of Swap Contracts permitted under Section 8.03(d);

[Credit Agreement]

(i)    Investments consisting of purchases and acquisitions of assets or services in the ordinary course of business;

(j)    Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business;

(k)    Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers;

(l)    Investments consisting of purchases or other acquisitions of inventory, supplies, services, material or equipment or the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(m)    Investments in an outstanding amount not to exceed, at the time any such Investment is made, the sum of (x) the greater of (i) $80,000,000 and (ii) 3.50% of Total Assets and (y) the Cumulative Equity Credit so long as, in each case, no Event of Default shall exist or result immediately after giving effect thereto;

(n)    Investments to the extent that, at the time any such Investments are made, the Payment Conditions are satisfied; and

(o)    Investments by the Borrower and its Subsidiaries in any Escrow Borrower for purposes of funding original issue discount, upfront fees, redemption or repayment premium and interest with respect to any Escrow Incremental Term Loans or debt securities issued pursuant to escrow arrangements, in each case, to the extent such Escrow Incremental Term Loans and debt securities are intended to provide a portion of the funds to finance an Acquisition permitted under this Agreement.

For purposes of determining whether an Investment is a permitted to be made pursuant to this Section 8.02, in the event that an Investment (or any portion thereof) meets the criteria of more than one of any provision of this Section 8.02, the Borrower, in its sole discretion, will classify such Investment (or any portion thereof) in any one or more of the types of Investments described in any applicable clause in this Section 8.02 and will only be required to include the amount and type of such Investment in such of the above clauses in this Section 8.02 as determined by the Borrower at such time.

Section 8.03.    *Indebtedness*.    Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness under the Credit Documents;

(b)    Indebtedness outstanding on the Closing Date and listed on Schedule 8.03 and any Permitted Refinancing thereof;

(c)    [reserved];

[Credit Agreement]

(d)    obligations (contingent or otherwise) of the Borrower or any Restricted Subsidiary existing or arising under any Swap Contract; *provided* that such obligations are entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by such Person, or changes in the value of securities issued by such Person, and not for purposes of speculation or taking a "market view";

(e)    Indebtedness of the Borrower and its Restricted Subsidiaries owing to the Borrower or any Restricted Subsidiary to the extent permitted by Section 8.02; *provided* that any such Indebtedness owed by a Credit Party to a Restricted Subsidiary that is not a Credit Party shall be subject to the Intercompany Note;

(f)    Indebtedness (including Indebtedness under Capitalized Leases and purchase money obligations) incurred to provide all or a portion of the purchase price (or cost of construction, acquisition, repair, lease or improvement), in each case, for capital assets and refinancings, refundings, renewals or extensions thereof, *provided* that the aggregate principal amount of all such Indebtedness shall not at any time outstanding exceed the greater of (i) $50,000,000 and (ii) 2.25% of Total Assets;

(g)    unsecured Indebtedness or Indebtedness secured by a Lien, that, in the case of a Lien on the assets of a Credit Party, such Lien on the Collateral is junior to the Lien securing the Obligations, so long as, after giving effect to the incurrence of such Indebtedness (whether or not secured), the Consolidated Total Net Leverage Ratio is not greater than the Consolidated Total Net Leverage Ratio permitted under Section 8.11(b) as of the most recently ended Test Period for which financial statements have been delivered pursuant to Section 7.01 less 0.50x ("**Ratio Debt**"); *provided* that (i) such Ratio Debt does not mature prior to the date that is 91 days following the Latest Maturity Date of the Revolving Credit Facility or have a Weighted Average Life to Maturity less than any then existing Class of Term Loans, (ii) such Ratio Debt does not have mandatory prepayment, redemption or offer to purchase events that are earlier than the Revolving Termination Date (but may include customary amortization, change of control and asset sale proceeds offers), (i) such Ratio Debt either (a) does not have financial maintenance covenants or (b) contains financial maintenance covenants that are no more restrictive than the Financial Covenants, (iv) to the extent such Ratio Debt is subordinated to the Facilities, is subject to subordination terms reasonably satisfactory to the Administrative Agent and (v) to the extent such Ratio Debt is secured by a Lien which is junior to the Lien securing the Obligations, it is subject to a lien subordination and intercreditor arrangement reasonably satisfactory to the Borrower and the Administrative Agent; *provided further*, that any such Indebtedness incurred by a Restricted Subsidiary that is not a Credit Party, together with Indebtedness incurred by a Restricted Subsidiary that is not a Credit Party pursuant to Section 8.03(h), does not exceed in the aggregate at any time outstanding the greater of (a) $66,000,000 and (b) 3.00% of Total Assets;

(h)    Indebtedness of the Borrower or any Restricted Subsidiary assumed (including Acquired Indebtedness) in connection with, but not incurred in contemplation of, any Acquisition so long as, after giving Pro Forma Effect thereto and any related transactions, the Borrower could incur $1.00 of Ratio Debt; *provided* that any such Indebtedness incurred by a

[Credit Agreement]

Restricted Subsidiary that is not a Credit Party does not exceed, together with Indebtedness incurred by a Restricted Subsidiary that is not a Credit Party pursuant to Section 8.03(g), in the aggregate at any time outstanding the greater of (i) $66,000,000 and (ii) 3.00% of Total Assets;

(i)     Support Obligations by the Borrower and its Restricted Subsidiaries in respect of Indebtedness otherwise permitted hereunder; *provided* that Support Obligations by the Credit Parties with respect to Indebtedness of Restricted Subsidiaries that are not Credit Parties is an Investment permitted by Section 8.02;

(j)     Indebtedness (i) representing deferred compensation to employees of the Borrower or any of its Restricted Subsidiaries incurred in the ordinary course of business (including, for the avoidance of doubt, any acquisition permitted hereunder), or (ii) to current or former officers, managers, consultants, directors and employees, and their respective estates, spouses or former spouses to finance the purchase or redemption of Capital Stock or other equity-based awards of the Borrower permitted by Section 8.06;

(k)     Indebtedness of Restricted Subsidiaries that are not Credit Parties in an aggregate principal amount at any time outstanding not to exceed the greater of (i) $50,000,000 and (ii) 2.25% of Total Assets;

(l)     Treasury Management Obligations and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guaranties thereof;

(m)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the ordinary course of business;

(n)     obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(o)     (A) Indebtedness of the Borrower or any Restricted Subsidiary in an aggregate principal amount not to exceed the amount of the net cash proceeds received by the Borrower since the Closing Date from the issuance or sale of Capital Stock of the Borrower or cash contributed to the capital of the Borrower (in each case, other than proceeds of Disqualified Stock or sales of Capital Stock to the Borrower or any of its Subsidiaries) as determined in accordance with clauses (a) and (b) of the definition of "Cumulative Equity Credit" to the extent such net cash proceeds have not been applied pursuant to such clauses to make Investments pursuant to Section 8.02, Restricted Payments pursuant to Section 8.06 or to prepay, redeem, purchase, defease or satisfy Indebtedness pursuant to Section 8.12, so long as (i) such Indebtedness is incurred within one year following the receipt by the Borrower of such net cash proceeds, and (ii) such Indebtedness is designated as "Contribution Indebtedness" on the date incurred and (B) any Permitted Refinancing thereof;

[Credit Agreement]

(p)     Indebtedness pursuant to any Plan or owed to any Person providing health, retirement, disability or other employee benefits;

