a result of (i) the execution, enforcement or delivery of this Credit Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, the syndication of the credit facilities provided for herein, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Credit Agreement and the other Credit Documents, (i) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (ii) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property currently or formerly owned, leased or operated by the Borrower or any of its Restricted Subsidiaries or any of their respective predecessors, or any Environmental Liability related in any way to the Borrower or any of its Restricted Subsidiaries, or any of their respective predecessors, in each case relating to any of the foregoing or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Credit Party, and regardless of whether any Indemnitee is a party thereto, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE,** nor shall any Indemnitee, Related Party, Credit Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Credit Party, in respect of any such damages incurred or paid by an Indemnitee to a third party, or which are included in a third-party claim); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct or material breach of such Person's obligations under any Credit Document of such Indemnitee or (y) result from a claim brought by the Borrower or any other Credit Party against an Indemnitee for material breach of such Indemnitee's obligations hereunder or under any other Credit Document, if the Borrower or other such Credit Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) arise from disputes solely among Indemnitees, and in such event solely to the extent that the underlying dispute does not (i) arise as a result of an action, inaction or representation of, or information provided by or on behalf of, the Credit Parties or their Subsidiaries or Affiliates as determined by a court of competent jurisdiction by a final and nonappealable judgment, or (ii) relate to any action of such Indemnitee in its capacity as Administrative Agent, Arranger or Documentation Agent; *provided further*, that each Indemnitee shall promptly refund any amount received pursuant to this Section to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 11.04. This Section 11.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, and damages arising from any non-Tax claim. Payments under this Section 11.04(b) shall be made by the Borrower to the Administrative Agent for the benefit of the relevant Indemnitee.

[Credit Agreement]

(c)    *Reimbursement by Lenders.*  To the extent that the Borrower for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by them to the Administrative Agent (or any sub-agent thereof), the Collateral Agent, the L/C Issuer or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Collateral Agent, the L/C Issuer or such Related Party, as the case may be, such Lender's pro rata share (determined in each case as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Collateral Agent, the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Collateral Agent or the L/C Issuer in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.11(b).

(d)    *Waiver of Consequential Damages, Etc.*  To the fullest extent permitted by applicable Law, no Credit Party shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Credit Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Credit Agreement or the other Credit Documents or the transactions contemplated hereby or thereby other than for such direct or actual damages resulting from the gross negligence, bad faith or willful misconduct of such Indemnitee or from a breach in bad faith of such Indemnitee's obligations hereunder or under any Credit Document, in any case, as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    *Payments.*  All amounts due under this Section shall be payable not later than 10 Business Days after demand therefor.

(f)    *Survival.*  The agreements in this Section shall survive the resignation of the Administrative Agent, the L/C Issuer and the Swingline Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other obligations hereunder or under any other Credit Document.

Section 11.05. *Payments Set Aside.*  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, the L/C Issuer or any Lender, or the Administrative Agent, the L/C Issuer or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the L/C Issuer or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief

[Credit Agreement]

Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and each Lender and the L/C Issuer severally agrees to pay to the Administrative Agent on demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment. The obligations of the Lenders and the L/C Issuer under the preceding sentence shall survive the payment in full of the Obligations and the termination of this Credit Agreement.

Section 11.06. *Successors and Assigns.*

(a) *Successors and Assigns Generally.* The provisions of this Credit Agreement and the other Credit Documents shall be binding upon and inure to the benefit of the parties hereto and thereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Credit Party may assign or otherwise transfer any of their respective rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Assignee pursuant to an assignment made in accordance with the provisions of Section 11.06(b) (such an assignee, an "**Eligible Assignee**"), (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Credit Agreement, express or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the L/C Issuer and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Credit Agreement.

(b) *Assignments by Lenders.* Any Lender may at any time assign to one or more assignees ("**Assignees**") all or a portion of its rights and obligations under this Credit Agreement and the other Credit Documents (including all or a portion of its Commitment and the Loans (including for purposes of this subsection (b), participations in L/C Obligations and in Swingline Loans) at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i) *Minimum Amounts.* (A) In the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the related Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned and (B) in any case not described in this subsection (b)(i), the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is

[Credit Agreement]

delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 and integral multiples thereof (or if less, all of such Lender's remaining Loans or Commitments in respect of such Class), in the case of an assignment of the Revolving Credit Commitments (and the Revolving Credit Loans relating thereto), and $5,000,000 and integral multiples thereof, in the case of an assignment of Term Commitments or Term Loans; *provided* that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    *Proportionate Amounts*. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Credit Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not apply to the Swingline Lender's rights and obligations in respect of Swingline Loans;

(iii)    *Required Consents*.    No consent shall be required for any assignment except to the extent required by subsection (b)(i) of this Section and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (1) an Event of Default under Section 9.01(a) or (f) (solely with respect to the Borrower) has occurred and is continuing at the time of such assignment (2) in the case of an assignment of Term Loans, such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund or (3) in the case of an assignment by Goldman Sachs Bank USA to Goldman Sachs Lending Partners LLP; *provided* that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof;

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) shall be required for assignments in respect of (1) the Revolving Credit Commitments (and the Revolving Credit Loans relating thereto) if such assignment is to a Person that is not a Lender with a Revolving Credit Commitment (for holding Revolving Credit Loans), an Affiliate of such Lender or an Approved Fund with respect to such Lender or (2) any Term Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund; and

(C)    the consent of the Swingline Lender and the L/C Issuer (such consents not to be unreasonably withheld, conditioned or delayed) shall be

[Credit Agreement]

required for any assignment in respect of the Revolving Credit Commitments (and the Revolving Credit Obligations relating thereto).

(iv)    *Assignment and Assumption*.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500 (other than an assignment from a Lender to one or more of its Affiliates or pursuant to Section 11.13); *provided* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(v)    *No Assignment to Certain Persons*.  No such assignment shall be made (A) to the Borrower or any of the Borrower's Affiliates or Subsidiaries, except as set forth in Section 11.06(i), (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (v), (C) to a natural person or (D) to any Disqualified Institution; and

(vi)    *Certain Additional Payments*.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swingline Loans in accordance with its Aggregate Commitment Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Credit Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Credit Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Credit Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its

[Credit Agreement]

obligations under this Credit Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Credit Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 11.04 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Credit Agreement that does not comply with this subsection shall be treated for purposes of this Credit Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)    *Register*. The Administrative Agent, acting solely for this purpose as an agent of the Borrower (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender and the owner of the amounts owing to it under the Credit Documents as reflected in the Register for all purposes of the Credit Documents, notwithstanding notice to the contrary. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection by any of the Borrower, the L/C Issuer and the Lenders at any reasonable time and from time to time upon reasonable prior notice.

(d)    *Participations*. Any Lender may at any time (without notice to, or the consent of, any Person) sell participations to any Person (other than a natural person, a Disqualified Institution, a Defaulting Lender or the Borrower or the Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Credit Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations and/or Swingline Loans) owing to it); *provided* that (i) such Lender's obligations under this Credit Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent, the Lenders and the L/C Issuer shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Credit Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Credit Agreement and to approve any amendment, modification or waiver of any provision of this Credit Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the second proviso of Section 11.01 that affects such Participant. Subject to subsection (e) of this Section, the Borrower agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section; *provided* that such Participant agrees to be

[Credit Agreement]

subject to the provisions of <u>Section 3.06</u> as if it were an assignee under paragraph (b) of this Section. To the extent permitted by Law, each Participant also shall be entitled to the benefits of <u>Section 11.08</u> as though it were a Lender, *provided* that such Participant agrees to be subject to <u>Section 2.12</u> as though it were a Lender.

(e)      *Limitations on Participant Rights.* A Participant shall not be entitled to receive any greater payment under <u>Section 3.01</u> or <u>3.04</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of <u>Section 3.01</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with <u>Section 3.01(e)</u> as though it were a Lender.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Credit Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or of its other Obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other Obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations, or is otherwise required thereunder. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)      *Certain Pledges.* Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Credit Agreement (including under its Note(s), if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)      *[Reserved].*

(h)      *Resignation as L/C Issuer or Swingline Lender after Assignment.* Notwithstanding anything to the contrary contained herein, if at any time Bank of America assigns all of its Revolving Credit Commitment and Revolving Credit Loans pursuant to subsection (b) above. Bank of America may, (i) upon 30 days' notice to the Borrower and the Revolving Credit Lenders, resign as the L/C Issuer and/or (ii) upon 30 days' notice to the Borrower, resign as the Swingline Lender. In the event of any such resignation as the L/C Issuer

[Credit Agreement]

or the Swingline Lender, the Borrower shall be entitled to appoint from among the Revolving Credit Lenders, a successor L/C Issuer or Swingline Lender hereunder; *provided* that no failure by the Borrower to appoint any such successor shall affect the resignation of Bank of America as the L/C Issuer or the Swingline Lender, as the case may be. If Bank of America resigns as the L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as the L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Revolving Credit Lenders to make Base Rate Loans or fund risk participations in L/C Unreimbursed Amounts pursuant to Section 2.03(c)). If Bank of America resigns as the Swingline Lender, it shall retain all the rights of the Swingline Lender provided for hereunder with respect to Swingline Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Revolving Credit Lenders to make Base Rate Loans or fund risk participations in outstanding Swingline Loans pursuant to Section 2.04(c). Upon the appointment of a successor L/C Issuer and/or Swingline Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer or Swingline Lender, as the case may be, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements reasonable satisfactory to Bank of America to effectively assume the obligations of Bank of America with respect to such Letters of Credit.

