UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NORTH COLLIER FIRE CONTROL AND RESCUE DISTRICT FIREFIGHTERS' PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No. 1:23-cv-13065-WGY |
| | ) ) | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'** |
| Plaintiff, | ) ) | **MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** |
| vs. | ) ) ) | |
| MERCURY SYSTEMS, INC., MARK ASLETT, MICHAEL D. RUPPERT, WILLIAM L. BALLHAUS, and DAVID E. FARNSWORTH, | ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................................1

II.   STATEMENT OF FACTS .....................................................................................3

    A.    Full Integration of Acquisitions Was Critical to Mercury ......................................3

    B.    Mercury's Reliance on Over Time Accounting Caused the Company's
Unbilled Receivables to Spike and Cash Flow to Dissipate ..................................4

    C.    The Failure to Fully Integrate the Company's Acquisitions Prevented
Mercury from Converting Its Inflated Unbilled Receivables to Cash ....................5

    D.    The Legacy Defendants and Defendant Ballhaus Were Motivated to
Falsely Inflate Mercury's Value During the Class Period ......................................5

    E.    The Replacement Defendants Understood in August and November 2023
that Mercury's FY24 Financial Guidance Was Unachievable ...............................6

    F.    Defendants' Fraud Was Revealed Through Partial Corrective Disclosures ...........7

III.  ARGUMENT .......................................................................................................8

    A.    The AC Adequately Alleges Falsity .......................................................................8

        1.    The Legacy Defendants' False Statements and Omissions ........................9

            a.    The Legacy Defendants' Full Integration Statements Were
Materially False and Misleading.........................................................9

            b.    The Legacy Defendants' Unbilled Receivables Statements
Were Materially False and Misleading ...........................................12

        2.    The Replacement Defendants' False Statements and Omissions .............13

    B.    The AC Adequately Alleges Defendants' Scienter ...............................................15

        1.    The Legacy Defendants' Reckless and/or Conscious Misconduct
Raises a Strong Inference of Scienter ......................................................16

        2.    The Replacement Defendants' Reckless and/or Conscious
Misconduct Raises a Strong Inference of Scienter ..................................19

        3.    The AC's Motive Allegations Support an Inference of Scienter for
the Legacy Defendants and Defendant Ballhaus ....................................20

IV.   CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008)..................................................................................................16, 20

*Chalverus v. Pegasystems, Inc.*,
  59 F. Supp. 2d 226 (D. Mass. 1999) ...................................................................................20

*Childers v. Maloney*,
  247 F. Supp. 2d 32 (D. Mass. 2003) ................................................................................8, 12

*Chun v. Fluor Corp.*,
  2021 WL 1788626
  (N.D. Tex. May 5, 2021)......................................................................................................10

*City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
  683 F. Supp. 3d 120 (D. Mass. 2023) ................................................................................9, 11

*Collier v. ModusLink Glob. Sols., Inc.*,
  9 F. Supp. 3d 61 (D. Mass. 2014) .......................................................................................18

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
  22 F.4th 1 (1st Cir. 2021)................................................................................................ *passim*

*Crowell v. Ionics, Inc.*,
  343 F. Supp. 2d 1 (D. Mass. 2004) ........................................................................18, 19, 20

*Galestan v. OneMain Hldgs., Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)..................................................................................10

*In re Allaire Corp. Sec. Litig.*,
  224 F. Supp. 2d 319 (D. Mass. 2002) ..................................................................9, 11, 12, 19

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002)................................................................................................8, 15

*In re Peritus Software Servs., Inc. Sec. Litig.*,
  52 F. Supp. 2d 211 (D. Mass. 1999) ..............................................................................10, 11

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .............................................................................................14

*In re Razorfish, Inc. Sec. Litig.*,
  2001 WL 1111502
  (S.D.N.Y. Sept. 21, 2001)....................................................................................................10

**Page**

*In re Sepracor, Inc. Sec. Litig.*,
    308 F. Supp. 2d 20 (D. Mass. 2004) ................................................................13, 14

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
    604 F. Supp. 2d 332 (D. Mass. 2009) ...............................................................10, 11

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)................................................................................8, 20

*Local No. 8 IBEW Retirement Plan & Trust v. Vertex Pharmaceuticals, Inc.*,
    838 F.3d 76 (1st Cir. 2016).......................................................................................17

*Metzler Asset Management GmbH v. Kingsley*,
    928 F.3d 151 (1st Cir. 2019).....................................................................................17

*Miss. Pub. Emps. Ret. Sys. v. Bos. Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008).........................................................................................8

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
    2018 WL 844420
    (N.D. Ill. Feb. 12, 2018)............................................................................................10

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229
    (D.N.J. July 27, 2018)................................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................................15, 16, 17, 20

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b).....................................................................................................................1
    §78t(a) .................................................................................................................1, 20
    §78u-4(b)(1)(B)........................................................................................................8

Federal Rules of Civil Procedure
    Rule 12(b)(6)............................................................................................................8
    Rule 15(a)...............................................................................................................20

Lead Plaintiff Carpenters Pension Trust Fund for Northern California and plaintiffs University of Puerto Rico Retirement System and North Collier Fire Control and Rescue District Firefighters' Pension Plan ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Amended Complaint (the "AC," cited as "¶_") (ECF No. 57).[1]

## I.    PRELIMINARY STATEMENT

This case is centered on fraudulent statements made by two sets of Defendants – the Legacy Defendants (*i.e.*, Mercury's CEO and CFO when the Class Period began), and the Replacement Defendants (*i.e.*, the current CEO and CFO, who replaced the Legacy Defendants by July 2023).

First, the Legacy Defendants falsely told investors that Mercury had fully integrated the businesses acquired by the Company as part of its M&A Strategy. Full integration – "a core part of [Mercury's] strategy" – was key to enabling the contracts Mercury had acquired to contribute to its future revenue and profit. As the Replacement Defendants admitted in August 2023, however, there had been a "***lack of full integration of key functional areas***" since 2020. This meant that the Legacy Defendants' statements about full integration during the Class Period were false, and that investors were never told that Mercury's failure to fully integrate acquisitions had caused execution problems in numerous acquired contracts, which decimated Mercury's profit. Indeed, unbeknownst to investors during the Class Period, Mercury was incurring significant costs in attempting to achieve performance obligations for acquired contracts that Mercury was unable to meet because of the execution problems caused by the Legacy Defendants' failure to fully integrate acquisitions. These undisclosed costs caused a significant reduction to Mercury's profit during the Class Period.

