# EXHIBIT 2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NORTH COLLIER FIRE CONTROL AND RESCUE DISTRICT FIREFIGHTERS' PENSION PLAN, Individually and On Behalf of All Other Persons Similarly Situated, | ) ) ) ) | Civil Action No. 1:23-cv-13065-WGY |
| | ) | **[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Plaintiff, | ) ) | |
| vs. | ) ) | CLASS ACTION |
| MERCURY SYSTEMS, INC., MARK ASLETT, MICHAEL D. RUPPERT, WILLIAM L. BALLHAUS, and DAVID E. FARNSWORTH, | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

Style Definition: TOC 1: Indent: Left: 0", First line: 0"

Style Definition: TOC 4: Indent: Left: 0", First line: 0"

Style Definition: TOC 5: Indent: Left: 0.5", First line: 0"

**TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION ...........................................................................................11

JURISDICTION AND VENUE ......................................................................................13

PARTIES ........................................................................................................................13

SUBSTANTIVE ALLEGATIONS ................................................................................17

    The Company and Its Business...............................................................................17

    Mercury's Revenue and Profit Dramatically Increase Before the Class Period Through the Legacy Defendants' M&A Strategy.................................................18

    The Legacy Defendants Intentionally Shifted Mercury's Business Model to Primarily Using Over Time Accounting, Which Caused Mercury to Experience Unprecedented Levels of Increased Unbilled Receivables and Related Reduced Cash Flow ...............................................................................................................21

    Defendants Falsely and Repeatedly Assured Investors that Mercury Had Fully Integrated Its Acquisitions Before and During the Class Period ......................................34

        The Legacy Defendants' M&A Strategy Caused Mercury to Experience Unprecedented Levels of Unbilled Receivables and Working Capital, and Related Reduced Cash Flow ...............................................................................21

    The Legacy Defendants Knew, or Recklessly Disregarded, that Mercury Failed to Fully Integrate the Company's Acquisitions During the Class Period and that This Failure Had Negatively Impacted the Company's Financial Performance ......................40

    The Legacy Defendants Were Motivated to Falsely Inflate Mercury's Value During the Class Period .........................................................................................49

    The Replacement Defendants Admit that the Legacy Defendant Ballhaus Admits that Defendants Failed to Fully Integrate Mercury's Acquisitions and that This Failure Negatively Impacted Mercury's Value.................................................52

    Nonetheless, the Replacement Defendants Ballhaus and Farnsworth Made Their Own Materially False and Misleading Statements and Omissions After Blaming the Legacy Defendants...............................................................................5454

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD ...................................................................62

Field Code Changed

Field Code Changed

Field Code Changed

Formatted: Indent: Left: 0.5"

Field Code Changed

Field Code Changed

Formatted: Indent: Left: 0.5"

Field Code Changed

Formatted: Indent: Left: 0.5"

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

**Page**

The False and Misleading Statements and Omissions Made by the Legacy Defendants Regarding Full Integration...............................................................62

The False and Misleading Statements and Omissions Made by Defendant Aslett Regarding Unbilled Receivables.............................................................68

The False and Misleading Misstatements and Omissions Made By the Replacementby Defendants Ballhaus and Farnsworth ...............................................70

ADDITIONAL SCIENTER ALLEGATIONS...........................................................73

LOSS CAUSATION/ECONOMIC LOSS ................................................................76

CLASS ACTION ALLEGATIONS ........................................................................79

NO SAFE HARBOR .............................................................................................81

APPLICATION OF PRESUMPTION OF RELIANCE:  THE *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS ........................................................................................81

COUNT I ...............................................................................................................83

Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (*Against All Defendants*) ...............................................83

COUNT II ..............................................................................................................84

Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (*Against Defendants Ballhaus and Farnsworth*).............................84

COUNT III.............................................................................................................85

Violations of §20(a) of the Exchange Act (*Against the Individual Defendants*)...............85

PRAYER FOR RELIEF .........................................................................................86

JURY DEMAND ....................................................................................................8686

**Formatted:** TOC Page, Space After:  12 pt

**Formatted:** Indent: Left:  0.5"

**Field Code Changed**

**Formatted:** Indent: Left:  0.5"

**Field Code Changed**

**Field Code Changed**

**Field Code Changed**

**Field Code Changed**

**Field Code Changed**

**Field Code Changed**

**Field Code Changed**

**Field Code Changed**

**Field Code Changed**

**Field Code Changed**

**Field Code Changed**

Lead Plaintiff Carpenters Pension Trust Fund for Northern California ("Lead Plaintiff"), and named plaintiffs University of Puerto Rico Retirement System ("UPRRS") and North Collier Fire Control and Rescue District Firefighters' Pension Plan ("North Collier," and together with Lead Plaintiff and UPRRS, "Plaintiffs"), allege the following based upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things: (i) a review and analysis of Securities and Exchange Commission ("SEC") filings made by Mercury Systems, Inc. ("Mercury" or the "Company"); (ii) a review and analysis of other publicly available information, including press releases issued by Mercury, transcripts of Mercury conference calls, analyst reports on Mercury, and news articles concerning Mercury; ~~and~~ (iii) a review and analysis of other available materials relating to Mercury; and (iv) interviews with a former Mercury employee. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of all purchasers of Mercury common stock between February 3, 2021 and February 6, 2024, inclusive (the "Class Period"), seeking remedies pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). "Defendants" are Mercury; ~~its~~the Company's former President, Chief Executive Officer ("CEO") and a director on the Board of Directors (the "Board"), Mark Aslett ("Aslett"); ~~its~~and Mercury's former Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer, Michael D. Ruppert ("Ruppert~~," and with Mercury and Aslett, the "Legacy Defendants"); its~~"). Also named as defendants are Mercury's current President, CEO, and Chairman of the Board, William L. Ballhaus ("Ballhaus~~");~~"), and ~~its~~Mercury's current Executive Vice President, CFO, and Treasurer, David E. Farnsworth ("Farnsworth~~," and with Mercury and~~").

References to defendants Ballhaus, the "Replacement Defendants"). and/or Farnsworth herein are intended to also include Mercury.

2.    Mercury is a technology company that serves the defense and aerospace industries by developing and selling productsgoods or services pursuant to, among others, defense contractors contracts with the Company's customers.  Before and during the Class Period, rather than achieve growth solely by expanding Mercury's existing business, the Legacy Defendants (*i.e.,* the CEO and CFO in place at the start of the Class Period) grew Mercury by acquiring other15 businesses.  In particular, Mercury paid premiums to buy businesses in order to increase the Company's revenue and profit by simply adding the revenue and profit of the acquired companies. The Legacy for approximately $1.4 billion – *i.e.,* the M&A Strategy.  Defendants' goal with these acquisitionsfor the M&A Strategy was for Mercury to achieve the "milestone" of $1 billion in annual revenue – a substantialnearly 5 times increase over Mercury's pre-Class PeriodM&A Strategy revenue.[1]

3.    During the Class Period, the Legacy Defendants engaged in a scheme to defraud Mercury's investors by falsely stating that the Company The M&A Strategy had fully integrated the businesses it had acquired, and concealing the negative impact to Mercury's financial performance caused by their failure to fully integrate.  Indeed, in every earnings call held from the beginning of the Class Period until May 2023, the Legacy Defendants falsely told Mercury's investors that there had been full integration of the Company's acquisitions.

4.    Full integration was critical to Mercury's growth strategy because it was necessary for the programs and a significant drawback, however, as it caused Mercury to shift to primarily having contracts that the Company had acquired to be able to contribute to Mercury's revenue and

---

[1]    Capitalized terms used in this section are defined later in this complaint.

**Formatted:** Font color: Auto

profit. As such, the Legacy Defendants convinced analysts and investors that Mercury had, in fact, been fully integrating the many businesses the Company had acquired for over $1 billion combined, and that doing so was crucial to Mercury's success.

5. The Legacy Defendants' statements were false. This was confirmed by the Replacement Defendants (*i.e.*, the CEO and CFO who replaced the Legacy Defendants by July 2023), who admitted that Mercury failed to fully integrate its acquisitions during the Class Period.

6. Nonetheless, after making this admission, the Replacement Defendants then engaged in their own scheme to defraud Mercury's investors by concealing the extent of the negative impact to Mercury's financial performance caused by the Legacy Defendants' full integration failure.

7. Defendant Ballhaus, Mercury's current CEO, was no stranger to the Legacy Defendants – he was previously a director on the Board before he replaced defendant Aslett. Defendant Ballhaus was named to the Board in June 2022 at the request of JANA, an activist investor. By late 2021, defendant Ballhaus and JANA started to pressure the Legacy Defendants to sell the Company. The Legacy Defendants stood to collectively receive tens of millions of dollars in additional compensation if Mercury was sold, thereby incentivizing the Legacy Defendants to engage in, and conceal, the Company's failure to fully integrate and the effects thereof.

8. By June 2023, it became clear that Mercury could not be sold at the valuation desired by defendant Ballhaus and the Legacy Defendants. In response, Mercury announced that defendant Aslett was being replaced as CEO because the Company needed "refreshed leadership." Even though the Company was not sold, defendant Aslett informed the Board that he was entitled to his eight figure change in control payment. The Board denied this demand. Earlier in 2023,

- 3 -

~~defendant Ruppert resigned as CFO. In July 2023, the Company announced that defendant Farnsworth had been hired to replace him. Thus, by July 2023, the Replacement Defendants were running Mercury.~~

~~9.    The execution problems caused by the Legacy Defendants' failure to fully integrate caused twenty Mercury programs to experience execution challenges. These execution challenges posed a significant threat to Mercury's financial performance because Mercury had been acquiring businesses that used "~~<u>utilized "</u>over time" <u>accounting for</u> revenue recognition ~~accounting, which differed from the Company's historical reliance on "point in time" revenue recognition accounting.~~

~~10.    During the Class Period, more than half of Mercury's revenue came from "over time contracts," which refers to an~~ <u>.  This</u> accounting method ~~whereby~~<u>allows</u> Mercury ~~could~~<u>to</u> recognize revenue ~~before~~ <u>and profit as incremental progress is made towards</u> a performance obligation on a contract ~~was complete. By contrast, "point in time" accounting only allows revenue recognition when~~<u>, but before the customer is provided with the good or service and sent an invoice.  Once</u> the performance obligation is ~~met. Over time revenue recognition~~<u>complete, Mercury then invoices the customer, which</u> allows Mercury to ~~book~~<u>convert the previously recognized revenue and profit to cash, thereby providing the Company with liquidity.  In other words, over time revenue recognition allows Mercury to record</u> future payments from customers as revenue<u> and profit</u>, even though the related performance obligation ~~remains~~<u>is</u> incomplete and ~~the customer~~<u>Mercury</u> has ~~not been billed.~~

~~3.    The revenue that is recognized on over time contracts, but that has not been invoiced to the customer, is known~~ <u>received no cash payment from its customer.  Mercury</u>

categorized this type of revenue as "unbilled receivables." Defendants reported on Mercury's acquired businesses unbilled receivables to investors during each fiscal quarter of the Class Period.

4. By contrast, before FY20, Mercury primarily had substantial contracts that used "point-in-time" accounting. This accounting method only allows revenue to be recognized if a performance obligation is met, and the customer has received the good or service and has been invoiced.

11. Through the M&A Strategy, Defendants intentionally shifted Mercury's business by the start of the Class Period to primarily consist of contracts that utilized over time contracts, which accounting. This caused Mercury's unbilled receivables to balloon during the Class Period.

12.5. When unbilled receivables linger on a company's balance sheet, cash flow is negatively impacted because the Specifically, Mercury had $119.346 million in unbilled receivables are not converting to cash. It was critical that Mercury was able to complete the performance obligations associated with the contracts that the Company had acquired so that Mercury could collect the cash that had already been recognized on these contracts as revenue and profit at the start of the Class Period in February 2021, and $376.722 million in unbilled receivables by May 2023, the last earnings report made by defendant Aslett before his "resignation" from the Company in June 2023 – an increase of approximately 316% in less than three years.

6. The execution challenges that resulted from the Legacy Defendants' failure to fully integrate Mercury's acquisitions prevented the Company from converting its unbilled receivables to cash. These execution challenges Mercury's ballooning unbilled receivables were significantly harming the Company's financial performance during the Class Period. Specifically, Defendants' failure to fully integrate key functional areas of certain acquired businesses prevented Mercury from completing the performance obligations on twenty acquired contracts that comprised

approximately 20% of Mercury's revenue. Thus, Mercury could not convert its unbilled receivables to cash, which caused Mercury's operating cash flow to evaporate during the Class Period – dropping from $23.939 million in February 2021 at the start of the Class Period (for 2Q21), to negative ($66.039 million) by November 2022 (for 1Q23).

13.7. The execution challenges on Mercury's contracts caused by the failure to fully integrate also forced Mercury to incur substantial additional costs to do the work necessary to achieve the unmet performance obligations and convert the associated unbilled receivables to cash. These costs caused a direct and significant negative financial impact to Mercury because they had to be incurred in the current period with no offsetting revenue or profit since the corresponding revenue and profit had already been recognized. Here, because the execution challenges plagued over time contracts acquired by Mercury that totaled approximately 20% of Mercury's revenue, these additional costs substantially reduced Mercury's revenue and profit during the Class Period.

8. InsteadThus, it was critical during the Class Period that Mercury was able to complete the performance obligations associated with the Company's acquired contracts so that Mercury could collect the cash that had already been recognized on those contracts as revenue and profit. That is why Defendants repeatedly and falsely told investors during the Class Period that Mercury had achieved "full integration" of the businesses acquired pursuant to the M&A Strategy, or had "fully integrated" these acquisitions," or was then-currently "fully integrating the businesses we acquire" – Defendants needed investors to believe that Mercury would have no difficulty converting the Company's massive increase in unbilled receivables to cash.

9. Defendants' integration statements were false when made. Plaintiffs allege numerous facts demonstrating that Defendants knew, or recklessly disregarded, during the Class Period that Mercury failed to fully integrate the businesses the Company had acquired, meaning

performance obligations on acquired contracts were not being met, the Company could not convert unbilled receivables to cash, and Mercury's revenue and profit was negatively impacted.

10. First, in the initial earnings call with investors held by defendants Ballhaus and Farnsworth after they replaced Defendants in July 2023, defendant Ballhaus admitted that there had been a "lack of full integration of key functional areas" in the businesses the Company had acquired and that this failure had begun by FY20 – *i.e.*, **before** the start of the Class Period. Defendant Ballhaus directly linked Defendants' failure to fully integrate acquisitions to: (i) the execution problems that prevented performance obligations from being met; (ii) the Company's inability to convert unbilled receivables to cash during the Class Period; and (iii) the associated negative impact to Mercury's financial results. Defendant Ballhaus based his admission on his personal exhaustive, granular review of Mercury's challenged programs in July 2023 – *i.e.*, the same internal data and documents that were available to Defendants during the Class Period.

11. Second, FE1 – a former Director of Engineering at Mercury from February 2023 to June 2024 – has provided detailed information demonstrating that Mercury's failure to fully integrate acquisitions was obvious to Defendants during the Class Period. FE1 was hired, in part, to remediate the effects of the long-standing full integration failures at Mercury, meaning that those failures already existed and had not been remediated when FE1 was hired. Among other things, FE1 confirmed that Mercury had not fully integrated the engineering platforms and CRM, HRIS, ERP, or financial systems for certain acquired businesses – *i.e.*, "key functional areas" of integration – and that Mercury had integration playbooks that set out specific criteria that needed to be met for full integration to be achieved, which did not happen. According to FE1, Mercury's acquisition of POC – for $310 million in December 2020, Mercury's largest acquisition ever –

never achieved full integration at any point between the time that Mercury acquired POC and FE1's departure from Mercury in June 2024.

