# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

AFSHIN GALESTAN, Individually and on
Behalf of All Others Similarly Situated,

                     Plaintiff,

    vs.

ONEMAIN HOLDINGS, INC., JAY N.
LEVINE and SCOTT T. PARKER,

                  Defendants.

————————————————————— x

: Civil Action No. 1:17-cv-01016-VM
:
: <u>CLASS ACTION</u>
:
: AMENDED COMPLAINT FOR
: VIOLATIONS OF THE FEDERAL
: SECURITIES LAWS
:
: <u>DEMAND FOR JURY TRIAL</u>
:
:
:
:
:

**TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION ............................................................................................1

JURISDICTION AND VENUE ........................................................................................4

PARTIES ..........................................................................................................................5

CLASS ACTION ALLEGATIONS ..................................................................................8

LEAD PLAINTIFFS' ALLEGATIONS ARE SUPPORTED BY INFORMATION
PROVIDED BY FORMER EMPLOYEES......................................................................10

SUBSTANTIVE ALLEGATIONS ................................................................................12

    Relevant Background...........................................................................................12

    Despite Significant Differences Between the Two Companies,
    Springleaf Acquired the Much Larger Legacy OneMain to Create OneMain...................13

    Integrating the Legacy OneMain Branches Into the Springleaf Model Was Central
    to the Success of the Acquisition......................................................................15

    Defendants Knew, or Recklessly Disregarded, that the Underwriting Process
    Changes Made Shortly After the Acquisition Closed Had Negatively Impacted
    Productivity at the Legacy OneMain Branches ..................................................16

    Defendants Knew, or Recklessly Disregarded, that Forcing the Legacy OneMain
    Branches to Focus on Secured Lending Negatively Impacted Productivity at
    These Branches ..................................................................................................21

    Defendants Knew, or Recklessly Disregarded, that Firing Legacy OneMain
    Personnel During the Class Period Further Negatively Impacted Productivity at
    These Branches ..................................................................................................23

    Defendants Knew, or Recklessly Disregarded, that Integration Activities Caused
    Delinquencies to Increase at the Legacy OneMain Branches............................24

    Defendants Knew, or Recklessly Disregarded, that the Company Lacked
    Adequate Training Mechanisms for the Switch to the Class Platform, that
    Symphony and Class Were Highly Incompatible, and that Switching Legacy
    Onemain Branches to Class Would Exacerbate the Existing Productivity and
    Delinquency Issues at These Branches...............................................................29

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS
DURING THE CLASS PERIOD ....................................................................................30

The February 2016 Statements ...............................................................................31

The April and May 2016 Statements .....................................................................35

The August 2016 Statements .................................................................................38

Omissions Based on Violations of Items 303 and 503 .........................................42

    Item 303 .......................................................................................................42

    Item 503 .......................................................................................................44

DEFENDANTS' POST-CLASS PERIOD DISCLOSURES ............................................45

ADDITIONAL SCIENTER ALLEGATIONS ...............................................................61

LOSS CAUSATION/ECONOMIC LOSS .....................................................................66

NO SAFE HARBOR ....................................................................................................68

APPLICATION OF PRESUMPTION OF RELIANCE:  THE *BASIC* AND
*AFFILIATED UTE* PRESUMPTIONS .........................................................................68

COUNT I .....................................................................................................................70

    For Violations of §10(b) of the Exchange Act and Rule 10b-5
    Against All Defendants.............................................................................................70

COUNT II ....................................................................................................................71

    For Violations of §20(a) of the Exchange Act
    Against the Individual Defendants...........................................................................71

PRAYER FOR RELIEF ...............................................................................................72

JURY DEMAND ..........................................................................................................72

Lead Plaintiff Afshin Galestan ("Lead Plaintiff" or "Plaintiff"), on behalf of himself and all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's amended complaint for violations of the federal securities laws against Defendants (defined below) (the "AC"), alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things: (i) a review and analysis of public filings by OneMain Holdings, Inc. ("OneMain" or the "Company") and Springleaf Holdings, Inc. ("Springleaf") with the U.S. Securities and Exchange Commission ("SEC"); (ii) a review and analysis of other publicly available information, including press releases issued by OneMain and Springleaf, transcripts of OneMain and Springleaf conference calls with Wall Street analysts, analyst reports on OneMain and Springleaf, and articles concerning OneMain and Springleaf in the general and financial press; (iii) a review of all public filings and documents relating to Springleaf's acquisition of OneMain Financial Holdings, LLC ("Legacy OneMain") that led to the creation of the Company; (iv) interviews with numerous former employees of OneMain and Legacy OneMain; and (v) a review and analysis of other available materials relating to OneMain, Springleaf, and Legacy OneMain.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of all purchasers of the common stock of OneMain between February 25, 2016 and November 7, 2016, inclusive (the "Class Period"). Lead Plaintiff is asserting claims against OneMain and certain of its senior executives and/or directors under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and

SEC Rule l0b-5 promulgated thereunder (17 C.F.R. §240.10b-5), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

2.      In November 2015, Springleaf, a company in the personal loan business focusing primarily on secured lending, completed its acquisition of Legacy OneMain, a much larger company in the same business focusing primarily on unsecured lending, in an all-cash transaction valued at $4.25 billion (the "Acquisition").  OneMain was the resulting entity.

3.      Following the Acquisition, Defendants – *i.e.*, OneMain, Chief Executive Officer ("CEO") Jay N. Levine ("Levine") (Springleaf's former CEO), and Chief Financial Officer ("CFO") Scott T. Parker ("Parker") (Springleaf's former CFO) – made a series of positive statements regarding the integration of Springleaf and Legacy OneMain and the Company's resulting operations and financial performance.  Unbeknownst to investors, however, these statements were materially false and misleading because the integration of Springleaf's and Legacy OneMain's different operating procedures, loan underwriting standards, pricing, systems, and cultures was wreaking havoc on the combined Company, as numerous former employees of the Company attest and corroborate.

4.      For example, shortly after the Acquisition, the Company began integrating Legacy OneMain's branches into the new entity by changing the required underwriting process.  Among other things, employees at these branches could no longer simply utilize Legacy OneMain's underwriting software, known as the "Symphony platform," to tell them if a loan should be approved (and in what amount), as they had previously done.  Instead, the Company now required an additional layer of review to comply with Springleaf's underwriting standards.  This new practice led to an immediate decrease in productivity at the Legacy OneMain branches that persisted throughout the Class Period.

Case 1:17-cv-01016-VM Document 20 Filed 06/13/17 Page 8 of 77

5.    In addition, although Legacy OneMain had historically deemphasized secured lending by offering only small discounts to customers who chose to secure their loans, after the Acquisition the Company wanted loans to be secured by collateral (preferably an automobile). This new practice further hampered productivity, as the customers they typically serviced generally lacked the necessary collateral.

6.    Moreover, Defendants failed to disclose that, shortly after the Acquisition closed, they were experiencing higher delinquencies in the Legacy OneMain portfolio due to the Company prohibiting certain tools previously used by the Legacy OneMain branches, further negatively impacting operations and financial performance.

7.    By September 2016, the Company began switching Legacy OneMain branches off the Symphony platform altogether and onto Springleaf's underwriting software, known as the "Class platform." Despite the significant differences between the Symphony and Class platforms, the Company lacked adequate training mechanisms for Legacy OneMain employees and provided little, if any, support to the branches for the conversion to Class. The failure to properly train these employees exacerbated the ongoing productivity and delinquency problems at these branches, as did the Company's decision, no later than March 2016, to begin laying off long-time Legacy OneMain managers and employees.

8.    Despite their awareness of, or reckless disregard for, these issues, Defendants spun a positive story about their integration activities. Defendants represented, for example, that the Company's focus on secured lending was a perfect fit for the Legacy OneMain customer base, and that the Legacy OneMain team members were embracing the Company's post-Acquisition focus on secured lending. Defendants also represented that integration efforts were making meaningful

progress and that the Company was on track to achieve earnings guidance for 2016 and 2017 that Defendants provided to investors at the beginning of the Class Period.

9. Only after the Class Period did Defendants disclose that integrating Springleaf's and Legacy OneMain's very different underwriting and pricing models, requiring the selling of secured loans to a customer base that generally lacked access to collateral, firing long-time Legacy OneMain managers and employees, and rolling out the Class platform without adequate training mechanisms for Legacy OneMain employees was a disaster that resulted in productivity and delinquency problems at the Company.

10. At the same time, investors learned that these problems, which Defendants knew about during the Class Period, necessitated slashing the Company's guidance for 2016 and 2017 by approximately 18% and 36%, respectively. These significant reductions in earnings guidance came after Defendants' repeated Class Period statements that this earnings guidance was achievable.

11. Upon Defendants' disclosure of these facts after the close of trading on November 7, 2016, investors reacted severely. Once trading resumed on November 8, the share price of OneMain common stock collapsed over 38% (on heavy trading volume). Analysts also reacted negatively, with many questioning why Defendants failed to disclose these pervasive integration issues earlier. One analyst even publicly questioned "[OneMain] management['s] credibility" following these revelations.

## JURISDICTION AND VENUE

12. Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5.

13. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

Case 1:17-cv-01016-VM   Document 20   Filed 06/13/17   Page 9 of 77

14.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

15.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## PARTIES

16.     Lead Plaintiff Afshin Galestan purchased OneMain common stock during the Class Period as set forth in the certification previously filed with the Court and incorporated herein by reference, and has been damaged thereby.  *See* ECF No. 11-2.

17.     Defendant OneMain was created through the Acquisition and comprises the combined operations of Springleaf and Legacy OneMain.  OneMain is engaged in the personal loan business and services the middle-income and non-prime markets through over 1,900 branches, the majority of which are Legacy OneMain branches.  The Company's common stock is publicly traded on the NYSE under the ticker symbol "OMF" and was first listed on November 27, 2015, following the completion of the Acquisition.

18.     Defendant Levine has served as OneMain's President, CEO, and a director on the OneMain board of directors (the "Board") since the Acquisition was completed in November 2015.  Before the Acquisition, defendant Levine served in these same roles with Springleaf beginning in October 2011.  According to a September 2, 2009 article in *The Washington Post* entitled "So You Just Squandered Billions . . . Take Another Whack at It," before his affiliation with OneMain and Springleaf, defendant Levine was the co-CEO of RBS Greenwich Capital, a subsidiary of Royal Bank of Scotland ("RBS") that experienced tens of billions of dollars in U.S. credit losses that

contributed to RBS becoming a financial ward of the British government following the global financial crisis in 2008.

19.    Defendant Scott T. Parker ("Parker") has served as OneMain's CFO since November 15, 2015.  According to an October 19, 2015 press release issued by Springleaf, Defendant Parker was hired in anticipation of the closing of the Acquisition to oversee the integration of Springleaf and Legacy OneMain branches.

20.    Defendants Levine and Parker are collectively referred to herein as the "Individual Defendants."

21.    OneMain and the Individual Defendants are collectively referred to herein as "Defendants."

22.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

23.    It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified in ¶¶17-19 above.  Each of the above officers of OneMain, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest

levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

24. As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, and which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and managerial positions and/or Board membership with OneMain, the Individual Defendants each had access to the adverse undisclosed information about OneMain's business prospects and financial condition and performance as particularized herein and knew (or recklessly

disregarded) that these adverse facts rendered the positive representations made by or about OneMain and its business materially false and misleading.

26.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained herein.

27.     Each Defendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of OneMain common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding OneMain's financial reporting, business, operations and management and the intrinsic value of OneMain's common stock; and (ii) caused Lead Plaintiff and the Class to purchase OneMain publicly-traded stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

28.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of OneMain during the Class Period, inclusive, and who were damaged thereby (the "Proposed Class"). Excluded from the Proposed Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

29.     The members of the Proposed Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, OneMain common stock was actively traded on the NYSE.  While the exact number of Proposed Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the Proposed Class.  Record owners and other members of the Proposed Class may be identified from records maintained by OneMain and/or its transfer agent and may be notified of the pendency of this action by mail or by electronic mail, using the form of notice similar to that customarily used in securities class actions.

30.     Lead Plaintiff's claims are typical of the claims of the members of the Proposed Class as all members of the Proposed Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Proposed Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Proposed Class and predominate over any questions solely affecting individual members of the Proposed Class.  Among the questions of law and fact common to the Proposed Class are:

        (a)     whether statements made by Defendants misrepresented material facts about the business, operations and management of OneMain;

        (b)     whether Defendants failed to include material facts in discussing the business, operations and management of OneMain, making those statements materially false and misleading;

        (c)     whether the federal securities laws were violated by Defendants' acts or omissions as alleged herein;

- 9 -

(d)     whether the price of OneMain stock was artificially inflated during the Class Period; and

(e)     to what extent the members of the Proposed Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Proposed Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**LEAD PLAINTIFFS' ALLEGATIONS ARE SUPPORTED
BY INFORMATION PROVIDED BY FORMER EMPLOYEES**

34.     As part of the investigation conducted by and under the supervision of Lead Plaintiff's counsel, eleven former employees ("FEs") provided facts and information known to them concerning Lead Plaintiff's allegations.  These individuals were employed by Legacy OneMain and, following the Acquisition, OneMain, both before and during the Class Period, and have provided facts concerning the allegations contained herein.  As detailed below, the FEs served in positions at Legacy OneMain and OneMain that provided them with access to the information they are alleged to possess.

