UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                 )
NORTH COLLIER FIRE CONTROL AND   )
RESCUE DISTRICT FIRFIGHTERS'     )
PENSION PLAN, individually and on )
behalf of all other persons similarly )   CIVIL ACTION
situated,                        )   NO. 23-13065-WGY
                                 )
            Plaintiffs,          )
                                 )
        v.                       )
                                 )
MERCURY SYSTEMS,INC., MARK ASLETT, )
MICHAEL RUPPERT, WILLIAM L. BALLHAUS )
and DAVID E. FARNSWORTH,         )
                                 )
            Defendants.          )
_____ )
```

YOUNG, D.J.                              February 20, 2025

## MEMORANDUM AND ORDER

## I. INTRODUCTION

Here the Carpenters Pension Trust Fund for Northern
California, University of Puerto Rico Retirement System, and
North Collier Fire Control and Rescue District Firefighters'
Pension Plan ("the Plaintiffs") move for leave to file a
Proposed Second Amended Complaint ("PSAC"), ECF No. 82. Mercury
Systems, Inc. ("Mercury" or "the Company"), Mark Aslett
("Aslett"), William Ballhaus ("Ballhaus"), Michael Ruppert
("Ruppert"), and David Farnsworth ("Farnsworth") (collectively,

"the Defendants") oppose the motion.  For the reasons stated below, the motion is ALLOWED in part and DENIED in part.[1]

## II.  BACKGROUND

### A.  Procedural History

On July 24, 2024, the Court allowed the Defendants' Motion to Dismiss without prejudice and with leave granted to the Plaintiffs to file a motion for leave to amend the complaint. See July 24, 2024 Hearing Tr. 8, ECF No. 78.  On August 23, 2024, the Plaintiffs timely filed their motion, along with a supporting memorandum of law.  Pls.' Mot. Leave to File Second Am. Class Action Compl., ECF No. 82; Mem. Supp. Pls.' Mot. Leave to File Second Am. Class Action Compl., ECF No. 83 ("Pls.' Mem.").  The Motion is fully briefed.  See Defs.' Opp'n Pls.' Mot. Leave to File Second Am. Class Action Compl. ("Mercury Opp'n."), ECF No. 86; Pl.'s Reply ("Reply"), ECF No. 89; Defs.' Sur-reply ("Sur-reply"), ECF No. 96.  The Court having heard oral argument on the earlier motion to dismiss, determines that further oral argument is not necessary, and therefore decides

---

[1] The Court observes that the parties jointly moved to cancel alternative dispute resolution while this motion was pending.  See Joint Motion to Cancel Alternative Dispute Resolution Hearing, ECF No. 97.  That motion was allowed by Magistrate Judge Bowler and the case returned to this Session. See Order, ECF No. 98 and Report of Alternative Dispute Resolution Provider, ECF No. 99.  The parties shall propose an Alternative Dispute Resolution date as part of the proposed Scheduling Order.

the matter on the parties' well-briefed submissions.  See Local
Rule 7.1(f).

**B.   Facts Alleged in the Proposed Second Amended Complaint[2]**

The Plaintiffs claim that Mercury, a technology company
that serves defense and aerospace industries by developing goods
and services with Mercury's customers, expanded its revenue
during the Class Period not through organic growth but rather
through acquisitions (the "M&A Strategy").  PSAC ¶¶ 2, 48, 52.
Beginning in Fiscal Year ("FY") 2014 (before the Class Period)
Mercury and Aslett embarked in the M&A Strategy, acquiring
companies to grow Mercury's revenue and adjusted Earnings Before
Interest, Taxes, Depreciation and Amortization ("EBITDA").  Id.
¶ 48.

By the start of the Class Period in February 2021, Mercury
had spent over $1,000,000,000 on at least twelve acquisitions,
including: (1) Physical Optics Corporation ("POC") in December
2020, for $310,000,000 (Mercury's largest acquisition – equating
to 22% of what Mercury spent on the M&A Strategy.); (2) American
Panel Corporation; (3) Syntonic Microwave LLC; (4); The Athena
Group, Inc.; and (5) GECO Avionics, LLC.  Id. ¶¶ 49-50.  In
addition, during the Class Period, Mercury acquired three

---

[2] The Facts, although summarized and reorganized, are in
most instances taken verbatim from the PSAC, ECF No. 84-1, for
completeness, but are not quoted for readability.

others: (1) Pentek Systems, Inc.; (2) Avalex Technologies, LLC; and (3) Atlanta Micro, Inc. PSAC ¶ 50. These acquisitions allowed Mercury to report to investors significantly increased revenue and adjusted EBITDA beyond the amount of organic revenue and profit that Mercury had experienced during this time. Id. ¶ 52. By the start of the Class Period, Mercury's M&A Strategy was crucial to the Company's value and financial performance. Id. The Company's M&A Strategy was central to achieving the Defendants' $1,000,000,000 annual revenue goal. Id. ¶ 53. Accordingly, analysts and investors viewed the success of Mercury's M&A Strategy to be highly material. Id. ¶ 55.

The shift in strategy also had revenue recognition consequences. Certain of the fifteen businesses that Mercury acquired pursuant to the M&A Strategy had contracts that used "over time"[3] accounting, which is an accounting methodology that allows for the incremental recognition of revenue and profit as progress is made on completing the relevant performance obligation for the contract. Id. ¶ 56. By contrast, Mercury had primarily used the "point-in-time" method of revenue

---

[3] "Over time" revenue recognition on contracts allows Mercury to recognize revenue as the Company proceeds towards a performance obligation on a contract, but before the customer is sent an invoice for the completed work. PSAC ¶ 57. "Over time" revenue recognition is used for long-term contracts because there is typically an extended period between the Company's recognition of revenue and its performance of the obligation, and issuance of an invoice, to the customer. Id.

recognition before the Class Period, which is an accounting methodology that allows for the recognition of revenue and profit when the good is shipped or the service is completed, and the client has been invoiced. Id. ¶ 59. In the three fiscal years preceding the start of the Class Period, Mercury derived approximately 75% of its revenue from contracts that utilized point-in-time accounting. Id.

Because Mercury acquired businesses before and during the Class Period that had long-term contracts that utilized over time revenue recognition, the overall share of Mercury's revenue derived from long-term contracts that used over time revenue recognition increased significantly during the Class Period. Id. ¶ 60. Before and during the Class Period, Mercury categorized the revenue recognized in excess of the amounts invoiced to the Company's customers as "unbilled receivables."[4] Id. ¶ 58. Mercury's SEC filings during this period confirm an increase in over time accounting because of long-term contracts.

---

[4] Unbilled receivables are a current asset. PSAC ¶ 68. Working capital is calculated by subtracting a company's current liabilities from its current assets. Id. Thus, higher levels of unbilled receivables lead to concomitant higher levels of working capital. Id. Higher levels of working capital decrease a company's cash flow. Id. ¶ 69. Cash flow is a measure of profitability that represents the actual amount of cash at a company's disposal. Id. Decreased cash flow has negative financial implications for Mercury because it means that the Company's unbilled receivables are lingering on Mercury's balance sheet and not turning into actual cash payments from customers. Id. ¶ 70.

Id. ¶¶ 59-65.  Mercury acknowledged that the acquisitions had increased these unbilled receivables, and the need to reduce unbilled receivables.  Id. ¶¶ 66-67.

