UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NORTH COLLIER FIRE CONTROL AND RESCUE DISTRICT FIREFIGHTERS' PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No. 1:23-cv-13065-WGY **REQUEST FOR ORAL ARGUMENT** |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| MERCURY SYSTEMS, INC., MARK ASLETT, and WILLIAM L. BALLHAUS, | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY THIS ACTION AS A CLASS ACTION AND RELATED RELIEF**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS COMMON TO THE PROPOSED CLASS ............................3

III.    THE PROPOSED CLASS SATISFIES RULE 23 ......................................................7

        A.      Legal Standard ...............................................................................................7

        B.      The Proposed Class Satisfies Rule 23(a) ......................................................8

                1.      The Proposed Class Is Sufficiently Numerous ..........................................8

                2.      Questions of Law and Fact Are Common to the Proposed Class ................9

                3.      The Proposed Class Representatives' Claims Are Typical.........................9

                4.      The Proposed Class Representatives Will Fairly and Adequately
                        Protect the Proposed Class's Interests ........................................................10

        C.      The Proposed Class Satisfies Rule 23(b)(3) ................................................12

                1.      Common Questions Predominate ................................................................12

                        a.      The *Cammer* Factors Establish Mercury Systems Common
                                Stock Traded in an Efficient Market................................................14

                        b.      The *Krogman* Factors Establish Mercury Systems Common
                                Stock Traded in an Efficient Market................................................17

                        c.      Damages Can Be Calculated in the Same Manner for All
                                Proposed Class Members.................................................................18

                2.      A Class Action Is Superior to Other Available Methods for the Fair
                        and Efficient Adjudication of This Action..................................................19

        D.      The Court Should Appoint Plaintiffs' Choice of Counsel .....................................20

IV.     CONCLUSION..................................................................................................20

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ..................................................................................................................12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) .................................................................................................2, 7, 12, 13

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .................................................................................................2, 13, 16

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) .........................................................................13, 14, 16, 18

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ...............................................................................................................18, 19

*Dahhan v. OvaScience, Inc.*,
  2020 WL 2602138
  (D. Mass. May 8, 2020) ......................................................................................................8, 10

*De Giovanni v. Jani-King Int'l, Inc.*,
  262 F.R.D. 71 (D. Mass. 2009) ...........................................................................................12

*Einhorn v. AxoGen, Inc.*,
  2019 WL 5636382
  (M.D. Fla. Apr. 30, 2019) ...............................................................................................11, 12, 20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ............................................................................................................13, 16

*In re AVEO Pharms., Inc. Sec. Litig.*,
  2017 WL 5484672
  (D. Mass. Nov. 14, 2017) ...................................................................................................8, 9, 10

*In re Bos. Sci. Corp. Sec. Litig.*,
  604 F. Supp. 2d 275 (D. Mass. 2009) .................................................................................2, 7, 8, 19

*In re Credit Suisse-AOL Sec. Litig.*,
  253 F.R.D. 17 (D. Mass. 2008) ..........................................................................................14, 15, 16

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
  275 F.R.D. 382 (D. Mass. 2011) ........................................................................................8, 9, 10, 19

**Page**

*In re Nexium (Esomeprazole) Antitrust Litig.*,
297 F.R.D. 168 (D. Mass. 2013), *aff'd sub nom.,*
*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ..................................................10, 18

*In re Suffolk Univ. Covid Refund Litig.*,
2022 WL 6819485 (D. Mass. Oct. 11, 2022)...........................................................................9

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005)...............................................................................14, 15, 16, 17

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) .......................................................................13, 17, 18

*Levy v. Gutierrez*,
448 F. Supp. 3d 46 (D.N.H. 2019)........................................................................................18

*Lumen v. Anderson*,
280 F.R.D. 451 (W.D. Mo. 2012)........................................................................................16

*Luna v. Carbonite, Inc.*,
2023 WL 4539855
(D. Mass. July 14, 2023).......................................................................................11, 18, 20

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014).....................................................................................17

*Medoff v. CVS Caremark Corp.*,
2016 WL 632238
(D.R.I. Feb. 17, 2016) .........................................................................................................10

*N. Collier Fire Control & Rescue Dist. Firefighters' Pension Plan v. Mercury Systems, Inc.*,
768 F. Supp. 3d 133 (D. Mass. 2025) ...............................................................................3, 13

*ODS Cap. LLC v. JA Solar Holdings Co.*,
2020 WL 7028639
(S.D.N.Y. Nov. 30, 2020) ...............................................................................................15, 16

*Okla. Firefighters Pension & Ret. Sys. v. Biogen Inc.*,
348 F.R.D. 268 (D. Mass. 2025)........................................................................... *passim*

*Prinzo v. Hannaford Bros. Co., LLC*,
343 F.R.D. 250 (D. Mass. 2023)............................................................................................9

*Swack v. Credit Suisse First Bos.*,
230 F.R.D. 250 (D. Mass. 2005).............................................................................................8

**Page**

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)..................................................................................................16


**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §78j(b)........................................................................................................................................1
   §78t(a) .......................................................................................................................................1

