UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NORTH COLLIER FIRE CONTROL AND RESCUE DISTRICT FIREFIGHTERS' PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | No. 1:23-cv-13065-WGY<br><br>CLASS ACTION<br><br>JOINT DECLARATION OF MICHAEL G. CAPECI AND KARIN E. FISCH IN SUPPORT OF: (1) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (2) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARDS TO PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4) |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| MERCURY SYSTEMS, INC., et al., | ) ) | |
| Defendants. | ) ) ) ) | |

4938-1982-3005.v1

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT .................................................................................2

II.     THE LITIGATION ..................................................................................................7

        A.      The Commencement of the Litigation and Appointment of Lead Plaintiff.............7

        B.      Lead Counsel's Investigation and Filing of the Amended Complaint.....................7

        C.      Defendants' Motion to Dismiss and the Court's Decision ....................................8

        D.      Lead Counsel's Further Investigation and the Second Amended Complaint........10

        E.      The Court's Decision to Partially Sustain Claims Against Mercury and
                Defendants Aslett and Ballhaus, and Defendants' Answer to the
                Complaint..............................................................................................................13

        F.      Fact Discovery ......................................................................................................13

                1.      Joint Proposed Schedule ..............................................................................14

                2.      Initial Disclosures .......................................................................................14

                3.      Stipulations Regarding Discovery ...............................................................15

                        a.      Negotiations Concerning the Production of Electronically
                                Stored Information ("ESI").................................................................15

                        b.      Protective Order................................................................................15

                4.      Written Discovery Directed at Defendants ...................................................17

                        a.      Document Requests ...........................................................................17

                        b.      Interrogatories...................................................................................18

                5.      Discovery Disputes with Defendants............................................................19

                        a.      Search Terms and Custodians of Relevant Documents .................19

                        b.      Defendants' Interrogatory Responses and Plaintiffs' Pursuit
                                of Rule 30(b)(6) Testimony .............................................................21

                        c.      Defendants' Change in Counsel and Deficiencies in
                                Defendants' Rolling Document Productions .................................24

                6.      Third Party Discovery Efforts.....................................................................26

4938-1982-3005.v1

**Page**

7.    Plaintiffs' Review and Analysis of Discovery Materials...........................27

8.    Depositions ......................................................................................28

9.    Plaintiffs' Response to Defendants' Discovery ........................................30

G.    Class Certification Proceedings ...................................................................31

H.    Expert Witnesses and Consultants ...............................................................33

1.    Dr. Steven P. Feinstein, Ph.D., CFA...............................................33

2.    Dr. Timothy J. Galpin, Ph.D. .........................................................33

3.    Jon Bellman ...................................................................................33

III.    THE RISKS OF THE LITIGATION...........................................................................34

A.    Falsity and Materiality for the Feb. 2022 Statement.................................35

B.    Falsity and Materiality for the May 2023 Statement .................................36

C.    Falsity for the Aug. 2023 Statement ..........................................................36

D.    Scienter for the Feb. 2022 Statement.........................................................37

E.    Scienter for the May 2023 Statement..........................................................38

F.    Scienter for the Aug. 2023 Statement.........................................................38

G.    Loss Causation and Damages .....................................................................38

IV.    SETTLEMENT NEGOTIATIONS AND TERMS .........................................................41

A.    The Settlement Is in the Best Interest of the Class and Warrants Approval..........43

B.    The Plan of Allocation ................................................................................43

V.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND
EXPENSES IS REASONABLE...................................................................................44

A.    Time, Labor, and Fee Percentage Requested.............................................44

B.    Risk, Magnitude, and Complexity of the Litigation ...................................47

4938-1982-3005.v1

**Page**

C. Quality of Representation ......................................................................47

VI. THE REQUESTED EXPENSES ARE FAIR AND REASONABLE ...............................49

VII. THE REQUESTED PLAINTIFF AWARDS ARE FAIR AND REASONABLE............50

VIII. CONCLUSION.........................................................................................51

4938-1982-3005.v1

MICHAEL G. CAPECI and KARIN E. FISCH declare as follows pursuant to 28 U.S.C. §1746:

1.    I, Michael G. Capeci, am an attorney duly licensed to practice in the State of New York and I have been admitted *pro hac vice* in this action. I am a partner with the law firm Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), Lead Counsel for the proposed Class in the above-captioned litigation (the "Litigation") and counsel for Lead Plaintiff Carpenters Pension Trust Fund for Northern California ("Carpenters Fund" or "Lead Plaintiff").[1] I have been actively involved in all material aspects of the prosecution and resolution of this Litigation, and have personal knowledge of the matters set forth herein.

2.    I, Karin E. Fisch, am an attorney duly licensed to practice in the State of New York and my *pro hac vice* application is pending in this Litigation. I am a partner with the law firm Grant & Eisenhofer P.A. ("G&E") and Lead Counsel for the proposed Class in the Litigation, and counsel for named plaintiff North Collier Fire Control and Rescue District Firefighters' Pension Plan ("North Collier," and with Lead Plaintiff and University of Puerto Rico Retirement System ("UPRRS"), "Plaintiffs"). I have been actively involved in all material aspects of the prosecution and resolution of this Litigation, and have personal knowledge of the matters set forth herein.

3.    We respectfully submit this joint declaration in support of Plaintiffs' motion for final approval of the all-cash settlement of $32,500,000 (the "Settlement Amount") and the proposed Plan of Allocation and Lead Counsel's motion for an award of attorneys' fees and expenses and awards to Plaintiffs pursuant to 15 U.S.C. §78u-4(a)(4) in connection with Plaintiffs' representation of the Class.

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in the Stipulation of Settlement, dated December 1, 2025 (ECF 145, the "Stipulation").

- 1 -

4.    The Class, preliminarily certified by the Court in its Order Preliminarily Approving Settlement and Providing for Notice (ECF 146), is defined as:

> All purchasers and acquirers of Mercury common stock during the period between February 3, 2021 and February 6, 2024, inclusive.  Excluded from the Class are Defendants and their immediate families, the Company's officers and directors at all relevant times, as well as their immediate families, Defendants' legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.  Also excluded is any Person who properly excludes himself, herself, itself, or themselves by submitting a valid and timely request for exclusion.  To the extent any Mercury employee benefit plan receives a distribution from the Net Settlement Fund, no portion shall be allocated to any person or entity who is excluded from the Class by definition.  (ECF 146 at 1-2).

## I.    PRELIMINARY STATEMENT

5.    This declaration does not seek to detail each and every event that occurred since the Litigation commenced in 2023.  Rather, it provides the Court with key highlights of the Litigation, including the extensive fact discovery that was conducted, the events leading up to September 20, 2025, the date the Settlement was reached, and the bases upon which Lead Counsel and Plaintiffs recommend the Settlement's approval.

6.    This action was initiated in December 2023 against Mercury Systems, Inc. ("Mercury" or the "Company"), Mercury's former CEO, Mark Aslett ("Aslett"), and former CFO, Michael Ruppert ("Ruppert"), on behalf of the Class for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").[2]  The gravamen of the operative Second Amended Complaint for Violations of the Federal Securities Laws (ECF 102, the "Complaint") is that Defendants made allegedly materially false and misleading statements regarding Mercury's

---

[2]    Mercury's CEO, William Ballhaus ("Ballhaus"), and Mercury's CFO David Farnsworth ("Farnsworth") were later added as defendants in the Complaint.  Mercury, Aslett, Ballhaus, Ruppert, and Farnsworth are referred to as "Defendants."

4938-1982-3005.v1

purported full integration of businesses the Company had acquired, which led to execution challenges on certain acquired contracts, known as programs.

7.      After extensive briefing on the pleadings, the Court upheld three sets of misrepresentations alleged in the Complaint: (1) defendant Aslett's statements on February 1, 2022, that Mercury had "fully integrated" all of the businesses acquired by the Company "by moving them to [a]. . . common ERP [Enterprise Resource Planning] . . . system[]" (the "Feb. 2022 Statement"); (2) defendant Aslett's statements on May 2, 2023, that the cause of Mercury's operational challenges was "not unique to Mercury" and that the cost growth caused by these challenges was "nearing completion" (the "May 2023 Statement"); and (3) defendant Ballhaus's statements on August 15, 2023, that Mercury's FY23 financial underperformance caused by the failure to fully integrate acquired businesses did not "reflect a structural shift in our margin profile," and that the resulting operational challenges were "unanticipated" and would be "temporary" (the "Aug. 2023 Statement"). *See N. Collier Fire Control & Rescue Dist. Firefighters' Pension Plan v. Mercury Sys., Inc.*, 768 F. Supp. 3d 133, 146-49 (D. Mass. 2025).

8.      With respect to the Feb. 2022 Statement, the Complaint alleges Aslett misrepresented to investors that Mercury had fully integrated its acquisitions into Mercury by, *inter alia*, moving them to a common enterprise resource planning ("ERP") system, when, as Defendants later allegedly admitted, no such integration had occurred.

9.      With respect to the May 2023 Statement, the Complaint alleges Aslett misrepresented to investors that the execution challenges (which were caused by Mercury's alleged failure to fully integrate) were not unique to the Company.

10.     With respect to the Aug. 2023 Statement, the Complaint alleges that after the Company had disclosed worsening financial performance and inflated unbilled receivables balance

caused by an inability to fully integrate its acquisitions, Ballhaus misrepresented to investors that the problems were unanticipated and temporary, despite knowing their true cause much earlier.

11. Once the Court upheld these misrepresentations, the Settling Parties proceeded to discovery. Although Plaintiffs and Lead Counsel believed in the strength of the claims and vigorously pursued evidence in support of their claims to ultimately present for a jury's consideration at trial, a successful outcome on behalf of the Class remained uncertain. This Settlement, however, provides the Class a definite, immediate, and significant recovery.

12. This Settlement is the product of an efficient litigation strategy executed from the commencement of the Litigation in December 2023 until the Settling Parties agreed upon this Settlement. The Settlement was reached following an all-day mediation session and subsequent negotiations, culminating in the acceptance by the Settling Parties of a mediator's proposal, only after Lead Counsel, *inter alia*: (i) conducted a thorough investigation regarding the claims and drafted a detailed amended complaint and the subsequently filed Complaint; (ii) successfully moved for leave to file the Complaint following the Court's order dismissing the amended complaint; (iii) moved for class certification; and (iv) engaged in extensive fact discovery that involved the production and review by Lead Counsel of over 400,000 pages of documents, and the taking of several depositions.