(q)     (A) Indebtedness in respect of one or more series of senior or subordinated notes or loans (which may be unsecured or secured on a pari passu or junior lien basis to the Obligations), and, in the case of notes, issued in a public offering, Rule 144A or other private placement or bridge in lieu of the foregoing, in each case, that are issued or made in lieu of Incremental Revolving Commitments and/or Incremental Term Commitments (the "**Incremental Equivalent Debt**"); *provided* that (i) the aggregate principal amount of such Incremental Equivalent Debt shall be subject to the limitations set forth under Section 2.18(c)(ii) as if such Incremental Equivalent Debt constituted Incremental Term Loans incurred in compliance therewith; (ii) such Incremental Equivalent Debt shall not be subject to any Guaranty by any Person other than a Credit Party, (iii) if such Incremental Equivalent Debt is secured, the obligations in respect thereof shall not be secured by any Lien on any asset of the Borrower or any Restricted Subsidiary other than any asset constituting Collateral, (iv) no Default or Event of Default shall have occurred and be continuing or would exist immediately after giving effect to such incurrence, (v) if such Incremental Equivalent Debt is secured, the security agreements and other collateral documents relating to such Incremental Equivalent Debt shall be substantially similar to the Collateral Documents (with such differences as are reasonably satisfactory to the Administrative Agent), (vi) if such Incremental Equivalent Debt is (a) secured on a *pari passu* basis with the Obligations under Term Loans and Revolving Credit Loans that are secured on a first lien basis, then such Incremental Equivalent Debt shall be subject to a First Lien Intercreditor Agreement, (b) secured on a junior basis with the Obligations under Term Loans and Revolving Credit Loans that are secured on a first lien basis, then such Incremental Equivalent Debt shall be subject to a Junior Lien Intercreditor Agreement or other lien subordination and intercreditor arrangement satisfactory to the Borrower and the Administrative Agent or (c) unsecured and subordinated to the Obligations, then such Incremental Equivalent Debt shall be subject to a Subordination Agreement (or, alternatively, terms in the definitive documentation for such Incremental Equivalent Debt substantially similar to those in such applicable agreement, as agreed by the Borrower and Administrative Agent), (vii) such Incremental Equivalent Debt shall have a final maturity date which is no earlier than 91 days after the Revolving Termination Date, (viii) such Incremental Equivalent Debt shall have a Weighted Average Life to Maturity no shorter than that of any Class of then-existing Term Loans, (ix) such Incremental Equivalent Debt shall not be subject to any mandatory redemption or prepayment provisions or rights (except customary amortization and offers to repurchase and prepayment events upon a change of control, asset sale or event of loss and a customary acceleration right after an event of default), in each case prior to Revolving Termination Date, (x) such Incremental Equivalent Debt shall (a) have financial maintenance covenants that are not more restrictive than the Financial Covenants or (b) not have any financial maintenance covenants, and (xi) except as otherwise set forth in this clause (q), such Incremental Equivalent Debt shall have terms and conditions (other than with respect to pricing, fees, rate floors and optional prepayment or redemption terms) substantially similar to, or (taken as a whole) no more favorable (as reasonably determined by the Borrower in good faith) to the lenders or holders providing such Incremental Equivalent Debt, than those applicable to the Revolving Credit Loans (except for covenants or other provisions applicable only to periods after the Latest Maturity

[Credit Agreement]

Date at the time of the issuance or incurrence of such Incremental Equivalent Debt) and (B) any Permitted Refinancing thereof;

(r)   (x) Indebtedness of the Borrower in the form of or more series of senior or subordinated notes of loans (which may be unsecured ("**Permitted Unsecured Refinancing Debt**") or secured on a first lien ("**Permitted Pari Passu Secured Refinancing Debt**") or junior lien ("**Permitted Junior Secured Refinancing Debt**") basis), and, in the case of notes, issued in a public offering, Rule 144A or other private placement in lieu of the foregoing and, in each case, any Permitted Refinancing thereof (the "**Refinancing Equivalent Debt**"), in each case, in exchange for, or to extend, renew, replace, repurchase, retire or refinance, in whole or in part, any Refinanced Debt; *provided* that any Refinancing Equivalent Debt:  (A) (1) shall not have a Maturity Date prior to the 91 days after the Revolving Termination Date, (2) if in the form of term loans, shall not have a Weighted Average Life to Maturity shorter than the remaining Weighted Average Life to Maturity of the Refinanced Debt, (3) [reserved], (4) shall not be subject to mandatory redemption, repurchase, prepayment or sinking fund obligations (except with respect to customary amortization, offers to repurchase and prepayment events upon a change of control, asset sale or event of loss and a customary acceleration right after an event of default), in each case prior to the Revolving Termination Date, (5) shall not be guaranteed by Persons other than Guarantors, (6) (A) if such Refinancing Equivalent Debt is (x) Permitted Pari Passu Secured Refinancing Debt then such Refinancing Equivalent Debt shall be subject to a First Lien Intercreditor Agreement or otherwise subject or other lien or intercreditor arrangement satisfactory to the Borrower and the Administrative Agent or (y) Permitted Junior Secured Refinancing Debt, then such Refinancing Equivalent Debt shall be subject to a Junior Lien Intercreditor Agreement to which a Senior Representative acting on behalf of the holders of such Permitted Junior Secured Refinancing Debt shall have become a party or otherwise subject or other lien subordination or intercreditor arrangement satisfactory to the Borrower and the Administrative Agent or (B) if unsecured and subordinated to the Obligations, shall be subject to a Subordination Agreement, (7) if secured, shall be subject to security agreements relating to such Refinancing Equivalent Debt that are substantially the same as or more favorable to the Credit Parties than the Collateral Documents (with such differences as are reasonably satisfactory to the Administrative Agent), (8) if secured shall be secured by the Collateral on a junior lien basis with the Obligations under the Term Loans and Revolving Credit Loans and shall not be secured by any property or assets of the Borrower or any Restricted Subsidiary other than the Collateral, (9) shall not have a greater principal amount than the principal amount of the Refinanced Debt plus accrued and unpaid interest, fees, premiums (if any) and penalties thereon and reasonable fees, expenses, OID and upfront fees associated with the refinancing, (10) (A) shall have financial maintenance covenants that are not more restrictive than the Financial Covenants or (B) shall not have financial maintenance covenants, and (11) except as otherwise set forth in this clause (r), shall have terms and conditions (other than with respect to pricing, fees, rate floors and optional prepayment or redemption terms) substantially similar to, or (taken as a whole) no more favorable (as determined by the Borrower in good faith) to the lenders or holders providing such Refinancing Equivalent Debt, than those applicable to the Revolving Credit Loans (except for covenants or other provisions applicable only to periods after the Latest Maturity Date at the time of the issuance or incurrence of such Refinancing Equivalent Debt) and (B) shall be incurred solely to repay, repurchase, retire or refinance substantially concurrently the Refinanced Debt and (y) any Permitted Refinancing thereof;

[Credit Agreement]

(s)     other Indebtedness in an aggregate principal amount at any time outstanding not to exceed the greater of (i) $80,000,000 and (ii) 3.50% of Total Assets;

(t)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (s) above; and

(u)     Indebtedness owing in connection with a Permitted Receivables Transaction in the event that any purchase of Receivables thereunder is recharacterized as a secured loan.

For purposes of determining compliance with Section 8.03, in the event that an item of Indebtedness (or any portion thereof) at any time, whether at the time of incurrence meets the criteria of more than one of the categories of permitted Indebtedness described in Section 8.03(a) through (u) above, the Borrower, in its sole discretion, will classify such item of indebtedness (or any portion thereof) in any one or more of the types of Indebtedness described in Section 8.03(a) through (u) above and will only be required to include the amount and type of such Indebtedness in such of the above clauses as determined by the Borrower at such time. The Borrower will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Section 8.03(a) through (u) above. Notwithstanding the foregoing, Indebtedness incurred (a) under the Credit Documents, any Incremental Commitments, any Incremental Loans, any Refinancing Commitments and any Refinancing Loans shall only be classified as incurred under Section 8.03(a), (b) as Incremental Equivalent Debt shall only be classified as incurred under Section 8.03(q), and (c) as Refinancing Equivalent Debt shall only be classified as incurred under Section 8.03(r).

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, plus the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and expenses (including OID) incurred in connection with such refinancing.