(i)      *Assignments to the Borrower and its Subsidiaries.* Notwithstanding anything to the contrary contained in this Section 11.06 or any other provision of this Agreement, so long as no Event of Default has occurred and is continuing or would result therefrom, each Term Lender shall have the right at any time to sell, assign or transfer all or a portion of the Term Loans owing to it to the Borrower or any of its Subsidiaries on a non-pro rata basis, subject to the following limitations:

(i)      Such sale, assignment or transfer shall be pursuant to one or more modified Dutch auctions conducted by the Borrower (each, an "**Auction**") to repurchase all or any portion of the Term Loans; *provided* that (A) notice of and the option to participate in the Auction shall be provided to all Term Lenders and (B) the Auction shall be conducted pursuant to such procedures as the Auction Manager may establish, which are consistent with this Section 11.06(i) and the Auction Procedures and are otherwise reasonably acceptable to the Borrower, the Auction Manager and the Administrative Agent;

(ii)      With respect to all repurchases made by the Borrower or any of its Subsidiaries pursuant to this Section 11.06(i), (A) the Borrower shall (x) represent and warrant to the Term Lenders that, as of the launch date of the related Auction and the effective date of any such repurchase, it does not possess material non-public information with respect to the Borrower and its Subsidiaries that has not been disclosed to the Administrative Agent and the non-Public Lenders or (y) make a statement that it cannot make such representation and warranty, (B) the Borrower or any of its Subsidiaries shall not use the proceeds of any Revolving Credit Loans to repurchase such Term Loans and (C) the assigning Term Lender and the Borrower or its applicable Subsidiary shall execute and deliver to the

[Credit Agreement]

Auction Manager an Assignment and Assumption with respect to such repurchase; and

(iii)     Following a repurchase by the Borrower or any of its Subsidiaries pursuant to this Section 11.06(i), the Term Loans so repurchased shall, without further action by any Person, be deemed canceled and no longer outstanding (and may not be resold by the Borrower or any of its Subsidiaries) for all purposes of this Credit Agreement and all other Credit Documents, including, but not limited to (A) the making of, or the application of, any payments to the Term Lenders under this Credit Agreement or any other Credit Document, (B) the making of any request, demand, authorization, direction, notice, consent or waiver under this Credit Agreement or any other Credit Document or (C) the determination of the Required Lenders or the Required Term Lenders, or for any similar or related purpose, under this Credit Agreement or any other Credit Document.  If any Term Loan is purchased and canceled in accordance with this Section 11.06(i), all such prepayments shall be applied to the remaining scheduled installments of principal of the relevant Class of Term Loans on a pro rata basis across such installments. In connection with any Term Loans repurchased and canceled pursuant to this Section 11.06(i), the Administrative Agent is authorized to make appropriate entries in the Register to reflect any such cancellation.

(j)     If any assignment is made to any Disqualified Institution without the Borrower's prior consent in violation of clause (b)(v) above, the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, notwithstanding anything to the contrary in Section 2.07 or Section 2.12, (A) terminate any Revolving Credit Commitment of such Disqualified Institution and repay all Obligations of the Borrower owing to such Disqualified Institution in connection with such Revolving Credit Commitment, (B) in the case of outstanding Term Loans held by Disqualified Institutions, prepay such Term Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Term Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and under the other Credit Documents and/or (C) require such Disqualified Institution to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in this Section 11.06), all of its interest, rights and obligations under this Agreement and related Credit Documents to an Eligible Assignee that shall assume such obligations at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and other the other Credit Documents; *provided* that (i) such assignment does not conflict with applicable Laws and (ii) in the case of clause (B), the Borrower shall not use the proceeds from any Loans to prepay Term Loans held by Disqualified Institutions.

(k)     Notwithstanding anything to the contrary contained in this Agreement, the Disqualified Institutions (A) will not (x) have the right to receive information, reports or other materials provided to Lenders by the Borrower, the Administrative Agent or any other Lender, (y) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (z)

[Credit Agreement]

access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent or the Lenders and (B) (x) for purposes of any consent to any amendment, waiver or modification of any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Credit Document, each Disqualified Institution will be deemed to have consented in the same proportion as the Lenders that are not Disqualified Institutions consented to such matter, and (y) for purposes of voting on any plan of reorganization, liquidation, arrangement, adjustment or composition or similar dispositive restructuring plan pursuant to any Debtor Relief Laws (a "**Reorganization Plan**") each Disqualified Institution party hereto hereby agrees (1) not to vote on such Reorganization Plan, (2) if such Disqualified Institution does vote on such Reorganization Plan notwithstanding the restriction in the foregoing clause (1), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Reorganization Plan in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (3) not to contest any request by any party for a determination by the Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (2).

Section 11.07. *Treatment of Certain Information; Confidentiality.* Each of the Administrative Agent, the Lenders and the L/C Issuer agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (in which case such Person, to the extent practicable and so long as it is permitted by Law and except in connection with any order or request as part of a regulatory examination or audit, agrees to inform the Borrower promptly thereof), to any other party hereto, in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Credit Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Credit Agreement or any Eligible Assignee invited to become a Lender pursuant to Section 11.06(b), (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, with the consent of the Borrower or to the extent such Information, (iii) becomes publicly available other than as a result of a breach of this Section, (iv) to the extent that such information is independently developed by the Administrative Agent, a Lender, L/C Issuer or such parties Affiliates, in each case, so long as not based on information obtained in a manner that would otherwise violate this provision, (v) becomes available to the Administrative Agent, any Lender, the L/C Issuer or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower or (vi) with the Borrower's consent. In addition, the Administrative Agent and the Lenders may disclose the existence of this Credit Agreement and information about this

[Credit Agreement]

Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent and the Lenders in connection with the administration of this Credit Agreement, the other Credit Documents, and the Commitments.

For purposes of this Section, "**Information**" means all information received from the Credit Parties or their Subsidiaries or Affiliates relating to the Credit Parties or their Subsidiaries or Affiliates or any of their respective businesses, other than any such information that is available to the Administrative Agent, any Lender or the L/C Issuer on a nonconfidential basis prior to disclosure by the Credit Parties or their Subsidiaries or Affiliates; *provided* that all information received after the Closing Date from the Borrower or any of its Subsidiaries shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the Lenders and the L/C Issuer acknowledges that (a) the Information may include material non-public information concerning the Credit Parties or their Subsidiaries or Affiliates, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including federal and state securities Laws.

Section 11.08. *Right of Setoff.*  If an Event of Default shall have occurred and be continuing, each Lender, the L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the L/C Issuer or any such Affiliate to or for the credit or the account of the Borrower or any other Credit Party against any and all of the obligations of the Borrower or such Credit Party now or hereafter existing under this Credit Agreement or any other Credit Document to such Lender or the L/C Issuer, irrespective of whether or not the Lender or the L/C Issuer shall have made any demand under this Credit Agreement or any other Credit Document and although such obligations of the Borrower or such Credit Party may be contingent or unmatured or are owed to a branch or office of such Lender or the L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender, the L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the L/C Issuer or their respective Affiliates may have.  Each Lender and the L/C Issuer agrees to notify the Borrower and the

[Credit Agreement]

Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 11.09. *Interest Rate Limitation*.    Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, characterize any payment that is not principal as an expense, fee, or premium rather than interest, exclude voluntary prepayments and the effects thereof, and amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 11.10. *Integration; Effectiveness*.  This Agreement, the other Credit Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent or the L/C Issuer, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 11.11. *Survival of Representations and Warranties*.    All representations and warranties made hereunder and in any other Credit Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than any Obligations under any Swap Contract Obligation, Treasury Management Obligation or contingent indemnity obligations, in any such case not then due and payable) or any Letter of Credit shall remain outstanding (unless the such Letter of Credit has been Cash Collateralized or back-stopped by a letter of credit in form, amount and substance reasonably satisfactory to the Administrative Agent or a deemed reissuance under another facility or as to which other arrangements reasonable satisfactory to the Administrative Agent and the L/C Issuer shall have been made).

Section 11.12. *Severability*.  If any provision of this Credit Agreement or the other Credit Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Credit Agreement and the other Credit Documents shall not

[Credit Agreement]

be affected or impaired thereby and the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 11.12, if and to the extent that the enforceability of any provisions in this Credit Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, the L/C Issuer or the Swingline Lender, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 11.13. *Replacement of Lenders*. If (a) any Lender requests compensation under Section 3.04, (b) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (c) any Lender gives a notice pursuant to Section 3.02, (d) any Lender does not consent to a proposed change, waiver, discharge or termination (a "**Non-Consenting Lender**") with respect to any Credit Document requiring the approval of all the Lenders or of all the Lenders directly affected thereby that has been approved by the applicable Required Facility Lenders or, to the extent applicable, the Required Lenders, or (e) any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), (i) all of such Lender's interests, rights and obligations under this Credit Agreement and the related Credit Documents, or (ii) solely in the case of a Non-Consenting Lender, all of such Lender's Class of Loans with respect to which such Lender is a Non-Consenting Lender, in each case to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that:

        (i)       the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 11.06(b)(iv);

        (ii)      such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and L/C Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Credit Documents (including any amounts under Section 3.05) that is to be assigned hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

        (iii)     in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

        (iv)     such assignment does not conflict with applicable Law;

        (v)      in the case of any such assignment resulting from a Non-Consenting Lender's failure to consent to a proposed change, waiver,

[Credit Agreement]

discharge or termination with respect to any Credit Document, the applicable assignee consents to the proposed change, waiver, discharge or termination; and

(vi)    the failure by any Lender described in clauses (a) – (e) above to execute and deliver an Assignment and Assumption shall not impair the validity of the removal of such Lender, and the assignment of such Lender's Commitments and outstanding Loans and participations in L/C Obligations and Swingline Loans pursuant to this Section 11.13 shall nevertheless be effective without the execution by such Lender of an Assignment and Assumption.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 11.14.    *Governing Law; Jurisdiction; Etc.*

(a)    *GOVERNING LAW.* THIS CREDIT AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS CREDIT AGREEMENT (INCLUDING ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    *SUBMISSION TO JURISDICTION.*    EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF SUCH STATE AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT, AND, SUBJECT TO THE LAST SENTENCE OF THIS CLAUSE (B), EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE BROUGHT, HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS CREDIT AGREEMENT OR IN ANY OTHER CREDIT DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY LENDER OR THE L/C ISSUER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT AGAINST THE BORROWER OR ANY OTHER CREDIT PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

[Credit Agreement]

(c)    *WAIVER OF VENUE.* EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    *SERVICE OF PROCESS.* EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02. NOTHING IN THIS CREDIT AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 11.15. *Waiver of Jury Trial.* EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS CREDIT AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 11.16. *USA Patriot Act Notice.* Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Credit Parties in accordance with the Act. The Credit Parties shall, promptly following a request by the Administrative Agent or any Lender, provide all reasonable documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

Section 11.17. *Termination.* Notwithstanding any other provision to the contrary, upon termination of the commitments hereunder and payment in full of all Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii)

[Credit Agreement]

Obligations described in clauses (b) and (c) of the definition thereof) and the expiration or termination of all Letters of Credit (other than Letters of Credit as to which other arrangements reasonable satisfactory to the Administrative Agent and the L/C Issuer shall have been made), the Collateral Documents and the security interests created thereby shall terminate, all rights in the Collateral shall revert to the applicable Credit Party and the Administrative Agent and the Collateral Agent, at the request and sole expense of the Borrower, will execute and deliver such documents as the Borrower shall reasonably request to evidence such termination; *provided* that if an Event of Default shall have occurred and is continuing, no such termination will be effective unless arrangements reasonable satisfactory to the holders of the Swap Contract Obligations and Treasury Management Obligations shall have been made, and will not affect provisions which expressly survive termination.