---

[1] The AC alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all purchasers of Mercury Systems, Inc. ("Mercury" or the "Company") common stock between February 3, 2021 and February 6, 2024, inclusive (the "Class Period"). ¶1. "Defendants" are Mercury, the "Legacy Defendants" – *i.e.*, Mark Aslett ("Aslett") and Michael D. Ruppert ("Ruppert"), and the "Replacement Defendants" – *i.e.*, William L. Ballhaus ("Ballhaus") and David E. Farnsworth ("Farnsworth"). *Id.* "Def. Mem." refers to Defendants' memorandum of law, dated May 24, 2024. ECF No. 65. "Def. Ex. _" refers to the exhibits in Defendants' Appendix of Public Records, dated May 24, 2024. ECF No. 66. "Pl. Ex. _" refers to the exhibits in the Declaration of Theodore M. Hess-Mahan, submitted herewith. Unless otherwise noted, all emphasis in quotations is added and all internal citations and quotation marks are omitted. All capitalized terms in the Preliminary Statement are later defined in this memorandum of law.

Second, the Replacement Defendants also deceived investors by falsely stating that the Legacy Defendants' full integration failure would not negatively impact Mercury's FY24 profit. Before making these false statements in August and November 2023, the Replacement Defendants "personally led reviews of our challenged programs" in July 2023, meaning they did an exhaustive review of the remaining costs that were needed to achieve the unmet performance obligations in the impacted contracts. At the end of the Class Period, in February 2024, the Replacement Defendants admitted that the execution challenges caused by the full integration failure imperiled 20% of Mercury's revenue, causing Mercury's 2Q24 "profit" to be ***negative*** ($21.3 million).

Notwithstanding Plaintiffs' well-pled allegations, which carefully particularize between the Legacy and Replacement Defendants, Defendants have moved to dismiss on falsity and scienter grounds only. In seeking dismissal, Defendants mischaracterize the AC by arguing that the Legacy Defendants never stated that Mercury had fully integrated all of its acquisitions – an easily disproved assertion. *See* ¶181. Likewise, Defendants ignore this Court's decisions and those of other courts in wrongly arguing that statements about integration can never be actionable. They frequently are, and especially should be here because the Legacy Defendants said the integration was ***full***, *i.e.*, complete. That definitive, historical description is why these statements are not puffery, forward-looking, or opinions. Equally unavailing are Defendants' challenges to the Replacement Defendants' statements that wholly ignore the weekly "granular" contract reviews they began making in July 2023.

Likewise, Defendants avoid addressing the AC's allegations holistically, and instead engage in a categorical attack that avoids the AC's most compelling allegations – Defendants' own statements that they were intimately involved in Mercury's full integration efforts and the related accounting for the acquired contracts. Buttressed by the significant personal benefits that the Legacy Defendants and defendant Ballhaus stood to gain, the AC more than adequately alleges scienter.

- 2 -

Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Full Integration of Acquisitions Was Critical to Mercury

Beginning in fiscal year 2014,[2] defendant Aslett initiated Mercury's strategy of primarily growing the Company's revenue and profit through acquisition (the "M&A Strategy").  ¶45. Between 2014 and November 2021, Mercury spent over $1.3 billion to acquire 15 companies. ¶¶46-49.  The Company's reported revenue and adjusted EBITDA benefitted, growing from $234.8 million and $44.4 million, respectively, in fiscal year 2015 (Pl. Ex. 1 at 3) to $924 million and $201.9 million, respectively, by the start of the Class Period in fiscal year 2021.  Def. Ex. 6 at 3.

The key ingredient to the success of the M&A Strategy was ***full*** integration of the acquired businesses.  ¶50.  Because full integration of the acquired companies was necessary for Mercury to grow its revenue and profit, and to convert that revenue to cash, the Legacy Defendants repeatedly told investors during the Class Period that full integration was "core to [Mercury's] strategy" (¶¶51-56) and touted Mercury's "integration playbook" and "consistent acquisition integration."  ¶¶57-58. On a February 1, 2022 earnings call, defendant Aslett stated, without qualification, that:

> ***Since fiscal '14, we've completed 15 acquisitions, deploying $1.4 billion of capital***. We've dramatically scaled and transformed the business as a result, growing total company revenue 4.4x from FY '14 through FY '21.  ***We fully integrated these acquired entities*** by moving them to common collaboration and engineering platforms as well as common ERP, HRIS and CRM systems while also consolidating facilities.
>
> ***We've also unified these 15 businesses under the Mercury brand with the combined sales force and single go-to-market strategy as well as the shared culture and values***. As a result of these actions, over the past 7 fiscal years, we've extracted substantial cost and revenue synergies, leading to adjusted EBITDA growing more than 9x or twice the growth in revenues.  ***This has resulted in substantial value creation for shareholders***.

Def. Ex. 17 at 6; ¶181.  In other words, the Legacy Defendants ***did*** state that "Mercury had *fully and successfully integrated every* acquisition made before and during the Class Period" (Def. Mem. at 7 (emphasis in original)), and directly linked that supposed achievement to Mercury's valuation.

---

[2]  Since fiscal year 2019, Mercury's fiscal year has run from July 1 to June 30 of the following year.  Def. Ex. 8 at 3.