12.    Third, during each fiscal quarterly results presentation in 2021 and 2022, Defendants detailed Mercury's performance in both unbilled receivables and operating cash flow. These results showed that as unbilled receivables were increasing at an unprecedented rate, Mercury's operating cash flow had evaporated and turned negative.  By virtue of Defendants' intentional shift to primarily having contracts that utilize over time accounting, if unbilled receivables are not converting to cash that means performance obligations on contracts are not being met.  Mercury's 2021 and 2022 unbilled receivables and operating cash flow results put Defendants on notice of this fact.  Indeed, Defendants acknowledged in February 2022 that Mercury's significant increase in unbilled receivables came from POC – an acquisition that FE1 confirmed was not fully integrated.  Thus, Defendants knew, or recklessly disregarded, that Mercury's failure to fully integrate acquisitions was causing execution problems.

13.    Fourth, Defendants made numerous and repeated statements during the Class Period demonstrating that they were paying careful and close attention to the status of Mercury's integration efforts and the Company's inability to convert unbilled receivables to cash.  In addition, Defendants repeatedly stated during the Class Period that achieving full integration was "core" to the success of Mercury's M&A Strategy, and they frequently spoke with analysts and investors about the critical importance of converting Mercury's ballooning levels of unbilled receivables to cash.  Indeed, it is well known that "roll-up" acquisition strategies like the M&A Strategy will fail if full integration of all acquisitions is not quickly achieved.

14.    Finally, Defendants possessed powerful motives to make false and misleading statements and omissions regarding Mercury during the Class Period.  Defendant Ballhaus,

- 8 -

Mercury's current CEO, was no stranger to Mercury when he replaced defendant Aslett in June 2023 – he had been a director on the Board since June 2022. Defendant Ballhaus was named to the Board at the request of JANA, an activist investor. By late 2021, defendant Ballhaus and JANA began to pressure Defendants to sell the Company. Defendants stood to collectively receive tens of millions of dollars in additional compensation if Mercury was sold, thereby incentivizing Defendants to engage in, and conceal, the Company's failure to fully integrate and the negative consequences thereof. By June 2023, it became clear that Mercury could not be sold. In response, Mercury announced that defendant Aslett was being replaced as CEO because the Company needed "refreshed leadership." Even though the Company was not sold, defendant Aslett asserted to the Board that he was entitled to his eight-figure change-in-control payment. The Board denied this demand. Earlier in 2023, defendant Ruppert resigned as CFO, shortly before Defendants' failure to fully integrate Mercury's acquisitions became known to investors. These motives and resignations provide compelling additional evidence of scienter.

15. In addition to Defendants' fraudulent scheme described above and herein, beginning in August 2023 defendants Ballhaus and Farnsworth engaged in their own scheme to defraud Mercury's investors by fraudulently concealing the extent of the negative impact to Mercury's financial performance caused by Defendants' full integration failure.

14.16. Specifically, instead of disclosing the consequences of Mercury's full integration failure to investors upon taking control of Mercury from the Legacy Defendants in July 2023, the Replacement Defendants defendants Ballhaus and Farnsworth chose to make several materially false and misleading statements and omissions in August 2023 and November 2023 in their attempt to conceal the severity of the harm caused by the Legacy Defendants' fraud.

~~15.~~17. ~~Indeed, during~~During the August 2023 earnings call, ~~the Replacement Defendants~~defendants Ballhaus and Farnsworth provided FY24 financial guidance of up to $1 billion in revenue – virtually unchanged from FY23 – and ~~up to $185~~at least $160 million in adjusted EBITDA – well above the ~$130 million in adjusted EBITDA that Mercury reported in FY23. ~~The Replacement ~~Defendants Ballhaus and Farnsworth also falsely stated that the problems ~~with~~facing Mercury's twenty challenged programs were "temporary.~~"~~." incorrectly implying that they could be quickly and cheaply remediated. Analysts and investors responded positively, as these statements indicated that ~~the Replacement Defendants knew how to quickly and cheaply resolve~~Mercury was capable of effectively and efficiently fixing the execution problems caused by ~~the Legacy ~~Defendants' full integration failure.

~~16.~~18. This too was false. In the following two earnings calls, in November 2023 and on the last day of the Class Period, in February 2024, ~~the Replacement Defendants~~defendants Ballhaus and Farnsworth were forced to admit that the severe problems caused by ~~the Legacy ~~Defendants' failure to fully integrate acquisitions had prevented the Company from easily resolving the execution problems in the twenty challenged programs. ~~The Replacement Defendants were aware of this in August 2023 because, upon taking control of Mercury, they admitted that they had conducted an exhaustive granular review of the challenged programs in July 2023 and "personally led reviews of our challenged programs[.]"~~, and instead caused Mercury's FY24 revenue and adjusted EBITDA to decline to levels substantially below the Company's performance in FY23.

19. Defendants Ballhaus and Farnsworth effectively admit that they were aware of, or recklessly disregarded, the significant costs and time needed to remediate Defendants' full integration failure. By their own statements during the August 2023 earnings call, Defendants

Ballhaus and Farnsworth repeatedly and emphatically explained that in July 2023 they had personally conducted an exhaustive granular review of the challenged programs and "personally led reviews of our challenged programs[.]"  In other words, defendants Ballhaus and Farnsworth left no doubt before speaking to investors in August 2023 that they had personally reviewed all of the relevant internal Mercury corporate documents and data needed for them to ascertain the extent of the costs and time that were required to remediate Defendants' full integration failure.

17.20.  At the end of the Class Period, the Replacement Defendants defendants Ballhaus and Farnsworth were forced to finally admit that in FY24 Mercury would report substantially below $1 billion in revenue, and nowhere near the ~$130 million in adjusted EBITDA that Mercury had in FY23, because of the Legacy Defendants' full integration failure 160 million adjusted EBITDA guidance for FY24, because the very same costs that were apparent to them in July 2023 had caused significant reductions to Mercury's FY24 revenue and adjusted EBITDA. In fact, on August 13, 2024, Mercury announced FY24 revenue of $835.3 million and FY24 adjusted EBITDA of only $9.3 million – *~95% less* than the guidance defendants Ballhaus and Farnsworth falsely issued in August and November 2023.

18.21.  Beginning in August 2022, investors began learning about the extent of Defendants' collective fraud through a series of partial corrective disclosures.

19.22.  First, on August 2, 2022, Mercury announced the Company's 4Q22 and FY22 financial results and disclosed for the first time that Mercury's inability to achieve performance obligations on certain contracts was negatively impacting the Company's unbilled receivables and cash flow, providing the first indication of possible execution problems with the programs Mercury had acquired, which led to a 13.3% decline in Mercury's common stock price.

- 11 -

20.23.  Second, on May 2, 2023, Mercury announced the Company's 3Q23 financial results and disclosed for the first time that the Company was experiencing significant margin degradation caused by execution problems in one dozen challenged Mercury programs.  These execution problems necessitated a significant reduction in Mercury's FY23 financial guidance for adjusted EBITDA, which led to a 17.3% decline in Mercury's common stock price.

21.24.  Third, on November 7, 2023, Mercury announced the Company's 1Q24 financial results and disclosed for the first time that converting the unbilled receivables tied to the twenty challenged programs to cash would require Mercury to incur significant costs to recognize the small fraction of the total remaining revenue and profit on the challenged programs.  This resulted in adjusted EBITDA of $2 million in 1Q24, a year-over-year decline of 93.4%, which led to a 12.6% decline in Mercury's common stock price.

22.25.  Fourth and finally, on February 6, 2024, Mercury announced the Company's 2Q24 financial results and disclosed for the first time that converting the unbilled receivables tied to the challenged programs to cash was so costly that it would result in Mercury's revenues declining by approximately 20% in FY24, and the Company's adjusted EBITDA to be significantly reducedbelow $160 million in FY24, which led to an 11.4% decline in Mercury's common stock price.

23.26.  As a result of Defendants' fraudulent schemes, Mercury lost *nearly two-thirds of its value* during the Class Period.  By contrast, the S&P 500 gained 29.06% (not including reinvested dividends) during that time frame.  In short, Defendants' fraud has decimated Mercury's investors, including Plaintiffs and the Class.

**JURISDICTION AND VENUE**

24.27.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§-78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §-240.10b-5).

25.28.  This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

26.29.  Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1391(b), as Mercury's principal place of business is located within this District.

27.30.  In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

**PARTIES**

28.31.  Lead Plaintiff acquired Mercury common stock during the Class Period as set forth in the certification previously filed with the Court and incorporated herein by reference, and was damaged thereby.  *See* ECF No. 13-2.

29.32.  UPRRS acquired Mercury common stock during the Class Period as set forth in the attached certification, which is  previously filed with the Court and incorporated herein by reference herein, and was damaged thereby.  ECF No. 57-1.

30.33.  North Collier is a defined benefit public pension fund based in Fort Myers, Florida that provides retirement, death, and disability benefits to firefighters.  North Collier acquired Mercury common stock during the Class Period as set forth in the attached certification, which is

previously filed with the Court and incorporated herein by reference herein, and was damaged thereby. ECF No. 57-2.

31.34. Defendant Mercury is a Massachusetts corporation that is headquartered in Andover, Massachusetts. Mercury's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MRCY." According to Mercury's Form 10-K for the fiscal year ended June 30, 2023, which was filed with the SEC on August 15, 2023 and signed by the Replacement Defendantsdefendants Ballhaus and Farnsworth (the "2023 Form 10-K"), the Company had 58,189,929 shares of common stock outstanding as of July 31, 2023.

32.35. Defendant Aslett was the Company's CEO, President, and a director on the Board from November 2007 until his resignation on June 23, 2023.

33.36. Defendant Ruppert was the Company's CFO, Executive Vice President, and Treasurer from 2018 until his resignation on February 17, 2023.

34.37. Defendant Ballhaus served as a regular director on the Board from June 23, 2022 to August 15, 2023. Defendant Ballhaus was nominated to the Board by JANA Partners LLC ("JANA"), an activist investor who acquired more than 5% of Mercury's common stock in late 2021. Following defendant Aslett's resignation, defendant Ballhaus served as the Company's interim CEO from June 24, 2023 to August 15, 2023. Since August 15, 2023, defendant Ballhaus has been the Company's permanent CEO, President, and Chairman of the Board.

35.38. Defendant Farnsworth has been the Company's CFO, Executive Vice President, and Treasurer since July 17, 2023.

36.39. The Defendants referenced above in ¶¶32 35-38 are sometimes referred to herein as the "Individual Defendants."

- 14 -

37.40.  Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about Mercury's business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

38.41.  It is appropriate to treat Defendants and defendants Ballhaus and Farnsworth as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of Defendantscurrent or former Mercury officers and directors identified in ¶¶32 35-38 above.  Each of the above officers and directors of Mercury, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and/or was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

39.42.  As officers, directors, and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, and which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and accurate information.  Defendants'The false and misleading misrepresentations and omissions made by Defendants and defendants Ballhaus and Farnsworth during the Class Period violated these specific requirements and obligations.

40.43.  The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions and/or Board membership with Mercury, the Individual Defendants each had access to the adverse undisclosed information about Mercury's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Mercury and its business materially false and misleading.

41.44.  The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class

- 16 -

Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained herein.

42.45.  Each Defendantdefendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Mercury common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme:  (i) deceived the investing public regarding Mercury's financial reporting, business, operations and management, and the intrinsic value of Mercury's common stock; and (ii) caused Plaintiffs and the Class to purchase Mercury's publicly-traded common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS
### The Company and Its Business

43.46.  Mercury describes itself as a leading technology company that serves the aerospace and defense industry.  Specifically, Mercury seeks to envision, create and deliver technological solutions that are custom built to meet the Company's customers' high-tech needs.  To that end, Mercury manufactures essential components, modules, and subsystems that the Company sells to defense prime contractors, the U.S. government, and commercial aerospace companies.

44.47.  Mercury's products and solutions are part of approximately 300 programs spread across approximately 25 different defense prime contractors and aviation companies.

**Mercury's Revenue and Profit Dramatically Increase Before the Class Period
Through ~~the Legacy~~ Defendants' M&A Strategy**

~~45.~~48.  Beginning in FY14, Mercury and defendant Aslett embarked on a business strategy of acquiring companies to grow Mercury's revenue and adjusted EBITDA instead of relying solely on organic growth from Mercury's then-existing ~~businesses~~business.  Thus, Mercury and defendant Aslett sought to achieve growth and profit through serial acquisitions (the "M&A Strategy").

~~46.~~49.  By the start of the Class Period in February 2021, Mercury had spent over $1 billion on at least 12 acquisitions combined, having acquired, among other businesses: (1) Physical Optics Corporation ("POC") in December 2020, for $310 million; (2) American Panel Corporation in September 2019, for $100 million; (3) Syntonic Microwave LLC in April 2019, for $20 million; (4) The Athena Group, Inc. in April 2019, for $20 million; and (5) GECO Avionics, LLC in January 2019., for $36.5 million

~~47.~~50.  In addition, during the Class Period, Mercury acquired: (1) Pentek Systems, Inc., on May 27, 2021, for $65 million; (2) Avalex Technologies, LLC, on November 5, 2021, for $155 million; and (3) Atlanta Micro, Inc., on November 29, 2021, for $90 million, spending an additional approximately $310 million on these three companies.

51.    Of Mercury's 15 acquisitions, the $310 million spent to acquire POC was the Company's largest ever in terms of cost, equating to approximately 22% of the amount spent by Mercury overall on the M&A Strategy.

~~48.~~52.  These acquisitions allowed Mercury to report to investors significantly increased revenue and adjusted EBITDA beyond the amount of organic revenue and profit that Mercury had experienced during this time.  When the M&A Strategy was first implemented, Mercury's reported

- 18 -

revenue was $234.8 million and adjusted EBITDA was $44.4 million.  By the start of the Class Period, Mercury's reported revenue was $796.6 million and adjusted EBITDA was $176.2 million.

49.1.   Thus, by the start of the Class Period, Mercury's M&A Strategy was crucial to the Company's value and financial performance.  Accordingly, and unsurprisingly, analysts and investors viewed the success of Mercury's M&A Strategy to be highly material.

**The Legacy Defendants Falsely and Repeatedly Assured Investors that Mercury Had Fully Integrated Its Acquisitions Before and During the Class Period**

50.   Central to Mercury's M&A Strategy was full integration of the businesses that the Company was acquiring.  According to the Legacy Defendants, full integration of acquisitions was necessary for the acquisitions to contribute to the Company's revenue and adjusted EBITDA.

51.   Because full integration was so central to the Company's success, the Legacy Defendants repeatedly and enthusiastically told investorsBefore and during the Class Period that Mercury had "fully integrated" the Company's acquisitions.

52.   In fact, in every earnings call helmed by the Legacy Defendants during the Class Period (from February 2021 until May 2023), they informed Mercury's investors that fully integrating the businesses Mercury had acquired was a core strategy of the Company.

53.   The Legacy Defendants made similar statements shortly before the beginning of the Class Period.  For example, defendant Aslett stated on May 11, 2020, that "***we do seek to rapidly and fully integrate and enculturate the acquired businesses*** . . . And so we know what we're going to do on day 1, day 30, day 90 until the business is fully integrated."[2]

54.1.   The Legacy Defendants continued to explain the importance of full integration during the Class Period.  For example, on May 11, 2021, defendant Aslett stated that Mercury's

---

[2]   Unless otherwise stated, all emphasis is added.

- 19 -

"EBITDA has actually grown faster . . . as we've acquired *and then fully integrated businesses,* which is a core part of our strategy."

55.1.    Likewise, on November 2, 2021, defendant Aslett stated that the full integration component of Mercury's M&A strategy "is working extremely well[.]"