35.     FE1 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who worked as a Branch Account Executive II from 2014 to September 2016 in the Durham, North Carolina area.

36.     FE2 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who worked as a Branch Manager from around 1997 to September 2016 in the Richmond,

Virginia area. FE2 reported to a district manager whose area manager was FE5 until March 2016. FE2 was first employed by Legacy OneMain in another role beginning in 1993.

37. FE3 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who worked as a Branch Manager from 2000 to November 2016 in the Valparaiso, Indiana area.

38. FE4 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who worked as a Branch Manager from 2005 to December 2016 in the Louisville, Kentucky area. FE4 was first employed by Legacy OneMain in another role beginning in 1998.

39. FE5 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who worked as an Area Director from 2001 to March 2016. FE5 supervised approximately sixty-two branches in Virginia and Maryland. FE5 oversaw nine district managers who each had six to ten branch managers reporting to them.

40. FE6 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who worked as a District Manager from 2000 to August 2016 supervising either 6 or 7 branches in Ohio.

41. FE7 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who worked as a Senior Vice President in Home Office Credit from November 2015 to August 2016 and as a Senior Vice President in Risk from August 2016 to October 2016. FE7 was employed by Legacy OneMain for approximately 20 years total in a variety of positions.

42. FE8 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who worked as a District Manager from January 2015 to November 2016. From January 2015 until July 2016 FE8 supervised approximately 7 Legacy OneMain branches in Idaho.

Beginning in July 2016, FE8 supervised approximately 8 branches that were a mixture of Legacy OneMain and Springleaf locations in Idaho and Oregon.

43.     FE9 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who was Vice President of Internal Communications and Strategic Initiatives from 2014 to May 2016 at Legacy OneMain's former headquarters in Baltimore, Maryland.

44.     FE10 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who worked remotely from home as a Project Manager for the Training Department from 2010 to April 2016.

45.     FE11 is a former employee of Legacy OneMain and, following the Acquisition, OneMain, who worked as an Audit and Compliance Senior Analyst from January 2016 to November 2016, and, before that, as a Department Systems Analyst from 2013 to January 2016, at Legacy OneMain's former headquarters in Baltimore, Maryland.  FE11 worked for Legacy OneMain in various other roles beginning in 2000.

## SUBSTANTIVE ALLEGATIONS

### Relevant Background

46.     OneMain operates in the personal loan business by providing loans to individuals primarily in the middle-income and non-prime markets who have limited access to credit from traditional lenders.  The Company was formed as the result of the Acquisition when Legacy OneMain was acquired by Springleaf.  Legacy OneMain was previously a division of Citigroup Inc. ("Citi").

47.     The combination of Springleaf and Legacy OneMain created one of the largest providers of personal loans in the United States with approximately 2.2 million customers.

48.     The Company's core business, its Consumer and Insurance business, involves originating and servicing personal loans to consumers in OneMain's individual branches.  Each loan

issued by OneMain must be underwritten before the loan is approved by the Company. According to the Federal Deposit Insurance Corporation, underwriting is a process whereby the lender reviews information submitted by the applicant to determine whether the applicant is creditworthy and should receive the loan and in what amount.

49. OneMain's underwriting for its loans was critical to the Company's operations and financial performance because most of OneMain's customers are considered non-prime. The Company has admitted that these customers require significantly higher levels of servicing in comparison to prime or near-prime customers.

**Despite Significant Differences Between the Two Companies, Springleaf
Acquired the Much Larger Legacy OneMain to Create OneMain**

50. Before the Acquisition, Springleaf and Legacy OneMain operated under very different business models. For example, Legacy OneMain focused on selling unsecured loans, *i.e.*, those not backed by any collateral. Springleaf, on the other hand, focused on selling secured loans, *i.e.*, those backed by some form of collateral, preferably an automobile.

51. In addition, the companies had different underwriting systems. Specifically, Legacy OneMain's underwriting process involved inputting customer information into a computerized underwriting platform known as Symphony and thereafter adhering to Symphony's recommendation about whether or not to advance a loan to a borrower. At Springleaf, however, the underwriting process relied on the less sophisticated Class platform that lacked many of the Symphony platform's capabilities and required additional review and input from Springleaf's underwriters before a loan could be approved.

52. Moreover, as a division of Citi, Legacy OneMain was significantly larger than Springleaf. In fact, before the Acquisition, Legacy OneMain had 1,139 branches in 43 states and a

portfolio of loans worth approximately $8.4 billion compared to Springleaf's 830 branches in 27 states and portfolio of loans worth approximately $4 billion.

53.    Notwithstanding the different methods of conducting business, underwriting standards, pricing and customer bases, Springleaf acquired Legacy OneMain from Citi.  Specifically, on March 3, 2015, Springleaf issued a press release announcing that it was acquiring Legacy OneMain and creating a combined company that would comprise 1,967 branches across 43 states with a portfolio of loans worth approximately $13 billion.

54.    In connection with the announcement of the Acquisition, on March 12, 2015, defendant Levine confirmed that Springleaf had conducted adequate due diligence on Legacy OneMain before proceeding with the Acquisition.

55.    Shortly after the Acquisition was announced, the antitrust division of the United States Department of Justice ("DOJ") raised anti-competitive concerns regarding the Acquisition.

56.    On November 13, 2015, Springleaf issued a press release announcing that it had reached a settlement with the DOJ that would allow the Acquisition to close contingent upon Springleaf selling 127 branches in 11 states to Lendmark Financial Services (the "Lendmark Sale"). The settlement required the Lendmark Sale to be completed by April 1, 2016.  According to Springleaf, the Lendmark Sale would leave OneMain with 1,850 branches in 43 states and would not involve the sale of any Legacy OneMain branches.

57.    On November 16, 2015, the Acquisition closed.

58.    On November 27, 2015, OneMain began trading on the NYSE under the ticker symbol "OMF."

59.    Following the Acquisition, OneMain first reported the Company's combined operations and financial results on February 25, 2016, the first day of the Class Period.

**Integrating the Legacy OneMain Branches Into the
Springleaf Model Was Central to the Success of the Acquisition**

60.     Defendants believed that integrating the Legacy OneMain branches into the Springleaf model was critical to the success of the Acquisition.

61.     Accordingly, the Individual Defendants paid careful attention to the progress of integration efforts at the Legacy OneMain branches throughout the Class Period.  In fact, defendant Parker was hired by Springleaf as its CFO for the express purpose of overseeing integration activities following the Acquisition.

62.     In addition, during the Class Period, Defendants closely tracked metrics to ensure that OneMain's underwriting models were working and that losses and overall returns were performing in conformance with the Company's projections.

63.     As a result of their active and personal management of the integration, Defendants were well aware throughout the Class Period that integration efforts at the Legacy OneMain branches caused productivity to immediately decline.  Among other things, these issues happened because, shortly after the Acquisition, the Company immediately made the underwriting process at these branches more complicated and shifted the Company's focus toward secured lending even though the majority of Legacy OneMain's customers sought to purchase unsecured loans.  This disruption was exacerbated by the fact that the Company fired long-time employees and management at the Legacy OneMain branches.

64.     Integration efforts also caused delinquencies to increase at the Legacy OneMain branches because the Company prohibited these branches from using certain tools they previously had at their disposal to combat delinquencies.

65.     These problems only got worse when, beginning in September 2016, the Company began to switch Legacy OneMain branches to the Class platform without adequate training.

**Defendants Knew, or Recklessly Disregarded, that the Underwriting Process
Changes Made Shortly After the Acquisition Closed Had Negatively
Impacted Productivity at the Legacy OneMain Branches**

66.     Immediately following the close of the Acquisition, the Company imposed new underwriting guidelines on the Legacy OneMain branches that were much different than those used by these branches before the Acquisition.  Defendants knew, or recklessly disregarded, that these new guidelines had an immediate negative impact on productivity at these branches.

67.     The pre-Acquisition underwriting process at the Legacy OneMain branches was very simple.  Legacy OneMain had an automated underwriting system that mainly assessed unsecured loan applications.  By contrast, Springleaf's guidelines focused on secured loan applications and therefore required additional layers of review.  Switching the Legacy OneMain branches to Springleaf's underwriting guidelines was a disaster.

68.     According to FE1, a former Branch Account Executive II at a Legacy OneMain branch in North Carolina until September 2016, the Symphony platform would pull a potential customer's credit report, which detailed any judgments, collections or bankruptcies for the customer, and then generate a loan approval amount (or deny the application) based on this information.

69.     FE2, a former Branch Manager at a Legacy OneMain branch in Virginia until September 2016, and FE3, a former Branch Manager at a Legacy OneMain branch in Indiana until November 2016, both confirmed that utilizing the Symphony platform and following its recommendation was the standard practice for Legacy OneMain's underwriting process before the Acquisition.

70.     After the Acquisition, Defendants imposed drastic changes to the underwriting process used at the Legacy OneMain branches.  For example, according to FE4, a former Branch Manager at a Legacy OneMain branch in Kentucky until December 2016, rather than allowing these

- 16 -

Case 1:17-cv-05016-VM Document 20 Filed 06/13/17 Page 20 of 77

branches to solely rely on Symphony, Springleaf required all loans that were approved by Symphony to be sent to Springleaf's underwriters for additional review.

71. Many other former employees reported the same underwriting change at Legacy OneMain branches. For example, FE1 stated that once the Acquisition was complete in November 2015, the majority of underwriting was pulled back from the Legacy OneMain branches to central underwriting at OneMain (*i.e.*, Springleaf) headquarters.

72. Likewise, FE3 stated that after the Acquisition closed, the underwriting guidelines for what qualified as an approved loan had changed a lot, and were continuing to be changed frequently, and that this caused the loan approval process to become extremely confusing.

73. Further, FE2 stated that the Company changed the underwriting process for the Legacy OneMain branches by no later January 2016. FE2 stated that this change involved branches having to send loans approved by Symphony to Springleaf's headquarters that would provide the final word on whether the loan was approved and the amount of the loan. According to FE2, this change in process had an immediate negative impact on productivity.

74. Numerous other former employees of the Company also observed this underwriting change shortly after the Acquisition and the corresponding negative impact on productivity that it had at the Legacy OneMain branches. For example, FE5, an Area Manager who oversaw approximately 62 branches until March 2016, stated that these underwriting changes were causing a decrease in productivity.

75. Likewise, FE6, a former District Manager for Legacy OneMain branches until August 2016, confirmed that integration activities, including changes to the underwriting process, took place shortly after the Acquisition closed. According to FE6, these changes negatively impacted productivity because the way that Springleaf's underwriting process works – requiring additional

layers of review beyond Symphony – required a lot more information from customers than had previously been needed at Legacy OneMain.

76.     FE1, FE3, and FE4 all confirmed that these changes negatively impacted productivity.  In fact, FE1 stated that the additional level of scrutiny "bottlenecked everything."

77.     Defendants knew about, or recklessly disregarded, the negative impact on productivity that the underwriting process changes had at the Legacy OneMain branches during the Class Period.

78.     For example, these productivity issues were discussed by defendants Levine and Parker at meetings.  Specifically, defendant Levine ran, and defendant Parker was present at, a manager's kick-off meeting in Florida in or around January 2016.  According to FE2, who was at this meeting, defendants Levine and Parker specifically addressed that productivity at the branches was bad and was something that needed to be corrected.

79.     Likewise, FE6 participated on three conference calls with other district managers and defendant Levine, which took place approximately every two to three months following the close of the Acquisition until FE6 was terminated in August 2016, where defendant Levine acknowledged the decrease in productivity at the Legacy OneMain branches. FE6 stated that McDowell was also a participant on these calls for a time following the close of the Acquisition.

80.     In addition, during the Class Period Defendants received, or had access to, reports that detailed the production issues caused by the change in underwriting practices.  For example, according to a former Senior Vice President in Home Office Credit until October 2016, FE7, there were reports run at the end of every month through Symphony that showed decreases in productivity at the Legacy OneMain branches. FE7 stated that these reports drew their source information from the Symphony platform.

- 18 -

81. During the Class Period, FE7 provided these monthly reports by email to Mary McDowell ("McDowell"), Legacy OneMain's former CEO since 2007 who served as an Executive Vice President at OneMain from November 2015 until March 31, 2016 whereupon she became a consultant to the Company, and John Schachtel ("Schachtel"), Legacy OneMain's Chief Operating Officer ("COO"). In August 2016, FE7 added George Roach ("Roach"), Senior Vice President of Operations for the Company who came from Springleaf, to these emails and discontinued sending them to Schachtel.

82. According to FE7, Schachtel reported directly to defendant Levine. During his tenure at OneMain, Schachtel had oversight of sales, field operations, marketing and collections. Before the Acquisition, Schachtel had been Legacy OneMain's COO since March 2014 and had reported directly to McDowell. FE5 believed that Schachtel was the Legacy OneMain equivalent to Borchers (defined below).

83. FE7 also stated that Roach reported directly to Bradford D. Borchers ("Borchers"), OneMain's Executive Vice President of Branch Operations, who reported directly to defendant Levine. FE8, a former District Manager for Legacy OneMain and Springleaf branches until November 2016, confirmed that Borchers reported directly to defendant Levine. According to the Company's SEC filings, Borchers was an executive officer of the Company during the Class Period and was a former member of Springleaf's board of directors.