The Plaintiffs claim that the overheated expansion and incomplete integration of the acquired companies slowed conversion of unbillable receivables into billed receivables and also led to increased costs in conversion.  Id. ¶¶ 74-75. Specifically, Mercury's high level of unbilled receivables from recognizing revenue over time on the contracts acquired pursuant to Mercury's M&A Strategy was catastrophic because the Mercury could not meet the performance obligations on at least twenty contracts that represented approximately 20% of Mercury's revenue.  Id. ¶ 74.  Thus, at all times during the Class Period, Mercury was unable to convert the unbilled receivables for contracts that represented 20% of the Company's revenue to cash, leading to a decline in Mercury's cash flow.  Id.  Incurring additional costs to resolve execution challenges directly caused Mercury's adjusted EBITDA and gross margins to decline, thereby negatively impacting the Company's financial performance.  Id. ¶ 76.  Contracts where the majority of revenue (and corresponding profit) had already been recognized in the form of unbilled receivables negatively impacted Mercury's revenue and profits during the Class Period by necessitating

additional costs and precluding future work from commencing.  <u>Id</u> ¶ 78.

The result was striking: during the six fiscal years ended June 30, 2023, Mercury's annual revenue more than doubled, increasing from approximately $409 million during FY16 to approximately $974 million during FY23.  <u>Id.</u> ¶ 79.  The Company's M&A Strategy, and corresponding increase in unbilled receivables, significantly contributed to Mercury's increased revenue over this time period.  <u>Id.</u>  Nonetheless, as set forth in the Plaintiffs' chart below, while Mercury's reported revenue was experiencing unprecedented growth through acquisition, the cash flow from Mercury's operations substantially declined, from a positive $59,000,000 in FY 2017 to a negative $21,000,000 in FY 2023.



Id. ¶ 79.

The alleged misrepresentations are analyzed below, but the well-pleaded allegations demonstrate that revenues were increasing and cashflow was declining. A former employee and confidential witness ("FE1") who was hired to, among other things, address and remediate the effects of lack of integration, corroborates some of the broad integration problems, but has no personal knowledge as to the level of knowledge of any of the Individual Defendants. Id. ¶ 11. FE1

is a former employee of Mercury who worked as the Director of Engineering, Process and Tools, from February 2023 to June 2024. Id. ¶ 131. Among FE1's duties at Mercury was to help facilitate integration of the engineering processes of the businesses that Mercury had acquired pursuant to the M&A Strategy. Id.

According to FE1, the fact that Mercury had failed to fully integrate certain acquisitions was common knowledge within the Company during FE1's tenure. Id. ¶ 132. FE1 recounted that, during FE1's tenure, Vice Presidents and Directors at Mercury were constantly communicating about how programs at Mercury's Torrance location in California, for example, were not operating properly, which indicated that they had not been fully integrated. Id. FE1 confirmed that Mercury's Torrance location (i.e., POC) had never achieved full integration through the conclusion of FE1's tenure at Mercury in June 2024. Id. ¶ 134. According to FE1, Mercury had internal processes in place that had to be met in order for an acquisition to be considered fully integrated. Id. ¶ 138. This process was known as "playbooking," and consisted of various playbooks -- e.g., an electrical engineering playbook, a software engineering playbook, or a systems engineering playbook -- that Mercury's employees used as a benchmark to assess whether an acquisition had been fully

integrated. <u>Id.</u> The playbooks defined the specific processes and tools that had to be met in order for the engineering functions of the acquired business to be considered fully integrated into Mercury. <u>Id.</u> FE1 confirmed that certain requirements of several engineering playbooks had not been met for certain Mercury acquisitions during the Class Period. <u>Id.</u> In addition, FE1 confirmed that Mercury had not achieved full integration for certain acquisitions of common: (1) engineering platforms; (2) ERP systems; (3) HRIS systems; (4) CRM systems; or (5) financial systems. <u>Id.</u> ¶ 139.

Furthermore, FE1 submitted program performance metrics on a weekly and monthly basis to members of Mercury's executive leadership team, including to Allen Couture ("Couture"), a Senior Vice President of Execution Excellence at Mercury from October 2022 to January 2024. <u>Id.</u> ¶ 140. According to the 2023 Form 10-K, Couture directly reported first to Aslett and then to Ballhaus during the Class Period. <u>Id.</u> According to FE1, the program performance metrics that FE1 submitted to Couture demonstrated that full integration had not been achieved for certain acquisitions. <u>Id.</u>

By January 2022, as revenues increased and cash flow fell, Ballhaus announced his intention to stand for election as a director of Mercury, with a platform of possibly selling Mercury. <u>Id.</u> ¶¶ 171-76. The increasing unbilled receivable

trend continued through the Spring of 2022.  See id. ¶ 79.  On June 23, 2022, Ballhaus became a director on the Board of Mercury.  Id. ¶ 180.  By September 2022, severance incentives were in place for Aslett and Ruppert if Mercury were sold within eighteen months of their separation from Mercury.  Id. ¶¶ 181-82.

On January 31, 2023, Mercury announced that the Board had "approved a plan to explore strategic alternatives, including a potential sale of the Company."  Id. ¶ 183.  In addition, Mercury announced that Ruppert had informed the Board that he was resigning effective February 17, 2023, meaning after Mercury's sale process had begun.  Id. ¶ 184.

According to the Plaintiffs, as reflected in their chart below, every time that the Defendants reported Mercury's quarterly results for unbilled receivables and operating cash flow in 2021 and 2022, and coupled those results with statements about Mercury's then-existing efforts to fully integrate, that Mercury had fully integrated acquisitions, or that Mercury had achieved full integration, they knew, or recklessly disregarded, that Mercury's contracts that utilized over time accounting were not meeting performance obligations, as evidenced by unbilled receivables not timely converting to cash.

[11]



Id. ¶ 97.

On May 2, 2023, after the close of trading, Mercury announced its financial results for 3Q23, disclosing for the first time that the Company had execution challenges in a dozen programs, which caused continued poor cash flow performance because Mercury was unable to convert its high levels of unbilled receivables to cash. Id. ¶ 163. Further, Mercury disclosed that the costs of resolving the execution problems with the one dozen challenged programs necessitated a

significant reduction in Mercury's FY23 financial guidance for adjusted EBITDA, down to a range of $160,000,000 to $170,000,000 from a range of $202,500,000 to $215,000,000 that was previously provided in January 2023. Id. Mercury, however, did not disclose that these problems were the result of an integration failure, were related to any programs Mercury had acquired, or the full extent of the negative impact to Mercury's financial performance caused by Mercury's integration failure.

On June 23, 2023, Mercury revealed that the Board had held discussions with more than 40 potential bidders, entered into confidentiality agreements with 20 parties, but ultimately received only two proposals. Id. ¶ 185. The Board did not believe that the two offers reflected Mercury's intrinsic value, and, as a result, Mercury decided to conclude the sale process and instead proceed "under refreshed leadership." Id. ¶ 186. That same day Mercury announced that on June 19, 2023, Aslett had informed the Board that he was resigning as CEO and as a director on the Board. Id. ¶ 188. The Board, in turn, announced that defendant Ballhaus would serve as Mercury's interim CEO beginning on June 24, 2023. Id. ¶ 189.