Federal Rules of Civil Procedure
   Rule 23 ..........................................................................................................1, 7, 10, 20
   Rule 23(a)......................................................................................................2, 7, 8, 20
   Rule 23(a)(1) .............................................................................................................8
   Rule 23(a)(2) .............................................................................................................9
   Rule 23(a)(3) .............................................................................................................9
   Rule 23(a)(4) ......................................................................................................10, 11
   Rule 23(b) ..................................................................................................................7
   Rule 23(b)(3)...........................................................................................2, 12, 19, 20
   Rule 23(g) ................................................................................................................20
   Rule 23(g)(1).............................................................................................................20
   Rule 23(g)(1)(A)(i)-(iv) ..........................................................................................20

17 C.F.R.
   §239.13........................................................................................................................16

Lead Plaintiff Carpenters Pension Trust Fund for Northern California and named plaintiffs University of Puerto Rico Retirement System and North Collier Fire Control and Rescue District Firefighters' Pension Plan (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for an Order: (1) certifying this action as a class action pursuant to Federal Rule of Civil Procedure ("Rule") 23; (2) appointing Plaintiffs as Class Representatives; and (3) appointing Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Grant & Eisenhofer P.A. ("Grant & Eisenhofer") as Co-Class Counsel.[1]

## I.    INTRODUCTION

This is a federal securities class action asserting claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  Plaintiffs allege that Defendants made materially false and misleading statements and omissions to investors between February 1, 2022 and February 6, 2024, inclusive (the "Class Period") regarding Mercury Systems' purported full integration of the businesses the Company had acquired, and the negative consequences of Defendants' admitted failure to achieve full integration during the Class Period.

Plaintiffs seek to certify a class of purchasers of Mercury Systems common stock during the Class Period, and propose themselves as Class Representatives and Robbins Geller and Grant & Eisenhofer as Co-Class Counsel.

---

[1]    References to the "Feinstein Expert Report" are to the Report on Market Efficiency and Damages Methodology by Steven P. Feinstein, Ph.D., CFA ("Dr. Feinstein"), dated July 18, 2025, attached as Exhibit ("Ex.") 1 to the Declaration of Michael G. Capeci in Support of Plaintiffs' Motion to Certify This Action as a Class Action and Related Relief. ("Capeci Decl."), filed herewith.  Exhibits referenced herein are also attached the Capeci Decl.  References to: (1) "Carpenters Fund Decl." is to the Declaration of Carpenters Pension Trust Fund for Northern California in support of this motion; (2) "UPRRS Decl." is to the Declaration of the University of Puerto Rico Retirement System in support of this motion; and (3) "North Collier Decl." is to the Declaration of North Collier Fire Control and Rescue District Firefighters' Pension Plan in support of this motion, all filed herewith.  "Defendants" in this action are Mercury Systems, Inc. ("Mercury Systems" or the "Company"), Mark Aslett ("Aslett") and William L. Ballhaus ("Ballhaus"). Unless otherwise noted, all emphasis in quotations is added and all internal citations and quotation marks are omitted.

The "Proposed Class" is defined as follows:

All purchasers of the common stock of Mercury Systems during the Class Period, inclusive. Excluded from the Proposed Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

Both the U.S. Supreme Court and courts in this Circuit routinely hold that class treatment is "particularly appropriate in the context of securities litigation." *In re Bos. Sci. Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 280 (D. Mass. 2009); *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). This action readily satisfies all of Rule 23(a)'s requirements:

- Numerosity: Hundreds if not thousands of investors acquired and sold millions of publicly held shares of Mercury Systems common stock during the Class Period.

- Commonality: The Proposed Class's claims arise from the same alleged misstatements and omissions by Defendants when speaking to all investors.

- Typicality: Plaintiffs, like all Proposed Class members, were injured by Defendants' misconduct, which arises from a single course of conduct.

- Adequacy: Plaintiffs and proposed Co-Class Counsel have vigorously prosecuted this action, and Plaintiffs' interests are directly aligned with the Proposed Class's interests.

This action also satisfies Rule 23(b)(3)'s predominance and superiority requirements because common questions of law and fact predominate over individual ones, and class treatment is superior to individual adjudications. Issues of scienter, materiality and loss causation all present common questions. Reliance is presumed under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) because, as Plaintiffs' expert, Dr. Feinstein, has demonstrated, Mercury Systems common stock traded in an efficient market during the Class Period. Dr. Feinstein has also set forth a model for calculating damages on a class-wide basis that uses a common methodology – precisely the model that courts in this Circuit, including this Court, routinely accept in securities class actions. Finally, class action treatment is superior to thousands of individual actions.

- 2 -

Accordingly, class certification is appropriate in this action and Plaintiffs respectfully request that the Court grant this motion in its entirety.

## II.   STATEMENT OF FACTS COMMON TO THE PROPOSED CLASS

As detailed in Plaintiffs' Second Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 102, the "SAC"), and as summarized by the Court in granting in part Plaintiffs' motion for leave to amend, *N. Collier Fire Control & Rescue Dist. Firefighters' Pension Plan v. Mercury Systems, Inc.*, 768 F. Supp. 3d 133, 137-145 (D. Mass. 2025), beginning in 2014, Aslett – the Company's former Chief Executive Officer ("CEO") – launched a strategy of growing the Company's revenue and profit through the acquisition of related businesses (the "M&A Strategy").  ¶48.[2]  Pursuant to the M&A Strategy, between 2014 and late 2021, Mercury Systems spent over $1.3 billion to acquire 15 businesses.  ¶¶49-51.