13. The Settlement takes into consideration the significant risks specific to this Litigation, including, for example, the risk that the Court would render an adverse decision on Plaintiffs' motion for class certification or grant Defendants' likely motion for summary judgment after the completion of discovery. Furthermore, the Settlement is the result of arm's-length negotiations between the Settling Parties facilitated by mediator David M. Murphy, Esq., a nationally recognized mediator of complex cases and class actions. These negotiations were

- 4 -

4938-1982-3005.v1

conducted by experienced counsel with an understanding of the strengths and weaknesses of the claims and defenses, and the Settlement was reached after each side had an opportunity to reflect on the negotiations at the mediation and deliberate further.

14.     The Settlement provides a significant recovery to the Class.  Despite the fact that many of the Complaint's allegations were independently supported, numerous uncertainties remain in the Litigation.  This is especially true given that, at the time the Settling Parties reached a settlement in principle, the Court had not yet ruled on Plaintiffs' motion for class certification, and fact discovery was ongoing.

15.     In opting to settle the Litigation, Plaintiffs and Lead Counsel considered the risks of proving the securities fraud claims alleged in the Complaint and the various defenses that Defendants might persuasively assert.  For example, it was Defendants' position that even though the acquired programs operated on different ERP systems, those disparate systems still constituted a common ERP system.  Additionally, Defendants argued that the alleged misstatements had no impact on Mercury's stock price.  Although Plaintiffs disputed (and continue to dispute) Defendants' assertions, it was clear that Defendants would attempt to marshal evidence in support of these arguments as the Litigation progressed, which is what Defendants did in opposing class certification shortly before the Settlement was reached, and would continue to do so at summary judgment and at trial.

16.     In addition, Plaintiffs and Lead Counsel weighed the documents and information they believed supported the allegations in the Complaint against other documents and information that could be used to undercut those allegations.  Indeed, the Settling Parties disagreed on the importance of much of the evidence in this Litigation – including the evidence the Settling Parties utilized at the mediation – and there is no way to predict which interpretations or inferences a jury

4938-1982-3005.v1

would accept.  On balance, considering all of the circumstances and risks both sides faced if this Litigation progressed further, both Plaintiffs (for themselves and the Class) and Defendants concluded that the Settlement on the terms agreed upon was in their respective best interests.

17.    To date, Lead Counsel have prosecuted this Litigation and reached this highly favorable Settlement on a wholly contingent basis and, in so doing, have advanced and incurred substantial, albeit reasonable, litigation expenses.  Consequently, Lead Counsel shouldered the substantial risk of an unfavorable result in a challenging case and have not received any compensation for those efforts thus far.

18.    The fee application of 25% of the Settlement Amount is fair, reasonable, and within (if not below) the range of fee percentages frequently awarded in this type of action.  Indeed, the fee request here was approved by all Plaintiffs.  Under the facts and circumstances of this Litigation, the requested fee percentage is justified in light of the substantial benefits conferred on the Class, the risks undertaken on a contingency basis, the quality of representation, and the extent of legal services performed.

19.    Lead Counsel also seek an award of expenses totaling $381,236.78 that were reasonably and necessarily committed to prosecuting the Litigation.  These costs include: (i) those associated with conducting and/or defending depositions, which included court reporter and videographer fees as well as reasonable travel expenses; (ii) fees and expenses of consultants and experts whose services Lead Counsel required in the prosecution and resolution of this Litigation; (iii) fees, expenses and other costs associated with Lead Counsel's investigative efforts; (iv) charges for hosting and managing over 400,000 pages comprising over 77,000 documents stored in an online repository; (v) factual and legal research; (vi) photocopying and shipping fees; and

4938-1982-3005.v1

(vii) fees to engage in mediation services. These charges and expenses were reasonable and necessary to obtain the successful result reflected in the Settlement.

20.     In addition, as permitted under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Carpenters Fund seeks an award of $1,840.00, North Collier seeks an award of $423.00, and UPRRS seeks an award of $1,750.00 in connection with their representation of the Class. As explained below and in their respective declarations, Plaintiffs reviewed drafts of filings, provided input on litigation and settlement strategy, prepared for depositions, and assisted in gathering and producing documents in discovery. Plaintiffs' expenditure of time and effort greatly contributed to the Settlement.

21.     The following is a summary of the principal events that occurred during the course of the Litigation and the legal services provided by Lead Counsel to Plaintiffs and the Class.

## II.     THE LITIGATION

### A.     The Commencement of the Litigation and Appointment of Lead Plaintiff

22.     The Litigation began on December 13, 2023, when North Collier filed a putative class action against Mercury, defendant Aslett, and defendant Ruppert. ECF 1. Shortly thereafter, putative class members, including Carpenters Fund and UPRRS, filed three competing motions seeking appointment as lead plaintiff. ECFs 8, 11, 14. The competing movants (including UPRRS) filed notices of non-opposition to the motion filed by Carpenters Fund. ECFs 19-20. Accordingly, on February 27, 2024, the Court appointed Carpenters Fund as Lead Plaintiff, and approved of Carpenters Fund's choice of lead counsel (Robbins Geller and G&E). ECF 22.

### B.     Lead Counsel's Investigation and Filing of the Amended Complaint

23.     Before and after filing Carpenter Fund's motion to be appointed as the lead plaintiff in this matter, Lead Counsel directed an extensive investigation of the alleged violations of the

4938-1982-3005.v1

securities law at issue.  Specifically, Lead Counsel analyzed years of Mercury's public filings with the U.S. Securities and Exchange Commission (the "SEC"), media reports, analyst reports, earnings and industry call transcripts, and trading data.

24.    Based on this investigation, Lead Counsel prepared the Amended Complaint for Violations of the Federal Securities Laws (the "AC") on behalf of Mercury investors, including Plaintiffs, who purchased or otherwise acquired Mercury common stock between February 3, 2021 and February 6, 2024, inclusive, and who were damaged thereby.  The AC alleged violations of §§10(b) and 20(a) of the Exchange Act by Mercury and defendants Aslett, Ruppert, Ballhaus, and Farnsworth for allegedly making materially false and misleading statements regarding the status of Mercury's full integration of its acquisitions and its effects on the Company's unbilled receivables balance.  More specifically, the AC alleged that Defendants employed a strategy of serially acquiring other companies and touted to investors that Mercury had fully integrated these acquisitions, but had failed to fully integrate these acquisitions into Mercury's infrastructure.  Moreover, the alleged failure to fully integrate acquisitions caused execution challenges at Mercury for certain acquired programs, which delayed contract milestones, caused unbilled receivable balances to balloon, and accordingly harmed Mercury's financial results.  The AC was filed on April 18, 2024.  ECF 57.

### C.    Defendants' Motion to Dismiss and the Court's Decision

25.    On May 24, 2024, Defendants moved to dismiss the AC.  In accordance with the PSLRA, discovery in the Litigation was stayed until the Court subsequently permitted the filing of the Complaint.

4938-1982-3005.v1

26.    In support of their motion to dismiss, Defendants argued that: (i) the AC failed to allege any actionable misstatements or omissions; and (ii) the AC failed to allege specific facts supporting a strong inference of Defendants' scienter.

27.    Plaintiffs filed their opposition to Defendants' motion to dismiss on June 24, 2024. ECF 71.  Plaintiffs' opposition set forth arguments supported by considerable legal research and careful detail of the facts and circumstances surrounding Defendants' alleged fraud.  Plaintiffs argued, *inter alia*, that Defendants repeatedly touted that Mercury's acquisitions were fully integrated, when they were not.  Plaintiffs also argued that Defendants misled investors by characterizing Mercury's ballooning unbilled receivables balance as not unique to Mercury, when in fact, Mercury's alleged failure to fully integrate its acquisitions caused the increasing unbilled receivables.  As for scienter, Plaintiffs explained that Mercury's 1MPACT initiative, as well as the importance of Mercury's acquisition strategy to the Company's financial performance, indicated that defendants Aslett and Ruppert were tracking the status of full integration, and therefore knew, or recklessly disregarded, that Mercury had not fully integrated its acquisitions.  Moreover, as Plaintiffs argued, defendants Ballhaus and Farnsworth each assured investors that they had thoroughly reviewed each of the challenged programs when replacing defendants Aslett and Ruppert in mid-2023, such that they knew, or recklessly disregarded, that Mercury's challenges with unbilled receivables were due to its failure to fully integrate, which was an issue unique to Mercury and not an industry-wide condition.

28.    On July 12, 2024, Defendants filed a reply brief in further support of their motion to dismiss the AC.  ECF 73.  The reply brief supplemented Defendants' arguments that Plaintiffs had failed to plead a strong inference of scienter or any actionable material misstatements or omissions.

4938-1982-3005.v1

29.     On July 24, 2024, the Court held a hearing on Defendants' motion to dismiss the AC. ECF 77. At the conclusion of the hearing, the Court granted the Defendants' motion to dismiss the AC without prejudice, and instructed Plaintiffs to move for leave to file a proposed second amended complaint within 30 days. The Court further instructed Plaintiffs that the second amended pleading should include additional allegations supporting a strong inference of scienter.

**D.      Lead Counsel's Further Investigation and the Second Amended Complaint**

30.     To remedy the deficiencies identified by the Court on July 24, 2024, Lead Counsel conducted an extensive additional investigation to uncover more facts to support a strong inference of scienter. This investigation involved, *inter alia*: (i) interviews with former Mercury employees; (ii) further research on Mercury's "roll-up" strategy; and (iii) research on specific integration activities purportedly completed by Mercury.

31.     Based on Lead Counsel's renewed investigation, Lead Counsel prepared the [Proposed] Second Amended Complaint for Violations of the Federal Securities Laws (*i.e.*, the Complaint), which built upon the allegations in the AC, but with bolstered allegations supporting falsity and scienter.

32.     The Complaint included, *inter alia*, allegations from Former Employee 1 ("FE1"), a former Mercury employee who left the Company after the AC was filed. Mercury had hired FE1, in part, to remediate the effects of the Company's long-standing full integration failures. As the Complaint alleged, FE1 confirmed that – contrary to defendant Aslett's Feb. 2022 Statement – Mercury had not fully integrated the ERP systems for certain acquired businesses, *i.e.*, the systems defendant Aslett represented were fully integrated. Moreover, Mercury's largest acquisition, Physical Optics Corporation ("POC"), never achieved full integration before or during FE1's tenure.

- 10 -

4938-1982-3005.v1

33.     The Complaint also included detailed allegations explaining how the failure to fully integrate the Company's acquisitions prevented Mercury from meeting performance obligations on 20 acquired contracts that comprised 20% of Mercury's revenue (specifically, by causing execution problems that rendered those contracts non-performing), and how Defendants knew, or recklessly disregarded, the pervasive execution challenges caused by the Company's full integration failure.