The accrual of interest or the accretion of accreted value shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 8.03.

Section 8.04.   *Mergers and Dissolutions.*   Enter into a transaction of merger or consolidation; *provided* that:

[Credit Agreement]

(a)     the Borrower and its Restricted Subsidiaries may merge or consolidate with any Credit Party; *provided* that (i) if the Borrower is a party to the merger or consolidation, it shall be the surviving entity and (ii) if the Borrower is not a party to the merger or consolidation, then a Credit Party thereto shall be the surviving entity;

(b)     a Restricted Subsidiary of the Borrower that is not a Credit Party may merge or consolidate with any other Subsidiary that is not a Credit Party; or

(c)     the Borrower and its Restricted Subsidiaries may merge or consolidate with Persons that are not Credit Parties; *provided* that (i) if the Borrower is a party to the merger or consolidation, it shall be the surviving entity and (ii) if a Restricted Subsidiary of the Borrower that is a Credit Party is a party to the merger or consolidation, either (I) the Restricted Subsidiary that is a Credit Party will be the surviving entity, or (II) such transaction shall be an Investment permitted under Section 8.02;

(d)     So long as no Default has occurred and is continuing or would result therefrom, the Borrower may merge or consolidate with any other Person; *provided* that (i) the Borrower shall be the continuing or surviving corporation or (ii) if the Person formed by or surviving any such merger or consolidation is not the Borrower (any such Person, the "**Successor Company**"), (A) the Successor Company shall be an entity organized or existing under the Laws of the United States, any state thereof, the District of Columbia or any territory thereof, (B) the Successor Company shall expressly assume all the obligations of the Borrower under this Agreement and the other Credit Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (C) each Guarantor, unless it is the other party to such merger or consolidation, shall have confirmed that its Guaranty shall apply to the Successor Company's obligations under the Credit Documents, (D) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement and other applicable Collateral Documents confirmed that its obligations thereunder shall apply to the Successor Company's obligations under the Credit Documents, (E) [reserved], and (F) the Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Collateral Document comply with this Agreement; *provided further*, that if the foregoing are satisfied, the Successor Company will succeed to, and be substituted for, the Borrower under this Agreement;

(e)     any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Credit Party, then (i) the transferee must be a Credit Party or (ii) to the extent constituting an Investment, such Investment must be an Investment permitted by Section 8.02;

(f)     Credit Parties (other than the Borrower) may (i) be dissolved or liquidated into another Credit Party or (ii) otherwise have their existence terminated to the extent that the assets of such Credit Party are distributed, upon such termination, to one or more Credit Parties or to a Restricted Subsidiary that is not a Credit Party so long as such transaction shall be an Investment permitted under Section 8.02;

[Credit Agreement]

(g)      Restricted Subsidiaries that are not Credit Parties may be dissolved, liquidated or otherwise have their existence terminated; and

(h)      so long as no Event of Default has occurred and is continuing or would result therefrom, a merger, consolidation, amalgamation, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 8.05.

Section 8.05.    *Dispositions*.  Make any Disposition, except:

(a)      (i) Dispositions between and among Credit Parties, (ii) Dispositions between and among Restricted Subsidiaries that are not Credit Parties and (iii) Dispositions between Credit Parties, on the one hand, and Restricted Subsidiaries that are not Credit Parties, on the other hand, *provided* that in the case of any disposition by a Credit Party to a Restricted Subsidiary that is not a Credit Party, such Disposition shall be an Investment permitted by Section 8.02;

(b)      Dispositions by the Borrower or any Restricted Subsidiary; *provided* that (i) at the time of such Disposition, no Event of Default shall exist or would result from such Disposition, (ii) the aggregate book value of all property Disposed of in reliance on this clause (b) in any fiscal year shall not exceed an amount equal to ten percent (10%) of Total Assets of the Borrower and its Restricted Subsidiaries as of the last day of the immediately preceding fiscal year, and (iii) with respect to any Disposition for a purchase price in excess of $10,000,000, the consideration for any such Disposition shall be at least 75% cash or Cash Equivalents; *provided, however,* that for the purposes of this subclause (iii), the following shall be deemed to be cash: (A) any liabilities (as shown on the Borrower's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that (i) are assumed by the transferee with respect to the applicable Disposition or (ii) are otherwise cancelled or terminated in connection with the transaction with such transferee (other than intercompany debt owed to the Borrower or its Restricted Subsidiaries) and, in each case, for which the Borrower and all of its Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities, notes or other obligations or assets received by the Borrower or the applicable Restricted Subsidiary from such transferee that are converted by the Borrower or such Restricted Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, and (C) aggregate non-cash consideration received by the Borrower or the applicable Restricted Subsidiary having an aggregate fair market value (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed the greater of (x) $27,500,000 and (y) 1.25% of Total Assets (net of any non-cash consideration converted into cash and Cash Equivalents) and (ii) such Disposition shall be for at least the fair market value (as determined by the Borrower in good faith) of the assets or property subject to such Disposition;

(c)      Dispositions consisting of the licensing or sublicensing of intellectual property and licenses, leases or subleases of other property, in each case in the ordinary course of business or Dispositions of intellectual property, in the Borrower's reasonable business

[Credit Agreement]

judgment, that are not material to the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(d)    Dispositions permitted by Section 8.04, that constitute a Lien permitted by Section 8.01, that constitute an Investment permitted by Section 8.02 and that constitute a Restricted Payment permitted by Section 8.06;

(e)    to the extent allowable under Section 1031 of the Code (or comparable or successor provision), any exchange of like property (excluding any boot thereon permitted by such provision);

(f)    any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrower and its Subsidiaries as a whole, as determined in good faith by the management of the Borrower;

(g)    any sale of Capital Stock in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(h)    Dispositions of Investments (including equity interests) in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(i)    the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial IP Rights;

(j)    Dispositions of non-core assets acquired in any Acquisition consummated after the Closing Date; *provided* that the aggregate value of any property Disposed of after any Acquisition shall not exceed 20% of the aggregate consideration for such Acquisition;

(k)    Dispositions by any Credit Party to any wholly-owned Restricted Subsidiary of the type described in clauses (d), (h) and (i) of the definition of "Excluded Subsidiary" to the extent consisting of contributions or other Dispositions of Capital Stock in other Subsidiaries of the type described in clauses (d), (h) or (i) of the definition of "Excluded Subsidiary" to such wholly-owned Restricted Subsidiary; and

(l)    Dispositions of Receivables and Receivables Related Rights pursuant to a Permitted Receivables Transaction.

To the extent any Collateral is Disposed of as expressly permitted by this Section 8.05 to any Person other than the Borrower or a Credit Party, such Collateral shall be sold free and clear of the Liens created by the Credit Documents, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

Section 8.06.    *Restricted Payments.*    Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

[Credit Agreement]

(a)    Restricted Subsidiaries of the Borrower may pay dividends and make distributions in respect of their Capital Stock ratably to their equity holders;

(b)    the Borrower may declare and make dividend payments or other distributions payable solely in the common stock or other common equity interests of the Borrower;

(c)    repurchases of Capital Stock in the Borrower or any Restricted Subsidiary of the Borrower deemed to occur upon exercise of stock options or warrants or the settlement or vesting of other equity-based awards if such Capital Stock represents a portion of the exercise price of, or tax withholdings with respect to, such options, warrants or other equity-based awards;

(d)    the Borrower may purchase, redeem or otherwise acquire shares of its common stock or other common equity interests or warrants or options to acquire any such shares with the proceeds received from the substantially concurrent issue of new shares of its common stock or other common equity interests to the extent such proceeds have not been applied as a utilization of the Cumulative Equity Credit;