Section 11.18. *No Advisory or Fiduciary Responsibility*.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), the Borrower and each other Credit Party acknowledge and agree, and acknowledge their respective Affiliates' understanding, that: (i) the arranging and other services regarding this Credit Agreement provided by the Administrative Agent, the Arrangers and Documentation Agents are arm's-length commercial transactions between the Borrower, each other Credit Party and their respective Affiliates, on the one hand, and the Administrative Agent, the Arrangers and the Documentation Agents, on the other hand, (ii) each of the Borrower and the other Credit Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) each of the Borrower and each other Credit Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; the Administrative Agent, each Arranger, each Documentation Agent and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, any other Credit Party or any of their respective Affiliates, or any other Person and the Administrative Agent, the Arrangers, Documentation Agents and the Lenders shall not have any obligation to the Borrower, any other Credit Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; and the Administrative Agent, the Arrangers, Documentation Agents and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Credit Parties and their respective Affiliates, and the Administrative Agent, the Arrangers, Documentation Agents and the Lenders shall not have any obligation to disclose any of such interests to the Borrower, any other Credit Party or any of their respective Affiliates. To the fullest extent permitted by Law, each of the Borrower and the other Credit Parties hereby waives and releases any claims that it may have against the Administrative Agent, the Arrangers, Documentation Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 11.19. *Electronic Execution; Electronic Records; Counterparts*.    This Agreement, any Credit Document and any other Communication, including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures.  Each of the Credit Parties and each of the Administrative Agent and the

[Credit Agreement]

Lenders agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on such Person to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of such Person enforceable against such Person in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Administrative Agent and each of the Lenders may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("**Electronic Copy**"), which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, neither the Administrative Agent, the L/C Issuer nor the Swingline Lender is under any obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by such Person pursuant to procedures approved by it; *provided further*, without limiting the foregoing, (a) to the extent the Administrative Agent, the L/C Issuer and/or the Swingline Lender has agreed to accept such Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Credit Party and/or any Lender without further verification and (b) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by such manually executed counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

Section 11.20. *Acknowledgment and Consent to Bail-In of Affected Financial Institutions.* Solely to the extent any Lender or the L/C Issuer that is an Affected Financial Institution is a party to this Agreement and notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender or the L/C Issuer that is an Affected Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender or the L/C Issuer that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

[Credit Agreement]

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 11.21. *Judgment Currency.* If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Credit Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of each Credit Party in respect of any such sum due from it to the Administrative Agent or any Lender hereunder or under the other Credit Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or any Lender from any Credit Party in the Agreement Currency, such Credit Party agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or such Lender, as the case may be, against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or any Lender in such currency, the Administrative Agent or such Lender, as the case may be, agrees to return the amount of any excess to such Credit Party (or to any other Person who may be entitled thereto under applicable Law).

Section 11.22. *Acknowledgement Regarding Any Supported QFCs.* To the extent that the Credit Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**," and each such QFC, a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

[Credit Agreement]

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

As used in this Section 11.01, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

Section 11.23. *Intercreditor Agreements*.

(a)    PURSUANT TO THE EXPRESS TERMS OF EACH INTERCREDITOR AGREEMENT, IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THE TERMS OF THE RELEVANT INTERCREDITOR AGREEMENT AND ANY OF THE CREDIT DOCUMENTS, THE PROVISIONS OF THE RELEVANT INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL (EXCEPT IN THE CASE OF A CONFLICT WITH ANY PROVISION OF SUCH INTERCREDITOR AGREEMENT REFERENCING THE RIGHTS, DUTIES, PRIVILEGES, IMMUNITIES AND INDEMNITIES OF THE ADMINISTRATIVE AGENT, THE PROVISIONS OF ARTICLE 11 OF THIS AGREEMENT WILL CONTROL).

[Credit Agreement]

(b)     EACH    LENDER    AUTHORIZES    AND    INSTRUCTS    THE ADMINISTRATIVE AGENT TO ENTER INTO THE RELEVANT INTERCREDITOR AGREEMENT ON BEHALF OF SUCH LENDER, AND TO TAKE ALL ACTIONS (AND EXECUTE ALL DOCUMENTS) REQUIRED (OR DEEMED ADVISABLE) BY IT IN ACCORDANCE WITH THE TERMS OF SUCH INTERCREDITOR AGREEMENT(S). EACH LENDER AGREES TO BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE RELEVANT INTERCREDITOR AGREEMENT.

(c)     THE PROVISIONS OF THIS SECTION 11.23 ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE RELEVANT INTERCREDITOR AGREEMENT. REFERENCE MUST BE MADE TO THE RELEVANT INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF. EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE RELEVANT INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NO AGENT (AND NONE OF ITS AFFILIATES) MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE RELEVANT INTERCREDITOR AGREEMENT.

(d)     THE PROVISIONS OF THIS SECTION 11.23 SHALL APPLY WITH EQUAL FORCE, MUTATIS MUTANDIS, TO THE FIRST LIEN INTERCREDITOR AGREEMENT, THE JUNIOR LIEN INTERCREDITOR AGREEMENT, THE SUBORDINATION AGREEMENT AND ANY OTHER INTERCREDITOR AGREEMENT OR ARRANGEMENT PERMITTED BY THIS AGREEMENT.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[Credit Agreement]

**Exhibit 99.1**



Innovation That Matters®

**FOR IMMEDIATE RELEASE**

# Mercury Systems Reports First Quarter Fiscal 2024 Results

**ANDOVER, Mass. November 7, 2023** Mercury Systems, Inc. (NASDAQ: MRCY, www.mrcy.com), reported operating results for the first quarter of fiscal year 2024, ended September 29, 2023.

"In the first quarter, we made progress against our enhanced execution plan to deliver predictable results, build a thriving growth engine, expand margins, and drive improved free cash flow," said Bill Ballhaus, Mercury's President and CEO. "We are reiterating our full-year guidance based on our current view of bookings, timing of product delivery, and allocation of factory capacity."

"During the quarter we completed two of our 20 challenged programs, remaining on track to complete a total of at least five by the end of the first half and the majority by the end of the fiscal year. We received several important bookings in the quarter and have good line of sight on additional major franchise awards later in the year that will drive organic growth next year and beyond. We are targeting margin expansion by executing on challenged programs and minimizing cost growth impacts, moving closer to our historical mix of production and development programs, and achieving efficiencies through our cost structure. And we are working to improve free cash flow conversion and cash release by delivering hardware and transitioning to a more cash-efficient approach to timing material buys more closely to resource availability and hardware deliveries."

**First Quarter Fiscal 2024 Results**

Total Company first quarter fiscal 2024 revenues were $181.0 million, compared to $227.6 million in the first quarter of fiscal 2023.

Total bookings for the first quarter of fiscal 2024 were $191.5 million, yielding a book-to-bill ratio of 1.06 for the quarter.

Total Company GAAP net loss and loss per share for the first quarter of fiscal 2024 was $36.7 million, and $0.64, respectively, compared to GAAP net loss and loss per share of $14.3 million, and $0.26, respectively, for the first quarter of fiscal 2023.  Adjusted (loss) earnings per share ("adjusted EPS") was $(0.24) per share for the first quarter of fiscal 2024, compared to $0.24 per share in the first quarter of fiscal 2023.

First quarter fiscal 2024 adjusted EBITDA for the total Company was $2.0 million, compared to $31.2 million for the first quarter of fiscal 2023.

Cash flows used in operating activities in the first quarter of fiscal 2024 were $39.1 million, compared to $66.0 million in the first quarter of fiscal 2023. Free cash flow, defined as cash flows from operating activities less capital expenditures for property and equipment, was $(47.1) million for the first quarter of fiscal 2024 and $(73.4) million for the first quarter of fiscal 2023.

**Backlog**

Mercury's total backlog at September 29, 2023 was $1.15 billion, a $73.3 million increase from a year ago. Of the September 29, 2023 total backlog, $732.8 million represents orders expected to be recognized as revenue within the next 12 months.

**Business Outlook**

*This section presents our current expectations and estimates, given current visibility, on our business outlook for fiscal year 2024. It is possible that actual performance will differ materially from the estimates given, either on the upside or on the downside. Investors should consider all of the risks with respect to these estimates, including those listed in the Safe Harbor Statement below and in the First Quarter Fiscal 2024 Earnings Presentation and in our periodic filings with the U.S. Securities and Exchange Commission, and make themselves aware of how these risks may impact our actual performance. All references in this press release to the full fiscal 2024 are to the 52-week period ending June 28, 2024.*

For the full fiscal year 2024, revenues are forecasted to be in the range of $950.0 million to $1.00 billion, and GAAP net (loss) income of $(15.9) million to $3.8 million, or $(0.28) to $0.07 (loss) earnings per share, and approximately 58.0 million weighted average diluted shares outstanding. Adjusted EBITDA for the full fiscal year is expected to be approximately $160.0 million to $185.0 million, and adjusted EPS for the full fiscal year is expected to be approximately $1.19 to $1.54 per share.