**B.      Mercury's Reliance on Over Time Accounting Caused the Company's Unbilled Receivables to Spike and Cash Flow to Dissipate**

The M&A Strategy, designed to achieve $1 billion in revenue, had caused Mercury to acquire numerous contracts that used "over time" accounting for revenue recognition, a change from the Company's traditional use of "point-in-time" accounting. ¶¶60-65. Point-in-time accounting allows for revenue recognition when the customer receives the good or service and is invoiced. ¶67. Over time accounting allows for revenue (and profit) recognition as Mercury makes incremental progress on a performance obligation, but before the customer is invoiced for the completed obligation. ¶65. Mercury classified this revenue – *i.e.*, the revenue recognized in excess of the amounts invoiced to the Company's customers – as "unbilled receivables." ¶66. Due to the M&A Strategy, Mercury's share of contracts using over time accounting increased from 27% in fiscal year 2020 to 56% by fiscal year 2023. ¶¶68-71. Mercury's revenue and profit increased in tandem. ¶81.

Mercury's shift to primarily having over time contracts led to a substantial increase in the Company's level of unbilled receivables and working capital, which caused Mercury's cash flow to decrease. ¶¶72-74. Unbilled receivables must subsequently be converted to cash – *i.e.*, performance obligations must be met – to substantiate the prior revenue recognition and provide cash. ¶¶75-76.

Failing to meet performance obligations, and thereby to convert unbilled receivables to cash, has devastating financial consequences. ¶¶77-80. By not meeting the performance obligations on over time contracts, Mercury must expend additional costs to achieve those obligations, even though the majority of the revenue and profit has already been recognized. ¶77. These costs ultimately reduced Mercury's future profit. ¶78. Execution problems on over time contracts also precludes the achievement of subsequent performance obligations, imperiling future revenue and profit. ¶¶79-80. Thus, while an increased reliance on over time accounting got Mercury closer to its $1 billion revenue goal during the Class Period, Mercury needed to convert its receivables to cash. ¶81.

### C.   The Failure to Fully Integrate the Company's Acquisitions Prevented Mercury from Converting Its Inflated Unbilled Receivables to Cash

In the Replacement Defendants' first earnings call with investors, on August 15, 2023, defendant Ballhaus admitted that: (1) since 2020, there was a "lack of full integration of key functional areas"; (2) this failure caused execution problems in 20 acquired over time contracts, meaning Mercury was unable to achieve the performance obligations on those contracts during the Class Period; and (3) the execution problems prevented Mercury from converting its unbilled receivables to cash and necessitated the expenditure of significant costs to address the execution problems, which reduced Mercury's FY23 adjusted EBITDA by $56 million.[3]  ¶¶83-85, 137-40.

During the Class Period, the Legacy Defendants were intimately familiar with Mercury's acquired contracts, and the related impacts those contracts were having on the Company's unbilled receivables and costs.  ¶¶86-101.  Indeed, on August 3, 2021, the Legacy Defendants announced the 1MPACT initiative, which was supposed to further enhance Mercury's ability to generate profit from acquisitions through full integration.  ¶88.  In commenting on the 1MPACT initiative during the Class Period, defendant Aslett stated that he was personally and routinely reviewing the status of Mercury's full integration efforts and the progress of Mercury's contracts.  ¶¶87-95.  Likewise, defendant Ruppert regularly told investors during the Class Period that he was taking a "proactive approach" to managing unbilled receivables, which he deemed to be a "***key account***[]" for Mercury, and he was actively involved in trying to convert Mercury's unbilled receivables to cash.  ¶¶96-100.

### D.   The Legacy Defendants and Defendant Ballhaus Were Motivated to Falsely Inflate Mercury's Value During the Class Period

Defendant Ballhaus was a director on the Company's board (the "Board") when he replaced defendant Aslett as CEO in June 2023. ¶34.  Defendant Ballhaus was appointed to the Board in June

---

[3]  The $56 million hit to Mercury's adjusted EBITDA in fiscal year 2023 ("FY23") was significantly material.  *See* Def. Ex. 11 at 3 ("Fiscal 2023 adjusted EBITDA for the total Company was $132.3 million, compared to $200.5 million for fiscal 2022.  Excluding approximately $56.3 million of impact from approximately 20 challenged programs in fiscal 2023, adjusted EBITDA would have been $188.6 million.").

2022 after JANA Partners LLC ("JANA") increased its ownership stake in Mercury and pushed for a sale of Mercury in December 2021. ¶¶115-16, 124. Defendant Aslett was also on the Board. ¶32.

Defendant Ballhaus pressured the Legacy Defendants to sell Mercury. ¶¶119-20. To motivate them, in February 2022, the Board implemented an accelerated equity retention plan. ¶¶121-22. Then, in September 2022, the Board announced that defendant Aslett would receive a $33 million severance if he left Mercury during a sales process and the Company was subsequently sold, and only a $2.4 million severance otherwise. ¶125. Similarly, defendant Ruppert would receive a $10.5 million severance under the same conditions, and only a $991,000 severance otherwise. ¶126.

The Board initiated a public sales process on January 31, 2023. ¶127. On June 23, 2023, the Board announced the conclusion of the sales process after receiving just two "no premium" offers, even though Mercury's financial advisors had executed confidentiality agreements with 20 third parties. ¶¶129-31. Also on June 23, the Board announced that defendant Aslett was resigning as CEO and as a director on the Board, and that defendant Ballhaus would serve as interim CEO. ¶¶132-33. The Board made clear that defendant Aslett's departure had been the Board's decision by stating that the Company needed to move forward with "refreshed leadership." ¶130. In his "resignation" letter to the Board, defendant Aslett claimed he was entitled to $33 million in severance even though Mercury was not sold, an assertion the Board rejected. ¶¶134-35.

### E. The Replacement Defendants Understood in August and November 2023 that Mercury's FY24 Financial Guidance Was Unachievable

In addressing Mercury's investors as CEO for the first time on August 15, 2023, and admitting that Mercury had failed to fully integrate acquisitions since 2020, defendant Ballhaus told investors that he reached that conclusion after he and defendant Farnsworth (who became CFO on July 17, 2023 (¶35)) had "visited [Mercury's] major centers of operation and *personally led reviews of our challenged programs* . . . [to identify] *any roadblocks or risk to completion*." ¶¶141-42.