56.1.    In addition, on March 15, 2022, defendant Ruppert stated that Mercury has "*integrated our acquisitions because that's core to our strategy.*"

57.1.    As a result of the Legacy Defendants' repeated statements that the Company had achieved full integration of Mercury's acquisitions, investors and analysts believed that this had, in fact, occurred during the Class Period.  For example, a William Blair analyst report on June 2, 2021, stated, in pertinent part, as follows:

> *Management continues to employ its very successful M&A strategy* to gain new capabilities and market expansion, through in-house deal origination, *a full integration approach that generates substantial cost/revenue synergies after acquisitions close*, targeting of multiple M&A themes, and *benefitting from a scalable business platform that allows for consistent acquisition integration (which the company has referred to as its integration playbook)*.

58.    In other words, the Legacy Defendants left no doubt that the Company had fully integrated every acquisition made by Mercury before and during the Class Period, and that doing so was critical to the Company's future financial performance.  The reference to an "integration playbook" demonstrates that Mercury had a very specific method of achieving full integration of the businesses it acquired, with concrete milestones and metrics to determine when a business was "fully integrated."  Unbeknownst to investors, Mercury was failing to fully integrate its acquired businesses by no later than FY20, which ended on July 3, 2020, meaning before the Class Period began.

59. ~~Accordingly, the Legacy Defendants' repeated statements about full integration demonstrate their knowledge, or reckless disregard, of the true status of Mercury's full integration of acquisitions during the Class Period.~~

~~**The Legacy Defendants' M&A Strategy Caused Mercury to Experience Unprecedented Levels of Unbilled Receivables and Working Capital, and Related Reduced Cash Flow**~~

~~60.~~53. ~~Before and during the Class Period, the Legacy~~. Defendants were focused on achieving <u>the milestone of</u> $1 billion in revenue for Mercury.  The Company's M&A Strategy was central to achieving ~~the Legacy~~ Defendants' $1 billion revenue goal.

~~61.~~54. On August 3, 2021, in commenting on Mercury's FY21 financial results and discussing the Company's expectations for FY22, defendant Aslett stated that "crossing the $1 billion revenue threshold is . . . *a milestone to be celebrated*[.]"

55. <u>Thus, by the start of the Class Period, Mercury's M&A Strategy was crucial to the Company's value and financial performance.  Accordingly, and unsurprisingly, analysts and investors viewed the success of Mercury's M&A Strategy to be highly material.</u>

~~**But achieving revenue growth through**~~**Defendants Intentionally Shifted Mercury's Business Model to Primarily Using Over Time Accounting, Which Caused Mercury to Experience Unprecedented Levels of Increased Unbilled Receivables and Related Reduced Cash Flow**

~~62.~~ <u>Certain of the 15 businesses that Mercury acquired pursuant to</u> the M&A Strategy had ~~a significant drawback.  Specifically, many of Mercury's acquisitions recognized revenue on their~~ contracts ~~over a period of time, called~~ <u>that used</u> "over time" accounting. ~~Mercury, in contrast, had historically used the "point-in-time" method of revenue recognition.~~

~~63.~~ ~~Before the beginning of the Class Period, approximately 25% of the revenue Mercury reported was for contracts that utilized over time~~, <u>which is an</u> accounting ~~for revenue recognition, with the majority coming from point-in-time accounting for revenue recognition.~~

64.56.  According to Mercury's Form 10-Kmethodology that allows for the fiscal year ended July 3, 2020, which was filed withincremental recognition of revenue and profit as progress is made on completing the SEC on August 18, 2020 and signed by relevant performance obligation for the Legacy Defendants (the "2020 Form 10-K"), Mercury's "[t]otal revenue recognized under long-term contracts over time was 27% [in FY20], 23% [in FY19] and 21% [in FY18] of revenue[.]"contract.

65.57.  Over time revenue recognition on contracts allows Mercury to recognize revenue as the Company proceeds towards a performance obligation on a contract, but before the customer is sent an invoice for the work that has been completed work.  Over time revenue recognition is used for long-term contracts because there is typically an extended period between the Company's recognition of revenue and its issuance of the performance of the obligation, and issuance of an invoice, to the customer.

66.58.  Before and during the Class Period, Mercury categorized the revenue recognized in excess of the amounts invoiced to the Company's customers as "unbilled receivables."

67.59.  By contrast, Mercury had primarily used the "point-in-time" method of revenue recognition on contracts allows for revenue recognition when control of the good or service transfers to the customerbefore the Class Period, which generally occurs upon completion of the performance obligation.  In is an accounting methodology that instance,allows for the customer promptly receivesrecognition of revenue and is profit when the good is shipped or the service is completed, and the client has been invoiced for the performance obligation when the.  In the three fiscal years preceding the start of the Class Period, Mercury derived approximately 75% of its revenue is recognized. from contracts that utilized point-in-time accounting.

*Formatted: Font color: Black*

*Formatted: Font color: Black*

*Formatted: Font color: Black*

68.60.  Because Mercury acquired ~~companies~~businesses before and during the Class Period that had long-term contracts that utilized over time revenue recognition ~~on long term contracts~~, the overall share of Mercury's revenue derived from long-term contracts that used over time revenue recognition increased significantly during the Class Period.  Thus, as Mercury made additional acquisitions before and during the Class Period, the Company's unbilled receivables correspondingly increased. substantially.

69.61.  According to the Company's Form 10-K for the fiscal year ended on July 2, 2021, which was filed with the SEC on August 17, 2021 and signed by ~~the Legacy~~ Defendants (the "2021 Form 10-K"), Mercury's "[t]otal revenue recognized under long-term contracts over time was 42% [in FY21] . . . of revenue[.]"

70.62.  According to the Company's Form 10-K for the fiscal year ended on July 1, 2022, which was filed with the SEC on August 16, 2022 and signed by ~~the Legacy~~ Defendants (the "2022 Form 10-K"), Mercury's "[t]otal revenue recognized under contracts over time was 55% [in FY22] . . . of revenue[.]"

71.63.  According to the 2023 Form 10-K, Mercury's "[t]otal revenue recognized under contracts over time was 56% [in FY23] . . . of revenue[.]"

64.    ~~In~~In other words, during the Class Period, Defendants had intentionally shifted Mercury's business model to primarily using over time accounting and being heavily reliant on unbilled receivables to drive revenue and profit growth.

72.65.  Indeed, in Mercury's Form 10-Q dated February 8, 2022 (the "2Q22 Form 10-Q"), which was signed by defendant Ruppert and certified by ~~the Legacy~~ Defendants pursuant to the Sarbanes-Oxley Act of 2022 ("SOX"), the Company acknowledged that "revenues associated with . . . integrated subsystems and related services has increased over the last several years *and*

**Formatted:** Font: Bold, Italic

- 23 -

*especially with the acquisition of POC on December 30, 2020. These revenues are typically recognized over time and can include milestone billing structures which drive higher unbilled balances*." In other words, Defendants acknowledged in the 2Q22 Form 10-Q that a major source of Mercury's acquired over time contracts came from the POC acquisition in December 2020, *i.e.*, from the Company's Torrance, California, location.

66.    In the accompanying investor earnings call to discuss Mercury's 2Q22 financial results, held on February 1, 2022 (the "Feb 2022 Call"), defendant Ruppert acknowledged both that the POC acquisition had pushed Mercury towards primarily having contracts that utilize over time accounting and had caused unbilled receivables to balloon, necessitating the conversion of those unbilled receivables to cash, stating, in pertinent part, that:

> As a result of this strategic shift to larger integrated subsystems *as well as the acquisition of POC a year ago, our proportion of overtime revenue to total revenue has increased to just below 50%. Our unbilled receivables balance has naturally increased as well. We expect to continue to make progress in reducing our unbilled receivables as a percentage of overtime revenue in future quarters.*

67.    Thus, at all times during the Class Period, the 2Q22 Form 10-Q demonstrates that Defendants knew, or recklessly disregarded, that intentionally shifting Mercury's business model to primarily having contracts that utilized over time accounting meant that the Company's unbilled receivables would balloon if the Company could not meet the performance obligations on its acquired contracts.

73.68. Unbilled receivables are a current asset of a company. Working capital is calculated by subtracting a company's current liabilities from its current assets. Thus, higher levels of unbilled receivables lead to concomitant higher levels of working capital.

69.    Higher levels of working capital decrease a company's cash flow. Cash flow is a measure of profitability that represents the actual amount of cash at a company's disposal.

- 24 -

74.70.  Decreased cash flow has negative financial implications for Mercury because it means that the Company's unbilled receivables are lingering on Mercury's balance sheet and not turning into actual cash payments from customers.  ~~Thus, decreased cash flow suggests that Mercury was unable to meet the performance obligations that would allow Mercury to convert its unbilled receivables to cash.~~

71.     Because Defendants made Mercury heavily reliant on contracts that utilized over time accounting through the M&A Strategy, especially by acquiring POC in December 2020, they knew, or recklessly disregarded, that when Mercury was unable to convert unbilled receivables to cash and the Company' cash flow dissipated, this meant that Mercury was not meeting the performance obligations on over time contracts.  As alleged further below, defendant Ballhaus admits that at least 20 acquired over time contracts were not performing properly because Defendants had failed to fully integrate certain key functions of the businesses that had been acquired through the M&A Strategy.

72.     It is critical for companies that use over time revenue recognition, like Mercury, to convert unbilled receivables to cash by meeting their performance obligations.  High levels of unbilled receivables that are not quickly converted to cash ~~signal~~mean that the company ~~cannot meet its~~ is not meeting the performance obligations~~.~~  on its contracts that utilize over time accounting.

75.73.  From a financial standpoint, a company must be able to convert ~~is~~its unbilled receivables to cash by meeting performance obligations in order for the company to operate as a business.  This was particularly important for Mercury because of the Company's reliance on the M&A Strategy to grow revenue and profit during the Class Period.

76.74.  As such, increased levels of unbilled receivables are problematic when the company cannot convert unbilled receivables to cash.  In Mercury's case, the Company's high level of unbilled receivables from recognizing revenue over time on the contracts acquired pursuant to the Company's M&A Strategy would be problematic ifwas catastrophic because the Company could not meet the performance obligations for theseon at least twenty contracts, and therefore that represented approximately 20% of Mercury's revenue.  Thus, at all times during the Class Period, Mercury was unable to convert the unbilled receivables for contracts that represented 20% of the Company's revenue to cash., leading to a disastrous decline in Mercury's cash flow.

77.75.  IfDangerously low levels of cash flow were not the only consequence of Mercury's inability to convert the Company's unbilled receivables to cash during the Class Period.  Because Mercury was not meeting performance obligations on long-term contracts using over time revenue recognition where the majority of revenue (and corresponding profit) had already been recognized because ofdue to execution challenges, then on those contracts caused by the Company's failure to fully integrate the acquisitions made pursuant to the M&A Strategy, Mercury would needwas forced to expend significant additional costs to achieve the performance obligations during the Class Period.

78.76.  Incurring additional costs beyond those associated with the revenue (and corresponding profit) that had already been recognized to resolve execution challenges would causedirectly caused Mercury's adjusted EBITDA and gross margins to decline, thereby negatively impacting the Company's financial performance.

79.77.  Likewise, the execution challenges on contracts where the majority of revenue (and corresponding profit) had already been recognized would preventprevented the Company from moving ahead to the nextfuture performance obligation.  The nextobligations on the challenged

contracts that utilized over time accounting.  These performance ~~obligation is an~~obligations are immediate ~~source~~sources of future revenue (and corresponding profit).  Mercury cannot record any future revenue (and corresponding profit) for work on ~~later~~future performance obligations until the execution challenges on the current performance obligations are resolved.

~~80.~~78.  Thus, execution challenges on contracts where the majority of revenue (and corresponding profit) had already been recognized ~~will~~in the form of unbilled receivables had negatively ~~impact~~impacted Mercury's revenue and profits during the Class Period by necessitating additional costs and precluding future work from commencing.

~~81.~~79.  During the six fiscal years ended June 30, 2023, Mercury's annual revenue more than doubled, increasing from approximately $409 million during FY16 to approximately $974 million during FY23.  The Company's M&A Strategy, and corresponding increase in unbilled receivables, significantly contributed to Mercury's increased revenue over this time period. Nonetheless, while the Company's reported revenue was experiencing unprecedented growth through acquisition, the cash flow from Mercury's operations substantially declined, from a positive $59 million in FY17 to a *negative* ~~$~~($21 million) in FY23, as reflected in the chart below:

> **Formatted:** Font: Bold, Italic





~~Accordingly,~~

80.    Indeed, during each quarterly financial results presentation made in 2021 and 2022, Defendants reported ballooning unbilled receivables and dissipating operating cash flow, putting them on notice that Mercury was unable to convert unbilled receivables to cash during each respective quarter.  Thus, either Defendants inquired about the reason why performance obligations were not being met each quarter in 2021 and 2022 – because of the failure to fully integrate key functions – or they were reckless in failing to make that inquiry.

81.    In Mercury's Form 8-K dated February 2, 2021, which reported the Company's 2Q21 financial results and was signed by defendant Ruppert and quoted defendant Aslett,

Defendants reported unbilled receivables of $119.346 million, an increase of 32.2% since July 3, 2020, and operating cash flow of $23.939 million, a 51% year-over-year decline.

82.    That same day, defendant Aslett chose to speak about the subject of Mercury's full integration efforts, including the integration of POC, telling investors and analysts that "we're fully integrating the businesses we acquire to generate cost and revenue synergies over time . . . [which] should produce attractive returns for our shareholders."

83.    In Mercury's Form 8-K dated May 4, 2021, which reported the Company's 3Q21 financial results and was signed by defendant Ruppert and quoted defendant Aslett, Defendants reported unbilled receivables of $138.378 million, an increase of 53.3% since July 3, 2020, and operating cash flow of $23.185 million, a 22.9% year-over-year decline.

84.    That same day, defendant Aslett chose to speak about the subject of Mercury's full integration efforts, including the integration of POC, telling investors and analysts that "we're fully integrating the businesses that we acquire to generate cost and revenue synergies over time . . . [which] should produce attractive returns for our shareholders."

85.    In Mercury's Form 8-K dated August 3, 2021, which reported the Company's 4Q21 and FY21 financial results and was signed by defendant Ruppert and quoted defendant Aslett, Defendants reported unbilled receivables of $162.921 million, an increase of 80.4% year-over-year, and operating cash flow of $27.194 million, a 5.3% year-over-year decline.

86.    That same day, defendant Aslett chose to speak about the subject of Mercury's full integration efforts, including the integration of POC, telling investors and analysts that "[w]e've been fully integrating [the Company's acquisitions]."

87.    In Mercury's Form 8-K dated November 2, 2021, which reported the Company's 1Q22 financial results and was signed by defendant Ruppert and quoted defendant Aslett,

Defendants reported unbilled receivables of $194.367 million, an increase of 19.3% since July 2, 2021, and operating cash flow of negative ($2.006 million), a 108.7% year-over-year decline.

88.    That same day, defendant Aslett chose to speak about the subject of Mercury's full integration efforts, including the integration of POC, telling investors and analysts that "we're fully integrating the businesses we acquire to generate cost and revenue synergies over time . . . [which] should produce attractive returns for our shareholders."

89.    In Mercury's Form 8-K dated February 1, 2022, which reported the Company's 2Q22 financial results and was signed by defendant Ruppert and quoted defendant Aslett, Defendants reported unbilled receivables of $193.803 million, an increase of 18.9% since July 2, 2021, and operating cash flow of $6.824 million, a 71.5% year-over-year decline.

90.    That same day, defendant Aslett chose to speak about the subject of Mercury's full integration efforts, including the integration of POC, telling investors and analysts that "[w]e fully integrated these acquired entities by moving them to common collaboration and engineering platforms as well as common ERP, HRIS and CRM systems while also consolidating facilities. We've also unified these 15 businesses under the Mercury brand with the combined sales force and single go-to-market strategy as well as the shared culture and values."

91.    In Mercury's Form 8-K dated May 3, 2022, which reported the Company's 3Q22 financial results and was signed by defendant Ruppert and quoted defendant Aslett, Defendants reported unbilled receivables of $242.304 million, an increase of 48.7% since July 2, 2021, and operating cash flow of negative ($4.252 million), a 118.3% year-over-year decline.