84. FE7's monthly email to McDowell and Schachtel (and later Roach) also included an Excel report that showed the decreases in productivity month over month and year over year. FE7's monthly email was also sent to all of the area managers who oversaw Legacy OneMain branches. According to FE7, this monthly email was also sent to other senior executives at the Company and would have gone to any executive in charge of the Legacy OneMain branches.

85.     In addition, FE4 stated that the Symphony platform had real-time reports of branch productivity.  Specifically, FE4 stated that Symphony had a feature that showed productivity metrics for each branch in a given district and area.  According to FE4, this feature allowed the branches to see where they were ranked in their district and area versus other branches on the basis of productivity.  FE4 personally checked these metrics on a daily basis.  FE4 believed that district managers and area managers reviewed these reports on a daily basis, even multiple times per day.

86.     Likewise, FE2 stated that Symphony had reports that contained a real time assessment of productivity for each branch.  FE2 stated that each branch could only see its own productivity assessment, but that any district or area manager could see this metric for all the branches they had under their control.  FE2 stated that the branches were ranked on productivity within the Company, and also by area and by district.  These rankings were reflected on the Symphony reports and FE2 paid careful attention to this information.

87.     In addition, FE3 stated that management could view reports every day on Symphony, called branch reports, which showed the productivity rate for a particular branch.  According to FE3, anyone at the Company had access to these Symphony branch reports.  In addition, FE3 stated that these reports were sent out every single morning by the assistants for the district managers and the area managers.

88.     FE5 stated that, as an area manager, FE5 had access to reports from Symphony on a daily, weekly, and monthly basis.

89.     FE9, a former Vice President of Internal Communications and Strategic Initiatives at OneMain until May 2016, believed that the negative impact that integration efforts were having on branch productivity was a known concern throughout the Company.

- 20 -

90. Moreover, Defendants further knew of the problems caused by integration efforts because they spent a lot of time in the field with managers in the branches in an effort to find the root cause of the productivity problems. Defendants ultimately admitted that this experience caused them to conclude that the majority of the problem came from integration activities.

**Defendants Knew, or Recklessly Disregarded, that Forcing the Legacy OneMain Branches to Focus on Secured Lending Negatively Impacted Productivity at These Branches**

91. At the same time the Company was changing the underwriting process at the Legacy OneMain branches, it was also changing the way these branches had historically done business by pressuring them to increase sales of secured loans, *i.e.*, those with collateral, instead of unsecured loans, *i.e.*, those lacking collateral.

92. At the beginning of the Class Period, Defendants stated that the primary way that the Company sought to achieve more secured lending at the Legacy OneMain branches was by immediately rolling out the Springleaf auto loan product after the Acquisition closed. The Springleaf auto loan product was a secured loan product that required the customer to put up their vehicle as collateral to receive a loan for debt consolidation, home improvements, or cash. During the Class Period, Defendants informed investors that the Springleaf auto loan product was a perfect fit for Legacy OneMain's customer base.

93. This was untrue. In reality, the Springleaf auto loan product and the Company's focus on secured lending only caused additional productivity declines at the Legacy OneMain branches because Legacy OneMain's customers were ill-suited for secured loans.

94. For example, according to FE5, the Springleaf auto loan product was not able to achieve growth at the Legacy OneMain branches because it did not fit in with the Legacy OneMain financial business model. FE5 confirmed that there were important differences between Springleaf and Legacy OneMain. Specifically, FE5 stated that Springleaf was a distressed lender whose

- 21 -

average account balance was approximately $3,000 but that Legacy OneMain was a much larger operation whose average account balance was approximately $6,000. Because Legacy OneMain had much bigger accounts, FE5 stated it was much harder to grow these accounts as compared to the much smaller accounts that Springleaf was accustomed to servicing.

95. Further, unlike with the unsecured loans that Legacy OneMain had historically provided to its customers, the new underwriting standards required an additional layer of underwriting scrutiny even after loans were approved by Symphony. So, for example and according to FE2, if a customer came in and Symphony stated that the customer qualified for a $15,000 unsecured loan, FE2 would have to send the loan to Springleaf's underwriters for review. FE2 would then be told that the customer could only receive a loan if it was secured, that the collateral had to be an automobile, and that the loan could only be for half of the amount approved by Symphony. According to FE2, this was problematic because customers chose Legacy OneMain because they did not have any collateral. As a result, FE2 stated that it was hard for the branches to attract customers who could satisfy the additional underwriting requirements, which had an immediate negative impact on productivity.

96. At the end of the Class Period, Defendants admitted that the Company's mandate to the Legacy OneMain branches to focus on secured lending during the Class Period led to productivity declines, and a resultant inability to achieve the 2016 Guidance or the 2017 Guidance, because customers seeking unsecured loans typically do not have the collateral or willingness to take on a secured loan.

97. In addition, the interplay between the underwriting changes made at the Legacy OneMain branches and the simultaneous focus on secured lending combined to cause productivity declines during the Class Period.

98.     Moreover, according to FE5, the Legacy OneMain customer base was not a good candidate for secured auto loans because many customers came to Legacy OneMain in the first place looking for unsecured loans.

99.     Further, according to FE3, Springleaf's focus on obtaining collateral hurt productivity because most of Legacy OneMain's portfolio was unsecured loans and the need to get collateral from potential customers impacted Legacy OneMain's ability to close loans because many customers did not want to put up their automobiles as collateral.

100.    FE4 confirmed that following the Acquisition the Company heavily pushed obtaining secured loans with collateral at the Legacy OneMain branches.  According to FE4, the Company would not approve a loan without collateral and this had a negative impact on productivity.

101.    In addition, FE8 confirmed that around April or May 2016 the Company lowered the amount available for unsecured loans.  According to FE8, this change caused the dollar amount and number of loans booked to be a lot lower at the Legacy OneMain branches, thereby negatively impacting productivity.

102.    Accordingly, during the Class Period, Defendants knew, or recklessly disregarded, that forcing the Legacy OneMain branches to focus on secured lending, and the Springleaf auto loan product in particular, was another integration change that negatively impacted productivity.

**Defendants Knew, or Recklessly Disregarded, that Firing Legacy OneMain Personnel During the Class Period Further Negatively Impacted Productivity at These Branches**

103.    Another factor contributing to the productivity declines during Springleaf's efforts to integrate the Legacy OneMain branches following the Acquisition was the fact that the Company fired numerous long-time Legacy OneMain managers and employees.

104.    For example, according to FE5, along with six other Legacy OneMain area managers, FE5 was let go from the Company by March 2016.  FE5 stated that Legacy OneMain had

- 23 -

approximately 20 area managers in total at the time of the Acquisition. As a result, the seven area managers laid off by the Company in March 2016 accounted for approximately 35% of the senior Legacy OneMain branch leadership.

105. According to FE7, the Company also fired numerous district managers after the Acquisition. In fact, according to FE7, every month saw additional long-time Legacy OneMain management and employees being laid off, which FE7 confirmed only furthered the negative impact that integration activities were having on productivity.

106. Accordingly, Defendants knew, or recklessly disregarded, that layoffs of long-time Legacy OneMain managers and employees contributed to the negative impact that integration efforts were having on Legacy OneMain branches during the Class Period.

## Defendants Knew, or Recklessly Disregarded, that Integration Activities Caused Delinquencies to Increase at the Legacy OneMain Branches

107. Productivity declines were not the only problems being experienced at the Legacy OneMain branches shortly after the Acquisition closed. Indeed, another change made by the Company as part of its integration efforts that came shortly after the Acquisition closed also negatively impacted the operations and financial performance of the Legacy OneMain branches. This change involved taking away certain tools used by these branches to combat delinquent loans.

108. A loan delinquency occurs when a customer of the Company is late or overdue on a loan repayment. If a customer is delinquent for an extended period of time, the Company must take a charge-off for the loan, which is a declaration by the Company that the amount of the loan is unlikely to be repaid. According to the 2015 Form 10-K (defined below), the Company issues a charge-off for loans once they have been delinquent for six months.

109.     Further, according to the 2015 Form 10-K, keeping delinquencies low is important to the Company's financial performance and the Company therefore pays careful attention to the rate of delinquencies for its loans.

110.     Defendants knew, or recklessly disregarded, that delinquencies were rising shortly after the Acquisition closed.

111.     For example, these delinquency problems were discussed by defendants Levine and Parker at meetings.  Specifically, FE2 stated that the manager's kick-off meeting in Florida around January 2016 that was run by defendant Levine where defendant Parker was also present, described above in ¶78, included a discussion that delinquencies were bad.

112.     Likewise, FE6 participated on three conference calls that included defendant Levine, which took place approximately every two to three months following the close of the Acquisition until August 2016, and sometimes included McDowell and which is described above in ¶79, where defendant Levine acknowledged the increase in delinquencies at the Legacy OneMain branches.

113.     These delinquency problems were also discussed at meetings attended by direct reports to defendant Levine.  For example, FE8 participated at a meeting in May 2016 with executive leadership at the Company that was helmed by Borchers and Legacy OneMain COO Schachtel where the Class Period delinquency increases were discussed.  According to FE8, district managers informed Borchers and Schachtel at this meeting that the reason why delinquencies were increasing at the Legacy OneMain branches was because the Company had taken away the tools previously used by these branches to rectify delinquencies.  FE8 stated that both Borchers and Schachtel acknowledged the concern with delinquencies at this meeting.

- 25 -

114.    FE6, a District Manager like FE8, also participated at this May 2016 meeting and confirmed FE8's account of this meeting, *i.e.*, that Borchers and Schachtel were informed that delinquencies were increasing because the Company had taken away previously used tools.

115.    FE8 recounted that a second meeting took place in the early fall of 2016 where Borchers was again leading the meeting but this time Schachtel was absent.  FE8 stated that the delinquency concerns at Legacy OneMain branches were again made clear to OneMain's leadership at this meeting.  FE8 stated that Borchers indicated at this meeting that he understood that delinquencies were a challenge.

116.    In addition, during the Class Period Defendants received, or had access to, reports that detailed the delinquency problems caused by the Company's decision to remove certain tools previously used by the Legacy OneMain branches.  For example, FE7 stated that the monthly emails sent by FE7 to both McDowell and Roach following the Acquisition, described above in ¶¶81-84, also detailed the acceleration in delinquencies at Legacy OneMain branches.  FE7 also stated that this email included an Excel report that showed the changes in delinquencies month over month and year over year.

117.    In addition, according to FE10, a former Project Manager for the Training Department at OneMain until April 2016, there was constant numbers tracking done at the management level of the Company through Symphony.  FE10 stated that Symphony was able to reflect within one day when delinquencies increased or decreased.

118.    Among other things, the Symphony platform reported loan delinquencies and ranked the branches according to FE4.  These reports and rankings included delinquency rates.  According to FE4, district managers and area managers reviewed these reports on a daily basis, even multiple times per day.

119.   In addition, the Symphony reports and the rankings of the branches in Symphony described by FE2 in ¶86 above included the delinquency rates for these loans.  Unlike productivity, FE2 believed that the delinquency rates were viewable for all branches in Symphony, not just FE2's branch.  According to FE2, all of the Legacy OneMain branches, not just FE2's branch, were dealing with increased delinquencies following the Acquisition.

120.   Likewise, the branch reports of the loans in Symphony described by FE3 in ¶87 above also included the delinquency rate for a particular branch.  According to FE3, anyone at the Company had access to these Symphony branch reports and they were circulated daily.

121.   Other factors also point to Defendants' knowledge, or reckless disregard, of the increased delinquencies at the Legacy OneMain branches during the Class Period.  For example, FE2 explained that the Company's management must have known about the increase in delinquencies because, during the first quarter of 2016, FE2 was offered cash bonuses to get delinquencies in line at FE2's branch.  Specifically, FE2 was offered around $800 to get FE2's branch to hit a certain percentage of delinquencies for a given month.  FE2 was able to do this and received this bonus several times before FE2's employment with OneMain ended in September 2016.

122.   Similarly, FE6 stated that the branches were given incentives to combat the increased delinquencies.  FE6 stated that these incentives were rolled out before the May 2016 meeting referenced in ¶114 and likely started by April 1, 2016.

123.   In addition, FE4 confirmed that the Company once again allowed the Legacy OneMain branches to use some of the tools banned during the Class Period beginning in November 2016.  FE4 understood that this happened due to shareholder reaction to the delinquency rate of the Company.

124.     FE4 also stated that differences between Class and Symphony also contributed to increased delinquency problems during the Class Period.  Specifically, according to FE4, Class kept up with delinquencies on a recency basis whereas Symphony was on a contractual basis, meaning that they calculated the amount owed by the customer differently.  According to FE4, this meant that many loans that qualified as up-to-date in Symphony were considered delinquent in the Class system.   Unsurprisingly, this contributed to the delinquency problems that Legacy OneMain branches were already experiencing.

125.     At the end of the Class Period, Defendants finally acknowledged that the Legacy OneMain branches were experiencing increased delinquencies since the Acquisition closed.  Specifically, Defendants admitted that, using a metric for analyzing delinquencies known as 60 days past due at 6 months on book, delinquencies on loans made during the first fiscal quarter of 2016 had increased significantly due to integration related activities.