On August 15, 2023, Mercury announced that Ballhaus had become its permanent CEO and would also become the Chairman of the Board. Id. ¶ 192. In the accompanying earnings call

held that same day, Ballhaus addressed Mercury's investors for the first time as CEO.    Id. ¶ 193.    Ballhaus stated:

> Second impression: **over the past several years the company grew inorganically into strategically attractive areas, but didn't fully integrate some of the businesses and mature processes and management systems to align with Mercury's evolving business portfolio.**   In my experience, this is not uncommon in businesses that grow rapidly via acquisitions.   **At Mercury, though, the immaturity and lack of full integration of key functional areas have led to the serious challenges the company experienced forecasting business performance over the past several quarters.**   That said, maturing in these areas is doable, within our control, and underway.
>
> My third and most important takeaway is that while our recent results are disappointing, the majority of our business is performing well, delivering predictable and profitable growth. **However, this solid performance has been masked by approximately 20 programs that are experiencing unique and outsized costs,** primarily temporary cost growth related to initial development challenges.   In fiscal '23, these few programs impacted our financial performance by approximately $56 million. Said differently, our reported margin in 2023 does not at all reflect a structural shift in our margin profile.

\*        \*        \*

Second, as I mentioned earlier, **because our management systems and processes have not matured at the same pace as our growth over the last several years to address the complexities inherent in many of these development programs, a small number of programs have become challenged, leading to unanticipated and temporary impacts on our overall performance. In FY '23, execution challenges on approximately 20 programs, a majority of which are development in nature, drove approximately $56 million of impact or approximately 580 basis points of margin contraction.**

\*        \*        \*

**Our fourth focus area is driving improved free cash flow conversion and cash release. Over the past 2 fiscal years, Mercury has delivered $333 million of adjusted EBITDA, but generated negative $107 million in free cash flow, which is clearly unacceptable. Since FY '20, working capital has grown from approximately 35% of revenue to approximately 65% of revenue in FY '23. This growth has primarily been driven by increases in unbilled receivables and inventory and is a direct result of the temporary execution challenges previously discussed.**

Id. ¶ 193. Ballhaus further admitted that the failure to fully integrate Mercury's acquisitions had directly caused twenty programs at Mercury to experience execution problems -- an additional eight programs on top of the dozen disclosed by Defendants on May 2, 2023 -- which had been, and would continue to be, materially and significantly negatively impacting Mercury's profits because of the costs associated with resolving these challenges. Id. ¶ 196.

Ballhaus later admitted at the end of the Class Period, on February 6, 2024, that these twenty programs comprised approximately 20% of Mercury's revenue. Id. ¶ 197. In response

[15]

to this revelation, the price of Mercury common stock declined $7.84 per share, or approximately 17.3%, from a close of $45.28 per share before the announcement, to close at $37.44 on May 3, 2023. Id. ¶ 164. In response to the disclosures post-market close on February 6, 2024, the price of declined $3.45 per share, or approximately 11.4%, from a close of $30.25 before the announcement, to close at $26.80 per share on February 7, 2024. Id. ¶ 222.

According to Ballhaus, in the weeks leading up to August 15, 2023, he personally had done the following in concluding that there was a "lack of full integration of key functional areas" at Mercury since FY20:

> **[S]pent significant time with the team digging into the details of the business** in forming an assessment of Mercury and its value creation potential. Specifically, **I have visited our major centers of operation and personally led reviews of our challenged programs** and expanded those reviews to include 100% of our current development programs, **their estimated cost to complete and any roadblocks or risk to completion.**

Id. ¶ 199. Further, Ballhaus admitted that, by August 15, 2023, he and defendant Farnsworth had "reviewed our major unbilled receivables balances by program and our inventory in detail to establish burn-down plans and drive improved free cash flow conversion." Id. ¶ 200.

In addition, Ballhaus admitted that, starting on July 1, 2023, he had personally assembled all of Mercury's

[16]

internal experts to assess the twenty troubled contracts
and reach agreement on the length and cost it would take to
meet the performance obligations on those contracts,
stating, in pertinent part, that:

> [w]e've brought the senior team across all relevant
> functions from engineering, manufacturing, our program
> managers, our program management leadership, and we
> literally have reviewed every development program . .
> . [.]  So by the time we finished that process, we
> had gone through every program in -- every development
> program in the portfolio.  And we took a very
> stringent eye on the activities to complete those
> programs and our estimates to complete . . . [.]  I
> feel very good about the rigor that we put into
> establishing our cost to complete, getting all of the
> experts in the company to stare at those programs
> and contribute to the assessment of our cost to
> complete and give us a robust view of what it's going
> to take to execute on the remainder of these challenged
> programs.

Id. ¶ 201.  In fact, defendant Ballhaus admitted on August
15, 2023, that "we're getting very granular when it comes
to things like burning down our unbilled in our inventory
and literally looking at it program by program every week."
Id. ¶ 202

In the second earnings call helmed by Ballhaus and
Farnsworth, held on November 7, 2023, Ballhaus surprised the
market by disclosing that the unbilled receivables for the
twenty challenged programs represented over 80% of each
contract's value, meaning "the majority of revenue has been
recognized and only a small portion of the contract revenue

remains to be recognized with the final delivery of the hardware." Id. ¶ 207. Ballhaus further disclosed on November 7, 2023 that "completing hardware associated with the unbilled receivables consumes significant operational capacity, but generates little revenue." Id. ¶ 208. According to Ballhaus, this meant that Mercury "will see some temporary impacts to our P&L, as we are applying operational capacity to delivering hardware with little revenue[.]" Id. Ballhaus reported that these impacts had resulted in adjusted EBITDA of $2,000,000 in 1Q24, a year-over-year decline of 93.4%, significantly below analyst estimates. Id. In response to this revelation, the price of Mercury common stock declined $4.63 per share, or approximately 12.6%, from a close of $36.78 per share before the announcement, to close at $32.15 per share on November 8, 2023. Id. ¶ 210. Notwithstanding these disclosures, Ballhaus and Farnsworth purportedly continued deceiving investors on November 7, 2023, by reaffirming the FY24 revenue guidance of up to $1 billion and the FY24 adjusted EBITDA guidance of at least $160 million. Id. ¶ 211.

On February 6, 2024, the last day of the Class Period, defendants Ballhaus and Farnsworth reported negative adjusted EBITDA for Mercury of ($21,300,000) for 2Q24, versus positive adjusted EBITDA for Mercury of $35,700,000 in 2Q23, and cut the FY24 guidance for revenue down from a possible $1,000,000,000 to

a range of $800,000,000 million to $850,000,000.  Id. ¶ 215.

Ballhaus explained that one product line associated with five of

the twenty challenged programs, "representing approximately 20%

of our revenue . . . has experienced the majority of the revenue

and earnings volatility that we saw in Q2 and that we expect to

see within the fiscal year."  Id. ¶ 216.  Farnsworth further

stated that the Company's inability to complete the five

challenged programs had caused "[a]djusted EBITDA for the second

quarter [to be] negative $21,300,000 compared to [positive]

35,700,000 in the prior year."  Id. ¶ 217.  As a result,

defendant Ballhaus stated that "we are updating our guidance for

full year FY '24 revenue from the prior range of $950,000,000 to

$1,000,000,000 to a revised range of $800,000,000 to

$850,000,000 . . . [.]  [W]e are withdrawing our full year FY '24

GAAP and non-GAAP net earnings guidance, including adjusted

EBITDA, provided on November 7, 2023."  Id. ¶ 218.