According to Aslett, the key ingredient for the success of the M&A Strategy was quickly achieving *full* integration of the acquired businesses.  ¶¶53-54.  Because full integration of the acquired companies was necessary for Mercury Systems to grow its revenue and profit, and to convert that revenue to cash, Mercury Systems repeatedly stated to investors during the Class Period that full integration was "core to [Mercury Systems'] strategy" (¶122), with analysts believing that the Company had successfully implemented "a full-integration approach" during the Class Period.  ¶125.  To that end, on February 1, 2022 – the first day of the Class Period – Aslett stated that Mercury Systems had "completed 15 acquisitions" since "fiscal '14," and told investors that Mercury Systems had "fully integrated these acquired entities by moving them to common collaboration and engineering platforms as well as common ERP, HRIS and CRM systems" and had benefitted from "the synergies that we've generated through full integration[.]"  ¶239.

---

[2]   Citations to "¶__" or "¶¶___" refer to the SAC.

These statements were materially false and misleading when made because, unbeknownst to investors, Mercury Systems had not fully integrated the acquired businesses and this failure was negatively impacting the Company's unbilled receivables, cash flow and profit. *Mercury Sys.*, 768 F. Supp. 3d at 138-139. As part of the M&A Strategy, Mercury Systems had acquired businesses with numerous long term contracts that used "over time" accounting for revenue recognition, a change from the Company's traditional use of "point-in-time" accounting. ¶¶56, 59. Point-in-time accounting allows for revenue recognition when the customer receives the good or service and is invoiced. ¶59. Conversely, over time accounting allows for revenue (and profit) recognition when incremental progress is made on a performance obligation, but before the customer is invoiced and pays for the completed obligation. ¶57. Mercury Systems classified the revenue it recognized in excess of the amounts invoiced to the Company's customers on over time contracts as "unbilled receivables." ¶58.

As a direct result of the M&A Strategy, Mercury Systems' share of contracts using over time accounting increased from 42% in fiscal year 2021 to 56% by fiscal year 2023. ¶¶61-65. Mercury Systems' shift to primarily having over time contracts substantially increased the Company's unbilled receivables (and working capital), which caused Mercury Systems' cash flow to decrease while invoices and payments awaited the completion of performance obligations. ¶¶65-67. Full integration of the businesses acquired was critical to Mercury Systems' ability to meet performance obligations on over time contracts, and thereby convert unbilled receivables to cash. ¶¶68-78. Failing to fully integrate acquired businesses delayed completing performance obligations on over time contracts and converting revenue recognized as unbilled receivables to cash. *Id.* The full integration failure also required the Company to incur additional costs to meet its performance obligations, thereby reducing profits. *Id.*

- 4 -

About one month before the Class Period began, and as Mercury Systems' unbilled receivables were climbing, activist investors began agitating for a sale of the Company. On December 23, 2021, JANA Partners LLP ("JANA") announced JANA's beneficial ownership of 6.6% of Mercury Systems' outstanding shares and desire for a sale. ¶¶171-172.[3] As part of this effort, JANA also announced that it intended to appoint Ballhaus to Mercury Systems' Board of Directors (the "Board"). ¶171. On June 23, 2022, Ballhaus was appointed to the Board. ¶180. Shortly thereafter, on January 31, 2023, the Board initiated a sale process for the Company. ¶183.

On May 2, 2023, Aslett held what would be his final earnings call as CEO. ¶251. At this time, Mercury Systems' sale process was nearing failure and the Company's unbilled receivables balance was continuing to balloon. *Id.* During the call, Aslett disclosed for the first time that "[a]pproximately a dozen" of Mercury Systems' programs were experiencing execution challenges and related cost growth, preventing Mercury Systems from meeting performance obligations and converting its high levels of unbilled receivables to cash. *Id.* Aslett, however, falsely stated that Mercury Systems' "challenges" were "not unique to Mercury[,]" and that the "cost growth" Mercury Systems was "experiencing" was being driven by factors other than the Company's failure to fully integrate its acquired businesses. ¶¶251-253.

On June 23, 2023, the Board announced the conclusion of the sale process after receiving just two "no premium" offers. ¶¶185-187. Also on June 23, the Board announced that Aslett was resigning as CEO and as a director, and that Ballhaus would serve as interim CEO. ¶¶188-189.

On August 15, 2023, Ballhaus, addressing Mercury Systems' investors as CEO for the first time, admitted that: (1) since 2020, there was a "lack of full integration of key functional areas" by Mercury Systems of the businesses it had acquired pursuant to the M&A Strategy; (2) this

---

[3]    On January 13, 2022, a second activist investor (Starboard Value LP) joined JANA's effort. ¶¶173-174.

failure caused execution problems in 20 programs, eight more than Aslett had disclosed in May 2023; and (3) these execution problems prevented Mercury Systems from meeting performance obligations and converting the Company's high level of unbilled receivables to cash, and necessitated the expenditure of additional significant costs, which reduced Mercury Systems' fiscal year 2023[4] adjusted EBITDA by $56 million.  ¶¶192-197.  Nonetheless, during the same call, Ballhaus continued to mislead investors.  *Id.*  Rather than acknowledge the severity of the financial impact of the Company's failure to achieve full integration, Ballhaus falsely assured investors that Mercury Systems' "reported margin in 2023 does not at all reflect a structural shift in our margin profile[,]" and that the impact of the challenged programs on the Company's performance was "unanticipated and temporary[.]"  ¶¶255-257.