34.     Finally, the Complaint buttressed the scienter allegations against defendants Ballhaus and Farnsworth by detailing the admissions they made regarding the many personal steps they took in June and July 2023 to become apprised of the costs needed to remediate the 20 challenged programs caused by Defendants' full integration failure.

35.     On August 23, 2024, Plaintiffs filed their Motion for Leave to file the [Proposed] Second Amended Complaint for Violations of the Federal Securities Laws. ECFs 82-85. In their memorandum of law in support of their motion, Plaintiffs argued, *inter alia*, that FE1's particularized allegations showed that Mercury's senior management reviewed internal documents and data regarding integration weekly, such that they knew, or should have known, of specific integration failures across Mercury, including the failure to fully integrate POC. Moreover, Plaintiffs highlighted the Complaint's detailed allegations regarding internal documents defendant Ballhaus reviewed before admitting to the lack of full integration in August 2023. While the Court had focused primarily on scienter in granting Defendants' motion to dismiss, Plaintiffs also reiterated in the motion for leave to amend that the Complaint, like the AC, adequately alleged falsity.

36.     On September 6, 2024, Defendants filed their opposition brief. ECF 86. Defendants argued that the Complaint did not cure the perceived deficiencies in the AC's scienter

4938-1982-3005.v1

allegations because FE1's allegations did not demonstrate that Defendants' statements regarding full integration were false when made, and the new scienter allegations merely repackaged allegations in the AC. Defendants also argued that amendment would be futile because the alleged misstatements in the Complaint were not actionable.

37.    On September 16, 2024, Plaintiffs filed a motion for leave to file a reply brief in further support of their motion for leave to file the Complaint, and attached the proposed reply brief as an exhibit to the motion. ECF 87. In their proposed reply, Plaintiffs argued that Defendants, in discussing scienter, failed to consider the Complaint's scienter allegations holistically. Plaintiffs also explained that amendment would not be futile because none of Defendants' challenged statements were forward-looking or puffery, and were therefore actionable. Plaintiffs were granted leave to file their reply brief on September 17, 2024. ECFs 88-89.

38.    On September 26, 2024, Plaintiffs filed a motion for leave to file a notice of supplemental authority. ECF 90. In the notice, Plaintiffs sought to notify the Court of the Second Circuit's recently issued Summary Order in *Leadersel Innotech ESG v. Teladoc Health, Inc., et al.*, 2024 WL 4274362 (2d Cir. Sept. 24, 2024), vacating in part and remanding in part, a district court decision granting a motion to dismiss for reasons that supported the allegations in the Complaint. ECF 90. The Court granted Plaintiffs leave to file their notice of supplemental authority on October 1, 2024. ECFs 92, 95.

39.    On September 30, 2024, Defendants moved for leave to file a sur-reply in further support of their opposition to Plaintiffs' motion for leave to file the Complaint. ECF 91. Defendants were granted leave to file their sur-reply on October 1, 2024. ECFs 94, 96.

4938-1982-3005.v1

E.      The Court's Decision to Partially Sustain Claims Against
        Mercury and Defendants Aslett and Ballhaus, and
        Defendants' Answer to the Complaint

40.     On February 20, 2025, the Court issued a Memorandum and Order granting in part and denying in part Plaintiffs' motion for leave to file the Complaint.  ECF 100.  The Court upheld three sets of statements: (i) defendant Aslett's Feb. 2022 Statement; (ii) defendant Aslett's May 2023 Statement; and (iii) defendant Ballhaus's Aug. 2023 Statement.  *Mercury Sys., Inc.*, 768 F. Supp. 3d at 153-56.  The Court also found that those three statements were "bolstered by a strong inference of scienter," because the Complaint alleged defendants Ballhaus and Aslett were: (i) "aware of the integration problems at the time they made [those] statements"; and (ii) involved in the potential sale of Mercury.  *Id.* at 156.  The Court also noted that defendant "Ballhaus's statements, officer compensation, and confidential witness statements add to the mix of facts raising a strong inference of scienter[.]"  *Id.*  The Court then instructed Plaintiffs to file the Complaint and ordered the remaining Defendants to answer the Complaint within 21 days. Moreover, the Court instructed the Settling Parties to file a joint proposed scheduling order no later than April 1, 2025, including a proposed Alternative Dispute Resolution date, and scheduled a trial to begin in early March 2026.

41.     Plaintiffs filed the Complaint on February 20, 2025.  ECF 102.

42.     Defendants filed their Answer to the Complaint on March 13, 2025, denying Plaintiffs' substantive allegations and asserting 15 separate affirmative defenses.  ECF 109.

F.      Fact Discovery

43.     Lead Counsel immediately began discovery efforts following the issuance of the February 20, 2025 Memorandum and Order.  Until the Settling Parties reached an agreement in principle to settle this Litigation, Plaintiffs engaged in rigorous fact discovery.  As detailed below,

- 13 -

Lead Counsel received and reviewed over 400,000 pages of documents produced by Defendants and third parties.

### 1.    Joint Proposed Schedule

44.    The Settling Parties met and conferred in order to outline the major scheduling milestones for the Litigation.  On April 1, 2025, the Settling Parties jointly filed a [Proposed] Joint Case Management Order setting forth the deadlines and pertinent dates for: (i) class certification; (ii) fact discovery; (iii) alternative dispute resolution/mediation; (iv) expert discovery; and (v) dispositive motions and *Daubert* motions.  ECF 110.  In lieu of proposing an alternative dispute resolution date, the Settling Parties agreed to engage a private mediator by October 1, 2025.  *Id.* at 2.  The Settling Parties believed a private mediator would provide the best chance for achieving any settlement, and the Settling Parties agreed to provide the Court with an update on the status of the mediation two weeks after it occurred.  The Court entered the Joint Case Management Order, with minor alterations, on April 7, 2025.  ECF 111.

### 2.    Initial Disclosures

45.    Pursuant to Fed. R. Civ. P. 26(a)(1), Plaintiffs served their Initial Disclosures on Defendants on March 26, 2025.  In their Initial Disclosures, Plaintiffs identified numerous individuals and entities likely to have discoverable information supporting the claims alleged in the Complaint.  To compile this information, Lead Counsel reviewed their own internal investigation files, public information regarding Mercury's corporate organization and employee hierarchy, as well as employee departures at Mercury, and Mercury's SEC filings.  Lead Counsel also reviewed and compiled information from analyst reports covering Mercury to identify individuals likely to possess knowledge and information regarding Mercury's operations.

4938-1982-3005.v1

46.     On April 4, 2025, Defendants served their Initial Disclosures on Plaintiffs. Plaintiffs reviewed Defendants' Initial Disclosures for potentially relevant sources of information.

### 3.     Stipulations Regarding Discovery

#### a.     Negotiations Concerning the Production of Electronically Stored Information ("ESI")

47.     Multiple meet and confer discussions were necessary to address the identification and production of relevant ESI.   Virtually all of the relevant documents were maintained electronically by Mercury, making these discussions particularly important to the prosecution of this Litigation.   Given the importance of ESI, the Settling Parties negotiated, and Plaintiffs submitted to the Court, a Stipulated Electronic Discovery Protocol and [Proposed] Order (the "ESI Protocol") on April 22, 2025.  ECF 112.  The Court approved the ESI Protocol on April 23, 2025. ECF 113.

#### b.     Protective Order

48.     To protect against the public disclosure of potentially sensitive personal or proprietary information, classified information, and information restricted by U.S. export laws, the Settling Parties negotiated and prepared a protective order to govern the treatment, handling, and continued protection of confidential and restricted information produced in this Litigation.  The Settling Parties also negotiated the extent to which, and the conditions under which, such confidential or restricted information could be shown to deponents, non-parties, and others not previously privy to such information.  The Settling Parties ultimately reached an agreement on all of their respective areas of concern and, on April 23, 2025, filed a Stipulation and [Proposed] Order for the Protection and Exchange of Confidential Information (the "Protective Order").  ECF 114.  On April 24, 2025, the Court entered the Protective Order with a modification to paragraph

23 therein, ordering that nothing shall be filed under seal pursuant to the Protective Order.  ECFs 115, 116.

49.    In addition, Lead Counsel, based on consultation with their in-house ESI and information technology ("IT") personnel, posed detailed questions to Defendants concerning Mercury's IT systems, focused on the general electronic systems maintained by and for Mercury and the location of potentially responsive ESI.  The ensuing discussions involved, *inter alia*: (i) custodial and non-custodial sources of ESI; (ii) search terms and date ranges for identifying relevant ESI; (iii) ESI retention and destruction policies and practices; (iv) file server and document management systems and policies; and (v) the volume of data by custodian, date, and file type.

50.    Lead Counsel also initiated and participated in written and telephonic exchanges with Defendants' Counsel regarding the use of metadata, de-duplication, file type filtering, date filtering, and other potential methods to efficiently search, review, and produce documents from ESI custodians.  The Settling Parties additionally discussed and resolved Defendants' concerns regarding the burden they identified in reviewing potentially vast amounts of ESI for privilege. The Settling Parties also discussed and resolved Plaintiffs' concerns regarding the production of ESI that includes hyperlinked files or shared platforms.

51.    Additionally, to identify relevant ESI, the Settling Parties worked cooperatively to reach agreement on search terms over several months, beginning in May 2025 and ending on July 16, 2025.  This process involved running and testing various alternatives to Plaintiffs' and Defendants' proposed searches in an effort to reach a mutually agreeable set of search terms.  At each step, Lead Counsel utilized the services of their in-house e-discovery personnel.

52.    To ensure that discovery progressed while the Settling Parties negotiated a resolution of these matters, Plaintiffs secured from Defendants a commitment to produce documents on a rolling basis.  By the time the Settling Parties reached the Settlement, Defendants had made nine productions of documents, and indicated that document production was on-going as of August 28, 2025.

53.    All told, the Settling Parties and non-parties collectively produced to Lead Counsel over 400,000 pages of documents, which Robbins Geller electronically hosted and managed for the prosecution of this Litigation on an advanced platform in-house, as discussed below.  Lead Counsel reviewed each of the over 400,000 pages of the documents that were produced in advance of the mediation that ultimately resulted in the Settlement.

### 4.    Written Discovery Directed at Defendants

### a.    Document Requests

54.    Plaintiffs served their First Set of Requests for the Production of Documents on March 14, 2025.  It consisted of 68 requests germane to the Settling Parties' claims and defenses, and called for the production of documents from January 1, 2020 through August 13, 2024, inclusive.