(e)    the Borrower and each Restricted Subsidiary may pay for the repurchase, retirement or other acquisition or retirement for value of Capital Stock or settlement of equity-based awards of such Restricted Subsidiary (or of the Borrower) held by any future, present or former employee, officer, director, manager, consultant or independent contractor (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributes of any of the foregoing) of such Restricted Subsidiary (or the Borrower) or any of its Subsidiaries, in each case, upon the death, disability, retirement or termination of employment or services, as applicable, of any such Person or pursuant to any equity plan, stock option plan or any other benefit or incentive plan or any agreement (including any stock subscription agreement, shareholder agreement or stockholders' agreement) with any employee, director, officer, manager, consultant or independent contractor of such Restricted Subsidiary (or the Borrower) or any of its Restricted Subsidiaries; *provided* that the aggregate amount of Restricted Payments made pursuant to this clause (e) shall not exceed the greater of (x) $16,750,000 and (y) 0.75% of Total Assets determined as of the last day of the immediately preceding fiscal year in any calendar year (with 100% of the unused amounts in any calendar year being carried over to the next two succeeding calendar years); *provided further*, that the foregoing amount shall be increased by the Net Cash Proceeds of key man life insurance policies received by the Borrower or its Restricted Subsidiaries less the amount of Restricted Payments previously made with the cash proceeds of such key man life insurance policies;

(f)    the Borrower or any of the Restricted Subsidiaries may pay cash in lieu of fractional Capital Stock in connection with any dividend, split or combination thereof or any Acquisition;

(g)    so long as no Event of Default shall have occurred and be continuing at the time, Restricted Payments in an aggregate amount per annum not to exceed an amount equal to 6% of the net proceeds received by (or contributed to) the Borrower and its Restricted Subsidiaries from all Equity Offerings after the Closing Date;

[Credit Agreement]

(h)    so long as no Event of Default shall have occurred and be continuing at the time, Restricted Payments in an aggregate amount not to exceed, together with the aggregate amount of all prepayments of Junior Debt made pursuant to Section 8.12(a)(iii), at the time any such Restricted Payment is made, the sum of (x) the greater of (i) $50,000,000 and (ii) 2.25% of Total Assets and (y) the Cumulative Equity Credit;

(i)    Restricted Payments may be made by the Borrower so long as, at the time any such Restricted Payment is made, the Payment Conditions are satisfied; and

(j)    to the extent constituting Restricted Payment, the Borrower or any of its Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 8.04 and Section 8.09 (other than Section 8.09(d)).

Section 8.07.    *Change in Nature of Business*.  Engage in any material line of business substantially different from those lines of business conducted by the Borrower and its Restricted Subsidiaries on the Amendment No. 4 Effective Date or any business substantially related, complementary, synergistic, ancillary or incidental thereto (including related, complementary, synergistic, ancillary or incidental technologies) or reasonable extensions thereof.

Section 8.08.    *Change in Fiscal Year*.  Change its fiscal year (except, on one occasion, to change its fiscal year to a fiscal year ending September 30 or December 31; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 8.09.    *Transactions with Affiliates*.  Enter into any transaction of any kind with any Affiliate of the Borrower involving aggregate payments or consideration in excess of $5,000,000 for any individual transaction or series of related transactions, whether or not in the ordinary course of business, other than (a) transactions on fair and reasonable terms substantially as favorable to the Borrower or such Restricted Subsidiary as would be obtainable by the Borrower or such Restricted Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, (b) transactions amongst the Borrower and its Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction, (c) payment of reasonable compensation (including reasonable salary, bonus and other reasonable incentive arrangements) and stock option and other equity or incentive award plans and employee benefit plans, practices and arrangements for directors, officers, employees, managers, consultants and independent contractors, (d) directors' fees and reasonable out of pocket costs to, and indemnities provided on behalf of, directors, officers, employees, consultants and independent contractors of the Borrower and its Restricted Subsidiaries, (e) Restricted Payments permitted pursuant to Section 8.06, (f) Investments permitted by Section 8.02(b), Section 8.02(c), Section 8.02(g), Section 8.02(o), (g) Dispositions permitted by Section 8.05(h), (h) transactions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth in Schedule 8.09 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect, (i) transactions with customers, clients, joint venture

[Credit Agreement]

partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and its Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from a Person that is not an Affiliate, (j) transactions in which the Borrower or any of the Restricted Subsidiaries, as the case may be, deliver to the Administrative Agent a letter from an independent financial advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (a) of this Section 8.09, (k) payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by the Borrower and its Restricted Subsidiaries in such joint venture) to the extent otherwise constituting an Investment or Restricted Payment permitted under this Agreement, (l) Indebtedness permitted by Section 8.03(j), and (m) transactions with an Escrow Borrower, including any Escrow Funding Assignment, any Escrow Assumption and the entrance into any agreements related thereto so long as the proceeds of any related Indebtedness of the assets or Capital Stock acquired therewith are promptly contributed or otherwise transferred to the Borrower or a Subsidiary promptly upon the use of such proceeds.

Section 8.10.    *[Reserved]*.

Section 8.11.    *Financial Covenants*.

(a)    *Consolidated Cash Interest Coverage Ratio*.  Permit the Consolidated Cash Interest Coverage Ratio as of the last day of any Test Period (commencing with the Test Period ending July 1, 2022) to be less than 3.00:1.00.

(b)    *Consolidated Total Net Leverage Ratio*.  Permit the Consolidated Total Net Leverage Ratio as of the last day of any Test Period ~~(commencing with the Test Period ending July 1, 2022) to be greater than 4.50:1.00 (or~~, to be greater than the ratio set forth below opposite such period:

| FROM AND INCLUDING | TO AND INCLUDING | THE LEVERAGE RATIO SHALL NOT BE GREATER THAN: |
|---|---|---|
| July 1, 2022 | September 30, 2023 | 4:50 to 1.00 |
| October 1, 2023 | December 31, 2023 | 5.25 to 1.00 |
| January 1, 2024 | and each Test Period thereafter | 4.50 to 1.00 |

; *provided* that following the consummation of any Material Acquisition after the Covenant Relief Period End Date, the Consolidated Leverage Ratio set forth above shall increase to 5:00 to 1.00 for any Test Period ending after the consummation of ~~any~~such

[Credit Agreement]

Material Acquisition and prior to the end of the fourth fiscal quarter end following such Material Acquisition, 5.00 to 1.00).

Section 8.12.    *Prepayments etc. of Indebtedness.*

(a)    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal, interest and mandatory prepayments shall be permitted) any Incremental Equivalent Debt, any Refinancing Equivalent Debt, any Ratio Debt or any other Indebtedness for borrowed money of a Credit Party, in each case, that is (x) unsecured or (y) subordinated in right of payment to the Loan Obligations expressly by its terms or to the Lien securing the Collateral expressly by its terms (other than Indebtedness among the Borrower and its Restricted Subsidiaries) to the extent permitted by any applicable subordination provisions (collectively, "**Junior Debt**"), except (i) any Permitted Refinancing thereof, (ii) the conversion of any such Junior Debt to Capital Stock (other than Disqualified Stock) of the Borrower from the substantially concurrent issuance of new shares of its common stock or other common equity interests, (iii) prepayments, redemptions, purchases, defeasances and other repayments in respect to Junior Debt in an aggregate amount not to exceed, together with the aggregate amount of all Restricted Payments made pursuant to Section 8.06(h), at the time any such prepayment, redemption, purchase, defeasance or other repayment is made, the sum of (x) the greater of (a) $50,000,000 and (b) 2.25% of Total Assets and (y) the Cumulative Equity Credit, and (iv) prepayments, redemptions, purchases, defeasances and other repayments in respect of Junior Debt so long as, after giving effect to such prepayments, redemptions, purchases, defeasances and other repayments, the Payment Conditions are satisfied.

(b)    Amend, modify or change in any manner materially adverse to the interests of the Lenders, as determined in good faith by the Borrower, any term or condition of any Junior Debt having an aggregate outstanding principal amount in excess of $30,000,000 (other than as a result of any Permitted Refinancing in respect thereof) without the consent of the Administrative Agent (which consent shall not be unreasonably withheld, conditioned or delayed).