**Conference Call Information**

Management will host a conference call and simultaneous webcast at 5:00 p.m. ET on Tuesday, November 7, 2023, to discuss Mercury's quarterly financial results, business highlights and outlook. In addition, Company representatives may answer questions concerning business and financial developments and trends, the Company's view on earnings forecasts, and other business and financial matters affecting the Company, the responses to which may contain information that has not been previously disclosed.

To attend the conference call or webcast, participants should register online at ir.mrcy.com/events-presentations. Participants are requested to register a day in advance or at a minimum 15 minutes before the start of the call. A replay of the webcast will be available two hours after the call and archived on the same web page for six months.

**Use of Non-GAAP Financial Measures**

In addition to reporting financial results in accordance with generally accepted accounting principles, or GAAP, the Company provides adjusted EBITDA, adjusted income, adjusted earnings per share ("adjusted EPS"), free cash flow, organic revenue and acquired revenue, which are non-GAAP financial measures. Adjusted EBITDA, adjusted income, and adjusted EPS exclude certain non-cash and other specified charges. The Company believes these non-GAAP financial measures

are useful to help investors understand its past financial performance and prospects for the future. However, these non-GAAP measures should not be considered in isolation or as a substitute for financial information provided in accordance with GAAP. Management believes these non-GAAP measures assist in providing a more complete understanding of the Company's underlying operational results and trends, and management uses these measures along with the corresponding GAAP financial measures to manage the Company's business, to evaluate its performance compared to prior periods and the marketplace, and to establish operational goals. A reconciliation of GAAP to non-GAAP financial results discussed in this press release is contained in the attached exhibits.

**Mercury Systems - Innovation that Matters® by and for People Who Matter**

Mercury Systems is a technology company that delivers mission-critical processing power to the edge, making advanced technologies profoundly more accessible for today's most challenging aerospace and defense missions. The Mercury Processing Platform allows customers to tap into innovative capabilities from silicon to system scale, turning data into decisions on timelines that matter. Mercury's products and solutions are deployed in more than 300 programs and across 35 countries, enabling a broad range of applications in mission computing, sensor processing, command and control, and communications. Mercury is headquartered in Andover, Massachusetts, and has 24 locations worldwide. To learn more, visit mrcy.com. (Nasdaq: MRCY)

Investors and others should note that we announce material financial information using our website (www.mrcy.com), SEC filings, press releases, public conference calls, webcasts, and social media, including Twitter (twitter.com/mrcy and twitter.com/mrcy_CEO) and LinkedIn (www.linkedin.com/company/mercury-systems). Therefore, we encourage investors and others interested in Mercury to review the information we post on the social media and other communication channels listed on our website.

**50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY**

Mercury Reports First Quarter Fiscal 2024 Results, Page 5

**Forward-Looking Safe Harbor Statement**

This press release contains certain forward-looking statements, as that term is defined in the Private Securities Litigation Reform Act of 1995, including those relating to the Company's focus on enhanced execution of the Company's strategic plan under a refreshed Board and leadership team. You can identify these statements by the words "may," "will," "could," "should," "would," "plans," "expects," "anticipates," "continue," "estimate," "project," "intend," "likely," "forecast," "probable," "potential," and similar expressions. These forward-looking statements involve risks and uncertainties that could cause actual results to differ materially from those projected or anticipated. Such risks and uncertainties include, but are not limited to, continued funding of defense programs, the timing and amounts of such funding, general economic and business conditions, including unforeseen weakness in the Company's markets, effects of any U.S. federal government shutdown or extended continuing resolution, effects of geopolitical unrest and regional conflicts, competition, changes in technology and methods of marketing, delays in or cost increases related to completing development, engineering and manufacturing programs, changes in customer order patterns, changes in product mix, continued success in technological advances and delivering technological innovations, changes in, or in the U.S. government's interpretation of, federal export control or procurement rules and regulations, changes in, or in the interpretation or enforcement of, environmental rules and regulations, market acceptance of the Company's products, shortages in or delays in receiving components, supply chain delays or volatility for critical components such as semiconductors, production delays or unanticipated expenses including due to quality issues or manufacturing execution issues, failure to achieve or maintain manufacturing quality certifications, such as AS9100, the impact of the COVID pandemic and supply chain disruption, inflation and labor shortages, among other things, on program execution and the resulting effect on customer satisfaction, inability to fully realize the expected benefits from acquisitions, restructurings, and execution excellence initiatives or delays in realizing such benefits, challenges in integrating acquired businesses and achieving anticipated synergies, effects of shareholder activism, increases in interest rates, changes to industrial security and cyber-security regulations and requirements and impacts from any cyber or insider threat events, changes in tax rates or tax regulations, such as the deductibility of internal research and development, changes to interest rate swaps or other cash flow hedging arrangements, changes to generally accepted accounting principles, difficulties in retaining key employees and customers, which difficulties may be impacted by the termination of the Company's announced strategic review initiative, unanticipated challenges with the transition of the Company's Chief Executive Officer and Chief Financial Officer roles, including any dispute arising with the former CEO over his resignation, unanticipated costs under fixed-price service and system integration engagements, and various other factors beyond our control. These risks and uncertainties also include such additional risk factors as are discussed in the Company's filings with the U.S. Securities and Exchange Commission, including its Annual Report on Form 10-K for the fiscal year ended June 30, 2023 and subsequent Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. The Company cautions readers not to place undue reliance upon any such forward-looking statements, which speak only as of the date made. The Company undertakes no obligation to update any forward-looking statement to reflect events or circumstances after the date on which such statement is made.

# # #

Contact:
David E. Farnsworth, CFO
Mercury Systems, Inc.
978-967-1991

**50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY**

Mercury Systems and Innovation That Matters are registered trademarks of Mercury Systems, Inc. Other product and company names mentioned may be trademarks and/or registered trademarks of their respective holders.

**50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY**

**MERCURY SYSTEMS, INC.**
**UNAUDITED CONSOLIDATED BALANCE SHEETS**
(In thousands)

| | | September 29, 2023 | | June 30, 2023 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 89,369 | $ | 71,563 |
| Accounts receivable, net | | 91,448 | | 124,729 |
| Unbilled receivables and costs in excess of billings | | 388,555 | | 382,558 |
| Inventory | | 362,910 | | 337,216 |
| Prepaid expenses and other current assets | | 22,422 | | 20,952 |
| Total current assets | | 954,704 | | 937,018 |
| | | | | |
| Property and equipment, net | | 117,174 | | 119,554 |
| Goodwill | | 938,093 | | 938,093 |
| Intangible assets, net | | 285,551 | | 298,051 |
| Operating lease right-of-use assets, net | | 60,877 | | 63,015 |
| Deferred tax asset | | 39,919 | | 27,099 |
| Other non-current assets | | 4,446 | | 8,537 |
| Total assets | $ | 2,400,764 | $ | 2,391,367 |
| | | | | |
| **Liabilities and Shareholders' Equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 95,825 | $ | 103,986 |
| Accrued expenses | | 33,660 | | 28,423 |
| Accrued compensation | | 17,717 | | 30,419 |
| Income taxes payable | | - | | 13,874 |
| Deferred revenues and customer advances | | 58,116 | | 56,562 |
| Total current liabilities | | 205,318 | | 233,264 |
| | | | | |
| Income taxes payable | | 5,166 | | 5,166 |
| Long-term debt | | 576,500 | | 511,500 |
| Operating lease liabilities | | 64,168 | | 66,797 |
| Other non-current liabilities | | 8,800 | | 7,955 |
| Total liabilities | | 859,952 | | 824,682 |
| | | | | |
| Shareholders' equity: | | | | |
| Preferred stock | | - | | - |
| Common stock | | 573 | | 570 |
| Additional paid-in capital | | 1,205,573 | | 1,196,847 |
| Retained earnings | | 320,731 | | 357,439 |
| Accumulated other comprehensive income | | 13,935 | | 11,829 |
| Total shareholders' equity | | 1,540,812 | | 1,566,685 |
| Total liabilities and shareholders' equity | $ | 2,400,764 | $ | 2,391,367 |

**50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY**

**MERCURY SYSTEMS, INC.**
**UNAUDITED CONSOLIDATED STATEMENTS OF OPERATIONS**
(In thousands, except per share data)

| | First Quarters Ended | |
| --- | --- | --- |
| | September 29, 2023 | September 30, 2022 |
| Net revenues | $ 180,991 | $ 227,579 |
| Cost of revenues[1] | 130,464 | 149,484 |
| Gross margin | 50,527 | 78,095 |
| | | |
| Operating expenses: | | |
| Selling, general and administrative[1] | 35,794 | 38,943 |
| Research and development[1] | 31,872 | 27,766 |
| Amortization of intangible assets | 12,547 | 14,574 |
| Restructuring and other charges | 9,546 | 1,508 |
| Acquisition costs and other related expenses | 969 | 2,498 |
| Total operating expenses | 90,728 | 85,289 |
| | | |
| Loss from operations | (40,201) | (7,194) |
| | | |
| Interest income | 103 | 29 |
| Interest expense | (7,863) | (4,547) |
| Other expense, net | (1,774) | (3,645) |
| | | |
| Loss before income taxes | (49,735) | (15,357) |
| Income tax benefit[2] | (13,027) | (1,022) |
| Net loss | $ (36,708) | $ (14,335) |
| | | |
| Basic net loss per share | $ (0.64) | $ (0.26) |
| | | |
| Diluted net loss earnings per share | $ (0.64) | $ (0.26) |
| | | |
| Weighted-average shares outstanding: | | |
| Basic | 57,105 | 55,931 |
| Diluted | 57,105 | 55,931 |
| | | |
| (1) Includes stock-based compensation expense, allocated as follows: | | |
| Cost of revenues | $ 816 | $ 799 |
| Selling, general and administrative | $ 1,761 | $ 4,878 |
| Research and development | $ 1,540 | $ 1,572 |

(2) For the first quarter ended September 29, 2023, the Company calculated the U.S. income tax benefit using the discrete method as though the three-month period was the annual period as this was more appropriate given the facts and circumstances. The Company determined that the application of the estimated annual effective tax rate ("AETR") method generally required by ASC 740 is impractical given that normal deviations in the projected close to break-even pre-tax net income (loss) could result in a disproportionate and unreliable effective tax rate under the AETR method.