Further, defendant Ballhaus admitted that before the August 15 earnings call, the Replacement Defendants had "reviewed our major unbilled receivables balances by program" – "we literally have reviewed every development program" and "we took a very stringent eye on the activities to complete those programs *and our estimates to complete*." ¶¶143-44. Defendant Ballhaus emphasized on the August 15 call that "we're getting very granular when it comes to things like burning down our unbilled in our inventory and literally looking at it program by program *every week*." ¶145. Thus, when the Replacement Defendants falsely stated that Mercury's guidance for fiscal year 2024 ("FY24") would increase from FY23 to upwards of $1 billion in revenue and a minimum of $160 million in adjusted EBITDA, investors and analysts believed them. ¶¶146-49.

### F.   Defendants' Fraud Was Revealed Through Partial Corrective Disclosures

The AC alleges four corrective disclosures, none of which Defendants challenge. ¶¶213-23. First, on August 2, 2022, the Legacy Defendants announced that Mercury's inability to achieve performance obligations was negatively impacting the Company's unbilled receivables, but incorrectly blamed supposed supply chain issues, not execution problems, causing a 13.3% decline in Mercury's stock price. ¶¶103-06. Second, on May 2, 2023, Mercury announced that execution problems on 12 over time contracts[4] had prevented the conversion of unbilled receivables to cash, necessitating increased costs to meet performance obligations, causing a 17.3% decline and negative analyst reaction. ¶¶107-14. Third, on November 7, 2023, defendant Ballhaus admitted that unbilled receivables already accounted for 80% of the value of the 20 impacted contracts (¶150), and that the costs incurred in trying to achieve the unmet performance obligations led Mercury to earn only $2 million in adjusted EBITDA in 1Q24 (¶¶151-52), causing a 12.6% decline. ¶153.

Nonetheless, on November 7, 2023, the Replacement Defendants reaffirmed Mercury's FY24 guidance of a minimum of $160 million in adjusted EBITDA, allaying analyst concern. ¶¶154-56.

---

[4] On August 15, 2023, defendant Ballhaus clarified that the number of Mercury acquired over time contracts with execution problems was actually 20, not 12 as defendant Aslett stated on May 2, 2023. ¶140.

Fourth, on February 6, 2024, the Replacement Defendants admitted that the execution problems caused by the Legacy Defendants' failure to fully integrate acquisitions had imperiled 20% of Mercury's revenue, rendering the FY24 adjusted EBITDA guidance unachievable and causing *negative* adjusted EBITDA of ($21.3 million) for 2Q24. ¶¶157-61. Analysts were dismayed, stating that "integration proved to be an issue, leading to limited program oversight and eventual cost creep," and noting that the market had assumed that the execution problems had already been resolved by 2Q24. ¶¶162-64. In response, Mercury's stock declined another 11.4%. ¶¶165-67.

## III.    ARGUMENT

In deciding a Fed. R. Civ. P. 12(b)(6) motion, a court must accept all well-pled facts as true and draw all reasonable inferences in favor of the plaintiff. *See Miss. Pub. Emps. Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008). "In ruling on a motion to dismiss, a court must not decide questions of fact." *Childers v. Maloney*, 247 F. Supp. 2d 32, 35 (D. Mass. 2003) (Young, J.). When "'determining the adequacy of a complaint[, a court] cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.'" *Bos. Sci.*, 523 F.3d at 90. "[C]ourts will allow private securities fraud complaints to advance past the pleadings stage when some questions remained unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 32 (1st Cir. 2002).

### A.    The AC Adequately Alleges Falsity

At the pleading stage, Plaintiffs need only "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). "The falsity of a statement and the materiality of a false statement are questions for the jury." *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 209 (1st Cir. 2005). Thus, a court should "review the complaint only to determine that it pleads the existence of [misleading] statements and presents a plausible jury question of materiality." *Cabletron*, 311 F.3d at 34.

- 8 -

### 1.    The Legacy Defendants' False Statements and Omissions

#### a.    The Legacy Defendants' Full Integration Statements Were Materially False and Misleading

During the Class Period, the Legacy Defendants falsely told investors that Mercury had "fully integrated" its acquisitions. ¶¶173, 181, 183. Defendant Ballhaus admitted this was untrue – there was a "lack of full integration of key functional areas" since 2020 that caused execution challenges in 20 acquired over time contracts. ¶¶137-40, 174. These challenges prevented Mercury from converting unbilled receivables to cash and required substantial additional costs to achieve the unmet performance obligations, which decimated Mercury's profit. *Id.* Such "objectively false" statements are plainly actionable. *See City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, 133-34 (D. Mass. 2023) (Young, J.).

For the same reasons, the Legacy Defendants' repeated statements that Mercury had achieved "full integration" (¶¶181, 187, 189), was then-currently "acquiring and then fully integrating businesses," or was then-currently "fully integrating the businesses we acquire" (¶¶169, 171, 175, 177, 179), were materially false and misleading. Each of these statements were based on the false premise that businesses had been fully integrated upon acquisition, when, in reality, they had not. ¶¶43-167, 170. These statements are actionable. *See In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 334 (D. Mass. 2002) (Young, J.) (statement that a product "seamlessly integrate[s]" with other products was actionable because instead of seamless integration the product was causing problems).

Faced with these obviously false statements, the Legacy Defendants ignore or distort the AC's allegations in advancing a hodgepodge of easily rejected arguments. *See* Def. Mem. at 7-12.

First, ignoring ¶181, the Legacy Defendants wrongly argue that they never represented that Mercury had "*fully and successfully integrated every* acquisition made before and during the Class Period." Def. Mem. at 7 (emphasis in original). As discussed above, the Legacy Defendants

unequivocally stated precisely that. *See supra* 3; Def. Ex. 17 at 6; ¶181; ECF No. 65-1 at 4.[5]

Second, the Legacy Defendants incorrectly argue that their statements of current or historical fact are puffery. Def. Mem. at 8-9. The Legacy Defendants overlook the significance of their choice to repeatedly describe Mercury's acquisitions as having been "fully" integrated or achieved "full" integration. By using definitive terms like full and fully, the Legacy Defendants conclusively stated that Mercury's acquisitions had been completely integrated, not that they aspired to achieve some undefined amount of integration. ¶¶50-59, 83. Thus, the AC's allegations are not "counterfactual," as the Legacy Defendants incorrectly argue (Def. Mem. at 9 n.6), but instead show that "definite" present or historical information that was "important to a potential investor" was misrepresented. *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009) ("only purely forward-looking statements are entitled to protection as 'mere puffery.'").