92.    That same day, defendant Aslett chose to speak about the subject of Mercury's full integration efforts, telling investors and analysts that "[o]ur strategy is to improve margins while growing the business organically, supplemented with disciplined M&A and full integration."

93.    In Mercury's Form 8-K dated August 2, 2022, which reported the Company's 4Q22 and FY22 financial results and was signed by defendant Ruppert and quoted defendant Aslett, Defendants reported unbilled receivables of $303.356 million, an increase of 86.2% year-over-year, and operating cash flow of negative ($19.435 million), a 171.5% year-over-year decline.

94.    That same day, defendant Aslett chose to speak about the subject of Mercury's full integration efforts, telling investors and analysts that "[e]xecuting on our long-term strategy over the past decade, we've improved margins while growing the business organically, supplemented with disciplined M&A and full integration."

95.    In Mercury's Form 8-K dated November 1, 2022, which reported the Company's 1Q23 financial results and was signed by defendant Ruppert and quoted defendant Aslett, Defendants reported unbilled receivables of $330.495 million, an increase of 8.9% since July 1, 2022, and operating cash flow of negative ($66.039 million), a 3,192.1%, year-over-year decline.

96.    That same day, defendant Aslett chose to speak about the subject of Mercury's full integration efforts, telling investors and analysts that "[e]xecuting on our long-term strategy over the past decade, we've improved margins by growing the business organically, supplemented with disciplined M&A and full integration."

97.    In other words, as reflected in the chart below, every time that Defendants reported Mercury's quarterly results for unbilled receivables and operating cash flow in 2021 and 2022, and coupled those results with statements about Mercury's then-existing efforts to fully integrate, that Mercury had fully integrated acquisitions, or that Mercury had achieved full integration, they knew, or recklessly disregarded, that Mercury's contracts that utilized over time accounting were not meeting performance obligations, as evidenced by unbilled receivables not timely converting to cash:

- 32 -



98.    As explained below in ¶¶192-197, according to defendant Ballhaus – who had been a director on the Board since June 2022 and had been advocating for a sale of Mercury since December 2021 – Mercury was not meeting the performance obligations on contracts that utilized over time accounting because there was a "lack of full integration of key functional areas" for the acquisitions made pursuant to the M&A Strategy increasedsince FY20 – before the Company's useClass Period began.

99.    Defendant Ballhaus's admission that Mercury had failed to fully integrate the businesses the Company had acquired pursuant to the M&A Strategy since FY20, which prevented Mercury from meeting the performance obligations on over time contracts, is fully consistent with Mercury's unbilled receivables and operating cash flow results during 2021 and 2022.

100.    In addition, as explained below in ¶¶131-140, according to FE1 (defined below), Mercury never achieved full integration of the engineering platforms or the ERP, HRIS or CRM

- 33 -

systems for certain acquired businesses, which is corroborated by Mercury's unbilled receivables and operating cash flow results during 2021 and 2022.

101.    Accordingly, Defendants knew, or recklessly disregarded, that their intentional shift via the M&A Strategy to primarily having contracts that utilized over time accounting on long-term contracts, which had led to corresponding increases in unbilled receivables and working capital, and reductions in cash flow, which was caused by the Legacy Defendants knew, or should have known, the drivers behindfailure to meet performance obligations on at least twenty contracts that represented approximately 20% of Mercury's unbilled receivables, working capital, and cash flow levels during the Class Period. revenue as a result of Mercury's failure to fully integrate the businesses it had acquired.

82.102.In addition, because the Legacy Defendants acknowledged the importance of converting unbilled receivables to cashachieving full integration during the Class Period, they knew, or should have known, that Mercury was unable to meet performance obligations on certain long-term contracts at least twenty contracts that represented approximately 20% of Mercury's revenue and that these execution challenges were havingharming, and would continue to have, negative impacts onharm, Mercury's financial performance during the Class Period.

**Defendants Falsely and Repeatedly Assured Investors that Mercury Had Fully Integrated Its Acquisitions Before and During the Class Period**

103.    The success of Mercury's M&A Strategy hinged on achieving full integration of the businesses that the Company was acquiring.

104.    The M&A Strategy is a business strategy commonly known as a "roll-up," which is the process of acquiring multiple smaller target companies in the same industry and consolidating them into the larger acquiring company.  Combining smaller companies into the

larger company allows the acquiring company to combine their resources, thus reducing operational costs and increasing revenues and profit.

105.    The key element to a successful roll-up strategy is referred to as "tucking-in," or fully integrating, the acquired businesses into the acquiring company's operations.  The acquiring company achieves full integration when the acquired company is fully absorbed into the infrastructure of the acquiring company such that the acquired company no longer retains its individual structure and is indistinguishable from the acquiring company.  Because the acquiring company already possesses the operational infrastructure needed to run the business, including, for example, engineering platforms and ERP (enterprise resource planning), HRIS (human resources information system) and CRM (customer relationship management) systems, the acquiring company can only achieve revenue and profit synergies if full integration is achieved.

106.    If the acquiring company fails to achieve full integration in a roll-up strategy, the acquired companies will not properly operate within the infrastructure of the acquiring company, which prevents the realization of the desired revenue and profit benefits of the acquisition.  Thus, achieving timely full integration is the paramount driver of success for the acquiring company to efficiently and effectively absorb the companies acquired pursuant to the roll-up strategy, and realize the associated cost savings and revenue and profit enhancement.

107.    The best practice of companies that engage in a roll-up strategy to achieve growth is to use a systemized and documented M&A process in the form of a "playbook" of tools and templates to apply during the integration process.  This is an objective method of achieving full integration that is standard and repeatable, meaning that any failure to follow the playbook is ascertainable and definitive.  Generally, the playbooks are focused first on the highest priority integration initiatives, such as the key functional areas of the acquired company, to quickly begin

capturing the projected revenue and profit enhancement. As confirmed by Defendants' Class Period statements, FE1's observations, and as recounted by an analyst following the Company, Mercury utilized integration playbooks for the acquisitions made pursuant to the M&A Strategy.

108. To effectively implement the playbook, the acquiring company typically installs a steering committee of several senior executives to oversee the integration process, a program management team to track integration efforts on a daily basis, and various task forces for the key functional areas of the integration – such as operations, engineering, IT, HR, and marketing, who are responsible for implementing the integration efforts across each functional area.

109. Typically, weekly review meetings will occur between the steering committee, program management team, and various task forces to review the integration progress made in the past week, identify any obstacles encountered, and assess what integration activities remain incomplete and how best to achieve them.

110. The failure to achieve full integration results in common problems that are understood by firms that engage in roll-up strategies. These include, among other things: (1) operational overlaps between the buyer company and acquired company that creates bottlenecks leading to poor service quality and slower service delivery; (2) management in-fighting about roles and responsibilities, prohibiting organizational decision-making; (3) workforce confusion regarding decision-making and service delivery priorities, creating missed service deadlines and poor or non-existence customer service; and (4) a demotivated workforce and exiting of key talent, which hinders the ability of the acquired business to properly function.

111. Defendants understood how important it was to achieve full integration for Mercury's M&A Strategy to be successful. That is why Defendants repeatedly told investors during the Class Period that achieving full integration of all the acquisitions made pursuant to the

M&A Strategy was necessary for the contracts held by the acquired businesses to properly contribute to the Company's revenue and adjusted EBITDA. Thus, Defendants' statements during the Class Period that Mercury had "fully integrated" the Company's acquisitions, had achieved "full integration" of the Company's acquisitions, was then-currently "acquiring and then fully integrating businesses," and was then-currently "fully integrating the businesses we acquire" were made to convince investors that the M&A Strategy was operating as expected.

112. During the Feb 2022 Call, defendant Aslett explained that Mercury's acquisitions being "fully integrated" meant, at least in part, that they had been moved to "common collaboration and engineering platforms," "common ERP, HRIS and CRM systems" and were unified "under the Mercury brand with the combined sales force[.]" These are among the key functional areas of the businesses that were acquired pursuant to the M&A Strategy.

113. During the Feb 2022 Call, defendant Aslett also made clear that his reference to Mercury having "fully integrated these acquired entities" encompassed each of the 15 acquisitions that Mercury had completed since FY14 for approximately $1.4 billion in capital, as described in ¶¶48-51 above.

114. Defendants' Class Period statements concerning full integration routinely referenced the "businesses" or "acquisitions" that Mercury had acquired, meaning the 15 acquisitions that Mercury had completed since FY14 for approximately $1.4 billion in capital, as described in ¶¶48-51 above. No aspect of these statements ever indicated that Defendants' references to full integration were intended to apply to a sub-set of these acquisitions.

115. Thus, achieving full integration of the businesses that Mercury had acquired through the M&A Strategy was not an aspirational or generic goal of the Company, but rather was presented to investors as a critical step that had definitively occurred or was definitively occurring.

- 37 -

116.    In fact, in every earnings call helmed by Defendants during the Class Period (from February 2021 until May 2023), they informed Mercury's investors that achieving full integration of the businesses Mercury had acquired was a core strategy of the Company.

117.    Defendants made similar statements shortly before the beginning of the Class Period.  For example, defendant Aslett stated on May 11, 2020, that "***we do seek to rapidly and fully integrate and enculturate the acquired businesses***. . . . And so we know what we're going to do on day 1, day 30, day 90 until the business is fully integrated."[3]

118.    According to Mercury's corporate website, Mercury aims to achieve "[r]apid integration that maximizes value" through the Company's "rapid, methodical integration process [that] accelerates access to a broader portfolio of technologies, capabilities, and corporate resources [for the businesses that Mercury has acquired]."[4]

119.    Defendants continued to explain the importance of full integration during the Class Period.  For example, on May 11, 2021, defendant Aslett stated that Mercury's "EBITDA has actually grown faster . . . as we've acquired ***and then fully integrated businesses***, which is a core part of our strategy."

120.    Likewise, on November 2, 2021, defendant Aslett stated that the full integration component of Mercury's M&A strategy "is working extremely well[.]"

121.    Further, during the Feb 2022 Call, defendant Aslett told investors that the synergies Mercury had supposedly achieved "through full integration" caused Mercury's revenues to grow "by over 4.4x" and adjusted EBITDA to grow "at 9x or twice the growth in revenues."  In other

---

[3]    Unless otherwise stated, all emphasis is added.

[4]    https://www.mrcy.com/company/mergers-and-acquisitions (last visited August 23, 2024).

words, defendant Aslett confirmed the direct link between: (1) the need for Mercury to achieve full integration; and (2) growing Mercury's revenue and adjusted EBITDA.

122.    In addition, on March 15, 2022, defendant Ruppert stated that Mercury has "*integrated our acquisitions because that's core to our strategy.*"

123.    Further, defendant Aslett was paying careful attention to the full integration status of POC during the Class Period, as evidenced by his statements to investors on May 4, 2021, that "[t]he integration of POC is on track and the business is performing well" and "[t]he POC integration is progressing well[.]"   As FE1 confirmed, POC was never fully integrated from December 2020, when the POC acquisition closed, through the conclusion of FE1's tenure with Mercury in June 2024.

124.    Likewise, defendant Aslett told investors on August 3, 2021, that "[t]he integrations of POC and Pentek are on track and both businesses are performing well," which again demonstrates that defendant Aslett was apprised of the integration status of the acquisitions made pursuant to the M&A Strategy during the Class Period, especially for POC.

125.    As a result of Defendants' repeated statements that the Company had achieved full integration of Mercury's acquisitions, investors and analysts believed that this had, in fact, occurred during the Class Period.  For example, a William Blair analyst report on June 2, 2021, stated, in pertinent part, as follows:

> *Management continues to employ its very successful M&A strategy* to gain new capabilities and market expansion, through in-house deal origination, *a full-integration approach that generates substantial cost/revenue synergies after acquisitions close*, targeting of multiple M&A themes, and *benefitting from a scalable business platform that allows for consistent acquisition integration (which the company has referred to as its integration playbook).*

126.    ~~The Legacy~~ In other words, Defendants left no doubt that the Company had fully integrated every acquisition made by Mercury before and during the Class Period, and that doing

so was critical to the Company's future financial performance.  The reference to an "integration playbook" – which FE1 confirms existed within Mercury during the Class Period – demonstrates that Mercury had a very specific method of achieving full integration of the businesses it acquired, with concrete milestones and metrics to determine when a business was "fully integrated." Unbeknownst to investors, however, Mercury was failing to fully integrate its acquired businesses by no later than FY20, which ended on July 3, 2020, meaning before the Class Period began.

127.    Accordingly, Defendants' repeated statements about full integration demonstrate they knew, or recklessly disregarded, that at all times during the Class Period Mercury had failed to achieve full integration of the Company's acquisitions.

**Defendants Knew, or Recklessly Disregarded, that Mercury Failed to Fully Integrate the Company's Acquisitions During the Class Period and that This Failure Had Negatively Impacted the Company's Financial Performance**

83.128.As explained below in ¶¶136-167, the Replacement Defendants192-197, defendant Ballhaus admitted that Mercury had not fully integrated the Company's acquisitions beginning in FY20 and that this failure caused Mercury's financial performance to be negatively impacted. Because full integration of an acquisition is binary and not a matter of degree – it either was fully integrated, or it was not – the Replacement Defendants'defendant Ballhaus's admission means that the Legacy Defendants knew, or recklessly disregarded, that Mercury had not fully integrated the Company's acquisitions during the Class Period and that this failure caused Mercury's financial performance to be negatively impacted.

84.129.As the Replacement Defendantsdefendants Ballhaus and Farnsworth admit, Mercury's failure to fully integrate the Company's acquisitions caused twenty programscontracts obtained through acquisition, which represented 20% of Mercury's revenue, to become challenged and experience significant execution problems, which directly caused Mercury's unbilled receivables and working capital to balloon and cash flow to evaporate, and also causedthereby

causing Mercury's adjusted EBITDA and profit margins to deteriorate because additional costs were ~~necessary~~needed to ~~resolve~~fix the execution challenges and meet the performance obligations for these contracts.

~~85.~~130.Thus, the execution challenges created by ~~the Legacy~~ Defendants' failure to fully integrate these twenty challenged programs: (1) prevented the Company from quickly or easily reducing Mercury's historic levels of unbilled receivables and working capital, or from increasing cash flow; (2) forced the Company to incur significant additional costs to remediate these programs, which severely negatively impacted Mercury's adjusted EBITDA; and (3) precluded the Company from recognizing future revenue and profit on later performance obligations associated with the challenged programs.

131.    ~~The Legacy Defendants were~~Former employee one ("FE1") is a former employee of Mercury who worked as the Director of Engineering, Process and Tools, from February 2023 to June 2024.  Among FE1's duties at Mercury was to help facilitate integration of the engineering processes of the businesses that Mercury had acquired pursuant to the M&A Strategy.

132.    According to FE1, the fact that Mercury had failed to fully integrate certain acquisitions was common knowledge within the Company during FE1's tenure.  FE1 recounted that, during FE1's tenure, Vice Presidents and Directors at Mercury were constantly communicating about how programs at Mercury's Torrance location in California, for example, were not operating properly, which indicated that they had not been fully integrated.

133.    According to the press release issued by Mercury on December 7, 2020, and as confirmed in the 2021 Form 10-K, Mercury's Torrance, California location was obtained through Mercury's acquisition of POC in December 2020.

134.    FE1 confirmed that Mercury's Torrance location (*i.e.*, POC) had never achieved full integration through the conclusion of FE1's tenure at Mercury in June 2024.

135.    FE1 further recounted that Mercury's failure to fully integrate certain acquisitions caused execution problems on contracts by preventing the Company from identifying or easily fixing problems once the contracts came under the Mercury umbrella.  FE1 believed that these execution problems had been persisting before FE1 was hired to work at Mercury.