126.     FE5 believed that delinquencies do not spike automatically and that it was a trend that would be developing all along.  According to FE5, if the 60 days past due at 6 months on book metric was showing increased delinquencies by the third fiscal quarter of 2016 this meant that the trend would have been spotted as early as March 2016 and definitely by June 2016.  Accordingly, the 60 days past due at 6 months on book metric represents an admission by Defendants that the Company was observing, or recklessly disregarding, increased delinquencies by this time.

127.     Defendants confirmed the importance of tracking delinquency rates by characterizing the 60 days past due at 6 months on book metric as one of the most important leading indicators of loan performance that gives the Company its best early read on the health of the Company's loans.

- 28 -

**Defendants Knew, or Recklessly Disregarded, that the Company Lacked Adequate Training Mechanisms for the Switch to the Class Platform, that Symphony and Class Were Highly Incompatible, and that Switching Legacy OneMain Branches to Class Would Exacerbate the Existing Productivity and Delinquency Issues at These Branches**

128. By August 2016, Defendants knew that when the Company implemented the Class platform at Legacy OneMain branches in September 2016 it would only amplify the ongoing productivity and delinquency problems because: (i) the Company lacked adequate training mechanisms for Legacy OneMain management and employees; and (ii) Class was highly incompatible with Symphony.

129. According to FE11, when the Company began implementing Class in the Legacy OneMain branches there was a learning curve but not a lot of training. FE11 believed that it was not possible to bring together two companies with completely different underwriting systems, and provide only a little training, and expect the Legacy OneMain branches to meet their goals.

130. In fact, according to FE8, there was no training for branch managers on the change in underwriting processes undertaken at the Legacy OneMain branches during the Class Period, which directly led to a decline in productivity because branch managers had to spend increased time dealing with underwriting issues. FE8 stated that the decline in productivity took place soon after the Acquisition closed.

131. Even for the employees who were offered training, FE4 stated that the Company required that all training take place after work hours. Even worse, FE4 stated that the training in and of itself was not very good.

132. In addition, FE6 confirmed that employees at FE6's branches did not receive any training when the Company implemented the Springleaf underwriting processes following the close of the Acquisition.

133.    This lack of adequate training mechanisms was especially problematic because the Class platform was significantly more complicated than the Symphony platform and, therefore, was much harder for Legacy OneMain branch employees to utilize effectively.

134.    According to FE8, who obtained experience using the Class platform in July 2016 when FE8 was given oversight of several Springleaf branches in addition to Legacy OneMain branches, the Class platform is difficult to use for Symphony users because the Class and Symphony interfaces were "entirely different."  For example, FE8 stated that in Class you had to manually underwrite the loan and build the loan product as opposed to simply inputting the relevant information into Symphony.  FE8 was not provided any training at all by the Company before FE8 began using the Class platform.

135.    FE11 confirmed that Symphony was an automated system whereas Class was manual based.  FE11 believed that Class being manual based hurt productivity because the branches had to input more information, thereby forcing them to spend more time on each loan than they previously had done.  FE11 confirmed that Symphony and Class were so different that it made it much more time consuming for Legacy OneMain employees to learn Class after having only used Symphony and would also require a significant amount of training.

136.    FE7 agreed that if an employee was accustomed to using Symphony and had to learn the Class platform that "[y]ou could not just go in and work it.  You had to have intense training."

137.    As detailed by FE6 in ¶132 above, however, this training was not provided.

### MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

138.    During the Class Period, Defendants disseminated materially false and misleading statements, and otherwise violated an obligation to disclose material information, concerning: (i) the Company's efforts to integrate Legacy OneMain and drive growth at Legacy OneMain following the

Acquisition; (ii) the achievability of the 2016 Guidance and the 2017 Guidance; and (iii) known uncertainties and material risks associated with OneMain's operations.

**The February 2016 Statements**

139.     The Class Period begins on February 25, 2016.  On that date, the Company held a conference call for analysts and investors (the "2/25/16 Conf Call") to discuss the financial results and other information set forth in the press release and presentation issued by Defendants that same day.  During the 2/25/16 Conf Call, defendant Levine stated, in pertinent part, that "***[t]he popularity of our auto refinance program fits perfectly with the [Legacy OneMain] customer base***."[1]

140.     During the 2/25/16 Conf Call, defendant Parker stated, in pertinent part, that:

> ***The introduction of direct auto and increasing originations of hard secured loans have been very successful strategies for Springleaf, and we're very confident that they'll be equally effective as OneMain***, with the anticipated outcome of driving lower losses.

141.     The statements referenced above in ¶¶139-40 were materially false and misleading because Defendants misrepresented or failed to disclose the following facts, which were known to or recklessly disregarded by Defendants:

(a)     that forcing the Legacy OneMain branches to focus on secured lending, and the Springleaf auto loan product in particular, negatively impacted productivity at these branches because Legacy OneMain's customer base was a bad fit for secured lending because it was primarily comprised of borrowers seeking unsecured loans who did not have the willingness or collateral to obtain a secured loan; and

(b)     by virtue of these known and/or recklessly disregarded facts, Defendants lacked a reasonable basis for their positive statements about the Company, its earnings and prospects.

---

[1]     Unless stated otherwise, all emphasis is added.

142.    In connection with the 2/25/16 Conf Call, on February 25, 2016 the Company

distributed a Power Point slide presentation (the "2/25/16 Presentation"). Among other things, the

2/25/16 Presentation provided analysts and investors with the Company's financial earnings

guidance for fiscal year 2016 (the "2016 Guidance") and the Company's financial earnings guidance

for fiscal year 2017 (the "2017 Guidance"), as follows:



143.    In addition, with respect to the 2016 Guidance and the 2017 Guidance, on the 2/25/16

Conf Call, defendant Parker stated, in pertinent part, as follows:

> ***As we begin to realize the benefit from growth, credit performance and operating
> expense synergies, we are projecting a core EPS in 2016 in the range of $4.50 to
> $5.00. Which takes into consideration the lost earnings from the sale of the $600
> million to Lendmark. With the 2016 EPS amount anticipated to grow to the range
> of $6.20 to $6.70 per share in 2017***.

144.    The statements referenced above in ¶¶142-43 were materially false and misleading

for the reasons set forth in ¶141. In addition, the statements referenced above in ¶¶142-43 were

- 32 -

materially false and misleading because Defendants misrepresented or failed to disclose the following facts, which were known to or recklessly disregarded by Defendants:

      (a)     that the change from Legacy OneMain's underwriting process to Springleaf's underwriting process was causing severe disruption and negatively impacting productivity because the Legacy OneMain underwriting process was automated while the Springleaf process was more subjective and required additional review by Springleaf's central office;

      (b)     that integration activities resulted in the diversion of management and employee attention and resources that adversely affected productivity at the Company;

      (c)     that growth was slowing in the Legacy OneMain branches shortly after the Acquisition due to integration activities;

      (d)     that the problems caused by integration activities forced the Company to postpone a number of growth initiatives;

      (e)     that numerous layoffs of Legacy OneMain managers and employees had a negative impact on productivity;

      (f)     that Defendants realigned field management at the Legacy OneMain branches which caused additional disruption at these branches in terms of productivity;

      (g)     that banning certain tools previously used by Legacy OneMain to combat delinquencies caused delinquency rates to increase;

      (h)     that based on their personal interactions with branch managers and attendance at manager's kick-off meetings, Defendants knew integration activities were causing productivity to decline, delinquencies to increase, and growth to slow; and

(i)     by virtue of these known and/or recklessly disregarded facts, Defendants lacked a reasonable basis for their positive statements about the Company, its earnings and prospects.

145.    On February 29, 2016, OneMain filed its first ever annual report on Form 10-K with the SEC for FY15 (the "2015 Form 10-K"). The Individual Defendants signed the 2015 Form 10-K and certified that the information contained therein complied with the Sarbanes-Oxley Act of 2002 ("SOX"). The 2015 Form 10-K misleadingly informed investors that the integration risks associated with the Acquisition were merely speculative, and stated, in pertinent part, as follows:

> ***It is possible that the integration process could take longer than anticipated and could result in the loss of valuable employees, additional and unforeseen expenses, the disruption of our ongoing business, processes and systems, or inconsistencies in standards, controls, procedures, practices, policies and compensation arrangements***, any of which could adversely affect our ability to achieve the anticipated benefits of the OneMain Acquisition.

146.    The statement in ¶145 that "[i]t is possible that the integration process . . . could result in . . . the disruption of our ongoing business[]" was materially false and misleading because it failed to disclose that it was not merely possible that integration activities could disrupt the Company's business and financial performance; this risk had already materialized because the integration changes made at Legacy OneMain branches as part of the Company's integration efforts – including the underwriting guideline changes made at the Legacy OneMain branches, the focus on secured lending and the Springleaf auto loan product in particular, the removal of previously used delinquency tools, and the layoffs of senior Legacy OneMain management and employees – all combined to negatively impact productivity and delinquencies at these branches immediately following the closing of the Acquisition in November 2015.

**The April and May 2016 Statements**

147. On April 7, 2016, OneMain announced that it intended to offer, subject to market and other conditions, up to $1 billion in 8.250% senior notes due December 2020 (the "April 2016 Offering"). In connection with the April 2016 Offering, OneMain filed a Form 424B5 with the SEC that included a prospectus supplement that incorporated by reference the risk factors listed in the 2015 Form 10-K, including the false and misleading statement set forth in ¶145 above.

148. The statement referenced above in ¶147 was materially false and misleading for the reasons set forth in ¶146.

149. On May 4, 2016, the Company held a conference call for analysts and investors (the "5/4/16 Conf Call") to discuss the financial results and other information set forth in the press release and presentation issued by the Company that same day. During the 5/4/16 Conf Call, defendant Parker stated, in pertinent part, as follows:

> From the time we first announced the acquisition last March, we have talked about the great opportunity we have to ramp up originations at OneMain, including secured lending. ***We're really pleased with the responses to the new offerings from the OneMain branch team members***, who appreciate being able to offer customers choices and options that were not previously available.

150. The statement referenced above in ¶149 was materially false and misleading for the reasons set forth in ¶144. In addition, the statement referenced above in ¶149 was materially false and misleading because Defendants misrepresented or failed to disclose the following facts, which were known to or recklessly disregarded by Defendants:

(a)    that, as confirmed by FE1, FE2, FE3, FE4, FE5, FE6, FE7 and FE8, team members at the Legacy OneMain branches were not responding positively to the new offerings and were instead being adversely impacted by severe integration issues and the resulting disruption;

(b)    that Legacy OneMain team members had a negative response to learning Springleaf's underwriting process because the Legacy OneMain underwriting process was

- 35 -

automated while the Springleaf process was more subjective and required a second layer of review by Springleaf's central office;

(c)     that Legacy OneMain team members were frustrated that they had to sell secured loans when the core customer base lacked collateral and wanted unsecured loans;

(d)     that Legacy OneMain team members reacted negatively to the new offerings because integration activities resulted in the diversion of management and employee attention and resources that kept them from focusing on being productive and managing delinquencies; and

(e)     by virtue of these known and/or recklessly disregarded facts, Defendants lacked a reasonable basis for their positive statements about the Company, its earnings and prospects.

151.    In connection with the 5/4/16 Conf Call, on May 4, 2016 the Company distributed a Power Point slide presentation (the "5/4/16 Presentation").  Among other things, the 5/4/16 Presentation provided analysts and investors with the 2016 Guidance and the 2017 Guidance, as follows:



### Significant Earnings Expansion

|  | 2016 | 2017 [1] |
|---|---|---|
| Core EPS Guidance [2] | $4.20 – $4.70 | $5.60 - $6.10 |
| Impacts | SpringCastle earnings | SpringCastle earnings, higher borrowing costs |

**Operating leverage expands earnings growth**



Projected Growth in Average Net Receivables ($B)

~10-15%
~$14     ~$16
2016 Projected     2017 Projected [1]



Projected Growth in Core EPS
Based on mid-point of above guidance range

~30%
$4.45     $5.85
2016 Projected     2017 Projected

(1)    Adjusted 2017 EOP Receivables guidance is $16.5-$17.5B due to SpringCastle Sale
(2)    Core EPS is a non-GAAP financial measure. See Appendix for Regulation G disclosures

13

152.    In addition, with respect to the 2016 Guidance and the 2017 Guidance, on the 5/4/16

Conf Call, defendant Parker stated, in pertinent part, as follows:

> Turning to slide 13, I would like to review our core EPS guidance for 2016 and 2017
> and illustrate the positive operating leverage in our model.  First, *for 2016, we are*
> *maintaining our prior guidance*, but adjusting it by $0.30 to reflect the sale of
> SpringCastle and the impact on earnings for the last three quarters of the year, which
> bring us to a range of $4.20 to $4.70 per share.
>
> *For 2017, we're following the same approach*, with about half the change in the
> guidance coming from the SpringCastle impact and half due to the higher expected
> funding cost, as I just explained.  This brings us to a range of $5.60 to $6.10 for
> 2017.

153.    The statements referenced above in ¶¶151-52 were materially false and misleading

for the reasons set forth in ¶144.

154.    Defendants' false and misleading statements in the 5/4/16 Presentation and the 5/4/16

Conf Call misled analysts to believe that integration activities were positively contributing to the

Company's operations and financial performance.  For example, a May 4, 2016 report on OneMain

by analyst Eric Wasserstrom of Guggenheim stated that "OMF advanced several critical initiatives in

the period, including the integration of its acquisition of OneMain."