### C.   Purported Materially False and Misleading Statements and Omissions Made During the Class Period

The Plaintiffs claim that during the Class Period, the

Defendants made materially false and misleading statements

regarding Mercury's full integration of the companies that

Mercury acquired pursuant to the M&A Strategy and the related

negative impact to Mercury's financial performance, and

separately, that Ballhaus and Farnsworth made materially false

[19]

and misleading statements regarding the negative impact to
Mercury's financial performance caused by Mercury's failure
fully to integrate its acquisitions.  Id. ¶ 226.

### 1. **Purported False and Misleading Statements and Omissions Made by Defendants Regarding Full Integration**

For Statements Nos. 1 through 12, Mercury claims that the
statements concerning "integrating" or "integrated" were
materially false and misleading because Mercury was not fully
integrating, or had not fully integrated, the businesses that it
acquired, which caused execution challenges in twenty acquired
programs that:

> (a)  prevented Mercury from converting its
>      ballooning unbilled receivables to cash
>      because performance obligations on these
>      contracts could not be met;
>
> (b)  required Mercury to incur substantial
>      additional costs to remediate the execution
>      challenges and meet the performance
>      obligation on those contracts; and
>
> (c)  caused negative impacts to Mercury's
>      financial performance.

Id. ¶¶ 228, 230, 232, 234, 236, 238, 240, 242, 244, 246, 248,
250.

### a.   **Statement No. 1.**

On February 2, 2021, after market close, Mercury hosted
an earnings call with analysts and shareholders to discuss the
Company's 2Q21 financial results (the "Feb 2021 Call"). During

the Feb 2021 Call, defendant Aslett stated, in pertinent part, that **"we're fully integrating the businesses we acquire** to generate cost and revenue synergies over time . . . [which] should produce attractive returns for our shareholders." Id. ¶ 227.

### b.    Statement No. 2.

On May 4, 2021, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 3Q21 financial results (the "May 2021 Call"). During the May 2021 Call, defendant Aslett stated, in pertinent part, that **"we're fully integrating the businesses that we acquire** to generate cost and revenue synergies over time . . . [which] should produce attractive returns for our shareholders." Id. ¶ 229.

### c.    Statement No. 3.

On May 11, 2021, Mercury participated at the Goldman Sachs Industrials and Materials Conference, and filed the associated presentation slides on Form 8-K that same day. During this conference, defendant Aslett stated, in pertinent part, that "[o]ur EBITDA has actually grown faster than that as we've acquired **and then fully integrated businesses,** which is a core part of our strategy." Id. ¶ 231.

[21]

####        d.      Statement No. 4.

On June 2, 2021, Mercury participated at the William Blair Growth Stock Conference. During this conference, defendant Aslett stated, in pertinent part, that "[w]e're successfully **acquiring and then fully integrating businesses** that have allowed us to actually expand our addressable market as well as our capability set as well as our growth rate over time," and that "[w]hat we do is **we basically fully integrate the business that we're acquiring**, moving them to our own ERP applications or other business system . . . it's a really important part of the strategy that we've executed." Id. ¶ 233.

####        e.      Statement No.5

On August 3, 2021, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 4Q21 and FY21 financial results (the "Aug 2021 Call"). During the Aug 2021 Call, defendant Aslett stated, in pertinent part, that "**[w]e've been fully integrating** [the Company's acquisitions]." Id. ¶ 235.

####        f.      Statement No. 6.

On November 2, 2021, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 1Q22 financial results (the "Nov 2021 Call"). During the Nov 2021 Call, defendant Aslett stated, in pertinent part, that "**we're fully integrating the businesses we acquire** to generate cost

and revenue synergies over time . . . [which] should produce
attractive returns for our shareholders." Id. ¶ 237.

### g.    Statement No. 7

On February 1, 2022, Mercury hosted the Feb 2022 Call to
discuss the Company's 2Q22 financial results, during which
defendant Aslett stated, in pertinent part, as follows:

> Since fiscal '14, we've completed 15 acquisitions,
> deploying $1.4 billion of capital. We've dramatically
> scaled and transformed the business as a result,
> growing total company revenue 4.4x from FY '14 through
> FY '21. **We fully integrated these acquired entities**
> by moving them to common collaboration and
> engineering platforms as well as common ERP, HRIS
> and CRM systems while also consolidating
> facilities.
>
> . . . .
>
> **And as a result of the acquisitions, but more
> importantly, through the synergies that we've
> generated through full integration,** we've been able to
> actually grow total company revenues by over 4.4x over
> the course of the last 7 or so years. **And because
> integration and full integration is such an important
> element of the strategy** and 1MPACT about taking that
> to the next level, we've been able to actually grow
> adjusted EBITDA at 9x or twice the growth in revenues.

Id. ¶ 239.

### h.    Statement No. 8.

On March 15, 2022, Mercury participated at the JPMorgan
Industrials Conference. During this conference, defendant
Ruppert stated, in pertinent part, that "**[w]e've integrated our
acquisitions because that's core to our strategy.**" Id. ¶ 241.

### i.    Statement No. 9

On May 3, 2022, Mercury hosted an earnings calls to discuss the Company's 3Q22 financial results (the "May 2022 Call"). During the May 2022 Call, defendant Aslett stated, in pertinent part, that "[o]ur strategy is to improve margins while growing the business organically, **supplemented with disciplined M&A and full integration.**"  Id. ¶ 243.

### j.    Statement No. 10.

On August 2, 2022, Mercury hosted an earnings call to discuss the Company's 4Q22 and FY22 financial results (the "Aug 2022 Call").  During the Aug 2022 Call, defendant Aslett stated, in pertinent part, that "[e]xecuting on our long-term strategy over the past decade, we've improved margins while growing the business organically, **supplemented with disciplined M&A and full integration.**"  Id. ¶ 245.

### k.    Statement No. 11

On November 1, 2022, Mercury hosted an earnings call to discuss the Company's 1Q23 financial results (the "Nov 2022 Call").  During the Nov 2022 Call, defendant Aslett stated, in pertinent part, that "[e]xecuting on our long-term strategy over the past decade, we've improved margins by growing the business organically, **supplemented with disciplined M&A and full integration.**"  Id. ¶ 247.

[24]

### 1.    Statement No. 12

On January 31, 2023 Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 2Q23 financial results (the "Jan 2023 Call"). During the Jan 2023 Call, defendant Aslett stated, in pertinent part, that "[w]e've improved margins by growing the business organically, **supplemented with disciplined M&A and full integration.**" Id. ¶ 249.

### 2. Purported False and Misleading Statements and Omissions Made by Aslett Regarding Unbilled Receivables

### a.    Statement No. 13

On May 2, 2023, Mercury filed a Form 8-K announcing the Company's 3Q23 financial results (the "May 2023 Form 8-K"). Id. ¶ 251. The May 2023 Form 8-K included a statement from defendant Aslett that "[o]ur **challenges are** . . . largely timing and cost-related, they're short-term, and they're **not unique to Mercury.**" Id. Also on May 2, 2023, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 3Q23 financial results (the "May 2023 Call"). Id. During the May 2023 Call, defendant Aslett stated, in pertinent part, as follows:

> In terms of R&D, Mercury is a leveraged commercial investment model focus on developing sophisticated new technologies and products. These highly differentiated capabilities are then used across multiple DoD programs. **The cost growth we're experiencing is associated with certain new technology developments that are nearing completion** and new product introductions, which are taking longer

than planned.  The higher costs are related to both labor as well as materials driven by labor and supply chain inefficiencies, manufacturing constraints and inflation.  Approximately a dozen or so of our 300-plus active programs have been affected.  In over 2 of the affected programs, more than 90% complete in terms of the total expected costs incurred.  The good news is that once we completely develop into new product introduction activities, multiple programs will quickly benefit due to our product program leverage model.