Ultimately, Defendants' fraud was revealed through several partial corrective disclosures throughout the Class Period.

*First*, on August 2, 2022, Mercury Systems and Aslett disclosed for the first time that the Company's inability to achieve performance obligations on certain undisclosed contracts was negatively impacting the Company's unbilled receivables and cash flow.  ¶279.  In response to the disclosure of this previously unknown information, the price of Mercury Systems common stock declined by approximately 13.3%.  ¶280.

*Second*, on May 2, 2023, Mercury Systems and Aslett disclosed for the first time that the Company had execution challenges in a dozen programs.  These challenges prevented Mercury Systems from converting the Company's high level of unbilled receivables to cash, causing continued poor cash flow performance.  ¶281.  In response to the disclosure of this previously

---

[4]   During the Class Period, Mercury Systems' fiscal year ran from July 1 to June 30 of the following year.  ¶34.

unknown information, the price of Mercury Systems common stock declined by approximately 17.3%. ¶282.

*Third*, on November 7, 2023, the Company and Ballhaus disclosed for the first time that converting the substantial unbilled receivables associated with the now-twenty challenged programs to cash would require Mercury Systems to incur significant additional costs to recognize the small fraction of total remaining revenue on the challenged programs. ¶283. In response to the disclosure of this previously unknown information, the price of Mercury Systems common stock declined by approximately 12.6%. ¶284.

*Finally*, on February 6, 2024, Mercury Systems and Ballhaus disclosed for the first time that the costs incurred to convert the unbilled receivables associated with the twenty challenged programs to cash would cause the Company's revenue to decline by approximately 20% in fiscal year 2024 ("FY24"), and the Company's adjusted EBITDA to be substantially reduced in FY24. ¶285. In response to the disclosure of this previously unknown information, the price of Mercury Systems common stock declined by approximately 11.4%. ¶286.

In total, Mercury Systems lost nearly two-thirds of its value during the Class Period, demonstrating the extent of the damage caused by Defendants' fraud. ¶¶224-225.

## III.   THE PROPOSED CLASS SATISFIES RULE 23

### A.   Legal Standard

To certify a class, the Court must determine whether the requirements of Rule 23(a) and at least one subsection of Rule 23(b) are satisfied. *See Amgen*, 568 U.S. at 459. This inquiry at the class certification stage is not concerned with whether the plaintiff will ultimately prevail on the merits, but rather whether the requirements of Rule 23 are met. *See id.* at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage[.]"); *Bos. Sci.*,

604 F. Supp. 2d at 280 ("The First Circuit has cautioned . . . that a court must not turn the class-certification proceeding into an unwieldy trial on the merits.").

Rule 23(a) requires a plaintiff to demonstrate that: (1) the class is so numerous that joinder of all members is impractical; (2) at least one question of law or fact is common to the class; (3) the class representatives' claims are typical of the class's claims; and (4) the class representatives will be able to fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *Dahhan v. OvaScience, Inc.*, 2020 WL 2602138, at \*3-\*4 (D. Mass. May 8, 2020). Under Rule 23(b)(3), a plaintiff must also meet the "predominance and superiority requirements." *Swack v. Credit Suisse First Bos.*, 230 F.R.D. 250, 256 (D. Mass. 2005).

### B.    The Proposed Class Satisfies Rule 23(a)

#### 1.    The Proposed Class Is Sufficiently Numerous

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While a plaintiff need not identify the exact number or identity of class members, "forty class members generally establishes numerosity" *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 275 F.R.D. 382, 388 (D. Mass. 2011); *see also Swack*, 230 F.R.D. at 258. In a securities fraud action, "the class size may be reasonably inferred to be in the hundreds or thousands when there are millions of shares outstanding and . . . millions of transactions during the class period." *In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672, at \*3 (D. Mass. Nov. 14, 2017).

During the Class Period, Mercury Systems averaged over 57 million shares outstanding, with an average weekly trading volume of 2.39 million shares. Ex. 1 ¶¶62, 97. Mercury Systems shares changed hands daily, and over 241 million shares traded during the Class Period. Ex. 1 ¶60. These facts establish numerosity. *See Evergreen*, 275 F.R.D. at 388 (finding numerosity established with 64-68.9 million shares outstanding and noting "courts in this district have found

- 8 -

that numerosity was established in cases with many fewer class members"); *AVEO Pharms.*, 2017 WL 5484672, at \*3 ("more than 43 million shares were outstanding" suffices for numerosity).

### 2.    Questions of Law and Fact Are Common to the Proposed Class

Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The "requirement of commonality is a low bar, and courts have generally given it a permissive application."  *Prinzo v. Hannaford Bros. Co., LLC*, 343 F.R.D. 250, 252 (D. Mass. 2023) (Young, J.).  "To meet this commonality standard, a class need not establish that every question of law or fact is identical; rather, the existence of a single significant common issue of fact or law is sufficient."  *Okla. Firefighters Pension & Ret. Sys. v. Biogen Inc.*, 348 F.R.D. 268, 276 (D. Mass. 2025) (Young, J.).