55.    In their responses, served on April 25, 2025, Defendants objected to nearly every request for production on the grounds of relevance, over-breadth, ambiguity, and/or privilege. Moreover, Defendants asserted positions reflecting material disagreements as to the relevant subject matter of this Litigation, including the relevance of the strategic review and potential sale of Mercury, as well as the relevant time period for the purposes of discovery and the claims alleged in this Litigation.

- 17 -

4938-1982-3005.v1

56.     In an effort to resolve these material, global disputes without judicial intervention, Lead Counsel engaged in numerous discussions, spanning many months, with Defendants' Counsel.  Plaintiffs worked diligently and in good faith to resolve the disputes without judicial intervention to conserve the resources of the Settling Parties and the Court, and to ensure that production occurred in the most efficient manner possible under the circumstances.

### b.     Interrogatories

57.     On March 14, 2025, Plaintiffs also served their First Set of Interrogatories on Defendants, consisting of seven interrogatories designed to identify various current and former Mercury personnel, including those responsible for the full integration of acquisitions and remedying the execution challenges for challenged programs.  Moreover, the interrogatories sought the identity of the specific acquisitions and acquired programs that were experiencing execution challenges stemming from the failure to fully integrate.

58.     Defendants served their objections and responses on April 25, 2025.  The Settling Parties met and conferred, and Defendants served amended and restated responses and objections.

59.     Following a number of subsequent letters and an additional meet and confer, Defendants served their second amended and restated responses and objections to Plaintiffs' First Set of Interrogatories on June 13, 2025.

60.     On June 16, 2025, Plaintiffs notified Defendants of additional deficiencies in their second amended and restated responses and objections, and that Defendants had failed to provide a verified copy of the second amended and restated objections and responses.  Defendants provided a verified copy on June 18, 2025.

4938-1982-3005.v1

61. Defendants served their third amended and restated responses and objections on August 6, 2025. Lead Counsel relied on each iteration of Defendants' responses to these interrogatories in guiding their strategy in prosecuting this Litigation.

### 5. Discovery Disputes with Defendants

62. Lead Counsel devoted significant time to reviewing and analyzing documents produced in discovery, preparing for and participating in conferences with Defendants' Counsel, and drafting email and letter correspondence memorializing these conversations and detailing Plaintiffs' positions on discovery disputes. When the Settling Parties reached this Settlement, many discovery disputes remained.

### a. Search Terms and Custodians of Relevant Documents

63. Defendants first provided proposed search terms and custodians on May 8, 2025. Defendants proposed 6 custodians and 21 search term queries. Appreciating the full scope of Plaintiffs' claims regarding systemic failures to fully integrate acquisitions, Plaintiffs worked diligently to craft a tailored counter-proposal congruent with the scope of the claims. Plaintiffs provided Defendants with a robust counter-proposal on May 12, 2025.

64. The Settling Parties met and conferred numerous times regarding the Settling Parties' respective proposals. Given the importance of obtaining documents from different employees at different levels of Mercury's organizational hierarchy, Plaintiffs maintained the position that this Litigation required searches directed to numerous document custodians, and negotiated with Defendants in good faith to that effect. Plaintiffs also sought to ensure the search terms used to locate responsive documents were precise and tailored to the needs of the Litigation.

65. The Settling Parties had numerous email exchanges and meet and confers between May 2025 and July 2025 to reach an agreement on search terms and custodians. On May 23, 2025,

4938-1982-3005.v1

Defendants provided a counter-proposal for search terms and custodians with hit counts. On May 29, 2025, Plaintiffs sent a letter to Defendants detailing the defects in Defendants' proposal, but given the deadline for the end of fact discovery, Plaintiffs requested that Defendants begin producing documents on a rolling basis based on Defendants' proposal as the Settling Parties continued to negotiate search terms and custodians.

66.    On June 6, 2025, the Settling Parties met and conferred to discuss the scope of search terms and custodians in this Litigation. Following an additional meet and confer on June 13, 2025, Defendants agreed to include nicknames and code names for certain challenged programs in the relevant search terms.

67.    On June 12, 2025, Defendants made their first substantive production of documents based on the search terms and custodians in Defendants' May 23, 2025 counter-proposal. Following this production, Plaintiffs gained a clearer understanding of the terminology and relevant individuals associated with Plaintiffs' claims. On June 17, 2025, Plaintiffs proposed a revised list of search terms and custodians based on their review of Defendants' June 12, 2025 document production.

68.    On June 25, 2025, Defendants sent a letter with a counter-proposal on custodians, and noted that they were still in the process of reviewing Plaintiffs' June 17, 2025 search terms and custodians proposal.

69.    On June 26, 2025, the Settling Parties met and conferred to discuss the outstanding issues regarding search terms and custodians. During the call, Plaintiffs made a "best and final" proposal for custodians. Also during the call, Defendants highlighted a number of search terms that were yielding unmanageably high hit count results.

4938-1982-3005.v1

70.     On July 27, 2025, Defendants agreed to Plaintiffs' June 26, 2025 proposal for custodians via email, agreeing to search 25 relevant custodial files.

71.     On July 9, 2025, Defendants sent Plaintiffs an email with a counterproposal on search terms that removed five proposed search terms and modified 20 search terms.

72.     The Settling Parties met and conferred on July 11, 2025, to discuss Defendants' July 9, 2025 proposal.  During the meet and confer, each side agreed to propose revised search terms for a handful of not yet agreed upon search terms.  Following a number of emails between July 14, 2025 and July 16, 2025 addressing the remaining issues with certain search terms, on July 16, 2025, the Settling Parties reached an agreement on dozens of search strings relevant to Plaintiffs' claims that would be run against the 25 agreed-upon custodians (or sub-sets of such custodians).

### b.      Defendants' Interrogatory Responses and Plaintiffs' Pursuit of Rule 30(b)(6) Testimony

73.     Plaintiffs relied on Defendants' interrogatory responses in order to assess: (i) who was responsible for fully integrating Mercury's acquisitions; (ii) which programs were experiencing execution challenges; (iii) the physical location of each challenged program; (iv) the acquisition(s) from which the challenged program(s) originated; and (v) the specific execution challenges plaguing the challenged programs.

74.     In Plaintiffs' view, Defendants' initial interrogatory responses omitted necessary information regarding the employees responsible for full integration and remedying execution issues on challenged programs, as well as information regarding the acquisitions that caused Mercury to acquire programs that later became challenged.

75.     On May 1, 2025, the Settling Parties met and conferred regarding Defendants' responses to Plaintiffs' first set of interrogatories.  Plaintiffs explained that Defendants' responses

4938-1982-3005.v1

failed to: (i) identify all individuals who worked for Mercury during the relevant period; (ii) identify the acquisitions where each challenged program had originated; (iii) provide the names or other identifying characteristics of each challenged program; and (iv) articulate the reason(s) each challenged program was experiencing execution challenges. Defendants' position was that much of this information would be provided through Defendants' rolling document productions. During the meet and confer, Plaintiffs stated that if Defendants were unwilling to supplement their responses, then scheduling a Rule 30(b)(6) deposition was the most efficient way to obtain the missing information.

76.    On May 8, 2025, Defendants sent Plaintiffs a letter notifying them that they would evaluate their interrogatory responses, and potentially supplement them by May 28, 2025.

77.    On May 12, 2025, Plaintiffs sent a response to Defendants' May 8, 2025 letter, reiterating the material deficiencies in Defendants' initial interrogatory responses. Plaintiffs also argued that Defendants' proposal to potentially supplement their responses by May 28, 2025 was unacceptable, as over a month and a half had passed since Plaintiffs first served their interrogatories on March 14, 2025. Finally, Plaintiffs reiterated their position that an early Rule 30(b)(6) deposition was the most efficient way to obtain the missing information in Defendants' responses.

78.    On May 16, 2025, Defendants sent an email to Plaintiffs stating that they would respond to Plaintiffs' May 12, 2025 letter the following week. Additionally, Defendants represented that they were in a position to provide new information in a supplementary response to their first interrogatory responses.

79.    On May 19, 2025, having received no update or new information from Defendants, Plaintiffs served on Defendants a Rule 30(b)(6) deposition notice, with 14 topics intended to

- 22 -

4938-1982-3005.v1

encompass the information sought in the interrogatories that had still not been received by Plaintiffs. The deposition was noticed for May 30, 2025.

80.     On May 23, 2025, Defendants sent Plaintiffs a response letter representing that they planned to supplement their interrogatory response by May 28, 2025, before the date for which Plaintiffs had noticed the Rule 30(b)(6) deposition.

81.     On May 28, 2025, Defendants served their Amended and Restated Responses and Objections, supplementing two of their interrogatory responses to include the customers associated with challenged programs and additional employees responsible for challenged programs.

82.     The next day, on May 29, 2025, Plaintiffs sent a letter to Defendants in response to the May 23, 2025 letter and Defendants' amended interrogatory responses. In their letter, Plaintiffs explained that the amended responses were still deficient, as they failed to include necessary information regarding the origin of the challenged programs, the specific execution issues for each challenged program, and the dates of defendant Ballhaus's reviews of the challenged programs. Plaintiffs proposed that if Defendants agreed to produce this information by June 2, 2025, Plaintiffs would withdraw their deposition notice without prejudice to rescheduling at a later date.

83.     On May 30, 2025, Defendants served their Reponses and Objections to Plaintiffs' May 19, 2025 Notice of Rule 30(b)(6) Deposition. Defendants objected to each of the 14 topics and refused to designate a witness for any of the 14 topics.

84.     On June 13, 2025, following Defendants' change in counsel (described in more detail below), Defendants served on Plaintiffs their Second Amended and Restated Responses and Objections to Plaintiffs' First Set of Interrogatories.

4938-1982-3005.v1

85.     On June 16, 2025, Plaintiffs sent an email to Defendants explaining that the second amended interrogatory responses were still deficient, because they failed to include the name of the acquisition(s) from which each challenged program had originated.

86.     On June 18, 2025, Defendants sent a letter to Plaintiffs explaining Defendants' position that the failure to fully integrate did not cause the programs to become challenged, and therefore not all challenged programs necessarily originated from acquisitions.  Nevertheless, Defendants agreed to supplement their responses to identify which of the challenged programs had been entered into or negotiated by an acquired company, rather than by Mercury itself.

87.     In a letter sent to Defendants on June 20, 2025, Plaintiffs explained that, while it was unnecessary to litigate the facts of the case in interrogatory responses, defendant Ballhaus had admitted that the failure to fully integrate caused the challenged programs to experience execution issues.  Thus, the information that Plaintiffs were seeking was admittedly in the Company's possession.

88.     On August 6, 2025, Defendants served on Plaintiffs their Third Amended and Restated Responses and Objections to Plaintiffs' First Set of Interrogatories.  These responses included additional information on how the challenged programs had been acquired by Mercury.