Section 8.13.    *Burdensome Agreements.*    Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of the Borrower or any Credit Party to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations or (ii) the ability of any Restricted Subsidiary that is not a Credit Party to pay dividends or other distributions with respect to any of its Capital Stock; *provided* that (A) the foregoing shall not apply to restrictions and conditions imposed by Law, or by any Credit Document, or with respect to clause (ii) above any document evidencing any Ratio Debt, Incremental Equivalent Debt or Refinancing Equivalent Debt (or any Permitted Refinancing thereof), (B) the foregoing shall not apply to customary provisions in joint venture agreements and other similar agreements applicable to joint ventures constituting Investments permitted hereunder and applicable solely to such joint venture, (C) the foregoing shall not apply to restrictions and conditions imposed on any Restricted Subsidiary that is not a Credit Party by

[Credit Agreement]

the terms of any Indebtedness of such Restricted Subsidiary that is not a Credit Party permitted to exist or be incurred hereunder, (D) clause (i) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted hereunder if such restrictions or conditions apply only to the property or assets financed by such Indebtedness, (E) clause (i) of the foregoing shall not apply to customary provisions in leases, licenses, purchase money contracts and other contracts (including joint venture agreements) restricting the assignment, sublease or sublicense thereof, (F) the foregoing shall not apply to restrictions that arise in connection with cash or other deposits imposed by customers under contracts entered into in the ordinary course of business and not prohibited hereunder, (G) the foregoing shall not apply to Contractual Obligations which (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 8.13) are listed in Schedule 8.13 and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing does not expand the scope of such Contractual Obligation, (H) the foregoing shall not apply to Contractual Obligations which are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary of the Borrower, so long as such Contractual Obligations were not entered into solely in contemplation of such Person becoming a Restricted Subsidiary of the Borrower or entered into for the purpose of creating such prohibition or restrictions, (I) the foregoing shall not apply to Contractual Obligations which arise in connection with cash or other deposits permitted under Section 8.01, and limited to such cash or deposits, (J) the foregoing shall not apply to Contractual Obligations which comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 8.03(f), (k) (with respect to clause (i)), (h) and (m)(i) to the extent that such restrictions apply only to the property or assets subject to such Indebtedness or, in the case of Section 8.03(h), to the Restricted Subsidiaries incurring or guaranteeing such Indebtedness, (K) the foregoing shall not apply to Contractual Obligations which are customary restrictions that arise in connection with (x) any Lien permitted by Sections 8.01(g), (h), (p), (r), (x)(i), (x)(ii), (y) and (z) and relate to the property subject to such Lien or (y) arise in connection with any Disposition permitted by Section 8.04 or 8.05 and relate solely to the assets or Person subject to such Disposition, (L) the foregoing shall not apply to Contractual Obligations which comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Closing Date and permitted under Section 8.03 that are, taken as a whole, in the good faith judgment of the Borrower, no more restrictive in any material respect with respect to the Borrower or any Restricted Subsidiary than those encumbrances and other restrictions that are in effect on the Closing Date pursuant to agreements and instruments in effect on the Closing Date or, if applicable, on the date on which such Restricted Subsidiary became a Restricted Subsidiary pursuant to agreements and instruments in effect on such date.

[Credit Agreement]

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

Section 9.01.   *Events of Default.*   Any of the following shall constitute an "**Event of Default**":

(a)   *Non-Payment.*   The Borrower or any other Credit Party fails to pay (i) when and as required to be paid herein and in the currency required hereunder, any amount of principal of any Loan or any L/C Obligation, or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or on any L/C Obligation, any fee due hereunder or any other amount payable hereunder or under any other Credit Document; or

(b)   *Specific Covenants.*   The Borrower or any other Credit Party fails to perform or observe any term, covenant or agreement contained in any of Sections 2.01(e), 7.03(a), 7.05(a) (solely with respect to the Borrower), 7.11 or Article 8; or

(c)   *Other Defaults.*   The Borrower or any other Credit Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Credit Document on its part to be performed or observed and such failure continues for 30 days after the date upon which written notice thereof is given by the Administrative Agent; or

(d)   *Representations and Warranties.*   Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Credit Party herein, in any other Credit Document, or in any document delivered in connection herewith or therewith shall be false or misleading in any material respect when made or deemed made; or

(e)   *Cross-Default.*   The Borrower or any Restricted Subsidiary (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, but after giving effect to any applicable grace period) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $30,000,000, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto (in each case, after giving effect to any applicable grace period), or any other event occurs (other than, in any case pursuant to this clause (B) with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any other default thereunder by any Credit Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity but only to the extent that such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Revolving Credit Commitments or acceleration of the Loans pursuant to Section 9.02; or

[Credit Agreement]

(f)     *Insolvency Proceedings, Etc.*  The Borrower or any Restricted Subsidiary that is a Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; or

(g)     *Inability to Pay Debts; Attachment.*  (i) The Borrower or any Restricted Subsidiary that is a Material Subsidiary becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within 60 days after its issue or levy; or

(h)     *Judgments.*  There is entered against the Borrower or any Restricted Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding $30,000,000 (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), and (i) enforcement proceedings are commenced by any creditor upon such judgment or order, or (ii) there is a period of 60 consecutive days during which (1) a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect or (2) the same is not discharged, satisfied or vacated; or

(i)     *ERISA.*  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or would reasonably be expected to result in liability of a Credit Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, or (ii) a Credit Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan that has resulted or would reasonably be expected to result in liability of a Credit Party in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect; or

(j)     *Invalidity of Credit Documents.*  Any material provision of any Credit Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Credit Party contests in any manner the validity or enforceability of any Credit Document; or any Credit Party denies that it has any or further liability or obligation under any Credit Document, or purports to revoke, terminate or rescind any Credit Document; or

(k)     *Collateral Documents.*  (i) Any Collateral Document after delivery thereof pursuant to Section 5.01 of this Agreement as in effect on the Closing Date, 7.11 or 7.13 shall for

[Credit Agreement]

any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction not prohibited under this Agreement) cease to create a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 8.01, (x) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file the original Uniform Commercial Code financing statements provided to it on the Closing Date or to file Uniform Commercial Code continuation statements and (y) except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (ii) any Lien created or purported to be created by the Collateral Documents shall cease to have the lien priority established or purported to be established by the applicable Intercreditor Agreement; or

(l)     *Change of Control*.  There occurs any Change of Control.

Section 9.02.     *Remedies Upon Event of Default*.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)     declare the Commitments of the Lenders to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Credit Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)     require that the Borrower Cash Collateralize the L/C Obligations (in an amount equal to 103% of the then Outstanding Amount thereof); and

(d)     exercise on behalf of itself and the Lenders all rights and remedies available to it or to the Lenders under the Credit Documents or applicable Law; *provided* that upon the occurrence of an Event of Default under Section 9.01(f), the obligation of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

Section 9.03.     *Application of Funds*.  After the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 9.02(d)), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

[Credit Agreement]

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including reasonable attorneys' fees and disbursements and amounts payable under Article 3) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and Letter of Credit Fees) payable to the Lenders (including reasonable attorneys' fees and disbursements and amounts payable under Article 3), ratably among the Lenders in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit Fees, interest on the Loans and L/C Borrowings, ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to (i) payment of that portion of the Obligations constituting unpaid principal of the Loans, L/C Borrowings and other Obligations, (ii) payment of fees, premiums, scheduled periodic payments, breakage, termination and any interest accrued thereon or other amounts owing in respect of any Swap Contract between the Borrower and any of its Restricted Subsidiaries and any Agent, Lender or Affiliate of an Agent or Lender (or any Person that was an Agent, a Lender or an Affiliate of an Agent or a Lender on the date such Swap Contract was entered into), (iii) payments of amounts due under any Treasury Management Agreement between the Borrower or any of its Restricted Subsidiaries and any Lender, or any Affiliate of a Lender and (iv) the Administrative Agent for the account of the L/C Issuer, to Cash Collateralize that portion of the L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit, ratably among such parties in proportion to the respective amounts described in this clause Fourth payable to them;

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law; *provided* that, subject to Section 2.03, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fourth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above, and if not so applied shall be returned to the Borrower.