**MERCURY SYSTEMS, INC.**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | First Quarters Ended | |
| --- | --- | --- |
| | September 29, 2023 | September 30, 2022 |
| Cash flows from operating activities: | | |
| Net loss | $ (36,708) | $ (14,335) |
| Depreciation and amortization | 22,692 | 23,701 |
| Other non-cash items, net | (3,651) | 8,814 |
| Cash settlement for termination of interest rate swap | 7,403 | 5,995 |
| Changes in operating assets and liabilities | (28,804) | (90,214) |
| | | |
| Net cash used in operating activities | (39,068) | (66,039) |
| | | |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (8,015) | (7,328) |
| Other investing activities | - | 50 |
| | | |
| Net cash used in investing activities | (8,015) | (7,278) |
| | | |
| Cash flows from financing activities: | | |
| Borrowings under credit facilities | 65,000 | 60,000 |
| Payments for retirement of common stock | - | (63) |
| | | |
| Net cash provided by financing activities | 65,000 | 59,937 |
| | | |
| Effect of exchange rate changes on cash and cash equivalents | (111) | (293) |
| | | |
| Net increase (decrease) in cash and cash equivalents | 17,806 | (13,673) |
| | | |
| Cash and cash equivalents at beginning of period | 71,563 | 65,654 |
| | | |
| Cash and cash equivalents at end of period | $ 89,369 | $ 51,981 |

**50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY**

**UNAUDITED SUPPLEMENTAL INFORMATION RECONCILIATION OF GAAP TO NON-GAAP MEASURES**
(In thousands)

Adjusted EBITDA, a non-GAAP measure for reporting financial performance, excludes the impact of certain items and, therefore, has not been calculated in accordance with GAAP. Management believes that exclusion of these items assists in providing a more complete understanding of the Company's underlying results and trends, and management uses these measures along with the corresponding GAAP financial measures to manage the Company's business, to evaluate its performance compared to prior periods and the marketplace, and to establish operational goals. The adjustments to calculate this non-GAAP financial measure, and the basis for such adjustments, are outlined below:

*Other non-operating adjustments.* The Company records other non-operating adjustments such as gains or losses on foreign currency remeasurement, investments and fixed asset sales or disposals among other adjustments. These adjustments may vary from period to period without any direct correlation to underlying operating performance.

*Interest income and expense.* The Company receives interest income on investments and incurs interest expense on loans, financing leases and other financing arrangements. These amounts may vary from period to period due to changes in cash and debt balances and interest rates driven by general market conditions or other circumstances outside of the normal course of the Company's operations.

*Income taxes.* The Company's GAAP tax expense can fluctuate materially from period to period due to tax adjustments that are not directly related to underlying operating performance or to the current period of operations.

*Depreciation.* The Company incurs depreciation expense related to capital assets purchased to support the ongoing operations of the business. These assets are recorded at cost or fair value and are depreciated using the straight-line method over the useful life of the asset. Purchases of such assets may vary significantly from period to period and without any direct correlation to underlying operating performance.

*Amortization of intangible assets.* The Company incurs amortization of intangible assets primarily as a result of acquired intangible assets such as backlog, customer relationships and completed technologies but also due to licenses, patents and other arrangements. These intangible assets are valued at the time of acquisition or upon receipt of right to use the asset, amortized over the requisite life and generally cannot be changed or influenced by management after acquisition.

*Restructuring and other charges.* The Company incurs restructuring and other charges in connection with management's decisions to undertake certain actions to realign operating expenses through workforce reductions and the closure of certain Company facilities, businesses and product lines. The Company's adjustments reflected in restructuring and other charges are typically related to acquisitions and organizational redesign programs initiated as part of discrete post-acquisition integration activities. Management believes these items are non-routine and may not be indicative of ongoing operating results.

*Impairment of long-lived assets.* The Company incurs impairment charges of long-lived assets based on events that may or may not be within the control of management. Management believes these items are outside the normal operations of the Company's business and are not indicative of ongoing operating results.

*Acquisition, financing and other third party costs.* The Company incurs transaction costs related to acquisition and potential acquisition opportunities, such as legal, accounting, and other third party advisory fees. The Company may also incur third party costs, such as legal, banking, communications, proxy solicitation, and other third party advisory fees in connection with engagements by activist investors or unsolicited acquisition offers. Although the Company may incur such third party costs and other related charges and adjustments, it is not indicative that any transaction will be consummated. Additionally, the Company incurs unused revolver and bank fees associated with maintaining its credit facility as well as non-cash financing expenses associated with obtaining its credit facility. Management believes these items are outside the normal operations of the Company's business and are not indicative of ongoing operating results.

*Fair value adjustments from purchase accounting.* As a result of applying purchase accounting rules to acquired assets and liabilities, certain fair value adjustments are recorded in the opening balance sheet of acquired companies. These adjustments are then reflected in the Company's income statements in periods subsequent to the acquisition. In addition, the impact of any changes to originally recorded contingent consideration amounts are reflected in the income statements in the period of the change. Management believes these items are outside the normal operations of the Company and are not indicative of ongoing operating results.

*Litigation and settlement income and expense.* The Company periodically receives income and incurs expenses related to pending claims and litigation and associated legal fees and potential case settlements and/or judgments. Although the Company may incur such costs and other related charges and adjustments, it is not indicative of any particular outcome until the matter is fully resolved. Management believes these items are outside the normal operations of the Company's business and are not indicative of ongoing operating results. The Company periodically receives warranty claims from customers and makes warranty claims towards its vendors and supply chain. Management believes the expenses and gains associated with these recurring warranty items are within the normal operations and operating cycle of the Company's business. Therefore, management deems no adjustments are necessary unless under extraordinary circumstances.

*COVID related expenses.* The Company incurred costs associated with the COVID pandemic. These costs relate primarily to enhanced compensation and benefits for employees as well as incremental supplies and services to support social distancing and mitigate the spread of COVID. These costs include expanded sick pay related to COVID, overtime, the Mercury Employee COVID Relief Fund, meals and other compensation-related expenses as well as ongoing testing for onsite employees. Management believes these items are outside the normal operations of the Company and are not indicative of ongoing operating results.

*Stock-based and other non-cash compensation expense.* The Company incurs expense related to stock-based compensation included in its GAAP presentation of cost of revenues, selling, general and administrative expense and research and development expense. The Company also incurs non-cash based compensation in the form of pension related expenses and matching contributions to its defined contribution plan. Although stock-based and other non-cash compensation is an expense of the Company and viewed as a form of compensation, these expenses vary in amount from period to period, and are affected by market forces that are difficult to predict and are not within the control of management, such as the market price and volatility of the Company's shares, risk-free interest rates and the expected term and forfeiture rates of the awards, as well as pension actuarial assumptions. Management believes that exclusion of these expenses allows comparisons of operating results to those of other companies, both public, private or foreign, that disclose non-GAAP financial measures that exclude stock-based compensation and other non-cash compensation.

Mercury uses adjusted EBITDA as an important indicator of the operating performance of its business. Management excludes the above-described items from its internal forecasts and models when establishing internal operating budgets, supplementing the financial results and forecasts reported to the Company's board of directors, determining a portion of bonus compensation for executive officers and other key employees based on operating performance, evaluating short-term and long-term operating trends in the Company's operations, and allocating resources to various

50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY

initiatives and operational requirements. The Company believes that adjusted EBITDA permits a comparative assessment of its operating performance, relative to its performance based on its GAAP results, while isolating the effects of charges that may vary from period to period without any correlation to underlying operating performance. The Company believes that these non-GAAP financial adjustments are useful to investors because they allow investors to evaluate the effectiveness of the methodology and information used by management in its financial and operational decision-making. The Company believes that trends in its adjusted EBITDA are valuable indicators of its operating performance.

Adjusted EBITDA is a non-GAAP financial measure and should not be considered in isolation or as a substitute for financial information provided in accordance with GAAP. This non-GAAP financial measure may not be computed in the same manner as similarly titled measures used by other companies. The Company expects to continue to incur expenses similar to the adjusted EBITDA financial adjustments described above, and investors should not infer from the Company's presentation of this non-GAAP financial measure that these costs are unusual, infrequent or non-recurring.

The following table reconciles the most directly comparable GAAP financial measure to the non-GAAP financial measure.

| | First Quarters Ended | |
| --- | --- | --- |
| | September 29, 2023 | September 30, 2022 |
| Net loss | $ (36,708) | $ (14,335) |
| Other non-operating adjustments, net | 731 | 1,797 |
| Interest expense, net | 7,760 | 4,518 |
| Income tax benefit | (13,027) | (1,022) |
| Depreciation | 10,145 | 9,127 |
| Amortization of intangible assets | 12,547 | 14,574 |
| Restructuring and other charges | 9,546 | 1,508 |
| Impairment of long-lived assets | - | - |
| Acquisition, financing and other third party costs | 1,332 | 2,864 |
| Fair value adjustments from purchase accounting | 177 | (176) |
| Litigation and settlement expense, net | 503 | 1,305 |
| COVID related expenses | - | 61 |
| Stock-based and other non-cash compensation expense | 8,951 | 10,940 |
| Adjusted EBITDA | $ 1,957 | $ 31,161 |

**50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY**

Mercury Reports First Quarter Fiscal 2024 Results, Page 13

Free cash flow, a non-GAAP measure for reporting cash flow, is defined as cash provided by operating activities less capital expenditures for property and equipment, which includes capitalized software development costs, and, therefore, has not been calculated in accordance with GAAP. Management believes free cash flow provides investors with an important perspective on cash available for investment and acquisitions after making capital investments required to support ongoing business operations and long-term value creation. The Company believes that trends in its free cash flow are valuable indicators of its operating performance and liquidity.