Moreover, repeatedly telling investors that Mercury had achieved full integration is neither general nor optimistic. The Legacy Defendants ignore that courts routinely sustain integration statements much less definitive than the full integration statements challenged in the AC. *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *2-*3 (N.D. Ill. Feb. 12, 2018) ("TreeHouse was reliant on acquisitions to maintain growth levels and . . . [r]epresentations about the integration efforts and performance would therefore have a profound significance to investors"); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *13-*15 (D.N.J. July 27, 2018) (sustaining all "statements regarding the present success of the integration"); *Galestan v. OneMain Hldgs., Inc.*, 348 F. Supp. 3d 282, 292, 303 (S.D.N.Y. 2018) (finding that statements like "[t]he integration . . . remains on track" are not puffery).[6]

---

[5] Thus, these statements are unlike the one at issue in *Chun v. Fluor Corp.*, 2021 WL 1788626, at *7 (N.D. Tex. May 5, 2021) (Def. Mem. at 7), where the plaintiff was criticized for inaccurately summarizing the defendant's statement.

[6] None of the Legacy Defendants' cases address "full" integration statements. *See, e.g.*, *In re Razorfish, Inc. Sec. Litig.*, 2001 WL 1111502, at *1 (S.D.N.Y. Sept. 21, 2001) (dismissing statements about the relative progress of integration efforts, and not addressing "full integration" statements); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d

Third, the Legacy Defendants wrongly invoke the safe harbor by arguing that generic risk warnings in Mercury's Forms 10-K about the impact future integration failures "could have" meant investors knew about Mercury's then-current failures and the related consequences during the Class Period. Def. Mem. at 3-4, 9-10. Not only do the cited risk warnings say nothing of the sort, risk warnings can only immunize forward-looking statements. *Smith & Wesson*, 604 F. Supp. 2d at 341 (the safe harbor does not cover "statements of present or historical fact"). Here, the Legacy Defendants ***fail to argue*** that any full integration statement is forward-looking (Def. Mem. at 9-10), which is fatal. One analyst's comment about future "uncertainty regarding ability to continue to integrate acquisitions" (Def. Mem. at 4 (citing Def. Exs. 29-40)) does not prove that investors knew about Mercury's then-current integration failures and the related consequences.[7] At bottom, the Legacy Defendants' reliance on risk warnings of the possible harm caused by failing to integrate future acquisitions, when their full integration failure was actively harming Mercury, amounts to an improper truth-on-the-market defense. *See Pegasystems*, 683 F. Supp. 3d at 136-37.

Finally, the Legacy Defendants misread the AC and this Court's opinion in *Allaire* in arguing fraud by hindsight. Def. Mem. at 10-12. Plaintiffs' reliance on Defendant Ballhaus' admission in August 2023 is not fraud by hindsight because "[t]he proof offered to prove that the product did not work at time 'x' is that, at time 'x+1,' the product did not work." *Allaire*, 224 F. Supp. 2d at 330. Defendant Ballhaus was clear – there was a "lack of full integration of key functional areas" since 2020 (¶137), meaning acquisitions had not been fully integrated at all times from then to August 2023. Moreover, although the Legacy Defendants criticize the lack of former employee allegations in the AC (Def. Mem. at 1-2, 6, 16), the most reliable and credible source Plaintiffs can cite for the

---

211, 229 (D. Mass. 1999) (Young, J.) (finding the "success" part of a statement, not the integration part, to be puffery).
[7] By contrast, the four over 10% declines in Mercury's stock alleged in the AC as corrective disclosures (¶¶213-23), which Defendants do not challenge, and analysts' negative responses to learning about the Legacy Defendants' full integration failure and the consequences thereof (¶¶105-06, 109-14, 162-64), demonstrate that investors were unaware of these issues until the occurrence of the corrective disclosures alleged in the AC.

status of Mercury's full integration efforts during the Class Period is the current CEO, who previously was a director on the Board and was intimately involved in Mercury's failed sales effort. *See supra* 5-6. Even less compelling is the Legacy Defendants' speculation that full integration is relative and meant different things to the Legacy and Replacement Defendants. Def. Mem. at 11. These quintessential fact arguments cannot be resolved on this motion, and are unsupported by the AC's allegations or the dozens of exhibits Defendants submit. *See Childers*, 247 F. Supp. 2d at 35.

### b. The Legacy Defendants' Unbilled Receivables Statements Were Materially False and Misleading

In May 2023, during defendant Aslett's final earnings call as CEO, and as Mercury's sales process was nearing failure, he falsely told investors that Mercury's "challenges" with unbilled receivables were "not unique to Mercury." ¶191. But as defendant Ballhaus admits, the execution problems were the direct result of the Legacy Defendants' failure to fully integrate Mercury's acquisitions since 2020, meaning that these challenges were, in fact, unique to Mercury. ¶192; *see also* ¶137 (defendant Ballhaus: "20 programs that are experiencing ***unique*** and outsized costs . . . .").

Contrary to defendant Aslett's arguments (Def. Mem. at 12-15), this statement is: (1) a present statement of fact, not forward-looking, and therefore is not subject to the safe harbor; (2) a definitive statement that lacks any of the hallmarks of opinion statements (*see Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 7 (1st Cir. 2021)); and (3) false because of defendant Ballhaus' admission in August 2023. *See Allaire*, 224 F. Supp. 2d at 330.

For the same reasons, defendant Aslett's arguments (Def. Mem. at 12-15) also fail for his statements on May 2023 that Mercury would "quickly relieve unbilled receivables through . . . cash collections" and "[t]he cost growth we're experiencing is associated with certain new technology developments that are nearing completion," because the execution problems were caused by the Legacy Defendants' failure to fully integrate acquisitions, resulting in cash shortfalls and increased

costs required to meet the performance obligations for the impacted contracts.  ¶¶191-94.