136.    In fact, FE1 was hired at Mercury in February 2023, in part, to help the Company fix the effects of the integration problems that were then-existing.  Thus, the failure to fully integrate certain acquisitions that FE1 witnessed at Mercury, and from Torrance specifically, was an ongoing problem that existed since at least December 2020.  This timing aligns with the FY20 start time that defendant Ballhaus provided to investors in August 2023, and from Mercury's reported unbilled receivables and operating free cash flow quarterly results in 2021 and 2022.

137.    According to FE1, it was impossible for defendant Aslett to have not known about the failure to fully integrate certain of Mercury's acquisitions during the Class Period because "everyone was talking about it" at all levels of the Company during FE1's tenure.

138.    According to FE1, Mercury had internal processes in place that had to be met in order for an acquisition to be considered fully integrated.  This process was known as "playbooking," and consisted of various playbooks – *e.g.*, an electrical engineering playbook, a software engineering playbook, or a systems engineering playbook – that Mercury's employees used as a benchmark to assess whether an acquisition had been fully integrated.  The playbooks defined the specific processes and tools that had to be met in order for the engineering functions of the acquired business to be considered fully integrated into Mercury. FE1 confirmed that certain

- 42 -

requirements of several engineering playbooks had not been met for certain Mercury acquisitions during the Class Period, meaning those acquisitions had not been fully integrated into Mercury.

139.    In addition, FE1 confirmed that Mercury had not achieved full integration for certain acquisitions of common: (1) engineering platforms; (2) ERP systems; (3) HRIS systems; (4) CRM systems; or (5) financial systems.

140.    Furthermore, FE1 submitted program performance metrics on a weekly and monthly basis to members of Mercury's executive leadership team, including to Allen Couture ("Couture"), a Senior Vice President of Execution Excellence at Mercury from October 2022 to January 2024.  According to the 2023 Form 10-K, Couture directly reported first to defendant Aslett and then to defendant Ballhaus during the Class Period.  According to FE1, the program performance metrics that FE1 submitted to Couture demonstrated that full integration had not been achieved for certain acquisitions.

86.141. In addition to the information provided by FE1, Defendants' statements to investors during the Class Period demonstrate that they were both intimately familiar with Mercury's programs, and therefore knew, or should have known, about the execution problems associated with at least twenty of those programs, which represented 20% of Mercury's revenue, that were caused by the failure to fully integrate Mercury's acquisitions during the Class Period.

87.142. For example, on May 4, 2021, defendant Aslett admitted that he had been "going over *all the individual line items* from the – in the various programs" in composing the Company's FY22 financial guidance.

88.143. Likewise, on August 3, 2021, as Mercury was set to achieve the "milestone to be celebrated" of "crossing the $1 billion revenue threshold," defendant Aslett announced the

- 43 -

1MPACT initiative, which was supposed to further enhance Mercury's fictitious ability to fully integrate acquisitions.

89.144.As part of developing 1MPACT, according to defendant Aslett on August 3, 2021, Mercury "engaged a Tier 1 consulting firm to do a full assessment of the company.  Working with them, *we took a fresh look at the business* from an organizational structure and value-creation perspective."

90.145.Further, defendant Aslett stated on August 3, 2021, that, in connection with 1MPACT, "we've basically taken a pretty comprehensive look kind of *top to bottom left to right across the business*."  In other words, defendant Aslett was personally involved with carefully reviewing the results of Mercury's supposed full integration of acquisitions, which would have, or should have, alerted him to the fact that the Company had not fully integrated Mercury's acquisitions and the negative consequences thereof.

91.146.Also, on February 1,the Feb 2022 Call, defendant Aslett stated that "*because integration and full integration is such an important element of the strategy and 1MPACT* about taking that to the next level, we've been able to actually grow adjusted EBITDA at 9x or twice the growth in revenues."

92.147.Indeed, defendant Aslett confirmed on February 1,the Feb 2022 Call that "I mean we spent a fair amount of time, obviously, with customers just *looking at our major programs and just diligencing them as we continue to look at the ramp in H2*."

93.148.Moreover, on May 3, 2022, defendant Aslett confirmed that as part of 1MPACT, he and the Company had "*actually been reviewing every contract as it comes up for renewal*."

94.149.In addition, on May 2, 2023, defendant Aslett admitted that "*we conducted a very extensive root cause analysis*" to understand the cause of the problems with the challenged programs at Mercury that the Company first disclosed on May 2, 2023.

95.150.Thus, defendant Aslett knew, or recklessly disregarded, that Mercury's inability to convert unbilled receivables to cash was caused by Mercury's failure to fully integrate the Company's acquisitions during the Class Period, and the resulting negative impact on the Company's financial performance caused by this failure.

96.151.With respect to defendant Ruppert, on August 4, 2021, he admitted that he was personally involved in managing the Company's working capital and unbilled receivables during the Class Period, stating, in pertinent part, that "just from a working capital perspective, as [defendant Aslett] said on the supply chain, *we are keeping an eye on it*."

97.152.Likewise, on February 1,the Feb 2022 Call, defendant Ruppert admitted that "[f]rom a working capital perspective, *we continue to be focused on improving efficiencies in key accounts, including unbilled receivables* and inventory."

153.    Moreover, on August 2, 2022, in providing guidance to investors on what to expect in FY23 for Mercury, defendant Ruppert acknowledged the growth in Mercury's unbilled receivables and dissipation of cash flow, but wrongly stated that the reason why unbilled receivables were not converting to cash was because of "supply chain delays," instead of Mercury's failure to meet performance obligations on acquired contracts.  Defendant Ruppert acknowledged to investors on this call that it was absolutely critical to Mercury for the Company to convert unbilled receivables to cash.

98.154.In addition, on November 1, 2022, defendant Ruppert acknowledged that "[u]nbilled receivables increased approximately $27 million with our intentional strategic shift to

- 45 -

more integrated subsystems, which meet the criteria of over time revenue recognition, our unbilled receivables have naturally increased. . . . ***We continue to take a disciplined and proactive approach to unlocking unbilled receivables***[.]"

99.155. In fact, in commenting on Mercury's difficulties in converting unbilled receivables to cash, defendant Ruppert stated on November 1, 2022 that "we're trying to change the way we contract with customers" to "get more favorable milestones and progress payments on new and existing programs." Thus, defendant Ruppert acknowledged that he was actively engaged in trying to convert Mercury's unbilled receivables to cash during the Class Period.

100.156.    ~~Thus~~Accordingly, defendant Ruppert knew, or recklessly disregarded, that Mercury's inability to convert unbilled receivables to cash was caused by Mercury's failure to fully integrate the Company's acquisitions during the Class Period, and the resulting negative impact on the Company's financial performance caused by this failure.

101.157.    ~~Coupled~~Along with the ~~Replacement Defendants'~~ later admissions, by defendants Ballhaus and Farnsworth and the ~~Legacy~~information provided by FE1, Defendants' statements about Mercury's ~~programs~~contracts and levels of unbilled receivables and working capital demonstrate their knowledge, or reckless disregard, during the Class Period of the fact that Mercury's inability to convert unbilled receivables to cash was caused by Mercury's failure to fully integrate the Company's acquisitions during the Class Period, and the resulting negative impact on the Company's financial performance.

102.158.    Before ~~the Replacement Defendants~~defendant Ballhaus admitted ~~the falsity of the Legacy~~that Defendants' full integration misstatements and omissions were false, which occurred after ~~the Legacy~~ Defendants had left Mercury by June 2023, ~~the Legacy~~ Defendants made two partial corrective disclosures.

103.159.    First, on August 2, 2022, after the close of trading, Mercury announced the Company's financial results for 4Q22 and FY22, disclosing for the first time that Mercury's inability to achieve performance obligations on certain undisclosed contracts – which ~~the Legacy~~ Defendants incorrectly blamed on supposed supply chain issues, not full integration failures – was negatively impacting the Company's working capital, unbilled receivables, and cash flow.

104.160.    In response to this revelation, the price of Mercury common stock declined approximately $7.67 per share, or 13.3%, from a close of $57.48 per share before the announcement, to close at $49.81 per share on August 3, 2022.

105.161.    Thereafter, an analyst with J.P. Morgan noted in an October 19, 2022, report that "*[p]oor cash conversion is the most striking element of Mercury's recent performance*. Working capital has always been high percentage of sales at 42% on avg for FY16-20 but it has ballooned to 60% since then."

106.162.    Likewise, an analyst with Truist Securities noted in a November 1, 2022, report that "*[w]orking capital has been a significant headwind driven mainly by unbilled receivables* and inventory."

107.163.    Second, on May 2, 2023, after the close of trading, Mercury announced the Company's financial results for 3Q23, disclosing for the first time that the Company had ~~encountered~~ execution challenges in a dozen programs, which caused continued poor cash flow performance because Mercury was unable to convert its high levels of unbilled receivables to cash. Further, ~~the Legacy~~ Defendants disclosed on May 2, 2023, that the costs of resolving the execution problems with the one dozen challenged programs necessitated a significant reduction in Mercury's FY23 financial guidance for adjusted EBITDA, down to a range of $160 million to $170 million, from a range of $202.5 million to $215 million that was previously provided on

January 31, 2023. ~~The Legacy~~ Defendants, however, did not disclose that these problems were the result of Mercury's full integration failure, were related to any programs Mercury had acquired, or the full extent of the negative impact to Mercury's financial performance caused by Mercury's full integration failure.

~~108.~~164.    In response to this revelation, the price of Mercury common stock declined $7.84 per share, or approximately 17.3%, from a close of $45.28 per share before the announcement, to close at $37.44 on May 3, 2023.

~~109.~~165.    Analysts were dismayed by ~~the Legacy~~ Defendants' disclosures on May 2, 2023. According to a report by a Jefferies analyst dated May 2, 2023, the adjusted EBITDA guidance reduction for FY23 represented "[d]eath by a [t]housand [c]uts."

~~110.~~166.    In addition, an analyst with RBC Capital Markets noted in report dated May 2, 2023 that "the ~45% reduction in the implied EBITDA is greater than feared, and will weigh on sentiment, in our view."

~~111.~~167.    Similarly, an analyst with Truist Securities noted in a report dated May 2, 2023 that they were "[b]lindsided" by the one dozen challenged programs and related adjusted EBITDA guidance reduction, characterizing this as "***info we believe would have been useful to know 90 days ago***. F4Q23 EBITDA guidance was slashed by 45% and in response we have cut our FY23/24 ests."

~~112.~~168.    Indeed, during the Company's earnings call held on May 2, 2023, analysts expressed deep skepticism that the challenges with the one dozen programs, and related margin degradation, had only began after January 31, 2023.

113.169.     For example, an analyst with Robert W. Baird & Co. stated that "what I'm trying to understand is that a lot of those things were kind of known 3 months ago that your development mix was growing[.]"

114.170.     Likewise, an analyst with Truist Securities stated that "I still don't understand how EBITDA got cut 45% in 90 days . . . I guess on January 31, I mean, this seems like a pretty risky forecast you gave us[.]"

<div align="center">

**The Legacy Defendants Were Motivated
to Falsely Inflate Mercury's Value During the Class Period**

</div>

115.171.     During the Class Period, on December 23, 2021, defendant Ballhaus, as part of a group backed by JANA, a well-known activist investor, filed a Schedule 13D with the SEC announcing JANA's beneficial ownership of 6.6% of Mercury's outstanding shares and his intention to stand for election as a director to the Board at the Company's next annual meeting.

116.172.     Defendant Ballhaus stated on December 23, 2021, that he "intends to have discussions with the . . . [Board] and management regarding maximizing value for shareholders including evaluating strategic alternatives including a sale of [Mercury.]"

117.173.     On January 13, 2022, a second activist investor, Starboard Value LP ("Starboard") filed a Schedule 13D with the SEC announcing its beneficial ownership of 7.3% of Mercury's outstanding shares.

118.174.     Starboard also sent a letter to the Board on January 13, 2022, stating that it had held "conversations over the past several months with the Company's management team" about Mercury's strategic direction.

119.175.     Thus, by November 2021, the Legacy Defendants were aware that activist investors were agitating for, among other things, a sale of the Company.

- 49 -

120.176. The next day, on January 14, 2022, an analyst with Canaccord Genuity reported that the combined presence of JANA – led by defendant Ballhaus – and Starboard meant that "[p]ressure [was] rising on management for a sale[.]"

121.177. In response, on February 8, 2022, Mercury filed a Form 8-K with the SEC announcing that the Board had implemented an equity retention plan for, among others, the Legacy Defendants that would allow them to receive their equity awards for FY23 six months earlier than usual and for "awards [that] are larger than those the employees would have otherwise received as part of their ordinary [FY23] compensation." Specifically, defendant Aslett received a total of $12.6 million in regular and restricted stock awards, and defendant Ruppert received a total of $3.86 million in regular and restricted stock awards.

122.178. According to the February 8, 2022 Form 8-K, "Mercury must achieve financial results relative to its proxy peers for certain performance measures (revenue growth and adjusted EBITDA to revenue) for these awards to have any value."

123.179. Thus, by February 2022 at the latest, the Legacy Defendants were motivated to maintain and conceal Mercury's artificially inflated revenue and adjusted EBITDA caused by their undisclosed full integration failure to ensure that: (1) they would receive their enlarged FY23 equity awards; and (2) they could achieve a sale of Mercury at the highest valuation possible to appease defendant Ballhaus, JANA, and Starboard.

124.180. On June 24, 2022, Mercury filed a Form 8-K with the SEC and announced, among other things, that Mercury had entered into agreements with JANA and Starboard to allow defendant Ballhaus to become a director on the Board effective June 23, 2022.

125.181. According to the Form DEF 14A proxy statement filed by Mercury on September 8, 2022, defendant Aslett would be entitled to an approximate $33 million severance if

he left Mercury during a sale process for the Company and Mercury was subsequently sold within 18 months of his departure, and only an approximate $2.4 million severance otherwise.

126.182.    Similarly, according to the September 8, 2022 Form DEF 14A, defendant Ruppert would be entitled to an approximate $10.5 million severance if he left Mercury during a sale process for the Company and Mercury was subsequently sold within 18 months of his departure, and only an approximate $991,000 severance otherwise.

127.183.    On January 31, 2023, Mercury filed a Form 8-K with the SEC, which announced, among other things, that the Board "has approved a plan to explore strategic alternatives, including a potential sale of the Company."

128.184.    In addition, Mercury announced in the January 31, 2023 Form 8-K that defendant Ruppert had informed the Board that he was resigning effective February 17, 2023, meaning after Mercury's sale process had begun.

129.185.    On June 23, 2023, Mercury filed a Form 8-K with the SEC and announced, among other things, that the Board had held discussions with more than 40 potential bidders, entered into confidentiality agreements with 20 parties that were facilitated by Citi and Goldman Sachs & Co. LLC, but ultimately received only two proposals.

130.186.    The June 23, 2023 Form 8-K stated that the Board did not believe that the two offers reflected the Company's intrinsic value.  As a result, Mercury decided to conclude the sale process and instead proceed "under refreshed leadership."

131.187.    According to *Reuters*, "Mercury, which has a market value of $1.9 billion, decided to end the process to sell itself after just one round of offers, ***because the bids assigned it little to no premium to its share price***, a person familiar with the matter said."

132.188.    The June 23, 2023 Form 8-K further announced that on June 19, 2023, defendant Aslett informed the Board that he was resigning as CEO and as a director on the Board.

133.189.    In place of defendant Aslett, the Board announced that defendant Ballhaus would serve as Mercury's interim CEO beginning on June 24, 2023.

134.190.    According to the June 23, 2023 Form 8-K, in his resignation letter to the Board, defendant Aslett asserted that he was entitled to his approximate $33 million severance even though no change of control occurred (and has still not occurred as of today).  The Board rejected defendant Aslett's demand.

135.191.    Defendant Aslett's request for his change in control severance without achieving a change in control shows that his focus at all times during the Class Period was on obtaining a significant personal benefit by concealing the Company's failure to fully integrate Mercury's acquisitions and the related negative impact on Mercury's financial performance.