155.    Likewise, a May 4, 2016 report on OneMain by analyst Mike Grondahl of Northland

Capital Markets stated that "[o]verall we believe OMF is making solid progress on the integration

and generating growth at OneMain."

156.    On May 6, 2016, OneMain filed a Form 10-Q for 1Q16 (the "1Q16 Form 10-Q"),

which was signed and certified under SOX by the Individual Defendants.  The 1Q16 Form 10-Q

provided no update to the Company's risk factors since the filing of the 2015 Form 10-K, and stated,

in pertinent part, that:

> ITEM 1A. RISK FACTORS
>
> *There have been no material changes to our risk factors previously disclosed in*
> *Part I, Item 1A of our 2015 Annual Report on Form 10-K*.

- 37 -

157.    The statement referenced in ¶156 above was materially false and misleading when made for the reasons set forth in ¶146.

158.    Analysts continued to be misled regarding the true state of affairs at the Company regarding integration efforts and, in particular, switching the underwriting systems used at the Legacy OneMain branches.

159.    Specifically, according to a June 29, 2016 report on OneMain by analyst Mike Grondahl of Northland Capital Markets,"[i]ntegration progress sounds like it is on track with a lot of heavy lifting being done on the underwriting system and marketing system."  This same report also touted the effectiveness of the Springleaf auto loan product at the Legacy OneMain branches, stating, in pertinent part, as follows:

> Springleaf's successful local merchant referral program continues to generate some volume in OneMain legacy branches as the legacy sales force is now allowed to market outside of the branches. **In addition, Springleaf's auto program has been very effective since beginning its rollout in December of 2015 and become fully rolled out to all legacy OneMain branches by end of April 2016.**

[emphasis in original]

**The August 2016 Statements**

160.    On August 4, 2016, OneMain announced its financial results for the second fiscal quarter of 2016, for the period ended June 30, 2016 ("2Q16"), in a press release (the "8/4/16 Press Release"), which it filed with the SEC on Form 8-K.  Defendant Levine was quoted in the 8/4/16 Press Release positively describing the current status of integrating the Legacy OneMain branches, and stated, in pertinent part, as follows:

> Thanks, Craig, and thanks for joining [us] this morning. Before we get into the slides, I want to say that the second-quarter was a very good quarter for us with consumer insurance EPS of $0.96 versus $0.36 in last year's quarter, with solid performance on credit, growth, operating expenses, funding, ***and importantly, integration***.  We feel very good about our business, our operating model, and our competitive position.

161.     In addition to the statement in ¶160 above that there was "solid performance" on "importantly, integration" during the second fiscal quarter in 2016, defendant Levine made a litany of additional false and misleading statements on the 8/4/16 Conf Call.  For example, defendant Levine stated, in pertinent part, that "***The integration of Springleaf and OneMain remains on track***[,]" that "***we have made meaningful progress on implementing the technology integration required of the two networks***[,]" and that "***[t]he timing of our integration activities is meeting all of our expectations, and in some cases, even ahead of plan***."

162.     The statements referenced above in ¶¶160-61 were materially false and misleading for the reasons set forth in ¶144.  In addition, the statements referenced above in ¶¶160-61 were materially false and misleading because Defendants misrepresented or failed to disclose the following facts, which were known to or recklessly disregarded by Defendants:

(a)     that integration activities were not part of the Company's solid performance, nor were they on track, making meaningful progress, or even ahead of plan, because Defendants failed to ensure or implement adequate resources for training for integration activities;

(b)     that the training programs provided by the Company to the Legacy OneMain branches had limited learning retention and post-training support that hindered the ability of these branches to learn the Class platform;

(c)     that integration activities were negatively impacted because the way that Class and Symphony categorized delinquencies led to confusion surrounding the collection periods for delinquencies and the Company lacked centralized support for delinquencies, both of which further contributed to increased delinquencies at the Legacy OneMain branches; and

(d)     by virtue of these known and/or recklessly disregarded facts, Defendants lacked a reasonable basis for their positive statements about the Company, its earnings and prospects.

163.     In addition, defendant Levine, stated, in pertinent part:

We introduced direct auto lending to the former OneMain branches in December of last year and shortly after closing and by the end of April of this year we were originating direct auto loans in all 1,800 of our branches. ***Our early success with the rollout contributed to a meaningful improvement in origination growth at the former OneMain branches . . . and we see this initiative adding over $1 billion of new originations over the next 12 months***.

164.     Likewise, defendant Levine stated, in pertinent part:

Turning to slide 6, I want to discuss the significant progress we've made on a couple of integration initiatives. ***Since closing on the acquisition, we have highlighted the opportunity to re-invigorate growth while increasing the level of secured lending at the former OneMain. We showed good progress on these goals in the second quarter***. Average net receivables, excluding the receivables in the main branch sale, reached $13.1 billion in the quarter, up 2% sequentially from the first quarter.

165.     The statements referenced above in ¶¶163-64 were materially false and misleading because Defendants misrepresented or failed to disclose the following facts, which were known to or recklessly disregarded by Defendants:

(a)     that forcing the Legacy OneMain branches to focus on secured lending, and the Springleaf auto loan product in particular, negatively impacted productivity at these branches because Legacy OneMain's customer base was a bad fit for secured lending because it was primarily comprised of borrowers seeking unsecured loans who did not have the willingness or collateral to obtain a secured loan;

(b)     that these problems meant that secured lending initiatives at the Legacy OneMain branches were hindering growth, not facilitating it, and therefore it would not be contributing to increased originations at these branches; and

(c)     by virtue of these known and/or recklessly disregarded facts, Defendants lacked a reasonable basis for their positive statements about the Company, its earnings and prospects.

166.     In making the statements in ¶¶163-64 above, defendant Levine acknowledged that the Company's focus on secured lending could cause Legacy OneMain customers seeking unsecured loans to be turned away by the Company but failed to disclose that this had been taking place since the Acquisition closed and was negatively impacting productivity such that the 2016 Guidance and the 2017 Guidance were not reasonably achievable.

167.     In addition, during the 8/4/16 Conf Call, defendant Levine stated, in pertinent part, with respect to the 2017 Guidance that:

> *We remain comfortable with our previously stated EPS guidance for 2017 of $5.60 to $6.10 per share*, with an average receivables of $16 billion.

168.     The statement referenced above in ¶167 was materially false and misleading for the reasons set forth in ¶162.

169.     On August 5, 2016, OneMain filed a Form 10-Q for 2Q16 (the "2Q16 Form 10-Q"), which was signed and certified under SOX by the Individual Defendants.  The 2Q16 Form 10-Q provided no update to the Company's risk factors as it pertained to integration activities since the filing of the 1Q16 Form 10-Q, and stated, in pertinent part, that:

Item 1A. Risk Factors

*     *     *

> *There have been no other material changes to the risk factors included in Part I - Item 1A of our 2015 Annual Report on Form 10-K*.

170.     The statement referenced above in ¶169 was materially false and misleading for the reasons set forth in ¶146.

171.    Defendants' false and misleading statements in the 8/4/16 Press Release, the 8/4/16

Conf Call, and the 2Q16 Form 10-Q continued to mislead analysts regarding the true impact that

integration activities were having on the Company's operations and financial performance.  For

example, an August 8, 2016 report on OneMain by analyst Mark C. DeVries of Barclays stated that

"[w]ith OMF reiterating guidance, it appears longer term growth and integration is on track."

172.    A follow-up report by the same Barclays analyst on October 17, 2016, stated that "[i]t

appears that OMF is on track with the integration of the OneMain acquisition."

### Omissions Based on Violations of Items 303 and 503

**Item 303**

173.    The SEC created specific rules governing the content of disclosures by public

companies in their filings with the SEC.  SEC Regulation S-K requires that every Form 10-Q and

Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and

Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17

C.F.R. §229.303.  The MD&A requirements are intended to provide material historical and

prospective textual disclosures that enable investors and others to assess the financial condition and

results of operations of a company, with emphasis on that company's prospects for the future.

174.    Pursuant to Item 7 of Form 10-K and Item 2 of Form 10-Q, OneMain's Class Period

SEC filings were required to furnish certain information required under Item 303(a)(3) of Regulation

S-K including, among other things:

(a)    Describe any unusual or infrequent events or transactions or any significant

economic changes that materially affected the amount of reported income from continuing

operations and, in each case, indicate the extent to which income was so affected.  In addition,

describe any other significant components of revenues or expenses that, in the registrant's judgment,

should be described in order to understand the registrant's results of operations; and

- 42 -

(b)      Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

175.      Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

176.      The following were known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations and, therefore, were required to be disclosed by Defendants pursuant to Item 303 in the 2015 Form 10-K and the 1Q16 Form 10-Q:

(a)      that changes made by the Company to the underwriting process used at Legacy OneMain branches had negatively impacted productivity at these branches;

(b)      that forcing the Legacy OneMain branches to focus on secured lending, and the Springleaf auto loan product in particular, further negatively impacted productivity at these branches;

(c)      that banning certain tools previously used by Legacy OneMain to combat delinquencies caused such rates to increase;

(d)      that layoffs of long-time Legacy OneMain managers and employees contributed to the magnitude of the productivity and delinquency problems; and

- 43 -

(e)     that all of these problems had and were continuing to negatively impact the operations and financial performance of the Legacy OneMain branches.

177.     In addition to the known trends, events, or uncertainties listed in ¶176 above, the following were known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations and, therefore, were required to be disclosed by Defendants pursuant to Item 303 in the 2Q16 Form 10-Q:

(a)     that the Company lacked adequate training mechanisms for Legacy OneMain employees for integration activities;

(b)     that the Class and Symphony platforms had significant differences that made learning the Class platform very difficult for Legacy OneMain management employees thereby amplifying the existing problems with productivity and delinquencies; and

(c)     that all of these problems had and were continuing to negatively impact the operations and financial performance of Legacy OneMain branches.

178.     The foregoing facts were required to be disclosed pursuant to Item 303 because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

**Item 503**

179.     Pursuant to Item 1A of Form 10-K, OneMain's 2015 Form 10-K was required to furnish certain information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503], including,

- 44 -

among other things, a "discussion of the most significant factors that make the [securities] speculative or risky."

180. Pursuant to Item 1A of Form 10-Q, OneMain's Class Period Forms 10-Q were required to "[s]et forth any material changes from risk factors as previously disclosed" in OneMain's 2015 Form 10-K pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503].

181. Defendants failed to comply with Item 503 by failing to adequately disclose risk factors or material changes in risk factors in these SEC filings.

182. Specifically, Defendants failed to disclose in the 2015 Form 10-K that, shortly after the Acquisition, integration activities had caused a diversion of management and employee attention and resources at Legacy OneMain branches that adversely affected both productivity and delinquency at these branches, as required under Item 503.

183. Further, Defendants failed to disclose in the 1Q16 Form 10-Q and the 2Q16 Form 10-Q the material changes from the risk factors that Defendants failed to disclose in the 2015 Form 10-K, *i.e.*, the same information that was withheld from the 2015 Form 10-K in violation of Item 503 that is described in ¶182 above.

**DEFENDANTS' POST-CLASS PERIOD DISCLOSURES**

184. After the close of trading on November 7, 2016, during a conference call with analysts and investors, Defendants first began to disclose that the Company experienced significant integration problems at the Legacy OneMain branches and could not achieve the 2016 Guidance and the 2017 Guidance (the "11/7/16 Conf Call"). These revelations were not due to Defendants' candor, but were the result of probing questions from analysts. Indeed, shortly before the 11/7/16 Conf Call, OneMain issued a press release announcing the Company's financial results for 3Q16 that continued to misrepresent and omit facts concerning problems pertaining to integration activities (the

"11/7/16 Press Release"). In fact, defendant Levine represented that all was well and was quoted in

the 11/7/16 Press Release as representing:

> "Our third quarter results reflect the progress we have made on our strategic
> priorities and the integration of OneMain. In fact, our Consumer and Insurance
> segment adjusted earnings per diluted share more than doubled from last year."

> Levine added, "We continued to grow receivables, manage credit risk, further
> strengthen our liquidity and balance sheet, and realize synergies from the acquisition
> of OneMain. We also accomplished the significant task of combining the two branch
> networks under a single brand, which will further enhance our name recognition and
> our ability to offer competitive products to our customers."

185. This did not reflect the true state of affairs at the Company. Specifically, while

Defendants repeatedly made positive statements during the Class Period regarding integration

activities, Defendants for the first time revealed on the 11/7/16 Conf Call that integration had been,

and was continuing to be, a significant challenge for the Company, with defendant Levine admitting,

in pertinent part, as follows:

> ***[A]n integration of this scale is not without its challenges, and recently, we have
> seen a firm-wide slowdown in loan growth, relative to our expectations, as well as
> an uptick in early stage delinquency, principally at the OneMain branches***. I will
> discuss both these trends in greater detail later in the call.

*    *    *

> ***[D]elinquency was up from the second quarter***. This increase was due to normal
> seasonality, ***and to the impact of recent integration activities at the former
> OneMain branches. We believe the impact of integration from the former
> OneMain network, led to an incremental increase of 20 basis points in early stage
> delinquencies for the whole portfolio, at the end of third quarter***.