We expect these programs to complete over the next 2 to 3 quarters and transition to production-based contracts thereafter.  This transition should lead to stronger fiscal '24 results, not only improved gross margins and adjusted EBITDA as cost pressures diminish, but also lower working capital **as we quickly relieve unbilled receivables** through shipment, invoicing and cash collections.

As I said previously, **our challenges are** not related to end market demand, which remains strong.  They're largely timing and cost related, they're short term, and they're **not unique to Mercury**.  We're focused on controlling what we can in this environment given the technologies that we developed and the programs that we've won.  Structurally, our business model and financial outlook are sound, and we're very optimistic about the future.

Id.

The statements that performance obligations on the impacted programs were "not unique to Mercury" ("Statement No. 13(a)") were purportedly materially false and misleading because Mercury was experiencing these challenges as a result of execution problems on a dozen programs that were caused precisely by Mercury's failure fully to integrate the Company's acquisitions, meaning that these challenges were, in fact, unique to Mercury. Id. ¶ 252.

The statement in PSAC ¶ 251 that "[t]he cost growth we're experiencing is associated with certain new technology developments that are nearing completion" ("Statement No. 13(b)") was purportedly materially false and misleading because it was actually the execution problems caused by Mercury's failure fully to integrate acquisitions that had prevented the completion of performance obligations. Id. ¶ 253. Allegedly the true source of Mercury's cost growth was the additional costs needed to meet these performance obligations, not "certain new technology developments that are nearing completion[.]" Id.

The statement in PSAC ¶ 251 that Mercury will "quickly relieve unbilled receivables" ("Statement No. 13(c)") was purportedly materially false and misleading because the Company had failed fully to integrate the businesses Mercury acquired, which caused execution problems that prevented the Company from achieving the performance obligations on those contracts that would allow Mercury to convert its unbilled receivables into cash in a timely manner. Id. ¶ 254.

### 3. Purported False and Misleading Misstatements and Omissions Made by Defendants Ballhaus and Farnsworth

#### a.    Statement No. 14

On August 15, 2023, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 4Q23 and FY23 financial results (the "Aug 2023 Call"). Id. ¶ 255.

[27]

The Aug 2023 Call was the first Mercury earnings call handled by defendants Ballhaus and Farnsworth.  Id.   During the Aug 2023 Call, defendant Ballhaus stated, in pertinent part, as follows:

> Second impression: over the past several years the company grew inorganically into strategically attractive areas, but didn't fully integrate some of the businesses and mature processes and management systems to align with Mercury's evolving business portfolio.  In my experience, this is not uncommon in businesses that grow rapidly via acquisitions.  At Mercury, though, the immaturity and lack of full integration of key functional areas have led to the serious challenges the company experienced forecasting business performance over the past several quarters. That said, maturing in these areas is doable, within our control, and underway.
>
> My third and most important takeaway is that while our recent results are disappointing, the majority of our business is performing well, delivering predictable and profitable growth. However, this solid performance has been masked by approximately 20 programs that are experiencing unique and outsized costs, primarily temporary cost growth related to initial development challenges.  In fiscal '23, these few programs impacted our financial performance by approximately $56 million.  **Said differently, our reported margin in 2023 does not at all reflect a structural shift in our margin profile.**
>
> *        *        *
>
> Second, as I mentioned earlier, **because our management systems and processes have not matured at the same pace as our growth over the last several years to address the complexities inherent in many of these development programs, a small number of programs have become challenged, leading to unanticipated and temporary impacts on our overall performance.**  In FY '23, execution challenges on approximately 20 programs, a majority of which are development in nature, drove approximately $56 million of impact or approximately 580 basis points of margin contraction.

Id.  The statement that "[o]ur reported margin in 2023 does not at all reflect a structural shift in our margin profile" ("Statement No. 14(a)") was purportedly materially false and misleading because Defendants' failure fully to integrate Mercury's acquisitions had caused execution problems on twenty programs that would necessitate increased costs that would negatively impact Mercury's financial performance for FY24.  Id. ¶ 256.  In other words, Mercury's reported margin in FY23 did, in fact, represent a structural shift in Mercury's margin profile for FY24.  Id.

The statement that the execution problems with the challenged programs were "unanticipated" and "temporary" ("Statement No. 14(b)") was purportedly materially false and misleading because these execution problems were directly caused by Defendants' failure fully to integrate Mercury's acquisitions, meaning they were anticipated, and remediating these execution problems had been, and would continue to be, time consuming and costly, and therefore not temporary.  Id. ¶ 257.

### b.    Statement No. 15

During the Aug 2023 Call, defendant Farnsworth stated, in pertinent part, as follows:

> **Gross margins in the first half of the fiscal year will approximate those of fiscal '23** as we transition through the challenged programs and balance the potential for

unknown risks that may materialize through final stages
of completion.

Id. ¶ 258.  The statement that Mercury's "[g]ross margins in the
first half of [FY24] will approximate those of [FY23]" was
purportedly materially false and misleading because Defendants'
failure fully to integrate Mercury's acquisitions had caused
execution problems on twenty programs that necessitated
increased costs that would negatively impact Mercury's gross
margins in FY24 to a level substantially below Mercury's gross
margins in FY23.  Id. ¶ 259.

### c.    Statement No. 16

On August 15, 2023, Mercury filed a Form 8-K announcing the
Company's 4Q23 and FY23 financial results (the "Aug. 2023 Form
8-K").  Id. ¶ 260.  The Aug 2023 Form 8-K included a statement
from defendant Ballhaus that: "[f]or [FY24], revenues are
forecasted to be in the range of $950.0 million to $1.00
billion . . . [.] Adjusted EBITDA for [FY24] is expected to
be approximately $160.0 million to $185.0 million[.]"  Id.
During the Aug. 2023 Call, defendants Ballhaus and Farnsworth
reiterated Mercury's FY24 revenue and adjusted EBITDA guidance.
Id.

These statements were purportedly materially false and
misleading because Defendants' failure fully to integrate
Mercury's acquisitions had caused execution problems on twenty

programs that necessitated increased costs that made Mercury's FY24 revenue and adjusted EBITDA guidance unachievable. Id. ¶ 261.

### d.    Statement No. 17

On November 7, 2023, Mercury filed a Form 8-K announcing the Company's 1Q24 financial results (the "Nov 2023 Form 8-K"). Id. ¶ 262.  The Nov 2023 Form 8-K included a statement from defendant Ballhaus that Mercury was "reiterating our full-year guidance based on our current view of bookings, timing of product delivery, and allocation of factory capacity . . . [.] For [FY24], revenues are forecasted to be in the range of $950.0 million to $1.00 billion . . . [.] Adjusted EBITDA for [FY24] is expected to be approximately $160.0 million to $185.0 million[.]" Id.  Also on November 7, 2023, Mercury hosted an earnings call with analysts and shareholders to discuss the Company's 1Q24 financial results (the "Nov 2023 Call"). Id. During the Nov 2023 Call, defendants Ballhaus and Farnsworth again both reaffirmed Mercury's FY24 revenue and adjusted EBITDA guidance. Id.  The above statements were purportedly materially false and misleading because Defendants' failure to fully integrate Mercury's acquisitions had caused execution problems on twenty programs that necessitated increased costs that made Mercury's FY24 revenue and adjusted EBITDA guidance unachievable. Id. ¶ 263.