In this case, common questions include whether: (1) Defendants publicly misrepresented or omitted material facts they were required to disclose; (2) Defendants acted with scienter; (3) the alleged misconduct artificially inflated the price of Mercury Systems common stock; and (4) Defendants' conduct caused Proposed Class members to sustain damages.  These common questions easily satisfy Rule 23(a)(2).  *See, e.g.*, *AVEO Pharms.*, 2017 WL 5484672, at \*4 (finding commonality where "statements Plaintiffs allege were misleading due to material omissions were made to all of the class members.").

### 3.    The Proposed Class Representatives' Claims Are Typical

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality "is not a highly demanding requirement and the claims only need to share the same essential characteristics and need not be identical."  *In re Suffolk Univ. Covid Refund Litig.*, 2022 WL 6819485, at \*1 (D. Mass. Oct. 11, 2022) (Young, J.).  Therefore, "[t]ypicality is met whenever there is congruence between particular claims of the named class representatives and the generalized claims that are common

to the class." *Biogen*, 348 F.R.D at 277; *see also Evergreen*, 275 F.R.D. at 390 ("[C]lass representatives' claims can be considered typical even where there is some factual variation among the claims of different class members.").

Here, Plaintiffs' claims arise out of the same course of conduct as the Proposed Class's claims: Defendants' public, material misstatements and omissions that artificially inflated Mercury Systems' stock price. *See supra* §II. Moreover, Plaintiffs and the Proposed Class suffered losses from the same course of conduct, and Plaintiffs and the Proposed Class's claims will be proven by the same common evidence on a class-wide basis. Thus, typicality is established. *See, e.g.*, *AVEO Pharms.*, 2017 WL 5484672, at \*4 (finding typicality satisfied where all members of the class purchased the company's stock "which they allege was inflated in price due to [d]efendants' material omissions and were harmed by the later revelations that cured the omission.").

### 4. The Proposed Class Representatives Will Fairly and Adequately Protect the Proposed Class's Interests

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The First Circuit has explained that this rule comprises two parts: The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *OvaScience*, 2020 WL 2602138, at \*4.

As "the Court of Appeals has observed, speculative or hypothetical conflicts do not defeat Rule 23's adequacy requirement." *Medoff v. CVS Caremark Corp.*, 2016 WL 632238, at \*3 (D.R.I. Feb. 17, 2016). Disqualifying conflicts must be "'fundamental to the suit and . . . go to the heart of the litigation.'" *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 172 (D. Mass. 2013), *aff'd sub nom., In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015). Moreover, the

- 10 -

"[a]dequacy of counsel may be judged by counsel's work to identify and investigate claims, its experience in handling class actions, complex litigation, and similar claims, its knowledge of the relevant law, and the resources it has committed to the class." *Biogen*, 348 F.R.D. at 277.

Plaintiffs are institutional investors and have no conflicts with the Proposed Class; indeed, Plaintiffs' and the Proposed Class's interests are directly aligned. *See* Carpenters Fund Decl. ¶5; UPRRS Decl. ¶5; North Collier Decl. ¶¶3-4. Like all Proposed Class members, Plaintiffs purchased Mercury Systems common stock at inflated market prices during the Class Period and were injured by Defendants' misconduct. Carpenters Fund Decl. ¶3; UPRRS Decl. ¶5; North Collier Decl. ¶4. Plaintiffs have also demonstrated their willingness and ability to serve as representatives of the Class, and to monitor and participate in the prosecution of this action. Carpenters Fund Decl. ¶¶6-7; UPRRS Decl. ¶¶6-9; North Collier Decl. ¶¶5-6. To date, through proposed Co-Class Counsel, Plaintiffs have, *inter alia*, successfully moved for leave to amend and file the SAC, vigorously pursued discovery, answered interrogatories from Defendants, made productions of their own documents and reviewed Defendants' and third parties' documents, and, if appointed as Class Representatives, Plaintiffs will continue to actively monitor and direct this action to maximize the recovery for the Proposed Class. Carpenters Fund Decl. ¶¶6-8; UPRRS Decl. ¶¶6-10; North Collier Decl. ¶¶5-7. Plaintiffs' actions thus far, and the common interest they share with the Proposed Class in achieving success in this action, satisfy Rule 23(a)(4).

Plaintiffs have also demonstrated their adequacy by retaining capable attorneys with considerable experience litigating securities class actions. *See, e.g.*, *Luna v. Carbonite, Inc.*, 2023 WL 4539855, at *11 (D. Mass. July 14, 2023) ("Robbins Geller is highly experienced in litigating securities fraud class actions, and courts have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits."); *Einhorn v. AxoGen, Inc.*, 2019

- 11 -

WL 5636382, at *2 (M.D. Fla. Apr. 30, 2019) ("[Lead plaintiff] hired counsel [Grant & Eisenhofer] with extensive experience in securities fraud litigation.").

### C.    The Proposed Class Satisfies Rule 23(b)(3)

This action also satisfies Rule 23(b)(3)'s requirements that: (1) common questions of law or fact predominate over individual questions; and (2) no superior alternative method of resolving the dispute exists. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

### 1.    Common Questions Predominate

"Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625. This inquiry is satisfied where "***questions*** of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses." *Amgen*, 568 U.S. at 467 (emphasis in original). The predominance inquiry does not ask whether those common questions "will be answered, on the merits, in favor of the class." *Id.* at 459. "Importantly, Rule 23(b)(3) requires merely that common issues ***predominate***, not that all issues be common to the class." *De Giovanni v. Jani-King Int'l, Inc.*, 262 F.R.D. 71, 76 (D. Mass. 2009) (Young, J.) (emphasis in original).