**c.      Defendants' Change in Counsel and Deficiencies
in Defendants' Rolling Document Productions**

89.     This Court's April 7, 2025 Order set an October 24, 2025 deadline for the end of fact discovery.  Accordingly, Plaintiffs vigorously pursued fact discovery in an effort to comply with the Court's Order.

90.     By the beginning of June 2025, despite Plaintiffs having served Defendants with their First Set of Requests for Production of Documents on March 14, 2025, and the Settling Parties having met and conferred on May 1, 2025, the Settling Parties had yet to agree on search terms

and custodians, and Plaintiffs had received just one production of documents, consisting of approximately 700 non-custodial documents, the majority of which were public SEC filings and analyst reports, as well as a number of organizational charts for Mercury.

91.    On June 2, 2025, Lead Counsel was notified by Ropes & Gray LLP ("Ropes & Gray") that they would be substituting in as counsel for defendants Mercury and Ballhaus, and that Nutter McClennen & Fish LLP ("Nutter") would be substituting in as counsel for defendant Aslett, replacing Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  On June 4, 2025, attorneys from Ropes & Gray and Nutter appeared on behalf of the respective Defendants.  ECFs 117-121.

92.    Lead Counsel worked with Defendants' Counsel in early June 2025 to get them acclimated to the procedural posture and outstanding issues that were pending at the time Defendants chose to substitute their counsel.  Lead Counsel cooperated with new Defendants' Counsel in a successful effort to avoid requesting an extended case schedule from the Court.

93.    On June 12, 2025, Defendants made a production of board materials and meeting minutes, but again did not produce any custodial documents.

94.    Plaintiffs did not receive documents from custodial files until July 19, 2025. Thereafter, as a result of Lead Counsel's efforts to continue to work cooperatively with Defendants' Counsel, Defendants began producing documents from custodial files approximately every two weeks until the agreement in principle to settle this Litigation was reached.

95.    In reviewing Defendants' documents, Plaintiffs raised numerous issues with Defendants, including: (i) discrepancies in the custodial metadata; (ii) Defendants' failure to provide access to shared databases where relevant information was housed; and (iii) Defendants' failure to provide documents for every agreed-upon custodian.

- 25 -

4938-1982-3005.v1

96.     Throughout July and August 2025, the Settling Parties exchanged numerous emails on issues related to discovery and document productions, including the timing and volume of productions given the fact discovery deadline on October 24, 2025.

97.     Despite Lead Counsel's diligent efforts to address the disputes with Defendants' Counsel while obtaining the necessary documents to prove Plaintiffs' claims, many document discovery issues were still outstanding at the time the Settling Parties reached an agreement in principle to settle this Litigation.

### 6.     Third Party Discovery Efforts

98.     Relevant information was also in the possession, custody, or control of third parties. Lead Counsel expended significant time and resources issuing document subpoenas to third parties and addressing their objections to the subpoenas.  Lead Counsel subpoenaed documents and/or testimony from the following third parties:

| SUBPOENAED PERSON/ENTITY | DATE | RELATIONSHIP TO LITIGATION |
|---|---|---|
| Citigroup, Inc. | April 28, 2025 | Mercury's financial advisor during failed sales process |
| Goldman Sachs & Co. LLC | April 28, 2025 | Mercury's financial advisor during failed sales process |
| Starboard Value LP | April 30, 2025 | Activist investor with beneficial ownership of 7.3% of Mercury's outstanding shares |
| JANA Partners LLC | April 30, 2025 | Activist investor with beneficial ownership of 6.6% of Mercury's outstanding shares |
| Elliott Investment Management L.P. | May 2, 2025 | Private equity firm that submitted a bid to purchase Mercury during the failed sales process |
| Joele Frank, Wilkinson Brimmer Katcher | May 2, 2025 | Public relations consulting firm engaged by Mercury to, among other things, draft |

- 26 -

| SUBPOENAED PERSON/ENTITY | DATE | RELATIONSHIP TO LITIGATION |
|---|---|---|
| | | prepared remarks including the Feb. 2022 Statement |
| Veritas Capital Fund Management, L.L.C. | May 2, 2025 | Submitted a bid to purchase Mercury during the failed sales process |
| Warburg Pincus LLC | May 2, 2025 | Submitted a bid to purchase Mercury during the failed sales process |
| Boston Consulting Group | July 1, 2025 | Consulting firm engaged by Mercury to assist in full integration efforts |
| Alvarez & Marsal | July 1, 2025 | Consulting firm engaged by Mercury to review its ERP platform and provide potential solutions |
| KPMG LLP | July 1, 2025 | Independent registered public accounting firm for Mercury since 2006 |

99.     Plaintiffs' Counsel engaged in a series of meet and confers, by email and telephone, with each of these third parties to gain a better understanding of the third party's role in connection with the allegations in the Complaint and the relevant documents they possessed.  In total, Lead Counsel obtained and reviewed nearly 10,000 pages of documents from third parties.  These documents provided Plaintiffs with a deeper understanding of Mercury's sale process, Mercury's full integration efforts, Mercury's ERP systems, and Defendants' allegedly false and misleading statements.

### 7.     Plaintiffs' Review and Analysis of Discovery Materials

100.     As a result of Plaintiffs' document requests to Defendants, subpoenas to third parties, and Lead Counsel's extensive meet and confers with both Defendants and third parties, Plaintiffs obtained over 400,000 pages comprising over 77,000 documents.  Lead Counsel and

4938-1982-3005.v1

their staff devoted considerable effort to examining and analyzing these documents carefully yet efficiently to comply with the fact discovery deadline.

101.    First, Lead Counsel uploaded these documents to a database to manage the volume of documents produced.  Robbins Geller established and maintained the database in-house.  Then, Lead Counsel utilized this e-discovery system for, *inter alia*, identifying and tracking documents for use in depositions and briefs, identifying relevant witnesses for depositions or additional discovery requests, and establishing procedures to identify documents and information that had not been produced.

102.    Attorneys and staff reviewed documents by accessing the database and using search terms, date filters, custodian fields, and other metadata to analyze thousands of documents related to key issues in the Litigation.  These issues were included in coding sheets used to identify documents with responsive information.  Throughout the document review process, Lead Counsel analyzed the highly technical information contained in the documents, determined the documents' relevance to the allegations, and located the evidence necessary to support certain of the claims and rebut certain of Defendants' defenses.  In connection with this effort, Lead Counsel supervised and actively managed a team of attorneys in their respective offices in Melville, New York, and New York, New York, and elsewhere.

### 8.    Depositions

103.    Before the Settlement was reached, Lead Counsel had conducted two depositions and had prepared for and defended one expert deposition.

104.    From the inception of this case, Plaintiffs maintained that this District's ten-deposition limit was insufficient given the scope and magnitude of the issues at play in the Litigation.  Plaintiffs spent significant time determining key witnesses to be deposed.  Moreover,

Plaintiffs and Defendants exchanged numerous emails, and met and conferred numerous times regarding the proper number of depositions.  While the Settling Parties were not able to reach an agreement on the number of depositions to be taken, the Settling Parties agreed that Plaintiffs would notice the depositions of 20 individuals, with the mutual understanding that Plaintiffs would undertake a good faith effort to take fewer than 20 depositions.

105.    On September 4, 2025, Lead Counsel deposed Jay Abendroth in Boston, Massachusetts.  Mr. Abendroth, a former Mercury employee, had been directly responsible for overseeing the full integration of POC at Mercury.  Mr. Abendroth provided critical information about the status of POC's full integration, as well as the different systems, including ERP systems, used for programs originating from POC.

106.    On September 9, 2025, Lead Counsel deposed Turner Brinton, Mercury's Senior Director of Corporate Communications, in Denver, Colorado.  Mr. Brinton provided key testimony regarding the process for drafting prepared remarks for the May 2023 Statement and Aug. 2023 Statement, as well as how Mercury maintained documents and electronic files on its systems.

107.    On September 4 and 5, 2025, Lead Counsel prepared for and defended the deposition of Plaintiffs' market efficiency expert, Dr. Steven P. Feinstein, in Boston, Massachusetts.

108.    At the time the agreement in principle to settle this Litigation was reached, Plaintiffs were in the midst of intense preparation for upcoming depositions.  Plaintiffs had scheduled additional depositions and were actively working to schedule additional fact depositions:

4938-1982-3005.v1

| WITNESS | POSITION | DATE |
|---|---|---|
| Allen Couture | Executive Vice President Execution Excellence | September 18, 2025 |
| Nelson Erickson | Senior Vice President Strategy and Corporate Development | September 19, 2025 |
| Thomas Huber | Executive Vice President Chief Transformation Officer | September 26, 2025 |
| Michelle McCarthy | Chief Accounting Officer and Interim Chief Financial Officer | September 30, 2025 |
| Jonathan Roy | Vice President Finance | October 3, 2025 |
| Vivek Upadhyaya | Chief Financial Officer Mission Systems | October 24, 2025 |
| Jeffery Eason | Chief Information Officer | October 10, 2025 |
| Michael Ruppert | Chief Financial Officer | October 17, 2025 |

109. Thus, Lead Counsel was prepared to complete fact discovery within the time frame allotted by the case management order.

### 9. Plaintiffs' Response to Defendants' Discovery

110. Defendants served their First Set of Interrogatories, and First Set of Requests for Production of Documents on April 16, 2025. Plaintiffs individually served responses and objections to both sets of discovery requests on May 16, 2025. On July 1, 2025, the Settling Parties met and conferred regarding Plaintiffs' responses and objections to both sets of discovery requests.

111. Lead Counsel worked with Plaintiffs, as well as their financial and other advisors, to identify, review, and produce responsive, non-privileged documents. On July 2, 2025, Carpenters Fund and North Collier produced responsive documents. UPRRS produced responsive documents on July 11, 2025. North Collier produced additional responsive documents on September 5, 2025.

4938-1982-3005.v1

### G.    Class Certification Proceedings

112.    As outlined above, Lead Counsel spent substantial time and effort collecting and producing documents on behalf of each of the Plaintiffs in connection with class certification proceedings.  This process entailed meetings by telephone with representatives from each of the Plaintiffs concerning the nature, substance, and scope of documents responsive to Defendants' requests.

113.    Before the agreement in principle to settle the Litigation was reached, Defendants had noticed depositions for representatives from each of the Plaintiffs, which were set to take place on September 15, 16, and 17, 2025.  Defendants served Rule 30(b)(6) notices on each of the Plaintiffs on August 29, 2025.  Plaintiffs objected and responded to their respective Rule 30(b)(6) notices.  These depositions were postponed following the mediation.  Nonetheless, given the timing of the depositions vis-a-vis the mediation, Lead Counsel had begun preparing Plaintiffs for their depositions when the agreement in principle to settle the Litigation was reached.