## ARTICLE 10
### ADMINISTRATIVE AGENT

Section 10.01. *Appointment and Authorization of Administrative Agent.*

(a)    Each of the Lenders and the L/C Issuer hereby irrevocably appoints (i) Bank of America to act on its behalf as the Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and (ii) authorizes the Administrative Agent to take such

[Credit Agreement]

actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article 10 (other than Section 10.06 (solely with respect to the removal and consent/consultation rights set forth therein) and Section 10.10) are solely for the benefit of the Administrative Agent, the Lenders and the L/C Issuer, and the Credit Parties shall not have rights as a third party beneficiary of any of such provisions.

(b)    Each Lender hereby irrevocably appoints, designates and authorizes the Collateral Agent to take such action on its behalf under the provisions of this Credit Agreement and each other Credit Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Credit Agreement or any other Credit Document, together with such powers as are reasonably incidental thereto. In connection herewith, the Administrative Agent, as Collateral Agent, and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 10.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Credit Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article 10 and Article 11 (including Section 11.04, as though such co-agents, sub-agents and attorneys-in-fact were the Collateral Agent under the Credit Documents) as if set forth in full herein with respect thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Credit Document, the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein or therein, nor shall the Collateral Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Credit Agreement or any other Credit Document or otherwise exist against the Collateral Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Credit Documents with reference to the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. The Collateral Agent shall act on behalf of the Lenders with respect to the Collateral and the Credit Documents, and the Collateral Agent shall have all of the benefits and immunities (i) provided to the Administrative Agent under the Credit Documents with respect to any acts taken or omissions suffered by the Collateral Agent in connection with any Collateral or the Collateral Documents as fully as if the term "Administrative Agent" as used in such Credit Documents included the Collateral Agent with respect to such acts or omissions, and (ii) as additionally provided herein or in the other Credit Documents with respect to the Collateral Agent.

Section 10.02. *Rights as a Lender*. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of

[Credit Agreement]

business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 10.03. *Exculpatory Provisions*. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Credit Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Credit Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law;

(c)    shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity; and

(d)    shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor the list or identities of, or enforce, compliance with the provisions hereof relating to Disqualified Institutions.

Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 9.02) or (ii) in the absence of its own gross negligence, bad faith or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Borrower, a Lender or the L/C Issuer.

[Credit Agreement]

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (1) any statement, warranty or representation made in or in connection with this Credit Agreement or any other Credit Document, (2) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (3) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (4) the validity, enforceability, effectiveness or genuineness of this Credit Agreement, any other Credit Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (5) the value or sufficiency of any Collateral, or (6) the satisfaction of any condition set forth in Article 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 10.04. *Reliance by Administrative Agent*. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the L/C Issuer, the Administrative Agent may presume that such condition is reasonable satisfactory to such Lender or the L/C Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or the L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 10.05. *Delegation of Duties*. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub-agents appointed by the Administrative Agent; *provided, however*, that any such sub-agent receiving payments from the Credit Parties shall be a "U.S. person" and a "financial institution" within the meaning of Treasury Regulations 1.1441-1. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 10.06. *Resignation of the Administrative Agent*. The Administrative Agent may at any time give notice of its resignation to the Lenders, the L/C Issuer and the Borrower. If the Administrative Agent is subject to an Agent-Related Distress Event, the Required Lenders may remove the Administrative Agent upon ten (10) days' notice. Upon receipt of any such notice of

[Credit Agreement]

resignation or upon such removal of the Administrative Agent, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States; *provided* that such successor shall be a "U.S. person" and a "financial institution" within the meaning of Treasury Regulations Section 1.1441-1.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed to by the Required Lenders) (the "**Resignation Effective Date**")), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders and the L/C Issuer, appoint a successor Administrative Agent meeting the qualifications set forth above subject to the consultation rights of the Borrower in connection with such appointment.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

Commencing on the Resignation Effective Date (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer under any of the Credit Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent, and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed to between the Borrower and such successor.  After the retiring Administrative Agent's resignation or the removed Administrative Agent's removal hereunder and under the other Credit Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Any resignation by or removal of Bank of America as Administrative Agent pursuant to this Section shall also constitute its resignation or removal as the Collateral Agent, the L/C Issuer and the Swingline Lender.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Collateral Agent, L/C Issuer and Swingline Lender, (ii) the retiring Collateral Agent, L/C Issuer and Swingline Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Credit Documents, and (iii) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements reasonable

[Credit Agreement]

satisfactory to the retiring L/C Issuer to effectively assume the obligations of the retiring L/C Issuer with respect to such Letters of Credit.

Section 10.07. *Non-Reliance on Administrative Agent and Other Lenders.* Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Credit Agreement. Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Credit Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.

Section 10.08. *No Other Duties.* Anything herein to the contrary notwithstanding, none of the Arrangers, book managers or syndication or documentation agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Credit Agreement or any of the other Credit Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or the L/C Issuer hereunder.

Section 10.09. *Administrative Agent May File Proofs of Claim; Credit Bidding.* In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated), by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations (other than obligations under Swap Contracts or Treasury Management Agreements to which the Administrative Agent is not a party) that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuer and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuer and the Administrative Agent under Sections 2.09 and 11.04) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the

[Credit Agreement]

Administrative Agent and its agents and counsel, and any other amounts due to the Administrative Agent under Sections 2.09 and 11.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or the L/C Issuer any plan of reorganization, liquidation, arrangement, adjustment or composition or similar dispositive restructuring plan affecting the Obligations or the rights of any Lender or the L/C Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Secured Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code (or any similar provision(s) in any other Debtor Relief Laws), or any similar Laws in any other jurisdictions to which a Credit Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law. In connection with any such credit bid and purchase, the Secured Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Capital Stock or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided* that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Capital Stock thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a) through (e) of Section 11.01 of this Agreement, (iii) the Administrative Agent shall be authorized to assign the relevant Secured Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Capital Stock and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Secured Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Lenders pro rata and the Capital Stock and/or debt instruments issued by any acquisition vehicle on account of the Secured Obligations that had been assigned to the

[Credit Agreement]

acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 10.10. *Collateral and Guaranty Matters.* Each of the Lenders and the L/C Issuer irrevocably authorize the Administrative Agent and the Collateral Agent:

(a)     to automatically release any Lien on any property granted to or held by the Collateral Agent under any Credit Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations described in clauses (b) and (c) of the definition thereof) and the expiration or termination of all Letters of Credit (other than Letters of Credit that have been Cash Collateralized or back-stopped by a letter of credit in form, amount and substance reasonably satisfactory to the Administrative Agent and the L/C Issuer or a deemed reissuance under another facility or as to which other arrangements reasonable satisfactory to the Administrative Agent and the L/C Issuer shall have been made), (ii) that is sold or otherwise disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted hereunder or under any other Credit Document to a Person that is not a Credit Party, (iii) subject to Section 11.01, if approved, authorized or ratified in writing by the Required Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to subsection (c) below or (v) if such property becomes Excluded Property;

(b)     to subordinate any Lien on any property granted to or held by the Collateral Agent under any Credit Document to the holder of any Lien on such property that is permitted by Section 8.01(k); and

(c)     to release any Guarantor from its obligations under any Guaranty pursuant to Section 4.09.