Free cash flow is a non-GAAP financial measure and should not be considered in isolation or as a substitute for financial information provided in accordance with GAAP. This non-GAAP financial measure may not be computed in the same manner as similarly titled measures used by other companies. The Company expects to continue to incur expenditures similar to the free cash flow financial adjustment described above, and investors should not infer from the Company's presentation of this non-GAAP financial measure that these expenditures reflect all of the Company's obligations which require cash.

The following table reconciles the most directly comparable GAAP financial measure to the non-GAAP financial measure.

|  | First Quarters Ended | |
| --- | --- | --- |
|  | September 29, 2023 | September 30, 2022 |
| Net cash used in operating activities | $ (39,068) | $ (66,039) |
| Purchases of property and equipment | (8,015) | (7,328) |
| Free cash flow | $ (47,083) | $ (73,367) |

**50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY**

**UNAUDITED SUPPLEMENTAL INFORMATION RECONCILIATION OF GAAP TO NON-GAAP MEASURES**
(In thousands, except per share data)

Adjusted income and adjusted earnings per share ("adjusted EPS") are non-GAAP measures for reporting financial performance, exclude the impact of certain items and, therefore, have not been calculated in accordance with GAAP. Management believes that exclusion of these items assists in providing a more complete understanding of the Company's underlying results and trends and allows for comparability with its peer company index and industry. These non-GAAP financial measures may not be computed in the same manner as similarly titled measures used by other companies. The Company uses these measures along with the corresponding GAAP financial measures to manage the Company's business and to evaluate its performance compared to prior periods and the marketplace. The Company defines adjusted income as income before other non-operating adjustments, amortization of intangible assets, restructuring and other charges, impairment of long-lived assets, acquisition, financing and other third party costs, fair value adjustments from purchase accounting, litigation and settlement income and expense, COVID related expenses, and stock-based and other non-cash compensation expense. The impact to income taxes includes the impact to the effective tax rate, current tax provision and deferred tax provision[1]. Adjusted EPS expresses adjusted income on a per share basis using weighted average diluted shares outstanding.

The following table reconciles the most directly comparable GAAP financial measures to the non-GAAP financial measures.

|  | First Quarters Ended | | | |
|---|---|---|---|---|
|  | September 29, 2023 | | September 30, 2022 | |
| Net loss and loss per share | $ (36,708) | $ (0.64) | $ (14,335) | $ (0.26) |
| Other non-operating adjustments, net | 731 | | 1,797 | |
| Amortization of intangible assets | 12,547 | | 14,574 | |
| Restructuring and other charges | 9,546 | | 1,508 | |
| Impairment of long-lived assets | - | | - | |
| Acquisition, financing and other third party costs | 1,332 | | 2,864 | |
| Fair value adjustments from purchase accounting | 177 | | (176) | |
| Litigation and settlement expense, net | 503 | | 1,305 | |
| COVID related expenses | - | | 61 | |
| Stock-based and other non-cash compensation expense | 8,951 | | 10,940 | |
| Impact to income taxes[1] | (10,758) | | (5,191) | |
| Adjusted (loss) income and adjusted (loss) earnings per share[2] | $ (13,679) | $ (0.24) | $ 13,347 | $ 0.24 |
|  | | | | |
| Diluted weighted-average shares outstanding | | 57,105 | | 56,347 |

(1) Impact to income taxes is calculated by recasting income before income taxes to include the items involved in determining adjusted income and recalculating the income tax provision using this adjusted income from operations before income taxes. The recalculation also adjusts for any discrete tax expense or benefit related to the items.

(2) Loss per share and adjusted loss per share is calculated using basic shares whereas earnings per share and adjusted earnings per share is calculated using diluted shares. There was a $0.01 impact to the calculation of adjusted earnings per share as a result of this for the first quarter ended September 30, 2022.

**50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY**

**UNAUDITED SUPPLEMENTAL INFORMATION RECONCILIATION OF GAAP TO NON-GAAP MEASURES**
(In thousands)

Organic revenue and acquired revenue are non-GAAP measures for reporting financial performance of the Company's business. Management believes this information provides investors with insight as to the Company's ongoing business performance. Organic revenue represents total company revenue excluding net revenue from acquired companies for the first four full quarters since the entities' acquisition date (which excludes intercompany transactions). Acquired revenue represents revenue from acquired companies for the first four full quarters since the entities' acquisition date (which excludes intercompany transactions). After the completion of four full fiscal quarters, acquired revenue is treated as organic for current and comparable historical periods.

The following table reconciles the most directly comparable GAAP financial measure to the non-GAAP financial measure.

|  | First Quarters Ended | |
|  | September 29, 2023 | September 30, 2022 |
|---|---|---|
| Organic revenue | $ 180,991 | $ 227,579 |
| Acquired revenue | - | - |
| Net revenues | $ 180,991 | $ 227,579 |

**50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY**

**MERCURY SYSTEMS, INC.**
**RECONCILIATION OF FORWARD-LOOKING GUIDANCE RANGE**
Fiscal Year Ending June 28, 2024
(In thousands)

The Company defines adjusted EBITDA as income before other non-operating adjustments, interest income and expense, income taxes, depreciation, amortization of intangible assets, restructuring and other charges, impairment of long-lived assets, acquisition, financing and other third party costs, fair value adjustments from purchase accounting, litigation and settlement income and expense, COVID related expenses, and stock-based and other non-cash compensation expense.

The following table reconciles the most directly comparable GAAP financial measures to the non-GAAP financial measures.

| | Fiscal Year Ending June 28, 2024[1] | |
| --- | --- | --- |
| | Range | |
| | Low | High |
| GAAP expectation -- Net loss (income) | $ (15,900) | $ 3,800 |
| | | |
| Adjust for: | | |
| Other non-operating adjustments, net | - | - |
| Interest expense, net | 31,600 | 31,600 |
| Income tax benefit | (7,400) | (2,200) |
| Depreciation | 42,000 | 42,000 |
| Amortization of intangible assets | 47,600 | 47,600 |
| Restructuring and other charges | 9,500 | 9,500 |
| Impairment of long-lived assets | - | - |
| Acquisition, financing and other third party costs | 3,100 | 3,100 |
| Fair value adjustments from purchase accounting | 700 | 700 |
| Litigation and settlement expense, net | 500 | 500 |
| Stock-based and other non-cash compensation expense | 48,300 | 48,300 |
| Adjusted EBITDA expectation | $ 160,000 | $ 185,000 |

(1) Rounded amounts used.

50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY

**MERCURY SYSTEMS, INC.**
**RECONCILIATION OF FORWARD-LOOKING GUIDANCE RANGE**
Fiscal Year Ending June 28, 2024
(In thousands, except per share data)

The Company defines adjusted income as income before other non-operating adjustments, amortization of intangible assets, restructuring and other charges, impairment of long-lived assets, acquisition, financing and other third party costs, fair value adjustments from purchase accounting, litigation and settlement income and expense, COVID related expenses and stock-based and other non-cash compensation expense. The impact to income taxes includes the impact to the effective tax rate, current tax provision and deferred tax provision[3]. Adjusted EPS expresses adjusted income on a per share basis using weighted average diluted shares outstanding.

The following tables reconcile the most directly comparable GAAP financial measures to the non-GAAP financial measures.

| | Fiscal Year Ending June 28, 2024[1] | | | |
| --- | --- | --- | --- | --- |
| | Range | | | |
| | Low | | High | |
| GAAP expectation -- Net (loss) income and (loss) earnings per share[2] | $ (15,900) | $ (0.28) | $ 3,800 | $ 0.07 |
| Other non-operating adjustments, net | - | | - | |
| Amortization of intangible assets | 47,600 | | 47,600 | |
| Restructuring and other charges | 9,500 | | 9,500 | |
| Impairment of long-lived assets | - | | - | |
| Acquisition, financing and other third party costs | 3,100 | | 3,100 | |
| Fair value adjustments from purchase accounting | 700 | | 700 | |
| Litigation and settlement expense, net | 500 | | 500 | |
| Stock-based and other non-cash compensation expense | 48,300 | | 48,300 | |
| Impact to income taxes[3] | (24,500) | | (24,200) | |
| Adjusted income and adjusted earnings per share expectation | $ 69,300 | $ 1.19 | $ 89,300 | $ 1.54 |
| | | | | |
| Diluted weighted-average shares outstanding expectation | | 58,000 | | 58,000 |

(1) Rounded amounts used.

(2) Loss per share is calculated using basic shares whereas earnings per share and adjusted earnings per share is calculated using diluted shares. There was a $0.01 impact to the calculation of the low-end of adjusted earnings per share forward-looking guidance as a result of this for the fiscal year ending June 28, 2024.

(3) Impact to income taxes is calculated by recasting income before income taxes to include the items involved in determining adjusted income and recalculating the income tax provision using this adjusted income from operations before income taxes. The recalculation also adjusts for any discrete tax expense or benefit related to the items.