Separately, in August 2022, defendant Ruppert misleadingly told investors that "we think [unbilled receivables] will unwind in fiscal '23, more in the second half and then heading into fiscal '24."  ¶185.  This failed to disclose that the execution problems caused by the Legacy Defendants' full integration failure were preventing the conversion of unbilled receivables to cash.  ¶186.

In making this statement, defendant Ruppert fully understood the interplay between the execution problems on over time contracts caused by the failure to fully integrate acquisitions and Mercury's resulting inability to convert unbilled receivables to cash.  *See infra* 16-17.  In addition, defendant Ruppert only cites generic risk warnings that do not mention unbilled receivables or execution costs as risks (Def. Ex. 7 at 9), meaning the safe harbor cannot apply.  *See In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 34 (D. Mass. 2004) (risk warnings must be "sufficiently tailored" to preclude liability).  Likewise, defendant Ruppert overlooks that whether this is a statement of opinion is irrelevant (Def. Mem. at 14) – the statement inaccurately represented that unbilled receivables would begin to "unwind" in FY23.  *See Carbonite*, 22 F.4th at 7-8 (finding an opinion actionable where, as here, it "was based on the type of reasonable inquiry that an investor in context would expect to have been made").  Finally, defendant Ruppert argues that the AC pleads no "specifics" about the relationship between the failure to fully integrate and Mercury's inability to convert unbilled receivables to cash (Def. Mem. at 14-15), which ignores the AC's many detailed allegations connecting these issues.  *See supra* 4-5.  Indeed, the Legacy Defendants avoid addressing the implications of their purposeful shift to over time accounting (*see id.*), other than to confirm that the AC's allegations are accurate.  *See* Def. Mem. at 6 n.5.  That does not warrant dismissal.

### 2.    The Replacement Defendants' False Statements and Omissions

Despite admitting on August 15, 2023, that the Legacy Defendants' failure to fully integrate Mercury's acquisitions had decimated the Company's FY23 profit, defendant Ballhaus misled

investors by falsely reassuring them that "our reported margin in [FY23] does not at all reflect a structural shift in our margin profile" and that the execution problems on the 20 acquired over time contracts were "temporary[.]"   ¶195.   These statements were materially misleading because Mercury's significant decrease in margin in FY23 did, in fact, represent a structural shift in Mercury's margin for FY24 (¶196), and Mercury could not quickly or cheaply fix the execution problems.  ¶197.  Defendant Ballhaus was apprised of these facts as a result of his admitted personal review of Mercury's challenged programs before August 15, with a particular focus on "any roadblocks or risk to completion," which occurred on a weekly basis.  *See supra* 6-7.  These reviews meant that defendant Ballhaus fully understood that the execution problems had impaired 20% of Mercury's revenue and would substantially reduce Mercury's profit in FY24, as the Replacement Defendants admitted just six months later at the end of the Class Period.  *See id.* at 8.

Defendant Ballhaus argues that these statements are protected by the safe harbor (Def. Mem. at 12-13), ignoring that these are statements of present fact or, at best, mixed statements, neither of which can be protected.  *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (statement that a company's "fundamentals haven't changed" was not forward-looking).  Even if these statements were forward-looking, the cited risk warnings concerned Mercury's "ability to successfully integrate acquisitions" (Def. Mem. at 13), ***not*** the length of time or cost associated with fixing execution problems on over time contracts – *i.e.*, the information Plaintiffs allege that defendant Ballhaus misrepresented.  ¶¶196-97.  *See Sepracor*, 308 F. Supp. 2d at 34.  Nor are these statements of opinion.  Def. Mem. at 14.  Even if so, they are actionable.  *Carbonite*, 22 F.4th at 7-8.

In addition, on August 15, 2023, defendant Farnsworth falsely stated that Mercury's FY24 gross margins "will approximate those of [FY23]," and on the 1Q24 earnings call on November 7, 2023, the Replacement Defendants falsely reaffirmed Mercury's FY24 guidance of a minimum of

$160 million in adjusted EBITDA, despite Mercury earning only $2 million in adjusted EBITDA in 1Q24. ¶¶198-201. These misstatements led analysts to wrongly believe that the negative impact to Mercury's profit caused by the execution problems on the 20 acquired over time contracts would be limited to FY23, and would not cause further deterioration in FY24. ¶¶148-49, 155-56. By August and November 2023, the Replacement Defendants necessarily understood through their weekly, granular reviews that fixing the execution problems on the impacted acquired over time contracts, which constituted ~20% of Mercury's revenue, would decimate Mercury's profit. *See supra* 6-8.

The Replacement Defendants again cite no narrowly tailored risk warnings about Mercury's inability to achieve the FY24 guidance due to the costs associated with meeting the performance obligations on acquired over time contracts, and instead point to risk warnings about generic future integration problems. Def. Mem. at 13. But the Replacement Defendants' statements are false because they failed to disclose the full extent of the present costs necessitated by the Legacy Defendants' full integration failure (¶¶199, 201), meaning the cited risk warnings are irrelevant. Indeed, the Replacement Defendants do not address their weekly, granular reviews of the problem contracts that began before August 2023 (Def. Mem. at 13 n.7), which apprised them of these costs.[8]

### B.    The AC Adequately Alleges Defendants' Scienter

The First Circuit has held that scienter may be established by circumstantial evidence and has "rejected any rigid formula for pleading scienter, preferring to rely on a fact-specific approach that proceeds case by case." *Cabletron*, 311 F.3d at 38. A court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The inference need only be "at least as likely as any plausible opposing inference." *Id.* at 328. In other words, "where there are equally strong inferences for and

---

[8] Defendants concede that the statements in ¶198 and ¶200 are not opinions. Def. Mem. at 14; ECF No. 65-1 at 12-13.

against scienter, *Tellabs* now awards the draw to the plaintiff." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008).  The AC adequately alleges scienter for each Defendant.[9]

### 1.    The Legacy Defendants' Reckless and/or Conscious Misconduct Raises a Strong Inference of Scienter

As Mercury's former CEO and the architect of the M&A Strategy, defendant Aslett consistently told investors that Mercury had "fully integrated businesses, which is a core part of our strategy." ¶¶52-55.  As he purposely shifted Mercury towards over time contracts, defendant Aslett understood that the Company's ballooning unbilled receivables would wreak financial havoc if they could not be converted to cash.  ¶¶62-82.  As defendant Ballhaus admits, there had been a "lack of full integration of key functional areas" since 2020 (¶137), meaning defendant Aslett was apprised of the true status of Mercury's full integration efforts during the Class Period.  ¶83.