**The Replacement Defendants Admit that the LegacyDefendant Ballhaus Admits that
Defendants Failed to Fully Integrate Mercury's Acquisitions and that This Failure
Negatively Impacted Mercury's Value**

136.192.    On August 15, 2023, Mercury filed a Form 8-K with the SEC and announced, among other things, that defendant Ballhaus had become the Company's permanent CEO and would also become the Chairman of the Board.

137.193.    In the accompanying earnings call held that same day, defendant Ballhaus addressed Mercury's investors for the first time as CEO.  Defendant Ballhaus wasted no time blaming the Legacyadmitting that Defendants for the Company's underperformancehad not achieved full integration of Mercury's acquisitions in "key functional areas" before and during the Class Period, stating, in pertinent part, as follows:

> Second impression: ***over the past several years the company grew inorganically into strategically attractive areas, but didn't fully integrate some of the businesses and mature processes and management systems to align with Mercury's evolving***

*business portfolio*.  In my experience, this is not uncommon in businesses that grow rapidly via acquisitions.  ***At Mercury, though, the immaturity and lack of full integration of key functional areas have led to the serious challenges the company experienced forecasting business performance over the past several quarters***.  That said, maturing in these areas is doable, within our control, and underway.

My third and most important takeaway is that while our recent results are disappointing, the majority of our business is performing well, delivering predictable and profitable growth.  ***However, this solid performance has been masked by approximately 20 programs that are experiencing unique and outsized costs***, primarily temporary cost growth related to initial development challenges. In fiscal '23, these few programs impacted our financial performance by approximately $56 million. Said differently, our reported margin in 2023 does not at all reflect a structural shift in our margin profile.

<center>*      *      *</center>

Second, as I mentioned earlier, ***because our management systems and processes have not matured at the same pace as our growth over the last several years to address the complexities inherent in many of these development programs, a small number of programs have become challenged, leading to unanticipated and temporary impacts on our overall performance.  In FY '23, execution challenges on approximately 20 programs, a majority of which are development in nature, drove approximately $56 million of impact or approximately 580 basis points of margin contraction***.

<center>*      *      *</center>

***Our fourth focus area is driving improved free cash flow conversion and cash release. Over the past 2 fiscal years, Mercury has delivered $333 million of adjusted EBITDA, but generated negative $107 million in free cash flow, which is clearly unacceptable.  Since FY '20, working capital has grown from approximately 35% of revenue to approximately 65% of revenue in FY '23. This growth has primarily been driven by increases in unbilled receivables and inventory and is a direct result of the temporary execution challenges previously discussed.***

194.    Effectively, defendant Ballhaus – who had been personally pushing ~~the Legacy~~ Defendants to sell the Company for the highest amount possible since late 2021 – admitted to investors in his first remarks as Mercury's CEO that ~~the Legacy~~ Defendants ***had not fully integrated Mercury's acquisitions in key functional areas dating back to FY20, meaning before the Class Period began.***

139.195.    In so doing, defendant Ballhaus confirmed that the Legacy Defendants' many statements about the untrue fact that Mercury's acquisitions had been "fully integrated" or," that Mercury had achieved "full integration" of its acquisitions, or that Mercury was then-currently "fully integrating" acquisitions during the Class Period were materially false and misleading when made.  Moreover, defendant Ballhaus specified that "key functional areas" – *e.g.*, the common engineering platform and CRM, HRIS, and ERP systems discussed by defendant Aslett during the Feb 2022 Call that FE1 confirmed had not been integrated – had not been fully integrated by Mercury before or during the Class Period.

140.196.    Defendant Ballhaus further admitted that the failure to fully integrate Mercury's acquisitions had directly caused twenty programs at Mercury to experience execution problems – an additional eight programs on top of the dozen disclosed by the Legacy Defendants on May 2, 2023 – which had been, and would continue to be, materially and significantly negatively impacting Mercury's profits because of the costs associated with resolving these challenges.

197.    Nonetheless,Defendant Ballhaus later admitted at the Replacement end of the Class Period, on February 6, 2024, that these twenty programs comprised approximately 20% of Mercury's revenue.

**Defendants Ballhaus and Farnsworth Made Their Own Materially False and Misleading Statements and Omissions After Blaming the Legacy Defendants**

141.198.    By August 15, 2023, the Replacement Defendantsdefendants Ballhaus and Farnsworth knew about, or recklessly disregarded, the true extent of the negative impact on Mercury's financial performance associated with the execution problems Mercury was experiencing on the twenty challenged programs that were caused by the Legacy Defendants' failure to fully integrate Mercury's acquisitions.

- 54 -

142.199.    According to defendant Ballhaus, byin the weeks leading up to August 15, 2023, he had *personally* had done the following in concluding that there was a "lack of full integration of key functional areas" at Mercury since FY20:

> *[S]pent significant time with the team digging into the details of the business* in forming an assessment of Mercury and its value creation potential.  Specifically, *I have visited our major centers of operation and personally led reviews of our challenged programs* and expanded those reviews to include 100% of our current development programs, *their estimated cost to complete and any roadblocks or risk to completion*.

143.200.    Further, defendant Ballhaus admitted that, by August 15, 2023, he and defendant Farnsworth had "*reviewed our major unbilled receivables balances by program* and our inventory in detail to establish burn-down plans *and drive improved free cash flow conversion*."

144.201.    In addition, defendant Ballhaus admitted that, starting on July 1, 2023:, he had personally assembled all of Mercury's internal experts to assess the twenty troubled contracts and reach agreement on the length and cost it would take to meet the performance obligations on those contracts, stating, in pertinent part, that:

> [w]e've brought the senior team across all relevant functions from *engineering*, manufacturing, our program managers, our program management leadership, and *we literally have reviewed every development program* . . . So by the time we finished that process, we had gone through every program in – every development program in the portfolio.  *And we took a very stringent eye on the activities to complete those programs and our estimates to complete . . . I feel very good about the rigor that we put into establishing our cost to complete, getting all of the experts in the company to stare at those programs and contribute to the assessment of our cost to complete and give us a robust view of what it's going to take to execute on the remainder of these challenged programs.*

145.202.    In fact, defendant Ballhaus admitted on August 15, 2023, that "*we're getting very granular when it comes to things like burning down our unbilled in our inventory and literally looking at it program by program every week.*"

- 55 -

146.203.    Instead of candidly disclosing to investors that the execution problems Mercury was experiencing on the twenty challenged programs that were caused by ~~the Legacy~~ Defendants' failure to fully integrate Mercury's acquisitions would continue to negatively impact the Company's financial performance, ~~the Replacement Defendants~~defendants Ballhaus and Farnsworth chose to further mislead investors by stating on August 15, 2023 that, notwithstanding these issues, the Company could still achieve $1 billion in revenue in FY24 and ~~could~~would achieve adjusted EBITDA for FY24 of ~~up to $185~~at least $160 million, well above the adjusted EBITDA earned by Mercury in FY23 of $132.3 million.

147.204.    Thus, investors were falsely given the impression on August 15, 2023 that the execution problems on the twenty challenged programs caused by ~~the Legacy~~ Defendants' failure to fully integrate Mercury's acquisitions were "temporary" and under control, and would not cause a further material deterioration ~~in~~of the Company's financial performance in FY24.

148.205.    Analysts were also misled by the ~~Replacement Defendants'~~ statements made by defendants Ballhaus and Farnsworth on August 15, 2023.  For example, according to an analyst with Truist Securities in a report dated August 15, 2023, "the new leadership team remains confident in the co's technology assets, believes unbilled receivables can be monetized and continues to see a path toward low to mid 20% EBITDA margins" and "*[w]e believe new MRCY leadership has established a conservative and importantly beatable bar for FY24*."

149.206.    In addition, according to an analyst with J.P. Morgan in a report dated August 16, 2023, "Mercury has started the process of resetting expectations and rebuilding investor confidence . . . Mgmt acknowledged that Mercury's cash conversion in recent years has been unacceptable and we view this as a step forward, given that it has become a key issue underlying investor perceptions of the company."

150.207.    In the second earnings call helmed by ~~the Replacement Defendants~~defendants Ballhaus and Farnsworth, held on November 7, 2023, defendant Ballhaus surprised the market by disclosing that the unbilled receivables for the twenty challenged programs represented over 80% of each contract's value, meaning "the majority of revenue has been recognized and only a small portion of the contract revenue remains to be recognized with the final delivery of the hardware."

151.208.    Defendant Ballhaus further disclosed on November 7, 2023 that "completing hardware associated with the unbilled receivables consumes significant operational capacity, but generates little revenue."  According to defendant Ballhaus, this meant that Mercury "will see some temporary impacts to our P&L, as we are applying operational capacity to delivering hardware with little revenue[.]"  Defendant Ballhaus reported that these impacts had resulted in adjusted EBITDA of $2 million in 1Q24, a year-over-year decline of 93.4%, significantly below analyst estimates.

152.209.    In other words, ~~the Replacement Defendants~~defendant Ballhaus acknowledged on November 7, 2023, that Mercury had to incur even more costs, which would negatively impact revenues and adjusted EBITDA even further, to resolve the execution problems with the challenged programs that were caused by ~~the Legacy~~ Defendants' failure to fully integrate the Company's acquisitions.

153.210.    In response to this revelation, the price of Mercury common stock declined $4.63 per share, or approximately 12.6%, from a close of $36.78 per share before the announcement, to close at $32.15 per share on November 8, 2023.

154.211.    Notwithstanding these disclosures, ~~the Replacement Defendants~~defendants Ballhaus and Farnsworth continued deceiving investors on November 7, 2023, by reaffirming the

- 57 -

FY24 revenue guidance of up to $1 billion and the FY24 adjusted EBITDA guidance of ~~up to $185~~at least $160 million.  In other words, by reaffirming Mercury's FY24 financial guidance on November 7, ~~the Replacement Defendants~~defendants Ballhaus and Farnsworth falsely indicated to investors that the additional costs that were necessary to resolve the execution problems with the challenged programs associated with Mercury's failure to integrate would not cause the Company's financial performance to further deteriorate in FY24.

~~155.~~212.    Again, analysts were misled by the ~~Replacement Defendants'~~ statements made by defendants Ballhaus and Farnsworth.  For example, according to an analyst with Truist Securities in a report dated November 7, 2023, "[a]lthough results were weaker than consensus, mgmt reaffirmed all aspects of its outlook and importantly the portfolio of challenged programs remained at 20 with line of sight to reducing the number to ~10 by year-end . . . Despite the 1Q miss MRCY reaffirmed its full-year expectations for revenue and EBITDA[.]"

~~156.~~213.    Likewise, according to an analyst with J.P. Morgan in a report dated November 8, 2023, "[i]t seems to us that the year cannot be tracking to expectations but mgmt did leave the FY24 adj EBITDA guide unchanged, which suggests a line of sight to improvement, and the potential for a steep ramp in 2H earnings and the possible implications for FY25 are the sources of hope that emerge from this print."

~~157.~~214.    The ~~Replacement Defendants'~~ fraud perpetrated by defendants Ballhaus and Farnsworth quickly unraveled.  On February 6, 2024, ~~the Replacement Defendants~~defendants Ballhaus and Farnsworth were forced to concede the true extent of the Company's full integration failure and the related significant negative impact on Mercury's financial performance, *i.e.*, that Mercury's revenue would decline by approximately 20% in FY24 and the Company's profit would be significantly reduced in FY24 – meaning well below $~~185~~160 million.

- 58 -

158.215.    Indeed, on February 6, 2024, the Replacement Defendantsdefendants Ballhaus and Farnsworth reported *negative* adjusted EBITDA for Mercury of ($21.3 million) for 2Q24, versus positive adjusted EBITDA for Mercury of $35.7 million in 2Q23, and cut the FY24 guidance for revenue down from a possible $1 billion to a range of $800 million to $850 million.

159.216.    Defendant Ballhaus explained on February 6, 2024 that one product line associated with five of the twenty challenged programs, "*representing approximately 20% of our revenue* . . . has experienced the majority of the revenue and earnings volatility that we saw in Q2 and that we expect to see within the fiscal year."

160.217.    Defendant Farnsworth further stated on February 6, 2024 that the Company's inability to complete the five challenged programs had caused "[a]djusted EBITDA for the second quarter [to be] negative $21.3 million compared to [positive] $35.7 million in the prior year."

161.218.    As a result, defendant Ballhaus stated on February 6, 2024 that "we are updating our guidance for full year FY '24 revenue from the prior range of $950 million to $1 billion to a revised range of $800 million to $850 million . . . we are withdrawing our full year FY '24 GAAP and non-GAAP net earnings guidance, including adjusted EBITDA, provided on November 7, 2023."

162.219.    Analysts were again disappointed by the Replacement Defendants' revelations made by defendants Ballhaus and Farnsworth.  For example, according to an analyst with J.P. Morgan in a report dated February 6, 2024, "Mercury had a challenging quarter and the market lost a fair amount of visibility as mgmt pulled adj EBITDA and adj EPS guidance for FY24. The opportunity from here is to work through the challenged programs that have been weighing

on results . . . These programs have been a persistent problem and in order to gain confidence, we think the market will need to see progress on execution."

163.220.    Likewise, according to an analyst with William Blair & Co. in a report dated February 7, 2024, "[w]hile these challenged are isolated to 20% of the business . . . *we had also previously assumed that the large, troubled program and common component had already been resolved as well* . . . At this point, we believe investors are near capitulation[.]"

164.221.    Indeed, according to an analyst with BofA Securities, in a report dated February 20, 2024, there is a direct link between the Legacy Defendants' failure to fully integrate Mercury's acquisitions and the negative financial impacts belatedly reported by the Replacement Defendants.defendants Ballhaus and Farnsworth.  Specifically, "*integration proved to be an issue, leading to limited program oversight and eventual cost creep.  This culminated with the pulling of [Mercury's] FY24 outlook earlier this month.*"

165.222.    In response to the Replacement Defendants' disclosures post-market close made by defendants Ballhaus and Farnsworth on February 6, 2024, the price of Mercury common stock declined $3.45 per share, or approximately 11.4%, from a close of $30.25 per share before the announcement, to close at $26.80 per share on February 7, 2024.

223.    Following the end of the Class Period, Mercury reported 3Q24 financial results on May 7, 2024, and 4Q24 and FY24 financial results on August 13, 2024.  Mercury's reported adjusted EBITDA quarterly results in FY24 demonstrate the negative impact to Mercury's financial performance caused by the significant costs incurred in FY24 to remediate Defendants' failure to fully integrate the twenty programs that comprised at least 20% of the Company's revenue – *i.e.*, the very same costs that were readily apparent to defendants Ballhaus and Farnsworth when they conducted their personal, weekly, comprehensive and granular reviews of

Mercury's challenged programs in July 2023.  Indeed, as demonstrated in the chart below, Mercury achieved ***only $9.3 million in adjusted EBITDA in FY24, meaning the previous guidance of at least $160 million in adjusted EBITDA provided by defendants Ballhaus and Farnsworth was missed by $150.7 million, or by 94.2%***:

| Quarter | Guidance | Actual Adjusted EBITDA |
|---|---|---|
| 1Q24 (Nov. 7, 2023) | ~$40 million | $2.0 million |
| 2Q24 (Feb. 6, 2024) | ~$40 million | ($21.3 million) |
| 3Q24 (May 7, 2024) | ~$40 million | ($2.4 million) |
| 4Q24 (Aug. 13, 2024) | ~$40 million | $31.2 million |
| FY24 (Jul. 2023 to Jul. 2024) | **At least $160 million** | **$9.4 million** |

166.224.    In total, the Company lost nearly two-thirds of its value during the Class Period compared to the start of the Class Period on February 3, 2021, when Mercury's common stock price opened at $76.65.