> Finally, as we look ahead to expected charge-offs for full-year 2017, we're
> anticipating a higher loss range than we had shared earlier now 7.2% to 7.6%, and
> the first-half, 2017 charge-offs expected to be elevated as we go through this
> integration. Our revised credit outlook is partly related to denominator effect, with
> less expected near-term growth and receivables on our books, ***as well as a link to the
> uptick in delinquencies we anticipate experiencing through the integration***.

*    *    *

- 46 -

*As our integration activities accelerate[d] in the third quarter, the amount of change we asked of our branch team members, simply kept them from bringing their historical level of focus on new business and collections. In addition, we postponed a number of growth initiatives in light of the need to focus on the integration. As we think about our learnings from the integration over the past few months, and as we approach the final stages of our branch systems conversion, we now expect minimal growth to former OneMain, until the integration is completed in the first half of next year, with growth expected to pick up in the second half of the year*.

186. Further, Defendants also acknowledged for the first time that the Company's focus on secured lending at the Legacy OneMain branches, and the Springleaf auto loan product in particular, had been, and was continuing to be, a significant challenge for the Company, with defendant Levine admitting, in pertinent part, as follows:

*Again, for the overall portfolio, as well as for every vintage we originate, we closely track metrics to ensure our marketing and underwriting models are working, and that losses and overall returns are performing as originally projected. One of the most important leading indicators of loan performance, is the share of loans that are 60 days past due, at six months after origination. In fact this 60 at 6 indicator gives us the best early read on the health of each vintage, relative to expected performance*.

As you see in the top left, our secured mix at Springleaf -- the 60 at 6 measure has, over the time demonstrated the benefit of originating more secured volume. This gives us confidence that we can expect an underlying improvement in Springleaf net charge-offs going forward. Our 30 to 89 day delinquencies have improved in 2016, and we believe this will lead to lower charge-offs in 2017, compared to 2016 for Springleaf.

Let's turn to slide 9. As we've mentioned previously, over the past several years, OneMain has deemphasized secured lending, and you can clearly see that in the chart. Historically, interest rates on OneMain secured loans were only at a small discount compared to their unsecured offers. With this pricing, it was an easy decision for customers to take the unsecured offer and it was certainly easier for the branches to sell and close the unsecured loan.

This has had a negative impact on OneMain's recent and expected credit performance, as you can see in the 60 at 6 chart in the top right*. In addition, the performance of the first quarter vintage is showing some effects of the integration activities I mentioned earlier*. Needless to say, increasing secured lending in the portfolio has been one of our biggest priorities since closing, and we believe it will be a significant contributor to long-term growth, lower losses, and importantly, enhanced profitability.

- 47 -

With originations in the third quarter of OneMain at 38% secured versus 13% one year ago, and with the OneMain portfolio at 21% secured at the end of the third quarter, we have already made meaningful strides since closing, and expect the secured percentage of the OneMain portfolio will grow to approximately 35% by late 2017. This level of security is expected to drive losses and 2018, below the projected 2017 level.

*As we have brought new emphasis to secured lending in the OneMain branch network, we have recently seen a reduction in our unsecured volumes.  While we have had real success in selling secured loans, not every unsecured prospect or customer has the collateral or the willingness to take on a secured loan, and we believe that this along with the integration activities, has been a driver of the recent slowdown in growth at OneMain*.

187.    Defendants also disclosed for the first time the magnitude of the financial impact

these integration problems were causing at the Company and the resultant inability of the Company

to achieve the 2016 Guidance and the 2017 Guidance, with defendants Levine and Parker stating, in

pertinent part, as follows:

Levine: Let's turn to slide 11.  First, it goes without saying, that we are disappointed by the recent downturn in volume and growth, *and the resulting need to reduce our earnings guidance for 2016 and 2017*.  Let me share some of the critical factors that have shaped our updated view.

First, we're seeing more unsecured credit available and in response, *we have moved to eliminate unsecured lending to our highest risk prospects.  We have recaptured some of this volume with secured lending, but clearly not every one of these customers has the willingness or the collateral to take on a secured loan.*

Second, after we close on the acquisition, we saw tremendous excitement in the OneMain branches about the new products and growth potential and we experienced a strong first quarter pick up in loan originations.  *Unfortunately, as a moved into the more intensive portion of the integration particularly in this last quarter we have seen productivity decline in the OneMain network, impacting both growth and credit.*  We view this impact as transitional, and expect to see positive momentum in both receivables growth and credit performance after we complete the integration in the first half of 2017.

Accordingly *we're resetting our Consumer and Insurance adjusted EPS guidance for 2016, to a range of $3.60 to $3.70 per share*.  For 2017, we are lowering our target for total C&I ending net receivables, by about $2 billion, taking into account the full branch integration that we anticipate completing in the first quarter.  *This reduction in receivables, has led us to update our 2017 C&I adjusted EPS guidance to $3.75 to $4.00 per share*.

- 48 -

\*       \*       \*

Parker: As Jay mentioned, *as we move through the integration we're anticipating an uptick in delinquencies in the OneMain portfolio*, as well as a slower receivable growth from the OneMain branches. *With that in mind, we expect our results to come under some pressure in the fourth quarter and the first half of 2017, as we complete the branch integration*.

188.    The presentation distributed by Defendants, dated November 7, 2016, to accompany the 11/7/16 Press Release and 11/7/16 Conf Call for the Company's 3Q16 financial results (the "11/7/16 Presentation") confirmed the revisions to the 2016 Guidance and the 2017 Guidance and provided, in pertinent part, as follows:



189.    Analysts were stunned by these revelations and spent the 11/7/16 Conf Call demanding answers from defendant Levine.  For example, Moshe Orenbuch, an analyst with Credit Suisse, asked: "I am sort of hoping that you could give us a little more detail in terms of the integration issues . . . [b]ecause we spoke more than a month into this quarter [on the 2Q16 Conf Call] and it wasn't apparent at that time that this level of disruption was going to go on[.]"

- 49 -

Case 1:17-cv-05016-VM   Document 20   Filed 06/13/17   Page 53 of 77

190.    In response, defendant Levine admitted that the differences between Springleaf and Legacy OneMain's underwriting processes caused significant problems with the integration and that switching Legacy OneMain's branches to Springleaf's underwriting system was something that the Company had "been working on for some time," and stated, in pertinent part, as follows:

> Sure.  This was a quarter that, compared to everything that's happened in the past, was the most active quarter we've had and in particular it was pretty active late in the quarter as we began to position for the rebranding.  While we were operating two independent networks, one Springleaf, one OneMain, business largely continued as is.  We knew certain things were going to have to happen to ultimately operate as one brand which we did beginning October 1, OneMain. ***The biggest single component of that being aligned underwriting and pricing model.***  That was rolled out in September, so I'd say as we look back over the previous year, really the biggest change has occurred late in the third quarter.
>
> ***They were things we been working on for some time***, but clearly they had more of an impact on business, really what we would say in September and ultimately in October than possibly we anticipated. ***But it was the way the two companies went about their business was slightly different in terms of underwriting and processing of loans and marketing and all that came together and on both sides there was an adjustment.***  So I would say that has been dealt with, that's now in the system and being worked through.  As I think I also alluded to in October, on October 1, we converted two states from what had a former operating system of OneMain Symphony to the Springleaf system to make sure the systems all worked, and we are very pleased that that has all transpired.  The remaining 1000 branches will convert in January and February and we believe those are the last critical activities that have to happen.  So there's some adjustment to the new underwriting and pricing that's occurring as we speak.  There's a new system that had to be adjusted to that will happen in January and February but after that I think we are back to normal operating.

191.    Unsatisfied with this response, another analyst, Rick Shane from JPMorgan, pushed defendant Levine further, asking "[w]hen I think about the revision to guidance today, I think it's really three things . . . the third that you point to, and I think Moshe [Orenbuch] focused on this and I think we need to delve into this a little bit more, is on the integration."

192.    In response, defendant Levine further explained the negative impact on productivity caused by the underwriting process changes at Legacy OneMain branches and the focus on secured lending at these branches during the Class Period, stating, in pertinent part, as follows:

- 50 -

I think you nailed a couple of the few big ones. You are right, there was a little bit more in the way of credit that went into the numbers. But I'd say, look, the biggest one is the delta on receivables, which is origination and the originations -- the numbers have come down for a couple of reasons. One is the environment and I'd say in a slightly different way which is, as we look at the environment *and in particular some of the weaker customers, we are now saying we're happy to make that loan, but we want collateral. As we have aligned the underwriting through companies and as I think I alluded to, not every customer wants to pledge the collateral, and that means there's going to be slower growth as a result of that.*

\* \* \*

But as it relates to the integration we do think that is a near-term thing we're going through, we think it's one that passes within months. It has, really I'd say from every standpoint, gone very well *other than it has slowed down origination growth. Some of that is aligning the underwriting systems and people getting used to what's passing through*, but overall I would say the biggest things that have related to the change, it may be driven by integration, but is largely about the receivables delta.

193. As analysts continued to search for answers, defendant Levine was forced to admit that the Legacy OneMain branches were unfamiliar with the underwriting associated with selling secured loans, that the Company did not have enough resources for integration training, that the Individual Defendants spent time "in the field" working on the integration problems at the Company with branch managers, and that OneMain had laid off Legacy OneMain branch management and employees at the same time integration was taking place, all of which contributed to the negative impact that the integration issues were having on the Company's operations and financial performance and the resulting need to significantly cut the 2016 Guidance and the 2017 Guidance.

194. Specifically, in response to questions from analysts John Hecht ("Hecht") of Jefferies & Co., Bob Ramsey ("Ramsey") of FBR Capital Markets and David Scharf ("Scharf") of JMP Securities, defendant Levine stated, in pertinent part, as follows:

[In response to Hecht]: I'd say when we look at it - well, I'd say a couple of things. One, you saw, while OneMain previously, in a prior life, had emphasized secured lending, it has been a while and you've seen the portfolio decline down. *So I'd say the comfort around the process of taking the title, going through the entirety of the closing was probably a little bit different*.

- 51 -

When I look today at where we are I'd say we're you excited that OneMain's been successful, we probably originated $500 million to $750 million of loans. But when you look at the potential and the gap between what the Springleaf branch is continue to close and what the OneMain branches continue to close, it's one of the greatest points of our optimism of why we think growth is going to get back.  It's still probably running even after three quarters, it's still probably running at half to two-thirds of what we think it could be, and we know with those bigger loans, lower losses, the opportunity is there to build the receivables.  So I think what you just highlighted is one of those things that will come in time **but with all the other things going on in the branches it's one of those we haven't been able to put enough resources for the training and other things for the sale process**.

\*        \*        \*

[In response to Ramsey]: I would say, look, when we think about competition, we continue to see more demand for credit than we have seen.  Our apps are up year-over-year and we really see no challenges on that front.  What I think we're thinking about, it's really the ability of credit and making sure and being responsible about the [loan] we put on. Some of it is being prudent about underwriting, but that doesn't mean there's not demand --I would say that the market really hasn't **changed and the part about integration is really a very near term thing that we have to get trainings around a new system and underwriting modules to get rolled out in the case of underwriting across 1800 locations and in the case of new systems, around 1000 more stores**.

\*        \*        \*

[In response to Ramsey]: I would say the majority of what we're going through now is integration and you can't put a precise on any one of these things, **but from spending a lot of time in the field with our managers in the branches talking to people and trying to [root cause] all of these things, we see the majority of it being integration related**.

\*        \*        \*

[In response to Scharf]: The two systems are pretty comparable but as usual, **there are little differences and we're getting used to that**.  But I'd say some of the real benefits of it that we've already seen in North Carolina is there is paperless closing, so the whole closing process for our customer is much more efficient.  It's actually one of the reasons we went with this system and the whole customer experience, how long it takes to close a loan [without using] touch screens and all of that are all benefit.  That's sort of an aside so that's at the systems about.

What's going on, I'd say a number of things really transpired in the third quarter. **Besides [for just] systems, we streamlined the management of the field and in particular, we have what we call district managers and directors of operation that oversee all of our branches, and we realigned those to get efficiencies in other**

- 52 -

*things in the third quarter. So I will say a good chunk of our branch managers saw a new boss overseeing their branch in the third quarter.* So in addition to some of the other things, we had field consolidations, we changed how we routed our internet app to try and streamline those in the quarter. *So there was a number of different small things that I'd say probably all compounded to really create that level of a little bit of stress in what the normal ecosystem of lending and collecting for that branch manager.* So in hindsight, that was a lot we brought on them that we saw, without that, they were able to certainly grow and originate, as we saw on the first and second quarter, and certainly getting this behind us is what we're trying to get back to certainly in the second half of next year.

195.    In reaction to the disclosures in the 11/7/16 Presentation and the 11/7/16 Conf Call, the price of OneMain common stock plunged an astounding 38.7% once trading resumed on November 8, 2016.

196.    According to a November 8, 2016 report on OneMain by analyst John Hecht of Jefferies & Co., "[w]e believe the guidance reduction is primarily the result of integration issues, which have negatively impacted loan balance growth and loss rates, driving the lower expected range for core EPS."