## III. ANALYSIS

The Plaintiffs seek leave to amend the complaint for the second time.  As set forth below, the Defendants oppose the motion on futility grounds, addressing the new allegations and incorporating by reference their motion to dismiss. Accordingly, the Court construes the opposition as a cross-motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### A.    Legal Standard

The Plaintiffs timely seek leave to file their PSAC pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure in response to the dismissal of the original complaint, and to this Court's granting them leave to file a motion for leave to amend.  Elec. Clerk's Notes, ECF No. 77.  "A Rule 15(a) motion to amend pleadings is ordinarily granted freely."  In re Genzyme Corp. Sec. Litig., 754 F.3d 31, 46 (1st Cir. 2014) (citing Fed. R. Civ. P. 15(a)(2)).  The First Circuit has made "clear that the [Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4] has not modified the liberal amendment policy of Rule 15(a)."  Id. at 47 (citing ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 56 (1st Cir. 2008)). "That rule notwithstanding, '[a] court may deny leave to amend for a variety of reasons, including "futility, bad faith, undue delay, or a dilatory motive on the movant's part."'"  American

Bd. of Internal Med. v. Salas Rushford, 114 F.4th 42, 66 (1st
Cir. 2024) (quoting Privitera v. Curran (In re Curran), 855 F.3d
19, 27-28 (1st Cir. 2017)).  Indeed, the liberal amendment
policy undergirding Rule 15(a) "does not mean . . . that a trial
court must mindlessly grant every request for leave to amend."
Universal Trading & Inv. Co., Inc. v. Bureau for Representing
Ukrainian Interests in Int'l & Foreign Cts., 87 F.4th 62, 80
(1st Cir. 2023) (quoting Nikitine v. Wilmington Tr. Co., 715
F.3d 388, 390 (1st Cir. 2013)).  Here, the Defendants oppose the
motion on the grounds of futility.  Mercury Opp'n 4.

When assessing futility, the Court applies the standard of
review of Rule 12(b)(6) of the Federal Rules of Civil Procedure.
O'Leary v. New Hampshire Boring, Inc., 323 F.R.D. 122, 126 (D.
Mass. 2018) (Cabell, U.S.M.J.).  In order to withstand a motion
to dismiss, a complaint must "state a claim upon which relief
can be granted." Fed. R. Civ. P. 12(b)(6).  That is, the PSAC
must include sufficient factual allegations that, accepted as
true, "state a claim to relief that is plausible on its face."
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Under
this standard, the Court must "accept well-pleaded factual
allegations in [the Plaintiffs'] complaint as true and view all
reasonable inferences in [its] favor."  Zhou v. Desktop Metal,
Inc., 120 F. 4th 278, 287 (1st Cir. 2024) (quoting ACA Fin.
Guar. Corp., 512 F.3d at 58).  This Court does not, however,

"draw unreasonable inferences or credit bald assertions [or] empty conclusions." Guilfoile v. Shields, 913 F.3d 178, 186 (1st Cir. 2019) (alteration in original) (quoting Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018)), and disregards allegations that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (cleaned up).  As set forth below, "[b]ecause [Plaintiffs bring] federal securities fraud claims, several additional legal standards apply." Zhou, 120 F. 4th at 287.

"To state a claim under section 10(b), [the PSAC] must allege: '(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'" Quinones v. Frequency Therapeutics, Inc., 106 F. 4th 177, 182 (1st Cir. 2024) (quoting In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017)).  "Further, under Rule 9(b) [of the Federal Rules of Civil Procedure], as with all fraud claims, [the Plaintiffs are] required to plead the circumstances of the securities fraud with particularity . . . . And, under the PSLRA, [the Plaintiffs] must 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" Zhou, 120 F. 4th at

[34]

287 (quoting <u>ACA Fin. Guar. Corp.</u>, 512 F.3d at 58).  The First
Circuit "has been notably strict and rigorous in applying the
Rule 9(b) standard in securities fraud actions."  <u>Greebel</u> v. <u>FTP</u>
<u>Software, Inc.</u>, 194 F.3d 185, 193 (1st Cir. 1999) (citing
<u>Maldonado</u> v. <u>Dominguez</u>, 137 F.3d 1, 9 (1st Cir. 1998)).  "Rule
9(b) provides that '[i]n all averments of fraud or mistake, the
circumstances constituting fraud or mistake shall be stated with
particularity.  Malice, intent, knowledge, and other condition
of mind of a person may be averred generally.'  This Circuit has
interpreted Rule 9(b) to require 'specification of the time,
place, and content of an alleged false representation.'"  <u>Id.</u>
(first quoting Fed. R. Civ. P. 9(b); and then quoting <u>McGinty</u> v.
<u>Beranger Volkswagen, Inc.</u>, 633 F.2d 226, 228 (1st Cir. 1980)).

    Here, the Plaintiffs challenge elements one (falsity) and
two (scienter).  Mercury Opp'n. 4-5.  Both elements are
addressed below.

### B.  Material Misrepresentation/Omission Element

    "The securities statutes seek to maintain public confidence
in the marketplace."  <u>Dura Pharms., Inc.</u> v. <u>Broudo</u>, 544 U.S.
336, 345 (2005).  "To survive a motion to dismiss, [the
Plaintiffs] 'must show "that [the Defendants] made a materially
false or misleading statement or omitted to state a material
fact necessary to make a statement not misleading."'"  <u>Quinones</u>
v. <u>Frequency Therapeutics, Inc.</u>, 665 F. Supp. 3d 156, 167 (D.

Mass. 2023) (quoting <u>Ganem</u> v. <u>InVivo Therapeutics Holdings
Corp.</u>, 845 F.3d 447, 454 (1st Cir. 2017)), <u>aff'd</u>, 106 F. 4th 177
(1st Cir. 2024). The pleading standard is stiff, requiring that
the Plaintiffs "specify each statement alleged to have been
misleading [and] the reason or reasons why the statement is
misleading.'" <u>Id.</u> at 168 (alteration in original) (quoting
<u>Ganem</u>, 845 F.3d at 455). "Importantly, section 10(b) and Rule
10b-5 only prohibit omissions that engender 'half-truths.'"
<u>Zhou</u>, 120 F. 4th at 292 (quoting <u>Macquarie Infrastructure</u> v.
<u>Moab Partners, L. P.</u>, 601 U.S. 257, 263 (2024)). Indeed,
"section 10(b) and Rule 10b-5 'do not create an affirmative duty
to disclose any and all material information.'" <u>Id.</u> (quoting
<u>Matrixx Initiatives, Inc.</u> v. <u>Siracusano</u>, 563 U.S. 27, 44
(2011)). Said another way, "[a]n omission, even if material, is
actionable only if it 'renders affirmative statements made
misleading.'" <u>Id.</u> (quoting <u>Macquarie Infrastructure</u>, 601 U.S.
at 265). As to materiality, "[a] fact or omission is material
if a 'reasonable investor would have viewed it as having
significantly altered the total mix of information made
available.'" <u>Id.</u> (quoting <u>Ponsa-Rabell</u> v. <u>Santander Sec. LLC</u>,
35 F. 4th 26, 33 (1st Cir. 2022)).

### 1. Most Integration Statements Fail Because They Are Mischaracterized

#### a. Statements Nos. 1-6 and 8 Through 12 Are Non-Actionable Mischaracterizations

As this Court has written, "[a] securities fraud complaint cannot rest on a house of cards made of mischaracterized statements." Oklahoma Firefighters Pension & Ret. Sys. v. Biogen Inc., 665 F. Supp. 3d 125, 132 (D. Mass. 2023) (citing Kin-Yup Chun v. Fluor Corp., No. 3:18-CV-01338-X, 2021 WL 1788626, at *7 (N.D. Tex. May 5, 2021) (holding statements not false or misleading where plaintiff mischaracterized statements or defendants "never said" what plaintiff alleged)), vacated, No. CV 22-10200-WGY, 2024 WL 3178638 (D. Mass. Mar. 19, 2024). The Defendants persuasively argue that Statements Nos. 1, 2, 3, 4, 5, 6, and 8, 9, 10, 11, and 12 are mischaracterized and therefore not actionable. Mercury Opp'n 14-15; Mem. Supp. Defs.' Mot. Dismiss 7, ECF No. 65. Those statements use the term "integrating" or refer to an unknown number of "integrated" businesses, in phrases that do not encompass "full" integration or "fully" integrated. This encompasses a broad swath of the statements and is dispositive.