Defendants' liability turns on issues common to the Proposed Class – *i.e.*, whether Defendants made materially false and misleading statements and omissions with the requisite scienter through a uniform course of conduct and to the detriment of all Proposed Class members. Thus, each of the factual and legal elements of liability are common to all members of the Proposed Class. *See Amgen*, 568 U.S. at 475 ("loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified").

Further, the element of reliance does not preclude predominance because Plaintiffs are entitled to rely on the fraud-on-the-market ("FOTM") presumption for class-wide reliance. ¶¶296-

298; *Basic*, 485 U.S. at 241; *Amgen*, 568 U.S. at 460-62.  Under the FOTM theory, "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic*, 485 U.S. at 241-42; *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 270 (2014) ("*Halliburton II*") ("'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations'").  Importantly, *Halliburton II*, held that "[e]ven the foremost critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices." *Id.*  Accordingly, "reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." *Id.* at 268.

To invoke the presumption of reliance under the FOTM theory, a plaintiff must demonstrate that: (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.  *Id.*  Here, the Court has already found that Plaintiffs adequately alleged that Defendants made public, materially misleading misstatements and omissions. *Mercury Sys.*, 768 F. Supp. 3d at 153-55.  Plaintiffs also purchased Mercury Systems common stock between the time the misrepresentations were made and the end of the Class Period. *See* Capeci Decl. ¶6.  Finally, as detailed below, Dr. Feinstein has shown that each of the factors enumerated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) establish that Mercury Systems common stock traded in an efficient market during the Class Period.

### a.    The *Cammer* Factors Establish Mercury Systems Common Stock Traded in an Efficient Market

To determine whether the market for a particular stock was efficient, courts in this Circuit routinely apply the five factors set forth in *Cammer*. *See In re Xcelera.com Sec. Litig*., 430 F.3d 503, 511-19 (1st Cir. 2005); *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 27 (D. Mass. 2008) ("In determining whether the market for a specific security is efficient, the First Circuit uses the factors laid out by the court in *Cammer v. Bloom* . . ."). The *Cammer* factors "are: (1) the stock's average trading volume; (2) the number of securities analysts that followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file a Form S-3 Registration Statement; and (5) a cause-and-effect relationship, over time, between unexpected corporate events or financial releases and an immediate response in stock price." *Xcelera.com*, 430 F.3d at 511 (citing *Cammer*, 711 F. Supp. at 1286-87). "[T]here is no 'magic number' of factors for determining efficiency," and the First Circuit "leave[s] it to the district court in the first instance to decide which factors and how many factors it will consider." *Id.* at 518.

Here, each *Cammer* factor supports a finding of market efficiency.

*Mercury Systems Had a High Average Trading Volume*. Mercury Systems' average weekly trading volume of greater than 4% of its total outstanding shares during the Class Period warrants a strong presumption of market efficiency. Ex. 1 ¶62. This far surpasses the benchmarks for market efficiency under the first *Cammer* factor. *See Xcelera.com*, 430 F.3d at 514 (noting average weekly trading volume of 1% or 2% of outstanding shares serves "as the benchmark for supporting a presumption of efficiency").

*A Substantial Number of Securities Analysts Closely Followed Mercury Systems*. Mercury Systems was the subject of significant coverage by securities analysts, which also supports a finding of market efficiency. At least 11 analysts covered Mercury Systems during the

- 14 -

Class Period, including well-known firms such as William Blair, Jefferies, Bank of America, Berenberg, JPMorgan, Truist Securities, and RBC Capital Markets. Ex. 1 ¶66. This level of analyst coverage is more than enough to demonstrate market efficiency. *See, e.g.*, *Xcelera.com*, 430 F.3d at 514-16 (market efficient when company was covered by just one analyst).

Similarly, the media published at least 1,000 articles about the Company during the Class Period. Ex. 1 ¶73. This extensive media coverage further facilitated the flow of information regarding Mercury and supports a finding of market efficiency. *See Xcelera.com*, 430 F.3d at 515 (market efficiency established where information about the company "was widely distributed through 'news articles, press releases, television interviews and the Company's SEC filings'").

***Mercury Systems Was Listed on the NASDAQ and Had Numerous Market Makers***. "A market-maker is '[o]ne who helps establish a market for securities by reporting bid-and-asked quotations . . . .'" *Xcelera.com*, 430 F.3d at 515. Market makers indicate an efficient market because they "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. Here, there were at least 125 market makers for Mercury Systems common stock during the Class Period, including well-known firms such as Goldman Sachs and Barclays, which supports market efficiency. Ex. 1 ¶78; *Xcelera.com*, 430 F.3d at 516 (market efficiency supported by over 20 market-makers); *Credit Suisse-AOL*, 253 F.R.D. at 27 (finding market was efficient where stock "had numerous market makers"). Additionally, at least 544 institutional investors were invested in Mercury Systems' common stock during the Class Period, which further indicates market efficiency. Ex. 1 ¶82.

Mercury Systems common stock was listed on the NASDAQ during the Class Period, an open and efficient market. *See* Ex. 1 ¶29; *ODS Cap. LLC v. JA Solar Holdings Co.*, 2020 WL 7028639, at *14 (S.D.N.Y. Nov. 30, 2020) ("[T]he federal courts are unanimous in their agreement

that a listing on the NASDAQ . . . is a good indicator of efficiency."). *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (citing cases and finding it would be "remarkable for a court to conclude NASDAQ is not an efficient market – which is why [s]ecurities traded on NASDAQ are often presumed to be traded on an efficient market").