114.    On July 18, 2025, Plaintiffs filed their motion for class certification, supporting memorandum of law, and supporting declarations and exhibits, seeking to certify the proposed Class, appoint themselves as Class Representatives, and appoint Robbins Geller and G&E as Class Counsel.  ECFs 125-130.  The memorandum of law addressed all of the requirements of Fed. R. Civ. P. 23, as well as the factors required to show Mercury common stock traded in an efficient market for the purposes of the presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and upheld in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014).

115.    In support of their motion, Plaintiffs retained Dr. Steven P. Feinstein to conduct an event study of publicly available information on Mercury and to opine on the efficiency of the trading market for Mercury's common stock during the Class Period.  Based on his findings, Dr.

Feinstein concluded that Mercury's stock traded in an efficient market during the Class Period. Dr. Feinstein also described a damages methodology for Plaintiffs' claims and opined that this damages methodology could reliably calculate class-wide damages in this Litigation. Lead Counsel spent a substantial amount of time preparing Dr. Feinstein for his deposition, which, as mentioned above, occurred on September 5, 2025.

116.    Defendants served their opposition to Plaintiffs' motion for class certification on September 19, 2025, arguing, *inter alia*, that: (i) the alleged misstatements had no price impact; (ii) the Class Period should be shortened to end no later than August 15, 2023; and (iii) two of Mercury's activist investors, JANA and Starboard, should not be included in the Class. ECFs 132-133.

117.    Before Plaintiffs' class certification motion was fully briefed, the Settling Parties agreed in principle to settle the Litigation on September 20, 2025, and later entered into the Stipulation, which was signed and filed with the Court on December 1, 2025. On December 18, 2025, as part of its order preliminarily approving the Settlement, the Court certified, for settlement purposes only, the following Class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

> All purchasers and acquirers of Mercury common stock during the period between February 3, 2021 and February 6, 2024, inclusive. Excluded from the Class are Defendants and their immediate families, the Company's officers and directors at all relevant times, as well as their immediate families, Defendants' legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest. Also excluded is any Person who properly excludes himself, herself, itself, or themselves by submitting a valid and timely request for exclusion. To the extent any Mercury employee benefit plan receives a distribution from the Net Settlement Fund, no portion shall be allocated to any person or entity who is excluded from the Class by definition.

4938-1982-3005.v1

### H.    Expert Witnesses and Consultants

118.    To assist in investigating and proving Plaintiffs' claims and navigating the multitude of issues in this Litigation – including substantive issues, such as those relating to full integration of acquisitions and the implementation of IT systems such as ERP systems – Plaintiffs retained the services of several experts and consultants.  The work performed by these experts and consultants was critical and provided valuable insights to Lead Counsel in evaluating the merits of the claims and defenses and the prospects for settlement during the course of the Litigation.

#### 1.    Dr. Steven P. Feinstein, Ph.D., CFA

119.    Dr. Feinstein prepared a report, which Plaintiffs served with their motion for class certification.  Dr. Feinstein's report detailed market efficiency for Mercury's common stock and proposed a damages methodology used to calculate damages for the Class.  Dr. Feinstein was deposed by counsel for Defendants.  Dr. Feinstein also prepared the proposed Plan of Allocation for the Settlement.

#### 2.    Dr. Timothy J. Galpin, Ph.D.

120.    Dr. Galpin is Senior Lecturer of Strategy and Innovation, Director of the Postgraduate Diploma in Strategy and Innovation at Saïd Business School, University of Oxford.  He holds a Ph.D. from UCLA in Organization Development.  Dr. Galpin provided consulting services on the "roll-up" acquisition strategy used by Mercury.  At the time of Settlement, Lead Counsel intended to utilize Dr. Galpin to assist in fact discovery and, if serving as a testifying expert, to prepare reports on roll-up acquisitions for use in this Litigation.

#### 3.    Jon Bellman

121.    Jon Bellman is the founder of Reality Check LLC, a company that assesses and rescues high impact IT projects.  Mr. Bellman has served as a testifying and consulting expert in numerous cases involving ERP system implementations.  At the time of Settlement, Lead Counsel

- 33 -

4938-1982-3005.v1

utilized Mr. Bellman to examine technical documents produced during discovery related to Mercury's ERP system implementation across acquired programs. Lead Counsel intended for Mr. Bellman to serve as a testifying expert, and Mr. Bellman was actively preparing a report on Mercury's ERP system implementation when the agreement in principle to settle the Litigation was reached.

### III.        THE RISKS OF THE LITIGATION

122.    The Settlement was reached only after Lead Counsel had a thorough understanding of the strengths and potential weaknesses of the surviving claims in the Litigation. As discussed above, at the time of Settlement, Plaintiffs had completed significant document discovery and fact depositions were underway. Accordingly, Plaintiffs and Lead Counsel fully understood the strengths of their claims and Defendants' defenses, and the potential damages suffered by the Class.

123.    Numerous hurdles remained before trial. For example, Plaintiffs' motion for class certification was in the process of being briefed. While Plaintiffs strongly believed that the proposed Class was appropriate for class certification, there was no guarantee that the Court would certify it. Moreover, there was a risk that the Court would shorten the Class Period, reducing potential damages. There was also the risk that if a Class was certified, the Court might not maintain the Litigation, or particular claims, on a class-wide basis through trial.

124.    Likewise, motions determinative of Plaintiffs' ability to obtain a verdict in the Class's favor at trial likely would have been filed, including summary judgment and other motions that would have decided the extent of the evidence (if any) that could be presented at trial and the issues (if any) upon which liability could be premised. Depending on their outcome, such motions could seriously undermine or altogether preclude Plaintiffs from proving their case.

125.     While Plaintiffs firmly believed that the documentary and other evidence they had compiled and intended to develop would support their claims, Plaintiffs also understood that there is no way of predicting which interpretations, inferences, or testimony the Court and/or jury would have accepted.  Defendants have adamantly denied any culpability throughout this Litigation and were prepared to mount defenses that could have barred a class-wide recovery.  If the Court or jury sided with Defendants on even one of these defenses, the Class could have recovered nothing.  Meanwhile, Plaintiffs must prove each element – and successfully overcome any appeals brought – to secure a recovery at trial.

### A.     Falsity and Materiality for the Feb. 2022 Statement

126.     Plaintiffs alleged that defendant Aslett's Feb. 2022 Statement regarding the status of full integration was knowingly false when made because Mercury had not fully integrated its acquisitions, including POC, by moving them onto Mercury's ERP system, such that information from all programs was available throughout the Company.

127.     Defendants, however, contended that the Feb. 2022 Statement was taken out of context, and that defendant Aslett made clear that full integration was still ongoing.  Moreover, Defendants argued that "fully integrated" is an ambiguous phrase and the market reasonably understood that integration efforts were still ongoing.

128.     While the Settling Parties disagreed about the merits of these arguments, Plaintiffs recognized that if the Court or a jury found any of Defendants' arguments compelling, Plaintiffs would have difficulty demonstrating that defendant Aslett's Feb. 2022 Statement was materially false or misleading or otherwise actionable.

4938-1982-3005.v1

### B.    Falsity and Materiality for the May 2023 Statement

129.    Plaintiffs alleged that defendant Aslett's May 2023 Statement characterizing the Company's ballooning unbilled receivables and cost growth, and deteriorating financial performance, as not "unique" to Mercury was false and misleading because the true cause of Mercury's poor financial performance was the failure to fully integrate, which was unique to the Company.

130.    Defendants, however, argued that there was no direct link between any alleged failure to fully integrate and Mercury's increased costs.  Moreover, according to Defendants, any execution challenges plaguing challenged programs were not caused by the failure to fully integrate, and were instead attributable to technical engineering challenges, supply chain disruptions, and labor-related issues, all of which they contend were appropriately disclosed.

131.    While the Settling Parties disagreed about the merits of these arguments, Plaintiffs recognized that if the Court or a jury found any of Defendants' arguments compelling, Plaintiffs would have difficulty demonstrating that defendant Aslett's May 2023 Statement was materially false or misleading or otherwise actionable.

### C.    Falsity for the Aug. 2023 Statement

132.    As for the Aug. 2023 Statement, although defendant Ballhaus told investors that Mercury was experiencing execution challenges caused by the failure to fully integrate, defendant Ballhaus also told investors that these problems were "unanticipated" and "temporary," and did not reflect a "structural shift" in the Company's margin profile.  Plaintiffs allege these statements were false and misleading because Mercury still had not fully integrated its acquired businesses, so Mercury could not quickly or cheaply remedy these problems.

4938-1982-3005.v1

133.    Defendants again argued that Mercury's cost growth was not directly caused by the failure to fully integrate, and instead was attributable to technical engineering challenges, supply chain disruptions, and labor-related issues, all of which they contend were appropriately disclosed. Moreover, Defendants argued that these statements reflected defendant Ballhaus's honest assessment of the Company's financial situation at the time the statement was made.

134.    While the Settling Parties disagreed about the merits of these arguments, Plaintiffs recognized that if the Court or a jury found any of Defendants' arguments compelling, Plaintiffs would have difficulty demonstrating that defendant Ballhaus's Aug. 2023 Statement was materially false or misleading or otherwise actionable.

### D.    Scienter for the Feb. 2022 Statement

135.    In addition to the risks Plaintiffs faced in establishing falsity and materiality, Defendants would likely argue that Plaintiffs could not establish that defendant Aslett made the Feb. 2022 Statement with the requisite fraudulent intent.  Specifically, Defendants would argue that defendant Aslett honestly and reasonably believed that integration efforts were still ongoing, and that the use of the term "fully integrated" was not meant to convey that every acquired business had been fully integrated.

136.    Defendants were also likely prepared to argue that Plaintiffs could not demonstrate scienter because there was insufficient evidence of fraudulent intent, given the lack of motive allegations other than the existence of defendant Aslett's equity incentive compensation package. While these arguments were not dispositive on the issue of scienter and Plaintiffs had responses to them, it was plausible that the Court or a jury would find motive lacking and/or that the absence of motive undermined fraudulent intent generally.

4938-1982-3005.v1

### E.      Scienter for the May 2023 Statement

137.    Defendants would likely continue to challenge the requisite intent to defraud with regards to the May 2023 Statement.  Specifically, Defendants would argue that defendant Aslett was not motivated by a desire to sell Mercury, and therefore did not intend to drive up the stock price in anticipation of a sale.  Moreover, Defendants argued that due diligence during the sales process would have quickly exposed any purported deception by defendant Aslett.  While these arguments were not dispositive on the issue of scienter and Plaintiffs had responses to them, it was plausible that the Court or a jury would find motive lacking and/or that the absence of motive undermined fraudulent intent generally.