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the authority of the Collateral Agent to release or subordinate its interest in particular property and of the Administrative Agent to release any Guarantor from its obligations hereunder pursuant to this Section 10.10. In each case as specified in this Section 10.10, the Administrative Agent and the Collateral Agent will (and each Lender irrevocably authorizes the Administrative Agent and the Collateral Agent to), at the Borrower's expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Credit Documents and this Section 10.10.

Section 10.11. *Swap Contracts and Treasury Management Agreements.* No Agent, Lender or any Affiliate of a Lender that is party to any Swap Contract or any Treasury Management Agreement permitted hereunder that obtains the benefits of Section 9.03 or any Collateral by virtue of the provisions hereof or of any other Credit Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any

[Credit Agreement]

other Credit Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as an Agent or a Lender, as applicable, and, in such case, only to the extent expressly provided in the Credit Documents. Notwithstanding any other provision of this Article 10 to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other reasonable satisfactory arrangements have been made with respect to, Obligations arising under Swap Contracts and Treasury Management Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Lender or Affiliate of a Lender (or Person who was an Agent, a Lender or an Affiliate of an Agent or Lender at the time the applicable Swap Contract was entered into) that is party to such Swap Contract or such Treasury Management Agreement, as the case may be.

Section 10.12.   *Compliance with ERISA.*

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of

[Credit Agreement]

PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) subclause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with subclause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related hereto or thereto).

Section 10.13. *Recovery of Erroneous Payments.*    Without limitation of any other provision in this Agreement, if at any time the Administrative Agent makes a payment hereunder in error to any Lender (the "**Erroneous Party**"), whether or not in respect of an Obligation due and owing by the Borrower at such time, where such payment is a Rescindable Amount, then in any such event, each Erroneous Party receiving a Rescindable Amount severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount received by such Erroneous Party in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. Each Erroneous Party irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another) or similar defense to its obligation to return any Rescindable Amount.    The Administrative Agent shall inform each Erroneous Party promptly upon determining that any payment made to such Erroneous Party comprised, in whole or in part, a Rescindable Amount.    Notwithstanding anything to the contrary herein or in any other Credit Document, the provisions of this Section 10.13 are solely agreements among the Credit Parties and the Administrative Agent and shall not impose any obligations on the Borrower or the Credit Parties.

## ARTICLE 11
### MISCELLANEOUS

Section 11.01. *Amendments, Etc.* Except as expressly provided in, Section 2.18, 2.19 and 2.20 and herein below, no amendment or waiver of, or any consent to deviation from, any

[Credit Agreement]

provision of this Credit Agreement or any other Credit Document shall be effective unless in writing and signed by the Required Lenders (or by the Administrative Agent on behalf of the Required Lenders upon receipt of a consent and direction letter from the Required Lenders) and the Borrower and other Credit Parties, as the case may be, and acknowledged by the Administrative Agent in its role as such (such acknowledgment not to be unreasonably withheld, delayed or conditioned), and each such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given; *provided* that:

        (a)     no such amendment, waiver or consent (however characterized) shall:

        (i)     extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 9.02) (it being understood and agreed that amendment or waiver of any condition precedent set forth in Section 5.02 or of any Default or Event of Default shall not be considered an extension or increase in Commitments for purposes hereof) without the written consent of such Lender;

        (ii)     waive non-payment or postpone any date fixed by this Credit Agreement or any other Credit Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amount due to the Lenders (or any of them) hereunder or under any other Credit Document without the written consent of each Lender directly and adversely affected thereby;

        (iii)     reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing (it being understood that any change to the definition of "Consolidated Total Net Leverage Ratio" or in the component definitions thereof shall not constitute a reduction in any rate of interest), or any fees or other amounts payable hereunder or under any other Credit Document, in each case without the written consent of each Lender directly and adversely affected thereby; *provided* that only (A) the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate," (B) the consent of the applicable Required Facility Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate with respect to Loans under any Facility, and (C) the consent of the Required Revolving Credit Lenders shall be necessary to waive any obligation of the Borrower to pay Letter of Credit Fees at the Default Rate;

        (iv)     change any provision of this Section 11.01(a) or the definitions of "Aggregate Commitment Percentage," "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender directly and adversely affected thereby; *provided* that the definitions of "Required Revolving Credit Lenders," and "Required Term Lenders," may only be amended with the written consent of each Lender under the applicable Facility;

[Credit Agreement]

(v)    release all or substantially all of the Guarantors from their obligations under the Credit Documents (other than as provided herein or as appropriate in connection with transactions permitted hereunder) without the written consent of each Lender;

(vi)    except in connection with a transaction permitted under Section 8.04 or Section 8.05 or as permitted by Section 10.10, release all or substantially all of the Collateral without the written consent of each Lender;

(vii)    change Section 2.12 or Section 9.03 in a manner that would alter the pro rata sharing of amounts required thereby without the written consent of each Lender directly and adversely affected thereby;

(viii)    (a) waive any condition set forth in Section 5.02 as to any Credit Extension under one or more Classes of Revolving Credit Commitments or (b) amend, waive or otherwise modify any term or provision which directly and adversely affects Lenders under one or more Classes of Revolving Credit Commitments and does not adversely affect Lenders under any other Class, in each case, without the written consent of the Required Revolving Credit Lenders under such applicable Class or Classes of Revolving Credit Commitments (and in the case of multiple Classes which are affected, such Required Revolving Credit Lenders shall consent together as one Class) (it being understood that any amendment to the conditions of effectiveness of Incremental Commitments set forth in Section 2.18 shall be subject to clause (ix) below; *provided*, *however*, that the waivers described in this clause (viii) shall not require the consent of any Lenders other than (A) the Required Revolving Credit Lenders under such Class or Classes and (B) in the case of any waiver that otherwise would be subject to clause (i), (ii), (iii), (iv) or (v) above, each Lender or each directly and adversely affected Lender (as specified in clause (i), (ii), (iii), (iv) or (v) above) under the applicable Class or Classes of Revolving Credit Commitments;

(ix)    amend, waive or otherwise modify any term or provision (including the availability and conditions to funding under Section 2.18 with respect to Incremental Term Loans and Incremental Revolving Commitments and the rate of interest applicable thereto) which directly affects Lenders of one or more Incremental Term Loans or Incremental Revolving Commitments (including Loans extended under such Commitments) and does not adversely affect Lenders under any other Class, in each case, without the written consent of the Required Facility Lenders under such applicable Class of Incremental Term Loans or Incremental Revolving Commitments; *provided*, *however*, that the waivers described in this clause (ix) shall not require the consent of any Lenders other than (A) the Required Facility Lenders under such applicable Class of Incremental Term Loans or Incremental Revolving Commitments and (B) in the case of any waiver that otherwise would be subject to clause (i), (ii), (iii), (iv) or (v) above, each Lender, each directly affected Lender or each directly and adversely affected Lender (as specified in clause (i), (ii), (iii), (iv) or (v) above) under the applicable

[Credit Agreement]

Class or Classes of Incremental Term Loans or Incremental Revolving Commitments (including Loans extended under such Commitments);

(b)    unless also consented to in writing by the L/C Issuer, no such amendment, waiver or consent shall affect the rights or duties of the L/C Issuer under this Credit Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it or the definition of "Alternative Currency";

(c)    unless also consented to in writing by the Swingline Lender, no such amendment, waiver or consent shall affect the rights or duties of the Swingline Lender under this Credit Agreement;

(d)    unless also consented to in writing by the Administrative Agent, no such amendment, waiver or consent shall affect the rights or duties of the Administrative Agent under this Credit Agreement or any other Credit Document; and

(e)    unless also consented to in writing by the Collateral Agent, no such amendment, waiver or consent shall affect the rights or duties of the Collateral Agent under this Credit Agreement or any other Credit Document;