50 Minuteman Road, Andover, Massachusetts 01810 U.S.A. | +1-(978)-256-1300 | www.mrcy.com | twitter: @MRCY



# Forward-looking safe harbor statement

This presentation contains certain forward-looking statements, as that term is defined in the Private Securities Litigation Reform Act of 1995, including those relating to the Company's focus on enhanced execution of the Company's strategic plan under a refreshed Board and leadership team . You can identify these statements by the words "may," "will," "could," "should," "would," "plans," "expects," "anticipates," "continue," "estimate," "project," "intend," "likely," "forecast," "probable," "potential," and similar expressions. These forward-looking statements involve risks and uncertainties that could cause actual results to differ materially from those projected or anticipated. Such risks and uncertainties include, but are not limited to, continued funding of defense programs, the timing and amounts of such funding, general economic and business conditions, including unforeseen weakness in the Company's markets, effects of any U.S. federal government shutdown or extended continuing resolution, effects of geopolitical unrest and regional conflicts, competition, changes in technology and methods of marketing, delays in or cost increases related to completing development, engineering and manufacturing programs, changes in customer order patterns, changes in product mix, continued success in technological advances and delivering technological innovations, changes in, or in the U.S. government's interpretation of, federal export control or procurement rules and regulations, changes in, or in the interpretation or enforcement of, environmental rules and regulations, market acceptance of the Company's products, shortages in or delays in receiving components, supply chain delays or volatility for critical components such as semiconductors, production delays or unanticipated expenses including due to quality issues or manufacturing execution issues, failure to achieve or maintain manufacturing quality certifications, such as AS9100, the impact of the COVID pandemic and supply chain disruption, inflation and labor shortages, among other things, on program execution and the resulting effect on customer satisfaction, inability to fully realize the expected benefits from acquisitions, restructurings, and execution excellence initiatives or delays in realizing such benefits, challenges in integrating acquired businesses and achieving anticipated synergies, effects of shareholder activism, increases in interest rates, changes to industrial security and cyber-security regulations and requirements and impacts from any cyber or insider threat events, changes in tax rates or tax regulations, such as the deductibility of internal research and development, changes to interest rate swaps or other cash flow hedging arrangements, changes to generally accepted accounting principles, difficulties in retaining key employees and customers, which difficulties may be impacted by the termination of the Company's announced strategic review initiative, unanticipated challenges with the transition of the Company's Chief Executive Officer and Chief Financial Officer roles, including any dispute arising with the former CEO over his resignation, unanticipated costs under fixed-price service and system integration engagements, and various other factors beyond our control. These risks and uncertainties also include such additional risk factors as are discussed in the Company's filings with the U.S. Securities and Exchange Commission, including its Annual Report on Form 10-K for the fiscal year ended June 30, 2023 and subsequent Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. The Company cautions readers not to place undue reliance upon any such forward-looking statements, which speak only as of the date made. The Company undertakes no obligation to update any forward-looking statement to reflect events or circumstances after the date on which such statement is made.

Use of Non-GAAP (Generally Accepted Accounting Principles) Financial Measures
In addition to reporting financial results in accordance with generally accepted accounting principles, or GAAP, the Company provides adjusted EBITDA, adjusted income, adjusted EPS, free cash flow, organic revenue and acquired revenue, which are non-GAAP financial measures. Adjusted EBITDA, adjusted income, and adjusted EPS exclude certain non-cash and other specified charges. The Company believes these non-GAAP financial measures are useful to help investors better understand its past financial performance and prospects for the future. However, these non-GAAP measures should not be considered in isolation or as a substitute for financial information provided in accordance with GAAP. Management believes these non-GAAP measures assist in providing a more complete understanding of the Company's underlying operational results and trends, and management uses these measures along with the corresponding GAAP financial measures to manage the Company's business, to evaluate its performance compared to prior periods and the marketplace, and to establish operational goals. A reconciliation of GAAP to non-GAAP financial results discussed in this presentation is contained in the Appendix hereto.



## Business and Results

- Deepened understanding of underlying business opportunities and challenges

- Confident in strategic positioning, business model, and outlook

- Near term, we are addressing two transitory dynamics:

  - Transitioning high development program mix to predictable production programs

  - Converting increased working capital to significant free cash flow

- Challenges resolvable, within our control, will take time

4   © Mercury Systems, Inc.

Does not contain Technical Data
/Mercury Proprietary/No Tech Data/

mercury

## Transitioning high development program mix to production

- Increased development program mix impacting near term P&L

- Margin pressure from 1000bp lower development program gross margins on average

- Cost growth impact on subset of development programs pressuring margins further

- Working capital buildup as programs progress toward completion and billing milestones

- Follow-on production contract delays tied to completion of development activities

- Development programs positive leading indicator of organic growth

5    © Mercury Systems, Inc.

Does not contain Technical Data
/Mercury Proprietary/No Tech Data/

mercury

## Working capital to significant free cash flow

- Increased unbilled receivables on large, long-standing contracts driving higher working capital

- Addressing working capital buildup with shift to hardware delivery, improved material timing

  - Hardware completion will consume operational capacity, near-term P&L pressure

  - Revenue timing shifts as we better align material timing with hardware delivery, cash milestones

- Efforts underway will improve long-term working capital posture

6     © Mercury Systems, Inc.

mercury

## Our Four Focus Areas

- Enhancing execution to deliver predictable performance

- Building a thriving organic growth engine

- Addressing our cost structure to improve margin expansion

- Driving free cash flow release and improved conversion

7    © Mercury Systems, Inc.                Does not contain Technical Data
                                            (Mercury Proprietary/No Tech Data)                    mercury





## Expectations for FY24 and Beyond

- Reiterate FY24 guidance based on current view on bookings, product delivery timing, and factory capacity allocation

- Confident in our strategic positioning, business model and ability to deliver growth with expanding margins and attractive free cash flow

- Expect variability in timing as we address transients, anticipate benefit in H2 FY24

- Actions unlock growth, continued margin expansion as we exit the year

10    © Mercury Systems, Inc.                         Does not contain Technical Data /Mercury Proprietary/No Tech Data/                    mercury

# Q1 FY24 vs. Q1 FY23

| In $ millions, except percentage and per share data | Q1 FY24[3] | Q1 FY23[3] | CHANGE |
|---|---|---|---|
| Bookings<br>Book-to-Bill | $191.5<br>1.06 | $266.9<br>1.17 | (28%) |
| Backlog<br>12-Month Backlog | $1,150.4<br>732.8 | $1,077.0<br>694.6 | 7% |
| Revenue<br>Organic Revenue Decline[1][2] | $181.0<br>(20%) | $227.6<br>(4%) | (20%) |
| Gross Margin | 27.9% | 34.3% | (6.4) bps |
| Operating Expenses<br>Selling, General & Administrative<br>Research & Development<br>Amortization/Restructuring/Acquisition | $90.7<br>35.8<br>31.9<br>23.1 | $85.3<br>38.9<br>27.8<br>18.6 | 6% |
| GAAP Net Loss | ($36.7) | ($14.3) | N.A. |
| GAAP Loss Per Share<br>Weighted Average Diluted Shares | ($0.64)<br>57.1 | ($0.26)<br>55.9 | N.A. |
| Adjusted EPS[2] | ($0.24) | $0.24 | N.A. |
| Adj. EBITDA[2]<br>% of revenue | $2.0<br>1.1% | $31.2<br>13.7% | (94%) |
| Operating Cash Flow | ($39.1) | ($66.0) | N.A. |
| Free Cash Flow[2]<br>% of Adjusted EBITDA | ($47.1)<br>N.A. | ($73.4)<br>N.A. | N.A. |

Notes
(1) Organic revenue represents total company revenue excluding net revenue from acquisitions for the first four full quarters since the entities' acquisition date (which excludes any intercompany transactions). After the completion of four fiscal quarters, acquired businesses are treated as organic for current and comparable historical periods.
(2) Non-GAAP, see reconciliation table.
(3) All references in this presentation to the first quarter of fiscal 2024 and full fiscal 2024 are to the quarter ended September 29, 2023 and the 52-week period ending June 28, 2024. All references to the first quarter of fiscal 2023 and full fiscal 2023 are to the quarter ended September 30, 2022 and the 52-week period ended June 30, 2023.
(4) For the first quarter ended September 29, 2023, the Company calculated the U.S. income tax benefit using the discrete method as though the three-month period was the annual period as this was more appropriate given the facts and circumstances. The Company determined that the application of the estimated annual effective tax rate ("AETR") method generally required by ASC 740 is impractical given that normal deviations in the projected close to break-even pre-tax net income (loss) could result in a disproportionate and unreliable effective tax rate under the AETR method.

# Balance sheet

| (In $ millions)[1] | | As of | | | |
|---|---|---|---|---|---|
| | 9/30/22 | 12/30/22 | 3/31/23 | 6/30/23 | 9/29/23 |
| **ASSETS** | | | | | |
| Cash & cash equivalents | $52.0 | $76.9 | $64.4 | $71.6 | $89.4 |
| Accounts receivable, net | 494.7 | 479.3 | 502.3 | 507.3 | 480.0 |
| Inventory, net | 287.6 | 312.0 | 342.8 | 337.2 | 363.0 |
| PP&E, net | 125.9 | 122.0 | 119.5 | 119.6 | 117.2 |
| Goodwill and intangibles, net | 1,274.9 | 1,261.5 | 1,248.7 | 1,236.1 | 1,223.6 |
| Other | 114.0 | 96.2 | 106.2 | 119.6 | 127.6 |
| **TOTAL ASSETS** | **$2,349.0** | **$2,348.0** | **$2,383.9** | **$2,391.4** | **$2,400.8** |
| **LIABILITIES AND S/E** | | | | | |
| AP and accrued expenses | $158.8 | $167.5 | $170.4 | $162.8 | $147.2 |
| Other liabilities | 139.8 | 124.8 | 141.1 | 150.4 | 136.3 |
| Debt | 511.5 | 511.5 | 511.5 | 511.5 | 576.5 |
| **Total liabilities** | **810.1** | **803.9** | **823.0** | **824.7** | **860.0** |
| | | | | | |
| **Stockholders' equity** | **1,538.9** | **1,544.1** | **1,560.9** | **1,566.7** | **1,540.8** |
| **TOTAL LIABILITIES AND S/E** | **$2,349.0** | **$2,348.0** | **$2,383.9** | **$2,391.4** | **$2,400.8** |

Notes
(1) Rounded amounts used.