In addition, through his 1MPACT initiative, defendant Aslett was intimately familiar with the integration status of Mercury's acquired contracts, including "the individual line items[,]" which would necessarily include the extra costs needed to meet performance obligations.  ¶¶86-95, 101.  Moreover, defendant Aslett was Mercury's CEO during the Company's failed sales process in the first half of 2023, which meant that he was apprised of the status of Mercury's efforts to fully integrate acquisitions and the negative consequences thereof as part of the due diligence and negotiations that led to the two "no premium" bids.  ¶¶131, 208-09, 215.  And defendant Aslett resigned just one month after disclosing that Mercury faced execution problems in 12 acquired over time contracts, in response to the Board's public call for "refreshed leadership."  ¶¶130, 210.

With respect to defendant Ruppert, who was Mercury's CFO until February 2023, he too implemented the M&A Strategy and necessarily understood that shifting to over time accounting

---

[9]  Defendants wrongly argue that the AC "lumps" Defendants together in alleging scienter.  Def. Mem. at 17 n.8.  In fact, the AC carefully particularizes the allegations that pertain to the Legacy Defendants (¶¶50-140, 202-12) and the Replacement Defendants.  ¶¶141-65, 200-07, 209, 211-12.  It is Defendants – not Plaintiffs – who improperly group themselves together in contesting scienter.  *See* Def. Mem. at 17-20.

caused unbilled receivables to balloon and cash to dissipate. ¶¶62-82. In fact, during the Class Period, defendant Ruppert acknowledged he was keeping a close eye on Mercury's unbilled receivables, which he termed a "***key account***[.]" ¶¶96-97. According to defendant Ruppert, he was personally taking "a disciplined and proactive approach to unlocking unbilled receivables" during the Class Period. ¶¶98-101. Defendant Ruppert also paid close attention to Mercury's full integration efforts, saying it was "***core*** to our strategy." ¶56. Thus, defendant Ballhaus' admission applies equally to defendant Ruppert. ¶83. Defendant Ruppert also resigned from Mercury, leaving shortly before the Legacy Defendants' full integration failure was revealed. ¶¶210, 217.

The Legacy Defendants contravene *Tellabs* by making four categorical arguments that fail to address the AC's allegations holistically. Def. Mem. at 17-20. First, the Legacy Defendants argue the AC alleges scienter merely through the Legacy Defendants' status as senior executives. *Id.* at 17. But the AC alleges specific facts showing that the Legacy Defendants understood that: (1) Mercury's acquisitions were not fully integrated during the Class Period; (2) fully integrating its acquisitions was a core part of Mercury's strategy; and (3) a failure to fully integrate would decimate Mercury's profit (*see supra* 3-5), all of which stemmed from their choice to shift Mercury to over time accounting. *See Carbonite*, 22 F.4th at 9 (rejecting status argument and finding scienter adequately alleged where, as here, defendants repeatedly acknowledged the importance of a topic, meaning there was "a very strong inference that the senior executives who gave those apparently prepared remarks touting the [topic] would have paid at least some attention to the [topic]'s status").[10]

Second, the Legacy Defendants concede that full integration of acquisitions was a core operation of Mercury (Def. Mem. at 17-18), but argue that the AC fails to allege "*specific*

---

[10] *Carbonite* distinguishes *Local No. 8 IBEW Retirement Plan & Trust v. Vertex Pharmaceuticals, Inc.*, 838 F.3d 76 (1st Cir. 2016) and *Metzler Asset Management GmbH v. Kingsley*, 928 F.3d 151 (1st Cir. 2019), the main cases relied upon by the Legacy Defendants (Def. Mem. at 18-19), for the same reason they are inapplicable here – both *Vertex* and *Kingsley* lacked allegations that "invited further investigation," whereas, as here and in *Carbonite*, "it does not require a PhD to know" that failing to fully integrate acquisitions would harm Mercury's future profit. 22 F.4th at 9-10.

*information* regarding that topic that defendants may have seen[.]" *Id.* (emphasis in original). This misapprehends the core operations doctrine. *See Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (Young, J.) ("Facts critical to a business's core operations . . . generally are so apparent that their knowledge may be attributed to the company and its officers."). *Crowell* applies here with full force, especially because the AC does, in fact, particularize the link between the Legacy Defendants' full integration failure and their understanding of how execution problems on over time contracts would prevent converting unbilled receivables to cash and eviscerate Mercury's profit.

Third, the Legacy Defendants argue that their resignations do not establish scienter because their resignations must be connected to "the alleged fraud[.]" Def. Mem. at 19. Again, this argument rests upon a misreading of the AC, which does link defendant Aslett's resignation to Mercury's first public acknowledgment of execution problems on over time contracts, the failure of Mercury's sale process, and the Board's belief that the Company needed "refreshed leadership." *See supra* 6; ¶130. Likewise, defendant Ruppert's resignation came shortly before the Company had to admit to the aforementioned execution problems. *Id.* Thus, the Legacy Defendants' resignations support an inference of scienter. *See Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014) (resignations of senior officers contributed to overall inference of scienter).

Finally, the Legacy Defendants argue that Plaintiffs' reliance on defendant Ballhaus' August 2023 admission cannot support scienter because it amounts to "fraud by hindsight." Def. Mem. at 19. As explained above, relying on this admission is not fraud by hindsight. *See supra* 11-12.