167.225.    The below chart of Mercury's common stock trading during the Class Period demonstrates the extent of Defendants' fraud:





## MATERIALLY FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS MADE DURING THE CLASS PERIOD

168.226.    During the Class Period, Defendants made materially false and misleading statements and otherwise violated their obligation to disclose material information. Specifically, ~~the Legacy~~ Defendants made materially false and misleading statements and omissions regarding Mercury's full integration of the companies that Mercury acquired pursuant to the M&A Strategy and the related negative impact to Mercury's financial performance. Separately, ~~the Replacement Defendants~~defendants Ballhaus and Farnsworth made materially false and misleading statements regarding the negative impact to Mercury's financial performance caused by ~~the Legacy~~ Defendants' failure to fully integrate the Company's acquisitions.

**The False and Misleading Statements and Omissions Made by ~~the Legacy~~ Defendants Regarding Full Integration**

169.227.    On February 2, 2021, after market close, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 2Q21 financial results (the "Feb 2021 Call"). During the Feb 2021 Call, defendant Aslett stated, in pertinent part, that "*we're fully*

- 62 -

*integrating the businesses we acquire* to generate cost and revenue synergies over time . . . [which] should produce attractive returns for our shareholders."

228.    The statement in ¶227 was materially false and misleading for the reasons set forth in detail in ¶¶46-225 above, *i.e.*, because Mercury was not fully integrating the businesses that it acquired, which caused execution challenges in twenty acquired programs that:

(a)    prevented Mercury from converting its ballooning unbilled receivables to cash because performance obligations on these contracts could not be met;

(b)    required Mercury to incur substantial additional costs to remediate the execution challenges and meet the performance obligation on those contracts; and

(c)    caused negative impacts to Mercury's financial performance.

229.    On May 4, 2021, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 3Q21 financial results (the "May 2021 Call").  During the May 2021 Call, defendant Aslett stated, in pertinent part, that "*we're fully integrating the businesses that we acquire* to generate cost and revenue synergies over time . . . [which] should produce attractive returns for our shareholders."

230.    The statement in ¶229 was materially false and misleading for the reasons set forth in ¶228 above.

231.    On May 11, 2021, Mercury participated at the Goldman Sachs Industrials and Materials Conference, and filed the associated presentation slides on Form 8-K that same day. During this conference, defendant Aslett stated, in pertinent part, that "[o]ur EBITDA has actually grown faster than that as we've acquired *and then fully integrated businesses*, which is a core part of our strategy."

- 63 -

174.232.    The statement in ¶173231 was materially false and misleading for the reasons set forth in detail in ¶¶43-16746-225 above, *i.e.*, because Mercury had not "fully integrated" the businesses it acquired, which caused execution challenges in twenty acquired programs that:

(a)    prevented Mercury from converting its ballooning unbilled receivables to cash because performance obligations on these contracts could not be met;

(b)    required Mercury to incur substantial additional costs to remediate the execution challenges and meet the performance obligation on those contracts; and

(c)    caused negative impacts to Mercury's financial performance.

175.233.    On June 2, 2021, Mercury participated at the William Blair Growth Stock Conference.  During this conference, defendant Aslett stated, in pertinent part, that "[w]e're successfully *acquiring and then fully integrating businesses* that have allowed us to actually expand our addressable market as well as our capability set as well as our growth rate over time," and that "[w]hat we do is *we basically fully integrate the business that we're acquiring*, moving them to our own ERP applications or other business system . . . it's a really important part of the strategy that we've executed."

176.234.    The statements in ¶175233 were materially false and misleading for the reasons set forth in ¶170228 above.

177.235.    On August 3, 2021, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 4Q21 and FY21 financial results (the "Aug 2021 Call").  During the Aug 2021 Call, defendant Aslett stated, in pertinent part, that "*[w]e've been fully integrating* [the Company's acquisitions]."

- 64 -

178.236.    The statement in ¶177235 was materially false and misleading for the reasons set forth in ¶170228 above.

179.237.    On November 2, 2021, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 1Q22 financial results (the "Nov 2021 Call").  During the Nov 2021 Call, defendant Aslett stated, in pertinent part, that "*we're fully integrating the businesses we acquire* to generate cost and revenue synergies over time . . . [which] should produce attractive returns for our shareholders."

180.238.    The statement in ¶179237 was materially false and misleading for the reasons set forth in ¶170228 above.

181.239.    On February 1, 2022, Mercury hosted an earnings callsthe Feb 2022 Call to discuss the Company's 2Q22 financial results (the "Feb 2022 Call").  During the Feb 2022 Call, during which defendant Aslett stated, in pertinent part, as follows:

> Since fiscal '14, we've completed 15 acquisitions, deploying $1.4 billion of capital. We've dramatically scaled and transformed the business as a result, growing total company revenue 4.4x from FY '14 through FY '21.  **We fully integrated these acquired entities** by moving them to common collaboration and engineering platforms as well as common ERP, HRIS and CRM systems while also consolidating facilities.

> We've also unified these 15 businesses under the Mercury brand with the combined sales force and single go-to-market strategy as well as the shared culture and values. As a result of these actions, over the past 7 fiscal years, we've extracted substantial cost and revenue synergies, leading to adjusted EBITDA growing more than 9x or twice the growth in revenues.  This has resulted in substantial value creation for shareholders.

> \*        \*        \*

> Through integration of our acquisitions, we've been able to average down the multiples we've paid through the recognition of both cost and revenue synergies, creating substantial value for our shareholders as a result.

> \*        \*        \*

*And as a result of the acquisitions, but more importantly, through the synergies that we've generated through full integration*, we've been able to actually grow total company revenues by over 4.4x over the course of the last 7 or so years. *And because integration and full integration is such an important element of the strategy* and 1MPACT about taking that to the next level, we've been able to actually grow adjusted EBITDA at 9x or twice the growth in revenues.

182.240.    The statements in ¶181239 regarding "fully integrated" and "full integration" were materially false and misleading for the reasons set forth in ¶174232 above.

183.241.    On March 15, 2022, Mercury participated at the JPMorgan Industrials Conference.  During this conference, defendant Ruppert stated, in pertinent part, that "*[w]e've integrated our acquisitions because that's core to our strategy*."

184.242.    The statement in ¶183241 was materially false and misleading for the reasons set forth in ¶174232 above.

243.    On May 3, 2022, Mercury hosted an earnings calls to discuss the Company's 3Q22 financial results (the "May 2022 Call").  During the May 2022 Call, defendant Aslett stated, in pertinent part, that "[o]ur strategy is to improve margins while growing the business organically, *supplemented with disciplined M&A and full integration*."

244.    The statement in ¶243 was materially false and misleading for the reasons set forth in ¶232 above.

185.    On August 2, 2022, Mercury hosted an earnings call with analysts and shareholderscalls to discuss the Company's 4Q22 and FY22 financial results (the "Aug 2022 Call").  During the Aug 2022 Call, defendant RuppertAslett stated, in pertinent part, as follows:

245.    So coming into the year, we didn't expect that working capital increase that was really driven by the supply chain and the contracting delays that I mentioned. And that really shows up in unbilled. And to answer your second question in terms of unbilled and making sure that I clarify the percentages that"[e]xecuting on our long-term strategy over the past decade, we've

talked about. So if you look at our overtime revenue, it has increased since fiscal '20 from 27% to 55% in fiscal '22, so this year. And the 60% that you mentioned was our Q4 overtime revenue or percentage of completion revenue. And that's related to our subsystem work. And that's a natural growth as we do more subsystems consistentimproved margins while growing the business organically, *supplemented* with our customer base.*disciplined M&A and full integration*."

<div style="border:1px solid;">**Formatted:** Font: Bold, Italic</div>

> When we look at the — what's the right metric for unbilled, how do we size it and say what's the right amount of unbilled, because we're naturally going to have some. The way we look at that is the percentage of our overtime revenue. And so if you look back from fiscal '19 to fiscal '21, you'll see we averaged at around 35%. And in fiscal '22, that number went up to 43%. And that's what you're seeing, because of the supply chain delays, which delayed milestones, which delayed deliveries, and that's the number that as we look at normalization of our working capital, we're really going to drive down. And so that 43% that we ended the year with in '22, we think the good target is 35% over time. And *we think that will unwind in fiscal — a little bit in fiscal '23, more in the second half and then heading into fiscal '24*.

186.246.    The statement in ¶185 that "we think that will unwind in fiscal — a little bit in fiscal '23, more in the second half and then heading into fiscal '24"245 was materially false and misleading for the reasons set forth in detail in ¶¶43-167¶232 above, *i.e.*, because Mercury's historic level of unbilled receivables would not "unwind" in FY23, but would instead persist because the Company had failed to fully integrate Mercury's acquisitions, which caused execution problems that prevented the Company from achieving the performance obligations that would allow Mercury to convert its unbilled receivables to cash.

187.247.    On November 1, 2022, Mercury hosted an earnings calls to discuss the Company's 1Q23 financial results (the "Nov 2022 Call"). During the Nov 2022 Call, defendant Aslett stated, in pertinent part, that "[e]xecuting on our long-term strategy over the past decade, we've improved margins by growing the business organically, *supplemented with disciplined M&A and full integration*."

188.248.    The statement in ¶187247 was materially false and misleading for the reasons set forth in ¶174232 above.

189.249.    On January 31, 2023 Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 2Q23 financial results (the "Jan 2023 Call").  During the Jan 2023 Call, defendant Aslett stated, in pertinent part, that "[w]e've improved margins by growing the business organically, ***supplement with disciplined M&A and full integration***."

190.250.    The statement in ¶189249 was materially false and misleading for the reasons set forth in ¶174232 above.

**The False and Misleading Statements and Omissions Made by Defendant Aslett Regarding Unbilled Receivables**

191.251.    On May 2, 2023, Mercury filed a Form 8-K announcing the Company's 3Q23 financial results (the "May 2023 Form 8-K").  The May 2023 Form 8-K included a statement from defendant Aslett that "[o]ur ***challenges are*** . . . largely timing and cost-related, they're short-term, and they're ***not unique to Mercury***."  Also on May 2, 2023, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 3Q23 financial results (the "May 2023 Call").  During the May 2023 Call, defendant Aslett stated, in pertinent part, as follows:

> In terms of R&D, Mercury is a leveraged commercial investment model focus on developing sophisticated new technologies and products. These highly differentiated capabilities are then used across multiple DoD programs. ***The cost growth we're experiencing is associated with certain new technology developments that are nearing completion*** and new product introductions, which are taking longer than planned. The higher costs are related to both labor as well as materials driven by labor and supply chain inefficiencies, manufacturing constraints and inflation. Approximately a dozen or so of our 300-plus active programs have been affected. In over 2 of the affected programs, more than 90% complete in terms of the total expected costs incurred. The good news is that once we completely develop into new product introduction activities, multiple programs will quickly benefit due to our product program leverage model.
>
> We expect these programs to complete over the next 2 to 3 quarters and transition to production-based contracts thereafter. This transition should lead to stronger fiscal '24 results, not only improved gross margins and adjusted EBITDA as cost

- 68 -

pressures diminish, but also lower working capital *as we quickly relieve unbilled receivables* through shipment, invoicing and cash collections.

As I said previously, *our challenges are* not related to end market demand, which remains strong. They're largely timing and cost related, they're short term, and they're *not unique to Mercury.* We're focused on controlling what we can in this environment given the technologies that we developed and the programs that we've won. Structurally, our business model and financial outlook are sound, and we're very optimistic about the future.

192.252.    The statements in ¶191251 that Mercury's challenges withmeeting performance obligations on the dozenimpacted programs in 3Q23 were "not unique to Mercury" were materially false and misleading for the reasons set forth in detail in ¶¶43-16746-225 above, *i.e.*, because Mercury was experiencing these challenges as a result of execution problems on theone dozen programs that were caused by Mercury's failure to fully integrate the Company's acquisitions, meaning that these challenges were, in fact, unique to Mercury.

193.253.    The statement in ¶191251 that "[t]he cost growth we're experiencing is associated with certain new technology developments that are nearing completion" was materially false and misleading for the reasons set forth in detail in ¶¶43-16746-225 above, *i.e.*, because the execution problems were pervasive and would prevent the performance obligations from being completed in a short time frame due tocaused by Mercury's failure to fully integrate the Company's acquisitions. had prevented the completion of performance obligations, and the true source of Mercury's cost growth was the additional costs needed to meet these performance obligations, not "certain new technology developments that are nearing completion[.]"

194.254.    The statement in ¶191251 that Mercury will "quickly relieve unbilled receivables" was materially false and misleading for the reasons set forth in detail in ¶¶43-16746-225 above, *i.e.*, because the Company had failed to fully integrate the businesses Mercury acquired, which caused execution problems that prevented the Company from achieving the performance

**Formatted:** Font: Bold, Italic

**Formatted:** Font: Not Bold, Not Italic

obligations on those contracts that would allow Mercury to convert its unbilled receivables to cash in a timely manner.

**The False and Misleading Misstatements and Omissions
Made ~~By the Replacement~~by Defendants Ballhaus and Farnsworth**

~~195.~~255.    On August 15, 2023, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 4Q23 and FY23 financial results (the "Aug 2023 Call"). The Aug 2023 Call was the first Mercury earnings call handled by ~~the Replacement Defendants.~~defendants Ballhaus and Farnsworth.  During the Aug 2023 Call, defendant Ballhaus stated, in pertinent part, as follows:

> Second impression: over the past several years the company grew inorganically into strategically attractive areas, but didn't fully integrate some of the businesses and mature processes and management systems to align with Mercury's evolving business portfolio. In my experience, this is not uncommon in businesses that grow rapidly via acquisitions. At Mercury, though, the immaturity and lack of full integration of key functional areas have led to the serious challenges the company experienced forecasting business performance over the past several quarters. That said, maturing in these areas is doable, within our control, and underway.

> My third and most important takeaway is that while our recent results are disappointing, the majority of our business is performing well, delivering predictable and profitable growth. However, this solid performance has been masked by approximately 20 programs that are experiencing unique and outsized costs, primarily temporary cost growth related to initial development challenges. In fiscal '23, these few programs impacted our financial performance by approximately $56 million. ***Said differently, our reported margin in 2023 does not at all reflect a structural shift in our margin profile.***

> *        *        *

> Second, as I mentioned earlier, ***because our management systems and processes have not matured at the same pace as our growth over the last several years to address the complexities inherent in many of these development programs, a small number of programs have become challenged, leading to unanticipated and temporary impacts on our overall performance.*** In FY '23, execution challenges on approximately 20 programs, a majority of which are development in nature, drove approximately $56 million of impact or approximately 580 basis points of margin contraction.

- 70 -

**Formatted:** Left

196.256.    The statement in ¶195255 that "[o]ur reported margin in 2023 does not at all reflect a structural shift in our margin profile" was materially false and misleading for the reasons set forth in detail in ¶¶43-16746-225 above, *i.e.*, because the Legacy Defendants' failure to fully integrate Mercury's acquisitions had caused execution problems on twenty programs that would necessitate increased costs that would negatively impact Mercury's financial performance for FY24.  In other words, Mercury's reported margin in FY23 did, in fact, represent a structural shift in Mercury's margin profile for FY24.

197.257.    The statement in ¶196255 that the execution problems with the challenged programs were "unanticipated" and "temporary" was materially false and misleading for the reasons set forth in detail in ¶¶43-16746-225 above, *i.e.*, because these execution problems were directly caused by the Legacy Defendants' failure to fully integrate Mercury's acquisitions, meaning they were anticipated, and remediating these execution problems had been, and would continue to be, time consuming and costly, and therefore not temporary.

198.258.    Further, during the Aug 2023 Call, defendant Farnsworth stated, in pertinent part, as follows:

> ***Gross margins in the first half of the fiscal year will approximate those of fiscal '23*** as we transition through the challenged programs and balance the potential for unknown risks that may materialize through final stages of completion.