197.    Analysts were deeply concerned by Defendants' admissions on the 11/7/16 Conf Call. For example, a November 8, 2016 report on OneMain by analyst James Fotheringham of BMO Capital Markets, stated, in pertinent part, as follows:

> *OMF management waited for the release of 3Q16 earnings to communicate significant (growth-related) complications regarding the integration of OneMain.* Following OMF's 3Q16 13% miss and *non-trivial downward revisions to previous guidance* (e.g., mid-point of 2017E EPS guidance range lowered by 34%), we lower our forward core EPS estimates (by between 12% and 37%) as well as our target price (now $24). We continue to rate this volatile stock Outperform, but *we acknowledge that the restoration of loan growth (and subsequent management credibility) may take some time*.

198.    On November 8, 2016, OneMain filed a Form 10-Q for 3Q16 (the "3Q16 Form 10-Q"), which included new information and risk disclosures that should have been included throughout the Class Period concerning the issues regarding the integration of the Legacy OneMain branches

- 53 -

that have plagued the Company since the close of the Acquisition. The 3Q16 Form 10-Q stated, in

pertinent part, that:

> There have been no material changes to the risk factors included in Part I, Item 1A of
> our 2015 Annual Report on Form 10-K, except for changes previously disclosed in
> Part II, Item 1A of our Quarterly Report on Form 10-Q for the period ended June 30,
> 2016, filed with the SEC on August 5, 2016, and as set forth below:
>
> The OneMain Acquisition may not achieve its intended results, and we may be
> unable to successfully integrate our and OneMain's operations.
>
> We acquired OneMain with the expectation that the OneMain Acquisition will result
> in various benefits, including, among other things, cost savings and operating
> efficiencies. Achieving the anticipated benefits of the OneMain Acquisition is
> subject to a number of uncertainties (many of which are outside our control),
> including whether our business and the business of OneMain can be integrated in an
> efficient and effective manner.
>
> The integration of OneMain is a complex, costly and time-consuming process, and
> the significant size and scale of OneMain increases the risks to which we are subject
> relative to other acquired businesses. Such risks include the following, any of which
> could adversely affect our business, financial condition or results of operations or our
> ability to achieve the anticipated benefits of the OneMain Acquisition:
>
> • It is possible that the integration process could take longer than anticipated and
> could result in the loss of valuable employees, additional and unforeseen expenses,
> the disruption of our ongoing business, processes and systems, or inconsistencies in
> standards, controls, procedures, practices, policies and compensation arrangements.
>
> • There may be increased risk due to integrating financial reporting and internal
> control systems.
>
> • Difficulties in combining operations of the two companies could also result in the
> loss of contract counterparties or other persons with whom we or OneMain conduct
> business and potential disputes or litigation with contract counterparties or other
> persons with whom we or OneMain conduct business.
>
> • ***The integration process could result in the diversion of management and
> employee attention and resources or other disruptions that may adversely affect
> our ability to grow our business, pursue loan monitoring and collection activities,
> or achieve the anticipated benefits of the OneMain Acquisition***. During the third
> quarter of 2016, we completed a number of significant integration initiatives related
> to the OneMain Acquisition which involved a significant investment of time and
> effort by OneMain branch and field management personnel, as described above
> under "Management's Discussion and Analysis of Financial Condition and Results of
> Operations-Outlook." We believe these integration-related activities contributed to

- 54 -

lower than expected loan origination growth during the third quarter of 2016, primarily at the former OneMain branches, and an increase in our early stage 30-89 day delinquencies for loans originated in 2016. ***Given the substantial integration-related systems conversion activity and branch consolidation that we have planned through the first half of 2017, we may experience a heightened level of delinquency, net charge-offs and increases in the provision for receivables losses for the balance of 2016 and 2017***. No assurance can be given, however, that we will not continue to incur increased credit losses or declines in, or lower growth of, our personal loan net finance receivables in the future once the OneMain integration has been completed.

If we experience difficulties or delays with the OneMain integration process, or if our assumptions underlying expectations regarding the OneMain Acquisition prove to be inaccurate, the anticipated benefits, expense savings and synergies may not be realized fully or at all, or may take longer to realize than expected. Failure to achieve these anticipated benefits could result in increased costs, increased credit losses or decreases in the amount of expected revenues, any of which could adversely affect our future business, financial condition, operating results and prospects. Our results of operations following the OneMain Acquisition could also be adversely affected by any issues attributable to either company's operations that arise or are based on events or actions that occurred prior to the closing of the OneMain Acquisition.

Additionally, since the closing of the OneMain Acquisition, we remain reliant on Citigroup, the former parent company of OMFH, to provide certain operational services and support to OneMain, and a failure by Citigroup to perform such services could materially increase our costs or disrupt our business, which could adversely affect our financial condition and results of operations.

Our recent underwriting changes and strategy of increasing the proportion of secured loan originations within our loan portfolio may lead to declines in, or slower growth than anticipated of, our personal loan net finance receivables and yield, which could have a material adverse effect on our business, results of operations and growth prospects.

During the third quarter of 2016, in response to an increase in unsecured credit availability to our target customer base from online lenders and various other unsecured credit providers and an increase in our early stage 30-89 day delinquencies for loans originated in 2016, we tightened our underwriting criteria for unsecured personal loans to lower credit tier customers. As a result of these changes to our underwriting criteria, we are generally not underwriting new personal loans to this segment of our customer base absent collateral. We have also continued to execute on our strategy of increasing the proportion of our loan originations that are secured loans, particularly within the former OneMain branches where secured loan originations have historically represented a smaller proportion of total loan originations than those of the former Springleaf branches. Secured loans typically carry lower yields relative to unsecured personal loans. If we are unable to successfully convert lower credit tier customers to our secured loan products or

- 55 -

otherwise increase new originations of secured personal loans, this will adversely affect our ability to grow personal loan net finance receivables. In addition, as secured loans continue to represent a larger proportion of our loan portfolio, our yields may be lower than our historical yields in prior periods.

199.    Analysts continued to be concerned about these revelations. For example, according to a November 10, 2016 report on OneMain by analyst Mark C. DeVries of Barclays, this decline reflected a "reset [of] expectations following disappointing 3Q16 results where the company slashed earnings guidance for 2016 and 2017 . . . [t]he main driver of the guidance change was integration issues at the legacy OneMain branches[.]"

200.    On November 30, 2016, Defendants participated in a conference at the JPMorgan Fintech & Specialty Finance Conference (the "11/30/16 Conf"). During the 11/30/16 Conf, defendant Levine made numerous additional admissions concerning the negative impact caused by the Legacy OneMain integration issues, particularly as it pertained to the differences between Springleaf and Legacy OneMain's underwriting processes, the negative impact that the focus on secured lending had at the Legacy OneMain branches, the layoffs of long-time Legacy OneMain management and employees, and the lack of adequate training mechanisms for Legacy OneMain branch management and employees, and stated, in pertinent part, as follows:

> Turning to Slide 12, let's start off with a description of the branch environment. Our typical branch has three to four members, who under normal circumstances, spend their 40 hours a week making calls to prospective customers, making calls to customers whose payments are due, as well as working with customers in person in the branch. ***These activities are the foundation of both our growth and credit performance, and they require the investment of time and focus to understand and meet our customers' needs till any significant diversion or change impacts their performance. Integration activities had some transitional impacts at OneMain that we discussed on our third quarter earnings report, including an increase in early delinquencies and a slowdown in receivables growth***.
>
> In the third quarter, our branch has went through a tremendous amount of change as a result of integration activities, which accelerated in a meaningful way detailed on the slide. Let me highlight some of the more critical and time-consuming efforts. Most significant was the alignment of credit underwriting. ***At OneMain, this represented a shift from a highly automated model to a more customized approach, with***

- 56 -

*multiple options now being presented to the customer. Unfortunately, this has led to some growing pains for team members*, but we expect will lead to a better customer experience, a more secured book, and faster growth in the long-term. We introduced new online channels to the OneMain branches, requiring resources in time to handle larger volumes of leads. *And we also realigned field management, which as you might imagine, caused some additional disruption*.

*        *        *

Analyst [Rick Shane, JPMorgan Chase & Co.]: So, as we sort of start to pull the room for questions, I'll kick things off. You've talked about some of the integration issues. Third quarter results involved a very significant revision to 2017 earnings and when I think about it, it was really a function of origination volume as a result of lower origination expectations less efficiency, because of less originations not the mix shift that you anticipated to help enhance credit. I think two questions are here. One is, my understanding is that some of this was a policy shift and some of this is a product shift in terms of putting branches on the platform. Can you talk about the timing of the policy shift in terms of loan policy and the impact there and what the product shift will look like as well?

Levine: Sure. So, as you properly highlighted, the biggest reason for the change in guidance really had to do with the fact that there will be going to be less receivables in 2017 due to lower growth. So, OpEx was pretty similar, credit was net, net not that dissimilar to what the numbers had been. Really what was missing was the revenue off a couple billion dollars of receivables and what we saw in the third quarter, *as we went through the beginnings of the changes that we're going to be required to underwriting and then number of the other things, we saw a slowdown in growth across the OneMain branches*. And as a result, we reflected our growth rates accordingly, knowing that there's still some more change to go with the new systems going in.

So, that was the single biggest cause of the change in numbers was really the change in outstanding receivables. Some of the drivers, which I would say were nominal changes, we've been consistently pushing for a balanced mix of secured and unsecured lending, and I'd say, if you look at the numbers for the third quarter with 38% origination across the OneMain, we're making good progress, we're seeing that actually working well. We'd certainly like to see more volume, but at the same time, it's also important that as I discussed that we manage credit. So, there is a lot of changes. *We are asking a 1,100 branches to learning new origination in underwriting system that was different than it had been as I alluded to. OneMain had largely had an automated underwriting system, where the system was largely spit out a yes or a no, and we would be fulfilling a unsecured loan and now what we're trying to do is give customers choices*. We're trying to say, here is an option to pay off your existing car loan with a – with a new direct auto loan, here is a chance to take out a different size loan and there's just a lot more customization that goes on. *And what we found is, it's taking a little bit longer and slowed down growth*. We think that's clearly a short-term thing that is the team members across the OneMain

branches get comfortable that they will get to the point that we'll be able to close that gap, but it was much more around the changes and learnings that were going on in the quarter that we saw slowdown in growth than probably anything else.

Analyst [Rick Shane, JPMorgan Chase & Co.]: And presumably, Springleaf branch employees had been overtime possibly selected for their ability to do that more discretionary underwriting and to offer different types of loans. OneMain employees might certainly have -- don't have that experience, but frankly might not have that skill or that ability. When you sort of do your -- when you go through your thought process, do you think this is a product and that OneMain branch employees can or actually capable of offering?

Levine: And the answer is absolutely, it's a great question. ***Given the two different skill sets, one had lived off automated underwriting, and the other had been more subjective underwriting*** over time, had those two come together and the great news is we have a number of centralized underwriting facilities that are levered by both organizations. From the time we rolled out, our auto product that's become important part of our product suite. ***All those loans were underwritten in a couple of centralized locations, where the branches would shift the loan to get a second set of eyes to put final approval on it*** and all those resources are being used to support the OneMain branches.

Analyst [Rick Shane, JPMorgan Chase & Co.]: So, before I turn into the room, you don't think that there is any meaningful difference in either the education or experience of employees at OneMain branches versus Springleaf branches?

Levine: ***I definitely think there are some differences in terms of selling***.

\* \* \*

And it's really a process to sit down and work with that customer, look at all of their obligations and say, if we put this one and pay this one off, whether it's a car loan or credit card, we put it together into this loan, we could enhance financial situation. You could probably see your FICO go up. You may or may not have additional capacity available should something happen and ***I think it's that selling process is actually taking a little bit of time to be learned as opposed to just offering a single product***.

201.    Following the 11/30/16 Conf, analyst David Ho from Deutsche Bank issued a report on OneMain dated December 13, 2016 (the "Deutsche Bank Report"). The Deutsche Bank Report detailed visits made by Deutsche Bank to numerous OneMain branches (both Springleaf and Legacy OneMain) that were in North Carolina and Kentucky where the initial rollout of the Class platform

in the Legacy OneMain branches took place in 3Q16 to interview employees and assess the scope of

the integration disruption.  The Deutsche Bank Report stated, in pertinent part, as follows:

> Our branch channel checks confirmed that the integration in 3Q16 had tangible impacts on customer activity and servicing for legacy OneMain branches.  For most, this was to be expected, but *for many, learning Springleaf's systems has been a challenge and has taken materially longer than expected*.  Mgmt believes that it is hard to fully grasp how disruptive the integration process is until you go into a branch and see how customers and employees interact.  It would be fair to say that the vast majority of OMF's investor base has never and will never step foot inside an OMF branch (at least until another next Great Recession).
>
> Given this, we've spent a lot of time observing and speaking with local branch employees.  *We called 20+ OneMain/Springleaf branches in NC and KY (that were impacted by the 3Q16 "pilot" integration) and visited six OMF branches (4 legacy OneMain and 2 legacy Springleaf) to gather insight on the integration and the impact on operations at the branch level*.
>
> *Highlights from legacy OneMain branches that were converted in October*:
>
> - *We had a number of respondents confirm that learning the new Springleaf Class front end system has "been a challenge," taking longer than expected and "time away" from normal business activity*.
>
> - A majority of respondents echoed the sentiment that although the integration has "had its bumps," it's important to keep in mind the process only began a couple months ago and "these things take time".  As one respondent noted, the "process has been tough, learning the new systems required more work than expected, but I'm getting better."
>
> - *Respondents reaffirmed mgmt's renewed focus on providing adequate training and ground support* in order to alleviate the expected friction of learning a completely new system.
>
> - Other respondents were positive on the new systems, with one in particular noting that the new Springleaf front end system has "been a welcomed change in our branch."
>
> *Highlights from non-integrated legacy OneMain and legacy Springleaf branches*:
>
> - *There were instances where a manager suggested that the conversions were not "going as smoothly as expected*."  We noted multiple examples of confusion with product branding and store signage based on customers interactions we saw.
>
> - *Certain incompatibilities between legacy branches resulted in customers being "turned away" from a legacy OneMain branch* and needing to drive to a legacy

- 59 -

Springleaf branch in order to be serviced. I.e., "I can't look-up or handle any Springleaf customer payments at this time."