#### b.    Statement No. 7 Survives

"To survive a motion to dismiss, plaintiffs 'must show "that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a

statement not misleading.”’” _Quinones_, 665 F. Supp. 3d at 167 (quoting _Ganem_ v. _InVivo Therapeutics Holdings Corp._, 845 F.3d at 454). “Falsity under the PSLRA can be pled for an untrue statement of a material fact.” _Id._ at 168 (citing _Mississippi Pub. Emps.’ Ret. Sys._ v. _Boston Sci. Corp._, 523 F.3d 75, 85 (1st Cir. 2008)). As to materiality, “[i]nformation is material if a ‘reasonable investor would have viewed it as having significantly altered the total mix of information made available.’” _Id._ (quoting _Mississippi Pub. Emps.’ Ret. Sys._, 523 F.3d at 85).

The Defendants, incorporating their motion to dismiss arguments, Mercury Opp’n 14, argue that all of the statements regarding integration are neither false nor material, _id._ at 14-17. The Defendants argue that the references to full integration are immaterial statements of corporate optimism, citing among other cases, _In re Razorfish, Inc. Sec. Litig._, No. 00 CIV. 9474(JSR), 2001 WL 1111502, at *2 (S.D.N.Y. Sept. 21, 2001), and this Court’s decision in _In re Peritus Software Servs., Inc. Sec. Litig._, 52 F. Supp. 2d 211 (D. Mass. 1999). Mercury Opp’n 16.

In _Razorfish_, the defendant had acquired another company and had made statements that integration had been successful and complete. 2001 WL 1111502, at *1-2. That court dismissed the action:

[38]

Defendants now move to dismiss on the grounds that the allegations of the Complaint fail to meet the rigorous pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, either as to the falsity of the statements or as to the fraudulence of the defendants' intent.

As is obvious, most of the allegedly false statements -- in particular, numbers 1, 2, 4, 5, 6, 7, and 8 -- relate to the "integration" of i-Cube into Razorfish, and plaintiffs' principal contention is that these statements were false because the integration was neither successful nor complete. See, e.g., Complaint ¶¶ 29-42. But "integration" is far too loose and uncertain a term on which to premise a claim of securities fraud in this context. See, e.g., Grossman v. Novell, Inc., 120 F.3d 1112, 1121 (10th Cir. 1997) (finding inactionable a statement that defendant had experienced "substantial success" in integrating the sales forces of two companies, because it was a "soft, puffing statement[ ] incapable of objective verification"); In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 229 (D.Mass.1999) (finding a statement that "[t]he acquisition and integration of [Millennium] has been a success" to be non-actionable because it was a "rosy affirmation").

Id. at *2.

The Plaintiffs refer to cases where statements concerning integration have been upheld as material. Pls.' Mem. 16 (first citing Public Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc., No. 16 C 10632, 2018 WL 844420, at *2-3 (N.D. Ill. Feb. 12, 2018); then citing Roofer's Pension Fund v. Papa, No. 16-2805, 2018 WL 3601229, at *13-15 (D.N.J. July 27, 2018); and

then citing Galestan v. OneMain Hldgs., Inc., 348 F. Supp. 3d 282, 292, 303 (S.D.N.Y. 2018)); see also Leadersel Innotech ESG v. Teladoc Health, Inc., No. 23-1112-CV, 2024 WL 4274362, at *4 (2d Cir. Sept. 24, 2024) (finding integration statements actionable where they referred to specific business units and actions); In re Akorn, Inc. Sec. Litig., 240 F. Supp. 3d 802, 816-18 (N.D. Ill. 2017) (finding statement that certain acquisitions were "fully integrated" potentially false and material).

The Court only analyzes Statement No. 7, as the other statements relating to integration are mischaracterized. With respect to Statement No. 7, the Court is persuaded that, similar to the defendant in Treehouse Foods, Mercury was reliant on acquisitions and its representation as to their "full" integration was not, at the pleading stage, mere puffery, but is potentially material, false, and actionable. True, integration is a slippery concept and difficult to define, but Statement No. 7 is made in absolute terms -- i.e., fully integrated / full integration. At this stage of the proceedings, drawing all inferences in favor of the Plaintiffs, as this Court must, Statement No. 7 survives.

## 2. Financial Performance and Outlook, Statements Nos. 13(c), 15, 16 and 17 are Not Actionable

Of the remaining statements, Statements Nos. 13, 14, 15, 16 and 17, the Defendants argue that these statements concern the performance and outlook of Mercury, and are therefore protected by the PSLRA Safe Harbor provision.  Mercury Opp'n 19-20.

The PSLRA has a powerful, but narrow, statutory safe harbor provision.  A statement is not actionable if it is "a forward-looking statement, and [it] is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 34 (1st Cir. 2020) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)).  "The statute thus seems to provide a surprising rule that the maker of knowingly false and wilfully fraudulent forward-looking statements, designed to deceive investors, escapes liability for the fraud," In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 212 (1st Cir. 2005), where the statutory perquisites are met.  Indeed, "[i]f a forward-looking statement is accompanied by meaningful cautionary language the defendant's state of mind is wholly irrelevant."  Leavitt v. Alnylam Pharms., Inc., 451 F. Supp. 3d 176, 186 (D. Mass. 2020) (Gorton, J.) (citing Stone & Webster, 414 F.3d at 212); see also Brill v. Invivyd, Inc., No. 1:23-CV-10254-JEK, 2024 WL 4228832,

at *6 (D. Mass. Sept. 18, 2024) (Kobick, J.) (citing <u>Stone &</u>
<u>Webster</u>, 414 F.3d at 195) ("If a statement falls within the safe
harbor, it cannot give rise to liability, even where the
statement is fraudulent.").

"'Forward-looking' statements are, generally speaking,
statements that speak predictively of future economic
performance, plans, and objectives." <u>In re Biogen Idec, Inc.</u>
<u>Sec. Litig.</u>, No. 05-10400-WGY, 2007 WL 9602250, at *10 (D. Mass.