*Mercury Systems Was Eligible to File a Form S-3 Registration Statement*.  A company is eligible to file a Form S-3 registration statement if it has filed SEC reports for 12 consecutive months and has at least $75 million in voting stock held by non-affiliates (average during 60-day period before filing).  *See* 17 C.F.R. §239.13; Ex. 1 ¶87.  Here, Mercury Systems satisfied both requirements throughout the Class Period (Ex. 1 ¶¶89-91), further demonstrating its common stock traded in an efficient market.  *Cammer*, 711 F. Supp. at 1285 ("[T]he existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient."); *Credit Suisse-AOL*, 253 F.R.D. at 27.

*The Price of Mercury Systems Common Stock Reacted to New, Company Specific Information*.  The last *Cammer* factor focuses on whether the common stock at issue responded to new, company-specific information.  *Cammer*, 711 F. Supp. at 1287.  While the *Cammer* court found that a cause-and-effect relationship is "helpful" for showing market efficiency (*id.*), it "is not always necessary [in order] to establish market efficiency and invoke the *Basic* presumption[.]" *Waggoner v. Barclays PLC*, 875 F.3d 79, 96-97 (2d Cir. 2017).  To demonstrate that Mercury Systems common stock meets this factor, Dr. Feinstein conducted an event study evaluating the causal relationship between the announcement of Mercury Systems-specific news and a response in the price of Mercury Systems common stock.  Event studies are widely used to demonstrate market efficiency.  *See, e.g.*, *Halliburton II*, 573 U.S. at 280-81; *Xcelera.com*, 430 F.3d at 512-13 ("To demonstrate the existence of a cause-and-effect relationship . . . Plaintiffs' expert presented

- 16 -

the results of a sophisticated event study . . . .").  Here, the event study conducted by Dr. Feinstein identified a cause-and-effect relationship between the release of new, Mercury Systems-specific information and the movement in Mercury Systems' common stock price.  Ex. 1 ¶¶111-148.

> **b.      The *Krogman* Factors Establish Mercury Systems Common Stock Traded in an Efficient Market**

In assessing market efficiency, courts also consider the *Krogman* factors: (1) a company's market capitalization; (2) bid-ask spread; and (3) the stock's float.  *See Krogman*, 202 F.R.D. at 474, 478.

*Mercury Systems Had a Large Market Capitalization*.  A higher market capitalization indicates market efficiency "because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."  *Id*. at 478.  Here, over the course of the Class Period, the market capitalization of Mercury Systems common stock ranged from $1.75 billion to $3.96 billion, averaging $2.70 billion.  Ex. 1 ¶94.  Mercury Systems' market capitalization accordingly demonstrates market efficiency.  *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (finding market capitalization ranging from "$292 million to $585 million" weighed in favor of a finding of market efficiency).

*Mercury Systems Common Stock Had a Narrow Bid-Ask Spread*.  Mercury Systems common stock also had a narrow bid-ask spread, further indicating market efficiency.  During the Class Period, the average bid-ask spread for Mercury Systems common stock was approximately $0.05 per share, or 0.10% of the closing price, which favors a finding of market efficiency.  *See* Ex. 1 ¶¶99-102; *see also Krogman*, 202 F.R.D. at 478 ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."); *see also Krogman*, 202 F.R.D. at 478 (bid-ask spread of 5.6% supported market efficiency).

- 17 -

***Mercury Systems Had a Large Public Float***.  Courts also consider public float – *i.e.*, the percentage of shares held by the public, rather than insiders and affiliated entities – in assessing market efficiency.  *See Krogman*, 202 F.R.D. at 478.  Mercury Systems' public float was greater than 97% of its outstanding shares during the Class Period.  Ex. 1 ¶¶96-98.  This large public float provides further evidence that Mercury Systems common stock traded in an efficient market.  *Id*.

In sum, all of the *Cammer* and *Krogman* factors support a finding that the market for Mercury Systems common stock was efficient during the Class Period.  Thus, class-wide reliance may be presumed under the FOTM theory.

### c.    Damages Can Be Calculated in the Same Manner for All Proposed Class Members

At the class certification stage, Plaintiffs' burden "is simply to propose a methodology for calculating damages that corresponds to its theory of liability."  *Carbonite*, 2023 WL 4539855, at *10; *see also Nexium*, 777 F.3d at 23 ("simply . . . at class certification, the damages calculation must reflect the liability theory").  Accordingly, Plaintiffs must show only "'that damages are capable of measurement on a classwide basis.'"  *Levy v. Gutierrez*, 448 F. Supp. 3d 46, 64 (D.N.H. 2019) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-36 (2013)).  Indeed, the First Circuit and Supreme Court have made clear that "class certification ought not . . . turn into a 'free-ranging merits inquir[y]' through unnecessary demands for exact calculations of damages."  *Nexium*, 777 F.3d at 17.  Further, "'[w]here . . . common questions predominate regarding liability . . . courts generally find the predominance requirement to be satisfied even if individual damages issues remain.'"  *Id.* at 21.