### F.      Scienter for the Aug. 2023 Statement

138.    Defendants would also likely maintain that Plaintiffs could not demonstrate scienter for Ballhaus's Aug. 2023 Statement.  Defendants would argue that defendant Ballhaus was informed that certain issues had been resolved and would only have a one-time impact on the Company's financials.  Moreover, Defendants contended that by August 15, 2023, the sales process had concluded, meaning defendant Ballhaus did not have the same purported financial incentives as defendant Aslett.  While these arguments were not dispositive on the issue of scienter and Plaintiffs had responses to them, it was plausible that the Court or a jury would find motive lacking and/or that the absence of motive undermined fraudulent intent generally.

### G.      Loss Causation and Damages

139.    Even if Plaintiffs succeeded in proving falsity, materiality, and scienter, there was a risk they would be unable to prove loss causation for the Feb. 2022 Statement.  Defendants argued in opposing class certification that the period between the Feb. 2022 Statement and the May 2023 Statement should be excluded from the Class Period.  Defendants contended that on the

- 38 -

date of the Aug. 2023 Statement, in which defendant Ballhaus told investors about the failure to fully integrate, Mercury's stock price increased, which, in Defendants' view, demonstrates a lack of loss causation and/or absence of price impact. Had Defendants' arguments at class certification (and likely reiterated at summary judgment) been successful that the Class Period be shortened and certain large shareholders removed from the Class, then the recoverable damages for the Class would have been substantially diminished.

140. Similarly, Defendants likely would argue that Plaintiffs could not prove loss causation for the May 2023 Statement and the Aug. 2023 Statement, because those statements did not pertain to the failure to fully integrate. According to Defendants, because the execution challenges were not tied to the failure to fully integrate, and because the market knew about the failure to fully integrate by August 2023, there are no corrective disclosures for these statements.

141. Defendants' arguments, like Plaintiffs', would be buttressed by expert witnesses, and issues relating to loss causation and damages would have likely come down to an inherently unpredictable "battle of the experts."

142. While Plaintiffs would have had the burden of identifying and isolating the fraud-related damages suffered by Class Members pertaining to each alleged statement, Defendants only had to identify a flaw with the methodology utilized by Plaintiffs' experts, prevail on a *Daubert* motion, or win the inevitable battle of the experts before the jury. Defendants would have argued that the case either should not reach a jury or that the jury had no choice but to determine that there were little or no cognizable damages.

143. Although Plaintiffs were confident that they could support their claims with qualified and persuasive expert testimony, jury reactions to competing experts are difficult to predict, and Defendants would have presented highly experienced experts to support their various

- 39 -

defenses to liability. Accordingly, in the absence of the Settlement, there was a very real risk that the Class would have recovered an amount significantly less than the total Settlement Amount – or nothing at all.

144.    In short, the Settling Parties disagreed about the merits of this case, including whether or not damages were suffered and recoverable. Defendants strongly defended this lawsuit with experienced attorneys from Ropes & Gray and Nutter (and Skadden before them), and consistently denied that they were liable in any respect. Recovery of any amount at trial was far from certain, as was the prospect of even reaching trial.

145.    Assuming Plaintiffs reached and prevailed at trial, it is likely that Defendants would file post-trial motions and appeals to limit or overturn any verdict in Plaintiffs' favor. The post-trial motion and appeals process would likely span several years, during which time the Class would receive no payment. In addition, an appeal of any verdict would carry with it the risk of reversal, in which case the Class would receive no payment despite having prevailed on their claims at trial.

146.    While Lead Counsel had developed strong evidence before achieving the Settlement, Plaintiffs faced both factual and legal challenges in proceeding to trial and presenting this matter to a jury and potentially on appeal. Based on these numerous challenges confronting Plaintiffs, there existed a real risk that no recovery at all would be secured for the Class. This Settlement, however, represents a range of reasonably recoverable damages of 7% (assuming that Plaintiffs prevailed in every aspect of their claims and damages theory through trial and the inevitable appeals) to 32% (assuming that Defendants' class certification arguments regarding the removal of certain large shareholders from the Class and shortening the relevant Class Period were accepted by the Court). Moreover, this Settlement provides a certain recovery for the Class that

- 40 -

even at the low end of this range is several multiples of the median percentage recovery of 2.1% for securities cases settled between 2016 and 2025 with investor losses of between $400 million and $599 million, while the high end is many multiples of the median percentage recovery of 3.2% for investor losses between $100 million and $199 million.  Edward Flores, et al., *Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review*, at 27, fig. 23 (NERA Jan. 21, 2026) (attached as Ex. A hereto).  Furthermore, this Settlement is nearly double the median settlement value of $17 million for securities cases in 2025, which is the largest median settlement value for the last decade.  *Id.* at 24.  Based on this favorable result, as well as Lead Counsel's extensive securities class action experience, Lead Counsel submit that the Settlement, which provides a substantial recovery to Class Members, is far more beneficial than any realistic alternative offered by continued litigation.

## IV.    SETTLEMENT NEGOTIATIONS AND TERMS

147.    As ordered by the Court in the Case Management Order (ECF 111), the Settling Parties were to engage a private mediator and update the Court before October 1, 2025.  Following Defendants' substitution of counsel in June 2025, counsel for the Settling Parties began discussing potential mediators and mediation dates.

148.    As fact discovery continued to progress, the Settling Parties began settlement discussions with David M. Murphy, Esq., a nationally-recognized mediator with experience resolving complex litigation and class actions.  Before the mediation, the Settling Parties submitted detailed mediation statements that outlined their respective critical facts and legal principles, as well as select pieces of evidence.  The Settling Parties also submitted replies in response to each other's mediation statements.

4938-1982-3005.v1

149.    On September 11, 2025, the Settling Parties participated in a mediation session in New York City with Mr. Murphy.  In connection with the mediation process, Plaintiffs conducted arm's-length negotiations with respect to a potential compromise and settlement of this Litigation, with the goal of achieving the best result possible consistent with the interests of the Class.  No agreement could be reached at the mediation session.

150.    Following the mediation session, the Settling Parties continued to negotiate with the assistance of Mr. Murphy.  On September 12, 2025, Mr. Murphy issued a mediator's proposal for $32.5 million, which the Settling Parties accepted on September 20, 2025.  The Settling Parties notified the Court of their agreement in principle on September 30, 2025.

151.    The Settling Parties then negotiated, drafted, finalized, and signed the formal settlement agreement detailing the terms of the proposed Settlement, which was submitted to the Court with the Motion for Preliminary Approval filed on December 1, 2025.  On December 18, 2025, the Court granted preliminary approval of the Settlement, as well as the form and manner of notice of the Settlement to the Class.

152.    The Settlement set forth in the Stipulation resolves the claims of the Class against all Defendants.  The Stipulation provides that Defendants will pay or cause to be paid $32,500,000 in cash, inclusive of attorneys' fees and expenses and any awards to Plaintiffs.  The recovery for individual Class Members will depend on many variables, including the amount of Mercury common stock the Class Member purchased or acquired, and when and at what price such purchases or acquisitions were made.  If 100% of the eligible Mercury common stock purchases or acquisitions by Class Members participate in the Settlement, the estimated average distribution per share of Mercury common stock is $0.68, before deduction of any Court-approved fees and

expenses.  Historically, actual claim rates are lower than 100%, resulting in higher distributions per share of common stock.

### A.    The Settlement Is in the Best Interest of the Class and Warrants Approval

153.    Plaintiffs believe they would have prevailed on the merits at trial.  Defendants were just as adamant that Plaintiffs would not have.  There was a very real risk that Plaintiffs would not have convinced a jury that Defendants acted with scienter, or that the alleged misrepresentations and omissions were materially false and misleading when made, or caused Plaintiffs' and the Class's losses.

154.    Having considered the foregoing, and evaluated Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement of this matter before the Court is fair, reasonable, and adequate, and in the best interest of the Class.

155.    The Settlement represents an extremely favorable result.  Given both the risks at trial and the recognition that not all damaged Class Members will seek recovery, the size of the recovery strongly supports approval.

### B.    The Plan of Allocation

156.    The Net Settlement Fund will be distributed to Class Members who, in accordance with the terms of the Stipulation, are entitled to a distribution and who submit a valid and timely Proof of Claim and Release form.  The Plan of Allocation provides that a Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if the Class Member has an overall net loss on all of his, her, or its transactions in Mercury common stock during the Class Period.

4938-1982-3005.v1

157.     For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel conferred with their damages expert, Dr. Feinstein, and the proposed Plan of Allocation reflects an assessment of the damages that could have been recovered by Class Members had Plaintiffs prevailed at trial.  The plan is premised on the out-of-pocket measure of damages and is designed to measure the difference between what Class Members paid for Mercury common stock during the February 3, 2021 to February 6, 2024 Class Period, and what they would have paid had the allegedly omitted information been disclosed and/or the allegedly false and misleading statements and omissions had not been made.

158.     To date, there have been no objections to the Plan of Allocation.  Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable, and should be approved.

## V.     LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

159.     Lead Counsel respectfully request that the Court award attorneys' fees of twenty-five percent (25%) of the Settlement Amount.  Lead Counsel believe such a fee is reasonable and appropriate in light of the efficiency with which Robbins Geller and G&E litigated this matter, the resources Robbins Geller and G&E expended in prosecuting this case, the inherent risk of nonpayment from representing the Class on a contingent basis, and the aggregate monetary benefit conferred on the Class in a challenging case.  Lead Counsel further request an award of $381,236.78 in litigation expenses.  The legal authorities supporting the requested fees and expenses are set forth in the accompanying memorandum of law.

### A.     Time, Labor, and Fee Percentage Requested

160.     Lead Counsel have devoted a significant amount of time and resources in the research, investigation, and prosecution of this Litigation.

- 44 -

4938-1982-3005.v1

161.    Robbins Geller and G&E each have substantial experience representing investors in securities fraud cases, including in this District.  The identification and background of Robbins Geller and its partners is attached as Exhibit G to the Declaration of Spencer A. Burkholz Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Declaration"), submitted herewith.   The identification and background of G&E and its partners is attached as Exhibit F to the Declaration of Karin E. Fisch Filed on Behalf of Grant & Eisenhofer P.A. in Support of Application for Award of Attorneys' Fees and Expenses ("G&E Declaration"), submitted herewith.