*provided* that notwithstanding anything to the contrary contained herein, (1) no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (a) the Revolving Credit Commitment of such Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender and (b) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender, (2) each Lender is (subject to the terms of Section 11.06(k)) entitled to vote as such Lender sees fit on any plan of reorganization, liquidation, arrangement, adjustment or composition or similar dispositive restructuring plan that affects the Loans, and (3) each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code (or any similar provisions in any other Debtor Relief Laws) supersede the unanimous consent provisions set forth herein.  Notwithstanding anything to the contrary herein, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Term Loans, Revolving Credit Loans, Swingline Loans and L/C Obligations and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the Replacement Term Loans (as defined below) to permit the refinancing of all outstanding Term Loans of any Class ("**Replaced Term Loans**") with replacement term loans ("**Replacement**

[Credit Agreement]

**Term Loans**") hereunder (a "**Replacement Amendment**"); *provided* that (a) the aggregate principal amount of such Replacement Term Loans shall not exceed the aggregate principal amount of such Replaced Term Loans, plus accrued interest, fees, premiums (if any) and penalties thereon and reasonable fees and expenses associated with such Replacement Term Loans, (b) the all-in yield with respect to such Replacement Term Loans (or similar interest rate spread applicable to such Replacement Term Loans) shall not be higher than the all-in yield for such Refinanced Debt (or similar interest rate spread applicable to such Refinanced Debt) immediately prior to such refinancing, (c) the Weighted Average Life to Maturity of such Replacement Term Loans shall not be shorter than the Weighted Average Life to Maturity of such Replaced Term Loans at the time of such refinancing (except by virtue of amortization or prepayment of the Replaced Term Loans prior to the time of such incurrence) and (d) all other terms applicable to such Replacement Term Loans shall be substantially identical to, or less favorable to the Lenders providing such Replacement Term Loans than, those applicable to such Replaced Term Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the Latest Maturity Date of any Term Loans in effect immediately prior to such refinancing. Each amendment to this Agreement providing for Replacement Term Loans may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the opinion of the Administrative Agent and the Borrower to effect the provisions of this paragraph, and for the avoidance of doubt, this paragraph shall supersede any other provisions in this Section 11.01 to the contrary.

If the Administrative Agent and the Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Credit Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Credit Document), then the Administrative Agent (acting in its sole discretion) and the Borrower or any other relevant Credit Party shall be permitted to amend such provision and such amendment shall be deemed approved by the Lenders if the Lenders shall have received five Business Days' prior written notice of such change and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment.

Notwithstanding any provision herein to the contrary, this Agreement may be amended with the written consent of the Administrative Agent, the L/C Issuer and the Borrower to amend the definition of "Alternative Currency" or "Alternative Currency Daily Rate" or "Alternative Currency Term Rate" or Section 1.11 solely to add additional currency options and the applicable interest rate with respect thereto, in each case solely to the extent permitted pursuant to Section 1.11.

Notwithstanding the foregoing, no Lender consent is required to effect any amendment or supplement to any First Lien Intercreditor Agreement, Junior Lien Intercreditor Agreement, Subordination Agreement or other intercreditor agreement or arrangement permitted under this Agreement (i) that is for the purpose of adding the holders of Permitted Pari Passu Secured Refinancing Debt, Permitted Junior Secured Refinancing Debt, subordinated Permitted Unsecured Refinancing Debt, Incremental Equivalent Debt (or, in each case, a Senior

[Credit Agreement]

Representative with respect thereto)  as parties thereto, as expressly contemplated by the terms of such First Lien Intercreditor Agreement, such Junior Lien Intercreditor Agreement, such Subordination Agreement or such other intercreditor agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and *provided* that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by any First Lien Intercreditor Agreement, Junior Lien Intercreditor Agreement, Subordination Agreement or other intercreditor agreement or arrangement permitted under this Agreement; *provided*, *further*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Credit Document without the prior written consent of the Administrative Agent.

Section 11.02.  *Notices; Effectiveness; Electronic Communications.*

(a)  *Notices Generally*.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)  if to any Credit Party, the Administrative Agent, the L/C Issuer or the Swingline Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02 or as provided pursuant to subsection (d) below; and

(ii)  if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Credit Parties) or as provided pursuant to subsection (d) below.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)  *Electronic Communications*.  Notices and other communications to the Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail, FpML messaging, and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply

[Credit Agreement]

to notices to any Lender or the L/C Issuer pursuant to Article 2 if such Lender or the L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower each may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    *The Platform*. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE CREDIT PARTY MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE CREDIT PARTY MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE CREDIT PARTY MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower or any other Credit Party, any Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or any other Credit Party's or the Administrative Agent's transmission of Credit Party Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to the Borrower or any other Credit Party, any Lender, the L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    *Change of Address, Etc.* Each of the Borrower, the Administrative Agent, the L/C Issuer and the Swingline Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent, the L/C Issuer and the Swingline Lender. In addition, each Lender agrees to notify the Administrative Agent

[Credit Agreement]

from time to time to ensure that the Administrative Agent has on record (1) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (2) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States federal and state securities Laws, to make reference to Credit Party Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States federal or state securities Laws.

(e)    *Reliance by Administrative Agent, L/C Issuer and Lenders*.    The Administrative Agent, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices (including telephonic Loan Notices) purportedly given by or on behalf of the Borrower or any other Credit Party even if (1) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (2) the terms thereof, as understood by the recipient, varied from any confirmation thereof.    The Borrower shall indemnify the Administrative Agent, the L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower or any other Credit Party in the absence of gross negligence, bad faith or willful misconduct of such Person, as determined by a court of competent jurisdiction in a final and non-appealable judgment.    All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 11.03. *No Waiver; Cumulative Remedies; Enforcement*.    No failure by any Lender, the L/C Issuer, the Swingline Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Credit Document (including the imposition of the Default Rate) preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.    The rights, remedies, powers and privileges herein provided and provided under each other Credit Document are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Credit Document, the authority to enforce rights and remedies hereunder and under the other Credit Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 9.02 for the benefit of all the Lenders and the L/C Issuer; *provided*; that the foregoing shall not prohibit (i) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Credit Documents, (ii) the L/C Issuer or the Swingline Lender from exercising the rights and remedies

that inure to their benefit (solely in their capacity as L/C Issuer or Swingline Lender, as the case may be) hereunder and under the other Credit Documents, (iii) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.12), or (iv) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any Debtor Relief Law and *provided further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Credit Documents, then (1) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 9.02 and (2) in addition to the matters set forth in clauses (i), (ii) and (iii) of the preceding proviso and subject to Section 2.12, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 11.04.  *Expenses; Indemnity; Damage Waiver*.

(a)     *Costs and Expenses*.  The Borrower shall pay (1) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and their respective Affiliates (including the reasonable and documented out-of-pocket fees, charges and disbursements of one counsel for the Administrative Agent and the Collateral Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Credit Agreement and the other Credit Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated thereby shall be consummated), (2) all reasonable and documented out-of-pocket expenses incurred by the L/C Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (3) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, any Lender or the L/C Issuer in connection with the enforcement or protection of its rights (a) in connection with this Credit Agreement and the other Credit Documents, including its rights under this Section, or (b) in connection with the Loans made or Letters of Credit issued hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit (*provided* that with respect the fees and disbursements of counsel, all such Persons shall be represented by one primary counsel and (x) any special counsel and local counsel in each relevant jurisdiction retained by the Administrative Agent and (y) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected Person similarly situated, and for each of clauses (1) and (2) herein, such amounts shall be limited to those reasonable and documented out-of-pocket fees and actual disbursements of such counsel).

(b)     *Indemnification by the Borrower*.  The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each Arranger, each Documentation Agent the Collateral Agent, each Lender and the L/C Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related out-of-pocket expenses (including the reasonable and documented out-of-pocket fees, charges and disbursements of one counsel for all Indemnitees), incurred by any Indemnitee or asserted against any Indemnitee by the Borrower, any other Credit Party or any other Person arising out of, in connection with, or as

[Credit Agreement]