# Cash flow summary

| (In $ millions)[1] | For the Fiscal Quarters Ended | | | | |
|---|---|---|---|---|---|
| | 9/30/22 | 12/30/22 | 3/31/23 | 6/30/23 | 9/29/23 |
| **Net (Loss) Income** | ($14.3) | ($10.9) | $5.2 | ($8.2) | ($36.7) |
| Depreciation and amortization | 23.7 | 27.2 | 23.9 | 22.5 | 22.7 |
| Other non-cash items, net | 8.8 | (8.2) | 2.6 | (20.2) | (3.7) |
| Cash settlement for termination of interest rate swap | 6.0 | - | - | - | 7.4 |
| **Changes in Operating Assets and Liabilities** | | | | | |
| Accounts receivable, unbilled receivables, and costs in excess of billings | (47.3) | 16.4 | (22.8) | (5.0) | 27.0 |
| Inventory | (18.4) | (21.8) | (29.8) | 6.0 | (27.6) |
| Accounts payable and accrued expenses | (17.8) | (11.0) | 17.0 | (5.0) | (13.0) |
| Other | (6.7) | 43.7 | 0.7 | 22.6 | (15.2) |
| | (90.2) | 27.3 | (34.9) | 18.6 | (28.8) |
| **Operating Cash Flow** | (66.0) | 35.4 | (3.2) | 12.6 | (39.1) |
| Capital expenditures | (7.3) | (13.2) | (9.4) | (8.8) | (8.0) |
| **Free Cash Flow[2]** | ($73.4) | $22.2 | ($12.7) | $3.8 | ($47.1) |
| *Free Cash Flow[2] / Adjusted EBITDA[2]* | *N.A.* | *62%* | *N.A.* | *17%* | *N.A.* |
| *Free Cash Flow[2] / GAAP Net (Loss) Income* | *N.A.* | *N.A.* | *N.A.* | *N.A.* | *N.A.* |

Notes
(1) Rounded amounts used.
(2) Non-GAAP, see reconciliation table.

# FY24 annual guidance

| In $ millions, except percentage and per share data | FY23[1] | FY24[2][5] | CHANGE |
|---|---|---|---|
| Revenue | $973.9 | $950.0 - $1,000.0 | (2%) - 3% |
| GAAP Net (Loss) Income | ($28.3) | ($15.9) – $3.8 | N.A. |
| GAAP (Loss) Earnings Per Share<br>Weighted-average diluted shares outstanding | ($0.50)<br>56.6 | ($0.28)  - $0.07<br>57.7 | N.A. |
| Adjusted EPS[4] | $1.00 | $1.19 - $1.54 | 19% - 54% |
| Adj. EBITDA[4]<br>% of revenue | $132.3<br>13.6% | $160.0 - $185.0<br>16.8% - 18.5% | 21% - 40% |

Notes
(1) FY23 figures are as reported in the Company's earnings release dated August 15, 2023.
(2) The guidance included herein is from the Company's earnings release dated November 7, 2023.
(3) The effective tax rate in the guidance included herein excludes discrete items.
(4) Non-GAAP, see reconciliation table.
(5) All references in this presentation to the full fiscal 2023 are to the 52-week period ended June 30, 2023, and to the full fiscal 2024 are to the 52-week period ending June 28, 2024.



## Adjusted EPS reconciliation

| (In thousands, except per share data)[2] | Q1 FY23 | Q1 FY24 | LTM Q1 FY23 | LTM Q1 FY24 | FY24[2][4] Low | FY24[2][4] High |
|---|---|---|---|---|---|---|
| (Loss) earnings per share[1] | $ (0.26) | $ (0.64) | $ 0.06 | $ (0.88) | $ (0.28) | $ 0.07 |
| | | | | | | |
| Net (loss) income | $ (14,335) | $ (36,708) | $ 4,080 | $ (50,708) | $ (15,900) | $ 3,800 |
| Other non-operating adjustments, net | 1,797 | 731 | 4,312 | (2,655) | - | - |
| Amortization of intangible assets | 14,574 | 12,547 | 61,107 | 51,525 | 47,600 | 47,600 |
| Restructuring and other charges | 1,508 | 9,546 | 16,679 | 15,019 | 9,500 | 9,500 |
| Impairment of long-lived assets | - | - | - | - | - | - |
| Acquisition, financing and other third party costs | 2,864 | 1,332 | 13,839 | 8,487 | 3,100 | 3,100 |
| Fair value adjustments from purchase accounting | (176) | 177 | (524) | 709 | 700 | 700 |
| Litigation and settlement expense (income), net | 1,305 | 503 | 2,837 | (307) | 500 | 500 |
| COVID related expenses | 61 | - | 567 | 6 | - | - |
| Stock-based and other non-cash compensation expense | 10,940 | 8,951 | 39,826 | 41,042 | 48,300 | 48,300 |
| Impact to income taxes[3] | (5,191) | (10,758) | (29,671) | (33,343) | (24,500) | (24,200) |
| Adjusted income (loss) | $ 13,347 | $ (13,679) | $ 113,052 | $ 29,775 | $ 69,300 | $ 89,300 |
| | | | | | | |
| Adjusted earnings (loss) per share[1][5] | $ 0.24 | $ (0.24) | $ 2.01 | $ 0.53 | $ 1.19 | $ 1.54 |
| | | | | | | |
| Weighted-average shares outstanding: | | | | | | |
| Basic | 55,931 | 57,105 | | | 57,700 | 57,700 |
| Diluted | 56,347 | 57,105 | | | 58,000 | 58,000 |

Notes
(1) Per share information is presented on a fully diluted basis.
(2) Rounded amounts used.
(3) Impact to income taxes is calculated by recasting income before income taxes to include the items involved in determining adjusted income and recalculating the income tax provision using this adjusted income from operations before income taxes. The recalculation also adjusts for any discrete tax expense or benefit related to the items.
(4) All references in this presentation to the first quarter of fiscal 2024 and full fiscal 2024 are to the quarter ended September 29, 2023 and the 52-week period ending June 28, 2024. All references to the first quarter of fiscal 2023 and full fiscal 2023 are to the quarter ended September 30, 2022 and the 52-week period ended June 30, 2023.
(5) Earnings per share and Adjusted earnings per share is calculated using diluted shares whereas loss per share and adjusted loss per share is calculated using basic shares. There was a $0.01 impact to the calculation of adjusted earnings per share as a result of this for the first quarter ended September 30, 2022. There was a $0.01 impact to the calculation of the low-end of adjusted earnings per share forward-looking guidance as a result of this for the fiscal year ending June 28, 2024.

## Adjusted EBITDA reconciliation

| (In thousands)[1][2] | Q1 FY23 | Q1 FY24 | LTM Q1 FY23 | LTM Q1 FY24 | FY24[1][2] Low | FY24[1][2] High |
|---|---|---|---|---|---|---|
| Net (loss) income | $ (14,335) | $ (36,708) | $ 4,080 | $ (50,708) | $ (15,900) | $ 3,800 |
| Other non-operating adjustments, net | 1,797 | 731 | 4,312 | (2,655) | - | - |
| Interest expense, net | 4,518 | 7,760 | 9,595 | 27,348 | 31,600 | 31,600 |
| Income tax (benefit) provision | (1,022) | (13,027) | 6,539 | (32,212) | (7,400) | (2,200) |
| Depreciation | 9,127 | 10,145 | 34,521 | 44,795 | 42,000 | 42,000 |
| Amortization of intangible assets | 14,574 | 12,547 | 61,107 | 51,525 | 47,600 | 47,600 |
| Restructuring and other charges | 1,508 | 9,546 | 16,679 | 15,019 | 9,500 | 9,500 |
| Impairment of long-lived assets | - | - | - | - | - | - |
| Acquisition, financing and other third party costs | 2,864 | 1,332 | 13,839 | 8,487 | 3,100 | 3,100 |
| Fair value adjustments from purchase accounting | (176) | 177 | (524) | 709 | 700 | 700 |
| Litigation and settlement expense (income), net | 1,305 | 503 | 2,837 | (307) | 500 | 500 |
| COVID related expenses | 61 | - | 567 | 6 | - | - |
| Stock-based and other non-cash compensation expense | 10,940 | 8,951 | 39,826 | 41,042 | 48,300 | 48,300 |
| Adjusted EBITDA | $ 31,161 | $ 1,957 | $ 193,378 | $ 103,049 | $ 160,000 | $ 185,000 |

Notes
1. Rounded amounts used.
2. All references in this presentation to the first quarter of fiscal 2024 and full fiscal 2024 are to the quarter ended September 29, 2023 and the 52-week period ending June 28, 2024. All references to the first quarter of fiscal 2023 and full fiscal 2023 are to the quarter ended September 30, 2022 and the 52-week period ended June 30, 2023.

## Free cash flow reconciliation

| (In thousands) | Q1 FY23 | | Q1 FY24 | | LTM Q1 FY23 | | LTM Q1 FY24 | |
|---|---|---|---|---|---|---|---|---|
| Cash (used in) provided by operating | $ | (66,039) | $ | (39,068) | $ | (82,902) | $ | 5,717 |
| Purchases of property and equipment | | (7,328) | | (8,015) | | (29,607) | | (39,483) |
| Free cash flow | $ | (73,367) | $ | (47,083) | $ | (112,509) | $ | (33,766) |

## Organic revenue reconciliation

| (In thousands) | Q1 FY23 | | Q1 FY24 | | LTM Q1 FY23 | | LTM Q1 FY24 | |
|---|---|---|---|---|---|---|---|---|
| Organic revenue[1] | $ | 227,579 | $ | 180,705 | $ | 984,719 | $ | 913,738 |
| Acquired revenue | | - | | - | | 6,044 | | 13,270 |
| Net revenues | $ | 227,579 | $ | 180,705 | $ | 990,763 | $ | 927,008 |

Notes
(1) Organic revenue represents total company revenue excluding net revenue from acquisitions for the first four full quarters since the entities' acquisition date (which excludes any intercompany transactions). After the completion of four fiscal quarters, acquired businesses are treated as organic for current and comparable historical periods.

Does not contain Technical Data
(Mercury Proprietary/No Tech Data)

mercury