The Legacy Defendants' proffered non-culpable inference – speculating that "Mercury's integration efforts could be fairly characterized as 'full' at the time they made their challenged statements" – proves the infirmity of their scienter argument. Def. Mem. at 20. Here, as in *Carbonite*, the challenged statements "were framed in the present tense . . . [and] were not

projections of hoped-for future performance.  Rather, they were flat-out claims about the product as it then stood."  22 F.4th at 11.  That leaves only two plausible inferences – that the Legacy Defendants "either inquired about [whether Mercury's acquisitions were fully integrated] before deciding to promote it to investors or were reckless in failing to do so."  *Id.* at 10.

### 2. The Replacement Defendants' Reckless and/or Conscious Misconduct Raises a Strong Inference of Scienter

Before making the statements challenged in the AC, the Replacement Defendants admit that they both "personally led reviews of our challenged programs . . . [to identify] any roadblocks or risk to completion."  ¶¶141-42.  The Replacement Defendants both repeatedly assured investors on August 15, 2023, that they left no stone unturned in determining that execution problems would not continue to erode Mercury's profit in FY24.  *See supra* 6-7.  By February 2024, however, the Replacement Defendants reported two consecutive quarters of abysmal adjusted EBITDA performance and, as a result, revoked Mercury's FY24 adjusted EBITDA guidance.  *Id.* at 8.

In contesting scienter, the Replacement Defendants repeat two of the arguments advanced by the Legacy Defendants – status and core operations – both of which fail.  Def. Mem. at 17-19.  First, the AC does not merely rely on the Replacement Defendants' status for scienter, but on their many statements to investors that they had thoroughly vetted the costs of fixing the 20 acquired over time contracts that were experiencing execution problems, and that those costs would not continue hurting Mercury's profit in FY24.  ¶¶141-49.  Because the challenged programs account for 20% of Mercury's revenue (¶159), it "is simply inconceivable that [the Replacement Defendants] could not have known" that these costs would negatively impact Mercury's FY24 profit.  *Allaire*, 224 F. Supp. 2d at 329; *see also Carbonite*, 22 F.4th at 9-11.  Second, as of August 2023, there was nothing more critical to Mercury than fixing the execution problems without incurring additional costs, meaning core operations supports scienter.  *See Crowell*, 343 F. Supp. 2d at 19.

The Replacement Defendants' proffered non-culpable inference is that "their descriptions of Mercury's performance and outlook were accurate based on information known at the time." Def. Mem. at 20. But nothing in the record remotely supports this inference – the costs to fix the execution problems in August 2023 that the Replacement Defendants admit they closely reviewed are the same costs that led to the FY24 adjusted EBITDA guidance being revoked in February 2024. The only plausible inference is that the Replacement Defendants lied about these costs.

### 3. The AC's Motive Allegations Support an Inference of Scienter for the Legacy Defendants and Defendant Ballhaus

Plaintiffs need not plead motive, such as insider sales (Def. Mem. at 18), to adequately allege scienter. *See Tellabs*, 551 U.S. at 325 ("absence of a motive allegation is not fatal" to alleging a strong inference of scienter). Nonetheless, Plaintiffs plead powerful motives for the Legacy Defendants and defendant Ballhaus that extend beyond mere "generalized financial motivations" (Def. Mem. at 18-19), *i.e.*, tens of millions of dollars in additional severance that would be due if Mercury was sold (for the Legacy Defendants), achieving the "milestone" of $1 billion in revenue (also for the Legacy Defendants), and achieving JANA's goal of selling Mercury (for defendant Ballhaus). *See supra* 5-7. As this Court has recognized, such motives support scienter. *See Crowell*, 343 F. Supp. 2d at 15-16, 19 (finding that "pecuniary motives," such as trying "to consummate a major sale or acquisition," supports a finding of scienter); *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 236 (D. Mass. 1999) (Young, J.) (finding that a desire to achieve a "fiftieth consecutive profitable quarter" and access "compensation packages" contributed to scienter).

## IV. CONCLUSION

Plaintiffs respectfully request that the motion be denied against all Defendants.[11]

---

[11] Because Plaintiffs have adequately alleged primary Exchange Act violations, the Court should also deny Defendants' motion to dismiss the AC's Section 20(a) claims. *See Stone & Webster*, 414 F.3d at 206. In addition, should the Court grant any part of Defendants' motion, Plaintiffs respectfully request leave to amend the AC. *See ACA*, 512 F.3d at 55-56 (under Rule 15(a), "court[s] should freely give leave [to amend] when justice so requires").

DATED:  June 24, 2024

Respectfully submitted,

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN (*pro hac vice*)
MICHAEL G. CAPECI (*pro hac vice*)


                    /s/ *Michael G. Capeci*
   MICHAEL G. CAPECI

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mcapeci@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SPENCER A. BURKHOLZ (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com

GRANT & EISENHOFER P.A.
DANIEL L. BERGER (*pro hac vice*)
CAITLIN M. MOYNA (*pro hac vice*)
CECILIA E. STEIN (*pro hac vice*)
TIMOTHY CLARK B. DAUZ (*pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  646/722-8500
646/722-8501 (fax)
dberger@gelaw.com
cmoyna@gelaw.com
cstein@gelaw.com
tdauz@gelaw.com

*Co-Lead Counsel for Plaintiffs*

- 21 -

HUTCHINGS, BARSAMIAN, MANDELCORN
  & ZEYTOONIAN, LLP
THEODORE M. HESS-MAHAN, BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA  02481
Telephone:  781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

*Local Counsel for Plaintiffs*

WEINBERG, ROGER & ROSENFELD, P.C.
EZEKIEL D. CARDER
1375 55th Street
Emeryville, CA 94608
Telephone:  510/337-1001
510/337-1023 (fax)
ecarder@unioncounsel.net

*Additional Counsel for Lead Plaintiff*

ABRAHAM, FRUCHTER & TWERSKY, LLP
MITCHELL M.Z. TWERSKY
JACK G. FRUCHTER
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone:  212/279-5050
212/279-3655 (fax)
mtwersky@aftlaw.com
jfruchter@aftlaw.com

*Additional Counsel for UPRRS*