199.259.    The statement in ¶198258 that Mercury's "[g]ross margins in the first half of [FY24] will approximate those of [FY23]" was materially false and misleading for the reasons set forth in detail in ¶¶43-16746-225 above, *i.e.*, because the Legacy Defendants' failure to fully integrate Mercury's acquisitions had caused execution problems on twenty programs that necessitated increased costs that would negatively impact Mercury's gross margins in FY24 to a level substantially below Mercury's gross margins in FY23.

- 71 -

260.    On August 15, 2023, Mercury filed a Form 8-K announcing the Company's 4Q23 and FY23 financial results (the "Aug 2023 Form 8-K").  The Aug 2023 Form 8-K included a statement from defendant Ballhaus that: "[f]or [FY24], revenues are forecasted to be in the range of $950.0 million to $1.00 billion . . . Adjusted EBITDA for [FY24] is expected to be approximately $160.0 million to $185.0 million[.]"  During the Aug 2023 Call, defendants Ballhaus and Farnsworth reiterated Mercury's FY24 revenue and adjusted EBITDA guidance.

261.    The statements in ¶260 were materially false and misleading for the reasons set forth in detail in ¶¶46-225 above, *i.e.*, because Defendants' failure to fully integrate Mercury's acquisitions had caused execution problems on twenty programs that necessitated increased costs that made Mercury's FY24 revenue and adjusted EBITDA guidance unachievable.

200.262.    On November 7, 2023, Mercury filed a Form 8-K announcing the Company's 1Q24 financial results (the "Nov 2023 Form 8-K").  The Nov 2023 Form 8-K included a statement from defendant Ballhaus that Mercury was "reiterating our full-year guidance based on our current view of bookings, timing of product delivery, and allocation of factory capacity . . . For [FY24], revenues are forecasted to be in the range of $950.0 million to $1.00 billion . . . Adjusted EBITDA for [FY24] is expected to be approximately $160.0 million to $185.0 million[.]"  Also on November 7, 2023, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 1Q24 financial results (the "Nov 2023 Call").  During the Nov 2023 Call, the Replacement Defendantsdefendants Ballhaus and Farnsworth again both reaffirmed Mercury's FY24 revenue and adjusted EBITDA guidance.

201.263.    The statements in ¶200262 were materially false and misleading for the reasons set forth in detail in ¶¶43-16746-225 above, *i.e.*, because the Legacy Defendants' failure to fully integrate Mercury's acquisitions had caused execution problems on twenty programs that

necessitated increased costs that made Mercury's FY24 revenue and adjusted EBITDA guidance unachievable.

### ADDITIONAL SCIENTER ALLEGATIONS

202.264.     As alleged herein, Mercury and the Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly, or recklessly, and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

203.265.     As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Mercury, their control over, and/or receipt and/or modification of Mercury's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Mercury, participated in the fraudulent scheme alleged herein.

204.266.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

205.267.     The Individual Defendants were each executive officers and/or directors of Mercury during the Class Period.  Based on their roles at Mercury, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein, which centers on Mercury's revenue and profit on long-term contracts that utilize over time

- 73 -

revenue recognition accounting, critical financial metrics for the Company during the Class Period, and whether the Company fully integrated Mercury's acquisitions, which was a core strategy of Mercury during the Class Period.  Thus, Mercury's revenue and profit on long-term contracts that utilize over time revenue recognition accounting and integrations of acquisitions are core operations of the Company, such that Defendants would have had knowledge of material information related to Mercury's revenue and profit on long-term contracts that utilize over time revenue recognition accounting and integrations of acquisitions during the Class Period.

206.268.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Mercury, Defendants and defendants Ballhaus and Farnsworth knew, or recklessly disregarded, the extent and scope of their statements during the Class Period.

207.269.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, oversaw the Company as directors on the Board, were directly involved in the day-to-day operations of the Company at the highest levels, and/or were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

208.270.    In addition, each of the acquisitions made by Mercury before and during the Class Period were thoroughly vetted by the Legacy Defendants during the due diligence process for those deals.  This due diligence would have, or should have, alerted the Legacy Defendants to the inevitable integration failure that the Company experienced for these acquisitions.  In addition, the integration efforts that the Legacy Defendants made in their attempt to achieve full integration of Mercury's acquisitions would have, or should have, further alerted the Legacy Defendants to the integration failure that the Company experienced for these acquisitions.

209.271.    Similarly, the Legacy Defendants and defendantdefendants Aslett and Ballhaus were directly involved in Mercury's sale efforts that concluded in June 2023.  During this process, the Board executed confidentiality agreements with 20 parties to facilitate due diligence.  Given that, by FY23, long-term contracts that utilize over time revenue recognition accounting comprised approximately 56% of Mercury's revenue, this due diligence would have, or should have, included a granular review of Mercury's long-term contracts that utilize over time revenue recognition accounting and the integration status of the subset of those contracts that were later revealed to constitute the twenty challenged programs.  Thus, the Legacy Defendantsdefendants Aslett and defendant Ballhaus knew, or should have known, of the execution problems on the twenty challenged programs by virtue of the due diligence activities undertaken with 20 potential buyers during the Company's sale process.

272.    The resignations of the Legacy Defendants – defendants Aslett and Ruppert, Mercury's top executives for the majority of the Class Period – further supports a strong inference of scienter.

273.    Defendant Aslett, who served as Mercury's CEO for nearly 16 years, abruptly resigned in June 2023 when no sale of the Company could be achieved because the Board believed that "refreshed" Company leadership was needed.

~~210.~~274.    Defendant Ruppert resigned in February 2023 after serving as the Company's CFO for nearly 5 years, just before the Company was forced to begin revealing that Mercury's acquisitions made under the supervision of defendant Ruppert had not been fully integrated and that this failure had negatively impacted the Company's financial performance.

~~211.~~275.    The allegations above also establish a strong inference that Mercury, as an entity, acted with corporate scienter throughout the Class Period because its officers, directors, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Mercury's true operating condition and present and expected financial performance from investors.  By concealing these material facts from investors, Mercury maintained and/or increased its artificially inflated common stock price throughout the Class Period.

~~212.~~276.    As executives and/or directors of Mercury, the Individual Defendants are all candidates for imputing corporate scienter to Mercury.

### LOSS CAUSATION/ECONOMIC LOSS

~~213.~~277.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Mercury's common stock and operated as a fraud or deceit on Class Period purchasers of the Company's common stock.  When ~~Defendants'~~the prior misrepresentations and fraudulent conduct by Defendants and defendants

Ballhaus and Farnsworth were disclosed and became apparent to the market through a series of partial corrective disclosures, the trading price of Mercury's common stock fell precipitously as the artificial inflation was removed.

214.278.    As a result of their purchases of Mercury common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants'The false and misleading statements made by Defendants and defendants Ballhaus and Farnsworth had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $79.28 per share on April 16, 2021.

215.279.    On August 2, 2022, after the close of trading, Mercury announced the Company's financial results for 4Q22 and FY22, disclosing for the first time that Mercury's inability to achieve performance obligations on certain undisclosed contracts was negatively impacting the Company's working capital, unbilled receivables, and cash flow.

216.280.    In response to this revelation, the price of Mercury common stock declined approximately $7.67 per share, or 13.3%, from a close of $57.48 per share before the announcement on August 2, 2022, to close at $49.81 per share on August 3.

217.281.    On May 2, 2023, after the close of trading, Mercury announced the Company's financial results for 3Q23, disclosing for the first time that the Company had encountered execution challenges in a dozen Mercury programs, which caused continued poor cash flow performance because Mercury was unable to convert its high levels of unbilled receivables to cash, and the costs of resolving the execution problems with the one dozen challenged programs necessitated a significant reduction in Mercury's FY23 financial guidance

for adjusted EBITDA down to a range of $160 million to $170 million, from a range of $202.5 million to $215 million that was provided on January 31, 2023.

218.282.    In response to this revelation, the price of Mercury common stock declined $7.84 per share, or approximately 17.3%, from a close of $45.28 per share before the announcement on May 2, 2023, to close at $37.44 on May 3.

219.283.    On November 7, 2023, after the close of trading, Mercury announced the Company's financial results for 1Q24, disclosing for the first time that converting the substantial unbilled receivables associated with the twenty challenged programs to cash would require Mercury to incur significant additional costs to recognize the small fraction of total remaining revenue on the challenged programs, which had resulted in adjusted EBITDA of $2 million in 1Q24, a year-over-year decline of 93.4%, and significantly below analyst estimates.

220.284.    In response to this revelation, the price of Mercury common stock declined $4.63 per share, or approximately 12.6%, from a close of $36.78 per share before the announcement on November 7, 2023, to close at $32.15 per share on November 8.

221.285.    On February 6, 2024, after the close of trading, Mercury announced the Company's financial results for 2Q24, disclosing for the first time that converting the unbilled receivables associated with the twenty challenged programs to cash would be so costly that it would cause Mercury's revenue to decline by approximately 20% in FY24, and the Company's adjusted EBITDA to be substantially reduced in FY24, and had caused significantly negative adjusted EBITDA for 2Q24.

222.286.    In response to this revelation, the price of Mercury common stock declined $3.45 per share, or approximately 11.4%, from a close of $30.25 per share before the announcement on February 6, 2024, to close at $26.80 per share on February 7.

223.287.    As shown above, the timing and magnitude of the price declines in Mercury's common stock negate any inference that the losses suffered by Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

## CLASS ACTION ALLEGATIONS

224.288.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Mercury during the Class Period, inclusive, and who were damaged thereby (the "Proposed Class").    Excluded from the Proposed Class are Defendants and defendants Ballhaus and Farnsworth, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants and defendants Ballhaus and Farnsworth have or had a controlling interest.

225.289.    The members of the Proposed Class are so numerous that joinder of all members is impracticable.    Throughout the Class Period, Mercury common stock was actively traded on the NASDAQ.    While the exact number of Proposed Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the Proposed Class.    Record owners and other members of the Proposed Class may be identified from records maintained by Mercury and/or its transfer agent and may be notified of the pendency of this action by mail or by electronic mail, using the form of notice similar to that customarily used in securities class actions.

226.290.    Plaintiffs' claims are typical of the claims of the members of the Proposed Class as all members of the Proposed Class are similarly affected by Defendants'the wrongful conduct of Defendants and defendants Ballhaus and Farnsworth in violation of federal law that is complained of herein.

- 79 -

227.291.    Plaintiffs will fairly and adequately protect the interests of the members of the Proposed Class and have retained counsel competent and experienced in class and securities litigation.

228.292.    Common questions of law and fact exist as to all members of the Proposed Class and predominate over any questions solely affecting individual members of the Proposed Class.  Among the questions of law and fact common to the Proposed Class are:

(a)    whether statements made by Defendants and defendants Ballhaus and Farnsworth misrepresented material facts about the business, operations, and management of Mercury;

(b)    whether Defendants and defendants Ballhaus and Farnsworth failed to disclose material facts in discussing the business, operations, and management of Mercury, making those statements materially false and misleading;

(c)    whether the federal securities laws were violated by Defendants'the acts or omissions of Defendants and defendants Ballhaus and Farnsworth as alleged herein;

(d)    whether the price of Mercury stock was artificially inflated during the Class Period; and

(e)    to what extent the members of the Proposed Class have sustained damages and the proper measure of damages.

229.293.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Proposed Class

to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

230.294.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements challenged herein.  Many of the statements challenged herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants and defendants Ballhaus and Farnsworth are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer and/or director of the Company who knew that those statements were false when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## THE *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS

231.295.    Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine as outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as outlined in *Affiliated Ute Citizens of Utah v. United States,U.S.,* 406 U.S. 128 (1972) ("*Affiliated Ute*").

232.296.    With respect to the *Basic* presumption, a presumption of reliance under the fraud on the market doctrine is appropriate because, among other things:

(a)    Defendants and defendants Ballhaus and Farnsworth made public misrepresentations and failed to disclose material facts during the Class Period;

(b)    the misrepresentations and omissions were material;

(c)    Mercury's common stock traded in an efficient market;

(d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiffs and other members of the Proposed Class purchased Mercury common stock between the time Defendants and defendants Ballhaus and Farnsworth misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

233.297.    At all relevant times, the market for Mercury common stock was efficient for the following reasons, among others:

(a)    Mercury common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Mercury filed periodic public reports with the SEC;

(c)    Mercury regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Mercury was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

234.298.    As a result of the foregoing, the market for Mercury common stock promptly digested current information regarding Mercury from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Mercury common stock during the Class Period suffered similar injury through their purchase of Mercury common stock at artificially inflated prices and a presumption of reliance applies.

235.299.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims of the Proposed Class include material omissions by Defendants. and defendants Ballhaus and Farnsworth,  Because this action involves Defendants'the failure by Defendants and defendants Ballhaus and Farnsworth to disclose material adverse information regarding Mercury's centralcore business operations – information that Defendants and defendants Ballhaus and Farnsworth were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied.

## COUNT I

**Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(*Against All* Defendants)**

236.300.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

237.301.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

238.302.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Mercury common stock during the Class Period.

239.303.    Plaintiffs and the Proposed Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Mercury common stock. Plaintiffs and the Proposed Class would not have purchased Mercury common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

240.304.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Proposed Class suffered damages in connection with their purchases of Mercury common stock during the Class Period.

## COUNT II

**Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(*Against Defendants Ballhaus and Farnsworth*)**

305.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

306.    During the Class Period, defendants Ballhaus and Farnsworth disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed

to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

307.    Defendants Ballhaus and Farnsworth: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Mercury common stock during the Class Period.

308.    Plaintiffs and the Proposed Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Mercury common stock.  Plaintiffs and the Proposed Class would not have purchased Mercury common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

309.    As a direct and proximate result of the wrongful conduct by defendants Ballhaus and Farnsworth, Plaintiffs and the other members of the Proposed Class suffered damages in connection with their purchases of Mercury common stock during the Class Period.

## COUNT III

**Violations of §20(a) of the Exchange Act**
(*Against the Individual Defendants*)

310.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

311.    The Individual Defendants acted as controlling persons of Mercury within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Mercury, the Individual Defendants had the power and authority to

cause Mercury to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Robbins Geller Rudman & Dowd LLP and Grant & Eisenhofer P.A. as co-Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the Proposed Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Proposed Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding Plaintiffs and the Proposed Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  ~~April 18~~August 23, 2024

HUTCHINGS, BARSAMIAN, MANDELCORN ~~& ZEYTOONIAN~~, LLP
THEODORE M. HESS-MAHAN, BBO #557109

*/s/ Theodore M. Hess-Mahan*
THEODORE M. HESS-MAHAN

110 Cedar Street, Suite 250
Wellesley Hills, MA  02481
Telephone:  781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

**Formatted Table**

- 86 -

*Local Counsel for Plaintiffs*

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN (*pro hac vice*)
MICHAEL G. CAPECI *(pro hac vice)*
JONATHAN A. OHLMANN (*pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mcapeci@rgrdlaw.com
johlmann@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com

GRANT & EISENHOFER P.A.
DANIEL L. BERGER (*pro hac vice*)
CAITLIN M. MOYNA (*pro hac vice*)
CECILIA E. STEIN (*pro hac vice*)
TIMOTHY CLARK B. DAUZ (*pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  646/722-8500
646/722-8501 (fax)
dberger@gelaw.com
cmoyna@gelaw.com
cstein@gelaw.com
tdauz@gelaw.com

*Co-Lead Counsel for Plaintiffs*

WEINBERG, ROGER & ROSENFELD, P.C.
EZEKIEL D. CARDER
1375 55th Street
Emeryville, CA 94608
Telephone:  510/337-1001
510/337-1023 (fax)
ecarder@unioncounsel.net

*Additional Counsel for Lead Plaintiff*

ABRAHAM, FRUCHTER & TWERSKY, LLP
MITCHELL M.Z. TWERSKY
JACK G. FRUCHTER
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone:  212/279-5050
212/279-3655 (fax)
mtwersky@aftlaw.com
jfruchter@aftlaw.com

*Additional Counsel for UPRRS*