- Most looked forward to finalizing the transition in 1Q17 and "teaming up with" branches "down the road", but wanting to "move past this as soon as possible." We did not pick up any color to suggest that OneMain would not be able to hit this 1Q17 target.

- The Springleaf branch transition process has been "relatively frictionless," as respondents cited no need to retrain their employees on using a new underwriting software system.

What went "wrong" in 3Q16 (based on our observations):

- Most of initial training was done via online modules (with no real onsite support for the new system), leading to issues with reps not learning the system adequately. Recall that the remaining 1000 legacy OneMain branches are scheduled to switch to the Class system (Springleaf's front-end API) in Jan/Feb 2017. The initial online training manual program provided limited learning retention and post training support.

- Delinquency queues and displays differed significantly between the two systems, generating confusion surrounding the collection periods within the system; specifically, when reps should call their customers to collect. Since the decision was made to forgo parallel system processing at the branches, the ability to revert back to the old system (in order to handle the collections issue) was off the table. Therefore, there was a meaningful disruption of time in dealing with early stage collections, and not enough centralized support to handle the overflow.

- Springleaf's credit software generates a more customizable decision output than OneMain's platform. This led to over 200 new district managers taking on added responsibility of adapting to credit exceptions in the underwriting process.

- In addition to the front-end rollout, the new credit decision engine (installed at the back end in September) impacted BOTH legacy Springleaf and OneMain branches (in order to meet FCA fair lending guidelines to make credit outcomes uniformly priced)—by pushing through a new underwriting strategy of avoiding the worst unsecured customers, and requiring collateral for many of the <660 unsecured originations. This impacted legacy OneMain's ability to maintain historical unsecured lending volumes.

- 3Q16 also tends to be one of the busier quarters of the year, creating a more sensitive landscape for disruption.

202. Following the 11/7/16 Conf Call, the 3Q16 Form 10-Q, the 11/30/16 Conf and the

Deutsche Bank Report, the principal concern of OneMain investors was the status of integration

efforts at the Company. Indeed, even as late as January 12, 2017, a report on OneMain by analyst

Mark C. DeVries from Barclays stated, in pertinent part, as follows:

> Overall, *we think investors will be focused on any incremental details around the integration progress at legacy OneMain branches*, which is set to be completed by the end of 1Q17, *and whether the company is on track to meet, or possibly improve on their previous guidance*.

**ADDITIONAL SCIENTER ALLEGATIONS**

203.    As alleged herein, the Company and the Individual Defendants acted with scienter in

that they knew that the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading; knew that such statements or documents would be

issued or disseminated to the investing public; and knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary violations of

the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of

their receipt of information reflecting the true facts regarding the Company, their control over,

and/or receipt and/or modification of the Company's materially misleading statements and/or their

associations with the Company which made them privy to confidential proprietary information

concerning the Company, participated in the fraudulent scheme alleged herein.

204.    Defendants knew and/or recklessly disregarded the false and misleading nature of the

information which they caused to be disseminated to the investing public. The fraudulent scheme

described herein could not have been perpetrated during the Class Period without the knowledge and

complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company,

including the Individual Defendants.

205.    The Individual Defendants were executive officers of OneMain and, at a minimum,

should have been aware of key facts related to the Company's operations, including the integration

of Legacy OneMain branches following the Acquisition and the related underwriting changes, focus

on secured lending, and prohibition of delinquency tools.  These facts establish that the Individual

Defendants were personally involved in, and knowledgeable about, OneMain's integration efforts

during the Class Period.

206.    The Individual Defendants were each members of OneMain's senior management

and/or Board during the Class Period.  Based on their roles at OneMain, each of the Individual

Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

207.    The scienter of the Individual Defendants and OneMain is further evidenced by,

among other things, the following factors:

(a)    defendant Parker was hired by the Company to be its CFO for the express

purpose of overseeing the integration of the Legacy OneMain branches;

(b)    at all relevant times during the Class Period, Defendants closely tracked

metrics to ensure that the Company's marketing and underwriting models were working and that

losses and overall returns were performing as projected by the Company;

(c)    Defendants spent a lot of time in the field with the Company's branch to

assess the problems caused by integration activities;

(d)    According to FE2, defendants Levine and Parker acknowledged at a managers

kick-off meeting in Florida around January 2016 that productivity and delinquencies were bad at

Legacy OneMain branches, evidencing their knowledge that the underwriting changes at Legacy

OneMain branches made after the Acquisition closed in November 2015 were negatively impacting

these branches;

(e)    FE7 sent monthly emails to McDowell, Schachtel and (starting in August

2016) Roach, and all of the area managers overseeing Legacy OneMain branches, which included a

monthly report generated by Symphony and an Excel report that showed the decrease in productivity

and increase in delinquencies occurring at Legacy OneMain branches following the Acquisition on a month to month and year to year basis;

(f) FE6 and FE8 were present at a district managers meeting in May 2016 where Borchers (an executive officer of the Company) and Schachtel (Legacy OneMain's COO) were informed that delinquencies were increasing at Legacy OneMain branches, and acknowledged the same, because the Company had disallowed these branches from using the tools they formerly had at their disposal;

(g) FE8 was present at another district managers meeting in early Fall 2016 where Borchers was provided with the same information regarding delinquencies and their cause as at the May 2016 meeting and again acknowledged the same;

(h) FE6 participated on three conference calls with other District Managers and defendant Levine (and sometimes McDowell), which took place approximately every two to three months following the close of the Acquisition until August 2016, where defendant Levine acknowledged the decrease in productivity and increase in delinquencies at the Legacy OneMain branches;

(i) FE9 believed that the negative impact of integration activities on branch productivity was a known cause throughout the Company;

(j) FE10 believed that there was constant numbers tracking done at the management level of the Company through Symphony and Symphony was able to reflect within one day when delinquencies increased;

(k) FE4 stated that Symphony had real-time reports of productivity and delinquencies for the loans that also provided rankings of each branch for these metrics in a given

district or area. According to FE4, district managers and area managers reviewed these reports on a daily basis, even multiple times per day;

(l)     In addition, FE2 stated that there were reports available on Symphony that detailed productivity and delinquency metrics for the branches;

(m)     FE3 stated that management could view reports every day on Symphony, called branch reports, which showed the productivity and delinquency rates for a particular branch. According to FE3, anyone at the Company had access to these Symphony branch reports and they were circulated on a daily basis;

(n)     FE4 confirmed that the Company once again allowed the Legacy OneMain branches to use some of the previously banned delinquency tools beginning in November 2016, a change that occurred due to shareholder reaction to the delinquency rate of the Company;

(o)     FE2 explained that the Company's management must have known about the increase in delinquencies because during the first quarter of 2016 FE2 was offered cash bonuses each month to get delinquencies in line at FE2's branch;

(p)     FE6 confirmed that by around April 1, 2016, and certainly before the May 2016 meeting described by FE6 and FE8, that the Company gave the branches incentives to combat the increased delinquencies; and

(q)     the Individual Defendants repeatedly spoke to investors and analysts on conference calls throughout the Class Period regarding the status of integration activities and growth initiatives at the Legacy OneMain branches, meaning that they had taken, or recklessly failed to take, steps to inform themselves about the topics they discussed on these calls.

208. Taken collectively, the facts and circumstances described above demonstrate a strong inference that Defendants acted with scienter in making the misrepresentations and omissions challenged herein.

209. At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at OneMain regarding integration, Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Class Period.

210. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

211. Moreover, Defendants failed to disclose the increased risk associated with, among other things, the status of integration efforts at Legacy OneMain branches, which rendered the challenged statements materially false and misleading, thereby giving rise to an affirmative duty and/or obligation to disclose these known trends and uncertainties.

212. Likewise, the fraud alleged herein relates to the core business and operations of OneMain so knowledge of the fraud may be imputed to Defendants. Given Defendants' knowledge

of the truth concerning the integration efforts at Legacy OneMain branches, which directly implicated the operations and financial performance of the Company's core business, its Consumer and Insurance business, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading. Furthermore, these facts were known by OneMain employees in senior positions at OneMain and their knowledge can be imputed to OneMain itself.

213. The allegations above also establish a strong inference that OneMain as an entity acted with corporate scienter throughout the Class Period, as its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing OneMain's true operating condition and present and expected financial performance from the investing public. By concealing these material facts from investors, OneMain maintained and/or increased its artificially inflated common stock prices throughout the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

214. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of OneMain common stock and operated as a fraud or deceit on Class Period purchasers of OneMain common stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of OneMain common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of OneMain common stock during the Class Period, Lead Plaintiff and the other Proposed Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

215.     Defendants' false and misleading statements, which, as alleged above, were made without any reasonable basis and knowledge of falsity, had the intended effect and caused OneMain common stock to trade at artificially inflated prices throughout the Class Period.

216.     As a direct result of Defendants' disclosures set forth above, the price of OneMain common stock fell precipitously.  These drops removed the inflation from the price of OneMain common stock, causing real economic loss to investors who had purchased OneMain common stock during the Class Period.

217.     On November 7, 2016, after the close of trading, Defendants issued the 11/7/16 Press Release, the 11/7/16 Presentation, and held the 11/7/16 Conf Call to announce OneMain's financial results for 3Q16.  Among other things, Defendants reported that integration efforts had caused declines in productivity and increases in delinquencies and that these problems necessitated a significant reduction to the 2016 Guidance and the 2017 Guidance.  In response to these announcements, shares of the Company's stock fell $10.67 per share, or 38.7%, from a close of $27.57 per share on November 7, 2016, before the announcements, to close at $16.90 per share on November 8, 2017, on heavy trading volume of more than 11.27 million shares.

218.     The decline in the price of OneMain common stock after the disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in OneMain common stock negates any inference that the loss suffered by Lead Plaintiff and the other Proposed Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Proposed Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of OneMain common stock and the subsequent significant decline in

the value of OneMain common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## NO SAFE HARBOR

219.     The "Safe Harbor" warnings accompanying OneMain's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

220.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of OneMain who knew that the FLS was untrue. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE: THE *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS

221.     Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine as outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as outlined in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

222. With respect to the *Basic* presumption, a presumption of reliance under the fraud on the market doctrine is appropriate because, among other things:

(a) Defendants made public misrepresentations and failed to disclose material facts during the Class Period;

(b) the misrepresentations and omissions were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Lead Plaintiff and other members of the Proposed Class purchased OneMain common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

223. At all relevant times, the market for OneMain common stock was efficient for the following reasons, among others:

(a) OneMain common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, OneMain filed periodic public reports with the SEC and the NYSE;

(c) OneMain regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) OneMain was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

224.    As a result of the foregoing, the market for OneMain common stock promptly digested current information regarding OneMain from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of OneMain common stock during the Class Period suffered similar injury through their purchase of OneMain common stock at artificially inflated prices and a presumption of reliance applies.

225.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims of the Proposed Class are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding OneMain's business operations and financial prospects and performance – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

226.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

227.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts

- 70 -

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

228. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of OneMain common stock during the Class Period.

229. Lead Plaintiff and the Proposed Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for OneMain common stock. Lead Plaintiff and the Proposed Class would not have purchased OneMain common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

230. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Proposed Class suffered damages in connection with their purchases of OneMain common stock during the Class Period.

### COUNT II

**For Violations of §20(a) of the Exchange Act
Against the Individual Defendants**

231. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

232. The Individual Defendants acted as controlling persons of OneMain within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of OneMain, the Individual Defendants had the power and authority to cause OneMain to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Lead Plaintiff as a Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the Proposed Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Proposed Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding Lead Plaintiff and the Proposed Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  June 13, 2017                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         ROBERT M. ROTHMAN
                                         MICHAEL G. CAPECI


                                         */s/ Samuel H. Rudman*
                                         SAMUEL H. RUDMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com
                                         rrothman@rgrdlaw.com
                                         mcapeci@rgrdlaw.com

- 72 -

HOLZER & HOLZER, LLC
COREY D. HOLZER (*pro hac vice* pending)
MARSHALL P. DEES (*pro hac vice* pending)
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Lead Counsel for Lead Plaintiff Afshin Galestan
and the Proposed Class*

LAW OFFICES OF CURTIS V. TRINKO
CURTIS V. TRINKO
16 West 46th Street, Seventh Floor
New York, NY 10036
Telephone: 212/490-9550
212/986-0158 (fax)
ctrinko@trinko.com

*Additional Counsel for Plaintiffs*

- 73 -

CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on June 13, 2017, I authorized a true and correct

copy of the foregoing:

Amended Complaint for Violations of the Federal Securities Laws

to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such public filing to all counsel registered to receive such notice.


                                              /s/ Samuel H. Rudman
                                              SAMUEL H. RUDMAN