Oct. 25, 2007), <u>aff'd sub nom.</u> <u>New Jersey Carpenters Pension &</u>
<u>Annuity Funds</u> v. <u>Biogen IDEC Inc.</u>, 537 F.3d 35 (1st Cir. 2008).[5]
"The mere fact that a statement contains some reference to a
projection of future events cannot sensibly bring the statement
within the safe harbor if the allegation of falsehood relates to
non-forward-looking aspects of the statement." <u>Stone & Webster</u>,
414 F.3d at 213. Rather than provide a robust "<u>carte blanche</u> to
lie," the safe harbor "is intended to apply only to allegations

_____

[5] Under the PSLRA, "forward-looking statement" is
statutorily defined term including: (1) "a statement containing
a projection of revenues, income (including income loss),
earnings (including earnings loss) per share, capital
expenditures, dividends, capital structure, or other financial
items"; (2) "a statement of the plans and objectives of
management for future operations, including plans or objectives
relating to the products or services of the issuer"; (3) "a
statement of future economic performance, including any such
statement contained in a discussion and analysis of financial
condition by the management or in the results of operations";
and (4) "any statement of the assumptions underlying or relating
to any statement described in" (1) through (3) above. 15 U.S.C.
§ 78u-5(i)(1).

of falsehood as to the forward-looking aspects of the statement." Id.

"On any motion to dismiss based upon subsection (c)(1), the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." City of Miami Fire Fighters' and Police Officers' Ret. Tr. v. Cerence Inc., No. 22-CV-10321-ADB, 2024 WL 1258149, at *9 (D. Mass. Mar. 25, 2024) (Burroughs, J.) (quoting 15 U.S.C. § 78u-5(e)).

As argued by the Defendants, Statement Nos. 13(c), 15, 16, and 17 are forward-looking statements under the PSLRA because they concern the future performance and operations of Mercury and are accompanied by sufficient cautionary language, see ECF Nos. 66-10; 66-11; 66-15; 66-22; In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d 332, 340 (D. Mass. 2020) (Woodlock, J.) ("Statements projecting likely growth in the future are examples of such forward-looking statements."). The remainder of Statements Nos. 13(a), 13(b), 14(a), and 14(b) are not forward-looking statements, but rather refer to present facts that concern integration issues. See Roofer's Pension Fund, 2018 WL 3601229, at *14-15 (dismissing future statements concerning integration, but not dismissing present integration statements); In re Akorn, Inc., 240 F. Supp. 3d at 818 (ruling that

[43]

statements concerning present status of integration being "on track" are not protected by PSLRA safe harbor).

## C.  Scienter Element

At this stage of the proceedings, as to the few actionable statements, the Plaintiffs have alleged a strong inference of scienter, as required under the PSLRA.  "To support a finding of scienter under the PSLRA, a complaint must 'state with particularity facts giving rise to a strong inference that the defendant . . . either . . . consciously intended to defraud, or that they acted with a high degree of recklessness.'"  Quinones, 106 F. 4th at 182 (alterations in original) (quoting Mehta v. Ocular Therapeutix, Inc., 955 F.3d 194, 206 (1st Cir. 2020)).

Scienter is a demanding pleading element under the PSLRA. In affirming this Court, the First Circuit recently restated the high scienter pleading requirements: "The PSLRA dictates that to survive a motion to dismiss, '[a]n inference of scienter' must be 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  Id. at 184 (quoting In re Genzyme Corp., 754 F.3d at 40).  "A 'strong' inference is 'more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations.'"  Quinones, 106 F.4th at 182 (quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 323-24 (2007)). "Recklessness in this context means 'a highly unreasonable

[44]

omission, involving not merely simple, or even inexcusable[ ] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 44 (D. Mass. 2016) (Saylor, J.) (quoting Mississippi Pub. Emps.' Ret. Sys. v. Boston Sci. Corp. II, 649 F.3d 5, 20 (1st Cir.2011)), aff'd, 857 F.3d 34 (1st Cir. 2017).

Scienter is holistic concept and "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Tellabs, 551 U.S. at 323-24. "Certainly while '"[e]ach individual fact about scienter may provide only a brushstroke," . . . [the Court's] obligation [is] to consider "the resulting portrait."'" Quinones, 106 F. 4th at 184 (quoting Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc., 838 F.3d 76, 81 (1st Cir. 2016)). As the First Circuit points out, "[a]t the same time plaintiffs cannot amalgamate a series of sketchy brushstrokes and call it a van Gogh." Id. Indeed, "competing inferences should be weighed against plaintiffs' preferred interpretation of the facts." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d at 59. "While it may be unusual for courts to weigh competing inferences from facts, Congress mandated this review in the PSLRA." Id. "When there

[45]

are equally strong inferences for and against scienter, 'the draw is awarded to the plaintiff.'"  Pizzuto v. Homology Meds., Inc., No. 1:23-CV-10858, 2024 WL 1436025, at *15 March 31, 2024) (Kelley, J.) (quoting City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 757 (1st Cir. 2011)).  In the end, "[t]here is no one-size-fits-all way of analyzing securities fraud cases; rather, [the Court must] take a '"fact-specific approach" that proceeds case by case.'"  Karth v. Keryx Biopharms., Inc., 6 F. 4th 123, 134 (1st Cir. 2021) (quoting In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002)).

The few statements that survive are bolstered by a strong inference of scienter.  Ballhaus and Aslett were aware of the integration problems at the time they made statements that survive.  Ballhaus and Aslett were also involved in the potential sale of Mercury.  Ballhaus's statements, officer compensation, and confidential witness statements add to the mix of facts raising a strong inference of scienter, at least at this nascent stage of the proceedings.

In sum, the Plaintiffs present allegations that provide a strong inference of scienter only as to Statement Nos. 7, 13(a), 13(b), and 14(a).  Drawing all reasonable inferences in favor of the Plaintiffs, and weighing the competing theories here, the PSAC "contains clear allegations of admissions . . . suggesting

[46]

that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so." Brill, 2024 WL 4228832, at *11 (quoting In re Boston Sci. Corp. Sec. Litig., 686 F.3d 21, 31 (1st Cir. 2012)).  To be sure, the Defendants' competing narrative is at best a tie, and "[w]hen there are equally strong inferences for and against scienter, 'the draw is awarded to the plaintiff.'" Pizzuto, 2024 WL 1436025, at *15.

## IV.   SECTON 20(A) CLAIM

The parties agree that the Section 20(a) claim in Count III of the PSAC survives to the extent that a Section 10(b)-5 claim survives.  "The plain terms of section 20(a) indicate that it only creates liability derivative of an underlying securities violation." ACA Fin. Guar. Corp., 512 F.3d at 67-68 (citing 15 U.S.C. § 78t(a)).  Accordingly, the Section 20(a) claim survives only to the extent that the Section 10-b(5) claim survives.

## V.   CONCLUSION

For the aforementioned reasons, the Plaintiffs' Motion for Leave to Amend, ECF No. 82, is ALLOWED in part, only to the extent that Statements Nos. 7, 13(a), 13(b), 14(a), and 14(b), as identified above, are actionable and, while the Proposed Second Amended Complaint shall be filed forthwith by the Plaintiffs as-is, only those statements survive, and the motion

[47]

is otherwise DENIED.  Because claims against Michael Ruppert and David Farnsworth are not actionable, the action as against them is DISMISSED.

The Court has applied the Rule 12(b)(6) standard in its futility review of the Motion under Rule 15(a); accordingly, Mercury Systems, Inc., Mark Aslett, and William Ballhaus shall answer the Second Amended Complaint within 21 days of the filing of the PSAC.  Discovery shall proceed in the ordinary course and the parties shall file a joint proposed scheduling order no later than April 1, 2025.  The trial is scheduled to be held in March 2026.

**SO ORDERED.**

_William G. Young_
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[6]

---

[6] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.

[48]