Here, the Proposed Class's damages can be measured on a class-wide basis, consistent with Plaintiffs' theory of the case, using the widely accepted out-of-pocket measure of damages.  Ex. 1 ¶¶149-161; *see Biogen*, 348 F.R.D at 286 (finding that Dr. Feinstein's identical proposed damages

methodology in a securities fraud class action satisfied *Comcast* and recognizing that adopting defendants' argument would mean that no "securities fraud class action could proceed past the certification phase" and was instead "simply a loss causation argument in disguise"). Accordingly, common issues of damages will predominate.

### 2. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Rule 23(b)(3) also requires the Court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." To determine the issue of "superiority," Rule 23(b)(3) enumerates the following factors for the court to consider:

> (A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Courts in this Circuit recognize that class actions are the superior mechanism for adjudicating securities fraud cases. *See Bos. Sci.*, 604 F. Supp. 2d at 287-88 ("Class certification in this case is also superior to other methods because, in accordance with the 'core purpose' of Rule 23(b)(3), it will provide the opportunity for individual investors to vindicate potentially valid claims, even where those investors suffered relatively small damages and have insufficient resources to pursue litigation on their own."); *Evergreen*, 275 F.R.D. at 393 ("[O]ther judges of this Court have stressed that class actions are particularly appropriate for securities litigation because it may be the 'only practicable means of enforcing investors' rights.'").

This case is no different. The Proposed Class consists of a large number of geographically dispersed purchasers of Mercury Systems common stock whose individual damages likely are too small to make individual litigation economically worthwhile. Moreover, Plaintiffs are not aware

- 19 -

of any other active securities fraud litigation commenced by any Proposed Class member regarding the alleged fraud. In addition, this is the most desirable forum in which to prosecute this action, as Mercury Systems maintains its principal executive offices in this District, and many of the acts and transactions giving rise to the violations in this action also occurred in this District.

### D. The Court Should Appoint Plaintiffs' Choice of Counsel

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing class counsel, the Court considers counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). As mentioned previously, Robbins Geller and Grant & Eisenhofer are well qualified to prosecute this case on behalf of Plaintiffs and the other members of the Proposed Class. *See* Exs. 2-3. To date, proposed Co-Class Counsel have already vigorously prosecuted this action by conducting an extensive investigation of the claims, briefing and arguing Defendants' motion to dismiss, successfully moving for leave to file the SAC, engaging in discovery, and pursuing class certification. Capeci Decl. ¶¶9-10. In short, Robbins Geller and Grant & Eisenhofer have diligently prosecuted Proposed Class members' claims to date, and are committed to continue doing so to secure a successful outcome. *Carbonite*, 2023 WL 4539855, at *8; *see also AxoGen*, 2019 WL 5636382, at *2.

### IV. CONCLUSION

Plaintiffs have affirmatively demonstrated compliance with each Rule 23 requirement. Accordingly, Plaintiffs respectfully request that the Court enter an Order: (1) certifying this action as a class action pursuant to Rule 23(a) and Rule 23(b)(3); (2) certifying Plaintiffs as Class Representatives; and (3) appointing Robbins Geller and Grant & Eisenhofer as Co-Class Counsel pursuant to Rule 23(g).

DATED: July 18, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN (*pro hac vice*)
MICHAEL G. CAPECI (*pro hac vice*)
MAGDALENE ECONOMOU (*pro hac vice*)
JONATHAN A. OHLMANN (*pro hac vice*)


                    */s/ Michael G. Capeci*
                  MICHAEL G. CAPECI

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mcapeci@rgrdlaw.com
meconomou@rgrdlaw.com
johlmann@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ (*pro hac vice*)
LAURA M. ANDRACCHIO (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
landracchio@rgrdlaw.com

GRANT & EISENHOFER P.A.
CAITLIN M. MOYNA (*pro hac vice*)
KARIN E. FISCH (*pro hac vice* forthcoming)
CECILIA E. STEIN (*pro hac vice*)
TIMOTHY CLARK B. DAUZ (*pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  646/722-8500
646/722-8501 (fax)
cmoyna@gelaw.com
kfisch@gelaw.com
cstein@gelaw.com
tdauz@gelaw.com

*Co-Lead Counsel for Plaintiffs*

- 21 -

HUTCHINGS BARSAMIAN
MANDELCORN, LLP
THEODORE M. HESS-MAHAN, BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA  02481
Telephone:  781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

*Local Counsel for Plaintiffs*

WEINBERG, ROGER & ROSENFELD, P.C.
EZEKIEL D. CARDER
1375 55th Street
Emeryville, CA 94608
Telephone:  510/337-1001
510/337-1023 (fax)
ecarder@unioncounsel.net

***Additional Counsel for Lead Plaintiff Carpenters
Pension Trust Fund for Northern California***

ABRAHAM FRUCHTER & TWERSKY, LLP
MITCHELL M.Z. TWERSKY
JACK G. FRUCHTER
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: 212/279-5050
212/279-3655 (fax)
mtwersky@aftlaw.com
jfruchter@aftlaw.com

***Additional Counsel for University of Puerto Rico
Retirement System***

- 22 -

CERTIFICATE OF SERVICE

I, Michael G. Capeci, hereby certify that on July 18, 2025, I caused a true and correct copy of the foregoing document to be served on all counsel of record by providing them with copies via electronic mail.

/s/ Michael G. Capeci

MICHAEL G. CAPECI