162.    Lead Counsel's representation of the Class in this Litigation required considerable pre-filing investigation, as well as substantial work during the Litigation, including: (i) analyzing Mercury SEC filings and conference calls in preparing the AC and the Complaint; (ii) thoroughly researching the law pertinent to the claims and defenses asserted; (iii) drafting the AC; (iv) opposing the motion to dismiss; (v) further investigating, drafting, and moving for leave to file the Complaint; (vi) moving for class certification; (vii) completing substantial document discovery that involved the review of over 400,000 pages comprising over 77,000 documents from Defendants and third parties; (viii) consulting with internal and external experts; (ix) preparing, taking, and defending depositions; (x) drafting a mediation statement and amassing significant evidentiary support for use at the mediation; and (xi) preparing for and participating in a full-day mediation session, as well as subsequent negotiations.

163.    Lead Counsel's experience and advocacy were required in presenting the strengths of the Litigation from its inception to the meditation and thereafter, in an effort to achieve the best possible settlement and convince Defendants, their insurers, Defendants' Counsel, and the mediator of the risks Defendants faced if the Litigation were to continue.

- 45 -

164.    The fee requested is based upon a percentage of the recovery after discussion with and approval by Carpenters Fund, the Lead Plaintiff in this Litigation. *See* Declaration of William Feyling on behalf of Carpenters Fund ("Feyling Decl."), ¶6, submitted herewith. The fee request is similar to, if not below, other requests approved by judges in this District, as set forth in the accompanying memorandum.

165.    The fee request is also reasonable when cross-checked against the lodestars Robbins Geller and G&E incurred in prosecuting the Litigation.

166.    The number of hours spent on the Litigation by Robbins Geller is 7,038.10. A breakdown of the lodestar from Robbins Geller is provided in Exhibit A to the Robbins Geller Declaration. The lodestar amount for attorney/paraprofessional time based on Robbins Geller's current rates is $5,880,296.00.

167.    The number of hours spent on the Litigation by G&E is 2,493.30. A breakdown of the lodestar from G&E is provided in Exhibit A to the G&E Declaration. The lodestar amount for attorney/paraprofessional time based on G&E's current rates is $1,891,680.00.

168.    In total, Plaintiffs' Counsel spent 9,835.80 hours prosecuting the Litigation for a combined lodestar amount of $8,074,482.50.[3]

---

[3]    This total lodestar includes the time spent on the Litigation by Abraham, Fruchter & Twersky, LLP (275.70 hours, resulting in a lodestar amount of $288,300.00) and Hutchings Barsamian Mandelcorn, LLP (28.70 hours, resulting in a lodestar amount of $14,206.50). A breakdown of their respective lodestars is provided in Exhibit A to the Declaration of Mitchell M.Z. Twersky Filed on Behalf of Abraham, Fruchter & Twersky, LLP in Support of Application for Award of Attorneys' Fees and Expenses, and Exhibit A to the Declaration of Theodore M. Hess-Mahan Filed on Behalf of Hutchings Barsamian Mandelcorn, LLP in Support of Application for Award of Attorneys' Fees and Expenses. These declarations, along with the Robbins Geller and G&E Declarations, are referred to collectively as the "Fee Declarations."

### B.    Risk, Magnitude, and Complexity of the Litigation

169.    As detailed above, the Litigation involved challenging issues of law and fact that presented considerable risk to Plaintiffs' case.  This case involved litigating alleged violations of §§10(b) and 20(a) of the Exchange Act.  Thus, when Lead Counsel undertook this representation, there was no assurance that the Litigation would survive a motion to dismiss or other proceedings, and therefore no assurance Lead Counsel would recover any payment for their services.

170.    Lead Counsel accepted representation of the Class on a contingent basis in this securities class action where, even if a recovery was obtained, any payment for Lead Counsel's services was likely to be delayed for several years.  These cases present formidable challenges as there are numerous decisions ruling in favor of defendants at each stage of the litigation.  The motion to dismiss raised complex and challenging arguments, requiring experience and considerable effort to prepare a thorough and persuasive opposition.  Indeed, this Court granted Defendants' motion to dismiss the AC, which concretely demonstrates the risk that Plaintiffs faced in this Litigation.  And although a recovery is never guaranteed, Lead Counsel in this case had developed sufficient evidence before Settlement to convince Defendants and their insurers to pay $32,500,000 to settle these claims.  Had this case not settled, Lead Counsel were prepared to litigate this case through the remaining stages of fact discovery, expert discovery, class certification, summary judgment, trial, and appeal.  Each of those litigation stages would have posed considerable challenges and expenses.

### C.    Quality of Representation

171.    Lead Counsel worked efficiently and diligently to obtain an exceptional result for the Class.  From the outset, Lead Counsel devoted considerable resources and spent considerable time researching and investigating facts to support a pleading that could survive a motion to

dismiss and position the Litigation for class certification.  Theories of liability and damages were complex and Lead Counsel devoted much time to strengthening their claims by securing evidence and thoroughly understanding the legal arguments, as well as analyzing potential defenses.

172.    The recovery obtained for the Class is the direct result of the significant efforts of highly-skilled attorneys who possess substantial experience in prosecuting complex securities class actions.  Lead Counsel are among the most experienced securities practitioners in the country. The Settlement represents a substantial recovery for the Class – one that is attributable to the diligence, determination, hard work, and reputation of Lead Counsel.

173.    The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work.  Defendants were represented by experienced lawyers from Skadden, Ropes & Gray, and Nutter, which are among the largest and most well-respected defense firms.  Defense counsel has a reputation for vigorous advocacy in defending complex securities cases such as this. The ability of Lead Counsel to obtain a favorable settlement for the Class in the face of such opposition confirms the excellence of Lead Counsel's representation.

174.    When Lead Counsel undertook to represent Plaintiffs and the Class, it was with the expectation that they would have to devote a significant amount of time and effort in their prosecution and advance large sums of expenses on experts, mediation, and discovery.  The time spent by Lead Counsel on this case was at the expense of time that they could have devoted to other matters.  Lead Counsel undertook this case solely on a contingent fee basis, assuming a substantial risk that the case would yield no recovery and leave Lead Counsel uncompensated. Unlike counsel for Defendants, who are paid an hourly rate and paid for their expenses on a regular basis, Lead Counsel have not been compensated for any time or expenses since this case began in 2023.  When Lead Counsel undertook the representation of Plaintiffs and the Class in this matter,

4938-1982-3005.v1

it was with the knowledge that Lead Counsel would spend many hours of hard work against capable defense lawyers with no assurance of ever obtaining any compensation for their efforts. The only way Lead Counsel would be compensated was to achieve a successful result.

175. As discussed above, the Settlement is a strong result for the Class in light of the risks and obstacles to recovery presented in this Litigation, including the difficulty in establishing liability and damages at trial, if Plaintiffs would have ultimately been successful in certifying a class and had prevailed at the summary judgment stage. Instead of facing additional years of uncertain, costly and time-consuming litigation, the Settlement will provide Class Members a benefit now without the risk of no recovery if the Litigation were to continue.

## VI.        THE REQUESTED EXPENSES ARE FAIR AND REASONABLE

176. Robbins Geller seeks an award of $350,898.46 in expenses in connection with the prosecution of the Litigation. Those expenses and charges are summarized by category in Exhibit B to the Robbins Geller Declaration. These expenses are: (i) reflected in the books and records maintained by Robbins Geller; and (ii) accurately recorded in the Robbins Geller Declaration.

177. G&E seeks an award of $27,709.22 in expenses in connection with the prosecution of the Litigation. Those expenses and charges are summarized by category in Exhibit B to the G&E Declaration. These expenses are: (i) reflected in the books and records maintained by G&E; and (ii) accurately recorded in the G&E Declaration.

178. Lead Counsel submit that the expenses are reasonable and were necessary for the successful prosecution of this Litigation. Lead Counsel were aware that they might not recover any of these expenses unless and until this Litigation was successfully resolved. Accordingly, Lead Counsel took steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of Plaintiffs' claims.

4938-1982-3005.v1

179.    Lead Counsel's expenses reflect routine and typical expenditures incurred in the course of litigation, such as the costs of travel, investigation, document duplication, transcript fees, expert and consultant fees, mediation fees, and expedited mail delivery.  Lead Counsel believe these expenses are reasonable and were necessary for the successful prosecution of the Litigation.

## VII.    THE REQUESTED PLAINTIFF AWARDS ARE FAIR AND REASONABLE

180.    Additionally, in accordance with 15 U.S.C. §78u-4(a)(4), Carpenters Fund seeks an award of $1,840.00, North Collier seeks an award of $423.00, and UPRRS seeks an award of $1,750.00 in connection with their representation of the Class.  The amount of time and effort devoted to the Litigation by Plaintiffs is detailed in their respective accompanying declarations, submitted herewith.  *See* Feyling Decl., ¶¶3-4, 8; Declaration of Thel Whitley on behalf of North Collier, ¶¶5-8, 15; Declaration of Laura Santa Sànchez on behalf of UPRRS, ¶¶5-6, 10, submitted herewith.

181.    As discussed above, and in Plaintiffs' respective declarations, Plaintiffs have been fully committed to pursuing the Class's claims since they became involved in the Litigation. Specifically, Plaintiffs engaged in time-consuming discovery efforts and searches to obtain and produce documents responsive to discovery requests, including information concerning their proprietary investment strategies and investments, and monitored Lead Counsel and participated in the prosecution and resolution of this Litigation.

182.    As more fully set forth in the accompanying memorandum, the efforts expended by Plaintiffs during the course of this Litigation are precisely the types of activities courts have found adequate to support an award, and fully support the instant requests by Plaintiffs.

4938-1982-3005.v1

## VIII.    CONCLUSION

183.    In light of the significant recovery to the Class and the substantial risks presented by this Litigation, as described above and in the accompanying memorandum, Lead Counsel respectfully submit that the Settlement and Plan of Allocation should be approved as fair and reasonable.  In addition, as a result of the significant recovery obtained in the face of substantial risks, including the contingent nature of the fees and the complexity of the case, Lead Counsel respectfully submit that the Court should award attorneys' fees in the amount of 25% of the Settlement Amount, plus $381,236.78 in expenses, plus the interest earned thereon at the same rate and for the period as that earned on the Settlement Fund until paid, plus awards to Plaintiffs in the amounts requested.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 7, 2026, in Melville, New York.

*/s/ Michael G. Capeci*
MICHAEL G. CAPECI

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 7, 2026, in New York, New York.

*/s/ Karin E. Fisch*
KARIN E. FISCH

- 51 -

4938-1982-3005.v1

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 7, 2026.

s/ Michael G. Capeci

MICHAEL G. CAPECI